**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MELINDA SGARIGLIA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-5684 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| AMERICAN INTERNATIONAL | ) | |
| RELOCATION SERVICES, LLC d/b/a | ) | |
| AIRES, NICHOLAS GONRING, and | ) | |
| KELSEY GONRING, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Melinda Sgariglia ("Plaintiff") brings suit against Defendants Nicholas and Kelsey Gonring (the "Gonrings") and American International Relocation Services, LLC d/b/a AIRES ("AIRES") for violation of Illinois' Residential Real Property Disclosure Act, 765 ILCS 77/1 *et seq.* ("Disclosure Act") and fraudulent concealment. Currently before the Court is the Gonrings' motion for summary judgment [88]. For the following reasons, the motion [88] is denied. Third-Party Defendant John Gorr's motion for summary judgment [95] is stricken without prejudice to refiling, as that motion has yet to be briefed, see [97].

This case is set for telephonic status hearing on 9/29/21 at 9:15 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829 and passcode 6963747. Counsel are directed to file a joint status report by no later than 9/24/21 that includes (a) a proposed schedule for any discovery that remains to be completed; (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference; and (c) a proposed schedule for briefing of Third-Party Defendant Gorr's motion for summary judgment (assuming he intends to refile it).

## I.  Background

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits, see [91], [101], [105], and are undisputed except where a dispute is noted.  Plaintiff is a resident of Chicago, Illinois.  The Gonrings are residents of the State of Michigan.  AIRES is a limited liability company whose two members and owners are domiciled in Pennsylvania and Florida.  See [1] at 3.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district and the action involves real property located in the district.

This action arises out of the sale of a condominium unit located at 2726 West Cortez in Chicago, Illinois (the "Building").  The Building includes 3 units and is governed by a condominium association called 2726 W. Cortez Avenue Condominiums ("Condo Association").  Plaintiff resides in Unit 1 (the "Unit").  From May 5, 2016 until July 25, 2018, the Gonrings were the owners of record of the Unit.  Unit 3 was owned by John Gorr ("Gorr").  The Gonrings and the other unit owners were members of the Condo Association; Gorr was its president.

While the Gonrings owned the Unit, Gorr experienced problems with water leaking into Unit 1, mostly above the windows and doors.  Gorr sought coverage under the Condo Association's insurance policy with Erie Insurance Group ("Erie").  See [102-4] at 2.  Erie retained Engineering Systems, Inc. ("ESI") to inspect the Building.  ESI's report, dated October 19, 2017, states that ESI was retained "in regard to an issue with water filtration occurring in a multi-family residential structure."  [91-13] at 3.  More particularly, "ESI was retained to determine the cause of water infiltration occurring in Unit 3."  *Id*.  ESI "made a site inspection to the structure," which "was a three-story condominium with a masonry exterior and flat roof."  *Id*.  ESI summarized its opinion and recommendation as follows: "Water infiltration is occurring at various locations in the

structure, but particularly at window and door openings. The water infiltration is occurring because of deficiencies in the original construction of the building with the predominate issue being improper flashing at wall openings. …. This condition was not of recent origin and has been present since the building was constructed. … ESI recommends that the owner retain a masonry contractor to make exploratory openings in the masonry where the water infiltration is occurring and install proper flashing. All cracks in the masonry and other deficiencies should be addressed at that time. The flashing detail shall be installed in a manner that allows for any infiltration water to flow out of the building and shall also contain proper end dams." *Id*. at 3-4. Erie denied the Condo Association's claim on November 29, 2017. See [102-4] at 2.

On December 4, 2017, Gorr sent an email to the other members of the Condo Association, including the Gonrings, forwarding the results of ESI's inspection. See [102-4] at 1. Gorr wrote, *id*.:

> Hey guys, just wanted to forward the results of the inspection from the building insurance claim I put in for the water damage at my unit. … Most of the water issues at my place are above windows and doors, which is where the water would collect and leak into my unit. … After 5 years of being unable to solve this with minor fixes, I believe we have to move forward with the large repair. Based on everything I've learned so far, my thought is the following:
>
> 1. Inspect flashing at windows and doors. Remove a few bricks at one window and determine if flashing is appropriate. If not adequate, repair flashing above all 3rd floor windows and doors.
>
> 2. Tuck-point the split-face block (north, west, and east sides) at 3rd floor level to repair masonry cracks. Determine if more tuck-pointing should be performed anywhere else.
>
> 3. Apply a warrantied sealant to the exterior at my level, at least, and potentially just seal the whole building.
>
> Now, this could change based on the next few quotes. It's just what I believe is the best course of action right now.

> I've done everything I can over the years to repair on my own and it's just getting worse every year. At this point I believe it needs to become a building issue. To the best of my knowledge, it appears to me that the Condo documents would include this as a common element repair and would be paid for by the association. This also means it breaks down by unit percentage. (44% Unit 1, 26% Unit 2, 30% Unit 3) ….

Gorr subsequently received an estimate and passed it on to the other Condo Association members. On February 20, 2018, Kelsey Gonring responded by email and expressed that, "[g]iven the amount of interior, unit specific, exploratory work (drywall, windows) that needs to be completed, we are not comfortable with the HOA covering this cost." [34] at 49. She continued that, "[o]nce the issue is properly diagnosed, we intend to review each issue individually in the context of the HOA guidelines, specifically what is considered 'common elements' and what is unit owner responsibility, and once that is agreed upon, we can determine the appropriate financial responsibility of each unit." *Id*. Gorr responded by email, asserting among other things, *id.*: "[I]t's not a unit-specific problem, they just have to tear out the drywall in my unit to diagnose. The windows are not leaking, the building is leaking, the wall above my door is leaking, the vent on my ceiling is dripping water. It's most likely due to some of the following:

- Capstones on parapet,

- Improper flashing above windows and doors.

- Improper flashing between floors.

- Tuckpointing cracks.

- Lack of cavity wall, improper weepholes. Water absorbed through split-face block.

- Roof damage."

Gorr proposed that "[w]e fund the Bral exploratory quote as an HOA (not to exceed $5,000). Cost broken down by HOA percentages. If anything is determined to be my fault or responsibility, I will reimburse the other units the associated costs." *Id*. Gorr continued: "The fact remains we

have a building that is leaking and appears to be getting worse. It leaked this week during the rains. This issue will only cause more damage to the building the longer we wait so I'm pushing hard to get something to happen here. … At this point, if you talk to a contractor they'll tell you its clearly a building issue, if you can prove to me otherwise I'll pay for what I have to do." *Id*.

On March 11, 2018, the Condo Association held a meeting to discuss the water infiltration problem. See [101] at 7. The Gonrings provide affidavits from Mr. and Mrs. Gonring and Gorr concerning what was allegedly discussed at the meeting.[1] At the meeting, all three voted in favor of moving forward with exploratory work to determine the repair responsibility pursuant to the declaration and bylaws of the Condo Association. The exploratory work conducted by Bral was paid for by the members of the Condo Association based on their pro rata share of ownership in the Building.

On March 30, 2018, Gorr received a quote from Gralak Tuckpointing ("Gralak"). See [44] at 78 *et seq.* The $38,325.00 quote included two coats of "BASF MasterProtect H 185" water-based sealant on the two side walls and the rear wall of the Building; new caulking and sealant on large masonry cracks, gaps and missing/loose mortar, vents, and utility pipes; new caulking sealant to the Building's "doors, windows, sconces at the sealing parts of the building elevation as necessary"; "installation at the inner parapet wall counter flashing to protect termination bar"; "[i]nstallation elastometric flashing system underneath 3 sides of the parapet wall coping stones with stainless steel drip edges"; masonry rehabilitation, including "[t]uck pointing of 3 sides of the parapet wall, inner wall 4 blocks down, outside 10 down from the top of the wall"; and replacing one broken piece of glass block at the third floor west wall window opening. *Id*. at 79-81. The

---

[1] Plaintiff objects to the Gonrings' reliance on these affidavits based on the "best evidence rule," because minutes from the meeting were not attached as an exhibit to the Gonrings' Rule 56.1 statement. However, it is not apparent to the Court that minutes were ever recorded for this meeting. The Court will therefore consider the affidavits.

quote also includes a section titled "OUR RECOMMENDATIONS – NOT INCLUDED IN THIS

QUOTE," which provides:

> The services listed and priced in the quote are confined and agreed upon at the initiation of the project. Additional masonry/waterproofing work might be required to guarantee the warranties of water repellant application and duration time. Please find additional recommendations for your masonry/waterproofing project below.
>
> Our recommendations include:
>
> A. Masonry Rehabilitation: Complete tuck-pointing work that includes grinding-out and tuck-pointing all deteriorated joints and hairline cracks on the entire wall or partial sections of the wall.
>
> B. Installing the flashing systems (top and bottom) at the top lintel beam areas of windows and door openings, bottom windows and door stone sills and underneath the parapet walls coping stones.
>
> C. Installing a new thru-wall flashing system at all building floor levels.
>
> D. Applying a new caulking on all windows, doors and metal frames.
>
> E. Grounding out and replacing the existing cement mortar joints with the appropriate backer rod and ASTM approved caulking. …
>
> F. Installation a new counter flashing system at the parapet wall.

*Id*. at 81-82. The parties dispute whether Gralak was making these recommendations for the

Building specifically (as Plaintiff contends), or whether these were "standard recommendations

included with regard to the warranty for Gralak Tuckpointing's work," as the Gonrings contend.

[105] at 4-5.

On May 3, 2018, the Condo Association received Bral's report for "masonry inspection at

façade & interior units," specifically "inspection of masonry at the farthest South window on the

West elevation top floor & the top floor door opening on the North elevation." [102-5] at 1. Bral

reported that it "removed the drapery and drywall as needed to inspect the back side at interior of

wall during the water leak investigation" on the third floor. *Id*. at 9. Bral "accessed the west wall

with built up pipe scaffolding." *Id*. Bral "conducted [a] water leak test with standard water pressure from the building," and also "completed similar protection and opening above the North door of 3rd floor." *Id*. at 9. Bral reported: "At both locations [Bral was] able to produce water leakage within 10 minutes of spraying water. [It] complete[d] the test 2 xs with same results. The removal of drywall allowed Bral to confirm there is not a cavity wall system to be repaired and or reviewed. The existing flashing was through wall that allowed water to penetrate right into the back of the block. It was decided to not continue with reviewing any further window or door openings besides these two. It was explained that installing a cavity wall system over just the masonry openings and allowing a proper through wall flashing system to be installed would not prevent water from penetrating at locations in between the openings." *Id*. The Gonrings and Gorr all state in their affidavits that, according to the Bral report, the water infiltration into Unit 3 was occurring through the walls of Unit 3. Since the walls were a common element, they were to be taken care of by the Condo Association. See [91-1] at 4; [91-2] at 4; [91-4] at 3-4.

Plaintiff provides an affidavit from Steve Hier ("Hier"), a certified home inspector, who opines that the finding by Bral—that "existing flashing was though wall that allowed water to penetrate right into the back of block"—means that "the flashing was not installed properly to deflect water from the inside" and is "a construction defect." [102-6] at 2.

On May 7, 2018, Kelsey Gonring obtained an estimate from Arrow Masonry ("Arrow") to perform work on the Building. The "scope of work" proposed included: "spot grinding, spot tuckpointing, caulking, flashing installation and sealing of the east (70' x 48'), east (70' x 48') and north (24' x 48') elevations of split face block." [105] at 6. It further states that: "All window and door perimeter caulking will be inspected on all 3 elevations and all defective caulk will be removed and replaced"; "a Pac-clad flashing will be installed above all 3 rear decks"; "All

Renaissance stone or limestone interface joints at the top of the parapet walls or above the window and door headers on the 3 elevations will be ground out, primed, caulked and tooled"; and "The north, east and west elevations of CMU block will be sealed from the top of each wall to grade." *Id.* at 6-7.

The Condo Association held a special meeting the same day and decided to hire Arrow. The contract provided that Arrow would guarantee the walls against leaks after work was completed (but also included a number of exceptions). [101] at 9; see also [44] at 85-86. On May 30, 2018, the Gonrings paid a 50% down payment to Arrow Masonry in the amount of $6,231.00 based on their percentage of common element ownership. [105] at 7. They paid the balance to Arrow on June 8, 2018, in the amount of $6,230.00. *Id.* Arrow Construction started its work on May 31, 2018 and concluded its work by June 6, 2018.

The Gonrings maintain, and Plaintiff disputes, that they and Gorr believed that Arrow's work remediated the water infiltration in Unit 3 and fixed the water infiltration through the windows of his unit and other common elements of the Building. Hier, who was retained by Plaintiff, opines that Arrow "did nothing to address the fact that Bral found that the flashing was deficient." [102-6] at 2. He explains: "Arrow's scope of work failed to address the issue of the defective installation of through wall flashing. To correct what Bral found, they would have to have removed the concrete blocks and install the flashing properly. Failure to address this problem means that the building was still left with construction defects. The whole idea of having flashing is for the moisture to drop through the core of the CMUs to be directed to the rope weeps/ wicks to the exterior. The idea of putting a water repellant is to keep the water from getting in, but allowing moisture to leave through evaporation. It is not designed to 'drain through the split face block.' The repellant is designed to keep water out but it is not fool proof. This is why there is

8

flashing and wicks. The ESI report details the lack of proper flashing at doors and windows. The Arrow Masonry quote does not address these issues." *Id*. (paragraph numbers omitted).

In the Spring of 2018, the Gonrings relocated to Michigan for work. Around May 17, 2018, they signed a listing agreement with Coldwell Banker to list the Unit for $499,000.00. They were listed as "Seller" in the listing agreement. [105] at 11. Their agent was Garrett Luehrs ("Luehrs"). As a benefit of Nicholas' relocation, AIRES, a relocation company, was contracted to help relocate the Gonrings to Michigan and to facilitate the sale of the Gonrings' Unit. The Gonrings maintain that AIRES purchased the Unit from them, but Plaintiff disputes this. Plaintiff points out that the deed executed to her came directly from the Gonrings and that there is no deed recorded with the Cook County Recorder of Deeds conveying the unit from the Gonrings to AIRES. See [101] at 11. The Gonrings' evidence, by contrast, consists of a reference to two paragraphs of Nicholas Gonring's affidavit, which do not say that AIRES purchased the Unit. See [91] at 6; [91-1] at 4-5, ¶¶ 18-19.

On May 19 and 21, 2018—which was after the Condo Association hired Arrow but before Arrow completed its work—the Gonrings each filled out and executed a Residential Real Property Disclosure Report ("RRPDR"), as required by the Disclosure Act, 765 ILCS 77/1 *et seq*. See [101] at 12. The RRPDR cites to 765 ILCS 77/5 for the definition of "Residential real property," which "means real property improved with not less than one nor more than four residential dwelling units: units in residential cooperatives; or, condominium units including the limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit." [101] at 12. The RRPDR states that "[t]hese disclosures are not intended to cover the common elements of a condominium, but only the actual residential real property including limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit." *Id*. at

12-13.  In the Condo Association Declarations and Bylaws governing the Building, the term "common elements" includes among other things the "walls" and the term "limited common elements" includes "[t]he part of the Common Elements contiguous to and serving a single Unit exclusively as an inseparable appurtenance thereto including specifically balconies, decks, porches and such portions of the perimeter walls, floors and ceilings, windows, doors and all fixtures and structures therein which lie outside the Unit boundaries."  [101] at 6.

The Gonrings assert that the RRPDR "made disclosures regarding the sale of their Unit, not the building as a whole."  [101] at 12.  Plaintiff disputes this.  Plaintiff explains that the form asks the Gonrings to disclose whether they were aware of any defects in the foundation, and "leaks or defects in the roof" and also "material defects in the walls, windows, doors or floors."  [101] at 12.  They answered "no."  *Id*.  The Gonrings also note that the RRPDR states that "[t]hese disclosures are not intended to cover the common elements of a condominium, but only the actual residential real property including limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit."  *Id*. at 12-13.  Plaintiff admits this but maintains that the Gonrings "chose to answer above and beyond the requirements and failed to answer truthfully as it pertains to the limited common elements."  *Id.* at 13.  The Gonrings assert that since "the Unit did not have any leaks or material defects in the roof ceilings or chimney" or "any material defects in the walls, windows, doors, or floors," they represented that they were not aware of any such defects.  *Id*.  Plaintiff disputes this.  She points out that the Gonrings made the disclosures before Arrow completed any of its work.  She also relies on the ESI Report (detailed above) and an affidavit from a former neighbor of the Gonrings, Randee Horton ("Horton"), who lived in the next building and spoke with the Gonrings occasionally when they were coming in and out of the Building.  Horton states that at one point when the Gonrings were "grilling in the

10

back," Mrs. Gonring "said they were hearing water dripping in the walls and that some of the faucets would not turn on or the water would squirt out at high pressure." [102-11] at 2. Another time, Mr. Gonring told her "everybody in his building had some problem with the water." *Id*. Horton's last conversation with the Gonrings was on May 31, 2018, when the Unit was for sale. Horton asked Mrs. Gonring if they were moving and she allegedly responded, "Yes, we are getting the hell out of here. The water problem has become too much and we are taking our asses back to Michigan." *Id*.

The Unit was listed for sale on May 21, 2018. On May 29 and May 30, 2018 (before Arrow had completed its work on the Building), the Gonrings each signed a Sellers Property Disclosure Statement ("Sellers Disclosure"). The Sellers Disclosure sought information about the building as a whole, not just the Unit. See [101] at 14. The Gonrings disclosed that they were aware of "past water leakage in the house or other structures" and stated that "Unit 3 had leaks on west facing windows -> HOA sealed building to resolve Unit 3 leak." *Id*. When asked if they were aware of the past or present "deterioration or other problems with the walls, foundations or other structural components," the Gonrings answered "no." [105] at 10. The Gonrings also disclosed that they were aware of shared or common areas or maintenance agreements and further stated "Tuckpointing & sealing of Building exterior." [101] at 14. Plaintiff admits this is what the Sellers Disclosure says but disputes its accuracy. See *id*. The Gonrings further disclosed that in the past five years they had not filed any insurance claims on the homeowner's insurance policy on the Unit. See *id*. at 14-15.

Plaintiff made an offer to purchase the Unit. On June 7, 2018 (a day or two after Arrow completed its work), Plaintiff was provided the RRPDR and Sellers Disclosure. See [105] at 8.

On June 8, 2018, AIRES entered into a Condominium Real Estate Purchase and Sale Contract with Plaintiff (the "Contract"). [101] at 15. AIRES was listed as "Seller." [105] at 11.

On June 14, 2018, Gorr, as president of the Condo Association, prepared and signed a Section 22.1 Disclosure Statement (the "Disclosure Statement"). [101] at 15. The Disclosure Statement represented, among other things, that there were no "capital expenditures anticipated by the Association for the current or next two fiscal years that would require a special assessment and/or increase in the monthly assessment to the unit owners." *Id*.

Also on June 14, 2018, Plaintiff's attorney sent an attorney review letter to AIRES' attorney asking her to "verify that the Condo Association has not experienced any instances of water (interior or exterior) leaking into the Property and/or any water damage during Seller's ownership of the Property." [44] at 32. Plaintiff's attorney also asked if there had been "any insurance claims within the last 5 years" and if there was "any other matter concerning this property or the Seller that may interfere with the Buyer's enjoyment and marketability of the property." *Id*.; see also [105] at 11.

On June 18, 2018, AIRES' attorney responded to the letter, identifying the Seller as AIRES, and refused to answer these inquiries on the basis that, as a relocation company, it was unable to make any representation or warranties beyond its factual report. See [105] at 12. On June 22, 2018, counsel for Plaintiff reiterated their request for information and asked AIRES to contact the "prior owner" for information about water damage or leaking and insurance claims. *Id*.

On June 29, 2018, Plaintiff (through her attorney) received the May 7, 2018 special meeting minutes from the Condo Association. See [101] at 16. As detailed in the analysis section below, Plaintiff maintains that the meeting minutes failed to accurately describe the entire scope of

Arrow's work; contained no mention of ESI's report or why the other quotes obtained by the association were not selected; and do not mention the "expanded scope of work recommended by the other contractors." *Id*.

On July 2, 2018, AIRES' attorney responded to Plaintiff's counsel's June 22, 2018 letter. She represented that AIRES had no knowledge of any leaks "when the information reported in the [RRPDR] or other homeowner provided disclosures makes no mention of water infiltration issues within the Property." [105] at 12. AIRES' attorney also reported that no insurance claims were made against the Gonrings' homeowners' insurance within the last 5 years. *Id*. AIRES again conveyed the information that, as a third-party relocation company, it was unable to make additional representations or warranties. *Id.* at 105. According to Plaintiff, she relied on this representation in proceeding with the purchase of the Unit. Plaintiff closed on her purchase of the Unit on July 25, 2018.

While the Gonrings were in the process of selling their Unit to Plaintiff, Gorr also listed Unit 3 for sale. On June 26, 2018, he entered into a contract to sell Unit 3. That sale fell through because the buyers' inspector found excessive moisture in the unit. See [101] at 16. A second contract to purchase Unit 3 also fell through, after another inspector found excessive moisture in the unit. *Id*. On July 31, 2018—a week after Plaintiff closed on the purchase of her Unit—Gorr hired MI&T Mold Inspection Testing to test his unit for the presence of mold. *Id.* at 17. On September 7, 2018, the floorboards were removed in Gorr's unit and he discovered for the first time that the subflooring in his unit was damaged and that mold was growing behind the walls. Gorr did not notify the Gonrings regarding the discovery of mold in his unit.

On September 7, 2018, Gorr sent Plaintiff an email in which he disclosed the mold problem in his unit. The email stated, in part:

Hey Melinda - this is going to be an unfortunate way for us to start talking. I've been very busy trying to sell my place for the past few months and have had several setbacks. I'm not sure what was communicated to you during closing but there has been a history of water intrusion to the building. This has occurred primarily in my unit from leaks through the split face block. The history of water intrusion has been thoroughly documented over some years and was clearly communicated along the way to the other unit owners.

We had the building sealed with elastomeric sealant a few months back so we're fairly confident that the water has stopped getting into the building. However, with the recent inspections on my place a few items have been brought up that have shed light on a new problem. I recently tested positive for elevated levels of mold in my unit. That triggered me to look at replacing some floorboards. Upon removing the floorboards we discovered that the subfloor was severely damaged in many areas and there is mold behind some walls, please see the attached pictures. From what started out as me replacing some floorboards has turned into a large and costly problem that was caused by a building issue. I have spoken with a few contractors about the next steps and the appropriate resolve is to remove some of the subfloor, and much of the drywall on the perimeter of my unit, treat the mold, and then repair and repaint.

[101] at 17-18.

Plaintiff filed the instant lawsuit against the Gonrings and AIRES in June 2019.

On May 26, 2020, the Gonrings propounded interrogatories on Plaintiff. Interrogatory number 3 requested that Plaintiff "[i]dentify all damage to Your Unit that you claim was not disclosed by the Gonrings prior to Your purchase of the Unit." [101] at 18. Plaintiff responded in writing as follows, *id.* at 18-19:

ESI Report 60191A
Bral Resotoration [sic] quote of May 3, 2018 Steve Hier
Report September 14, 2018 See B Allendorfer invoices
P000636-662.
See Steve Hier report invoices- P000663-673
See Mold Solutions of Chicago invoices P000818-819

The Gonrings failed to identify any damages. During testimony of Steve Hier and B.Allendorfer, Bral Resoration [sic] and the author of the ESI report, the damages can be explained in further detail.

14

Plaintiff also produced in response to the interrogatory "invoices and quotes from B.Allendorfer Co., Inc. with regard to work performed by such contractor." [101] at 20. Plaintiff admits that the "invoices refer to work performed on the roof and outside walls of the Building and work performed inside of unit 3 of the Building," rather than in her Unit. *Id.* She maintains, however, that due to the Gonrings' "refusal to be truthful about the condition of the unit she purchased and the building as a whole, [she] was left to shoulder her share of all expenses for repairs." *Id.* Plaintiff asserts that had the "Gonrings been honest about the condition, [she] would have been warned about its condition and would have been prompted have investigated further [sic]." *Id.* "By concealing the conditions and failing to answer truthfully, [she] relied upon [the Gonrings'] untruths to her detriment." *Id*.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court

"must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted). It "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III. Analysis

### A. Disclosure Act

The Disclosure Act requires "[a] seller of residential real property" to complete the disclosure form set out at 765 ILCS 77/35. See 765 ILCS 77/20. "Residential real property" includes "condominium units, including the limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit." *Id*. A seller "who discloses any information on the [RRPDR] that he knows to be false shall be liable in the amount of actual damages and court costs, and the court may award reasonable attorney fees incurred by the prevailing party." 765 ILCS 77/55. However, a seller "is not liable for any error, inaccuracy, or omission of any information delivered pursuant to this Act if (i) the seller had no knowledge of

16

the error, inaccuracy, or omission, [or] (ii) the error, inaccuracy, or omission was based on a reasonable belief that a material defect or other matter not disclosed had been corrected." 765 ILCS 77/25(a). Thus, "[t]o establish a violation of the Disclosure Act, the Buyers [is] required to show [the] Seller … (1) failed to disclose material defects (2) of which she had actual knowledge and (3) there were actual damages." *Becker v. Scherer*, 2013 WL 6458078, at *8 (Ill. App. Dec. 5, 2013).

The Gonrings argue that they are entitled to summary judgment on the Disclosure Act claim because they did not fail to disclose any material defects to the Unit and were not required to disclose any alleged defects in other units or in any common elements of the Building. They emphasize that the damages for which Plaintiff has provided evidence concern work performed in another unit and common elements of the Building, which do not constitute "Residential Real Property" as defined in the Disclosure Act.

The RRPDR requires a seller to check a box "Yes," "No," or "N/A" to the statement "I am aware of material defects in the walls, windows, doors, or floors." [91-7] at 2. The Gonrings checked "No." Plaintiff has presented evidence that there were potential defects in the walls, windows, and doors of her Unit. In short, when ESI made "a site inspection to the structure," it determined that the water infiltration in Unit 3 was "occurring because of deficiencies in the original construction of the building with the predominate issue being improper flashing at wall openings" such "window and door openings." [91-13] at 3. ESI did not limit this opinion to the wall openings for Unit 3. *Id.* In response to the ESI report, the Condo Association hired Bral to perform further inspection and testing. See [102-5] at 1. Bral opined that "[t]he existing flashing was through wall that allowed water to penetrate right into the back of the block." *Id.* at 9. Hier, a certified home inspector retained by Plaintiff, opined that Bral's finding concerning the flashing

17

identified "a construction defect." [102-6] at 2. Plaintiff has also presented evidence supporting her theory that the Gonrings did not have a reasonable belief that the defect had been corrected, because the scope of the work performed by Arrow did not fix these problems. Hier explained that "[t]he Arrow Masonry quote does not address" the "lack of proper flashing at doors and windows" that was detailed in the ESI report. *Id*. To correct this problem, Arrow "would have to have removed the concrete blocks and install the flashing properly." *Id*.

Plaintiff has also come forward with at least some evidence that the defects in the walls, windows, and floors in her Unit, which may be considered "limited common elements" subject to the RRPDR, were "material defects" as the term is defined in that form and the Disclosure Act. They both explain that, "[i]n this form, a 'material defect' means a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected." [91-7] at 2; 765 ILCS 77/35. None of the parties discuss this definition or how it applies to the facts of this case. But if this case were to go to trial, the trier of fact would be required to determine if the defects identified by Plaintiff are ones that "have a substantial adverse effect on the value of" the Unit or that "significantly impair the health or safety of future occupants of" the Unit. *Id*.; see also 765 ILCS 77/20 (defining "residential real property" to include condo unit and its limited common elements); *Manaster v. Bernfield*, 2021 WL 3661216, at ¶ 57 (Ill. App. Aug. 17, 2021) (quoting jury instruction for Disclosure Act claim, that "[a] 'material defect' in the context of the [RRPDR] means that a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected").

18

Although Plaintiff has not specifically tied any of the work done to the Building since she purchased the Unit to defects in her Unit or its limited common elements, the record contains several pieces of evidence that, properly explained to a jury by an appropriate witness, might convince a jury that the Unit's limited common elements contain defects that have a substantial adverse effect on the value of the Unit. The ESI report suggests that *all* of the window and door openings in the building contain improper flashing due to deficiencies in how the Building was constructed. Bral further explained that the existing flashing system allows water to "penetrate right into the back of the block," [102-5] at 1—another issue that is not clearly limited to Unit 3, its limited common elements, or the Building's common elements. According to Hier, this is a "construction defect." [102-6] at 2. Perhaps the best evidence that the Building's construction defects also affect the limited common elements of the Unit is Gralak's bid, which recommends "[i]nstalling the flashing systems (top and bottom) at the top lintel beam areas of windows and door openings, bottom windows and door stone sills" and "[i]nstalling a new thru-wall flashing system at all building floor levels." [44] at 81-82.[2] Although Plaintiff does not quantify how much such a project would cost, it is not a stretch to presume that it would be significant enough that a reasonable trier of fact could find that it has a "substantial adverse effect on the value" of the Unit. *Manaster*, 2021 WL 3661216, at ¶ 57. Based on the somewhat limited record of damages presented by both sides, the Court cannot conclude that the Gonrings are entitled to summary judgment on the Disclosure Act claim.

---

[2] The Gonrings say that all of Gralak's additional recommendations are "standard recommendations included with regard to the warranty for Gralak Tuckpointing's work," [105] at 4-5, but that is not apparent solely from Gralak's quote, and the Gonrings offer no affidavits or other evidence confirming their characterization of the recommendations.

### B. Fraudulent Concealment

Under Illinois law, "[t]he elements needed to prove fraudulent concealment are (1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury." *Vandenberg v. Brunswick Corp.*, 90 N.E.3d 1048, 1056 (Ill. App. 2017); see also *D'Attomo v. Baumbeck*, 36 N.E.3d 892, 913 (Ill. App. 2015); *Nartey v. Franciscan Health Hospital*, 2 F.4th 1020, 1026 (7th Cir. 2021) ("Fraudulent concealment occurs when a defendant intentionally induces a false belief through the concealment of a material fact while under a duty to speak" (citing *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 274 (Ill. App. 2015))).

The Gonrings argue that they are entitled to summary judgment because Plaintiff cannot prove: (1) that they concealed a material fact; (2) that Plaintiff complied with her duty to investigate when presented with the RRPDR and the Sellers Disclosure; or (3) that Plaintiff's damages were caused by her reliance on the disclosures.

The Court first considers whether Plaintiff has come forward with sufficient evidence that the Gonrings concealed a material fact. For purposes of fraudulent concealment, a fact is "material" if "the plaintiff would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Bettua v. Sears, Roebuck and Co.*, 2009 WL 230573, at *2 (N.D. Ill. Jan. 30, 2009) (citing *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. App. 2001)); see also *Connick v. Suzuki Motor Company, Ltd.*, 675 N.E.2d 584, 595 (Ill. 1996) (same; Illinois Consumer Fraud Act

case cited by the Gonrings, see [89] at 11); *Metzger v. New Century Oil and Gas Supply Corp. Income and Development Program-1982*, 594 N.E.2d 1218, 1228 (Ill. App. 1992) (same; fraudulent misrepresentation claim).

In this analysis, the Court focuses primarily on the Sellers Disclosure. The Gonrings acknowledge that the Sellers Disclosure "sought information about the Building as a whole and not just the Unit," which is why they "disclosed that they were aware of past water leakage in the house or other structures and stated that 'Unit 3 had leaks on west facing windows -> HOA sealed building to resolve Unit 3 leak.'" [101] at 14. As they characterize it, this "disclosed that there was a water infiltration issue into unit 3 of the Building that had been addressed and, to the Gonrings' knowledge resolved." [89] at 12. However, this is just one possible view of the Sellers Disclosure and other relevant evidence in the summary judgment record.

Question 6(a) concerning "past or present water leakage" is only one of the questions on the Sellers Disclosure relevant to the Gonrings' alleged concealment. Question 6(b) also asks, "Are you aware of any *past or present* movement, shifting, deterioration or other *problems with walls*, foundations or other structural components." [44] at 24 (emphasis added).[3] The Gonrings checked the "No" box in response to this question. If they had checked "Yes," they would have been required to offer an explanation and, "[w]hen explaining reports to control or repair," to "describe the location and extent of the problem, and date and person by whom the work was done." *Id*. There is a reasonable argument that the Gonrings' responses to questions 6(a) and 6(b) minimize and fail to disclose the true scope of the problems that Unit 3 and the Building as whole were having with water infiltration. For instance, Gorr told the Gonrings in an email that the

---

[3] Unlike the RRPDR, the Sellers Disclosure does not contain the qualifying language that "[t]hese disclosures are intended to reflect the current condition of the premises and do not include previous problems, that seller reasonably believes have been corrected." *Id*. at 20.

leakage in Unit 1 was "not a unit-specific problem," or just a problem with the windows. [34] at 39. According to Gorr, "[t]he windows are not leaking, the building is leaking, the wall above my door is leaking, the vent on my ceiling is dripping water." *Id*. Gorr posited that this was "most likely due to some of the following:

- Capstones on parapet,

- Improper flashing above windows and doors.

- Improper flashing between floors.

- Tuckpointing cracks.

- Lack of cavity wall, improper weepholes. Water absorbed through split-face block.

- Roof damage."

ESI opined that "[t]he water infiltration is occurring because of deficiencies in the original construction of the building with the predominate issue being improper flashing at wall openings." [91-13] at 3. And Bral determined after conducting water leak tests at third floor door and window openings that "[t]he existing flashing was through wall that allowed water to penetrate right into the back of the block." [102-5] at 1. A reasonable factfinder could conclude that the Gonrings knew based on this information that there was not only "past water leakage" in the Building, but also that the Building had "past or present … problems with walls," yet failed to disclose this. [44] 24.

A reasonable factfinder could also conclude that these issues were "material," both as that term is defined in the Sellers Disclosure and for purposes of fraudulent concealment. The Sellers Disclosure states that "[a] material defect is a problem with the Property, or any portion of it, that would have a significant adverse impact on the value of the residential property or that involves an unreasonable risk to people on the land." [44] at 23. The Gonrings knew that the defects caused

22

a significant adverse impact on the value of the Building—at a minimum, because they had already paid thousands of dollars to Arrow trying to stop the water leaking through the walls and into Unit 3. Though the alleged defects caused leaks only in Unit 3, this affected the value of other units, the owners of whom were responsible for a pro rata shares of expenses associated with common elements. The extensive leaking in Unit 3 is also "the type of information upon which" the buyer of a condo "would be expected to rely when making his decision" to purchase a home. *Bettua*, 2009 WL 230573, at *2.

The Gonrings emphasize that, "[i]n further disclosure, Plaintiff received the Condo Association special meeting minutes from May 7, 2018 in which the Condo Association voted to hire Arrow Masonry to remediate" the water infiltration issue in Unit 3. [89] at 12. But it is not apparent from those minutes *why* the Condo Association chose to hire Arrow. The minutes do not mention any water infiltration issues in Unit 3 or anywhere else in the Building. See [91-6] at 2. One way of reading the minutes is that the Building was last sealed in 2012, so tuckpointing and sealing was now due again, with no awareness that Arrow was retained to address serious water infiltration problems that were caused by the Building being constructed improperly. Indeed, the Gonrings urge the same understanding here, emphasizing that the sealing and tuckpointing noted in the Sellers Disclosure was "ongoing routine … maintenance … for structures made with split face block as split face block requires tuckpointing and sealing approximately every five to seven years." [89] at 13. Further, the meeting minutes do not apprise Plaintiff that Arrow's quote did not address the problems the ESI and Hier noted concerning flashing at window and door openings.

There is also sufficient evidence in the record to support a conclusion that the Gonrings did not have a reasonable belief that the water infiltration problems in Unit 3 had, in fact, been fully resolved. There is evidence that the Gonrings were informed that more was necessary to solve the

water infiltration issue than simply sealing the building, as the Gonrings disclosed had been done in their response to question 6(a). ESI opined that a masonry contractor should be retained to "make exploratory openings in the masonry where the water infiltration is occurring and install proper flashing" and address "[a]ll cracks in the masonry and other deficiencies." [91-13] at 3. Gralak provided a $38,325.00 quote that including not only sealant, but also: new caulking and sealant on large masonry cracks, gaps and missing/loose mortar, vents, and utility pipes; new caulking sealant to the Building's "doors, windows, sconces at the sealing parts of the building elevation as necessary"; "installation at the inner parapet wall counter flashing to protect termination bar"; "[i]nstallation elastometric flashing system underneath 3 sides of the parapet wall coping stones with stainless steel drip edges"; and masonry rehabilitation, including "[t]uck pointing of 3 sides of the parapet wall, inner wall 4 blocks down, outside 10 down from the top of the wall." [44] at 79-81. In addition to the quoted work, Gralak also made "recommendations" for additional work, including "[i]nstalling …flashing systems (top and bottom) at the top lintel beam areas of windows and door openings, bottom windows and door stone sills and underneath the parapet walls coping stones." *Id*. at 81-82. A factfinder also might take note that the Condo Association paid under $17,000 to allegedly fix the problem in full, even though Gralak's quote was more than twice that amount and recommended additional, extensive work that was not within the scope of its bid. Other relevant evidence might include the affidavit of Ms. Horton that on May 31, 2018, Mrs. Gonring told her, "we are getting the hell out of here. The water problem has become too much and we are taking our asses back to Michigan." [102-11] at 2.

The Gonrings emphasize that they believed Arrow had solved the water infiltration problem because "Arrow Masonry guaranteed that its work would prevent future leaks into the Building." [89] at 6. The contract does state that "Arrow will guarantee the walls against leaks

after work is completed," but states that "any leaks attributed to the roof are not covered," [44] at 85, and also makes a number of other exceptions, including that it "does not guarantee leak prevention from … improperly installed windows/doors" and "is not liable for interior damage caused by water infiltration." *Id*. at 86. The contract may be persuasive evidence that the Gonrings thought the water infiltration into Unit 3 was fixed, but it is not dispositive. When Arrow performed its work, the Gonrings were days away from selling the Unit. An argument could be made that their main interest was in selling their condo with minimum expenditure and legal exposure, not ensuring that the full scope of the Building's problems were fixed. The factfinder should be allowed to consider the guarantee along with the other evidence in the record.

The Court next considers the Gonrings' argument that Plaintiff failed to make "a reasonable inquiry into the condition of the property, given the information received via the Disclosures." [89] at 13. Under Illinois law on fraudulent concealment, "'a person may not enter into a transaction with his eyes closed to available information.'" *Abazari*, 40 N.E.3d at 277 (quoting *Zimmerman v. Northfield Real Estate, Inc.*, 510 N.E.2d 409, 416 (1986)). However, "a plaintiff's failure to investigate the reliability of the defendant's representations is not fatal where such inquiries are inhibited by statements creating a false sense of security," *id*., or the defendant "blocked further inquiry," provided that the facts were not such as to put a reasonable person on inquiry. *Benzakry v. Patel*, 77 N.E.3d at 1130; see also *Vigortone Ag Products, Inc. v. PM Ag Products, Inc*., 217 F. Supp. 2d 858, 866 (N.D. Ill. 2001) ("a plaintiff's duty to investigate may be absolved when the defendant's deliberate misrepresentations lull the plaintiff into a false sense of security, or attempt to block further inquiry"). In determining whether the plaintiff's reliance on the defendant's representations was reasonable, "courts consider all of the circumstances, including 'the parties' relative knowledge of the facts available, opportunity to investigate the facts

25

and prior business experience.'" *Benzakry*, 77 N.E.3d at 1129-30 (quoting *Hassan v. Yusuf*, 944 N.E.2d 895, 916 (Ill. App. 2011)).

Here, there are number of disputed questions of material fact that prevent the Court from determining as a matter of law that Plaintiff's reliance on the Gonrings' representations and alleged failure to investigate is fatal to her fraudulent concealment claim. First, the Gonrings assert that Plaintiff "received significant information concerning water infiltration into unit 3 from the Gonrings and the Condo Association documents, detailing how the remediation of the infiltration concerned a common element of the Building." [89] at 13-14. However, they overstate the information that Plaintiff received concerning water infiltration in the Building. As noted above, the Sellers Disclosure stated only that "Unit 3 had leaks on west facing windows." [101] at 14. It did not use the term "water infiltration" and it did not disclose the much more extensive leakage that Gorr reported to other members of the Condo Association, including that "the building is leaking, the wall above my door is leaking, [and] the vent on my ceiling is dripping water." [34] at 39. Further, the meeting minutes on which the Gonrings rely do not actually "detail how … the Condo Association deliberated upon and voted to retain the services of Arrow Masonry to remediate the leaking occurring in Unit 3." [89] at 14. They do not even say that the work Arrow was doing was meant to remediate leaking. And elsewhere in the summary judgment record the Gonrings maintain that this work was simply routine maintenance for split block, which the minutes also suggest by noting that the Building had last been sealed in 2012. Arguably, the careful wording of the Sellers Disclosure and the meeting minutes "creat[ed] a false sense of security" that the water infiltration was a minor issue, limited to the windows on one side of Unit 3 and already fully resolved with routine application of sealant and tuckpointing. *Abazari*, 40 N.E.3d at 277.

Second, the Gonrings claim that "[a]fter receipt of these documents Plaintiff moved forward with the closing of her purchase of the Unit and made no further inquiry into the leaking in unit 3 of the Building." [89] at 14. However, as the Court detailed in its prior opinion denying the Gonrings' motion to dismiss, there is evidence in the record that after receiving the Sellers Disclosure, Plaintiff's attorney did seek additional information concerning the leaks on at least two occasions, but was thwarted by AIRES' attorney's representation that AIRES, as a third-party relocation company, was unable to make any verifications concerning water leaks or water leakage and had no knowledge. See [31] at 3-4. It should be left to a finder of fact to decide whether Plaintiff could and should have done more after encountering these roadblocks. See *Abazari*, 40 N.E.3d at 277 ("'Whether an injured party justifiably relied upon defendants' words or silence depends on the surrounding circumstances' and is a question of fact that is best left to the trier of fact." (quoting *Zimmerman*, 510 N.E.2d at 416); cf., e.g., *Zimmerman*, 510 N.E.2d at 416 (purchasers of real property were entitled to maintain action against vendors and real estate agents on fraudulent and negligent misrepresentation counts, regarding discrepancy in lot size, despite fact that purchasers had copy of property survey, where survey did not give square foot information and typical buyer could not read survey language).

Finally, the Court considers the Gonrings' argument that Plaintiff's damages were not caused by reliance on any fraudulent concealment. The Gonrings maintain that "[t]he sums expended by Plaintiff, and claimed as damages in this matter, for … remediation … are not a proximate result of any alleged fraudulent concealment by the Gonrings," as "[t]he mold infiltration into unit 3 was not discovered until after Plaintiff closed on her purchase of the Unit." [89] at 15. They recognize in their reply brief, though, that Plaintiff has submitted invoices documenting nearly $150,000 in work performed on behalf of the Condo Association since she

bought the Unit; she is responsible for 44%. Even if the Court assumes that the Gonrings should shoulder no responsibility for remediating the mold in Gorr's unit (an issue that is unnecessary to decide here), nearly $50,000 of the total cost was "for work on the Condo Building's walls," which the Gonrings characterize as "additional work to curb the water infiltration into [Gorr's] unit." [104] at 5. And while the Gonrings claim that they "believed that the work performed by Arrow Masonry on the common elements of the Condo Building, prior to Plaintiff's purchase of the Unit, had resolved the leaking issue into Gorr's unit," *id*. at 5, this is heavily disputed for the reasons explained above.

A more fundamental problem with the Gonrings' damages argument is that it addresses only one of the potential ways in which Plaintiff might ultimately establish damages for fraudulent concealment. Under Illinois law, "[t]here are two methods for measuring damages resulting from fraudulently concealing defects in property. The first method is granting the plaintiff the benefit of the bargain, *i.e.*, subtracting the value the property actually had at the time of the sale, given the defects, from the value the property would have had at the time of the sale had the defects not existed. The second method considers 'the cost of fixing the property to make it conform to the condition it would have had without the defects.'" *Napcor Corp. v. JP Morgan Chase Bank, NA*, 938 N.E.2d 1181, 1191 (Ill. App. 2010) (quoting *Dietrich v. Jones*, 526 N.E.2d 450, 456 (Ill. App. 1988)); see also *Posner v. Davis*, 395 N.E.2d 133, 138 (Ill. App. 1979). The Gonrings focus on only the second method of proving damages. They never address potential evidence—including perhaps even Plaintiff's own testimony—concerning the value the Unit would have had at the time of sale had the defects allegedly concealed by the Gonrings not existed. Cf. *Napcor*, 938 N.E.2d at 1188-89 (evidence was sufficient to establish that vendor's misrepresentation that warehouse roof was a tear-off, when it fact the old roof had been covered by the new roof, was material, where

purchaser's president testified that if he had known that the new roof was not a tear-off such knowledge would have had a financial impact on purchaser's offer).

Even if the Gonrings believed that Arrow fixed all of the leakage, it is still possible that Plaintiff could show—and a factfinder could believe—that Plaintiff would have paid less for the Unit based solely on the fact that the "past … water leakage" and "past … problems with walls," [44] at 24, were so extensive and were caused by problems with how the building was originally constructed. As Plaintiff explains, had the Gonrings "disclosed the material defects in the limited common elements, namely the windows, doors, porches that relate to the Condominium, [she] would have been put on notice that the Condo and the entire building had structural defects," [102] at 15—a problem that logically would affect the amount a buyer would be willing to pay for the Unit, or even whether a buyer would be willing to go through with the purchase at all. Gorr's difficulty in selling his own unit once the extent of the problem was known might also be circumstantial evidence of how the Building's issues with water leakage affect the value of Plaintiff's Unit. But all of these details can be left for another day, as discovery has not closed and the parties may want (and may even need) to retain experts to delve into damages further. See, e.g., *Napcor*, 938 N.E.2d at 1191-92 (upholding jury award of $1.2 million in fraudulent misrepresentation action where purchaser's expert testified that in order to fix the roof to conform vendor's representation the existing roof would have to be torn off and replaced with a new roof, and that the cost of doing so amounted to over $2 million).

## IV. Conclusion

For the foregoing reasons, the Gonrings' motion for summary judgment [88] is denied. Third-Party Defendant John Gorr's motion for summary judgment [95] is stricken without prejudice to refiling, as that motion has yet to be briefed. This case is set for telephonic status

hearing on 9/29/21 at 9:15 a.m.  Participants should use the Court's toll-free, call-in number 877-336-1829 and passcode 6963747.  Counsel are directed to file a joint status report by no later than 9/24/21 that includes (a) a proposed schedule for any discovery that remains to be completed; (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference; and (c) a proposed schedule for briefing of Third-Party Defendant Gorr's motion for summary judgment (assuming he intends to refile it).


Dated: September 16, 2021

_____

Robert M. Dow, Jr.
United States District Judge