IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELINDA SGARIGLIA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-5684 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| AMERICAN INTERNATIONAL RELOCATION SERVICES, LLC d/b/a AIRES, NICHOLAS GONRING, and KELSEY GONRING, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Melinda Sgariglia ("Plaintiff") brings suit against Defendant American International Relocation Services, LLC d/b/a AIRES ("AIRES") for fraudulent concealment (Count III) and against Defendants Nicholas and Kelsey Gonring (the "Gonrings") for violation of Illinois' Residential Real Property Disclosure Act, 765 ILCS 77/1 *et seq.* ("Disclosure Act") (Count I) and fraudulent concealment (Count II). Currently before the Court is AIRES' motion to dismiss Count III for failure to state a claim [96].[1] For the following reasons, AIRES' motion to dismiss [96] is denied. This case is set for telephonic status hearing on 9/29/21 at 9:15 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829 and passcode 6963747. Counsel are directed to file a joint status report by no later than 9/24/21 that includes (a) a proposed schedule for any discovery that remains to be completed; (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate

---

[1] AIRES has refiled this motion, which was originally docketed as [47]. The parties briefs are docket entries [48], [56], and [61]. The governing second amended complaint ("Complaint") is docket entry [44].

Judge for a settlement conference; and (c) a proposed schedule for briefing of Defendant Gorr's motion for summary judgment.

I.  **Background**

This diversity action arises out of the sale of a condominium unit located at 2726 West Cortez in Chicago, Illinois (the "Building"). The Building includes 3 units and is governed by a condominium association called 2726 W. Cortez Avenue Condominiums ("Condo Association"). At issue here is Unit 1 (the "Unit"). The Gonrings purchased the Unit in May 2016. The Unit was listed for sale on May 21, 2018 for $475,000.

On June 8, 2019, AIRES signed a Condominium Real Estate Purchase and Sale Contract ("Sales Contract") accepting Plaintiff's offer to purchase the Unit for $510,000. Although the Sales Contract and a subsequent addendum to the contract both list AIRES as the Seller, *see* [44] at 2-3, according to the Complaint, the Gonrings were the owners of the Unit as of the date those documents were executed, *id.* at 2.

Attached to the Sales Contract is a Residential Real Property Disclosure Report signed by the Gonrings ("RRPDR"). In it, they check the box "no" in response to questions concerning whether they are aware of certain defects, including "leaks or material defects in the roof, ceilings, or chimney" and defects "in the walls, windows, doors or floors." [44] at 2. Plaintiff also received a Sellers Property Disclosure Statement ("Sellers Disclosure"). See *id.* at 3. The Sellers Disclosure, which is on AIRES letterhead, is signed by the Gonrings as "Sellers." *Id*. at 23-29. In response to the question, "Are you aware of any past or present water leakage in the house or other structures?," the Gonrings checked "Yes" and wrote "Unit 3 had leaks on West facing windows … HOA sealed building to resolve Unit 3 leak." *Id*. at 24. In response to the question, "Are you aware of any past or present movement, shifting, deterioration or other problems with walls,

foundations or other structural components," the Gonrings checked "No." *Id*. Plaintiff relied on the representations contained in the RRPDR and the Sellers Disclosure and proceeded with the purchase of the Unit. *Id*. at 3.

On June 14, 2018, Plaintiff's attorney, Thomas Hawbecker ("Hawbecker"), sent an attorney review letter to Sarah Wilkins ("Wilkins"), see [44] at 31-34, an attorney who held herself out to be representing the "Seller," AIRES. *Id.* at 35. In paragraph 8, Hawbecker requests: "Please verify that the Condo Association has not experienced any instances of water (interior or exterior) leaking into the Property and/or any water damage during Seller's ownership of the Property. If there have been any such occurrences, please provide dates, locations, damage and repairs made." *Id*. at 32. In paragraph 9, Hawbecker asks "Seller" to represent and warrant "Sellers have not made any insurance claims within the last 5 years." *Id*.

On June 18, 2018, Wilkins responded. She stated, in part, that "[a]s a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leaking or water damage," or "representations or warranties regarding whether insurance claims have been made against the Property." [44] at 36.

On June 22, 2018, Hawbecker reiterated his request for information concerning water leakage/damage and insurance claims. See [44] at 4. He asked Wilkins: "Please confirm the same with the prior owner as the seller has direct contact with the prior owner." *Id*. at 39. On July 2, 2018, Wilkins responded. As to water leakage/damage, she stated: "[A]s a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leakage or water damage. However, Seller agrees to abide by the terms of the 'Buyer's Duty to Inspect/Test' section of the AIRES addendum with respect to possible leaks, seepage, or water infiltration of the Property, as Seller would have no knowledge of such matters

3

unless raised during the home inspection process when the information reported in the [RRPDR] or other homeowner provided disclosures makes no mention of water infiltration issues within the Property." *Id*. at 39. As to insurance claims, Wilkins stated: "Seller reports that the homeowners made no claims against their homeowner's insurance within the last 5 years. As a third-party corporate relocation company that has never occupied the Property, Seller is unable to make representations or warranties regarding whether insurance claims have been made against the Property, as Seller would have no knowledge of such matters." *Id*. at 40. Plaintiff alleges that she relied on these representations in deciding to proceed with the purchase of the Unit.

Prior to closing on the sale, Plaintiff was also provided with a disclosure statement from the Condo Association pursuant to 765 ILCS 605/22.1 ("22.1 Statement"), dated June 14, 2018 and signed by the association's President, John Gorr ("Gorr"). [44] at 4; 43-44. Gorr checked "no" in response to the question, "Are there any capital expenditures anticipated by the Association for the current or next two fiscal years that would require a special assessment and/or increase in the monthly assessment to the unit owners?" *Id*. at 43.

On July 25, 2018, the Gonrings conveyed the Unit to Plaintiff by Warranty Deed. Approximately six weeks later, on September 7, 2018, Gorr emailed Plaintiff: "I'm not sure what was communicated to you during closing but there has been a history of water intrusion to the building. This has occurred primarily in my unit from leaks through the split face block. The history of the water intrusion has been thoroughly documented over some years and was clearly communicated along the way to the other unit owners. We had the building sealed with elastomeric sealant a few months back so we're fairly confident that the water has stopped getting into the building. However, with the recent inspections on my place a few items have been brought

4

up that have shed light on a new problem"—damage to his subfloor and mold behind the walls in Unit 3. [44] at 45-46.

Plaintiff demanded and received from Gorr documentation of the problem. The documents attached to the complaint show that in December 2017, Gorr informed Kelsey Gonring and other residents that there was water leakage and damage in his unit, particularly around windows and doors. See [44] at 48. Gorr stated that he thought the Building needed to be tuck-pointed at the third-floor level, that there was also a need to "[d]etermine if more tuck-pointing should be performed anywhere else," and a need to "[a]pply a warrantied sealant to the exterior at my level, at least, and potentially just seal the whole building." *Id.* Gorr further wrote: "I've done everything I can over the years to repair on my own and it's just getting worse every year. At this point I believe it needs to become a building issue. To the best of my knowledge, it appears to me that the Condo documents would include this as a common element repair and would be paid for by the association." *Id*.

Emails between residents continued in February and March 2018. In a February 20, 2018 email, Kelsey Gonring wrote that "likely, grinding/re-pointing and/or sealing the building will be necessary." [44] at 50. She also claimed to be surprised about the extent of problem experienced by Gorr and accused Gorr of making the problem worse by not bringing it to the attention of the Condo Association and instead hiring his own contractors. See *id.* She further wrote that, as part of the Gonrings' purchase of the Unit, "we were given a signed document stating that no issues with any of the units had been raised with the HOA and no documented common element work had been done or was expected to be done in the next 2 years." *Id*.

During the Gonrings' ownership of the Unit, the Condo Association received an ESI Investigative Report that was sent to Gorr on November 29, 2017. See [44] at 52-63. The

Investigative Report opined that water infiltration was occurring "at various locations of the structure, but particularly at window and door openings," with the problem due to deficiencies in the "original construction of the building with the predominate issue being improper flashing at wall openings." *Id*. at 54. The Condo Association made a claim on its insurance coverage, which was denied on November 30, 2017. See *id.* at 64-68.

The Condo Association received multiple quotes for exterior and interior inspection and repair work. Gorr accepted a proposal from Bral Restoration, LLC ("Bral"), which inspected the Building and determined in a report dated May 3, 2018 that "the exiting flashing was through wall that allowed water to penetrate right into the back of block." [44] at 6. On May 7, 2018, Kelsey Goring received a quote from Arrow Masonry and Exteriors, Inc. ("Arrow") for $16,840. The quote described "work to be performed on the Building, including installing flashing 'above all 3 rear decks.'" *Id*. at 6-7; see also *id*. at 85-88. The Gonrings never provided Plaintiff with any of the reports or estimates; never disclosed any problems associated with the flashing; and allegedly concealed the magnitude of the problem by providing false and misleading answers on the RRPDR and Sellers Disclosure.

Once Plaintiff learned about the extent of the Building's problems, she obtained additional quotes for repairs. According to those estimates, the necessary repairs will cost the Condo Association $350,000. [44] at 8. According to the Condo Association Bylaws, Plaintiff is responsible for 44% of that cost. Plaintiff alleges that the Unit has depreciated in value due to the Building's defects. *Id*.

Plaintiff asserts three claims based on these facts. Only Count III, a claim against AIRES for fraudulent concealment, is at issue here. In Count III, Plaintiff alleges that AIRES was under a duty to disclose that it was not the title owner of the Unit but instead was an agent for the

6

Gonrings, [44] at 10. Plaintiff maintains that there was a relationship of trust and confidence between her attorney and AIRES' attorney based on their status as legal professionals and obligation under the Illinois Rules of Professional Conduct to not knowingly make false statements of material fact to third persons. *Id*. Plaintiff maintains that AIRES also had a duty to disclose because it represented in paragraph 8 of the Contract that AIRES would be executing and returning the deed to her, while "failing to fairly and fully disclose the material fact that The Gonrings were not the 'prior owner' but instead the current owners." *Id*. at 11. Plaintiff alleges that she relied on this concealed material fact to her detriment because it "caused her attorney to refrain from demanding direct communication with the actual owners of the Condominium," *i.e.*, the Gonrings. *Id*.

Plaintiff also alleges that AIRES was under a duty to disclose the fact that, in response to a question concerning "any" insurance claims, AIRES "failed to fairly and fully disclose the material fact that it was limiting its answer and not fully answering the question posed by Sgariglia's attorney," but rather was "narrowing its answer as to homeowner's insurance and refusing to answer as to other types of insurance claims, such as the common insurance." [44] at 11-12. Plaintiff concludes that, as a result of relying on AIRES' material misrepresentations, she suffered damages in excess of $100,000.

**II.    Legal Standard**

AIRES moves to dismiss the complaint pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss

under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). It is proper for the Court to "consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir.2012)); see also Fed. R. Civ. P. 10(c). Further, although it is well established that a "complaint may not be amended by the briefs in opposition to a motion to dismiss," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), the Court may "consider additional facts set forth in" a brief opposing dismissal "so long as those facts are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quoting *Geinosky*, 675 F.3d at 745 n. 1); see also *In re Dealer Management Systems Antitrust Litigation*, 313 F. Supp. 3d 931, 938–39 (N.D. Ill. 2018) (citing cases).

Plaintiff's claim for fraudulent concealment is subject to the heightened federal pleading standard of Rule 9(b), which requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see also *Wigod v. Wells Fargo Bank*, *N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). Specifically, Rule 9(b) requires alleging with particularity "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the

plaintiff." *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014).

**III. Analysis**

Under Illinois law, "[t]he elements needed to prove fraudulent concealment are (1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury." *Vandenberg v. Brunswick Corp.*, 90 N.E.3d 1048, 1056 (Ill. App. 2017); see also *D'Attomo v. Baumbeck*, 36 N.E.3d 892, 913 (Ill. App. 2015); *Nartey v. Franciscan Health Hospital*, 2 F.4th 1020, 1026 (7th Cir. 2021) ("Fraudulent concealment occurs when a defendant intentionally induces a false belief through the concealment of a material fact while under a duty to speak" (citing *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 274 (Ill. App. 2015)).

AIRES argues that Plaintiff does not adequately allege: (1) "a legal duty to speak that AIRES owed Sgariglia"; (2) "a material fact that AIRES concealed should a duty exist"; (3) "that Sgariglia was prevented from discovering these facts on her own"; or (4) "any specifics of when and how AIRES purportedly concealed material information from Sgariglia." [48] at 2.

The Court considers AIRES' first, second, and fourth points together, as they are interrelated. Under Illinois law, a duty to speak may arise in several ways. It may be "based on a fiduciary relationship, or "a relationship of trust and confidence where 'defendant [is] in a position of influence and superiority over plaintiff.'" *Toulon v. Continental Casualty Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996)). In

9

this case, Plaintiff does not allege or argue that she had a fiduciary relationship with AIRES. The facts alleged in the Complaint also do not suggest a relationship of trust and confidence that would place AIRES in a position of influence and superiority, as that type of relationship typically arises "by reason of friendship, agency, or experience." *Connick*, 675 N.E.2d at 593. Plaintiff cites no case law suggesting that the fact that both parties were represented by attorneys transforms the parties' relationship into one of trust and confidence. Rather, the allegations show "an arm's length business transaction between the parties," as AIRES contends. [48] at 4.

But these are not the only two ways a duty to speak may arise under Illinois law. As Plaintiff points out, "silence combined with deceptive conduct or the suppression of material facts results in active concealment, and then the seller has a duty to speak." *Henderson Square Cond. Ass'n v. LAB Townhomes, L.L.C.*, 16 N.E.3d 197, 216 (Ill. App. 2014); see also *Mitchell v. Skubiak*, 618 N.E.2d 1013, 1017 (Ill. App. 1993); *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 917 (N.D. Ill. 2019); *FE Digital Investments Ltd. V. Hale*, 499 F. Supp. 2d 1054, 1061 (N.D. Ill. 2007). "Under such circumstances, if a party to a contract of sale fails to disclose the whole truth, having the requisite intent to deceive, this amounts to fraud, equivalent to an affirmative falsehood." *Mitchell*, 618 N.E.2d at 1017. Similarly, a duty to disclose may also arise "if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009); see also *Toulon*, 877 F.3d at 737; *Newman v. Metropolitan Life Ins. Co.*, 885 F.3d 992, 1004 (7th Cir. 2018). "A half-truth is a disclosure that is misleading because it omits important information." *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 855 (N.D. Ill. 2021) (citing *Apotex Corp. v. Merck & Co.*, 229 F.R.D. 142, 149 (N.D. Ill. 2005)); see also *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969 (Ill. App. 2004) ("A statement which is

10

technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie.").

Plaintiff has pled sufficient facts to support a fraudulent concealment claim based on these theories of duty. The parties' attorneys had five business days after acceptance of the Contract to propose modifications. See [44] at 16, section 15. During this attorney review period, Plaintiff's attorney requested that AIRES' "verify that the Condo Association has not experienced any instances of water (interior or exterior) leaking into the Property and/or any water damage during Seller's ownership of the Property" and "[i]f there have been any such occurrences, please provide dates, locations, damage and any repairs made." *Id.* at 32, item 8(e). AIRES' attorney responded by stating: "As a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leakage or water damage. However, Seller agrees to abide by the terms of the 'Buyer's Duty to Inspect/Test' section of the Aires addendum with respect to possible leaks, seepage, or water infiltration of the Property, as Seller would have no knowledge of such matters unless raised during the home inspection process." *Id*. at 36. Plaintiff's attorney replied by requesting: "Please confirm the same *with the prior owner* as the seller has direct contact with the prior owner." *Id*. at 39 (emphasis added). This request alerted AIRES (to the extent it was not already aware) that Plaintiff and her attorney believed that the Gonrings had transferred the Unit to AIRES and no longer had an ownership interest in it.

AIRES' counsel remained silent and did not correct this faulty belief. Instead, in her response letter she repeated: "With respect to Item 8(e), as a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leakage or water damage. However, Seller agrees to abide by the terms of the 'Buyer's Duty to Inspect/Test' section of the Aires addendum with respect to possible leaks, seepage, or water

11

infiltration of the Property, as Seller would have no knowledge of such matters unless raised during the home inspection process when the information reported in the Residential Real Property Disclosure Report or other homeowner provided disclosures makes no mention of water infiltration issues within the Property." *Id.* at 42. Arguably, this response—coupled with AIRES' statement in Section 8 of the Contract that AIRES would "execute and deliver the Deed" upon Plaintiff's delivery of the balance of the purchase price—is deceptive, giving rise to a duty for AIRES to speak. This response might also be characterized as a misleading "half-truth" passed off "as the whole truth while omitting material facts." *BCBSM*, 512 F. Supp. 3d at 855. While AIRES could not *personally* verify the existence of water infiltration, since it never occupied the Building, it could have asked the Gonrings to verify the information. And the Gonrings, as the real owners of the Unit, would have had a duty to disclose what they knew about the Building's water infiltration problems. See *Illinois Central Gulf R. Co. v. Dep't of Local Gov't Affairs*, 523 N.E.2d 1048, 1052 (Ill. App. 1988) ("if the seller of a used house knows of and conceals facts materially affecting the value or desirability of the home and the buyer has no access to that information, the seller has a duty to disclose those facts" (citing *Posner v. Davis*, 395 N.E.2d 133, 137 (Ill. App. 1979)); *Mitchell*, 618 N.E.2d at 1018 (upon potential real estate purchasers' inquiries about source of ceiling crack, duty arose for vendors to speak of defect in the house; their failure to speak, or to disclose entire truth of the matter, gave rise to cause of action for fraudulent misrepresentation); *Heider v. Leewards Creative Crafts, Inc.*, 613 N.E.2d 805, 814 (Ill. App. 1993) (in claim for fraudulent concealment, vendor of warehouse had "a duty to reveal the existence of the [asbestos] report and the asbestos in the building upon inquiry from plaintiff"). AIRES' allegedly misleading responses shielded the Gonrings from having to explain in more detail what they knew about water infiltration in the Building.

The Complaint's allegations support a theory that Plaintiff "would have acted differently had [she] known of the concealed information." *Vandenberg*, 90 N.E.3d at 1056. Plaintiff explains that "only a party to the contract is under an affirmative duty to make disclosures to the best of their knowledge and belief," and therefore she was "at a disadvantage in not knowing that she ha[d] a contractual and ethical right to demand information directly from the Gonrings." [56] at 11. It is certainly plausible that AIRES' course of conduct compelled Plaintiff—believing that AIRES had no information and the Gonrings had no duty to provide it—to give up on asking for further verifications concerning water leakage and to rely on the disclosures provided by the Gonrings. *Id*. at 32.[2] According to the Complaint, those disclosures were not truthful about the Building's water infiltration problems. AIRES does not challenge the sufficiency of those allegations in the instant motion to dismiss. And in its opinion denying summary judgment to the Gonrings (which is also being issued today), the Court concludes that there are disputed questions of material fact concerning (1) whether the Gonrings failed to disclose in the Sellers Disclosure what they knew about the Building's extensive water infiltration problem, and (2) whether Plaintiff's reliance on the Sellers' Disclosure caused her injury. Ultimately, whether it was reasonable for Plaintiff to rely on AIRES statements and omissions is a question of fact that cannot be resolved on a motion to dismiss. *JTG Equities*, 2019 WL 2866713, at *3 (citing *Mitchell*, 618 N.E.2d at 1018).[3]

---

[2] AIRES maintains that there was nothing preventing Plaintiff from going directly to the Gonrings and asking them any questions she had. Whether it was reasonable not to pursue that avenue and instead rely on AIRES' representations is a question of fact that cannot be resolved on the pleadings. *JTG Equities, LLC v. Greenberg*, 2019 WL 2866713, at *3 (N.D. Ill. July 3, 2019) (citing *Mitchell*, 618 N.E.2d at 1018). It is certainly understandable why Plaintiff would not go to the Gonrings if she believed they were no longer the owners; they were not parties to the Contract and not (so Plaintiff thought) involved in the sale.

[3] In contrast to the issue of water infiltration, the Court is not convinced that Plaintiff "would have acted differently" in pursuing information concerning insurance claims had she been aware that the Gonrings still owned the Unit. Plaintiff's counsel never asked AIRES about insurance claims made by the Condo

13

In its reply brief, AIRES maintains that the exhibits to the Complaint "demonstrate that [Plaintiff] was well aware of the parties' positions in the transaction," because she knew AIRES was acting "as a relocation company in the transaction." [61] at 5. But neither AIRES nor the Complaint provide the Court with any information indicating that a relocation company cannot also be the owner and title-holder of the property it is selling. The Disclosure Act suggests the opposite, granting an exception to the Act for "[t]ransfers from an entity that has *taken title* to residential real property from a seller for the purpose of assisting in the relocation of the seller, so long as the entity makes available to all prospective buyers a copy of the disclosure form furnished to the entity by the seller." 765 ILCS 77/15(7) (emphasis added). AIRES also repeatedly identifies itself as "seller" in the Contract and attorney correspondence. AIRES apparently believes that this is completely different than claiming to be the "owner," but the difference between the two similar terms is not apparent from the pleadings, exhibits, or sources cited by the parties.

AIRES also asserts that its "counsel always refers to the Gonrings as the 'homeowners' (and never the 'prior homeowners' or 'prior owners')." [61] at 5 & n.25 (citing Exhibits E & G). However, the two letters on which AIRES relies do not demonstrate this—and further discovery could provide additional evidence supporting Plaintiff's opposite stance. In one of the letters, AIRES' counsel only uses the term "homeowner" in a general sense concerning homeowners' exemptions for property tax purposes. See [44] at 36. The other attorney letter refers to "homeowner provided disclosures," also in a general sense, when disclaiming any knowledge of water infiltration in the building. *Id*. at 41. In another paragraph of the letter, concerning insurance

---

Association. Instead, he asked for confirmation that "Sellers have not made any insurance claims within the last 5 years." [44] at 32. The Gonrings had not made any claims in the past five years, and AIRES' counsel ultimately confirmed this, after Plaintiff's counsel asked several times. See *id*. at 42. Plaintiff offers no convincing explanation for how knowing that the Gonrings still owned the Unit would have caused her to ask *them* the right questions and learn that the Condo Association had made claims against the Condo Association policy.

claims, Plaintiff's counsel does state that "Seller reports that the homeowners made no claims against their homeowner's insurance within the last 5 years." *Id*. at 42. But whether this single reference to the Gonrings as "homeowners" rather than "former homeowners" was enough to make Plaintiff "well aware" of the Gonrings' status as the current owners of Unit, [61] at 5, is a question of fact that cannot be resolved on the pleadings.

Finally, AIRES argues that Plaintiff was not prevented from discovering on her own that the Gonrings still owned the Unit, because a property's title holder is publicly available information. However, AIRES has not made any showing that, in this case, public records would have clarified that ownership never passed to AIRES. AIRES' argument assumes that the (hypothetical) deed transferring the Unit from the Gonrings to AIRES would be recorded in time for it to be publicly available at the time Plaintiff checked with the Recorder. AIRES does not provide any reason to suggest that must be the case. By contrast, Plaintiff explains: "As is typical in real estate transactions involving relocation companies, there are often two deeds recorded at closing. One deed is from the previous owner to the relocation company and the second deed is from the relocation company to the buyer. Only Defendant Aires and its counsel would have known that this typical procedure would not be followed in this transaction with Plaintiff Sgariglia. Practically speaking, until documents are recorded with the Recorder of Deeds, this information would be exclusive to Defendants Aires and The Gonrings." [56] at 8. AIRES offers no response to this explanation. Nor does it respond to Plaintiff's point that Section 8 of the Contract stated that AIRES would be executing and returning the deed to her, which further supports Plaintiff's belief that AIRES owned the Unit while negotiating the sale. [44] at 11.

**IV.** **Conclusion**

For these reasons, AIRES' motion to dismiss [96] is denied. This case is set for telephonic status hearing on 9/29/21 at 9:15 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829 and passcode 6963747. Counsel are directed to file a joint status report by no later than 9/24/21 that includes (a) a proposed schedule for any discovery that remains to be completed; (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference; and (c) a proposed schedule for briefing of Defendant Gorr's motion for summary judgment.

Dated: September 16, 2021

Robert M. Dow, Jr.
United States District Judge