IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELINDA SGARIGLIA, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:19-cv-05684 |
| v. ) | |
| ) | Honorable Robert M. Dow, Jr. |
| AMERICAN INTERNATIONAL ) | |
| RELOCATION SERVICES, LLC, d/b/a ) | Magistrate Judge Young B. Kim |
| AIRES, an Illinois limited liability ) | |
| company, NICHOLAS GONRING, and ) | |
| KELSEY GONRING, ) | Jury Demanded |
| ) | |
| Defendants. ) | |
| ) | |
| NICHOLAS GONRING and KELSEY ) | |
| GONRING, ) | |
| ) | |
| Third Party Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| 2726 WEST CORTEZ CONDOMINIUM and ) | |
| JOHN GORR, ) | |
| ) | |
| Third Party Defendants. ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT BASED UPON ON LIABILITY**

I.     **STANDARD OF REVIEW**

Summary judgment is appropriate there is no genuine issue of as to any material fact and … the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Factual disputes are 'material' only when they might affect the outcome of the suit under the governing law." *Oest v. Illinois Dept. of Corrections*, 240 F3d 605, 610 (7th Cir. 2001). While the court must take the facts in the light most favorable to the party opposing the motion, the nonmoving party cannot rest on the pleadings alone, but must identify specific facts that raise more than a mere scintilla of evidence to show a genuine issue of triable fact. See *Cornfield v. Consolidated*

1

*High School District No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993); *see also Murphy v. ITT Technical Services*, 176 F.3d 934, 936 (7th Cir. 1999)

## II. ARGUMENT

### A. THERE IS NO GENUINE ISSUE OF FACT THAT DEFENDANTS NICHOLAS AND KELLY GONRING VIOLATED 765 ILCS 77/35 ET SEQ.

Prior to the 2022 changes, Section 20 of the Illinois Residential Real Property Disclosure Act provided:

"A seller of residential real property shall complete all applicable items in the disclosure document described in [s]ection 35 of this Act. The seller shall deliver to the prospective buyer the written disclosure statement required by this Act before the signing of a written agreement by the seller and prospective buyer that would, subject to the satisfaction of any negotiated contingencies, require the prospective buyer to accept a transfer of the residential real property." 765 ILCS 77/20 (West 2010).

Section § 25. (a) states:

The seller is not liable for any error, inaccuracy, or omission of any information delivered pursuant to this Act if (i) the seller had no knowledge of the error, inaccuracy, or omission, (ii) the error, inaccuracy, or omission was based on a reasonable belief that a material defect or other matter not disclosed had been corrected, or (iii) the error, inaccuracy, or omission was based on information provided by a public agency or by a licensed engineer, land surveyor, structural pest control operator, or by a contractor about matters within the scope of the contractor's occupation and the seller had no knowledge of the error, inaccuracy, or omission.
 (b) The seller shall disclose material defects of which the seller has actual knowledge.
 (c) The seller is not obligated by this Act to make any specific investigation or inquiry in an effort to complete the disclosure statement.
 (d) The seller is under no obligation to amend the disclosure document after its delivery to a prospective buyer unless the disclosure document contains errors, inaccuracies, or omissions of which the seller had actual knowledge at the time the disclosure document was completed and signed by the seller. However, seller shall remain subject to the provisions of Section 45 of this Act.

" Under subsection 5 of the statute, it defines 'Seller' as follows:

"every person or entity who is an owner, beneficiary of a trust, contract purchaser or lessee of a ground lease, who has an interest (legal or equitable) in residential real

2

property. However, 'seller' shall not include any person who has both (i) never occupied the residential real property and (ii) never had the management responsibility for the residential real property nor delegated such responsibility for the residential real property to another person or entity."
765 ILCS 77/5 (West 2010).

The relevant portions of the Act pertaining exceptions pursuant to subsection 15 state as follows:

The provisions of this Act do not apply to the following:
(7) Transfers from an entity that has taken title to residential real property from a seller for the purpose of assisting in the relocation of the seller, so long as the entity makes available to all prospective buyers a copy of the disclosure form furnished to the entity by the seller.
765CS 77/15

The "purpose of the disclosure form requirement of the Residential Real Property Disclosure Act is to provide prospective home buyers with information about material defects in the home that are known to the seller." *Hawkins v. Voss*, 390 Ill.Dec. 963, 29 N.E.3d 1233, 1236 (Ill. App. Ct. 2005). "Although disclosure report under the Residential Real Property Disclosure Act is not a substitute for inspections or warranties, a purchaser is entitled to rely on the truthfulness, accuracy, and completeness of the statements contained therein." *Bauer v. Giannis*, 359 Ill.App.3d 897, 906, 834 N.E.2d 952, 961 (Ill. App. Ct. 2005). "Allowing a seller to ignore his or her obligation under the Act, avoid reporting a material defect, and thereby defeat a buyer's subsequent claim would only encourage the evils the legislature sought to remedy. " Id.

It is undisputed that on May 19 and May 20, 2018 Defendant Gonrings, as owners of the property located at 2726 W. Cortez, Unit 1, Chicago, IL, completed an Illinois Residential Real Property Disclosure Report, with an effective date of May 17, 2018. (Stmt. Mat. Facts, ¶7, 38). Defendant Gonrings answered "no" to the question of whether they were aware of defects in the foundation, and "leaks or defects in the roof" and also "material defects in the walls, windows, doors or floors." (Stmt. Mat. Facts, ¶38-39).

There is also no dispute that Defendant Gonrings were aware that Structure contained material defects, including defects in their own unit. (Stmt. Mat. Facts, ¶9-29, 35, 36, 52). After the Gonrings purchased their unit in 2016, they became aware of water issues in Unit 3, which prompted the Association to file an insurance claim with Erie Insurance, the building's carrier. (Stmt. Mat. Facts. ¶7, 9, 11). By filing a claim with the building insurance and not filing a claim exclusively with John Gorr's insurance of unit 3 exclusively, Defendant Gonrings admit that they were aware the issue was related to the common elements and not exclusively Mr. Gorr's unit.

After the Association made an insurance claim, Erie Insurance sent an engineering firm named Engineering Systems, Inc. ("ESI") to conduct a review of the structure located at 2726 West Cortez, Chicago, IL. (Stmt. Mat. Facts. ¶9-12). The ESI Report, which President of the Association John Gorr emailed to Defendant Gonrings on December 4, 2017, stated as follows: "Water infiltration is occurring at various locations of the structure, but particularly at window and door openings." . (Stmt. Mat. Facts.12-17). The Report describes the word "structure" as "located at 2726 W. Cortez Street in Chicago, Illinois." (See Stmt. Mat. Facts, ¶15). The Report's blunt assessment was that the original construction was deficient and that there was "improper flashing at wall openings." (See Stmt. Mat. Facts, ¶14). Doors and windows are considered wall openings. Furthermore, the Report never limits its findings to the 3rd floor unit, but indeed points to the "structure" repeatedly as the problem.

The Gonrings knowledge was further supplemented when Mr. Gorr provided them with his assessment that it was "a building problem" along with prior quotes for repairs as well as a history of the building's water infiltration. (See Stmt. Mat. Facts, ¶18-19). The Gonrings knowledge of the defects in the Structure was augmented by the many quotes they received from

contractors pointing to problems, pointing to problems that were entirely related to the Structure. (See Stmt. Mat. Facts, ¶20, 21, 24, 26, 27, 28, 35).

The Gonrings even confessed that they were aware of the magnitude of the water infiltration problem in their February 20, 2018 to Mr. Gorr. (Stmt. Mat. Facts, ¶22, 23). Defendant Kelsey Gonring laments that had she known of all the problems, negotiations to buy her unit would have "been conducted quite differently." (Stmt. Mat. Facts, ¶22). The exchange with Mr. Gorr continued, where he advises The Gonrings that the problem is "not unit-specific" and that "the building is leaking." (Stmt. Mat. Facts ¶23). Mr. Gorr further lists the root of the problems as "likely due to some of the following: Capstones on parapet. Improper flashing above windows and doors. Improper flashing between floors. Tuckpointing cracks. Lack of cavity wall. Improper weepholes. Water absorbed through split-face block. Roof damage." Mr. Gorr reiterates that the "building that is leaking" and that "it is clearly a building issue…: (Stmt. Mat. Facts ¶23).

Meanwhile, all the quotes that Mr. Gorr provides to Defendant Gonrings, as well as their own quote, evidences over and over again that the water intrusion was building wide and that it included portions of their own limited common elements. The March 30, 2018 quote from Gralak recommended installing "the flashing systems (top and bottom) at the top lintel beam areas of window and door openings…," "thru wall flashing system at all building levels," "applying caulking on all windows, doors and metal frames." (Stmt. Mat. Facts ¶26). On May 3, 2018, Bral Restoration gave the Association a quote that stated that the stated that "existing flashing was through wall that allowed water to penetrate right into the back of the block," and this condition is considered a construction defect. " (Stmt. Mat. Facts ¶27). Defendant Kelsey Gonring admits that she contacted a company called Arrow Masonry and obtained a quote for

5

"Pac-clad flashing will be installed above all 3 rear decks." Further, the Arrow quote provides that all "Renaissance stone or limestone interface joints at the top of the parapet walls or above the window and door headers on all 3 elevations will be ground out, primed, caulked and tooled." (Stmt. Mat. Facts ¶28-29). The bylaws of the Association make it clear that the limited common elements include " balconies, decks, porches and such portions of the perimeter walls, floors and ceilings, windows, doors and all fixtures and structures therein which lie outside the Unit boundaries." (Stmt. Mat. Facts ¶36).

Despite the mountain of evidence that the building's common and limited common elements had structural problems and leaks, Defendant Gonrings nonetheless completed their Illinois Residential Real Property Disclosure form without disclosing any of the defects. (Stmt. Mat. Facts ¶38). It is without question that they completed the First Disclosure Form with an effective date that was before Arrow performed any work to the Structure. (Stmt. Mat. Facts ¶38, 42). There is no question that on May 17, 2018, Defendant Gonrings were aware that the structure had problems from a building engineer and many masonry professionals. (Stmt. Mat. Facts, ¶20, 21, 24, 26-28, 35). The evidence is clear and convincing that Defendant Gonrings were made aware, over and over again, that the problems pertained to the original construction of the Structure, involving problems with the windows, walls, doors. Their own selected Arrow quote specified that work would be performed on the windows, doors, and all 3 rear decks, indicating that the walls and doors comprising the decks had material defects that Arrow was going to correct. The Honorable Judge Robert M. Dow, Jr. agreed with this assessment in his Feb. 26, 2020 ruling on the Gonrings' Motion to Dismiss, where he made the following assessment:

The Court finds most notable the quote that Kelsey Gonring received from Arrow on

May 7, 2018—just a few weeks before the Unit was placed on the market and the Gonrings completed and signed the Property Disclosure and Sellers Disclosure certifying that they were not aware of any "material defects" in the "walls, windows, [or] doors," [1-1] at 21, or any "problems with walls, foundations or other structural components," *id.* at 26. Drawing all reasonable inferences in Plaintiff's favor, the Arrow quote alone put Ms. Gonring on notice that repairs needed to be made to the limited common elements associated with the Unit—the deck, walls, windows and doors—and that those repairs included more than just the application of sealant, which the Gonrings noted in the Sellers Disclosure. It is also not an illogical jump to presume that Ms. Gonring informed her husband of these defects before both Gonrings signed the disclosure statements. *Sgariglia v. American International Relocation Services et. al*, 2020 WL 919253, page 4.

In the First Disclosure form and the 2nd Disclosure form, Defendant Gonrings intentionally chose to hide the problems from Plaintiff Sgariglia, in an effort to sell their unit. (Stmt. Facts ¶38-39; 42, 44-47). The scheme worked, and Sgariglia purchased the unit while relying upon the false statements, and was later shocked when learning of the magnitude of the problems. (Stmt. Mat. Facts,¶49, 50, 82-93).

Plaintiff Sgariglia relied to the Defendant Gonrings' First Disclosure Form to her detriment, as she has the right to do. See *Bauer v. Giannis*, 359 Ill.App.3d 897, 906, 834 N.E.2d 952, 961 (Ill. App. Ct. 2005)(stating that "a purchaser is entitled to rely on the truthfulness, accuracy, and completeness of the statements contained therein."). As a result of the Defendants'

lies, Plaintiff Sgariglia has incurred over $100,000.00 in special assessments, borrowing from her 401k and a home equity line of credit. (Stmt. Mat. Facts. ¶88-93).

> A. THERE IS NO GENUINE ISSUE OF FACT THAT DEFENDANTS AIRES, NICHOLAS AND KELLY GONRING FRAUDULENTLY CONCEALED OWNERSHIP & CONSTRUCTION DEFECTS FROM PLAINTIFF.

The standard for fraudulent concealment is recited herein from the Honorable Judge Robert M. Dow, Jr.. He cites as follows:

> To plead this tort properly, in addition to meeting the elements of fraudulent misrepresentation, a plaintiff must allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff." *Wigod*, 673 F.3d at 571. "The elements of a claim of fraudulent misrepresentation in Illinois are: '(1) [a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance.' " *Id.* at 569 (quoting *Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166 (Ill. App. 2009)). The additional "duty to disclose" element requires that " 'plaintiff and defendant are in a fiduciary or confidential relationship' or in a 'situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff.' " *Id.* at 571 (quoting *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 593 (Ill. 1996)).

Plaintiff Sgariglia has met her burden to prove that all Defendants engaged in a pattern to fraudulently conceal essential elements of the conveyance. The effort commenced in the Gonrings First Disclosure form, where its flawed elements are analyzed in the former section of this Memorandum.

The fraud continued during attorney review. As counsel for Sgariglia, Thomas Hawbecker sought answers to the Structure and the unit during in his attorney review letters, which have a legally binding effect. (Stmt. Mat. Facts,¶54, 56-67). He trusted that counsel would be forthcoming and honest. (Stmt. Mat. Facts ¶55). Despite this trust, neither AIRES nor The Gonrings advised Mr. Hawbecker that AIRES was not the owner of the unit. (Stmt. Mat. Facts, __). Defendants also concealed that fact that during attorney review, seller counsels Sarah and Terry Wilkins were communicating with The Gonrings, who were the ultimate decision makers on the Sgariglia's attorney review proposals. (Stmt. Mat. Facts,¶55). Indeed, The Gonrings understood that attorneys Wilkins were their lawyers, as they continued to refer to the Wilkins as "our attorneys" and "attorneys that are working on our behalf…" Not surprisingly, the Wilkins attorneys never disabused the Gonrings of this belief in any of their emails. (Stmt. Mat. Facts, ¶68-71, 73-75 ).

The Gonrings and AIRES also colluded by brushing off Thomas Hawbecker's demands with repeated statements of lack of knowledge. (Stmt. Mat. Facts ¶56, 57, 65, 66, 67). Yet during his deposition when Mr. Hawbecker saw the email correspondence that transpired between The Gonrings and counsels Wilkins for the first time, he stated that such conduct was "sneaky" and recognized immediately that the Gonrings were shielding themselves behind the relocation company, AIRES. (Stmt. Mat Facts.¶68-72, 74-75).

The false statement of material fact was also that AIRES and The Gonrings never admitted that the latter owned title to the Unit and that The Gonrings were actually pulling the strings in the attorney review letters. (Stmt. Mat Facts. ¶68-71, 74-75 ). Mr. Hawbecker testified repeatedly that he would have acted differently and refused to accept responses from AIRES had

he known that the Gonrings were the actual owners or that communication was with them directly as the true owners. (Stmt. Mat Facts ¶58-64, 70 ).

The blatant fraud in this case occurred on June 14, 2018, the same day that Thomas Hawbecker propounded his first attorney review letter. In an email, Defendant Kelsey Gonring wrote an email to John Gorr and Nicholas Gonring, where she advises the parties to not go into detail about the leaks. (Stmt. Mat Facts ¶51-52). She also advises against providing all the meeting minutes related to capital expenditures and special assessments, despite there being three meeting minutes back to back that approved special assessments and capital expenditures. Instead, they agreed to only disclose one, the Arrow approval meeting minutes of May 7, 2018. (Stmt. Mat Facts ¶51-52). Mr. Gorr agreed with this plan, while also agreeing to send the documents himself, clearly to appear as if the disclosures were from a disinterested party. (Stmt. Mat Facts ¶51-52). This email is the smoking gun. In the form itself, they were required to turn over all 3 meeting minutes and the parties to the email agreed not to do so. Indeed, Mr. Hawbecker only received the May 7, 2018 meeting minutes. (Stmt. Mat Facts ¶56).

The fraud continued until even right before closing. On July 13, 2018, a mere 12 days before closing, John Gorr advised Defendant Gonrings of more water damage to his unit after heavy rains. (Stmt. Mat. Facts. ¶76). He advised that he would offer to escrow for any special assessments for any "future work." (Stmt. Mat Facts, ¶76). The Defendant Gonrings never provided any correspondence evidencing that they forwarded this information to AIRES, to Plaintiff or her counsel. There are no documents evidencing that the 22.1 was ever updated. In essence, the Gonrings concealed this information also. (Stmt. Mat Facts ¶77).

On the day of closing, July 25, 2023, Defendant Gonrings transferred title directly to Plaintiff Sgariglia. (Stmt. Mat. Facts,¶78). There is no dispute that the Gonrings never conveyed

10

a deed to AIRES. (Stmt. Mat Facts ¶81). A mere 6 weeks after closing, on September 7, 2018, Mr. Gorr sent Plaintiff Sgariglia an email that contained information she found shocking. (Stmt. Mat. Facts. ¶82-83). After relying upon the Sellers' statements, she later learned the history of extensive water leaks throughout the building. (Stmt. Mat. Facts _¶84-93). Furthermore, Plaintiff Sgariglia has incurred over $100,000 in damages to repair her the Structure and her unit, in court costs and in attorney fees. (Stmt. Mat. Facts _¶84-93). Indeed, her unit is currently still leaking, with the front windows requiring replacement. (Stmt. Mat. Facts.¶92-93).

### III. CONCLUSION

Plaintiff Sgariglia respectfully asks this honorable Court to enter judgment against Defendants Kelsey and Nicholas Gonring (Count I) for liability. In addition, Plaintiff asks this honorable Court to enter judgment against Defendant AIRES and The Gonrings for Fraudulent Concealments (Counts II and III) as to liability. Plaintiff Gonring asks that this honorable Court enter an Order to allow the matter to go to trial only on the issue of Plaintiff's damages, court costs, and attorney fees.

Melinda Sgariglia,

By: /s/ Carol Oshana One of her attorneys

Carol Oshana
OSHANA LAW
20 N. Clark Street, Suite 3000
Chicago, IL 60602
Oshanalaw@yahoo.com
ARDC #: 6243613

11