IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MELINDA SGARIGLIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-05684 |
| | ) | |
| AMERICAN INTERNATIONAL RELOCATION SERVICES, LLC, D.B.A. AIRES, an ILLINOIS LIMITED LIABILITY CORPORATION, NICHOLAS GONRING & KELLY GONRING, | ) | |
| | ) | |
| Defendants. | ) | |

The hybrid deposition of MELINDA SGARIGLIA, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before KELLY A. BRICHETTO, CSR No. 84-3252, Certified Shorthand Reporter, of the State of Illinois, taken at Suite 3200, One North Franklin, Chicago, Illinois, on the 13th day of February, 2023, at 10 a.m.

Job No. CS5706285

APPEARANCES:

On behalf of the Plaintiff:

OSHANA LAW, by
MS. CAROL OSHANA
20 North Clark
Suite 3000
Chicago, Illinois 60602
(312) 404-8390
oshanalaw@yahoo.com

On behalf of the Defendant American International Relocation:

WALKER WILCOX MATOUSEK, LLP, by
MR. KEVIN KOJS
One North Franklin Street
Suite 3200
Chicago, Illinois 60606
(312) 244-6700
kkojs@walkerwilcox.com

On behalf of the Third-Party Defendant John Gorr and the Condo Association:

LOFTUS & EISENBERG, by
MR. ROSS GOOD
161 North Clark Street
Suite 1600
Chicago, Illinois 60601
(312) 899-6625
ross@loftusandeisenberg.com

On behalf of the Defendants Nicholas Gonring and Kelly Gonring:

PATZIK, FRANK & SAMOTNY, LTD., by
MR. JORDAN FINFER
200 South Wacker Drive
Suite 2700
Chicago, Illinois 60606
(312) 205-4462
jfinfer@pfs-law.com

RHOADES McKee, PC, by
MR. PAUL McCARTHY
55 Campau Avenue NW
Suite 300
Grand Rapids, Michigan 49503
(616) 235-3500

\- - - - - - - -

ALSO PRESENT:

ANDREW WATTS

Kelsey Gonring (Via Zoom)

TRANSCRIPT INDEX

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . 4

EXAMINATION OF MELINDA SGARIGLIA

BY MR. KOJS . . . . . . . . . . . . . . . . . . . . . 6

BY MR. GOOD . . . . . . . . . . . . . . . . . . . . 81

BY MR. FINFER . . . . . . . . . . . . . . . . . . . 86

BY MR. KOJS . . . . . . . . . . . . . . . . . . . . 168

BY MR. GOOD . . . . . . . . . . . . . . . . . . . . 174

REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 181

EXHIBIT CUSTODY

COURT REPORTER RETAINED PLAINTIFF'S EXHIBITS 1-8

ATTORNEY RETAINED PLAINTIFF'S EXHIBIT 9

ATTORNEY RETAINED ALL GONRING MARKED EXHIBITS

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit No. 1 | Condominium Real Estate Purchase and Sale Contract | 46 |
| Exhibit No. 2 | Addendum to the Purchase and Sale Agreement | 49 |
| Exhibit No. 3 | Seller's Property Disclosure Statement | 35 |
| Exhibit No. 4 | Residential Real Property Disclosure Report | 58 |
| Exhibit No. 5 | 6-14-18 letter Thomas Hawbecker to Sarah Wilkins | 60 |
| Exhibit No. 6 | Attorney Modifications Response Letter | 61 |
| Exhibit No. 7 | Attorney Modification Second Response Letter | 64 |
| Exhibit No. 8 | Plaintiff's Answers to Aires First Interrogatories | 66 |
| Exhibit No. 9 | Excel spreadsheet | 68 |
| Gonring No. 1 | Aires Disclosure | 93 |
| Gonring No. 2 | Letter of 5-7-18 | 92 |
| Gonring No. 3 | 9-10-18 meeting minutes | 100 |
| Gonring No. 4 | Gonring 2044-2045 | 106 |
| Gonring No. 5 | Plaintiff's Bates stamp 645 | 109 |
| Gonring No. 6 | Purchase order for the mold work | 121 |
| Gonring No. 7 | Association's 22.1 Disclosure | 123 |
| Gonring No. 8 | ESI Report | 148 |
| Gonring No. 9 | BRAL Report | 153 |

Page 6

Page 7

(Witness sworn.)

WHEREUPON:

MELINDA YOUNG,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KOJS:

Q. Can you please state your first and last name for the record and spell it, please.
A. Melinda Young, Y-O-U-N-G.
Q. Do you mind if I call you Melinda throughout this?
A. I don't mind.
Q. Thank you. Have you ever given a deposition before?
A. No.
Q. All right. So I'm sure your attorney went through some of the ground rules before, but obviously I'll be asking questions today. If you don't mind, just let me finish my question and then you answer. I'll let you answer before I start my next question.
A. Who are you?
Q. Kevin.
A. And you are?

Page 8

Q. I represent American International Relocation Services.
As you see, we have members on Zoom as well. They might have some questions at the end or later on. Then obviously we have a court reporter here, so just make sure your answers are out loud. Sometimes when you say yes or no you might shake your head up and down. It's hard for her to get that, so if you wouldn't mind just saying it verbally.
If you need a break at any time, we could take a five-minute break, ten-minute break to use the restroom. Just make sure if I have a question pending you answer before we take a break. Okay?
A. Yeah. I need a break from 1:55 until 3 o'clock.
Q. Okay.
MS. OSHANA: I sent you that e-mail.
MR. KOJS: Yeah.
BY MR. KOJS:
Q. I'm going to go through some background stuff with you and then we'll get to the meat of the case.
What is your date of birth?
A. 6-13-75.
Q. Are you married?

Page 9

A. No.
Q. Do you have any children?
A. Yes.
Q. How many children do you have?
A. Three.
Q. And where do you currently live?
A. 2726 West Cortez, Unit 1.
Q. How long have you lived there?
A. Since 2018.
Q. What's your highest level of education?
A. MBA.
Q. Where did you get your MBA at?
A. Chicago Booth.
Q. Did you get your undergraduate degree there too?
A. No.
Q. Where did you get your undergraduate degree?
A. Northwestern.
Q. What was it in?
A. English international studies.
Q. When did you graduate undergrad?
A. 1997.
Q. When did you get your MBA?
A. 2003.

Q. Do you have any other education?
A. No.
Q. Are you currently employed?
A. No.
Q. When were you last employed?
A. November.
Q. Of 2022?
A. Yes.
Q. What was your job?
A. Program manager.
Q. Who did you -- who was your employer?
A. Meta.
Q. How long were you employed there?
A. Year and three months.
Q. And why did you end up leaving there?
A. I was laid off.
Q. How about before Meta, where were you employed?
A. I was unemployed before Meta.
Q. When were you last employed before Meta?
A. 2020.
Q. Where were you employed then?
A. Nuveen.
Q. What was your job title there?

A. Program manager.
Q. How long were you employed there for?
A. Since 2016.
Q. All right. So we're here today to talk about the purchase of the condo at 2726 West Cortez Street, Unit 1, Chicago, 60622. That's the correct address; right?
A. Yes.
Q. So prior to buying that condo when -- do you recall when you first started looking at condos or houses or anything?
A. I'd been looking for about a year.
Q. Okay. What was your prior address?
A. 1012 North California.
Q. How long did you live there for?
A. Three years.
Q. Did you own that?
A. No.
Q. Prior to owning the unit on Cortez Street did you own any other property?
A. Yes.
Q. When was the last time you owned a property?
A. 2015.
Q. Was that a house, condo?

A. A house.
Q. Where was that located?
A. In Logan Square.
Q. How long did you live there for?
A. Since 2008.
Q. And then prior to that did you own any other properties?
A. Yes.
Q. Where did you own a property at prior to that?
A. Logan Square.
Q. And how long did you live at that property for?
A. Three years.
Q. And then prior to that --
MR. McCARTHY: I'm not hearing some of the answers. I don't know -- if the witness could speak up. I don't know if other people on Zoom -- sometimes there's just no answer coming through.
MR. GOOD: I am having a problem too. When she says yes, I hear it. When she says other things, the first word I don't always hear.
MS. OSHANA: Could you speak up?

BY MR. KOJS:
Q. So prior to the one we just talked about did you own any other properties?
A. Yes.
Q. And then what years were those?
A. 2001 to 2003.
Q. Where was that property located?
A. River North.
Q. How about prior to 2001?
A. No.
Q. All right. So before buying the property at Cortez you owned three different properties?
A. Yes.
Q. Did you own all those by yourself?
A. No.
Q. Can you just go through each one and say who you owned them with?
A. 2125 North Albany I owned with my ex-husband. The property before that in Logan Square I owned with my husband, and the property before that I owned by myself.
Q. And then the two you owned with your ex-husband, were you a big part of that process?
A. Yes.
Q. You read through all the documents, met with

Page 14

your real estate attorney, whoever you needed to meet with?
A. I worked with a real estate attorney.
Q. Okay. Were you there for inspections on those homes?
A. Yes, I was there for the inspection.
Q. Did you have to take out a mortgage on those two?
A. Yes.
Q. Were you -- did you have to sign the mortgage? You signed off on it?
A. I had to sign a mortgage when I bought that property.
Q. Okay. So would you say you have some familiarity with going through the process of buying a property?
A. I have some familiarity as a buyer.
Q. And then when did you first visit the Cortez property prior to buying it?
A. In 2018.
Q. Do you know which month?
A. I don't recall.
Q. Obviously sometime prior to July?
A. Yes.

Page 15

Q. How many times did you visit the property before you bought it?
A. Once.
Q. And when you visited, was it by yourself, real estate agent, anybody else?
A. With my real estate agent.
Q. What's the name of your real estate agent?
A. I don't recall her name right now.
Q. Had you used her for those prior three properties?
A. No.
Q. How did you find this real estate agent?
A. She was referred to me.
Q. By who?
A. A friend.
Q. Do you know what agency she worked at, the real estate agent?
A. @properties.
Q. Would you be able to find out the name at some point after the deposition maybe?
A. Yes.
Q. Do you know how long she had been a real estate agent?
A. No.

Page 16

Q. Do you know the approximate age of the real estate agent?
A. No.
Q. Would you say she's over 40, under 40?
A. I don't know.
Q. Did it seem like she had a lot of experience in the real estate industry?
A. I don't know.
Q. Did you feel comfortable with her?
A. Yes.
Q. Did you look at any other properties while you were looking to buy this one?
A. Yes.
Q. How many properties do you think you looked at?
A. Maybe five, six.
Q. And then when you visited the Cortez property, was it currently occupied?
A. Yes.
Q. Were the owners there when you took a visit there?
A. No.
Q. Then when did you first decide to put an offer in?

Page 17

A. May.
Q. Of 2018?
A. Yes.
Q. Then who conveyed the offer?
A. I don't understand your question.
Q. I mean who let them know or who let the prior owners know that you were putting an offer in, was it your real estate agent?
A. Yes.
Q. Do you know how she communicated the offer to them?
A. No.
Q. Did she ever tell you the names of the owners there at the time?
A. No.
Q. Then after you put your offer in was there any sort of negotiations?
A. Yes.
Q. Do you know what your initial offer was?
A. I don't recall.
Q. Approximately how long were the negotiations, a couple weeks, a month?
A. Maybe a month.
Q. And then do you know -- after you agreed on a

price, do you know when the inspection was done?
A. I don't recall how long before or after the inspection was done.
Q. Do you know who performed the inspection?
A. Yes.
Q. Who was it?
A. Windy City Inspection.
Q. Do you know the actual inspector that came out?
A. His name's in the paperwork.
Q. You don't know off the top of your head right now?
A. No.
Q. Was that somebody that you reached out to or your real estate agent found them for you?
A. My real estate agent referred them.
Q. Had you ever used Windy City Inspectors on your prior houses?
A. No.
Q. Were you there for the inspection?
A. Yes.
Q. Was anybody else there?
A. My real estate agent.
Q. So you, the real estate agent and the

inspector?
A. Yeah, and I think the real estate agent for the seller was there as well.
Q. Do you know the name of the real estate agent for the seller?
A. No.
Q. Was it a male, female?
A. A male.
Q. Did he ever tell you who the owners of the house were?
A. No.
Q. Then how long was the inspection for?
A. I don't recall.
Q. Were you following the inspector around while he was doing it or did you stay in one room?
A. I don't recall.
Q. Do you know if you asked any questions during the inspection?
A. I did.
Q. What sort of questions did you ask?
A. There was a light that was not functioning. The rear slider wasn't functioning.
Q. Did you bring that up to him or did he let you know?

A. We both discussed it. I don't know who brought what up to who.
Q. Besides those two things was there anything else that was brought up?
A. I don't recall.
Q. Did you ever look over the inspection report that he completed?
A. Yes.
Q. Did you have any questions about it?
A. Yes.
Q. What sort of questions did you have?
A. He had some recommendations, so I asked him about the recommendations. I asked him specifically about a couple of the issues that I noticed myself.
Q. And those issues were the light and you said rear slider?
A. Um-hum. Yes.
Q. Was there anything else?
A. I don't recall.
Q. What sort of recommendations did he have?
A. I don't recall him having recommendations.
Q. Was there anything he thought was concerning?
A. There was some information on a page about things that he found during the inspection.

Q. Anything you remember?
A. I'd have to look at the document.
Q. Okay. Did he ever discuss any sort of water damage or water issues or find anything?
A. There was water damage in the exterior of the basement entrance to the building.
Q. And was that part of your unit or was that part of the condo as a whole?
A. It was the condo.
Q. How many units were there?
MS. OSHANA: Just so -- when you say "condo," you're saying the Condo Association?
MR. KOJS: Yeah.
MS. OSHANA: You're saying -- you're not talking about the unit itself?
MR. KOJS: Yeah.
MS. OSHANA: Okay.
BY THE WITNESS:
A. Can you repeat the question, please.
BY MR. KOJS:
Q. Yeah. How many units were in the Condo Association?
A. Three.
Q. Did the inspector inspect anything else

Page 22

besides your unit?
A. We walked around the building.
Q. Did he notice anything else besides the, you said the water damage in the basement area, the door?
A. As I said before, I'd have to look at the document.
Q. So you just remember the -- was it the entrance to the basement?
A. Yes.
Q. What sort of water damage did he see?
A. The molding was black and it had expanded.
Q. Did he say how that occurred or what his --
A. I don't recall.
Q. Did you ever bring that up with the prior owners or anybody that lived in the other units?
A. I don't recall.
Q. How close is that area to your unit?
A. Three feet.
Q. Where was it located, like the back of your unit?
A. There's a door from the exterior basement of my unit three feet and then the door to the exterior of the building.
Q. Did that concern you at all that there was

Page 23

water damage there and some black mold or maybe not black mold but mold in the area you said?
A. I don't know what it was.
Q. Did that concern you at all though?
A. I had concerns about -- that I spoke with my real estate attorney about.
Q. What did you guys speak about?
A. You'd have to check the e-mails. It's in the e-mails.
Q. You don't remember off the top of your head?
A. No.
Q. Then I have the official purchase date as July 25th, 2018. Does that sound accurate?
A. If that's what the documents say, then that's accurate.
Q. Do you know when you would have moved in?
A. Probably a few days later.
Q. Do you know when the prior owners had moved out?
A. I don't know the date they moved out, no.
Q. When did you first start to notice any issues with the unit or the whole building in general?
A. I received an e-mail approximately six weeks after I moved in.

Page 24

Q. Who did you receive an e-mail from?
A. John Gorr.
Q. Who is John Gorr?
A. He was the owner of Unit 3.
Q. Was he the President of the HOA?
A. Yes.
Q. What did the e-mail say?
A. That there had been issues in the building for quite some time, that it was -- he was not sure what the former owners had communicated to me prior to closing, that they were aware of the issues in the building and their unit, that it was an unfortunate way to meet each other.
Q. Is there any reason he randomly sent you an e-mail six weeks after you moved in about this?
A. He failed a mold test as he was trying to sell his unit.
Q. In his unit he failed a mold test?
A. Yes.
Q. And that prompted him to send an e-mail to you?
A. Yes.
Q. Did he send it to Unit 2 as well?
A. Yes.

Page 25

Q. You mentioned he said former owners. Did he mention who the former owners were?
A. I don't know if he said that in the e-mail, if he said their names. He said -- I don't know.
Q. Is it your understanding the former owners that actually lived in your unit were Kelsey and Nicholas Gonring?
A. Yes.
Q. So as you sit here now, when John sent that e-mail and said the former owners were aware of this, you would imagine that was Kelsey and Nicholas Gonring?
A. Yes.
Q. Then what did John -- what do you remember John saying in that e-mail? Was he saying there was issues with the whole building, your unit specifically?
A. As I said before, I recall him saying that there were issues with the building and the unit.
Q. When you say "the unit," you're referring to yours?
A. Yes.
Q. Do you remember if he had said anything specifically about your unit?
A. I don't remember.
Q. Then did you respond to that e-mail?

A. Yes.
Q. Do you recall what you said back?
A. That I was shocked.
Q. So that was something -- you had no idea about all these issues to your unit and the building itself?
A. That's correct.
Q. So after responding, you said you were shocked, you know, what kind of happened after that?
A. I asked that the HOA convene a meeting to discuss what was going on.
Q. Did that meeting ever occur?
A. Yes.
Q. Do you know approximately when it occurred?
A. It's in the e-mails.
Q. Do you know if it was shortly after John sent that first e-mail to you?
A. Yes.
Q. Prior to John e-mailing you six weeks after you moved in had you met him before?
A. No.
Q. Had you met the owners of Unit 2?
A. No.
Q. That first HOA meeting you were at, who was all there?

A. John Gorr was there, Ryan Brown was there and myself.
Q. You said Ryan Brown?
A. Yes.
Q. Was he the Unit 2 owner?
A. Yes.
Q. So it was just the three of you?
A. Yes.
Q. Did you meet in person?
A. Yes.
Q. Where did you meet?
A. In my house.
Q. What do you recall being discussed at that meeting?
A. It's all in the e-mail, and the meeting minutes reflect that. We discussed that there were significant water issues in the building, that all three unit owners had experienced water damage in their units, that all three were aware of water damage in their building and in their units and that no one had done anything about the water that had been infiltrating the units since 2012.
Q. What was your initial reaction to hearing that?

A. As I said before, I was shocked.
Q. After that meeting concluded did you reach out to your real estate agent or anybody else that was part of the process of you buying the condo?
A. Yes.
Q. Who did you reach out to?
A. My closing attorney.
Q. Who was?
A. Hawbecker & Langveld.
Q. Did you have a specific attorney you were dealing with?
A. Hawbecker.
Q. Do you know the first name?
A. Thomas.
Q. Had you ever used them in your prior properties?
A. No.
Q. How did you get to the point where you used them for this purchase?
A. My real estate agent referred me.
Q. What were your impressions of Thomas?
A. What are you asking me?
Q. Just in general with him, you know, working with you closing. Did you feel he was experienced enough?

A. Yes.
Q. When you first reached out to him after that HOA meeting, do you know how you communicated to him?
A. Yes. I called him.
Q. Do you recall what you told him?
A. I told him there was significant water damage in the building and in the units that had not been disclosed to me and I asked what -- if he knew of an attorney that I could speak to.
Q. Did he refer you to someone?
A. He did.
Q. Who did he refer you to?
A. I don't recall that person's name.
Q. Did you ever reach out to them?
A. Yes.
Q. What did you tell them?
MS. OSHANA: Tell who?
MR. KOJS: The attorney.
MS. OSHANA: Attorney/client privilege. Objection.
BY MR. KOJS:
Q. Did you end up hiring them?

A. No.
Q. Why did you not hire them?
A. They were located in the suburbs and he told me that --
MS. OSHANA: Objection. Don't talk about it.
BY MR. KOJS:
Q. So they were just located in the suburbs and you didn't feel comfortable?
A. They were located in the suburbs.
Q. Did you ask Thomas to refer you to anybody else?
A. No.
Q. Did you end up -- were you searching any other attorneys to talk to?
A. Yes.
Q. Who did you next reach out to?
A. Ms. Oshana.
Q. Did you hire her shortly after reaching out to her?
A. Yes.
Q. Did you have any other HOA meetings to discuss these issues?
A. Yes.
Q. When was your next one after the first one?

MR. McCARTHY: Counsel, you're muted.
(Brief pause.)
MR. KOJS: Do you mind rereading the last question?
(Requested portion of the record read.)
BY THE WITNESS:
A. Very soon after.
BY MR. KOJS:
Q. Was that meeting in person?
A. Yes.
Q. Where was that located?
A. In my unit.
Q. What was discussed during that meeting?
A. We started to discuss what was gonna be the next step.
Q. Did you guys agree on the next step?
A. We discussed options for next steps.
Q. Which were?
A. Getting more information about what was going on, what the issue was in Unit 3 in greater detail, what was going on with his sale and how we would find out what was going on with the water damage in the building.
Q. When you say get more info, what do you mean?

A. Well, John had disclosed that there had been issues since 2012. He disclosed that all unit owners were aware. He disclosed that he -- I don't think he knew what we were gonna do next, and Ryan said that his unit was under contract and they wanted to do something quickly so that his sale could go through.
Q. So Ryan was selling his unit, Unit 2?
A. Yes. All three owners were selling their units all at the same time.
Q. Did you know if it was because of these issues that were brought up?
A. I came to understand that later, yes.
Q. Did they tell you that or you're just kind of assuming based on --
A. It's pretty clear from the evidence they were all colluding together. They knew.
Q. When you say "they all," who do you mean?
A. The Gonrings, the Gorrs and Ryan and Ada Brown.
Q. Is Ada Brown Ryan's spouse or partner?
A. Something. I don't know if they were married or not.
Q. But they both lived in Unit 2?
A. Yes, they did.

Q. Did John live with anybody?
MR. GOOD: Sorry to interrupt.
MR. KOJS: Yes.
MR. GOOD: Never mind. It's fixed.
(Brief pause.)
BY MR. KOJS:
Q. Did John live by himself?
A. John had moved out of the unit and had not been living there.
Q. When you say all of them were kind of colluding to keep it a secret, are you saying that based off the -- all those e-mails you read or what are you basing that off of?
A. The e-mails I read. The next door neighbor told me that the Gonrings couldn't wait to get out of there. I asked the neighbors if they were aware. Other neighbors told me that they knew there were water issues.
Q. Do you know the names of the neighbors you spoke to?
A. One was Brian. Brian lives on east side third floor.
Q. When you say "east side" -- I haven't looked at the actual area itself, but was there another building attached to yours or --

A. No.
Q. -- just next property over?
A. The next property.
Q. Did you go over there and like knock on their doors and inquire about your unit in your building?
A. I spoke with them from my back door and I spoke with them out in front of my building.
Q. And you were just investigating if they knew anything about your building and unit?
A. That's correct.
Q. Do you know if they spoke with the Gonrings personally about it?
A. My neighbor spoke with the Gonrings personally about it.
Q. Did it seem like they were friends?
A. No, it did not.
Q. Do you know if those neighbors spoke to Unit 2 or Unit 3?
A. I know that Brian spoke with Unit 3.
Q. Do you know if Brian still lives there today?
A. No, he does not.
Q. Do you still keep in touch with Brian?
A. I haven't spoken with him as of late.
Q. When was the last time you spoke with him?

A. In the fall of this year, 2022.
Q. Was it related to the issues we've been talking about?
A. No. That was related to his sale.
Q. Do you know if he'd ever been into your unit or any of the other units?
A. I don't know.
Q. Do you recall what he specifically said besides just saying there's, you know, been issues there, he knows the Gonrings wanted to sell?
A. Those are the issues that I'm aware of, and then the other neighbor told me that the Gonrings heard water running through their walls.
Q. Do you know approximately when that would have been?
A. She told me that, this was before my sale, that they couldn't wait to get out of there.
Q. Who's she?
A. The neighbor who filled out the affidavit. Her name is Randi.
Q. Was she in the same building as Brian?
A. No. She was in the building on the west side.
Q. How did you meet Randi?

A. I said hello to her as she was coming in the door to her unit.
Q. Would that have been back at some point in 2018?
A. Yes.
Q. How many times do you think you've spoken with her?
A. Five.
Q. Were they all -- all the conversations in regards to your property or your unit?
A. No.
Q. How did she know about the issues with the water in the walls?
A. She spoke to the Gonrings.
Q. Do you know when she spoke to the Gonrings about it?
A. I'd have to look at her affidavit.
Q. Besides Randi and Brian do you know anybody else you might have spoke to, any of the other neighbors?
A. I don't recall.
Q. Then we've spoken a little bit about the e-mails prior to you owning that property. Do you know when you received all those?
A. It was September, October of 2018.

Q. Who sent them to you?
A. John and Ryan and then the e-mails that Gorr also produced as part of his discovery or whatever he had to produce.
Q. You might have told me but did they say how long these issues had been going on?
A. Yes.
Q. How long?
A. Since 2012.
Q. And did you ask if there was any correspondence or they just let you know hey, we've been talking about this for the last six years, we have e-mails?
A. I asked them to release that information to me under Condo Association laws.
Q. Did you read through all the e-mails they sent you?
A. Yes.
Q. What was your initial reaction?
A. I was shocked.
Q. Do you recall what you ascertained from those e-mails when you first read them?
A. Yeah, that this was a nightmare.
Q. And all the e-mails that were sent to you,

Page 38

were they discussing issues with the property and the three units?
A. Yes, Kelsey, Nick, Ryan and John were all discussing the issues with the unit and with the building.
Q. Kelsey and Nick Gonring; right?
A. That's correct.
Q. Do you remember specifically what they were referencing?
A. I don't understand your question.
Q. Do you know if they specifically said any issues with the property like your unit itself or the exterior of the building?
A. Leaking windows, doors, vents, ceilings, walls.
Q. Did they say anything specifically about Unit 1?
A. Yes.
Q. What did they say in those e-mails?
A. That Unit 1 was having water leaking in their windows.
Q. Was that Kelsey or Nick that said that in the e-mails?
A. They were e-mails John Gorr forwarded me from

Page 39

the Mulligans who owned the property before the Gonrings purchased it that the Gonrings received.
Q. Do you know when the Gonrings purchased Unit 1 from the Mulligans?
A. Not off the top of my head, no.
Q. Do you know if in 2012 whether the Mulligans or Gonrings owned the property?
A. Mulligan owned the building in 2012.
Q. Owned Unit 1?
A. No. Yes, he owned Unit 1.
Q. So those e-mails that John provided you, you saw the Mulligans on there and the Gonrings on there?
A. Yes.
Q. Do you remember specifically anything about the actual building itself not just your unit that they discussed in those e-mails?
A. Yes. I said the windows, the doors, the walls, the roof, the ceiling.
Q. And that was all water damage they were talking about?
A. Yes.
Q. Do you know how old the building is?
A. The building was built in 2007.
Q. Did you ever reach out to the Mulligans or

Page 40

the Gonrings after you discovered these issues?
A. Absolutely not.
Q. And then after -- well, during that second HOA meeting, did you discuss having contractors come out to check on the damage?
A. We discussed what our next steps would be, and I discussed having an inspection done on the building and the units.
Q. Was that eventually done?
A. Yes.
Q. Were you the one kind of taking lead on all of this or did you guys --
A. Absolutely.
Q. -- split it up?
You were taking the lead?
A. Yes.
Q. Do you know who you hired to inspect the building?
A. Steve Hier. He's a water intrusion expert, specialist and expert in the field when it comes to split face block.
Q. How did you end up hiring him?
A. What do you mean?
Q. Well, how did you end up having him be the

Page 41

one that inspected your building? Were you referred to him?
A. Yes, I was referred to him.
Q. Who referred you to him?
A. Andrew Watts.
Q. Do you know approximately when he came out?
A. He came out in September or October of 2018.
Q. Were you there when he came out?
A. Yes.
Q. What did he say after his inspection or during it?
A. That it was the worst unit, building water damage he's ever seen in his career.
Q. Did he prepare like an inspection summary?
A. Yes.
Q. Did you read through it?
A. Yes.
Q. Did he have any recommendation for you?
A. Yeah, he recommended some exploratory work to try to determine how badly the damage permeated through the units and the building.
Q. Was that something he could do or you had to hire a separate --
A. No. He's an inspector.

Q. Did he have an opinion of what was causing the water intrusion and other water damage issues?

A. Yeah, that the block was letting in water, that whoever -- whatever had been applied to the building in June had been done incorrectly, that the windows and doors were improperly flashed, that it was a building construction issue.

Q. So he thinks this stems from when the building was built in 2007?

A. It stems from when the building was constructed and subsequent cheap, non-conforming fixes that were done to the building by non-qualified contractors.

Q. What kind of fixes were done?

A. Windows and doors were caulked. Weeps were sealed. The sealant that was applied was applied improperly, and it would not keep water from infiltrating into the block. Flashing was inappropriately done. The roof was inappropriately installed.

Q. Do you know when all these fixes were done after the building was constructed?

A. John supplied a document that the -- in his primary, first e-mail to me that had a history of the water infiltration into the building along with the

various fixes and quotes that he and others had gotten.

Q. Do you know when these services were performed?

A. From 2012 all the way up until June of 2018.

Q. Do you know who was the one taking the lead on hiring these contractors?

A. Kelsey hired the Arrow company. John hired some of them as well.

Q. What's the Arrow company?

A. Arrow is the company that the HOA hired in June to seal the building, flash, caulk.

Q. June of 2018?

A. Yes.

Q. And Steven, the inspector that you had hired, he said that was all done improperly?

A. Yes. He said that the sealant that was applied by Arrow had been applied incorrectly, that caulking should never be done around the windows and doors, the weeps should never be sealed. Those were the things he said to me. He also said the building was inappropriately constructed.

Q. After his inspection was done did you have another HOA meeting?

A. Yes.

Q. And the results of the inspection were discussed I'm assuming?

A. Yes.

Q. What was decided after that HOA meeting?

A. We came up with a scope of work and we decided to have this bid out. I also had looked at the ESI report that John provided. That was also provided to the Gonrings and the entire HOA.

Q. At that point were you, you know, looking for contractors to come and fix all these issues?

A. We had a scope of work defined and we were looking for a contractor who could address the issues that we had identified and adhere to the scope of work that we put together.

Q. Did you end up hiring different contractors or just one general contractor who maybe subcontracted the work out?

A. We bid out the work per the guidelines of best practices of the Condo Association and we got three bids on the work and we hired Allendorfer to do the work.

Q. When did he start the work?

A. I don't know. I'd have to look at the first contract.

Q. Did he end up completing everything?

A. He completed the work that we contracted him for.

Q. Do you know when he completed his work?

A. I don't know. I'd have to look at the last contract. 2020 or 2021.

Q. Did you hire anybody else to fix any of the issues that had been discussed in the HOA meetings?

A. Yeah, we hired Mold Solutions.

Q. Anybody else?

A. Not that I recall.

Q. Do you know when Mold Solutions came out?

A. Yeah, in 2018.

Q. And did they finish the work in 2018?

A. Yes.

Q. Do you know where they discovered mold in the building?

A. In Unit 3 and inside the walls.

Q. Inside the walls in Unit 3?

A. Yes.

Q. Was there any mold found in your unit?

A. We didn't open up my unit.

Q. Any reason they did not or you did not?

A. I don't recall.

Q. Are Ryan and John still in their respective

units?
A. John is. Ryan sold his unit.
Q. Have you met the new owners in Unit 2?
A. I know the unit owner.
Q. When did Ryan sell Unit 2?
A. You'd have to check his sales contract.
Q. Do you know if those owners were aware of all these issues prior to them purchasing Unit 2?
A. Yes.
Q. They were aware?
A. They were disclosed to. They told the truth.
Q. All right. Like I said in the beginning, I represent American Relocation Services. I'm going to refer to them as Aires if that's all right, A-R-I-E-S. Do you know what type of company they are?
A. It says relocation service.
Q. Had you ever heard of them before this case?
A. No.
Q. You ever hear of any sort of relocation service prior to this case?
A. No.
Q. All right. I'm going to show you what we're going to mark as Plaintiff's Exhibit 1. It's the Condominium Real Estate Purchase and Sale Contract for

your unit. I'm going to share this with everybody too.
MR. GOOD: Thank you.
MR. KOJS: Can you guys see it?
MR. GOOD: Yes.
MR. KOJS: Thank you.
(Exhibit No. 1 marked as requested.)
BY MR. KOJS:
Q. Have you seen this document before?
A. Yes.
Q. Then if we turn to --
MS. OSHANA: Can you give her the marked exhibit?
THE REPORTER: Yes.
BY MR. KOJS:
Q. Can you turn to Page 3 of Exhibit 1? Paragraph 118, "Buyer's name," is that your name right there?
A. Yes.
Q. The line up above it, 117, is that your electronic signature?
A. Yes.
Q. Then the same line, 117, "Seller's Signature," it says "Amanda Flucker." Do you see that?

A. Yes.
Q. Do you know Amanda?
A. No.
Q. Have you ever heard of her name?
A. I've seen her name in the correspondence.
Q. Then just below her signature it says: "Seller's name: Aires as an agent for American International Relocation Solutions, LLC"?
A. I see their name, but they weren't the seller.
Q. But did I read that correctly on the page?
A. Yes.
Q. When you were going over this document and signing it, were you confused why Aires was listed as the seller's name?
A. I saw an e-mail that said that Aires was the seller.
Q. Who did you see an e-mail from?
A. Sara Wilkins.
Q. Who's Sara Wilkins?
A. I don't know exactly what her title was. She was an attorney I think for Aires.
Q. Did she send an e-mail directly to you or --
A. No.

Q. Who did she send it to?
A. My attorney.
Q. Did your attorney explain who Aires was?
A. He told me that they were the seller, the owner.
Q. At this point in time when you were reading this over and signing it, did you know who the Gonrings were?
A. Yes. I believe there was another document that had the Gonrings' name on it as the seller.
Q. If you knew the Gonrings were the sellers as well, did you have any confusion that this one listed Aires but you also knew the Gonrings were selling it?
A. The e-mail from Sara said that Aires was the seller.
Q. Then so sticking on Page 3, like I said, the seller's name, paragraph 118, "Aires as an agent for American International Relocation Solutions." It doesn't say Aires as an agent for the Gonrings; correct?
A. The document does not say that.
MR. KOJS: We're going to mark Plaintiff's Exhibit 2.
(Exhibit No. 2 marked as requested.)

BY MR. KOJS:
Q. It is the addendum to the Purchase and Sale Agreement. Have you seen this document before?
A. Yes.
Q. If we turn to the last page, Page 3, where it says "Buyers," is that your signature?
A. Yes.
Q. It has a date of June 6, 2018?
A. Yes.
Q. Then seller says "American International Relocation Solutions" signed by Amanda Flucker?
A. It says that, but that's not the case. Aires never became a contractual owner of the property.
Q. On this page it says that though; correct?
A. Yes. It's a lie.
Q. Did you read through this document before signing?
A. I recall reviewing it with my attorney.
Q. Do you recall any questions while going through it?
A. I don't recall.
Q. Then if we go to the first page, it's the third bolded Seller's Representations. Do you see where I'm looking at?

A. Yes.
Q. It reads: "Any representation by seller shall be to the best of the seller's knowledge and belief without requiring investigation. No representation shall survive the closing unless specifically expressed herein." So according to this document, the seller would be Aires; correct?
A. No.
Q. Why no?
A. Aires was not the seller. They never received the deed. You can't sell something that you don't own.
Q. But according to this document, the seller is listed as Aires though; correct?
A. This document doesn't exist because they never became the contractual owner, so this document is not a document with any legal standing.
Q. That's fine, but at Page 3 under Seller it lists Aires; correct?
A. I'm not going to answer the question and say something illogical. Aires was never the seller.
Q. Okay. But on this document it says that Aires is the seller?
A. I am not going to tell you something

illogical. I'm not going to agree that they are the seller. They were not the seller. They were never the owner. You cannot sell something that you don't own.
Q. That's fine if you don't think they're the seller, but on this page, it lists their name as the seller?
A. I'm not going to agree to that.
Q. So, what, do you think it's somebody else that --
MS. OSHANA: Counselor, we get the point. On this piece of paper it reads --
MR. KOJS: I need her to say that.
MS. OSHANA: Can I finish? On a piece of paper it does list Aires as the seller. That's the point. It was not true. So yes, they misrepresented themselves.
MR. KOJS: Okay. Well, we don't need to fight about it here. I just want her to confirm that's what it says.
MS. OSHANA: I understand. That's what I'm stipulating to, so you don't need to ask her over and over again. There is a piece of paper that says that Aires is the seller. That's a misrepresentation.
MR. KOJS: Okay. Are you going to stipulate

that the "Seller's Representation" as of this document would be Aires?
MS. OSHANA: I'm sorry?
MR. KOJS: Will you stipulate where it says "Seller's Representation," what I just read, that when they're referring to "seller" it would be Aires?
MS. OSHANA: No. The legal consequences of this document have to be determined by the court. But I will tell you that on this piece of paper, whatever is printed on here, it does exist on this piece of paper. The legal effect is up to the judge.
MR. KOJS: No, we're not arguing legal effects right now.
MS. OSHANA: Right. But you're asking my client -- are you asking my client is there type that says seller's authority, things like this, seller's representation? There are words on this piece of paper. Yes, they are typed, and the judge will read these words, so what my client thinks of the words on this piece of paper, no, I will not.
MR. KOJS: That's fine. She can answer that.
MS. OSHANA: She is answering that. The piece of paper -- I'm answering for her. I will stipulate that the type that's on here does exist, yes.

MR. KOJS: So you'll stipulate that any part where it says seller, we'll fight over the legal part, but anywhere it says seller according to this paper is Aires?

MS. OSHANA: That's why there's a misrepresentation. The misrepresentation is Aires saying that they're the seller on many pieces of paper, and this is where they lied, yes.

MR. KOJS: I understand. But can you just stipulate that anywhere it says seller, according to this, it says Aires?

MS. OSHANA: Yes, of course. According to this piece of paper, this is where the misrepresentation occurred because Aires kept listing itself as the seller.

MR. KOJS: Okay.

BY MR. KOJS:

Q. If we go to "Condition of Premises" just below "Seller's Representation," it reads, the first sentence: "Buyer understands that seller is a relocation management service and has never lived on or in the property."

A. They are not the seller.

Q. That's fine. Can you confirm that's what it says?

MS. OSHANA: Counselor, hold on. We're not going to do this.

MR. KOJS: She can't confirm whether or not it says that?

MS. OSHANA: No. Hold on a second. We are not going to go into does it say this, does it say this, does it say this. There's a piece of paper. Of course everything that's typed on this piece of paper is on this piece of paper. If you want to ask her a question about her understanding, that's different. But if you're just saying does this piece of paper say this, the words say what's on this piece of paper. Why are you going into that?

MR. KOJS: Well, that's my prerogative why I would go through it.

MS. OSHANA: It's ridiculous.

MR. KOJS: It's not.

MS. OSHANA: Move on. No, it is ridiculous.

MR. KOJS: It's a huge speaking objection, and it's inappropriate.

MS. OSHANA: There's a piece of paper in front of us. We will stipulate that whatever is typed on this piece of paper does exist. I already stipulated to that.

BY MR. KOJS:

Q. All right. I will show you what we'll mark as Plaintiff's Exhibit 3. It's titled "Seller's Property Disclosure Statement."

(Exhibit No. 3 marked as requested.)

BY MR. KOJS:

Q. Have you seen this document before?

A. Yes.

Q. If we go to the last page, it says "Seller, Kelsey and Nicholas Gonring --"

A. Yes.

Q. -- is that correct?

It has your electronic signature as the buyer on there?

A. Yes.

Q. If we go back to the first page, it says "Seller" at the top under "property address Nicholas and Kelsey Gonring"?

A. Yes.

Q. When you were reading through this, was it your understanding that Nicholas and Kelsey were the ones that were checking either yes or no or unknown?

A. Yes.

Q. Then sticking on the first page, the first

sentence: "Seller must disclose to a buyer all known material defects about the property being sold." Do you see that?

A. Yes.

Q. When it says "seller," your understanding was that it would be Nicholas and Kelsey Gonring --

A. That's correct.

Q. -- to disclose that?

Then Section 2, "Occupancy" on the first page, subparagraph A it states: "Do you, seller, currently occupy the property." It's checked yes. It's your understanding that, again, seller there would refer to Nicholas and Kelsey Gonring?

A. Yes.

Q. If we go to the last page, the last thing on this document, you see, I think it's the third sentence in, it's capitalized: "Seller alone is responsible for the accuracy of the information contained in this statement." Do you see that?

A. Yes.

Q. And, again, as seller, you would -- your understanding was Kelsey and Nicholas Gonring?

A. I don't know who was the seller. I had documents that say Aires is the seller. I had documents

that said the Gonrings are the seller. I don't know who the seller is. Are we going to go through the document too where they were lying? Go through the documents where you guys were lying to me too.

Q. But on this document you already said the seller was, your understanding was Kelsey and Nicholas Gonring?

A. I don't know who the seller is.

MS. OSHANA: At the time or now?

MR. KOJS: At the time.

MS. OSHANA: I think he's saying at the time.

BY THE WITNESS:

A. I don't know. I was told Aires was the seller.

BY MR. KOJS:

Q. Okay. Even though it says "Nicholas and Kelsey" at the top under "Seller"?

A. At the time I understood Aires was the seller.

Q. Who did you think Nicholas and Kelsey Gonring were then?

A. I don't -- I don't -- I don't know. I don't understand.

Q. So when you were looking through this

document and you thought Aires was the seller, did you ask your real estate agent or anybody why it lists Nicholas and Kelsey Gonring as the seller at the top?

A. I don't recall.

THE WITNESS: Can we take a break?

MR. KOJS: Yeah.

(WHEREUPON, a break was taken.)

I'm going to mark this Plaintiff's Exhibit 4. It's the Residential Real Property Disclosure Report.

(Exhibit No. 4 marked as requested.)

BY MR. KOJS:

Q. Have you seen this document before?

A. Yes.

Q. If you go to Page 2, "Seller," is that the signatures of Kelsey and Nicholas Gonring?

A. Yes.

Q. And on Page 4, "Seller," again, it's electronic signatures of Nicholas and Kelsey Gonring?

A. Yes.

Q. Then back to the first page, seller's name, Nicholas Gonring and Kelsey Gonring; correct?

A. Yes.

Q. Then if we go to paragraph 5 and 6 towards the middle, paragraph 5 says: "I am aware of leaks or material defects in the roof, ceilings or chimney," and it's checked off no; correct?

A. Correct.

Q. On paragraph 6: "I'm aware of material defects in the walls, windows, doors or floors." Again, it's checked no?

A. That's correct.

Q. Is it your understanding that Kelsey and Nicholas checked no on this document?

A. Again, I have no idea who the seller and the owner are. Aires told me that they were the owner. They told me they were the seller. I have Nick and Kelsey Gonring on some documents that say they are the seller. I have Aires on other documents that say they were the seller.

Q. Did someone at Aires tell you they were the owner?

A. The e-mail from Sara Wilkins says they're a seller. I don't understand how you can sell something you don't own. I don't understand how you can give me this that says how the seller becomes the contractual owner on Exhibit 2.

Q. But Aires just told you they were the seller; correct?

MS. OSHANA: She just answered it. Did you hear what she just said?

MR. KOJS: She -- reread the question and answer if you don't mind.

(Requested portion of the record read.)

BY MR. KOJS:

Q. Were you on that e-mail from Aires?

A. As I told you before, my attorney shared that with me.

Q. On this document, the Disclosure Report, is there any indication that Aires or anybody from Aires checked any of these boxes or signed anything?

A. I don't see that.

MR. KOJS: All right. This will be Plaintiff's Exhibit 5. It is a June 14, 2018 letter from Thomas Hawbecker to Sarah Wilkins.

(Exhibit No. 5 marked as requested.)

BY MR. KOJS:

Q. Have you seen this document before?

A. Yes.

Q. This was sent from your attorney; correct?
A. It would appear so, yes.
Q. Did you have any involvement in preparing this letter?
A. We talked about this.
Q. If we go to Section 8 on Page 2, subparagraph E -- you see where I'm at?
A. Yes.
Q. It reads: "Please verify that the Condo Association has not experienced any instances of water, interior or exterior, leaking into the property and/or any water damage during seller's ownership of the property. If there have been any such occurrences, please provide dates, locations, damage and any repairs made." Did I read that correctly?
A. Yes.
Q. If you wouldn't mind keeping that one in front of you.
MR. KOJS: I'm going to mark this one as Plaintiff's Exhibit 6. It's titled "Attorney Modifications Response Letter." It's sent from Sarah Wilkins to Thomas Hawbecker.
(Exhibit No. 6 marked as requested.)

BY MR. KOJS:
Q. Have you seen this letter?
A. Yes.
Q. Would you agree this is a response to the June 14th, 2018 letter?
A. Yes.
MR. McCARTHY: Counsel, can you share the screen on that, please.
MR. KOJS: Yeah.
BY MR. KOJS:
Q. If you go to Page 2, Section 8, subparagraph E, it reads: "As a third-party corporate relocation company, seller is unable to make verifications regarding whether the property has experienced water leaking or water damage. However, seller agrees to abide by the terms of the buyer's duty to inspect, test sections of the Aires addendum with respect to possible leaks, seepage or water infiltration of the property. Seller would have no knowledge of such matters unless raised during the home inspection process." Did I read that correctly?
A. Yes.
Q. Then do you see the okay responses on the

left side?
MS. OSHANA: No, not this one. Not on hers either. Unless you're talking about the ones below. Are you talking about below?
MR. KOJS: Oh, yeah.
MS. OSHANA: You talking about down here?
MR. KOJS: Yeah. Not next to a, b but just --
MS. OSHANA: Oh.
BY MR. KOJS:
Q. Do you see the okay right next to 6a, 6b or 6c says "agreed"?
A. Yes.
Q. Is it your understanding those are your responses to these responses from Aires?
A. Yes.
Q. And then for 8e just at the bottom, it looks like it says: "Please confirm the same with the prior owner as the seller has direct contact with the prior owner"?
A. Yep. There you go again. Lying to me about who the seller is. So now we've looked at four different things that show who the seller is and it is all different.
Q. Would you agree that your attorney or

yourself wrote or responded with that saying: "Please confirm the same with the prior owner as the seller has direct contact with the prior owner"?
A. Yes.
Q. Based off of that, is it your understanding that you were asking Aires to confirm with the prior owner?
A. I'm not sure what else it would mean.
Q. Prior owner it's your understanding would be the Gonrings?
A. Yes.
Q. Keep that in front of you if you don't mind.
MR. KOJS: We'll mark this as Plaintiff's Exhibit 7. It's titled "Attorney Modification Second Response Letter."
(Exhibit No. 7 marked as requested.)
BY MR. KOJS:
Q. Have you seen this letter?
A. Yes.
Q. Again, this was sent by Sarah Wilkins to your attorney Thomas Hawbecker; correct?
A. Yes.
Q. The second sentence under: "Dear Mr.

Hawbecker: The seller has reviewed your June 22nd, 2018 in-line response to my June 18th, 2018 letter and has provided the following response." Did I read that correctly?

A. Yes.

Q. Would you agree that this response is to the responses that you made in the prior letter we just looked at? I know it's a little confusing with these three separate letters.

A. Yes.

Q. And then in a July 2nd, 2018 letter, if you look at Section 7: "With respect to item 8e, again, as third-party corporate relocation company, seller is unable to make verifications regarding whether the property has experienced water leakage or water damage. However, seller agrees to abide by the terms of the buyer being able to inspect, test section of the Aires addendum with respect to possible leaks, seepage or water infiltration of the property as seller would have no knowledge of such matters unless raised during the home inspection process when the information reported in the Residential Real Property Disclosure Report or the home owner provided disclosures makes no mention of water infiltration in the property."

A. Yeah, but you weren't the seller.

Q. Did I read that correctly though?

A. You're reading the words on the page.

Q. And then would you agree your response just to the left of Section 7 says "okay"?

A. Yes.

MR. KOJS: Exhibit 8. Exhibit 8 is Plaintiff's Answers to Aires First Interrogatories.

(Exhibit No. 8 marked as requested.)

BY MR. KOJS:

Q. Have you seen this document?

A. Yeah.

Q. On the last page that's your electronic signature verifying these Answers?

A. Yes.

Q. Did you work with your attorney to prepare these Answers?

A. Yes.

Q. Then question 1: "Describe all the evidence you have for your contention on paragraph 51 that claim that Aires is the agent for the Gonrings." Your response, first sentence was: "Aires was not the owner of the property despite their misrepresentations to the

contrary;" is that correct?

A. Correct.

Q. And what were the misrepresentations that you're talking about?

A. The calling yourself the seller in the last exhibits that you just shared with me, 7, 6, 5, 2, 1.

Q. Then the third sentence of the response to question 1 you say: "If one is not an owner of property and is trying to sell it, then that person is an agent." Did I read that correctly?

A. Yes.

Q. Where did you get that that person would be your -- company would be an agent?

A. What?

Q. You said: "If one is not an owner of a property and trying to sell it, then that person is an agent." I'm just wondering where you got that whoever's just trying to sell a property if they don't own it is considered an agent.

A. We would have looked it up.

Q. When you say "we," who do you mean?

A. I worked with my attorney.

Q. Where would you have looked it up?

A. Google search. Would have looked up the

legal definition of those words.

Q. A Google search that Aires was the agent for the Gonrings?

A. No. Google search for what a seller and an owner are.

Q. And that's how you came to the determination that Aires would be or if someone's not an owner trying to sell it would be an agent?

A. I'm not sure what you're trying to get me to say. What are you asking me?

MS. OSHANA: Just rephrase it. She's obviously -- just rephrase it.

MR. KOJS: We'll move on. I might come back to it.

BY MR. KOJS:

Q. All right. We'll move on from that. If you wouldn't mind looking at the screen up there. We'll mark this as Exhibit 9. Have you seen this Excel sheet before?

A. Yes.

Q. So your attorney provided this to us I think last Friday. Did you create this Excel sheet?

A. Yes.

Q. You yourself or did you have any help with

it?
A. I created it myself. I took something that the HOA had created and added to it.
Q. And all the way at the top it's titled "Area 1 2726 West Cortez Unit 1 Expenses"?
A. Yes.
Q. Then "Building Repairs and Unit 3 Work"?
A. Yes, that's what it says.
Q. All right. See where I'm highlighting it says "Special Assessment Date"?
A. Yes.
Q. Then "October 17, 2018 Mold Solutions"?
A. Yes.
Q. This is kind of what we talked about earlier; correct? You had to hire a mold solution company?
A. That's right.
Q. It says "Unit 1 Responsibility." That's you?
A. Yes.
Q. It has the number $5,926.36 paid in full?
A. That's right.
Q. That was out of a total contract from Mold Solutions for $13,469?
A. Yes.
Q. So was this for your unit directly or was it

for the building as a whole?
A. This was for the building and this was for Unit 3.
Q. Was this like a special assessment?
A. That's what it says.
MR. McCARTHY: Are you able to share your screen?
MR. KOJS: Yeah. I thought I was. It says I'm sharing.
MR. McCARTHY: But it's showing the interrogatories not the spreadsheet.
MR. GOOD: If you'd like, I could be of some assistance here. I have the spreadsheet. I think I can try it.
MR. KOJS: Do you see it now?
MR. GOOD: There it is.
MR. McCARTHY: Yes, we can see it.
MR. GOOD: Yes.
BY MR. KOJS:
Q. So for the $5,926.36 that you paid, did you pay the HOA for them to pay the contractor or did you pay Mold Solutions directly?
A. That's correct. The HOA paid the bills.
Q. Okay. So you sent like a check or a wire to

the HOA?
A. That's correct.
Q. All right. Then the next one, masonry work, March 26, 2019 has your responsibility as $61,919; correct?
A. Yes.
Q. Again, that was paid directly to the HOA?
A. That's correct.
Q. It was a special assessment?
A. That's what it says.
Q. And then April 27, 2019 "Structural exploratory and structural engineer, steel beams to rebuild ceiling, roofing, floor of Unit 3;" correct?
A. Yes, it does.
Q. Your responsibility, $4,628.80?
A. Yep.
Q. Again, that was paid to the HOA?
A. That's correct.
Q. Going back a second, sorry, masonry work, was that -- any of that for your specific unit?
A. That's correct.
Q. There was none for your --
A. No, there were absolutely things for my unit on that. Those were limited common elements, windows and

doors.
Q. Common elements?
A. I said limited common elements, windows and doors.
Q. And that would be for the other units too though?
A. That's correct.
Q. And then the 4-17 2019, like I said, you paid 4,628. Was any of that for your specific unit?
A. It was for the roof of Unit 3. It was for the roof of the building.
Q. Again, that was a special assessment?
A. Yes, it was.
Q. The next one, June 26, 2019, "Truss work plus roof replacement," you paid $42,116.80?
A. That's correct.
Q. This was a special assessment?
A. Yes, it was.
Q. Was any of that for your specific unit?
A. Yeah. The issues were with the structure. The structure comprises Unit 1, Unit 2, Unit 3. All of these repairs were done for Unit 1, Unit 2 and Unit 3, so yes, it was done for my unit.
Q. Okay. I don't need argumentative responses

Page 74

though. I'm just asking questions.
A. Yes, and you're leading me to try to get me to say something that you're going to come back and tell me in court was wrong.
MS. OSHANA: It's okay.
MR. KOJS: I'm not. I'm just trying to --
MS. OSHANA: Don't worry about it.
MR. KOJS: I'm just trying to confirm the Excel sheet.
MS. OSHANA: It's okay. She's -- it's okay.
BY MR. KOJS:
Q. And Unit 2 and Unit 3 paid into part of that --
A. Yes.
Q. -- the truss work?
Next one, January 21st, 2021, "South facing terrace roof replacement Unit 2 and Unit 1 responsibility." You paid $2,831.40?
A. Yes. I was having water leaking in my ceiling.
Q. Okay. This one was just -- based on the description it was just for Unit 1 and Unit 2?
A. I had water coming in my ceiling from those terraces.

Page 75

Q. Okay. But for purposes of paying this $6,000 bill, was this just you in Unit 2 or Unit 3 as well?
A. All three units paid.
Q. This was a special assessment?
A. That's correct.
Q. And you paid the HOA directly?
A. Yes.
Q. All right. August 8, 2021, "Refinish building front door," you paid $490.60; is that correct?
A. Yes.
Q. This was a special assessment?
A. Yes.
Q. You paid the HOA directly?
A. Yes.
Q. March 9th, 2022, "Heat trace cable installation main roof," you paid $2,882?
A. We've not done that work yet.
Q. This, again, though -- once the work is done and paid for it would be a special assessment?
A. Yes.
Q. And you would pay the HOA?
A. Yes.
Q. And then you have your Unit 1 total financial responsibility for building repairs $120,79.96?

Page 76

A. That's not total financial responsibility. The front steps aren't on there and the front window replacements aren't on there yet.
Q. Okay. So that would be a special assessment for everybody?
A. Yes.
Q. Do you know how much those are gonna cost?
A. Yeah. They're down below.
Q. Okay. This next headline, "Area 2 Unit 1 Additional Financial Responsibilities Related To Lawsuit Including Legal Fees, Loan on Interest and Other Expenses." Then June 20th, "Rebuild of interior Unit 3, that's $12,672?
A. Yes.
Q. You're not paying any of that; is that correct?
A. I haven't paid it.
Q. Is that going to be a special assessment?
A. I need to work with my attorney on that.
Q. Is Unit 3 asking you to pay some of that?
A. I need to look --
MS. OSHANA: I think so. I think he is asking. I have to look at the e-mails. I don't remember.

Page 77

BY THE WITNESS:
A. I have to reread the condo guidelines.
BY MR. KOJS:
Q. Okay. "Attorney Fees To Date HOA Lawsuit Versus Aires Insurance, $2,530." Is that a special assessment?
A. Yes.
Q. That hasn't been paid yet at all?
A. That was paid.
Q. Was that 2,500 your share or the total?
A. My share.
Q. And you paid the HOA directly?
A. That's correct.
Q. "Ongoing Accrued Interest," is that home equity loan?
A. That's correct.
Q. $8,855.74?
A. No, $18,855.74.
Q. Yes. Has that gone for payments for some of this stuff in here?
A. The home equity line of credit was taken out to pay for all the building repairs and the unit repairs.
Q. This 401(k) loan interest, accrued interest,

Page 78

$2,105.43?
A. Yes. That was a 401(k) loan to pay for the damages in Unit 1, 2, 3 and the building.
Q. That would have been a special assessment?
A. Yes.
Q. Next one, "Unit 1 Front Window Replacement South Facing, $19,750;" is that correct?
A. Yes.
Q. Is that a special assessment or is that yours?
A. No. That's a limited common element.
Q. But all three units are paying it?
A. No. That's my responsibility.
Q. Okay. "Ongoing Steve Heir Consulting Payments, $2,574.10"?
A. Yes.
Q. That's the Steve that came out and did an inspection we talked about earlier?
A. He's been working with us not only to do the inspection but to make sure the work was done in a workman like manner and to make sure that the completion of the work was done according to the specifications we issued in the statements of work.
Q. And that $2,574.10, is that total or just

Page 79

your --
A. That's my responsibility.
Q. And this is a special assessment?
A. Yes.
Q. You're paying the HOA directly for that?
A. Yes.
Q. "Ongoing Oshana Law Fees, 50,000;" is that correct?
A. Yes.
Q. Are you just paying that or is that part of the --
A. That's my responsibility. That's my agreement.
Q. Are you sharing that or is Unit 2 and Unit 3 involved with this or no?
A. No.
Q. "401(k) withdrawal, 100,630.20, $33,333.33;" is that correct?
A. Yes.
Q. Oh, the taxes owed is 33,000?
A. That's correct.
Q. That was to pay for some of this --
A. That's correct.
Q. -- on the Excel sheet?

Page 80

"Ongoing lawsuit, $1,000." It says: "No HOA component"?
A. So I also had Steve Hier working with me, so I have him -- I paid him another $1,000 for work for me related to this lawsuit.
Q. So this 1,000 is just you?
A. That's correct.
Q. And then "Replace Basement Storage Area In Basement Entry Area Door Frames, $1,364;" is that correct?
A. Yes.
Q. Is this a special assessment?
A. That's not been done yet, and it will be a special assessment.
Q. Okay. When it's paid, it will be directly to the HOA?
A. That's correct.
Q. "HOA Insurance Premium Increase Due to HOA Lawsuits, $10,584.64;" is that correct?
A. Yes.
Q. Is that a special assessment?
A. We voted as an HOA to increase the fees, the monthly assessments.
Q. It says: "Unit 1 Responsibility, $2,646.12"?

Page 81

A. That's per year, and it's been going on since 2020, so you have to multiply that out which is why it gets to $10,000.
Q. Okay. And that's -- everybody's contributing? Unit 2 and Unit 3 are contributing?
A. No. That's my responsibility.
Q. Unit 1 and Unit 3 are also paying a premium?
A. Their assessments went up as well.
Q. Then "Total Unit 1" or "Unit 1 Total Financial Responsibility as of 1-25-23, $277,735.63"?
A. Yes, that's my understanding.
Q. And that's just a total of all the numbers we just went through?
A. Yes.
Q. And then just above that: "Total Amount Of Additional Fees Related To Building Repairs As Of 11-4-22, $156,840.67"
A. Yes. So that's a summary of the second set of items we just went through.
Q. Okay.
A. So the orange line is the total amount.
Q. Just to confirm, you're not a real estate agent or never have been?
A. Correct.

Q. You don't have any sort of real estate license or any sort of certificates with real estate?
A. No.
MR. KOJS: All right. That's all I have for now. Thank you.
Anybody else want to ask questions?
MR. FINFER: Could we take a short, maybe ten-minute break? I'm trying to figure out how to do this in light of the hour.
MR. KOJS: Yeah, that's fine.
MR. GOOD: I have some questions as well.
(WHEREUPON, a break was taken.)
CROSS EXAMINATION
BY MR. GOOD:
Q. Earlier in the deposition you discussed the buyer's inspector that was retained by you and your realtor. Do you recall that?
A. Sorry. Who's speaking?
Q. I'm sorry. My name is Ross Good. I represent the Third-Party Defendants John Gorr and the Condominium Association.
A. Okay.
Q. I'll just reiterate. My question was do you

recall earlier in the deposition discussing the Buyer's Inspection Report generated by the inspector retained by yourself through your realtor?
A. You're asking about the Unit 1 inspection report?
Q. Yes, the one that was done prior to the purchase by you.
A. Yes.
Q. Do you recall disclosing that report to either the Gonrings or the Condominium Association prior to the purchase going through?
A. I don't recall.
Q. Do you recall discussing that with your real estate attorneys at the time?
A. Yes, I did.
Q. Do you recall discussing the water issue in the basement area with them?
MS. OSHANA: Who's them?
MR. GOOD: I'm sorry. What did you say?
MS. OSHANA: Who's them? You said them.
MR. GOOD: I'm sorry. I'll rephrase.
BY MR. GOOD:
Q. Do you recall discussing the water issue identified on that prior inspection report with anybody?

A. Yes. I shared the report with my attorney.
Q. Other than your attorney did you share it with anybody else?
A. The report?
Q. Yes, that's what I'm asking about.
A. I don't recall if it was shared with the Gonrings or not.
Q. And prior to purchasing the property was it shared with the Condominium Association, to your knowledge?
A. Not to my knowledge.
Q. Do you recall any correspondence drafted by your attorney referencing the basement water that was located?
A. There was a credit at closing that I believe might have been related to that.
Q. Did that credit reference anything in the buyer inspection report?
A. Yes.
Q. And did it reference the water damage in the common area?
A. I don't know. I'd have to look at the report or at the request.
Q. Were there any requests for remediation to

the Condominium Association for the common area water that was located by the buyer's inspector?
A. I don't know what the -- what was relayed to the HOA.
Q. I'm not going to put the exhibit back up, but on the spreadsheet you were shown before we went on break the HELOC was discussed. Do you recall that?
A. Yes.
Q. And HELOC stands for home equity line of credit; correct?
A. Yes, it does.
Q. And the home equity line of credit that's on the line item for that spreadsheet, that's a home equity line of credit for your unit; correct?
A. That's correct.
Q. And the 401(k) withdrawal on the line items is your own personal 401(k); is that correct?
A. Yes, it is.
Q. Were you instructed by anybody from the Condominium Association to take out a withdrawal from the 401(k)?
A. No.
Q. Were you advised of the tax implications from anybody at the Condominium Association?

A. In the Condo Association?
Q. That was my question, yes.
A. No.
Q. One of the line items for the work not done yet was for the replacement of the basement storage area and basement entry area door frames. Do you recall discussing that before going on break?
A. Yes.
Q. And the quote was provided by Renner & Renner and Allendorfer. Do you recall that?
A. Yes.
Q. Are those two different companies or is that all part of Allendorfer's company?
A. No. Those are different quotes from different contractors.
Q. And were those different quotes obtained by the Condominium Association?
A. Yes.
Q. And was the door frame issue something noted on the Buyer's Inspection Report prior to your purchase of the unit?
A. I would have to look at it but I believe so.
MR. GOOD: I have no further questions.
MR. FINFER: I'm ready to go unless someone

needs another break.
THE WITNESS: Okay.
MR. FINFER: Are we all good?
THE WITNESS: Yes.
MR. FINFER: All right. Good afternoon, Ms. Young. My name is Jordan Finfer. I'm the attorney for the Gonrings.
THE WITNESS: Hi.

CROSS EXAMINATION

BY MR. FINFER:
Q. I'd like to start by showing you -- I apologize, Kevin, if you marked this as an exhibit already, but I don't have it in my notes. What I want to show you is the Aires Seller Disclosure Statement. Can you see this?
A. Yes.
Q. Do you recall receiving this statement?
A. Yes.
Q. I'm scrolling down to the second page. Item 6 where it says "Structural Items" --
A. Yes.
Q. -- do you see that?
A. Um-hum.
Q. I can zoom in if it's helpful.

A. I see it.
Q. The question is: "Are you aware of any past or present water leakage in the house or other structures." And the answer by the Gonrings was: "Unit 3 had leaks on west facing windows. HOA building to -- HOA sealed building to resolve Unit 3 leak." Do you see that?
A. Yes.
Q. What, if anything, did you do to investigate that issue further prior to closing on the property?
A. I don't recall.
Q. Do you recall doing anything?
A. I just said I don't recall.
Q. Is there something that might refresh your recollection?
A. You know, I relied on this document and them to tell the truth about this. This is a lie. There was not a leak in Unit 3.
Q. Explain to me why --
A. There was water coming in the north, the west and the east side of the building, so there was no leak in just the west side. There was not just a sealant put on the building. There was flashing installed on my unit sliding door. There was caulking done, and the sealing

was to the entire building, so this is a lie.
Q. When did the building learn of these additional leaks that you just mentioned?
MS. OSHANA: Hold on. Objection. Vague. When you're saying "the building," you mean the Association?
MR. FINFER. Correct, yes.
BY THE WITNESS:
A. They've been aware for several years. 2012.
BY MR. FINFER:
Q. I'm sorry?
A. 2012.
Q. Well, you testified earlier that substantial work had been done from 2012 all through 2018; is that correct?
MS. OSHANA: I don't recall that.
BY THE WITNESS:
A. I don't recall saying that. I said it had been -- there had -- some work had been done, and it hadn't been done well and it had been done poorly.
BY MR. FINFER:
Q. Okay. So going back to my original question regarding this Disclosure, did you take any steps to investigate water leaking in the building prior to

closing?
A. I asked several times in my attorney review letters whether there had been water in the building, and I was told there was nothing or they neglected to answer the question which is lying by omission, so yes, I did.
Q. So other than the attorney review letters where Aires said they're not the seller and can't make any representations did you take any other steps to investigate the water leaks in the building?
A. Yes. I had asked the HOA as well whether there were issues with the building.
Q. And what did the HOA tell you?
A. They lied. You'll have to look at the HOA disclosures.
Q. So other than your attorney review letters and your inquiry into the HOA regarding leaks in the building did you take any other steps?
A. I can't recall.
Q. Is there anything that would refresh your recollection?
A. I don't know how to answer that question.
Q. Is there something I could show you that might help you recall?
A. I just told you to pull up the HOA 22.1,

didn't I?
Q. All right. So besides the HOA 22.1 is there anything else?
A. No.
Q. So it's fair to say that prior to you purchasing the unit you were aware that there had been leaks in Unit 3; correct?
A. No. This isn't a leak. This is not a leak. This is water coming from all three sides of the building and the roof. This is not a leak. I relied on them telling the truth. This is not true. This was not a leak. The e-mails between the Gorrs and the Gonrings and the Browns, he's saying water's coming in everywhere, water's coming in the building, water's coming in my unit, water's coming in Unit 1.
Q. So is it fair to say that you had been informed that there, whether you agree with the statement leaks or not, that you had been --
A. No, I don't agree.
Q. You weren't informed that there were leaks in Unit 3 before you closed?
A. There was not a leak in Unit 3. I just answered that question.
Q. Were you informed that there was water

infiltration in Unit 3 prior to closing?
A. No. They told me it was a leak.
Q. Okay. So the distinction here is that a leak to you doesn't mean water infiltration, is that what we're talking about?
A. The distinction here is you're trying to get me to say something so you can come back and tell me in court it wasn't right. The answer to you is still no. They told me it was a leak. That is not true. There was water on three sides of the building. They were coming in the walls, the doors, the windows, the roof, the vents.
Q. All right. So I understand that your issue is that leak doesn't adequately describe the magnitude of the problem?
A. Yeah, and it says it was remediated and it wasn't.
Q. And when did you learn that it wasn't remediated?
A. When I read the e-mails from John Gorr that said they had -- the Gonrings, John Gorr and the Browns said that Arrow had to come back and do some additional work on the unit and the building after they had done the original work in June.

Q. Are you aware what split face block is?
A. I am now.
Q. And do you recall seeing that the building was split face block in the inspection report prior to closing?
A. Yes.
Q. And prior to closing did you investigate what was required to maintain split face block?
A. Yes to maintain it. No for the repairs. No one did any repairs in the HOA. They put their heads in the sand. They didn't do the work, and the reason that they didn't do the work is why this is a complete nightmare. I relied on their statements that they were continuing to do work that needed to be done on the building. They didn't do that.
Q. I want to show you -- I can't tell. Are you seeing these meeting minutes from May 7, 2018?
A. Yes.
MS. OSHANA: Are you introducing this as an exhibit?
MR. FINFER: I'm sorry?
MS. OSHANA: Are you introducing this as an exhibit?
MR. FINFER: Yes. We can mark this as Gonring

Page 94

Exhibit 2.

Gonring Exhibit 1 should be the Aires Disclosure. I don't believe it was shown by counsel for Aires.

BY MR. FINFER:

Q. Do you recall seeing this document as part of the Disclosure prior to closing?

A. Yes.

Q. All right. And do you see that there was discussion regarding sealing the building at that time?

A. Yes.

Q. You further see that scope of work included spot grinding, tuckpointing, caulking, flashing and sealing of east, west, north elevations of the block; right?

A. Yes.

Q. So prior to closing you were made aware that the building had not been sealed since 2012; correct?

A. A building that is well maintained should not have to be sealed between 2012 and 2018. I was under the impression that they had been doing the appropriate work on this building. I relied on their representations, and if you go look at the e-mails around this particular document that was produced, Kelsey was very specific

Page 95

about the fact that oh, I'm just gonna put together a small document, I'm not going to say a whole lot, I'm going to keep it slow and then we're not going to talk about the water because they didn't bring it up. Of course, I did bring it up. I brought it up several times, and they lied.

Q. That wasn't really my question. My question was as of receiving this document which you received prior to closing you were aware the building --

MS. OSHANA: Wait. Objection. Which document? Which document?

MR. FINFER: The document that's up right now.

MS. OSHANA: You're saying you think my client received Exhibit 2 before closing?

MR. FINFER: Carol --

MS. OSHANA: Wait. I just want to --

MR. FINFER: She testified that she --

MS. OSHANA: No. No. No. She never testified she received this document before closing.

MR. FINFER: Carol, Carol, we cannot -- we cannot have speaking objections.

MS. OSHANA: My objection is you are -- you're incorrectly describing her previous testimony. She did not say that she received the May 7, 2018 meeting

Page 96

minutes -- I didn't hear that answer.

Answer the question. You can answer it. Go ahead. Did you receive this before closing, this May 7, 2018 document?

BY THE WITNESS:

A. I don't know.

BY MR. FINFER:

Q. All right. So I'm going to show you here. This is the top of the document. You testified before that you did but you don't recall --

MS. OSHANA: No, she didn't. I didn't hear that.

MR. FINFER: Carol, come on.

MS. OSHANA: Hold on a second. Hold on a second. You're not putting words in her mouth. I'm sorry.

If you can show me an e-mail -- where's the e-mail that's -- because obviously there's the attorney review letter. Is there an e-mail to that? I want to see it.

MR. FINFER: Yeah, here it is. I pulled it up. This is the same document. It says "Association Documents To Buyer 2726 West Cortez, Unit 1 Aires, Ms. Sgariglia." It was produced in discovery, and by the

Page 97

way, it is acknowledged that it was received in a request to admit prior to closing.

MS. OSHANA: I want to see.

MR. FINFER: It was provided by Hawbecker & Garver. Meeting Minutes, Rules and Regulations for the new Association that were sent to Ms. Young.

MS. OSHANA: Wait. You have to go back up. I have to read it. You're going too fast.

MR. FINFER: That's fine.

BY MR. FINFER:

Q. Ms. Young --

MS. OSHANA: Wait. No. No. No. I have to read the doc. It's not my fault that you didn't bring the docs here. If you're going to do that, I need a minute. You have to let me read it. You should have brought documents. I understand you're sick. That's totally fair. I get it. But you could easily have just asked counsel to print these for you, so now you have to give me a second. Hold on.

MR. FINFER: That's fine. I can e-mail it to you as well if that would be helpful.

MS. OSHANA: No, it's not. I didn't bring my laptop. If you would have told me ahead of time, I would have, but you didn't tell me, Jordan, so no, you have to

Page 98

wait a minute.

What number is this exhibit?

MR. FINFER: It's my Exhibit 2.

MS. OSHANA: Exhibit 2 is the May 7, 2018 letter and this document, this Friday, June 29th?

MR. FINFER: I'm only trying to demonstrate through this top one here that it was sent prior to closing.

MS. OSHANA: I understand that, but this particular e-mail dated June 29, 2018 are you saying is Exhibit 2? I just need to do it for my notes and for the dep.

MR. FINFER: Yes.

MS. OSHANA: Okay. So we have as Exhibit 2 the May 7, 2018 letter and this June 29, 2018 e-mail; correct?

MR. FINFER: That's correct. It's all part of the same document.

MS. OSHANA: Okay. So hold on a second.

(Brief pause.)

Okay. Go on.

MR. FINFER: So just scrolling down.

(Attorney scrolling.)

And this is from the paralegal for Ms.

Page 99

Young's real estate attorney.

MS. OSHANA: Okay. Go ahead.

(Attorney scrolling.)

Okay. What was your question?

BY MR. FINFER:

Q. Can you confirm that you received this prior to closing?

A. Yes.

Q. Okay. And when you reviewed this, were you aware then that the Association had not sealed the building since 2012?

A. No. This was also done on May 7th.

Q. 2018. You closed three months later; correct?

A. Yeah, and this is before they signed the Disclosures --

Q. In response to receiving --

A. -- so they knew there was water issues.

Q. The Disclosures were signed in June of 2018 but not that it matters. My question to you is did you take any steps to investigate the condition of the building in light of the fact that it hadn't been sealed in over six years.

MS. OSHANA: That's --

Page 100

BY THE WITNESS:

A. I relied on them telling the truth that they were doing the appropriate maintenance that needed to be done to the building, and they lied.

BY MR. FINFER:

Q. What in this document is a lie? What in this document is not truthful?

A. It doesn't talk about which units are having the flashing installed. They then filled out the Disclosure that said they weren't aware of any issues with water in their unit. This sounds to me like they were doing regular maintenance on the building. They were not doing regular maintenance on the building.

Q. But it's fair to say that in response to receiving these meeting minutes you did not take any further steps to investigate the condition of the building?

A. I trusted that they were gonna tell the truth.

Q. Please just answer my question. Did you take any further steps to investigate the building in response to these meeting minutes?

A. Yeah. Yeah. I asked them to fill out the Disclosures. I asked in the documents between my

Page 101

attorney and their attorney whether there had been water infiltration in the building. I asked whether the HOA had made any claims against the building. I did. I did investigate, and I was lied to.

Q. Other than being told that there was leaking in Unit 3?

A. There was no leaking in Unit 3. There was water pouring in the entire building including the limited common elements, the walls and the doors.

Q. I'm now sharing with you meeting minutes from September 10th, 2018. Can you see this?

A. No. You'll need to make it bigger. I can't read it.

Q. Okay.

MS. OSHANA: Which exhibit is this, 3?

MR. FINFER: I don't know if this was shown. This would be my Exhibit 3. I don't recall this being shown.

MS. OSHANA: No, I don't think it was. So can you go to the top so I can note it, what it is?

MR. FINFER: Yeah. Just one second. So it's Gorr production 249 through 250. I'll scroll to the top.

MS. OSHANA: Right. But it's the September 10, 2018 meeting minutes it looks like between

John Gorr, Melinda and Ryan Brown. Okay. This is Gonring Exhibit 3?

MR. FINFER: Yes.

BY MR. FINFER:

Q. So do you recall attending this meeting, Ms. Young?

A. Yes.

Q. And do you recall this particular note wherein what was discussed was that to the best of the building's knowledge the damage was due to water infiltration through the split face block prior to the building being sealed on May 31st, 2018?

A. Yeah. Now I know that's not true. There was still water coming into the building, and Arrow had to come back after they had the work done in June.

Q. Yeah, and no one's debating that they had to come back nor is anyone debating expenses associated with that. What I want to ask of you is what basis do you have to believe that this representation at the time it was made was false.

MS. OSHANA: What representation? Which representation?

MR. FINFER: Carol, just please object to vagueness. Where it says: "To the best of our

knowledge, the damage was due to water intrusion through the split face block prior to the building being sealed on May 31st, 2018."

BY THE WITNESS:

A. What's your question?

BY MR. FINFER:

Q. What basis do you have to believe that that representation is false?

A. I have all the e-mails. I have -- we saw that there's water coming in after they had the building sealed. There's --

Q. So when you sat in this meeting, it's your position that Gorr and Brown were lying about what they thought had been accomplished by the sealing?

A. Absolutely.

Q. What support do you have for that?

A. Well, I have the ESI report. I have the Arrow report. They speak English so do I. I have the neighbor's testimony. They lied throughout the whole transaction, so all the Disclosures are lies. I have lies about who the seller actually is.

Q. But other than these general statements about grand conjectures of lies is there any specific thing that you can point to that indicates that Gorr, Brown or

the Gonrings believed that there was still water intrusion after sealing on May 31st, 2018?

A. Yeah.

Q. What about the fact that the next item here says that: "The water damage around the perimeter is dry indicating that current sealant is preventing further water intrusion"?

A. Well, that was wrong.

Q. Yes, but was it a lie?

A. Yes.

Q. By whom?

A. All three unit owners conspired to get out of this sale because they knew that there was so much damage to this building that it was gonna cost an enormous amount of money to get this done. All three of them put their buildings up for sale or their units up for sale within six weeks of each other. They lied.

Q. So the basis for the lie is because they happened to put their, listed their units for sale around the same time?

A. Oh, my God.

MS. OSHANA: Objection, mischaracterizes her testimony.

MR. FINFER: I'm trying to figure it out.

MS. OSHANA: We just gave you the answer, Jordan. You just don't want to listen.

BY MR. FINFER:

Q. Are you aware that the reason that the Gonrings moved is because they were relocated for work?

A. So?

Q. Well, doesn't that cut against your theory that this was some conspiracy for them to get out all at the same time?

A. Not at all. This was a convenient way for them to get out of it.

Q. Okay. But you don't have support for that position; that's just what you've come up with?

A. Not at all. I have the testimony from the neighbor. I have Gorr, Brown saying we're not sure whether you knew this or not but there's been significant water issues with the building and the units since 2012. I have all the e-mails between the unit owners. I have the Gonrings saying yeah, we would have sued the former owner Mulligans; we should have done that.

Q. Going through this report further, it talks about mold testing in Unit 3 and that there's mold in Unit 3. Do you see that?

A. Yes.

Q. Can you explain how mold in Unit 3 has any impact on Unit 2 and Unit 1?
A. Yeah, I have e-mail from the Mulligans saying that they had mold in Unit 1 and that there was water infiltration where the windows and the door well openings are in the building, and I can't afford to open my walls yet, but we'll see what's there when we open them.
Q. So I just wanted to confirm this but you would agree that to date you've not discovered any mold in your unit; right?
A. Not yet, but there's water coming in.
Q. The water that you referenced coming in, I think that was on your damages spreadsheet, that's recent; correct?
A. No, it's not.
Q. Was it 2019?
A. I've had water coming in since the fall of 2018.
Q. I'm sorry. I don't see any items listed for repair work to Unit 1 for water coming in in the fall of 2018.
A. Yep, that's -- I just told you I can't afford to replace the windows.
Q. So here -- we have meeting minute here from

September of 2018 which is fall. At what point did you have water coming into Unit 1?
A. October, November and then after that.
Q. Is water still coming in?
A. Yes, it is.
Q. I'm sorry?
A. I said yes.
Q. Have you ever actually obtained a mold test for Unit 1?
A. I just explained to you I don't have the money.
Q. Are you aware that a mold test costs $500?
A. Are you aware how much money I've already spent to fix this fucking building?
Q. But you've never conducted a mold test for Unit 1?
A. I don't have the money.
Q. So no?
MS. OSHANA: Not yet.
BY MR. FINFER:
Q. Is this showing here? Can you see this?
A. Yep.
Q. Okay. So just for the record -- and this will be Gonring Exhibit 4. This is Gorr production 2044

through 2045.
Do you recall receiving this e-mail?
A. Yes.
Q. Do you see where at that time Gorr was telling you that the work was concluded regarding the sealant?
A. Yes. That's a lie.
Q. Do you think this is a lie where Gorr says we are fairly confident that the water stopped getting into the building?
A. That's a lie.
Q. Is it a lie or do you think he just misunderstood what the -- the success of the Arrow Masonry work?
A. Look at the e-mails. It says it's a building problem. There is water coming in at the wall openings. It is a lie. They had ESI come in, a structural engineer, and tell them what was wrong with the building, and they didn't do a thing to fix it, and anything they did do actually made it worse.
Q. So the basis for you believing that Gorr was lying to you is because the ESI report showed different issues?
A. The ESI report shows issues that they never

addressed. I don't know what you're asking me.
Q. Have you talked to the -- what's the name of the owner, the current owner of Unit 2?
A. Kristen Keene.
Q. Do you know what was disclosed to Kristen Keene?
A. No.
Q. Excuse me. I can withdraw that. That's a bad question.
Do you know what was disclosed to Kristen Keene prior to her purchasing the unit?
A. No, I don't.
Q. Do you know if there was some discount on her purchase price given the potential water infiltration issues in the building?
A. Yes, I do.
Q. And do you know what that was?
A. What what was?
Q. That discount.
A. I don't recall the number. I'd have to look at the documents.
Q. What document would you look at?
A. Whatever information was shared with her and whatever document was shared that had the discount that

you're discussing.
Q. I want to show you what we'll mark as Exhibit 5.
A. Can you please make it bigger.
Q. Yes. B. Allendorfer is the company that the Association used to address all of the issues that you believe exist in the building?
A. We hired them to fix the building issues that we're aware of.
Q. Okay. And so what I'm looking at here -- and this is something that you produced Bates stamped as 645, Plaintiff's Bates stamp 645. So the first thing that was paid for was remove the existing drywall ceiling in Unit 3, remove the existing drywall ceiling and walls in Unit 2, remove all debris resulting from our operation on the premises. Is this something that you had to pay for as part of a member of the Association?
A. Yeah, the bylaws state that if the HOA is negligent they are required to pay to remediate.
Q. So who at the Association determined that the HOA was negligent and thus responsible for all repairs to the building or any unit for that matter?
A. Anyone who could speak English.
Q. Yeah, but was there a vote at a meeting to

make that determination?
A. I don't recall, but yes, we came to that conclusion. I mean it's pretty clear from the fact that all the e-mails that John Gorr has been producing to me that the HOA was pretty negligent. They didn't do any work. They didn't do anything to fix this. They just let it sit and sit. They ignored the problem and they put their heads in the sand.
Q. Other than the sealant in 2018?
A. I don't know what your -- what's your question?
Q. I want to make sure I understand the point here. So you paid for work done in Unit 3 because collectively the Association decided -- because they had been so negligent in maintaining Unit 3 that the entire Association should be responsible for the repairs to Unit 3?
A. No, that's not what I'm saying at all. I'm saying if damage is caused to a unit by negligence of the HOA, it's the HOA's responsibility to remediate the issue. Read the bylaws.
Q. So have you sued the HOA?
A. Well, the Gonrings have done that.
Q. Yes, but if it is the HOA's negligence that

has caused you to incur damages or has breach of fiduciary duty, what does that have to do with the Gonrings?
MS. OSHANA: I'm going to object. You know, you're asking legal analysis of my client. You want to ask me, I'll tell you. Ask me. You're asking her for a legal analysis. She's not a lawyer.
MR. FINFER: Carol, just say objection, calls for legal conclusion --
MS. OSHANA: Thank you.
MR. FINFER: -- and then have her answer anyway.
MS. OSHANA: I'd be delighted to answer it.
BY MR. FINFER:
Q. Ms. Young, can you answer the question, please.
MS. OSHANA: I just told you she's not a lawyer. I'm going to object. It asks for a legal conclusion.
MR. FINFER: I'm not -- look --
MS. OSHANA: If you can answer.
MR. FINFER: I'm asking the question because -- Carol, I'm asking the question because she is a member of the Association and she has just testified

that the Association made a legal determination that the Association should be responsible for all the repairs to Unit 3. It is also the basis for almost the entirety of the damages claim asserted against my clients, so I certainly have the right to dig into that issue.
MS. OSHANA: You absolutely can.
MR. FINFER: That's what I'm trying to figure out.
MS. OSHANA: I didn't say you can't dig, but you can't ask her to answer legal questions. She doesn't know.
BY MR. FINFER:
Q. Have you considered pursuing claims against the Association, Ms. Young?
A. Yes.
Q. Is that something you intend to do?
A. That's something that I'll work on with my attorney.
Q. Okay. But is your position that the reason you paid for work done in Unit 3 was because of the HOA's negligence in maintaining the building?
A. Yes.
Q. Okay. I'm going to scroll down here. This is an 18-page document but it's many purchase orders. I

just want to ask you about each of them.
This is for June 5th, 2019. The work here -- can you see this okay?
A. Yep.
Q. So I'm highlighting this because from my review, this again has nothing to do with Unit 1 and this is work associated with Unit 3.
A. That's not true.
Q. And my question to you again --
A. This is for the roof. The roof belongs to, to the building.
Q. Right. It was the HOA's obligation to maintain the roof?
A. That's right.
Q. And its failure to maintain the roof is the basis that you are seeking to recover these damages now; correct?
A. I'm recovering damages because they lied to me about material issues with the building that they were required to disclose and they did not do that. They were required to disclose issues with the wall openings that are limited common elements. They did not disclose that. They know of materially evident information that affects the value of my unit. This materially affects the value

of my unit.
Q. Okay. But we're agreeing that the roof is a common element; correct?
A. The roof is a common element.
Q. And that the work here that was paid to Allendorfer for $27,500 was for roof repair; correct?
A. Yes.
Q. So this next item is for mortar and sealant maintenance to all glass block openings. This was the work that was previously performed by Arrow; correct --
A. No.
Q. -- the sealant?
A. It didn't say -- it says the -- no, the Arrow contract doesn't say that they applied sealant to glass block openings. It also doesn't say that they performed mortar to glass block openings. That's not what the Arrow contract says.
Q. Okay. So in your mind, this is just different work altogether?
A. This is work that should have been done.
Q. Okay. So the next item here is front stoop to be constructed with lower beam walls and steel railings?
A. Yup.

Q. What does this work have to do with something that wasn't properly disclosed?
A. They were, they were aware of issues that materially affected the value of my unit. They're required to disclose that. There was significant water damage to the stairs that was caused by the glass -- by the split face block. They are required to disclose issues that they are aware of that would materially affect the value of my building.
Q. So it's your position that the Association was aware of damage to the front steps, front stoop and didn't disclose it?
A. That's right.
Q. And that's your position because you believe the Association was aware of water infiltration generally to the building and should have known the causes of that would have included damage to the front stoop?
A. That's correct. And they lied the entire time.
Q. So this is another scope of work here which is again specific to Unit 3. Can you see this okay or do I need to zoom?
A. Zoom it in, please.
Q. You see where it says "kitchen and great

room"?
A. Yeah.
Q. So we agree that this is all work being done in Unit 3; correct?
A. That's right.
Q. And the reason that you paid for work that was being done to Unit 3 is because of the HOA's negligence in maintaining the common elements?
A. I didn't pay for this work.
Q. So I just pulled up the Allendorfer report which had all the work. I assumed --
A. You assumed wrong.
Q. Hold on.
(Brief pause.)
If you could look up here. What I was trying to do was figure out for the masonry work that accounts for $61,919 of your damages as to all that went into that.
A. You can pull up the quote from Allendorfer.
Q. Well, that's what I was doing. I was going through it. But that was a $15,000 item that you did not pay for?
A. No.
Q. But for purposes of this $61,919, this is all

Page 118

work that Allendorfer performed; correct?
A. Yes.
Q. Since I'm on this document, I wouldn't mind digging into it a little bit further. I think I have some of the answer based upon your prior testimony but nonetheless.
The first line item on here was the $5,926.36 for mold remediation which was mold remediation performed in Unit 3; correct?
A. No. There was mold in Unit 3 and there was mold in the walls and the floors and the joists.
Q. Mold in the walls of the entire building or mold in the walls of Unit 3?
MS. OSHANA: She said joists. I don't know if you heard her. She said floors and joists.
MR. FINFER: I did.
MS. OSHANA: Joists are obviously not in a unit.
BY MR. FINFER:
Q. Ms. Young, are you going to answer that question?
A. Would you please ask the question again.
Q. Yeah. Mold in the walls for the entire building or mold in the walls of Unit 3?

Page 119

A. There was mold in the building walls. There was also mold in Unit 3.
Q. Where was the mold -- was there mold remediation performed in your unit? I thought you already said there wasn't?
A. You asked me if there was mold in the building and I said yes. There's mold in the joists.
Q. Where was that remediation work performed?
A. Above and below and around Unit 3.
Q. So these were some limited common element and some common element repairs?
A. Yes.
Q. And they were limited common elements for Unit 3; correct?
A. Yes.
Q. And so you believe that it is your responsibility to pay for this because of the HOA's negligence in maintaining the building?
A. There was negligence and there were limited or there were walls of the building that had mold in them that had to be fixed.
Q. Sure but that's a common element; correct?
A. Sure. That's a common element.
Q. And you believe that the mold in the common

Page 120

elements, the walls and the joists was the result of the building's failure to properly maintain the building; correct?
A. There were two issues. The building was improperly constructed which was not disclosed to me and the HOA never did anything to remediate the issues. The HOA is comprised of the Gonrings, Unit 1, Unit 2 and Unit 3.
Q. Bear with me for a second.
(Brief pause.)
THE WITNESS: Can I take a break while you're trying to find stuff?
MS. OSHANA: Can she take a break?
MR. FINFER: Sure. Ms. Young, you need to leave -- you need to take a break in 35 minutes?
THE WITNESS: Yes.
MS. OSHANA: I'm hungry too. Are we taking a lunch break?
MR. FINFER: Well, I figured we would just do that during that hour break.
MS. OSHANA: She has to attend a meeting for her kid.
MR. FINFER: Okay. Tell me what you'd like to do.

Page 121

MS. OSHANA: I'd like to get food because she can't really eat while she's in a meeting.
MR. FINFER: Well, I don't want you to be uncomfortable, Ms. Young. I don't have a strong preference other than I'd like to get this done today.
MS. OSHANA: How much time do you think you have?
MR. FINFER: I don't know, 45 minutes, an hour.
MS. OSHANA: Oh, yeah, we need a lunch break for sure. Why don't we just break now? Let's break now because it's 1:20. She's got to be on the phone in 20 minutes for her kid. It's probably going to last like an hour?
THE WITNESS: Yeah.
MS. OSHANA: So in the meantime, I'll go get some food for all of us. We'll eat and come back at 3.
MR. GOOD: 3:05?
MS. OSHANA: Your meeting is until 3?
THE WITNESS: I can't say for sure, but it's scheduled for an hour.
MS. OSHANA: Okay. This is for -- you know, she has no choice but to attend this meeting. Why don't we just -- are you guys like -- are you by your phones?

Page 122

Can we e-mail you and say okay, we're back or -- you know, is that possible?

MR. GOOD: I'm going to leave my Zoom window open.

MS. OSHANA: Can you do the same?

MR. FINFER: You want to e-mail one of us? I think we all plan on being back here at 3:05.

MS. OSHANA: Yeah, let's do that.

MR. FINFER: Okay.

MS. OSHANA: Okay. Thanks.

(WHEREUPON, a lunch break was taken.)

MR. FINFER: Is it possible to have the court reporter read back the last exchange?

(Requested portion of the record read.)

BY MR. FINFER:

Q. So I want to share what we can mark as Gonring Exhibit 6. Ms. Young, are you able to see this? I can zoom out a little bit if that's helpful.

A. Yes, I can see it.

Q. Would this be the purchase order for the mold work that was performed?

A. Yes, it is.

Page 123

Q. So I'm just looking at this invoice. Some of it is covered over by the check that was written. Just for the record, this is what was produced, so it's Plaintiff's Bates stamp 819. I see where the mold remediation work was performed all within the interior of the unit. I'm trying to get some clarity as to whether this was the extent of the mold work that was performed or if there's another invoice out there.

A. I can produce the invoice without the check on top of it, but the last -- 1, 2, 3 -- 5, it looks like it's "Sanitize exposed walls."

Q. And so this was what you were referring to when you were talking about the common elements?

A. I'll have to look at that. I can't read it.

MR. FINFER: Carol, is that something you could produce?

MS. OSHANA: Yeah.

MR. FINFER: Carol, is that something you could produce?

MS. OSHANA: Yeah.

MR. FINFER: Thank you.

MS. OSHANA: Um-hum.

BY MR. FINFER:

Q. I'm going to show you what, I don't believe

Page 124

it's been shown before, we'll mark as Exhibit 7 which is the Association's 22.1 Disclosure. Ms. Young, have you seen this document before?

A. Yes.

Q. Okay. And I want to call your attention to question 3 which asks if there's any reserves designated by the Association for any specific projects. The answer was: "No." Then with respect to question 4: "Are there any anticipated capital expenditures," and the answer is "No." Is it -- this document was signed by John Gorr. Is it your position that when he signed this document indicating that there were no anticipated capital expenditures that this was a lie?

A. They were lying.

Q. So it is your position that this was a lie by the Association?

A. Kelsey and John have e-mails back and forth about how they were going to fill this out. This is a lie.

Q. Okay. But this is signed just -- Kelsey didn't sign this document just John did?

A. Yep. Kelsey was telling John how to write it. They were part of the HOA. They colluded about how they were going to fill this out.

Page 125

Q. Just to clarify, I think the e-mail communication you were referencing relates to the sale of a different unit?

A. No, it does not.

Q. And really my question -- but regardless of what work product went into completion of this 22.1 Disclosure, it's your position that the representations made in here are false; is that correct?

A. Yes.

MR. FINFER: Was this marked as an exhibit, it must have been --

MR. KOJS: Yeah.

MR. FINFER: -- your damages?

MR. KOJS: Yeah.

MR. GOOD: It's Exhibit 9 for Plaintiff.

MS. OSHANA: Not for Plaintiff. For yours.

MR. KOJS: I said Plaintiff's exhibit.

MS. OSHANA: Oh, you're calling it Plaintiff's exhibit?

MR. KOJS: Yeah.

MS. OSHANA: Okay.

BY MR. FINFER:

Q. So I want to go back to the masonry work that we talked about a little bit in the Allendorfer post. I

haven't seen anything in the production that shows what the base $120,000 contract was for. What was produced is what we sort of went through, and I think that you recalled there was some work that was anticipated being performed for Gorrs' unit on the interior which you testified to that you didn't pay for. I didn't see anything with respect to the full contract scope of the 120,000.

A. Okay.

Q. Do you have that?

A. I sent it over. Yeah, I'll resend it.

Q. Well, I mean here's -- I just want to pull this up. This is what we had marked as Gonring Exhibit 5. I pulled this from your production. I could scroll through it real quickly but I don't see anything in here that accounts for the full 140 or $120,000.

A. Okay. I'll send it through.

MS. OSHANA: I think -- I'm pretty sure I sent it to you.

BY MR. FINFER:

Q. This is what you sent. I looked back during the breaks to make sure that I wasn't missing something, and it's also, for whatever it's worth, the same thing that the Association sent and so I can't figure out --

because if you look, for example, we have a previous contract total of 129, excuse me, $129,900 here, but if you go -- if you scroll through the entirety of this document, you never really get -- I think it might be a different contract. This is for roofing work.

A. Yep. Can you go back --

Q. This is for elevation tuckpointing.

A. Can you go back to the spreadsheet?

MS. OSHANA: Go back to the spreadsheet.

THE WITNESS: Can you scroll to the right?

(Attorney scrolling.)

Okay. I'll send the invoice again.

BY MR. FINFER:

Q. Yeah, you sent this check on April 9th for $60,000.

A. Yep.

Q. Since we're on this topic, the $60,000 -- I'm sorry?

MS. OSHANA: No, I was trying to figure out where we could find it but go ahead.

BY MR. FINFER:

Q. The check for $60,000 that you wrote, check 1004 --

A. Yes.

Q. -- did that come from your personal funds?

A. No. That's an HOA check.

Q. But you wrote a total of $60,000, no?

A. I have all images of all the checks that I wrote, and I can clarify which checks are for what. One side is HOA check, and one side is my check to the HOA.

Q. Let me see if I can show you this. Are you able to see this check here?

A. No.

Q. It's not -- hold on. I can't tell what's shared. Do you see the check --

A. Yes.

Q. -- that you wrote?

A. Yes.

Q. So this is on August 6, 2020. So I have this check. I have this check on April 25th, 2019 for 26,400.

A. Okay.

Q. I assume this corresponds with -- maybe it doesn't. I see on your spreadsheet that you have there was a check written from the Association for -- here we go. I see. So your initial deposit was 26,400?

A. I don't know. If you go back to the spreadsheet, every check number I wrote corresponds with the HOA payments, and I have images that I've verified

and validated in --

Q. So I think I understand you now. So this was -- the initial payment here was 26,400. Then there's another payment for $8,712 and another payment for 4,158 then another for 9,722?

A. Yeah, that's correct. There's an initial deposit, and then you had to make progress payments against that contract or against the work that was being done.

Q. Okay. And for the total of the $61,919 that you paid to Allendorfer did these funds -- did this money come from your personal funds?

A. Yes.

Q. So no one lent you money or no one paid this on your behalf?

A. No. You can see my home equity line of credit, my 401(k) withdrawal, my 401(k) loan.

Q. Okay. I don't know that we have all these checks but I'd ask that whichever checks --

A. You have all the checks. I have reconciled this six times.

MS. OSHANA: Was it in the one we just sent right now, the last one too?

THE WITNESS: Yes.

Page 130

MS. OSHANA: Did you get my e-mail on Friday?
MR. FINFER: Yes. That's what I have pulled up. So I've got three checks --
THE WITNESS: Okay.
MR. FINFER: -- from Ms. Young.
MS. OSHANA: Hold on. She's pulling them up for you.
THE WITNESS: So the HOA checks for this particular masonry work that was done 3-26-19 is in a folder that's been shared with you called "HOA Check Reconciliation."
MR. FINFER: I have it entitled "HOA Checks And Bill Payments."
THE WITNESS: Okay. I don't have it open in front of me, so I can't --
MS. OSHANA: You mean the drive?
THE WITNESS: Yeah.
MR. FINFER: I just want to make sure we're -- I believe you. I just want to make sure that we're not missing some production since we're all sitting here, you know, spending our time doing this. I don't want to have to come back.
MR. McCARTHY: This is Paul McCarthy. I've gone through the production too. I can't tie out all of

Page 131

the checks from Melinda's account, so I would echo the request just to make sure that we have within the production all of the checks that were written from her various accounts.
MS. OSHANA: I'll make sure -- she and I will go over it again and I'll make sure that everything -- if there's anything missing, I'll definitely get it to you. I'll just reproduce all those -- you're talking about those one, two, three, four -- is it ten checks?
MR. FINFER: Is there a way for that to happen while we're sitting here?
MS. OSHANA: Can we get -- do you think we can get on the drive?
THE WITNESS: How long do you want to sit here for?
MR. FINFER: Not much longer, but by the same point, otherwise, we're going to look at these documents and we're going to have to come back.
THE REPORTER: Do you want to go off the record?
MR. FINFER: We can go off the record.
(Discussion had off the record.)
I'm going to stop the share for a minute

Page 132

while you pull that up.
(Discussion had off the record.)
Ms. Young, are you able to sort of move the camera a little bit just so I could see you?
(Camera readjusted.)
Thank you.
BY MR. FINFER:
Q. All right. You have to bear with me as I try to work through some of this because I'm looking at it for the first time. I'm just going to start here. No particular reason.
These are images of alleged water damage in Unit 1; is that correct?
A. Water infiltration and water damage, yes.
Q. When were these photos taken?
A. Since 2018.
Q. These photos were taken in 2018?
A. Since 2018. There have been multiple occasions of water intrusion. These represent different times that water has been in my unit.
Q. It looks like there's some stamp on there from 2021?
A. As I said --

Page 133

Q. What do you --
A. -- the water has been infiltrating since the fall of 2018. These are different images of multiple occasions that water has been infiltrating my unit from those windows.
Q. What did you take these photos with?
A. Camera.
Q. Was it like an iPhone camera?
A. Yeah, an iPhone camera.
MR. GOOD: Jordan, could we go off the record for a second?
MR. FINFER: Yes.
(Discussion had off the record.)
So just to be clear, I received a PDF but what Ross had access to was the metadata you see on the right, so we're going to have to go through each photo and confirm the accuracy on this metadata.
BY MR. FINFER:
Q. If you look at the photo right here, this indicates that it was taken --
A. I can't see. Your faces are over the metadata.
MS. OSHANA: Can you make it smaller? Can you

move the metadata? Can these screens be --
MR. FINFER: You can move our faces too.
MS. OSHANA: He's moving them. Hold on.
(Brief pause.)
MR. GOOD: Can you see the right side of the screen?
MR. KOJS: Yeah.
MR. FINFER: Where did Ms. Young go?
MS. OSHANA: She's getting water.
BY MR. FINFER:
Q. Can you see this, Ms. Young?
A. Yeah.
Q. So you see that it says "October 7th, 2021"?
A. No.
Q. Do you see where it says "Info"?
A. Yep.
Q. Do you see below it says "2-23"?
A. Yes.
Q. Then below there it says "October 7, 2021"?
A. Yes.
Q. "6:35 p.m."?
A. Um-hum.
Q. Do you have any reason to believe that that date is incorrect as to the date of when you took this

photo?
A. No.
Q. I'm sorry. Was that a no? I didn't --
MS. OSHANA: She said no.
BY MR. FINFER:
Q. Okay. Let's go to the next one. Same question. Do you see here it says "October 7th, 2021 6:37 p.m."?
A. Yep.
Q. Is that date correct?
A. Yep.
Q. Okay. Let's do the next one. Same question. This says "October 7th, 2021 at 6:31 p.m"?
A. Yep.
Q. Do you have any reason to believe that that date is incorrect?
A. No.
Q. Okay. Next one. This says "October 7th, 2021 6:34 p.m." Any reason to believe that this date's incorrect?
A. No.
Q. Next one. This says "October 7th, 2021 6:37 p.m."?
A. Yep.

Q. Any reason to believe that -- is that date correct?
A. No.
Q. No, it's not?
A. No, I have no reason to think it's incorrect.
Q. Okay. Got it.
Let's go to the next one. This one says "February 7th, 2023"?
A. Yes.
Q. Do you have any reason to believe that that date's incorrect?
A. No.
Q. Do you have any more?
MR. McCARTHY: I don't mean to be the technological knuckle dragger here but where are you seeing the dates on these?
MR. FINFER: On the right-hand side where it says "Info."
MR. McCARTHY: Oh, I see. My Zoom window is over it.
MR. FINFER: Yeah.
MR. McCARTHY: Okay. Thank you.
MR. FINFER: Did we just go through all the photos there, Ross?

MR. GOOD: These two appear to be duplicates, so yes.
MR. FINFER: Okay. I think you can stop sharing.
MR. GOOD: Okay.
BY MR. FINFER:
Q. Ms. Young, would you agree that all the photos of the water filtration were taken on October 7th, 2021 and February 7th, 2023?
A. Those pictures reflect those dates.
Q. Are there others?
A. I've produced everything that I have. The Mulligans had water in Unit 1. John Gorr says there's been water infiltration in Unit 1. I'm seeing water infiltration in Unit 1. And why the hell did they flash the rear deck sliding doors if they weren't having water infiltration in their unit?
MS. OSHANA: He's just asking about the photos. Are those the only photos?
BY THE WITNESS:
A. As far as I know, those are the only photos.
BY MR. FINFER:
Q. Okay. All right. So the next thing I noticed I haven't seen before -- I'll share this. Can

Page 138

you see this document here?
A. Yes.
Q. For the record, this is an engagement letter between the 2726 West Cortez Condominium Association and Klein, Daday, Aretos & O'Donoghue, Attorneys-at-Law. This is a contract for legal services related to a demand to Arrow Masonry & Exteriors dated July 22, 2020. Did you ever enter into an engagement letter with Klein, Daday, Aretos & O'Donoghue?
A. The HOA did.
Q. And do you know if a demand was sent to Arrow Masonry?
A. Yes.
Q. And what came of that?
A. Nothing.
Q. Is this law firm still engaged to pursue a claim against Arrow?
A. They could be. I don't have any more money to pursue any legal action against anyone else, and I certainly don't want someone with an F on the Better Business Bureau rating to come back or have anything to do -- to touch this building. They did shoddy work.
Q. I'm not sure who you're referring to.
A. Arrow. Arrow Masonry.

Page 139

Q. Well, there has never been produced a demand letter by the Association to Arrow Masonry.
A. Okay. Ask the Association.
Q. Has any money been recovered from Arrow?
A. No.
Q. Do you know if there's any communication between Arrow and the counsel that you hired?
A. There is not that I know of.
Q. I'm at a bit of a loss because this is a -- separately is a claim on behalf of the Association against Erie Insurance Group.
A. Yes.
Q. Did the Association file a lawsuit against Erie Insurance?
A. I believe so, but you'd have to ask John Gorr. This was his work.
Q. What was the outcome of that lawsuit?
A. I don't recall.
Q. Did the Association recover some money?
A. No, not at all.
Q. What was the nature -- what was the nature of the lawsuit?
A. I'd have to go back and look. I don't recall.

Page 140

Q. The last item on this document here is "Motion for Judgment on the Pleadings" which suggests to me that some at least endeavor to pursue a judgment against Erie -- I'm not -- it's not quite clear from this document whether that was obtained or not.
A. You need to ask John.
Q. Well, what's your role within the Association?
A. I have to do everything.
Q. But you didn't do anything for this lawsuit?
A. Okay. I was general contracting over $260,000 worth of repairs. It was the middle of COVID. I have three children. I don't know how to get money on the table, so forgive me if I didn't have the chance or the opportunity to work on this. Because of your client's lies I have so much debt. You have ruined my life. This has been a nightmare from the start, so I don't appreciate you going into me and asking me why I didn't do one thing or another. I did everything I could to remediate the issues that your clients left this mess for me.
Q. Yeah, I'm not challenging the effectiveness of your efforts.

Page 141

A. You absolutely are.
Q. However, we are -- no. We are here because you are pursuing a lawsuit for damages, and it is very relevant in that lawsuit as to whether or not any damages have been recovered to offset losses as we're not seeing any of that on your damage calculation and so --
A. Correct.
Q. -- that's the reason I'm asking the question.
MS. OSHANA: It looks like it might be a coverage lawsuit. Isn't that what this is? Isn't that coverage, seeking coverage?
THE WITNESS: I don't remember.
MR. FINFER: One could presume, but that doesn't make much sense in a deposition when we're trying to understand all the facts.
MS. OSHANA: We can look it up. It's in the state court; right? We can look it up.
MR. FINFER: Well, the bigger issue, Carol, is that we're four years into this litigation and I've never seen any of these documents.
MS. OSHANA: I don't know anything about this lawsuit either, so we can look it up.
MR. FINFER: Okay. Well, your client produced it to you.

MS. OSHANA: It's not really relevant to mine unless they got money which I don't think they did. I can look up the lawsuit. I think it's just about coverage which I'm sure was denied.

MR. FINFER: I appreciate you opining something you know nothing about.

MS. OSHANA: Otherwise, I'd be getting paid from the insurance company, right, but clearly they don't have coverage.

BY MR. FINFER:

Q. Okay. Ms. Young, you don't know the outcome of the lawsuit against Erie Insurance?

A. No, I don't recall at this time. We did not receive any money.

Q. Okay. And you don't know the outcome of the demands pursued against Arrow Masonry?

A. There was no -- nothing happened after the demand letter was issued.

Q. Has the Association, to your knowledge, recovered dollars from any other third party related to the damages that you've asserted in this lawsuit?

A. Not to my knowledge.

Q. And is there anybody else besides you that would know of this?

MS. OSHANA: Gorr.

BY THE WITNESS:

A. Yeah, you'd have to ask John Gorr. You'd have to ask Kristen.

BY MR. FINFER:

Q. Okay. Let's get back into the damage analysis here. So we went through the masonry work. I think we now have the contract with Allendorfer. The next item on this list is "Structural, exploratory and structural engineer steel beams to rebuild ceiling and roofing/floor of Unit 3." You wrote a check -- was this Allendorfer?

A. This was Allendorfer.

Q. To Allendorfer?

A. Yes.

Q. Do you know what the findings of that exploratory work were?

A. Yeah, there's a findings document.

Q. I think I have that. Hold on a second. I have a final structural engineer -- hold on. This is titled "Final Structural Engineer Exploratory Work Invoice." Is this where it would be or no?

A. Under structural engineering repairs there are several invoices.

Q. Yep.

A. I'm off line again. I can't access this. Okay. I'm in the folder with the structural engineering.

Q. I'm just looking for the report on the exploratory findings. I think it's this one.

A. No.

Q. Final structural --

A. There's actually a stamped structural engineering report that exists.

Q. Is that in here?

A. I don't see it.

Q. Okay. So the "structural exploratory and structural engineer steel beams to rebuild ceiling," this is all work that was done within Unit 3 and on the roof above Unit 3; correct?

A. The steel beams are part of the common elements.

Q. Okay. That's what I wanted to understand. So we're talking about common elements and possibly limited common elements. I don't know if roofing/floor of Unit 3 -- that would strike me as a limited common element to Unit 3?

A. I would need to read the report but I believe you're right.

Q. And did this become -- as to the limited common elements, was this your responsibility because of the Association's general negligence or breach of its obligations to maintain the building?

A. Yes.

Q. So let me go down to 6-26 2019. This is truss work and roof replacement. Again, this is all common element work; correct?

A. I believe the roof is a common element. I don't know what a truss is.

Q. It looks like this is the invoice for that work. Can you see this okay? I can zoom in if you need me to.

A. Yeah, that looks like it. That's the initial contract not -- yeah, the initial contract.

Q. So if I'm looking here: "Remove approximately 100 square feet of additional drywall ceiling on the south end of Unit 3, dismantle parapet wall on east side of building to access truss pockets, rebuild parapet wall, furnish all labor, furnish and apply mold sealant to all exposed trusses." This contract is for 64,690. There must have been some change orders for this as well?

A. Yes, I believe there were. So the engineering services here are split out from the truss work.
Q. Yeah, I see that. Okay. Did any of this work -- I'm just looking at this invoice or this contract for the moment. Where it says: "Remove the existing drywall, ceiling and walls in Unit 2, expose truss and truss pockets," I assume that the idea here was that because there was exposure on the roof that it impacted the trusses and truss pockets in Unit 2?
A. We did not find issues with Unit 2. I believe we opened the floor and we didn't find any issues.
Q. Okay. I'm going to go back to the damages calculation. So then we have: "South facing terrace roof replacement, Unit 2 and Unit 1 responsibility"?
A. So those were common elements.
Q. So why wasn't Unit 3 responsible?
A. I think that's a typo. Oh, yeah, there's no roof over John's balcony. No, there are. I have to look at a picture of the structure, but on the south side of the building there are two decks. There's a deck off Unit 3, I believe. There's a deck off Unit 2 on the south side. There was water leaking into Unit 1, so

those --
Q. From the terrace of Unit 2?
A. From the roof of Unit 2.
Q. Was this Allendorfer that did this work too?
A. Yes.
Q. I'm just looking for this -- was this contract under roofing in the subfolder of Allendorfer?
A. I'm looking.
Q. Oh, here we go. I got it.
Hold on. So I'm looking at a contract dated March 16th, 2021. This is for the work that's reflected here in your damage calculation for south facing terrace roof replacement?
A. Yes.
Q. I'm looking at this and I apologize. It doesn't seem apparent to me. What does this have to do with the water infiltration in Unit 3?
A. The roof of Unit 2 is the deck of Unit 3. The ceiling of Unit 2 is the deck, south facing deck in Unit 3.
Q. This happened two years after you repaired the roof on Unit 3 or the roof of the building I should say and the interior of Unit 3. Yeah, almost, I guess almost three years. It's just not clear to me whether

this relates to --
A. It's all related.
Q. -- the fact that you feel it's --
A. It's all related.
Q. In your mind, it's all related because -- in your mind, you feel it's all related because the building had water infiltration so any subsequent water infiltration problems relate back to that initial lack of as you allege disclosures?
A. The ESI report stated that there were structural issues in all the wall openings. Water continued to come in the building. As we found the water coming into the building, we fixed it. This was during COVID, so I can't -- I got these guys out as soon as I can get them out, but this was as you can see a significant amount of work.
Q. Yeah, I recognize that the building needed a lot of work. What I'm trying to parse out is whether that work relates to what disclosures you allege should have been made versus what disclosures were made, and that's why the timing of this is what I'm asking about.
A. It's all the same.
Q. Just so I understand, in your mind, it's all the same because there was water infiltration in Unit 3

that was not as you allege properly disclosed and that lack of alleged disclosure created issues throughout the entire building that took some time to figure it out, was that your position?
A. They didn't disclose the water infiltration in Unit 1 on both the south facing windows as well as their sliding door. All of this is related to the ESI report that indicates that the building was incorrectly built and there were structural defects with the building. They had the obligation to disclose those limited common elements and they never disclosed it.
MR. FINFER: Could we just take a quick, real quick just two-minute break? I just need another document. I don't have it in front of me. Thank you.
(WHEREUPON, a break was taken.)
BY MR. FINFER:
Q. I am now sharing the ESI report. We could mark that as Gonring Exhibit 8.
Ms. Young, can you see this?
A. Yes.
Q. I'm sorry. I didn't hear an answer.
A. Yes, I can see the report.
Q. This is the report that's dated October 20th,

2017?

A. Yes.

Q. This is a report that you've been referencing which shows that the entire unit's structurally unsound; correct?

A. Yes.

Q. So I just want to note, and maybe you're already aware of this, but the intro of this report is that the scope was to inspect water infiltration occurring in Unit 3. I'm highlighting that for your reference. Do you see that?

A. I do.

Q. Would you agree that the scope of ESI's inspection was just in Unit 3?

A. No. They say the entire structure at window and wall openings is defective. Structure includes Unit 1, Unit 2 and Unit 3.

Q. But they didn't go into Unit 1 or Unit 2?

A. They talk about the limited common elements of Unit 1, Unit 2 and Unit 3.

Q. But if you read the report, the only unit they went into was Unit 3?

A. They don't have to go into the unit to determine that there's a structural issue.

Q. I see. So we're in agreement that ESI's inspection was limited to Unit 3; correct?

MS. OSHANA: No.

BY THE WITNESS:

A. No. They filed an insurance claim for the building which includes Unit 1, Unit 2 and Unit 3, and the report talks about the structure which is Unit 1, Unit 2 and Unit 3. Water infiltration is occurring at various locations of the structure.

BY MR. FINFER:

Q. But just so we're clear, it's talking about Unit 3?

A. It's talking about the entire --

Q. And I'm fine -- we don't have to agree on this, but when you see the word structure here, it's your opinion that structure refers to the building not Unit 3?

A. Structure is Unit 1, 2 and 3.

MR. WATTS: Read the second bullet.

BY THE WITNESS:

A. It says that the water infiltration is occurring --

MR. KOJS: You can't keep telling her how to answer.

MS. OSHANA: Leave it alone. The document says what it says.

MR. FINFER: I'm sorry. I can't hear her. Is Carol telling her how to answer?

MS. OSHANA: No. No. The document says what it says. It is what it is.

MR. FINFER: With all due respect, this is your entire case, so it is relevant for us to discuss.

MS. OSHANA: You have a right to discuss it. I'm not talking to you. I'm talking to counsel.

BY MR. FINFER:

Q. Ms. Young, do you mind just lowering your camera a bit so I can see your face? I'm sorry.

A. Yes.

Q. I just want to see your face.

A. I can see my face on the screen.

Q. Would you mind just lowering it a little bit?

MS. OSHANA: It's black on the screen. I don't know why. I don't know if it's frozen on yours, Jordan.

MR. FINFER: Oh. It just went frozen. Could we get that back up.

(WHEREUPON, a break was taken.)

BY MR. FINFER:

Q. So going back to the ESI report, it talks about discussion and conclusion. It says: "ESI was retained to determine the cause of the water infiltration occurring in Unit 3 of the structure located at 2726 West Cortez," and it provides the following summary of its opinion that indicates here that a masonry contractor should be contacted and recommends BRAL Restoration. Do you see that?

A. Yes.

Q. So if we go to the BRAL report, they hired who ESI recommended. We could mark the BRAL report as Exhibit 9. You see the recommendations or the results of the water testing?

A. What are you pointing to?

Q. Well, take a moment to read this.

A. Yes. It says: "The existing flashing allowed the water to penetrate right to the back of the wall. They were able to produce leakage into Unit 3 because of the deficiencies in the building within ten minutes of spraying water," and they decided not to go any further.

Q. Well, that's incorrect. They hired Arrow Masonry; right? And the report states: "Previous

proposal including as-needed repointing and application of two coats of Modac was modified to include the application of one coat of chem treat as an alternative." We're talking about --

A. So it talks about the flashing that was not working and it talks about water coming through the building.

Q. Then it talks about a recommendation?

A. Right, from a contractor not a certified -- who did the ESI report? A licensed structural engineer.

Q. But you would agree that they hired Arrow Masonry to perform the work that was recommended here at the bottom of the BRAL report; correct?

A. No. They didn't do all the work. It says it was flashing issues. They didn't hire someone to complete all the work.

Q. So the issue then you have is that there was sealant but there wasn't flashing?

A. They didn't repair the issues to the building. They did a crappy job putting on the sealant. That didn't work. They added caulk which was not the right thing to do from the information I've learned, and they didn't flash the, all the windows and door openings.

Q. So I'm not really debating whether or not

Arrow did a poor job. My question to you is what does Arrow doing a bad job have to do with the Gonrings.

A. Kelsey signed the contract. How can you take all these different quotes over all these years for hundreds of thousands and then make a $17,000 decision? Only an idiot would do that. They went with the cheapest solution. They continued to ignore the problem.

Q. Even though they were following both ESI and BRAL?

A. No, they didn't. They didn't fix the structural openings in the walls and the doors. They didn't fix all the flashing.

Q. Have you seen all the quotes they got for the work?

A. I don't know. What's been produced I've seen the quotes, yes.

Q. So you're aware that Arrow was not the cheapest to do the work?

A. Arrow was the cheapest of the three quotes they got for $17,000. All these other quotes are coming in at 60,000 to $100,000 and they choose the $17,000 quote. That is ridiculous.

Q. How did you learn that information?

A. I looked at the quotes.

Q. And you got the quotes from the HOA?

A. I got the quotes from John Gorr.

Q. When?

A. When he disclosed to me that Unit 1, 2 and 3 were having water infiltration in September.

Q. Let's get back to your damages calculation here. When John disclosed this in 2018, did he tell you that he thought the issue was resolved?

A. No. He told me there was a continued history of water issues being in the building.

Q. Yes, but if you look back at his e-mail, this is the meeting, this was September 10th, 2018 where he says: "To the best of our knowledge, the water was due to water intrusion through split face block prior to the building being sealed on May 31st, 2018." I know you're saying the work was done was not work that should have been done and wasn't done well, but I'm asking you about Gorr's knowledge at the time. There's a difference.

A. He knew. He knew. He's lying.

Q. So you think what he said here in this meeting, this was a lie?

A. Yes.

Q. So on August 8, 2021, you wrote a check for -- I guess you had work performed to refinish

building front door?

A. Yes.

Q. Can you explain how this has to do with leaks in the building?

A. There was water leaking from the building onto the door. The door was damaged from water infiltration.

Q. This occurred three years after you bought your unit?

A. This entire building --

Q. Was this just a --

A. -- was crumbling. This work had to be staged out, and it takes an entire amount of work and time to get this stuff done.

Q. What about the heat trace cable installation, what is that?

A. We haven't put that in yet.

Q. Okay. Have you paid for all the truss work and roof replacement?

A. Yes.

Q. But the heat trace cable installation, that work hasn't been done?

A. Correct.

Q. What is that work?

A. They have to install some electric heating element into the downspouts off the roof.
Q. For when it freezes?
A. Yes. Water infiltrates the building.
Q. So in terms of your total financial responsibility through October 31st of last year, not all of this has been paid yet?
MS. OSHANA: You mean paid for?
BY MR. FINFER:
Q. No. The $2,882 for the heat trace cable hasn't been paid for. Is there anything else on here that you haven't paid for?
A. No.
MS. OSHANA: Windows.
BY THE WITNESS:
A. Oh, yeah, my windows. We haven't replaced my windows. That's further down below.
BY MR. FINFER:
Q. Yes. Yes. Right. So here you have the rebuild of interior Unit 3 but this you didn't pay for; right?
A. Correct.
Q. The attorney's fees for the HOA, did you pay the -- was this another special assessment where you paid

$2,500?
A. Yes, it was.
Q. Then I understand your interest on the HELOC. What was the amount of the loan you got?
A. $101,000.
Q. Has that been paid back?
A. No.
Q. And you also took out a loan on your 401(k)?
A. Yes.
Q. Has that been paid back?
A. Yes.
Q. That was paid back as of June 30th, 2021?
A. Yes.
Q. Window work you haven't done.
Have you actually paid Oshana Law $50,000?
A. Those are my accrued fees to date. No, I have not.
Q. Are you paying hourly or is this a contingency case?
A. I'm paying hourly.
Q. How much have you paid to date?
A. $1,000.
Q. But your invoices from Oshana Law equal $50,000?

A. That's my estimate.
Q. Have you seen invoices?
A. Not yet.
Q. So where did you estimate $50,000?
MS. OSHANA: From her lawyer.
MR. FINFER: Carol, come on.
MS. OSHANA: I'm telling you the answer. You're asking.
MR. FINFER: Don't give --
MS. OSHANA: You're asking about my invoices. I'm giving you an answer. She's getting the figures from me.
MR. FINFER: Okay. If you want to get out of here at a reasonable time, stop answering questions I'm asking to the deponent that are reasonable for me to ask.
MS. OSHANA: It's reasonable for you to ask. That's why I'm helping you. She's getting it from me.
BY MR. FINFER:
Q. So your lawyer told you that your bill to date is approximately $50,000?
A. Yes.
Q. But you haven't seen a bill for $50,000?
A. No.
Q. Is this going to be through trial or is this

to date?
A. This is to date.
Q. Have you produced the engagement letter?
MS. OSHANA: I don't think so.
BY THE WITNESS:
A. I don't know.
MS. OSHANA: I don't know if you asked for that. I don't remember. Did you ask?
MR. FINFER: Well, we've asked for all documents related to your damages, and $50,000 represents a significant portion of the alleged damages, so let's assume it was requested.
MS. OSHANA: Yeah, if you show me the interrogatory, of course, I'll produce it.
BY MR. FINFER:
Q. So on the 401(k) withdrawal, have you actually written a check for $33,333.33?
A. I sure have.
Q. So this is the 1,000 you paid Oshana Law. So your --
A. No. That's Steve --
Q. So your total --
A. That's Steve Hier. If you go to the left where it says "Lawsuit," go two cells to the left that

Page 162

you've highlighted, it says: "Miller Hier home inspection."

Q. Oh, got it. Have you produced a check that you wrote to the IRS?

A. I don't know. I can.

MS. OSHANA: I'll get it for you.

MR. FINFER: I don't think it's recoverable in the lawsuit, but, nonetheless, if you're going to claim it as damages, we should see it.

BY MR. FINFER:

Q. What's the "replace basement storage area and basement entry area door frames"?

A. There is --

MR. McCARTHY: Jordan, do we have an engagement on the record that the engagement letter and $33,000 IRS check are going to be produced?

MS. OSHANA: The check, yes. If you show me where it is, I will produce it. Just show me where it is in the request to produce.

MR. FINFER: Well, just as a reminder, this case started with the -- under the mandatory discovery. We were obligated to produce all documents to support a damage claim.

MS. OSHANA: Yeah, usually what I do with

Page 163

these attorney's fees petitions, they're produced at the time of the petition. I've done a million attorney's fee petitions. Under the statute when I present them, I present them with my motion to recover attorney fees. That's typically how it's done. I don't usually produce all my billing as it goes and goes and goes and goes. That's not normal. I never produce the engagement letters, like rarely.

MR. McCARTHY: This is Paul. So then for purposes of the damage claim, would you stipulate that the 50,000 or whatever she's asking for in fees comes out and that's a post-judgment motion?

MS. OSHANA: Yeah, the judge has to grant it to me because it's whatever the reasonable attorney fees are for the prevailing party. It's up to the judge to decide that.

BY MR. FINFER:

Q. The "replace basement storage area," what's going on in the basement storage area?

A. The trim around the basement doors is damaged from water.

Q. Okay. Have you received a -- is the quote from Renner & Renner in here?

A. Yes, I believe so.

Page 164

Q. Wasn't the damage that's referenced in "replacement of the basement storage area and basement entry door frames" in your inspection report?

A. Yes.

Q. You didn't seek a credit for this prior to closing, did you, or you didn't obtain one at least?

A. I didn't obtain one.

Q. So then we can agree to remove this from your damage calculation?

A. No.

Q. The last bullet point here: "Increased premium due to HOA lawsuits," is this in reference to the Erie lawsuit and the potential lawsuit against Arrow? I'm sorry. I didn't hear you.

A. Yeah, I'm thinking.

Q. Oh, got it.

A. The HOA has a claim on its record, and so as a result of that, we cannot get regular insurance, so this has -- the claims have caused the HOA insurance to go up.

Q. So this is a decision that the HOA made; right? It had nothing to do with the Gonrings or Aires?

A. No, this is related to the Gonrings and Aires. All the water infiltration has caused these

Page 165

issues and now the HOA can't get insurance. The only insurance we could get causes what this is right now.

Q. What claims are we talking about? I'm aware of the claim against Erie Insurance. Are there other claims?

A. All the pending litigation that's going on right now.

Q. I'm only aware of one pending litigation which is this. Are there others?

MS. OSHANA: Isn't there a countersuit?

BY THE WITNESS:

A. Yeah, the Gonrings are suing the HOA.

MS. OSHANA: Aren't your clients suing?

BY MR. FINFER:

Q. Yeah, this lawsuit. I'm aware of this lawsuit. I'm saying are there others.

A. Yes, my lawsuit against the Gonrings. My lawsuit against Aires.

Q. I also see here it says Cincinnati Life D&O. Did your D&O insurance increase?

A. Yes.

Q. Did anyone sue the Board of Directors?

A. Sounds like the Gonrings are.

Q. So one member. Are there any other claims

pending --
A. Not that I'm aware of.
Q. -- against the Board?
I'm seeing in your production the State Farm quote. Do you have a quote that predates this to indicate that it's $10,584 higher?
MS. OSHANA: Sorry. Which line are you looking at?
MR. FINFER: I'm just looking at this entire box 11.
MS. OSHANA: Okay.
BY THE WITNESS:
A. I do have a quote.
BY MR. FINFER:
Q. It says 10,864 -- $10,584.64 but it looks like it's including total here, let's see, right?
A. I don't know. If you click on the cell, the number 10,000 --
Q. Yeah, hold on.
A. -- now click up at --
Q. I know. I'm looking at it. D90 plus D91 times 4.
A. Yes. It's four years that this has been going on and I owe 44 percent of it.

Q. I see. So you're including all 23 in this then?
A. Yes.
Q. Do you have the contact information for Randi Horton?
A. Yes.
Q. What is it?
A. Isn't it in the affidavit?
Q. I don't think so.
A. (517) 489-6614.
Q. Thank you.
A. Um-hum.
Q. You're not alleging that the Gonrings had knowledge of mold in Gorrs' unit, are you?
A. The Gonrings had knowledge of significant issues in the building including mold.
Q. What do you cite to for support of that?
A. John Gorr shared e-mails between himself and the Mulligans with the Gonrings that state there was mold.
Q. Has the HOA pursued any claims against the developer?
A. We can't find the developer. No.
Q. I just want to go back to the May 7, 2018

meeting minutes that you had an opportunity to review prior to closing where it talks about the work that was going to be done by Arrow Masonry.
A. I see it.
Q. I just want to confirm -- thank you. I just want to confirm each step that you took to follow up on this. So I recall you saying that you had your lawyer follow up with Aires in those lawyer letters we looked at earlier; correct?
A. That's correct.
Q. What else?
A. We asked the HOA.
Q. Via the 22.1 Disclosure?
A. Yes.
Q. Okay. Anything else?
A. Not that I recall.
MR. FINFER: Would you mind if we take a five-minute break? I think I'm almost done here.
(WHEREUPON, a break was taken.)
Ms. Young, can you hear me?
THE WITNESS: Yes.
MR. FINFER: So I just want to confirm that you're going to produce your check to the IRS in the

amount of $33,333.33?
THE WITNESS: That's correct.
MR. FINFER: Subject to that and subject to us having the right to ask potentially additional questions at some point in the future given that we received a substantial document dump on Friday, I have no further questions.
MR. KOJS: I just have a few more.
MR. GOOD: I have a few follow-ups. Kevin, do you want to go first?
MR. KOJS: Yeah, if you don't mind. I just have one about the Excel sheet and then a couple random ones.
MR. GOOD: Go for it.
REDIRECT EXAMINATION
BY MR. KOJS:
Q. The one about the Unit 1 front window replacement, 19,750, I know you already testified you haven't paid that yet, are those the pictures that we looked at earlier?
A. Yes.
Q. What exactly are you claiming are wrong with your windows?
A. Water is leaking through the windows and --

between the masonry and the windows.
Q. And has that been occurring since you bought the place?
A. Yes.
Q. And it's your claim that it's from the failure of the Gonrings and the HOA to disclose certain issues with the unit in the property?
A. Yes.
Q. And then I just want to clear this part up. At the time you were going through the process of purchasing your unit did you believe Aires was the seller?
A. I believed Aires was the seller, therefore, the owner.
Q. So is there anything you would have done differently if it was your assumption at the time you were purchasing your unit that the Gonrings were the actual sellers?
A. Absolutely.
Q. What would you have done differently?
A. I would have forced them to answer these questions.
Q. Do you have any reason to believe you weren't able to reach out to the Gonrings during this purchasing

process?
A. We asked several times.
Q. Who is we?
A. My attorney.
Q. Real estate attorney?
A. Yes.
Q. Do you know who they asked?
A. Yes. It's in the letters. Exhibit 6, "Please confirm with the prior owner."
Q. What letter, the June 14th?
MS. OSHANA: It's Exhibit -- what is that?
BY THE WITNESS:
A. Exhibit 6.
BY MR. KOJS:
Q. Is that the June 14th letter?
A. It's June 18th, 2018.
Q. Thank you. Which one, 8E, or which one are you looking at?
A. 8E. Number 13 also says 8E.
Q. And then did you see their response in the July 2nd, 2018 letter under --
A. Yeah.
Q. -- number 7?
A. Yes.

Q. And you guys put or you and your real estate attorney put okay to the left?
A. Yes.
Q. And it says: "With respect to Item 8E, again, as third-party corporate relocation company, seller is unable to make verification regarding whether the property has experienced water leakage or water damage."
A. Aires was not the seller, so they hid it.
Q. Aires hid it?
A. You all are in collusion with each other, so y'all hid it from me.
Q. Okay. But at that time what did you think the Gonrings were?
A. The prior owner it says.
Q. Okay. And you said that you knew they were still living there while you were going through the purchasing process?
A. Yes.
Q. Is there any reason you or likely your attorney or real estate agent wouldn't reach out to the Gonrings specifically after Aires said in this response that they're unable to make verifications regarding whether the property had experienced water leakage or

water damage?
A. Are you joking?
Q. No.
A. No. This is -- this is an arm's length agreement. I have been -- I had legal advice not to contact them.
Q. Your real estate attorney told you not to contact the Gonrings?
A. I spoke -- I can see no reason to contact those people. This is between Sarah, Aires and me. We've asked more than two times whether or not there's an issue, and they continued to not answer the question.
Q. But after you guys said okay to that did you try to follow up again with the Gonrings or Aires?
A. I trusted the information in this document to be accurate and truthful. I trusted that the attorneys were being accurate and truthful. How many times do I have to ask to get an answer?
Q. So would that be a no, you didn't follow up after that?
A. I asked three times.
Q. Okay. But after you said okay in this July 2nd, 2018 response, I just want to confirm, you or nobody else followed up and wondered why Aires said they

were unable to make verifications whether their property experienced water leakage or damage?
A. Aires said they were the seller.
Q. Did you question why it said seller's unable to make verification about the water damage?
A. I asked -- we asked every question that we could ask and they hid the answers or they lied.
Q. If it was your impression that the Gonrings were the sellers, you would have or your real estate agent or real estate attorney would have reached out directly to them?
A. We would have reached out to their attorneys and asked them to answer the question.
Q. But did anybody specifically say you cannot reach out to the Gonrings?
A. I've never heard of a real estate transaction where the buyer reaches out directly to a --
Q. I'm not specifically saying you but maybe your real estate attorney or agent. Did anybody say --
A. It's in the letters. We asked.
Q. You asked if you could reach out to -- I just want to confirm. I know we're getting -- it's been awhile.
A. The letters say that we reached out. I

reached out. I reached out through my attorney and they didn't answer the questions. They lied.
Q. Okay. I get that. I just want to confirm that nobody said you couldn't reach out, you, your real estate agent, real estate attorney couldn't reach out to the Gonrings?
A. No.
MR. KOJS: That's all I have. Thank you.
MR. GOOD: I just have a couple follow-ups.
THE WITNESS: Okay.
RECROSS EXAMINATION
BY MR. GOOD:
Q. I'm putting on the screen a document. I don't know if it's identified or not. This is the September 10, 2018 meeting note. Can you see that?
A. Can you please increase the font or increase the size.
Q. Yes.
A. Yes.
Q. Are you able to read that now?
A. Yes.
Q. By September 10th, 2018 you had taken possession of the unit; is that correct?
A. Yes.

Q. I'm just going to read one sentence to you. "To the best of our knowledge, the damage was due to water intrusion through the split face block prior to the building being sealed on May 31, 2018." Do you see that?
A. Yes.
Q. And on September 10th, 2018, did you believe that statement to be accurate?
A. No. At that time?
Q. Yeah, on September 10th, 2018.
A. Yes.
Q. And did you believe -- Or strike that.
Well, is it your understanding that Ryan Brown believed that statement to be accurate?
A. I don't know what Ryan Brown was thinking.
Q. And was it your belief that John Gorr believed that statement to be accurate?
A. No.
Q. I'm sorry. I didn't hear you.
A. No. He's lying.
Q. But, again, I was asking specifically on September 10th, 2018 --
A. I don't know.
Q. -- you believed --
A. I don't know what John was thinking. I

don't, I don't know.
Q. Okay. You believe that now, but back on September 10th, 2018 did you believe that that statement was accurate?
A. Yes.
Q. And the mold testing that's referred to on bullet point two down, this was done after you purchased your unit; correct?
A. Yes. I don't know actually. I'd have to look at John's mold test. I assume so.
Q. Are you aware of any other instances where John Gorr lied in your opinion?
A. Yeah, he lied when he produced all this information and told me about all the water issues. He lied on the 22.1 and colluded with the Gonrings on the HOA. He's lied through this whole thing.
Q. And regarding the 22.1, you've alleged that he lied in collusion with the Gonrings. Do you also believe he lied in collusion with Ryan Brown?
A. Yes.
Q. Is there anybody else in on the collusion, to the best of your knowledge?
A. Ryan, John and the Gonrings.
Q. I understand that. I asked if there was

anybody in addition to them.
A. No.
Q. Were there any attorneys in on the collusion, to the best of your knowledge?
A. Well, the attorneys for Aires certainly lied when they told me they were the seller and the owner of the unit.
Q. And I apologize for not asking a specific enough question. Regarding the 22.1 Disclosure, was there anybody else that you allege was in on the collusion other than Mr. Brown, Mr. Gorr and the Gonrings?
A. Which 22.1 are you referring to?
Q. The Disclosure from the Homeowner's Association related to the water that you received prior to your purchase.
MS. OSHANA: To her? I think there's more than one. Are you talking about the one that she got?
MR. GOOD: Yes, the one that she got. I want to know if anybody else she alleges was part of the collusion.
MS. OSHANA: The one that was pertaining to her sale?
MR. GOOD: Yes. I'm asking if there's anybody

else besides Mr. Brown, Mr. Gorr and the Gonrings she alleges was part of the collusion.
BY THE WITNESS:
A. Not that I'm aware.
BY MR. GOOD:
Q. At all relevant times since you took ownership of the unit has Mr. Gorr been the President of the Condo Association?
A. No.
Q. And who else has been the President?
A. I am doing all three roles because John lied on the 22.1.
Q. And you were elected President?
A. I told him that he was not to touch any other documents related to the HOA because he was lying and I told him that --
Q. Did you do this in writing?
A. -- in the presence of Kristen and himself and that I was taking over.
Q. Did you follow up in writing?
A. There's an e-mail that says that.
Q. When your building inspector found the water damage in the basement, did your attorneys reach out to Mr. Gorr?

A. I don't know. You'll have to look at the correspondence between the attorneys asking for the HOA information.
Q. And to the best of your knowledge, did your attorneys reach out to the Homeowner's Association?
A. Yeah, they reached out to the Homeowner's Association to ask questions about water infiltration in our attorney letters back and forth with Aires. We asked them --
MR. GOOD: Madame Court Reporter, can you repeat the question?
(Requested portion of the record read.)
BY THE WITNESS:
A. They reached out to Aires to ask the Homeowner's Association about water infiltration.
MR. GOOD: I have no further questions.
MR. FINFER: I don't have any further questions other than the right to ask additional questions pending the additional documents we received on Friday.
MS. OSHANA: Okay. Thank you.
MR. GOOD: I make the same reservation. I have nothing else.

SIGNATURE:
It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

STATE OF ILLINOIS)
) SS:
COUNTY OF C O O K)

I, KELLY A. BRICHETTO, a Certified Shorthand Reporter of said state, do hereby certify that the within named witness, MELINDA SGARIGLIA, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotype in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney for either party or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this 27th day of February, 2023.

Kelly Brichetto

KELLY A. BRICHETTO
CSR License No. 84-3252

Carol Oshana, Esq.
oshanalaw@yahoo.com

February 27, 2023

RE: Sgariglia v. American Internation Relocation Services
2/13/2023, Melinda Sgariglia (#5706285)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Sgariglia v. American Internation Relocation Services, LLC
Melinda Sgariglia (#5706285)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE_______________________
_______________________________________________
REASON_________________________________________
PAGE_____ LINE_____ CHANGE_______________________
_______________________________________________
REASON_________________________________________
PAGE_____ LINE_____ CHANGE_______________________
_______________________________________________
REASON_________________________________________
PAGE_____ LINE_____ CHANGE_______________________
_______________________________________________
REASON_________________________________________
PAGE_____ LINE_____ CHANGE_______________________
_______________________________________________
REASON_________________________________________
PAGE_____ LINE_____ CHANGE_______________________
_______________________________________________
REASON_________________________________________

________________________________ _______________
Melinda Sgariglia Date

Sgariglia v. American Internation Relocation Services, LLC
Melinda Sgariglia (#5706285)

ACKNOWLEDGEMENT OF DEPONENT

I, Melinda Sgariglia, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Melinda Sgariglia Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC