# Exhibit 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   MELINDA SGARIGLIA,              )
                                    )
5                   Plaintiff,  )
                                    )
6       V.                      )  NO. 1:19-CV-05684
                                    )
7   AMERICAN INTERNATIONAL      )
    RELOCATION SERVICES, LLC,   )
8   D.B.A. AIRES, AN ILLINOIS   )
    LIMITED LIABILITY CORPORATION,)
9   NICHOLAS GONRING & KELLY    )
    GONRING,                    )
10                                  )
                    Defendants. )
11

12

13          Zoom Videoconference Deposition of KIRK
14   LANGEFELD taken before TRUDY G. GORDON, a Certified
15   Shorthand Reporter, pursuant to the Federal Rules of
16   Civil Procedure for the United States District Courts,
17   pertaining to the taking of depositions, commencing at
18   1:00 p.m. on the 23rd day of February, A.D., 2023.
19

20

21

22

23

24    Job No. CS5760610

```
                                         Page 2
 1   REMOTE APPEARANCES:
 2   OSHANA LAW FIRM
     33 North Dearborn
 3   Suite 200
     Chicago, Illinois  60602
 4   312-404-8390
     MS. CAROL OSHANA
 5   oshanalaw@yahoo.com
 6
         Appeared on behalf of the Plaintiff Melinda
 7   Sgariglia;
 8
 9   WALKER WILCOX MATOUSEK, LLP
     1 North Franklin Street
10   Suite 3200
     Chicago, Illinois  60606-3610
11   312-244-6700
     MS. CAITLIN M. McAULIFFE
12   cmauliffe@walkerwilcox.com
              -and-
13   MR. MATTHEW W. CASEY
     mcasey@walkerwilcox.com
14
15       Appeared on behalf of American International
     Relocations Services, LLC, d.b.a. AIRES, an Illinois
16   Limited Liability Corporation;
17
18   RHOADES McKEE, PC
     55 Campau Avenue NW
19   Suite 300
     Grand Rapids, Michigan  49503
20   616-235-3500
     MR. PAUL A. McCARTHY
21   mccarthy@rhoadesmckee.com
22
         Appeared on behalf of Nicholas and Kelsey Gonring;
23
24
```

```
                                                    Page  3

 1   (CONTINUED)

 2

 3   LOFTUS & EISENBERG, LTD.

     161 North Clark Street

 4   Suite 1600

     Chicago, Illinois  60601

 5   312-899-6626

     MR. ROSS GOOD

 6   ross@loftusandeisenberg.com

 7

         Appeared on behalf of John Gorr and the Condo

 8   Association;

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   REPORTED BY:  TRUDY G. GORDON, C.S.R.

24                 CERTIFICATE NO. 084-004077
```

```
                                                    Page 4

 1
                          I N D E X
 2
    WITNESS:                                        PAGE:
 3
    KIRK LANGEFELD
 4
    EXAMINATION BY MS. MCAULIFFE                       5
 5  EXAMINATION BY MR. MCCARTHY                        33
    EXAMINATION BY MS. OSHANA                          34
 6  EXAMINATION BY MR. MCCARTHY                        43
    EXAMINATION BY MS. MCAULIFFE                       44
 7
 8
 9                              E X H I B I T S
10  DEPOSITION EXHIBITS          DESCRIPTION        PAGE
11  EXHIBIT NO. 2                6-14-2018 LETTER      16
    EXHIBIT NO. 3                6-18 LETTER           19
12  EXHIBIT NO. 4                6-22 LETTER           21
    EXHIBIT NO. 5                ATTORNEYS' TITLE      21
13                               GUARANTY
    EXHIBIT NO. 6                7-2-LETTER            25
14                               7-3 RESPONSES
    EXHIBIT NO. 7                JULY 5 LETTER         26
15  EXHIBIT NO. 18               GONRING 000123        39
                                 E-MAIL
16
17
              (NO EXHIBITS RETAINED BY THE REPORTER)
18
19
20
21
22
23
24
```

```
                                                    Page 5
 1                    (WHEREUPON, THE WITNESS WAS
 2                    DULY SWORN.)
 3          MS. McAULIFFE:  Good afternoon.  My name is
 4     Caitlin McAuliffe, and I represent American
 5     International  Relocation Solutions.  I just gotta ask
 6     you a few questions.
 7          THE WITNESS:  Sure.
 8                    KIRK LANGEFELD,
 9     called as a witness herein, having been first duly
10     sworn, was examined and testified as follows:
11                              EXAMINATION
12     BY MS. McAULIFFE:
13          Q.    Can you please state your name for the
14     record.
15          A.    Kirk Langefeld.
16          Q.    Let the record reflect this is the discovery
17     deposition of Kirk Langefeld taken pursuant to notice
18     and scheduled to today's date by agreement of the
19     parties.  This deposition will be taken in accordance
20     with all applicable rules.
21               Have you ever been deposed before?
22          A.    No.
23          Q.    All right.  So to start I'm just going to go
24     over a couple grounds rules for the record and both for
```

Page 6

1    your own benefit.  So the first is that we have to let

2    each other finish even if we can anticipate the question

3    or the answer, so please wait until I'm done asking the

4    question before you provide your answer.  If you don't

5    understand the question or would like the question

6    clarified, please let me know and I'll be happy to

7    provide a clarification, and it's okay to say I don't

8    know if you don't know.  And we have a court reporter

9    here that's on Zoom with us that will be taking down

10   everything for the record.  So for a yes-or-no answer,

11   please make sure you say yes or no.  There's no nodding

12   or uh-huhs or shrugging because the court reporter can't

13   take that down.  If you need to take a break, just let

14   us know and we can certainly take a break.  The only

15   rule is you can't take a break while a question is

16   pending.  So just answer the question and then we can

17   take a break after that.

18        A.   Okay.

19        Q.   Do you have any questions for me?

20        A.   Nope.

21        Q.   Okay.  So let's get started.

22             Where are you while we're taking this

23   deposition right now?

24             I'm in my office in Hinsdale, Illinois.

Page 7

1    Q.   And and what is your date of birth?

2    A.   9-18-79.

3    Q.   Where do you currently live?

4    A.   Oak Park, Illinois.

5    Q.   What's your address in Oak Park?

6    A.   711 North Grove.

7    Q.   Okay.  And is that in Chicago?

8    A.   No, that's in Oak Park.

9    Q.   In Oak Park.  Sorry.

10        And does anyone live there with you?

11   A.   Yes, my wife and three kids.

12   Q.   Great.  Now, just some backgrounds questions.

13        What's your highest level of education?

14   A.   I have a law degree.

15   Q.   Where did you go to law school?

16   A.   Chicago-Kent.

17   Q.   And where did you attend undergrad?

18   A.   University of Illinois in Champaign.

19   Q.   When did you graduate from law school?

20   A.   2004.

21   Q.   When did you receive your law degree?

22   A.   Uhm.

23   Q.   Sorry.

24        When did you take the bar and become licensed?

1    A.   2004.

2    Q.   Okay.  Are you licensed in Illinois?

3    A.   Yes.

4    Q.   Are you licensed to any other state?

5    A.   No.

6    Q.   So how long have you been an attorney?

7    A.   Since 2004.

8    Q.   So about almost 20 years now?

9    A.   Correct.  Yes.

10    Q.   And where did you first start working when got

11 out of law school?

12    A.   A firm called Ash Anos Freedman & Logan.

13    Q.   What kind of work did you do there?

14    A.   It was mostly law clerk type of work.

15 Discovery.  You know, digging through boxes.  Filings.

16 Recordings.  I did some real estate closings.

17    Q.   And where did you -- And how long did you work

18 there?

19    A.   About a year.

20    Q.   Okay.  And where did you go after that?

21    A.   Another firm called Eckhart Kolak.

22    Q.   And what type of work did you perform at that

23 firm?

24    A.   Corporate work, estate planning, and real

```
                                             Page 9
 1   estate.
 2        Q.   And how long were you there?
 3        A.   I would say like 3 years.
 4        Q.   And where did you go after that?
 5        A.   I was out on my own for a couple years after
 6   that.  I worked for -- I owned a company that did
 7   corporate catering.
 8        Q.   Okay.  And was that legal work or was it more
 9   business work?
10        A.   I was doing legal work as well, not
11   necessarily for business.  It was mostly business work
12   for that.  I was there under five years.
13        Q.   And where did you go after you left that job?
14        A.   Hawbecker & Garver, where I am now.
15        Q.   What year did you start at Hawbecker & Garver?
16        A.   I -- I think 2013.
17        Q.   Okay.  So it's been around 10 years you've
18   been working there?
19        A.   About 10 years.  I think this year is 10
20   years.  Yeah.
21        Q.   So we heard from Tom earlier that your firm
22   does real estate and trusts and estates.
23             Is it your understanding that your firm does
24   anything else or do they focus on those two areas?
```

Page 10

1      A.    Just those two areas.

2      Q.    And do you have a specialty?

3      A.    Most of my practice is residential real

4   estate.

5      Q.    Okay.  Do you usually represent buyers or

6   sellers or a good mix?

7      A.    It's a mix.

8      Q.    Is most of the real estate you're helping buy

9   and sell located in Illinois?

10     A.    All of it is.

11     Q.    All of it?

12     A.    We are not licensed outside of the state.

13     Q.    Okay.  And how many real estate closings would

14   you say that you've done?

15     A.    I would say -- I'm trying to do the math.

16   Probably 5000-ish, you know, that I've been involved in

17   or more.

18     Q.    And all residential real estate closings?

19     A.    The -- Primarily some, you know, commercial

20   condos or commercial buildings, but not any real

21   business connection to that.  So primarily residential.

22     Q.    Have you done any residential real estate

23   closings with relocation companies before?

24     A.    Yes.

```
                                               Page 11

 1      Q.   How many would you say approximately have you

 2  done?

 3      A.   A hundred or so.  Maybe a little bit less.

 4      Q.   Okay.  When did these occur?  Just over the

 5  course of your career?

 6      A.   Right.

 7

 8      Q.   Was there a particular time frame?  Okay.

 9           Do you remember any of the lawyers that you

10  worked with when you were doing the relocation company

11  closings?

12      A.   Not offhand.  Well, I shouldn't say -- There's

13  one -- There's one that I remember, yes.

14      Q.   Okay.  And who is that?

15      A.   Joe Maselli.

16      Q.   Okay.  So you never have worked with Sarah

17  Wilkins before?

18      A.   I don't know.

19      Q.   Right.

20      A.   I don't recall.  That I should say.

21      Q.   Okay.  What's your understanding of how a

22  closing process works when there's a relocation company

23  involved?

24      A.   Can you restate it.  Or what do you mean?
```

Page 12

1    That's pretty broad.

2         Q.   Yes.

3              So we heard from Tom that -- he said typically

4    the buyer will execute a deed to the seller -- or to the

5    relocation company, and then the relocation company will

6    execute a second deed that goes to the eventual buyer.

7              Do you think -- Is that how you understand it

8    typically works?

9         A.   When you say the buyer, who do you mean?  Who

10   executes the deed?

11        Q.   Okay.  So his understanding that we heard

12   earlier today is that there's typically two deeds at

13   closings; one that goes from the first seller to the

14   relocation company would be one deed, and then the

15   second deed would be from the relocation company to the

16   eventual buyer?

17        A.   That's pretty typical.

18        Q.   Okay.  Have you ever been involved in a

19   closing where that didn't happen --

20        A.   Yes.

21        Q.   -- with a relocation company?

22             And are you familiar with the Illinois

23   Residential Real Property Disclosure Act?

24        A.   Yes.

Page 13

1  Q. And do you know -- Is it your understanding

2 that relocation companies are immune under that act?

3  A. I believe so, yes. I don't --

4  Q. Okay. So we're here today to talk about the

5 purchase of a condo by your client at the time, Melinda

6 Sgariglia, and the condo is 2726 West Cortez Street,

7 Unit 1, located in Chicago.

8    When did you first learn about this case?

9  A. I think it was a couple years back.

10  Q. And how did you hear about it?

11  A. Someone had had asked, either -- I think it

12 was they asked for some of our file, if I remember

13 right.

14  Q. Do you know who it was that asked for the

15 file?

16  A. I don't recall. I didn't look it up.

17  Q. Did you review anything in preparation for

18 your deposition today?

19  A. I looked at the file.

20  Q. Okay. What did you take a look at in the

21 file, if you remember?

22  A. I looked at -- We were trying to figure out

23 who was at the closing, so we dug through that, and then

24 I looked at the -- some of the Attorney Review Letters

Page 14

1   and the contract.

2       Q.   And do you remember who was at the closing?

3       A.   We -- I don't actually remember.  But from

4   what we've seen, we think it was Paul Garver.

5       Q.   Okay.  Did you speak to anyone?  It sounds

6   like you spoke to Tom, maybe, before the deposition

7   today about the case?

8       A.   Um-hum.  Yeah.  And --

9       Q.   And did you speak -- Go ahead.

10      A.   I spoke with Carol as well.

11      Q.   And what did you talk about with them?

12      A.   Just about the case.  It's a little broad to

13  repeat everything.  But --

14      Q.   Was it -- Did you go over anything together,

15  any documents?

16      A.   We talked about the attorney review.  By going

17  over it, I do not believe, you know -- We didn't

18  specifically look at it together or anything like that.

19  But we did talk about it.

20      Q.   And did you speak to Melinda, your former

21  client, about this deposition or before this deposition?

22      A.   She was on one of the calls.  We spoke a

23  little bit.

24      Q.   So when did that call take place?

Page 15

1      A.    Like two days ago.  It was either two or three

2   days ago.  I don't remember exactly.

3      Q.    And did you talk specifically about the

4   litigation or was it more reviewing what had happened at

5   the time of the purchase contract and the closing?

6      A.    Little bit of both.

7      Q.    What did you talk about in regards to between

8   the purchase contract and the closing?

9      A.    Can you clarify.

10      Q.    Yes.  So I'm just wondering what subject

11   matter, what -- was there any specify topic that you

12   discussed about any events that happened in 2018?

13      A.    When -- You're saying when I spoke with Carol

14   did we talk about any specify event from 2018?  Sorry.

15      Q.    Yes.

16      A.    I'm sorry to keep asking.  Again, I want to be

17   clear without trying to just repeat the entire

18   conversation.  Can you say it one more time what you

19   want me to answer.

20      Q.    Yes.  Well, and it's totally fine to ask for

21   clarification.  I want to make sure you understand the

22   question that I'm trying to ask.

23      A.    Yeah.

24      Q.    So I just was trying to ask when you spoke to

Page 16

1  Carol two days ago, did you speak about the

2  correspondences that was going on between you and the

3  closing attorney or -- What did you talk about?

4      A.   Yes, we spoke about the correspondence

5  letters, the -- Yes.  That's what we spoke about.

6      Q.   Okay.  And did she tell you about her position

7  in the case or go over any of the present case details

8  with you?

9      A.   Yes.

10     Q.   And now if you have the letters that I was

11 discussing, I'd like to go over some of those Attorney

12 Review Letters.  You mentioned that you went over them

13 before, but I'm going to pull them up just so that we

14 can all have them to reference.

15     A.   Please do because I won't remember them

16 probably now.

17     Q.   So if you'll see here, this was previously

18 marked as Exhibit 2 in the earlier deposition that we

19 took.  This is a June 14th letter from Thomas Hawbecker

20 to Ms. Wilkins.

21          Do you remember seeing this letter?

22     A.   Yes.

23     Q.   Did you ever see this letter in June of 2018?

24 Or when did you first go over this letter?

Page 17

1    A.   Yes, I'm sure that I did.  I mean I -- I can

2  say I don't specifically recall.  But I'm sure I did in

3  2018.

4    Q.   Okay.  And would you have participated in

5  writing this letter or would Tom have written this

6  letter?

7    A.   I can't say for sure.  But I would say yes.

8  You know, it would be -- It would have been rare if I

9  didn't participate in writing.

10   Q.   And you mentioned before you weren't sure if

11 you had ever heard of Ms. Wilkins before.

12        But you obviously in this case knew that she

13 was AIRES' closing attorney, right?

14   A.   Yes.

15   Q.   So what's the purpose of this initial letter

16 that you sent to Ms. -- that Mr. Hawbecker and you sent

17 to Ms. Wilkins?

18   A.   The purpose --

19   Q.   I can give you a moment -- Sorry.  I was going

20 to say I can give you a moment to go over it if you'd

21 like me to scroll through the letter.

22   A.   Generally I can say the purpose is to modify

23 the contract to benefit our clients.

24   Q.   Okay.  So what information was asked in this

Page 18

1  letter that Hawbecker and you wrote together?

2          I can let you review it, if you'd like.

3      A.   Well, right, I can tell you -- Generally I can

4  think -- I mean I can read every line about what

5  information.  Do you have a more specify question?

6      Q.   Yeah, so I guess generally what type of

7  information were you looking for in this initial letter?

8      A.   Well, if you want to scroll down, I mean I

9  think I know -- Are you referring to the request

10  regarding in Paragraph 8 and 9?

11      Q.   Yes.  Yes.

12      A.   All right.  So exactly the information that we

13  are seeking.  When you're asking for information, that's

14  what -- that's what it would be.

15      Q.   So you're referring to please verify that the

16  Condo Association has not experienced any instances of

17  water interiorly, exteriorly, seeping through property,

18  and/or any damage during seller's ownership of the

19  property.  For any such occurrences, please provide

20  dates, locations, damage, and any repairs made, right?

21      A.   Okay.

22      MS. OSHANA:  Just to clarify that you're reading

23  the letter.  Thank you.

24      MS. McAULIFFE:  Yes.

Page 19

1  BY MS. McAULIFFE:

2      Q.   So and then in Section 9 of the letter, it

3  also reads, seller represents in words that the

4  following are true and shall remain true at the time of

5  their losing.  Sellers have not made any insurance

6  claims within the last 5 years, right?

7      A.   Correct.

8      Q.   Is it typical to ask sellers these questions

9  in the initial letter that you send them?

10     A.   Yes.

11     Q.   And why is it important to ask these

12  questions?

13     A.   To get the information because this is

14  important information to know about a property before

15  you purchase it.

16     Q.   And now I'd like to turn to what was

17  previously marked as Exhibit 3.  This is the June 18th

18  letter where it's Ms. Wilkins responding to

19  Mr. Hawbecker.

20          And have you seen this document before?

21     A.   Yes.

22     Q.   All right.  And now I'd like to turn to her

23  response to the questions that I just read from the

24  previous exhibit.  And her answer for Number 8E says as

Page 20

1   a third-party corporate relocation company, seller is

2   unable to make verifications regarding whether the

3   property has experienced water leaking or water damages.

4   However, seller agrees to abide by the terms of the

5   buyer's duty to inspect (inaudible) section of the

6   AIRES' addendum with respect to possible leak, seepage

7   or water infiltration at the property as seller would

8   have no knowledge of such matters unless raised during a

9   home inspection process, right?

10      A.   Yes.

11      Q.   And then in answer to 9A, Sarah writes, as a

12  third-party corporate relocation company that has never

13  occupied the property, seller is unable to make

14  representations or warranties regarding whether

15  insurance claims have been made against the property as

16  seller would have had no knowledge of such matters,

17  right?

18      A.   Yes.

19      Q.   Okay.  So we'll see that AIRES said multiple

20  times that it's a third-party corporate relocation

21  company.

22           What did you think when you read that?

23      A.   That they have never occupied the property.

24      Q.   Was that a cause of concern for you?

Page 21

```
 1          As a response, yes.
 2      Q.   And it -- I'd like to turn now to your
 3  response which I believe was previously marked as
 4  Exhibit 5.  It is the response that you sent on
 5  June 22nd.  I'll scroll down.
 6          So you actually signed it, signed this letter,
 7  right?
 8      A.   Right.
 9      MR. McCARTHY:  Just to let you know, I think that's
10  Exhibit 4.  I think Exhibit 5 is the Title Commitment,
11  so the record is clear.
12      MS. McAULIFFE:  Thank you.
13      MR. McCARTHY:  You're welcome.
14  BY MS. McAULIFFE:
15      Q.   So you prepared the responses to Ms. Wilkins?
16      A.   Yes.
17      Q.   Did anyone help you prepare those responses?
18      A.   I don't recall.
19      Q.   Does -- Do you usually send out the responses
20  with other attorneys' input or can you usually respond
21  on your own?
22      A.   I can and usually respond on my own.
23      Q.   Okay.  So it's not required for anyone to
24  review your responses?
```

1       A.   No.

2       Q.   And in this instance --

3       A.   Well -- It's not required for another attorney

4   to review my response.

5       Q.   Yes.  Okay.

6            Do you review the responses that you draft

7   with your client before responding?

8       A.   Typically, yes.

9       Q.   In this case is that what you did?

10      A.   I believe so.  I don't -- I didn't look back

11  to see if we had e-mailed.  But yes.  I would say yes.

12      Q.   So now turn to the same questions that we were

13  looking at on the other two.  8E.  You wrote on this

14  response, please confirm the same with the prior owner

15  as the seller has direct contact with the prior owner,

16  right?

17      A.   Yes.

18      Q.   And you gave the same answer to 9A, please

19  confirm the same with the prior owner as the seller has

20  direct contact with the prior owner?

21      A.   Yes.

22      Q.   Okay.  So you were the one that wrote prior

23  owner, right?

24      A.   Yes.

Page 23

1      Q.    Did you discuss with anyone before you put

2  down prior owner?

3      A.    What do you mean?

4      Q.    When you selected the term prior owner, had

5  you brought that up as a potential issue or is that just

6  your understanding of the situation?

7      A.    Well, they referenced -- What do I say -- I'm

8  trying to see their response -- I don't -- I don't

9  really recall.  I just know -- You know, they're saying

10  does not know.  So who does know?

11     Q.    Okay.  And who did you mean by prior owner?

12     A.    The -- Well, in any case I know their name

13  now.  It's the Gonrings in this case.

14     Q.    At the time you didn't know their name?

15     A.    I don't believe so.  I may have -- It may have

16  been written somewhere.  But I don't -- I don't remember

17  it specifically.  But that's who I would have -- I think

18  that's who I would have meant.

19     Q.    Okay.  And I'd like to turn your attention to

20  what was marked Exhibit 5 which was the Title Commitment

21  that you received.

22          Do you recognize this Title Commitment?

23     A.    I recognize it as a Title Commitment, yes.

24     Q.    Did you review this Title Commitment in this

Page 24

1    case?

2         A.   I'm sure that I did if it was provided to us,

3    which I'm sure it was.

4         Q.   Okay.  And on Line 4 of the Schedule A it says

5    the title is as of the commitment date vested in

6    Nicholas Gonring and Kelsey Gonring, husband and wife as

7    tenants by the entirety, right?

8         A.   Um-hum.  Yes.

9         Q.   So if you had reviewed the Title Commitment,

10   you would have known that -- you would have thought that

11   the prior owners were the Gonrings?

12        A.   Correct.

13        Q.   When you refer to prior owners, that's who you

14   would have been referring to?

15        A.   Correct.

16        Q.   Okay.  Who did you understand to be the

17   current owners when you sent this Exhibit 4, June 22nd

18   letter?

19        A.   AIRES.

20        Q.   And was that a mutual understanding between

21   you, your clients, and Mr. Hawbecker?

22        MR. McCARTHY:  Object to form, foundation.

23   BY MS. McAULIFFE:

24        Q.   You reviewed this letter with your clients

Page 25

1    before you sent it out, right?

2         A.   I believe so.

3         Q.   Okay.  So you both thought that -- You both

4    agree to the use of prior owner, right?

5         MR. McCARTHY:  Same objection.

6         MS. McAULIFFE:  You can answer when they object.

7         THE WITNESS:  Sorry.  Repeat.  Can you repeat.

8    BY MS. McAULIFFE:

9         Q.   Yeah, so you and your clients both agreed to

10   the use of prior owner?

11        A.   Yes.

12        MR. McCARTHY:  Object to foundation.

13   BY MS. McAULIFFE:

14        Q.   So now I'd like to turn to what's been

15   previously marked as Exhibit 6, and this is --  It

16   combines the July 2nd letter from Ms. Hawkins and your

17   response that was provided on July 3rd.

18             So you signed this document, right?

19        A.   Yes.  Did you say Exhibit 6 or Exhibit 5?

20        Q.   This is 6.  Sorry.  The Title was 5.  You can

21   ignore the labels.  Yeah, you can ignore the labels.

22   For the record, it's what we say it is.

23        A.   Okay.  Go ahead and repeat.

24        Q.   So you signed this letter?

1      A.    Correct.  Yes.

2      Q.    And have you seen this letter before?

3      A.    Yes.

4      Q.    And did you also prepare the responses for

5    this letter?

6      A.    I believe so, yes.

7      Q.    Okay.  And same as the other one, you can send

8    letters out without them being reviewed, right?

9      A.    By another attorney, yes.

10     Q.    And do you recall reviewing your answers or

11   discussing your answers with any other attorney?

12     A.    I don't recall, no.

13     Q.    But you would have showed this to your clients

14   before sending it out?

15     A.    Yes.

16     Q.    All right.  So, again, turning to the favorite

17   question.  In this one -- So Sarah repeats in her

18   response, With respect to Item E again as a third-party

19   corporate relocation company, seller is unable to make

20   verifications regarding whether the property has

21   experienced water leaking -- leakage or damage.

22   However, seller agrees to abide by the terms of the

23   buyer's duty to inspect section of the AIRES' addendum

24   with respect to possible leak, seepage or water

Page 27

1    infiltration at the property as seller would have had no

2    knowledge of such matters unless raised during a home

3    inspection process when the information was reported in

4    the Residential Real Property Disclosure Report or other

5    homeowner-provided disclosures make no mention of water

6    infiltration issues within the property, right?

7         A.    Yes.

8         Q.    Okay.  And you said okay to that, right?

9         A.    Right.

10        Q.    So it seems like you agreed that that was okay

11   that they couldn't make the disclosures, right?

12        A.    Yes.

13        Q.    They couldn't make any representations or

14   warranties?

15        A.    Right.

16        Q.    And then for 9A, same thing, you also said,

17   okay, when Sarah said, seller is unable to make

18   representations or warranties regarding whether

19   insurance claims have been made against the property as

20   seller would have no knowledge of such matters, right?

21        A.    Right.

22        Q.    And you said okay to that again?

23        A.    Right.  Yes.

24        Q.    Now, why would you agree to those matters if

Page 28

1    they said they had no knowledge if it's important to get

2    the information?

3        A.    Well, you can only ask something so many times

4    at some point.  So I could keep asking or not, and I

5    would just keep getting the same answer.

6        Q.    Right.

7              And did you go out and get the information

8    from anyone else?

9        A.    I'm -- No, not particularly.  I'm not sure

10   what are you referring to though?  Who else would I get

11   that information from?

12       Q.    Did you ever speak to the Gonrings about the

13   information?

14       A.    No.  No.  I would have no right to speak to

15   them.

16       Q.    Did you -- And why do you think you didn't

17   have a right to speak to them?

18       A.    They're not involved in the transaction, as

19   far as I know.

20       Q.    But there's nothing preventing you from

21   seeking them out and asking them these questions, was

22   there?

23       A.    Well, I don't know if they are represented by

24   counsel and something else.  I wouldn't -- I wouldn't

                                                    Page 29

1   contact them directly, no.  I wouldn't try to do that.

2       Q.    Did you ever ask Sarah Wilkins if they were

3   represented by counsel?

4       A.    No.

5       Q.    And you didn't ask her for their contact

6   information or anything, right?

7       A.    Correct.

8       Q.    Okay.  So you mentioned earlier that you had

9   done about a hundred relocation closings?

10      A.    Um-hum.

11      Q.    And did you ever talk to the sellers in any of

12  those situations?

13      A.    No.

14      Q.    And why not?

15      MS. OSHANA:  I'm going to object to form.

16  BY THE WITNESS:

17      A.    You know, I just didn't.  I don't know why.

18  BY MS. McAULIFFE:

19      Q.    Had you received -- Have you ever received

20  similar responses from a relocation company saying they

21  don't have knowledge of certain information or certain

22  warranties that you wanted made?

23      A.    Yes.

24      Q.    And what do you typically do in that

Page 30

1   situation?

2       A.   Similar to what I did here, push for that

3   information as best I can, and see what their responses

4   are.

5       Q.   And do they typically provide those responses?

6       A.   Sometimes we get more information than others,

7   just like any other seller.

8       Q.   Okay.  But in this particular situation, you

9   didn't receive that information, right?

10      A.   You can see what I received.

11      Q.   Okay.  I'd like to just turn to the last

12  letter, just for completeness, that we had.  It was

13  marked previously as Exhibit 7.  So this is a letter

14  dated July 5th, and it's just a letter from Sarah

15  Wilkins to, again, Mr. Hawbecker at your firm.

16           Do you remember looking at this letter?

17      A.   Not specifically, but I'm sure I did.

18      Q.   Okay.  If it was in the file you would have

19  looked at it, right?

20      A.   Right.

21      Q.   Okay.  And so she sent you also the Addendum

22  to Purchase and Sale contract.

23           Was that signed and executed after this?

24      A.   I would assume it was.

Page 31

1        Q.    So was there any other letters that you had

2   with Sarah Wilkins that we didn't go over today?

3        A.    I don't recall.

4        Q.    In all of these letters we talked about the

5   information and how AIRES said they couldn't provide the

6   information but they did answer some questions.

7              So where did you think they were getting this

8   information?

9        A.    I don't know.

10       Q.    Did you ever ask them where they were getting

11  the information?

12       A.    No, that really wouldn't -- No.

13       Q.    Okay.  And did you -- Were you aware that

14  AIRES wasn't occupying the building at the time of --

15       A.    I believe they said they weren't occupying.

16  So yes.

17       Q.    So you stated that you went over these letters

18  before you sent the response with Melinda, right?

19       A.    She had had an opportunity to review them,

20  yes.

21       Q.    Okay.  And so you were passing along just the

22  information so she could determine whether she wanted to

23  take certain risks or not with purchasing the property,

24  right?

Page 32

1      A.   I was passing along so she could review it and
2   then we could discuss if necessary.
3      Q.   Okay.  And she ended up ultimately purchasing
4   the property, right?
5      A.   Yes.
6      MS. McAULIFFE:  All right.  That's all the
7   questions I have for right now.  I might have some
8   follow-up afterwards.  But I'd let whoever else would
9   like to speak go right ahead.  Thank you.
10      THE WITNESS:  Thank you.
11      MS. OSHANA:  Paul, are you going next?
12      MR. McCARTHY:  Yeah.  I don't see a need to reask
13   all of the same questions to this witness of what
14   Mr. Hawbecker identified in the file.
15         Does anyone else feel differently about that?
16      MR. GOOD:  I do not.
17      MR. McCARTHY:  Carol?
18      MS. OSHANA:  I'm sorry.  When you say identified in
19   the file, can you just say what you're saying.  I didn't
20   get that.
21      MR. McCARTHY:  Well, we went through the documents
22   in the file.  We marked them as exhibits.  I'm not
23   feeling the need to go spend the same -- go re-tread the
24   same tire we've already dealt with with Tom.

Page 33

1      MS. OSHANA:  Yeah, that's up to you.  I have some

2  questions, so you go ahead and do your thing.

3      MR. McCARTHY:  Okay.

4                         EXAMINATION

5  BY MR. MCCARTHY:

6      Q.   Can I call you Kirk?

7      A.   Kirk.

8      Q.   Kirk?

9      A.   Yeah.

10      Q.   So, Kirk, did a significant amount of your

11  experience in the real estate area come from working

12  with Mr. Hawbecker?

13      A.   Yes.

14      Q.   Do you look up to him a bit as a mentor in

15  this practice area?

16      A.   Yes.

17      MR. McCARTHY:  That's it.  I don't -- I'm confident

18  I don't need to go ask Kirk all the same questions I

19  already asked Tom.

20          Thank you.

21      THE WITNESS:  Okay.

22      MS. OSHANA:  I have a question.

23

24

1                      EXAMINATION

2  BY MS. OSHANA:

3     Q.   So I just want to clarify.

4          With these Attorney Review Letters, sometimes

5  you and Tom work together and sometimes you don't?  Is

6  that how it goes?  Or do you --

7     A.   Yeah, sometimes we work together.  Sometimes

8  we don't.  We always have the ability to work together.

9     Q.   And with these --

10    A.   If that makes sense.

11    Q.   With this particular Attorney Review Letters

12  that we're discussing, you don't remember specifically

13  if you did or didn't?

14    A.   I don't.

15    Q.   So it's possible that Mr. Hawbecker did work

16  on these letters?

17    A.   It is possible.

18    Q.   Now, with respect to the letter where you said

19  prior owner, which is Exhibit 6, I think.  Wait.

20         What is this exhibit right here, Ms. Tucker?

21    MS. McAULIFFE:  This is Exhibit 4.  I can also give

22  you control of sharing the screen and stop sharing mine

23  so you can point out --

24    MS. OSHANA:  It's okay.  Just leave this here

Page 35

1  because it's easier.

2       MS. McAULIFFE:  Okay.  Sorry.  I'll get it back.

3  There we go.

4  BY MS. OSHANA:

5       Q.   So this was Exhibit 4 -- Wait.  Is that

6  right?

7       MR. GOOD:  Yes, that's correct, it's Exhibit 4.

8       MS. OSHANA:  Okay.

9  BY MS. OSHANA:

10      Q.   I just wanted to clarify.  Mr. Hawbecker had

11  testified that with respect to the word prior owner,

12  please confirm the same with prior owner, it was his

13  understanding that prior owner meant the Gonrings, and

14  he assumed that AIRES was the current owner.

15           Was that your understanding?

16      A.   Yes.

17      Q.   Now, had you known that the Gonrings were the

18  actual owners and AIRES were not the owners of this

19  property, would you have acted any differently in these

20  Attorney Review Letters?

21      A.   I would say no.  But it's -- Because my

22  contract was with AIRES, and that's who we were in

23  contact with.

24      Q.   Let me ask you this.

Page 36

1              If you had known that AIRES' attorneys were
2     communicating directly with the Gonrings, would that
3     have changed anything?
4          A.   Yes.
5          Q.   Okay.  And how?
6          A.   I think -- I would have probably continued to
7     push further to say that the Gonrings need to answer
8     these questions.
9          Q.   Okay.
10         MS. OSHANA:  You can stop the share screen.
11    BY MS. OSHANA:
12         Q.   Now is it fair to say that when you received
13    responses from attorneys and the Attorney Review Letters
14    you're relying upon the attorney to tell the truth?
15         A.   Yes.
16         Q.   Is it fair to say that when you receive
17    responses from attorneys in these Attorney Review
18    Letters that you expect that they will give you full
19    disclosures to the answers that you asked?
20              Sorry.  Let me rephrase that.
21              Is it fair to say that with respect to these
22    Attorney Review Letters you expect attorneys to fully
23    disclose information that is in their purview as to
24    these Attorney Review Letters?

Page 37

1          A.   Yes.

2          MR. McCARTHY:   Object to form.

3          MS. McAULIFFE:   Join in that.

4          MS. OSHANA:   Let me try that again.

5    BY MS. OSHANA:

6          Q.   When you ask a letter -- When you ask a

7    question in the Attorney Review Letters, you expect the

8    attorney to fully disclose his or her knowledge?

9          A.   Yes.

10         Q.   Do you rely on that?

11         A.   Yes.

12         Q.   Do you rely on the truth where -- Do you rely

13   on what you believe to be the truth as to these

14   responses?

15         A.   Say it again.

16         Q.   Do you rely on the idea that whatever it is

17   the attorney is responding to in the Attorney Review

18   Letter is the truth?

19         A.   Yes.

20         Q.   So if an attorney is in communication with a

21   party, with an owner, would you expect that attorney to

22   tell you that?

23         MR. McCARTHY:   Object to foundation, form.

24         THE WITNESS:   Should I still answer?

```
                                          Page 38

 1        MR. McCARTHY:  Yes.

 2        MS. OSHANA:  Yes.

 3        THE WITNESS:  Sorry, can you say it again,

 4        MS. OSHANA:  Let me ask it a different way.

 5   BY MS. OSHANA:

 6        Q.    In this case -- In this file we now know that

 7   AIRES was never the title holder of this property on

 8   Cortez, you know that, right?

 9        A.    Yes.

10        Q.    Okay.  And, in fact, at the end the property

11   was conveyed from the Gonrings to Melinda Sgariglia, the

12   Plaintiff in this case, you're aware of that, right?

13        A.    Yes.

14        Q.    Okay.  And at the time that we were doing the

15   Attorney -- that you were doing the Attorney Review

16   Letters, you had no idea that the Gonrings had input on

17   these Attorney Review Letters, did you?

18        A.    Correct.

19        Q.    Would that have been important information for

20   you to know?

21        A.    Yes.

22        Q.    Would it have changed anything?

23              For example, let me give you an example.

24              The Gonrings were aware that it was -- they
```

Page 39

1    were the ones that approved the $3,000 credit for

2    repairs.  The Gonrings approved it.

3              Had you known that, would that have changed

4    the way you approached the issues as to the

5    disclosures?

6         MR. McCARTHY:  Object to form and foundation.

7         MS. McAULIFFE:  AIRES joins in that.

8    BY THE WITNESS:

9         A.   I would say probably.

10        MS. OSHANA:  Let me be more specify.

11   I showed this to Tom earlier.  I'm showing it to you

12   now.  This is Exhibit -- I believe this is Exhibit 18.

13            Is that right, you guys?

14        MR. GOOD:  Yes, that is correct.

15   BY MS. OSHANA:

16        Q.   July 3, 2018 e-mail, Exhibit 18.

17            Can you see it?

18        A.   Yes.

19        Q.   Okay.  Can you read it?

20        A.   Hold on one second.  My phone is ringing and

21   I'm getting instant messages.  Sorry about that.

22            Okay.  You want me to read the e-mail.

23        Q.   Yes, please.  You can see here it's an e-mail

24   from Kelsey Gonring, who is the -- who was the owner

Page 40

1   before my client purchased it, she had formerly

2   purchased it, and she's sending an e-mail to Sarah

3   Wilkins.  She's cc'd anyway.  And Nick Gonring is cc'd.

4       A.   Okay.  You want me to read the whole thing?

5       Q.   Yes.

6       A.   Hello every one.  Thank you for looping us in

7   ahead of time given the holiday.  Nick and I have

8   reviewed the buyer's response and decided to agree to

9   the buyer's terms, $3,000 closing credit and 125 tax --

10  percent tax proration outlined in the attached document.

11  To address Item Number 12 stating with respect to Item

12  15 another inquiry has been made with the property's

13  condominium association regarding all the rental

14  restrictions that are in place, and a firm response will

15  be provided.  There are no rules or regulations

16  regarding renting of the property.  This information can

17  be found in the association documents that are attached.

18  Please provide Nick and I with the necessary

19  documentation to sign at your earliest convenience in

20  order to finalize the sale.

21      Q.   Okay.  So here it's clear that she says Nick,

22  which is her husband, Nick and Kelsey Gonring are

23  communicating in their agreement as to the closing cost

24  credit and tax proration, right?

Page 41

1      MR. McCARTHY:  Object to form.

2  BY THE WITNESS:

3      A.   Yes.

4  BY MR. OSHANA:

5      Q.   Now, does this surprise you?

6      A.   Yes.

7      Q.   Why?

8      A.   Because they have input in the sale in that

9  way.

10      Q.   Because you assumed that the Gonrings were no

11  longer the owners, right?

12      A.   Correct.

13      Q.   This is a July 5 e-mail, Exhibit 19.  Can

14  you -- You don't have to read it out loud.  Just read it

15  to yourself.

16      A.   Okay.

17      Q.   Okay.  So obviously this is an e-mail from

18  Nicholas Gonring who was the owner of the property

19  before Melinda purchased it, and he's e-mailing his wife

20  and also Terry Wilkins of swilklaw.com.  Here, he is

21  saying, is it common for us to have zero contact with

22  the attorneys that are working on our behalf through

23  AIRES?

24           Do you see that?

Page 42

1      A.    Um-hum.  Yes.

2      Q.    Okay.  Would it be important for you to know

3  that the attorneys are working on the Gonrings' behalf?

4      A.    Yes.

5      Q.    Okay.  And how would that be important to you?

6      A.    Because that -- For example, what we're

7  talking about, we would understand that there should be

8  somebody who would answer the questions that we've

9  asked.

10      Q.    Okay.  And you would have assumed that the

11  Gonrings were not in communication with the attorney and

12  that's why the attorney couldn't get you that

13  information that you were seeking in Paragraphs 8 and 9

14  of your Attorney Review Letter, isn't that correct?

15      MR. McCARTHY:  Object to form.

16  BY THE WITNESS:

17      A.    Yes.

18  BY MS. OSHANA:

19      Q.    Is it fair to say that when you were saying

20  prior owners in the Attorney Review Letters, is it fair

21  to say that the attorney should have told you that the

22  Gonrings are not the prior owners, that they are the

23  current owners?

24      MR. McCARTHY:  Object to form and foundation.

Page 43

1        MS. McAULIFFE:  I'll just join in that.

2   BY THE WITNESS:

3        A.   Yeah, I don't know if that's fair to say or

4   not.

5   BY MS. OSHANA:

6        Q.   Isn't it fair to say that the attorney should

7   have disclosed to you that she was talking to the

8   Gonrings about your request?

9        A.   Yes.

10       MS. OSHANA:  Okay.  I have nothing further.

11       MR. McCARTHY:  I have just one quick follow-up

12  question.

13                      EXAMINATION

14  BY MR. McCARTHY:

15       Q.   When you were going through the letters back

16  and forth with Sarah, in using the term property, that

17  was a term that was capitalized.

18            Do you recall that?

19       A.   Yes.

20       Q.   And the capitalized term property ties into

21  the definition in the Purchase Agreement; is that

22  correct?

23       A.   Correct.

24       MR. McCARTHY:  All right.  That's all I have.

Page 44

1    Thank you.

2        MR. GOOD:  I have no questions for this witness.

3        MS. McAULIFFE:  I have just a few follow-ups.  Also

4    it will be brief.

5                              EXAMINATION

6    BY MS. McAULIFFE:

7        Q.   So why did you assume that the Gonrings

8    weren't the owners anymore?

9        A.   Because we had a contract with AIRES.

10       Q.   But did you ever ask AIRES who the current

11   owners were?

12       A.   No.

13       Q.   Did you ever ask AIRES for title?

14       A.   I assume at some point, yes, we asked for

15   title.  I'm sure we would have gotten it.

16       Q.   Did you ask -- Let me be more specify.

17       A.   Sure.

18       Q.   Did you ask AIRES if they had the title or had

19   possession of the title?

20       A.   Do you mean -- Not to ask you a question.  But

21   you mean the -- was the property deeded to them, is what

22   you're saying.

23       Q.   Yes.

24       A.   Yes.  No, I did not ask that.

Page 45

1      Q.   Do you typically ask relocation companies who

2  the deed is in --

3      A.   No.

4      Q.   -- whose name the deed is in?

5           And -- So when the relocation company in

6  general, in your experience, signs the contract, you

7  don't know who has the title until you show up at

8  closing, right?

9      A.   Correct.

10     Q.   And just one last question.

11          Did anyone tell you that you couldn't contact

12  the Gonrings, directly?

13     A.   No.

14     Q.   And did you ever tell your client that she

15  couldn't contact the Gonrings directly?

16     A.   I don't think so.  If I -- If asked, I may

17  have said that.  But I don't -- I don't know.

18     Q.   Okay.  And in her deposition she said that she

19  was told that she couldn't contact the Gonrings,

20  directly.

21     MS. OSHANA:  Objection as to mischaracterizing the

22  testimony.  Go ahead.

23     THE WITNESS:  Is there a question --

24     MS. OSHANA:  Also attorney-client privilege.

Page 46

1  Attorney-client privilege.

2      MR. McCARTHY:  It's not privileged if she said it.

3      MS. OSHANA:  Paul, I'm sorry, I didn't hear what

4  you said.  What did you say?

5      MR. McCARTHY:  I'm just saying it's not privileged

6  if that's what Melinda said at her deposition.

7      MS. OSHANA:  Yeah, but I don't believe that she

8  did.  Until you pull out the deposition and show me,

9  it's privileged.

10     MR. GOOD:  I believe the witness already answered

11 the question, making this moot.

12     MS. McAULIFFE:  Okay.  I'll just rephrase the

13 question.

14 BY MS. McAULIFFE:

15     Q.  So you don't remember telling Melinda that she

16 couldn't contact the Gonrings, right?

17     A.  I don't recall.

18     MR. McCARTHY:  Again, same objection.

19     MS. McAULIFFE:  Okay.  All right.  That was all the

20 questions I have if no one has any follow-up.

21     MR. GOOD:  I have nothing for this witness.  Thank

22 you for your time, sir.

23     MS. OSHANA:  Thanks, Kirk.

24     MR. McCARTHY:  Thanks, Kirk.

```
                                                    Page 47

 1          Hey, the only question I have is, before we

 2    go, and we can go off the record for this discussion.

 3                            (WHEREUPON, WE WERE OFF THE

 4                             RECORD AT 1:57 P.M.)

 5

 6              *       *       *       *       *       *

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 48

1  STATE OF ILLINOIS   )

2                      )  SS:

3  COUNTY OF COOK      )

4

5        I, TRUDY GORDON, within and for the County of

6  Cook, State of Illinois, and a Certified Shorthand

7  Reporter of said state, do hereby certify:

8        That previous to the commencement of the

9  examination of the witness, the witness was duly sworn

10 to testify the whole truth concerning the matters

11 herein;

12       That the foregoing deposition transcript was

13 reported stenographically by me, was thereafter reduced

14 to typewriting under my personal direction and

15 constitutes a true record of the testimony given and the

16 proceedings had;

17       That the said deposition was taken before me at

18 the time and place specified;

19       That I am not a relative or employee or attorney

20 or counsel, nor a relative or employee of such attorney

21 or counsel for any of the parties hereto, not interested

22 directly or indirectly in the outcome of this action.

23       IN WITNESS WHEREOF, I do hereunto set my hand

24 and affix my seal of office at Chicago, Illinois, this

Page 49

1   21st day of July, 2023.

2

3

                                 Trudy G. Gordon

4                                    CSR No. 084-004077

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

| & |
| --- |

**&** 1:9 3:3 8:12 9:14,15

| 0 |
| --- |

**000123** 4:15
**05684** 1:6
**084-004077** 3:24 49:4

| 1 |
| --- |

**1** 2:9 13:7
**10** 9:17,19,19
**12** 40:11
**125** 40:9
**14th** 16:19
**15** 40:12
**16** 4:11
**1600** 3:4
**161** 3:3
**1741** 49:3
**18** 4:15 39:12 39:16
**18th** 19:17
**19** 4:11 41:13
**1:00** 1:18
**1:19** 1:6
**1:57** 47:4

| 2 |
| --- |

**2** 4:11 16:18
**20** 8:8
**200** 2:3
**2004** 7:20 8:1,7
**2013** 9:16
**2018** 15:12,14 16:23 17:3

39:16
**2023** 1:18 49:1
**21** 4:12,12
**21st** 49:1
**22nd** 21:5 24:17
**23rd** 1:18
**25** 4:13
**26** 4:14
**2726** 13:6
**2nd** 25:16

| 3 |
| --- |

**3** 4:11 9:3 19:17 39:16
**3,000** 39:1 40:9
**300** 2:19
**312-244-6700** 2:11
**312-404-8390** 2:4
**312-899-6626** 3:5
**3200** 2:10
**33** 2:2 4:5
**34** 4:5
**39** 4:15
**3rd** 25:17

| 4 |
| --- |

**4** 4:12 21:10 24:4,17 34:21 35:5,7
**43** 4:6
**44** 4:6

**49503** 2:19

| 5 |
| --- |

**5** 4:4,12,14 19:6 21:4,10 23:20 25:19,20 41:13
**5000** 10:16
**55** 2:18
**5th** 30:14

| 6 |
| --- |

**6** 4:13 25:15,19 25:20 34:19
**6-14-2018** 4:11
**6-18** 4:11
**6-22** 4:12
**60601** 3:4
**60602** 2:3
**60606-3610** 2:10
**616-235-3500** 2:20

| 7 |
| --- |

**7** 4:14 30:13
**7-2** 4:13
**7-3** 4:14
**711** 7:6

| 8 |
| --- |

**8** 18:10 42:13
**8e** 19:24 22:13

| 9 |
| --- |

**9** 18:10 19:2 42:13

**9-18-79** 7:2
**9a** 20:11 22:18 27:16

| a |
| --- |

**a.d.** 1:18
**abide** 20:4 26:22
**ability** 34:8
**accordance** 5:19
**act** 12:23 13:2
**acted** 35:19
**action** 48:22
**actual** 35:18
**actually** 14:3 21:6
**addendum** 20:6 26:23 30:21
**address** 7:5 40:11
**affix** 48:24
**afternoon** 5:3
**ago** 15:1,2 16:1
**agree** 25:4 27:24 40:8
**agreed** 25:9 27:10
**agreement** 5:18 40:23 43:21
**agrees** 20:4 26:22
**ahead** 14:9 25:23 32:9 33:2 40:7

45:22
aires  1:8 2:15
  17:13 20:6,19
  24:19 26:23
  31:5,14 35:14
  35:18,22 36:1
  38:7 39:7
  41:23 44:9,10
  44:13,18
american  1:7
  2:15 5:4
amount  33:10
anos  8:12
answer  6:3,4
  6:10,16 15:19
  19:24 20:11
  22:18 25:6
  28:5 31:6 36:7
  37:24 42:8
answered
  46:10
answers  26:10
  26:11 36:19
anticipate  6:2
anymore  44:8
anyway  40:3
appearances
  2:1
appeared  2:6
  2:15,22 3:7
applicable  5:20
approached
  39:4
approved  39:1
  39:2

approximately
  11:1
area  33:11,15
areas  9:24 10:1
ash  8:12
asked  13:11,12
  13:14 17:24
  33:19 36:19
  42:9 44:14
  45:16
asking  6:3
  15:16 18:13
  28:4,21
association  3:8
  18:16 40:13,17
assume  30:24
  44:7,14
assumed  35:14
  41:10 42:10
attached  40:10
  40:17
attend  7:17
attention  23:19
attorney  8:6
  13:24 14:16
  16:3,11 17:13
  22:3 26:9,11
  34:4,11 35:20
  36:13,14,17,22
  36:24 37:7,8
  37:17,17,20,21
  38:15,15,17
  42:11,12,14,20
  42:21 43:6
  45:24 46:1

48:19,20
attorneys  4:12
  21:20 36:1,13
  36:17,22 41:22
  42:3
avenue  2:18
aware  31:13
  38:12,24

　　　　　b

b  4:9
back  13:9
  22:10 35:2
  43:15
backgrounds
  7:12
bar  7:24
behalf  2:6,15
  2:22 3:7 41:22
  42:3
believe  13:3
  14:17 21:3
  22:10 23:15
  25:2 26:6
  31:15 37:13
  39:12 46:7,10
benefit  6:1
  17:23
best  30:3
birth  7:1
bit  11:3 14:23
  15:6 33:14
boxes  8:15
break  6:13,14
  6:15,17

brief  44:4
broad  12:1
  14:12
brought  23:5
building  31:14
buildings  10:20
business  9:9,11
  9:11 10:21
buy  10:8
buyer  12:4,6,9
  12:16
buyer's  20:5
  26:23 40:8,9
buyers  10:5

　　　　　c

c.s.r.  3:23
caitlin  2:11 5:4
call  14:24 33:6
called  5:9 8:12
  8:21
calls  14:22
campau  2:18
capitalized
  43:17,20
career  11:5
carol  2:4 14:10
  15:13 16:1
  32:17
case  13:8 14:7
  14:12 16:7,7
  17:12 22:9
  23:12,13 24:1
  38:6,12
casey  2:13

**[catering - cs5760610]**                                          Page 3

**catering** 9:7
**cause** 20:24
**cc'd** 40:3,3
**certain** 29:21
  29:21 31:23
**certainly** 6:14
**certificate** 3:24
**certified** 1:14
  48:6
**certify** 48:7
**champaign**
  7:18
**changed** 36:3
  38:22 39:3
**chicago** 2:3,10
  3:4 7:7,16 13:7
  48:24
**civil** 1:16
**claims** 19:6
  20:15 27:19
**clarification**
  6:7 15:21
**clarified** 6:6
**clarify** 15:9
  18:22 34:3
  35:10
**clark** 3:3
**clear** 15:17
  21:11 40:21
**clerk** 8:14
**client** 13:5
  14:21 22:7
  40:1 45:14,24
  46:1

**clients** 17:23
  24:21,24 25:9
  26:13
**closing** 11:22
  12:19 13:23
  14:2 15:5,8
  16:3 17:13
  40:9,23 45:8
**closings** 8:16
  10:13,18,23
  11:11 12:13
  29:9
**cmauliffe** 2:12
**combines** 25:16
**come** 33:11
**commencem...**
  48:8
**commencing**
  1:17
**commercial**
  10:19,20
**commitment**
  21:10 23:20,22
  23:23,24 24:5
  24:9
**common** 41:21
**communicating**
  36:2 40:23
**communication**
  37:20 42:11
**companies**
  10:23 13:2
  45:1
**company** 9:6
  11:10,22 12:5

12:5,14,15,21
  20:1,12,21
  26:19 29:20
  45:5
**completeness**
  30:12
**concern** 20:24
**concerning**
  48:10
**condo** 3:7 13:5
  13:6 18:16
**condominium**
  40:13
**condos** 10:20
**confident** 33:17
**confirm** 22:14
  22:19 35:12
**connection**
  10:21
**constitutes**
  48:15
**contact** 22:15
  22:20 29:1,5
  35:23 41:21
  45:11,15,19
  46:16
**continued** 3:1
  36:6
**contract** 14:1
  15:5,8 17:23
  30:22 35:22
  44:9 45:6
**control** 34:22
**convenience**
  40:19

**conversation**
  15:18
**conveyed** 38:11
**cook** 48:3,6
**corporate** 8:24
  9:7 20:1,12,20
  26:19
**corporation**
  1:8 2:16
**correct** 8:9
  19:7 24:12,15
  26:1 29:7 35:7
  38:18 39:14
  41:12 42:14
  43:22,23 45:9
**corresponden...**
  16:4
**corresponden...**
  16:2
**cortez** 13:6
  38:8
**cost** 40:23
**counsel** 28:24
  29:3 48:20,21
**county** 48:3,5
**couple** 5:24 9:5
  13:9
**course** 11:5
**court** 1:1 6:8
  6:12
**courts** 1:16
**credit** 39:1 40:9
  40:24
**cs5760610** 1:24

**csr** 49:4
**current** 24:17
  35:14 42:23
  44:10
**currently** 7:3
**cv** 1:6

**d**

**d** 4:1
**d.b.a.** 1:8 2:15
**damage** 18:18
  18:20 26:21
**damages** 20:3
**date** 5:18 7:1
  24:5
**dated** 30:14
**dates** 18:20
**day** 1:18 49:1
**days** 15:1,2
  16:1
**dealt** 32:24
**dearborn** 2:2
**decided** 40:8
**deed** 12:4,6,10
  12:14,15 45:2
  45:4
**deeded** 44:21
**deeds** 12:12
**defendants**
  1:10
**definition**
  43:21
**degree** 7:14,21
**deposed** 5:21
**deposition** 1:13
  4:10 5:17,19

6:23 13:18
14:6,21,21
16:18 45:18
46:6,8 48:12
48:17
**depositions**
  1:17
**description**
  4:10
**details** 16:7
**determine**
  31:22
**different** 38:4
**differently**
  32:15 35:19
**digging** 8:15
**direct** 22:15,20
**direction** 48:14
**directly** 29:1
  36:2 45:12,15
  45:20 48:22
**disclose** 36:23
  37:8
**disclosed** 43:7
**disclosure**
  12:23 27:4
**disclosures**
  27:5,11 36:19
  39:5
**discovery** 5:16
  8:15
**discuss** 23:1
  32:2
**discussed** 15:12

**discussing**
  16:11 26:11
  34:12
**discussion** 47:2
**district** 1:1,1
  1:16
**division** 1:2
**document**
  19:20 25:18
  40:10
**documentation**
  40:19
**documents**
  14:15 32:21
  40:17
**doing** 9:10
  11:10 38:14,15
**draft** 22:6
**dug** 13:23
**duly** 5:2,9 48:9
**duty** 20:5 26:23

**e**

**e** 4:1,9,15 22:11
  26:18 39:16,22
  39:23 40:2
  41:13,17,19
**earlier** 9:21
  12:12 16:18
  29:8 39:11
**earliest** 40:19
**easier** 35:1
**eastern** 1:2
**eckhart** 8:21
**education** 7:13

**eisenberg** 3:3
**either** 13:11
  15:1
**employee** 48:19
  48:20
**ended** 32:3
**entire** 15:17
**entirety** 24:7
**estate** 8:16,24
  9:1,22 10:4,8
  10:13,18,22
  33:11
**estates** 9:22
**event** 15:14
**events** 15:12
**eventual** 12:6
  12:16
**exactly** 15:2
  18:12
**examination**
  4:4,5,5,6,6 5:11
  33:4 34:1
  43:13 44:5
  48:9
**examined** 5:10
**example** 38:23
  38:23 42:6
**execute** 12:4,6
**executed** 30:23
**executes** 12:10
**exhibit** 4:11,11
  4:12,12,13,14
  4:15 16:18
  19:17,24 21:4
  21:10,10 23:20

24:17 25:15,19
25:19 30:13
34:19,20,21
35:5,7 39:12
39:12,16 41:13
**exhibits** 4:10
4:17 32:22
**expect** 36:18,22
37:7,21
**experience**
33:11 45:6
**experienced**
18:16 20:3
26:21
**exteriorly**
18:17

**f**

**fact** 38:10
**fair** 36:12,16
36:21 42:19,20
43:3,6
**familiar** 12:22
**far** 28:19
**favorite** 26:16
**february** 1:18
**federal** 1:15
**feel** 32:15
**feeling** 32:23
**figure** 13:22
**file** 13:12,15,19
13:21 30:18
32:14,19,22
38:6
**filings** 8:15

**finalize** 40:20
**fine** 15:20
**finish** 6:2
**firm** 2:2 8:12
8:21,23 9:21
9:23 30:15
40:14
**first** 5:9 6:1
8:10 12:13
13:8 16:24
**five** 9:12
**focus** 9:24
**follow** 32:8
43:11 44:3
46:20
**following** 19:4
**follows** 5:10
**foregoing**
48:12
**form** 24:22
29:15 37:2,23
39:6 41:1
42:15,24
**former** 14:20
**formerly** 40:1
**forth** 43:16
**found** 40:17
**foundation**
24:22 25:12
37:23 39:6
42:24
**frame** 11:8
**franklin** 2:9
**freedman** 8:12

**full** 36:18
**fully** 36:22 37:8
**further** 36:7
43:10

**g**

**g** 1:14 3:23
49:3
**garver** 9:14,15
14:4
**general** 45:6
**generally** 17:22
18:3,6
**getting** 28:5
31:7,10 39:21
**give** 17:19,20
34:21 36:18
38:23
**given** 40:7
48:15
**go** 5:23 7:15
8:20 9:4,13
14:9,14 16:7
16:11,24 17:20
25:23 28:7
31:2 32:9,23
32:23 33:2,18
35:3 45:22
47:2,2
**goes** 12:6,13
34:6
**going** 5:23
14:16 16:2,13
17:19 29:15
32:11 43:15

**gonring** 1:9,9
2:22 4:15 24:6
24:6 39:24
40:3,22 41:18
**gonrings** 23:13
24:11 28:12
35:13,17 36:2
36:7 38:11,16
38:24 39:2
41:10 42:3,11
42:22 43:8
44:7 45:12,15
45:19 46:16
**good** 3:5 5:3
10:6 32:16
35:7 39:14
44:2 46:10,21
**gordon** 1:14
3:23 48:5 49:3
**gorr** 3:7
**gotta** 5:5
**gotten** 44:15
**graduate** 7:19
**grand** 2:19
**great** 7:12
**grounds** 5:24
**grove** 7:6
**guaranty** 4:13
**guess** 18:6
**guys** 39:13

**h**

**h** 4:9
**hand** 48:23
**happen** 12:19

**happened** 15:4
　15:12
**happy** 6:6
**hawbecker**
　9:14,15 16:19
　17:16 18:1
　19:19 24:21
　30:15 32:14
　33:12 34:15
　35:10
**hawkins** 25:16
**hear** 13:10 46:3
**heard** 9:21 12:3
　12:11 17:11
**hello** 40:6
**help** 21:17
**helping** 10:8
**hereto** 48:21
**hereunto** 48:23
**hey** 47:1
**highest** 7:13
**hinsdale** 6:24
**hold** 39:20
**holder** 38:7
**holiday** 40:7
**home** 20:9 27:2
**homeowner**
　27:5
**huhs** 6:12
**hum** 14:8 24:8
　29:10 42:1
**hundred** 11:3
　29:9
**husband** 24:6
　40:22

## i

**idea** 37:16
　38:16
**identified**
　32:14,18
**ignore** 25:21,21
**illinois** 1:1,8
　2:3,10,15 3:4
　6:24 7:4,18 8:2
　10:9 12:22
　48:1,6,24
**immune** 13:2
**important**
　19:11,14 28:1
　38:19 42:2,5
**inaudible** 20:5
**indirectly**
　48:22
**infiltration**
　20:7 27:1,6
**information**
　17:24 18:5,7
　18:12,13 19:13
　19:14 27:3
　28:2,7,11,13
　29:6,21 30:3,6
　30:9 31:5,6,8
　31:11,22 36:23
　38:19 40:16
　42:13
**initial** 17:15
　18:7 19:9
**input** 21:20
　38:16 41:8

**inquiry** 40:12
**inspect** 20:5
　26:23
**inspection** 20:9
　27:3
**instance** 22:2
**instances** 18:16
**instant** 39:21
**insurance** 19:5
　20:15 27:19
**interested**
　48:21
**interiorly**
　18:17
**international**
　1:7 2:15 5:5
**involved** 10:16
　11:23 12:18
　28:18
**ish** 10:16
**issue** 23:5
**issues** 27:6 39:4
**item** 26:18
　40:11,11

## j

**job** 1:24 9:13
**joe** 11:15
**john** 3:7
**join** 37:3 43:1
**joins** 39:7
**july** 4:14 25:16
　25:17 30:14
　39:16 41:13
　49:1

**june** 16:19,23
　19:17 21:5
　24:17

## k

**keep** 15:16 28:4
　28:5
**kelly** 1:9
**kelsey** 2:22
　24:6 39:24
　40:22
**kent** 7:16
**kids** 7:11
**kind** 8:13
**kirk** 1:13 4:3
　5:8,15,17 33:6
　33:7,8,10,18
　46:23,24
**knew** 17:12
**know** 6:6,8,8
　6:14 8:15
　10:16,19 11:18
　13:1,14 14:17
　17:8 18:9
　19:14 21:9
　23:9,9,10,10,12
　23:14 28:19,23
　29:17,17 31:9
　38:6,8,20 42:2
　43:3 45:7,17
**knowledge**
　20:8,16 27:2
　27:20 28:1
　29:21 37:8
**known** 24:10
　35:17 36:1

| | | | |
|---|---|---|---|
| 39:3 | 38:16,17 42:20 | **m** | 29:18 32:6 |
| **kolak** 8:21 | 43:15 | | 34:21 35:2 |
| **l** | **level** 7:13 | **m** 2:11 | 37:3 39:7 43:1 |
| | **liability** 1:8 | **made** 18:20 | 44:3,6 46:12 |
| **labels** 25:21,21 | 2:16 | 19:5 20:15 | 46:14,19 |
| **langefeld** 1:14 | **licensed** 7:24 | 27:19 29:22 | **mccarthy** 2:20 |
| 4:3 5:8,15,17 | 8:2,4 10:12 | 40:12 | 2:21 4:5,6 21:9 |
| **law** 2:2 7:14,15 | **limited** 1:8 2:16 | **mail** 4:15 39:16 | 21:13 24:22 |
| 7:19,21 8:11 | **line** 18:4 24:4 | 39:22,23 40:2 | 25:5,12 32:12 |
| 8:14 | **litigation** 15:4 | 41:13,17 | 32:17,21 33:3 |
| **lawyers** 11:9 | **little** 11:3 14:12 | **mailed** 22:11 | 33:5,17 37:2 |
| **leak** 20:6 26:24 | 14:23 15:6 | **mailing** 41:19 | 37:23 38:1 |
| **leakage** 26:21 | **live** 7:3,10 | **make** 6:11 | 39:6 41:1 |
| **leaking** 20:3 | **llc** 1:7 2:15 | 15:21 20:2,13 | 42:15,24 43:11 |
| 26:21 | **llp** 2:9 | 26:19 27:5,11 | 43:14,24 46:2 |
| **learn** 13:8 | **located** 10:9 | 27:13,17 | 46:5,18,24 |
| **leave** 34:24 | 13:7 | **makes** 34:10 | **mckee** 2:18 |
| **left** 9:13 | **locations** 18:20 | **making** 46:11 | **mean** 11:24 |
| **legal** 9:8,10 | **loftus** 3:3 | **marked** 16:18 | 12:9 17:1 18:4 |
| **letter** 4:11,11 | **loftusandeise...** | 19:17 21:3 | 18:8 23:3,11 |
| 4:12,13,14 | 3:6 | 23:20 25:15 | 44:20,21 |
| 16:19,21,23,24 | **logan** 8:12 | 30:13 32:22 | **meant** 23:18 |
| 17:5,6,15,21 | **long** 8:6,17 9:2 | **maselli** 11:15 | 35:13 |
| 18:1,7,23 19:2 | **longer** 41:11 | **math** 10:15 | **melinda** 1:4 2:6 |
| 19:9,18 21:6 | **look** 13:16,20 | **matousek** 2:9 | 13:5 14:20 |
| 24:18,24 25:16 | 14:18 22:10 | **matter** 15:11 | 31:18 38:11 |
| 25:24 26:2,5 | 33:14 | **matters** 20:8,16 | 41:19 46:6,15 |
| 30:12,13,14,16 | **looked** 13:19 | 27:2,20,24 | **mention** 27:5 |
| 34:18 37:6,18 | 13:22,24 30:19 | 48:10 | **mentioned** |
| 42:14 | **looking** 18:7 | **matthew** 2:13 | 16:12 17:10 |
| **letters** 13:24 | 22:13 30:16 | **mcasey** 2:13 | 29:8 |
| 16:5,10,12 | **looping** 40:6 | **mcauliffe** 2:11 | **mentor** 33:14 |
| 26:8 31:1,4,17 | **losing** 19:5 | 4:4,6 5:3,4,12 | **messages** 39:21 |
| 34:4,11,16 | **loud** 41:14 | 18:24 19:1 | **michigan** 2:19 |
| 35:20 36:13,18 | | 21:12,14 24:23 | |
| 36:22,24 37:7 | | 25:6,8,13 | |

**mine** 34:22
**mischaracteri...**
45:21
**mix** 10:6,7
**modify** 17:22
**moment** 17:19
17:20
**moot** 46:11
**multiple** 20:19
**mutual** 24:20

**n**

**n** 4:1
**name** 5:3,13
23:12,14 45:4
**necessarily**
9:11
**necessary** 32:2
40:18
**need** 6:13 32:12
32:23 33:18
36:7
**never** 11:16
20:12,23 38:7
**nicholas** 1:9
2:22 24:6
41:18
**nick** 40:3,7,18
40:21,22
**nodding** 6:11
**nope** 6:20
**north** 2:2,9 3:3
7:6
**northern** 1:1
**notice** 5:17

**number** 19:24
40:11
**nw** 2:18

**o**

**oak** 7:4,5,8,9
**object** 24:22
25:6,12 29:15
37:2,23 39:6
41:1 42:15,24
**objection** 25:5
45:21 46:18
**obviously**
17:12 41:17
**occupied** 20:13
20:23
**occupying**
31:14,15
**occur** 11:4
**occurrences**
18:19
**offhand** 11:12
**office** 6:24
48:24
**okay** 6:7,18,21
7:7 8:2,20 9:8
9:17 10:5,13
11:4,8,14,16,21
12:11,18 13:4
13:20 14:5
16:6 17:4,24
18:21 20:19
21:23 22:5,22
23:11,19 24:4
24:16 25:3,23
26:7 27:8,8,10

27:17,22 29:8
30:8,11,18,21
31:13,21 32:3
33:3,21 34:24
35:2,8 36:5,9
38:10,14 39:19
39:22 40:4,21
41:16,17 42:2
42:5,10 43:10
45:18 46:12,19
**ones** 39:1
**opportunity**
31:19
**order** 40:20
**oshana** 2:2,4
4:5 18:22
29:15 32:11,18
33:1,22 34:2
34:24 35:4,8,9
36:10,11 37:4
37:5 38:2,4,5
39:10,15 41:4
42:18 43:5,10
45:21,24 46:3
46:7,23
**oshanalaw** 2:5
**outcome** 48:22
**outlined** 40:10
**outside** 10:12
**own** 6:1 9:5
21:21,22
**owned** 9:6
**owner** 22:14,15
22:19,20,23
23:2,4,11 25:4

25:10 34:19
35:11,12,13,14
37:21 39:24
41:18
**owners** 24:11
24:13,17 35:18
35:18 41:11
42:20,22,23
44:8,11
**ownership**
18:18

**p**

**p.m.** 1:18 47:4
**page** 4:2,10
**paragraph**
18:10
**paragraphs**
42:13
**park** 7:4,5,8,9
**participate**
17:9
**participated**
17:4
**particular** 11:8
30:8 34:11
**particularly**
28:9
**parties** 5:19
48:21
**party** 20:1,12
20:20 26:18
37:21
**passing** 31:21
32:1

**paul** 2:20 14:4 32:11 46:3
**pc** 2:18
**pending** 6:16
**percent** 40:10
**perform** 8:22
**personal** 48:14
**pertaining** 1:17
**phone** 39:20
**place** 14:24 40:14 48:18
**plaintiff** 1:5 2:6 38:12
**planning** 8:24
**please** 5:13 6:3 6:6,11 16:15 18:15,19 22:14 22:18 35:12 39:23 40:18
**point** 28:4 34:23 44:14
**position** 16:6
**possession** 44:19
**possible** 20:6 26:24 34:15,17
**potential** 23:5
**practice** 10:3 33:15
**preparation** 13:17
**prepare** 21:17 26:4
**prepared** 21:15

**present** 16:7
**pretty** 12:1,17
**preventing** 28:20
**previous** 19:24 48:8
**previously** 16:17 19:17 21:3 25:15 30:13
**primarily** 10:19,21
**prior** 22:14,15 22:19,20,22 23:2,4,11 24:11,13 25:4 25:10 34:19 35:11,12,13 42:20,22
**privilege** 45:24 46:1
**privileged** 46:2 46:5,9
**probably** 10:16 16:16 36:6 39:9
**procedure** 1:16
**proceedings** 48:16
**process** 11:22 20:9 27:3
**property** 12:23 18:17,19 19:14 20:3,7,13,15,23 26:20 27:1,4,6

27:19 31:23 32:4 35:19 38:7,10 40:16 41:18 43:16,20 44:21
**property's** 40:12
**proration** 40:10,24
**provide** 6:4,7 18:19 30:5 31:5 40:18
**provided** 24:2 25:17 27:5 40:15
**pull** 16:13 46:8
**purchase** 13:5 15:5,8 19:15 30:22 43:21
**purchased** 40:1 40:2 41:19
**purchasing** 31:23 32:3
**purpose** 17:15 17:18,22
**pursuant** 1:15 5:17
**purview** 36:23
**push** 30:2 36:7
**put** 23:1

**q**

**question** 6:2,4 6:5,5,15,16 15:22 18:5 26:17 33:22

37:7 43:12 44:20 45:10,23 46:11,13 47:1
**questions** 5:6 6:19 7:12 19:8 19:12,23 22:12 28:21 31:6 32:7,13 33:2 33:18 36:8 42:8 44:2 46:20
**quick** 43:11

**r**

**raised** 20:8 27:2
**rapids** 2:19
**rare** 17:8
**read** 18:4 19:23 20:22 39:19,22 40:4 41:14,14
**reading** 18:22
**reads** 19:3
**real** 8:16,24 9:22 10:3,8,13 10:18,20,22 12:23 27:4 33:11
**really** 23:9 31:12
**reask** 32:12
**recall** 11:20 13:16 17:2 21:18 23:9 26:10,12 31:3 43:18 46:17

**receive** 7:21 30:9 36:16
**received** 23:21 29:19,19 30:10 36:12
**recognize** 23:22,23
**record** 5:14,16 5:24 6:10 21:11 25:22 47:2,4 48:15
**recordings** 8:16
**reduced** 48:13
**refer** 24:13
**reference** 16:14
**referenced** 23:7
**referring** 18:9 18:15 24:14 28:10
**reflect** 5:16
**regarding** 18:10 20:2,14 26:20 27:18 40:13,16
**regards** 15:7
**regulations** 40:15
**relative** 48:19 48:20
**relocation** 1:7 5:5 10:23 11:10,22 12:5 12:5,14,15,21 13:2 20:1,12

20:20 26:19 29:9,20 45:1,5
**relocations** 2:15
**rely** 37:10,12 37:12,16
**relying** 36:14
**remain** 19:4
**remember** 11:9 11:13 13:12,21 14:2,3 15:2 16:15,21 23:16 30:16 34:12 46:15
**remote** 2:1
**rental** 40:13
**renting** 40:16
**repairs** 18:20 39:2
**repeat** 14:13 15:17 25:7,7 25:23
**repeats** 26:17
**rephrase** 36:20 46:12
**report** 27:4
**reported** 3:23 27:3 48:13
**reporter** 1:15 4:17 6:8,12 48:7
**represent** 5:4 10:5
**representations** 20:14 27:13,18

**represented** 28:23 29:3
**represents** 19:3
**request** 18:9 43:8
**required** 21:23 22:3
**residential** 10:3 10:18,21,22 12:23 27:4
**respect** 20:6 26:18,24 34:18 35:11 36:21 40:11
**respond** 21:20 21:22
**responding** 19:18 22:7 37:17
**response** 19:23 21:1,3,4 22:4 22:14 23:8 25:17 26:18 31:18 40:8,14
**responses** 4:14 21:15,17,19,24 22:6 26:4 29:20 30:3,5 36:13,17 37:14
**restate** 11:24
**restrictions** 40:14
**retained** 4:17
**review** 13:17 13:24 14:16

16:12 18:2 21:24 22:4,6 23:24 31:19 32:1 34:4,11 35:20 36:13,17 36:22,24 37:7 37:17 38:15,17 42:14,20
**reviewed** 24:9 24:24 26:8 40:8
**reviewing** 15:4 26:10
**rhoades** 2:18
**rhoadesmcke...** 2:21
**right** 5:23 6:23 11:6,19 13:13 17:13 18:3,12 18:20 19:6,22 20:9,17 21:7,8 22:16,23 24:7 25:1,4,18 26:8 26:16 27:6,8,9 27:11,15,20,21 27:23 28:6,14 28:17 29:6 30:9,19,20 31:18,24 32:4 32:6,7,9 34:20 35:6 38:8,12 39:13 40:24 41:11 43:24 45:8 46:16,19

**[ringing - street]** Page 11

ringing 39:20
risks 31:23
ross 3:5,6
rule 6:15
rules 1:15 5:20
  5:24 40:15

**s**

s 4:9
sale 30:22
  40:20 41:8
sarah 11:16
  20:11 26:17
  27:17 29:2
  30:14 31:2
  40:2 43:16
saying 15:13
  23:9 29:20
  32:19 41:21
  42:19 44:22
  46:5
says 19:24 24:4
  40:21
schedule 24:4
scheduled 5:18
school 7:15,19
  8:11
screen 34:22
  36:10
scroll 17:21
  18:8 21:5
seal 48:24
second 12:6,15
  39:20
section 19:2
  20:5 26:23

see 16:17,23
  20:19 22:11
  23:8 30:3,10
  32:12 39:17,23
  41:24
seeing 16:21
seeking 18:13
  28:21 42:13
seems 27:10
seen 14:4 19:20
  26:2
seepage 20:6
  26:24
seeping 18:17
selected 23:4
sell 10:9
seller 12:4,13
  19:3 20:1,4,7
  20:13,16 22:15
  22:19 26:19,22
  27:1,17,20
  30:7
seller's 18:18
sellers 10:6
  19:5,8 29:11
send 19:9 21:19
  26:7
sending 26:14
  40:2
sense 34:10
sent 17:16,16
  21:4 24:17
  25:1 30:21
  31:18

services 1:7
  2:15
set 48:23
sgariglia 1:4
  2:7 13:6 38:11
share 36:10
sharing 34:22
  34:22
shorthand 1:15
  48:6
show 45:7 46:8
showed 26:13
  39:11
showing 39:11
shrugging 6:12
sign 40:19
signature 49:3
signed 21:6,6
  25:18,24 30:23
significant
  33:10
signs 45:6
similar 29:20
  30:2
sir 46:22
situation 23:6
  30:1,8
situations
  29:12
solutions 5:5
somebody 42:8
sorry 7:9,23
  15:14,16 17:19
  25:7,20 32:18
  35:2 36:20

38:3 39:21
  46:3
sounds 14:5
speak 14:5,9,20
  16:1 28:12,14
  28:17 32:9
specialty 10:2
specifically
  14:18 15:3
  17:2 23:17
  30:17 34:12
specified 48:18
specify 15:11
  15:14 18:5
  39:10 44:16
spend 32:23
spoke 14:6,10
  14:22 15:13,24
  16:4,5
ss 48:2
start 5:23 8:10
  9:15
started 6:21
state 5:13 8:4
  10:12 48:1,6,7
stated 31:17
states 1:1,16
stating 40:11
stenographic...
  48:13
stop 34:22
  36:10
street 2:9 3:3
  13:6

**subject** 15:10
**suite** 2:3,10,19
  3:4
**sure** 5:7 6:11
  15:21 17:1,2,7
  17:10 24:2,3
  28:9 30:17
  44:15,17
**surprise** 41:5
**swilklaw.com.**
  41:20
**sworn** 5:2,10
  48:9

**t**

**t** 4:9
**take** 6:13,13,14
  6:15,17 7:24
  13:20 14:24
  31:23
**taken** 1:14 5:17
  5:19 48:17
**talk** 13:4 14:11
  14:19 15:3,7
  15:14 16:3
  29:11
**talked** 14:16
  31:4
**talking** 42:7
  43:7
**tax** 40:9,10,24
**tell** 16:6 18:3
  36:14 37:22
  45:11,14
**telling** 46:15

**tenants** 24:7
**term** 23:4
  43:16,17,20
**terms** 20:4
  26:22 40:9
**terry** 41:20
**testified** 5:10
  35:11
**testify** 48:10
**testimony**
  45:22 48:15
**thank** 18:23
  21:12 32:9,10
  33:20 40:6
  44:1 46:21
**thanks** 46:23
  46:24
**thing** 27:16
  33:2 40:4
**think** 9:16,19
  12:7 13:9,11
  14:4 18:4,9
  20:22 21:9,10
  23:17 28:16
  31:7 34:19
  36:6 45:16
**third** 20:1,12
  20:20 26:18
**thomas** 16:19
**thought** 24:10
  25:3
**three** 7:11 15:1
**ties** 43:20
**time** 11:8 13:5
  15:5,18 19:4

23:14 31:14
38:14 40:7
46:22 48:18
**times** 20:20
  28:3
**tire** 32:24
**title** 4:12 21:10
  23:20,22,23,24
  24:5,9 25:20
  38:7 44:13,15
  44:18,19 45:7
**today** 12:12
  13:4,18 14:7
  31:2
**today's** 5:18
**together** 14:14
  14:18 18:1
  34:5,7,8
**told** 42:21
  45:19
**tom** 9:21 12:3
  14:6 17:5
  32:24 33:19
  34:5 39:11
**took** 16:19
**topic** 15:11
**totally** 15:20
**transaction**
  28:18
**transcript**
  48:12
**tread** 32:23
**trudy** 1:14 3:23
  48:5 49:3

**true** 19:4,4
  48:15
**trusts** 9:22
**truth** 36:14
  37:12,13,18
  48:10
**try** 29:1 37:4
**trying** 10:15
  13:22 15:17,22
  15:24 23:8
**tucker** 34:20
**turn** 19:16,22
  21:2 22:12
  23:19 25:14
  30:11
**turning** 26:16
**two** 9:24 10:1
  12:12 15:1,1
  16:1 22:13
**type** 8:14,22
  18:6
**typewriting**
  48:14
**typical** 12:17
  19:8
**typically** 12:3,8
  12:12 22:8
  29:24 30:5
  45:1

**u**

**uh** 6:12
**uhm** 7:22
**ultimately** 32:3
**um** 14:8 24:8
  29:10 42:1

**unable** 20:2,13 26:19 27:17
**under** 9:12 13:2 48:14
**undergrad** 7:17
**understand** 6:5 12:7 15:21 24:16 42:7
**understanding** 9:23 11:21 12:11 13:1 23:6 24:20 35:13,15
**unit** 13:7
**united** 1:1,16
**university** 7:18
**ups** 44:3
**use** 25:4,10
**using** 43:16
**usually** 10:5 21:19,20,22

**v**

**v** 1:6
**verifications** 20:2 26:20
**verify** 18:15
**vested** 24:5
**videoconfere...** 1:13

**w**

**w** 2:13
**wait** 6:3 34:19 35:5

**walker** 2:9
**walkerwilcox...** 2:12,13
**want** 15:16,19 15:21 18:8 34:3 39:22 40:4
**wanted** 29:22 31:22 35:10
**warranties** 20:14 27:14,18 29:22
**water** 18:17 20:3,3,7 26:21 26:24 27:5
**way** 38:4 39:4 41:9
**we've** 14:4 32:24 42:8
**welcome** 21:13
**went** 16:12 31:17 32:21
**west** 13:6
**whereof** 48:23
**wife** 7:11 24:6 41:19
**wilcox** 2:9
**wilkins** 11:17 16:20 17:11,17 19:18 21:15 29:2 30:15 31:2 40:3 41:20
**witness** 4:2 5:1 5:7,9 25:7

29:16 32:10,13 33:21 37:24 38:3 39:8 41:2 42:16 43:2 44:2 45:23 46:10,21 48:9 48:9,23
**wondering** 15:10
**word** 35:11
**words** 19:3
**work** 8:13,14 8:17,22,24 9:8 9:9,10,11 34:5 34:7,8,15
**worked** 9:6 11:10,16
**working** 8:10 9:18 33:11 41:22 42:3
**works** 11:22 12:8
**writes** 20:11
**writing** 17:5,9
**written** 17:5 23:16
**wrote** 18:1 22:13,22

**x**

**x** 4:1,9

**y**

**yahoo.com** 2:5
**yeah** 9:20 14:8 15:23 18:6

25:9,21 32:12 33:1,9 34:7 43:3 46:7
**year** 8:19 9:15 9:19
**years** 8:8 9:3,5 9:12,17,19,20 13:9 19:6

**z**

**zero** 41:21
**zoom** 1:13 6:9

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.