# Exhibit 6

Page 1

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   MELINDA SGARIGLIA,              )
                                    )
5           Plaintiff,              )
                                    )
6      -vs-                         )  NO. 1:19-CV-05684
                                    )
7   AMERICAN INTERNATIONAL          )
    RELOCATION SERVICES, LLC,       )
8   D.B.A. AIRES, AN ILLINOIS       )
    LIMITED LIABILITY CORPORATION,)
9   NICHOLAS GONRING & KELLY        )
    GONRING,                        )
10                                  )
            Defendants.             )

11

12

13          Zoom Videoconference Deposition of THOMAS
14   HAWBECKER taken before TRUDY G. GORDON, a Certified
15   Shorthand Reporter, pursuant to the Federal Rules of
16   Civil Procedure for the United States District
17   Courts, pertaining to the taking of depositions,
18   commencing at 9:00 o'clock a.m. on the 23rd day of
19   February, A.D., 2023
20

21

22

23

24   Job No. CS5760610

```
                                              Page 2
 1    REMOTE APPEARANCES:
 2         OSHANA LAW FIRM
           33 North Dearborn
 3         Suite 200
           Chicago, Illinois  60602
 4         312-404-8390
           BY:  MS. CAROL OSHANA
 5              oshanalaw@yahoo.com
 6              appeared on behalf of the Plaintiff
                Melinda Sgariglia;
 7
 8         WALKER WILCOX MATOUSEK, LLP
           1 North Franklin Street
 9         Suite 3200
           Chicago, Illinois  60606-3610
10         312-244-6700
           BY:  MS. CAITLIN M. McAULIFFE
11              cmcauliffe@walkerwilcox.com
12                   -and-
13              MR. MATTHEW W. CASEY
                mcasey@walkerwilcox.com
14
                appeared on behalf of American
15              International Relocation Services, LLC,
                d.b.a AIRES, an Illinois Limited Liability
16              Corporation;
17
18         RHOADES McKEE, PC
           55 Campau Avenue NW
19         Suite 300
           Grand Rapids, Michigan  49503
20         616-235-3500
           BY:  MR. PAUL A. McCARTHY
21              mccarthy@rhoadesmckee.com
22              appeared on behalf of Nicholas and Kelsey
                Gonring;
23
24
```

```
                                              Page  3
 1   (CONTINUED)
 2          LOFTUS & EISENBERG, LTD.
            161 North Clark Street
 3          Suite 1600
            Chicago, Illinois  60601
 4          312-899-6626
            BY:  MR. ROSS GOOD
 5               ross@loftusandeisenberg.com
 6               appeared on behalf of John Gorr and
                 the Condo Association.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   REPORTED BY:  TRUDY G. GORDON, C.S.R.
24                 CERTIFICATE NO. 084-004077
```

Page 4

1                    I N D E X

2    WITNESS                              PAGE

3    THOMAS HAWBECKER

4    EXAMINATION, BY MS. McAULIFFE................   6

5    EXAMINATION BY MR. McCARTHY...................  51

6    EXAMINATION BY MS. OSHANA.....................  98

7    EXAMINATION BY MR. GOOD......................  124

8    FURTHER EXAMINATION BY MR. McCARTHY..........  130

9    FURTHER EXAMINATION BY MS. OSHANA............  136

10   FURTHER EXAMINATION BY MR. McCARTHY..........  137

11

                     E X H I B I T S

12

13   DEPOSITION EXHIBITS        DESCRIPTION        PAGE

14   EXHIBIT NO. 1        HOME INSPECTION REPORT    17

15   EXHIBIT NO. 2          6-14-2018 LETTER        18

16   EXHIBIT NO. 3             6-18 LETTER          20

17   EXHIBIT NO. 4             6-22 LETTER          21

18   EXHIBIT NO. 5        ATTORNEYS' TITLE GUARANTY 23

19   EXHIBIT NO. 6       7-2 LETTER, 7-3 RESPONSES  25

20   EXHIBIT NO. 7           JULY 5 LETTER          26

21   EXHIBIT NO. 8            COMPLAINT             44

22   EXHIBIT NO. 9           INTERROGATORIES        49

23   EXHIBIT NO. 10         SELLERS PROPERTY        54

                         DISCLOSURE STATEMENT

24

Page 5

1   (CONTINUED)
2   EXHIBIT NO. 11      IL REALTORS RESIDENTIAL      64
                        REAL PROPERTY DISCLOSURE
3                            REPORT
4   EXHIBIT NO. 12      IL REALTORS RESIDENTIAL      65
                        REAL PROPERTY DISCLOSURE
5                            REPORT
6   EXHIBIT NO. 13       PURCHASE AGREEMENT          71
7   EXHIBIT NO. 14      22.1 DISCLOSURE STATEMENT    78
8   EXHIBIT NO. 15      6-29 E-MAIL, MEETING MINUTES 80
                            ARIANA LISTECKI
9
    EXHIBIT NO. 16       SETTLEMENT STATEMENT        88
10
    EXHIBIT NO. 17            DEED                    94
11
    EXHIBIT NO. 18       GONRING 000123 E-MAIL       102
12
    EXHIBIT NO. 19       JULY 5, 2018 E-MAIL         107
13
    EXHIBIT NO. 20       JULY 3, 2018 E-MAIL         115
14
    EXHIBIT NO. 21       MARCH 19, 2018 E-MAIL       122
15
16       (EXHIBITS NOT GIVEN TO THE COURT REPORTER)
17
18
19
20
21
22
23
24

```
                                                   Page 6
 1        THE REPORTER:  Due to the need for this
 2   deposition to take place remotely, the parties will
 3   stipulate that the court reporter may swear in the
 4   witness over videoconference.
 5             Please indicate your agreement by stating
 6   your name and agreement on the record beginning with
 7   the noticing attorney.
 8        MS. McAULIFFE:  Caitlin McAuliffe.  I agree.
 9        MS. OSHANA:  I agree.  Carol Oshana.
10        MR. HAWBECKER:  I agree.  Tom Hawbecker.
11        MR. GOOD:  I agree.  Ross Good.
12        MR. McCARTHY:  Paul McCarthy on behalf of the
13   Gonrings.  I agree.
14                      (WHEREUPON, THE WITNESS WAS DULY
15                       SWORN.)
16                      THOMAS HAWBECKER,
17   called as a witness herein, having been first duly
18   sworn, was examined and testified as follows:
19                      EXAMINATION
20   BY MS. McAULIFFE:
21        Q.    So can you please state your name for the
22   record.
23        A.    Sure.  Tom Hawbecker.
24        Q.    Let the record reflect this is the
```

Page 7

1   deposition of Thomas Hawbecker taken pursuant to

2   notice and scheduled to today's date by agreement of

3   the parties.  This deposition will be taken in

4   accordance with all applicable rules.

5            Do you mind if I call you Tom, or would

6   you prefer Mr. Hawbecker?

7       A.   Tom's fine.

8       Q.   Okay.  So, Tom, have you ever been deposed

9   before?

10      A.   Yes.

11      Q.   Okay.  So I just have to go over a couple

12  rules for the record so that they're on there.  First

13  is that we both have to let each other finish even if

14  we can anticipate the question or the answer.  So

15  please just wait until I'm done asking the question

16  before you begin to answer.  If you don't understand

17  the question or you'd like something clarified, just

18  let me know and I'll be happy to clarify the

19  question.  We have a court reporter with us and

20  she'll be taking down everything that you say, so

21  just make sure you provide a yes-or-no answer.  So no

22  unh-unhs, nodding your head or shrugging your

23  shoulders.  If you need to take a break, just let me

24  know and we can certainly take a break.  There just

```
                                            Page 8
 1    can't be a question pending when you'd like to take a

 2    break.

 3             Do you have any questions before we start?

 4      A.     I do not.

 5      Q.     Okay.  So let's get started.

 6             Where are you right now when this

 7    deposition is being taken?

 8      A.     At my office.

 9      Q.     Okay.  And what is your date of birth?

10      A.     November 8, 1974.

11      Q.     Where do you currently live?

12      A.     Burr Ridge, Illinois.

13      Q.     And what's your address in Burr Ridge?

14      A.     11602 Briarwood Lane in Burr Ridge, 60527.

15      Q.     And do you live with anyone?

16      A.     My wife and four kids.

17      Q.     Okay.  What's your highest level of

18    education?

19      A.     Law degree.  Juris Doctorate.

20      Q.     And where did you go to law school?

21      A.     Ohio State.

22      Q.     What year did you graduate from Ohio

23    State?

24      A.     2002.
```

```
                                              Page 9
```

1      Q.    Are you practiced -- Are you licensed to
2   practice law in Illinois?
3      A.    Yes, I am.
4      Q.    How long have you been an attorney?  Since
5   you graduated?
6      A.    Yes.  We started this firm in 2003, I
7   believe.
8      Q.    Okay.  So right out of law school?
9      A.    Um-hum.
10      Q.    And are you part of any legal
11   organizations?
12      A.    I'm sorry?
13      Q.    Are you part of any legal organizations,
14   like the Bar Association --
15      A.    Yes.
16      Q.    -- anything like that?
17      A.    I believe Chicago Bar Association.  I
18   believe -- Honestly, I can't remember them all.
19      Q.    That's okay.
20            And you mentioned you founded the firm in
21   2003.
22            So that was right out of law school,
23   right?
24      A.    Yeah.  It wasn't exactly right out of law

Page 10

1    school, but it was shortly thereafter, yes.

2         Q.    And what kind of areas does your firm

3    focus on?

4         A.    When we started the firm?

5         Q.    When you started the firm --

6         A.    Everything.

7         Q.    -- and now.  Okay.

8         A.    Everything when we started the firm

9    because it was a new firm, right.  So, you know, you

10   try -- you try to get a little business.  But out of

11   the gates residential real estate was always a big

12   part of the firm, and as that grew, we stopped doing

13   other things because we stayed busy with closings,

14   residential real estate.

15        Q.    And do you typically represent buyers or

16   sellers in closings or is it a mix?

17        A.    It's a mix.

18        Q.    How many residential real estate closings

19   would you say you've done?

20        A.    Since we started?

21        Q.    Yes.

22        A.    Thousands.  Thousands.

23        Q.    Great.

24              And have you ever done a residential real

Page 11

1  estate closing with a relocation company before?

2       A.    Yes.

3       Q.    How many closings would you say involved

4  relocation companies?

5       A.    Over the span of 20 years?  Gosh.  Oh, I

6  don't know.  Hundreds.

7       Q.    Great.  And has it been -- Or when did

8  these occur?  Just over the course of your career?

9  Or has there been, you know, instances where they

10 seem to happen more often?

11      A.    No, just through the course of the career,

12 peppered in throughout an annual basis.

13      Q.    Do you remember any of the law firms that

14 were involved when there was a residential relocation

15 company?

16      A.    Yeah, I do.

17      Q.    Who were some of those law firms?

18      A.    I mean, like Ed Shapiro sticks in my head.

19 He represents a lot of relo companies.  Morielli

20 Office -- Law Office represents a lot of relo

21 companies.  I mean, those are the names that at least

22 ring a bell off the top of my head.

23      Q.    Had you ever worked with Sarah Wilkins

24 before?

Page 12

1      A.      Before -- I don't know.  We may have.

2      Q.      Okay.  And had you ever done any closings

3  involving American International Relocation Solutions

4  before?

5      A.      I can't recall.

6      Q.      Okay.  How did the process work -- Is

7  there a typical process when there's a relocation

8  company involved or does it vary?

9      A.      No, there's -- You know, it's the same

10  underlying contract.  Usually there's addendums that

11  are part of that contract.  But the overall nature of

12  the transaction is the same.

13      Q.      And does the -- In your experience, does

14  the relocation company usually take title to the

15  property or does the seller usually retain title?

16      A.      Usually the relo -- Usually at closing you

17  will see two deeds.  You would see one from the prior

18  owner to the relo, and then one from the relo company

19  to the buyer.  Although I know that that isn't always

20  the case.

21      Q.      And in your experience did you ever

22  contact the homeowners directly when these closings

23  were going on or their rep -- their closing attorney

24  directly, or was it usually the relocation service?

Page 13

1      A.    It was usually the relocation service.

2      Q.    Okay.  And are you familiar with the

3  Illinois Residential Real Property Disclosure Act?

4      A.    Yeah, I am.

5      Q.    And do you know that the relocation

6  companies are immune under the act?

7      A.    Yes, I believe they don't have a duty to

8  disclose.

9      Q.    Okay.  And did you review the property

10 disclosures for 2726 West Cortez Street?

11     A.    I can't recall.  I mean, this is 5, 6

12 years ago or whatever it was.

13     Q.    Yeah.  So now I'd like to talk

14 specifically about the property here.

15           And when did you -- Which is 2726 West

16 Cortez Street, Unit 1, Chicago, Illinois.

17           So when did you first learn about this

18 case that's going on right now?

19     A.    Maybe a couple years ago.  I think my

20 client had reached out to me asking for a copy of the

21 file.

22     Q.    And did you review anything in particular

23 for your deposition today?

24     A.    Yeah, just some of the correspondence that

Page 14

1    had taken place.

2         Q.    Okay.  The correspondence --

3         A.    A review -- I'm sorry.  A review of the

4    Attorney Review Letters.

5         Q.    Okay.  And did you speak with anyone in

6    preparation for your deposition today?

7         A.    I spoke with Kirk in my office, and I

8    spoke with Carol Oshana.

9         Q.    Okay.  And did -- What did you speak about

10   with Carol Oshana?

11        A.    Essentially that, a review of the attorney

12   review correspondence.

13        Q.    And did you ever speak to Ms. Sgariglia

14   about this case?

15        A.    Who?

16        Q.    Ms. Sgariglia.  She's the buyer.

17        A.    Oh.  You know, I -- No, I haven't spoken

18   with her specifically about this case other than when

19   she had reached out a couple years ago just asking

20   for the file.  And even then I don't think we got

21   into it too much.  But I can't recall exactly.

22        Q.    Okay.  And -- So you were the Plaintiff's

23   real estate closing attorney for this property?

24        A.    Yeah, I represented Melinda, yes.

Page 15

```
1        Q.    Do you know how she found you?
2        A.    Probably a referral from her agent.
3        Q.    And do you remember when you started
4   working on the closing?
5        A.    Can you rephrase that a little precisely.
6        Q.    Yeah.  So you were the initial attorney
7   that was contacted by AIRES' closing attorney?
8        A.    Yeah.  Probably.  Yes.
9        Q.    Did anyone else work with you on the
10  closing?
11       A.    Yes.
12       Q.    Who was that?
13       A.    Kirk Langefeld in my office, and then Paul
14  Garber covered the closing.
15       Q.    Okay.  And why were there multiple
16  attorneys on the case?
17       A.    That's just the way that we're structured
18  as a firm.  We always have two attorneys on every
19  single file.  With the volume of closings that we do,
20  we're often out covering closings, and you don't want
21  the correspondence to come to a screeching halt, so
22  there's always an attorney in the office that can
23  facilitate correspondence while -- You know,
24  typically I'm the one that's out covering the
```

Page 16

1    closings, or my law partner, Paul, is out covering
2    the closings.
3         Q.    So did Kirk take over the case or was he
4    just involved in signing some of the response letters
5    later on?
6         A.    I can't recall how this particular
7    transaction transpired.  Usually -- I mean, there's
8    always exceptions.  But usually Kirk is more in the
9    file handling the attorney review correspondence, and
10   then I'm out covering closings.  Or if there's
11   issues, I'll step in.  But that can always change.
12   If the workload is too much, I'll jump in and handle
13   files.  You know, if he's on vacation or something,
14   I'd be jumping in and handling files.  So I certainly
15   handled my fair share of files.  How this one was
16   handled, I can't recall.
17        Q.    So now I'd like to turn to some items that
18   were in the file.  So if you don't recognize them,
19   that's totally fine, just let me know.
20             But do you know if Melinda ever had the
21   property inspected?
22        A.    Yes, I believe she did.
23        Q.    Okay.  And did you see a copy of the
24   inspection report?

Page 17

1      A.     I would have, yes.

2      Q.     Okay.  So I'm going to pull up a copy of

3   the inspection report.

4             And could we please mark this as

5   Exhibit 1.

6             Can you see the home inspection report

7   that I pulled up here?

8      A.     Yes.

9      Q.     Do you know when the inspection occurred?

10     A.     Presumably after she got under contract,

11  shortly thereafter.

12     Q.     Okay.  And do you -- Did you see any red

13  flags in this inspection report?

14     A.     I did not review the inspection report and

15  I wouldn't be able to recall.  I mean, do you want me

16  to take a second to take a look at it?

17     Q.     If you'd like.  Or we can discuss the

18  correspondence you had with Sarah Wilkins since you

19  said you had reviewed that previously?

20     A.     Yeah, go ahead.

21     Q.     Like I said, I'm gonna turn to the

22  correspondence you had between Sarah Wilkins.  And

23  I'll start with the first letter that it was

24  exchanged between her and your firm.  It's from

Page 18

1    June 14th.

2              And could we please mark this as

3    Exhibit 2.

4              So have you seen this document before?

5         A.    Yes.

6         Q.    You signed this document on the last page,

7    right?

8         A.    Yes.

9         Q.    What's the purpose of this initial letter

10   that you sent to Sarah?

11        A.    Kind of a due diligence letter.  The

12   contracts -- The boilerplate contracts as written

13   aren't perfect, so there are always what you would

14   call typical attorney-modification requests.  We look

15   for representations, try to get a little more

16   background on the property that may not be solicited

17   just from an inspection report or the residential

18   property disclosures.  That's about it.

19        Q.    Do you remember what modifications or what

20   information you were looking for from Sarah?

21        A.    Probably what's written in the letter.

22        Q.    Okay.  And so we can go over -- If you

23   want to take a second to go over the letter.

24              So these are some of the things that you

Page 19

1    asked for.

2         A.    Um-hum.

3         Q.    And -- Okay.  So I will just start on

4    Page 1, and you can let me know when you're done

5    taking a look at it, and I can go to the next page.

6         A.    Yeah, go ahead.  Yeah, I looked.  I'm

7    familiar with this.

8         Q.    Okay.

9         A.    Sorry.  Just making sure.  Are you waiting

10   for me to respond on something?

11        Q.    Yes.  I was just going to move to the next

12   page when you were ready.

13        A.    Oh, yeah, I've reviewed all the pages.

14        Q.    Okay.  So did you draft this letter?

15        A.    I can't recall.  It would have been myself

16   or Kirk.

17        Q.    Okay.  But you reviewed it and signed it

18   before it went out?

19        A.    Correct.

20        Q.    And as you can see, you asked about

21   insurance claims?

22        A.    Yes.

23        Q.    Is that -- Is this typical in these

24   letters that you send out?

Page 20

1      A.    It's standard in our letters.

2      Q.    Okay.  And you also asked about water

3   infiltration and damage.  Is that typical?

4      A.    In our letters it is.

5      Q.    Okay.  And when you use the word seller in

6   this letter, who do you mean when you say seller?

7      A.    AIRES.

8      Q.    And I'll turn now to the next letter that

9   was from June 18th.

10           If we could mark this as  Exhibit 3.

11           Have you seen this document?

12     A.    Yes, I have.  I'm sorry.  6-18.  Yes.

13     Q.    So would you like a moment to review this

14   response?

15     A.    No.  I mean, this is part of what I

16   reviewed.

17     Q.    Okay.  So what did Sarah say in regards to

18   your questions about water infiltration and damage?

19     A.    I -- Before getting to the exact spot, I'm

20   sure they said they don't have any knowledge because

21   they're a third-party relocation company.  So I don't

22   know -- So on my letter that question would have been

23   9A and 8E -- Yeah, 9A, they say that they don't have

24   any knowledge, and same thing with 8E.

Page 21

1        Q.    And what did you think about AIRES saying

2    that it couldn't provide information because it was a

3    relocation company?

4        A.    That's not surprising.  We'll still ask

5    the question.  But that's a typical response that we

6    would receive with a relocation company.

7        Q.    And do you -- What is your response

8    usually to that?  Would you like elsewhere?  Or

9    what's the process after they respond that way?

10       A.    Yeah, we try to dig a little deeper and

11   see if there's an ability for them to contact the

12   people that they have the relationship with or had

13   the relationship with, see if they can get answers to

14   those -- those questions.

15       Q.    Okay.  So -- Now I'll turn to the next

16   letter that was exchanged between both of you, and

17   this was from June 22nd.

18            If we can mark this as Exhibit 4.

19            And have you seen this document?

20       A.    Yes.

21       Q.    And you'll see Kirk signed this one,

22   right?

23       A.    Yes.

24       Q.    So did you help prepare the response?

Page 22

1      A.     I can't recall.  We may have discussed --

2      Q.     Would you have reviewed it before it went

3  out or would that be Kirk's responsibility?

4      A.     Kirk can certainly do that without me

5  having to review it.

6      Q.     Why would he continue to keep asking about

7  the water damage if they had stated that they didn't

8  have that information?

9      A.     Because we just don't take the initial

10  response as a given, right?  We want to see if

11  there's an opportunity that they can get a direct

12  answer from the person that lived in the property.  I

13  mean, we understand that the relo company does not

14  reside in the property, and these are important

15  questions, especially with condominiums.  Because if

16  you have problems with condominiums, these are why

17  these questions are in these letters, there's water.

18      Q.     Right.  And the same with insurance

19  claims?

20      A.     Exactly.

21      Q.     Right.  So in various places Kirk uses the

22  term prior owner.

23             Did you ever discuss who the prior owners

24  were with Kirk?

Page 23

1      A.    No, but I think this comes -- I should say

2  I can't recall that.  We may have.  But this kind of

3  comes back to what we said originally, that we're

4  assuming in these situations we're referencing a

5  prior owner as the person that would have conveyed

6  their interest to AIRES.

7      Q.    And when would that interest have

8  typically been conveyed in your experience with

9  relocation companies?

10     A.    My understanding would be that right at

11 the outset of the transaction, before AIRES even had

12 signed the contract with my client, that they had --

13 they would have had an even hand from what we would

14 coin as the prior owner.

15     Q.    Okay.  So just -- With what you just said,

16 I would like to turn to the title commitment that you

17 received in this case?

18     A.    Yes.

19     Q.    And please mark this as Exhibit 5.

20           I'll pull it up.

21           Have you seen this document before?

22     A.    Yes.

23     Q.    And what is it?

24     A.    It's a title commitment issued by

Page 24

1    Attorneys' Title Guaranty.

2         Q.    When did you receive this title

3    commitment?

4         A.    In my file it shows that we would have

5    received this on July 12th of 2018.

6         Q.    And what is a title commitment?

7         A.    A title commitment is a -- I guess what we

8    would use this for is it would show vesting and it

9    would show exceptions to title.  It would confirm the

10   legal description, the tax ID number, and it gives us

11   a glance into, you know, what we're dealing with, are

12   there exceptions on title that need to be had, are

13   there delinquent taxes, et cetera.

14        Q.    And is AIRES on the title commitment?

15        A.    No.

16        Q.    And I can go to the page.

17              But who is on the title commitment?

18        A.    Nicholas Gonring and Kelsey Gonring,

19   husband and wife as tenants by the entirety.

20        Q.    And you didn't receive any changes to the

21   title commitment after this first letter?

22        A.    Not that I see, no.

23        Q.    Would you have if AIRES had taken title?

24        A.    No.  Could have.  I'm not -- Could have.

Page 25

1   But typically not.

2          Q.    And now I'd just like to return -- Sorry

3   to jump around here -- to the letters that we were

4   discussing before.  This one is the July 2nd letter

5   and the July 3rd response provided by your firm.

6                 So please mark this as Exhibit 6.

7                 So do you recognize this document?

8          A.    Okay.  You know what, I had gotten out of

9   the file.  This is the July -- July 3rd letter you're

10  referencing?

11         Q.    Yes.  So it's the July 2nd letter sent by

12  Sarah Wilkins, and then July 3rd with the responses

13  next to her comments in the letter.

14         A.    Got it.

15         Q.    So you'll see again that Kirk signed this.

16                Did you have any input in this response?

17         A.    I don't recall.

18         Q.    And like you said, you -- he had authority

19  to send it without you reviewing it?

20         A.    Yes.

21         Q.    So you'll see that he said a few times,

22  okay, with -- next to statements where AIRES states

23  that it can't provide representation or warranties.

24                What does that mean?

Page 26

1       A.      That he was probably in agreement with

2   that representation.  Yeah, I think -- I think that

3   would be it.  It might be a better question for Kirk.

4       Q.      Yeah.  And then I'd just like to pull up

5   last letter that we have that was sent by Sarah

6   Wilkins on July 5th.

7               And please mark this as Exhibit 7.

8               So have you seen this letter?

9       A.      Yes.

10      Q.      And what happened after you received this

11  letter?

12      A.      I don't know.

13      Q.      So you'll see she attached an addendum to

14  Purchase and Sale Contract.  That was executed,

15  right?

16      A.      I would assume so.

17      Q.      But have you --

18      A.      Yeah.  It looks like I have a

19  fully-executed addendum, yes.

20      Q.      Okay.  So did you send any other letters

21  than the ones that we just went over?

22      A.      Just -- I don't know if what you're

23  looking at -- Just Kirk signing off on the July 5,

24  2018 letter on July 6, 2018.  We would have sent that

Page 27

1  correspondence back.  But no -- No changes.  Just

2  agreed, 7-6-18, and Kirk's signature.

3      Q.    Did you communicate by e-mail with Sarah

4  ever?

5      A.    I would imagine that we did.

6      Q.    Did you ever talk on the phone or by text?

7      A.    I can't recall.

8      Q.    So in all of these letters where did you

9  think AIRES was getting the information that they

10  were providing you?

11      A.    My understanding is that there's always a

12  relocation representative.

13      Q.    And what would that person do?

14      A.    Give the answers to the attorney.

15      Q.    And where would the representative be

16  getting the information?

17      A.    They would make the decisions.  Hey, we're

18  a third-party relocation company, we can't disclose

19  in regards to inspection requests.  Hey, let's give

20  them a $3,000 credit in lieu of repairs.  Or, yes,

21  we'll do this or, yes, we'll do that.

22      Q.    But the information they were able to

23  provide, do you know where they would have gotten

24  that?

Page 28

1        A.    Well, I believe that there was discussions

2    between AIRES -- I mean, I know now that there were

3    discussions between AIRES and the Gonrings.

4        Q.    And how do you know that?

5        A.    Carol mentioned that there was

6    correspondence between those two parties.

7        Q.    And that's what you're basing that

8    statement off of?

9        A.    In this particular situation, yes.  Had --

10   Had I not known that, the information would have come

11   from what I previously stated, from the contact at

12   the relocation company, the representative.

13       Q.    So at the time when this was all going on,

14   you didn't know where AIRES was getting their

15   information?

16       A.    Correct.

17       Q.    Did you ever go over these letters with

18   Carol or Melinda?

19       A.    Carol wouldn't have been involved at that

20   time.  But absolutely we -- we would have reviewed

21   these letters with Melinda.

22       Q.    And before or after you sent the response?

23       A.    What typically happens is when a letter

24   comes in, a response comes in, we'll send it to the

Page 29

1   client, and then give them a chance to review, and we

2   tell them to reach out to us once they've had an

3   opportunity to review, then we would discuss it at

4   that point, formulate a response, talk through the

5   issues, et cetera.

6       Q.   Okay.  And did Carol show you any

7   correspondence between AIRES and the Gonrings?

8       A.   No.

9       Q.   Have you seen any of that correspondence?

10      A.   No, I have not.

11      Q.   And what did Carol exactly tell you about

12  this case?

13      A.   Nothing other than that, the two parties

14  were talking.

15      Q.   Over e-mail or by phone?

16      A.   I can't remember what she said.  Just

17  maybe corresponding.  So maybe both.

18      Q.   And did she say anything about what the

19  correspondence contained?

20      A.   No.

21      Q.   Okay.  So now I'd like to turn to a

22  different topic, if that's all right.

23           So you knew that AIRES was a relocation

24  company, right?

Page 30

1      A.      Correct.

2      Q.      Did that concern you at all or was it fine

3  in your eyes?

4      A.      No -- It's not overly concerning.  But we

5  typically, even before this situation had developed,

6  know that, hey, when you're dealing with a

7  third-party relo, you know, these representations and

8  such that we ask for in attorney review typically

9  don't get answered, they're just going to say, hey,

10  we've never resided in the property, I think we'll,

11  you know, let clients know that.

12      Q.      And -- So you stated before it was your

13  understanding that typically the Gonrings would have

14  transferred title to AIRES?

15      A.      Yes.

16      Q.      And did anyone ever communicate that to

17  you?

18      A.      That title would have been transferred?

19      Q.      That title was transferred?

20      A.      No.  Other than just the way that the

21  transaction kind of manifested, right?  All the

22  correspondence.  Who signed the settlement statement.

23  You know, who was the seller in the contract.  I

24  mean, those sorts of things.  Just the indicia that

Page 31

1    AIRES was the owner of the property.

2        Q.    But Sarah Wilkins never affirmatively said

3    that AIRES had title?

4        A.    Not that I can recall.  But I don't -- I

5    don't know.

6        Q.    Did you or anyone at your firm ever ask if

7    AIRES had title?

8        A.    I can't recall.

9        Q.    But in the title commitment AIRES wasn't

10   on it when you received it, right?

11       A.    Yeah, correct.  But that's not -- That's

12   not atypical mind you.  For a relo company to record

13   a deed before the subsequent closing, there can be a

14   number of issues that can develop.  One, it could

15   trigger a due on sale.  If the mortgage wasn't paid

16   off, there's a transfer of a beneficial interest.  It

17   could trigger a due on sales clause.  It can alert an

18   assessor's office, hey, we got a new value here.  So

19   I thing the typical protocol for relo companies is to

20   record simultaneous deeds at closing, for that

21   reason, I would suspect.

22       Q.    And you said before that deeds are

23   typically change at closing from the owner to the

24   relocation company to the buyer, right?

Page 32

1      A.    Yeah, for those reasons that I just
2  stated.
3      Q.    Yeah.  So just to clarify.
4            What did you mean when you said deed in
5  hand?
6      A.    Well, title could have been transferred,
7  but not recorded.  Right?  So, you know, as part of
8  the arrangement between AIRES and the Gonrings,
9  and -- You know, to give -- Hey, Gonring -- Gonrings
10  are out, they've transferred title, they're no longer
11  part of this transaction, they have a deed in hand,
12  just not recorded.  Then they will record that first
13  at closing followed by the deed from the relo company
14  to what would have been Melinda.
15      Q.    Did they ever represent to you that they
16  had this deed?
17      A.    No.
18      Q.    But just based on your experience you
19  assumed that they had it when they signed the
20  contract?
21      A.    Yeah.  And I guess I should say five --
22  whatever, five years ago, maybe they represented
23  that.  Maybe there was a conversation on that.  But I
24  can't recall one way or the other.

Page 33

1      Q.     All right.   One moment.   Sorry.

2      A.     No problem.

3      Q.     So just -- When you said it was five years

4  ago and you couldn't recall, what were you basing --

5  assuming that they had the contract on?

6      A.     I'm sorry.   Say that again.

7      Q.     So what were you basing the fact that they

8  had a deed on?

9      A.     What was I basing -- Why I was assuming

10  that they had a deed in hand?

11      Q.     Yes.

12      A.     Oh.   Just because they're the seller.

13  They've held themselves out to be the seller.

14  Usually you're the owner of the property if you're

15  selling it.

16      Q.     Yeah.   So you stated that -- Let me

17  clarify.   I'm sorry.

18             You stated that they may have told you

19  though that they had a deed.

20             What are you basing that on?

21      A.     Oh, I don't know.   Just based on

22  experience with relocation companies I know that

23  it -- a deed may have been executed between the prior

24  owners and the relo company, but not recorded.   That

Page 34

1 doesn't get recorded until closing.

2     Q.   But they -- You're speculating based on

3 your experience that they may have told you that they

4 had a deed?

5     A.   Yeah.  Whether they told me that or not, I

6 don't know.  But I guess what I'm saying is when I

7 get a contract and it says seller on there and they

8 are holding themselves out to be a seller, I'm going

9 to assume that that is the seller, that that is the

10 owner of the property.

11     MS. McAULIFFE:  Okay.  So I'd like to turn a

12 little bit -- Oh, okay.  I'd like to take a break

13 actually at this time, if that's all right, for five

14 minutes, to go off the record and we can reconvene at

15 9:46.

16     THE WITNESS:  Sure.  It's okay with me.

17                 (WHEREUPON, WE WERE OFF THE

18                  RECORD.)

19 BY MS. McAULIFFE:

20     Q.   So I'll just take down the shared screen

21 so it's less distracting.  Okay.

22       So, Tom, I'd just like to take a step back

23 and -- You said you had done hundreds of relocation

24 company closings before -- and talk about that a

Page 35

1    little bit.  So you mentioned the typical procedures

2    are for a title to transfer from the owner to the

3    relocation company to the buyer.

4            How often would you say that happens?

5        A.    I would -- I mean -- I don't know.  I

6    don't know.  Often.

7        Q.    Would you say --

8        A.    More often than not.

9        Q.    Okay.  So 60 percent of the time would you

10   say that's fair?

11       A.    Probably more than that.

12       Q.    Would you say 80 percent of the time?

13       A.    Yeah, maybe.

14       Q.    Okay.  How often do the relocation -- How

15   often do you ask the relocation companies if they've

16   received title or not?

17       A.    I can't recall.

18       Q.    Would you say that's a typical question

19   you ask or not?

20       A.    No, I would say that it's not a typical

21   question that we ask.

22       Q.    Okay.  So does relocation companies hold

23   themselves out as having title though?

24       A.    Yeah, I --

Page 36

1      MR. McCARTHY:  Hang on a second.  Hang on a

2  second.  I'm going to object to that question as

3  mischaracterizing the testimony.

4      MS. McAULIFFE:  Okay.  I will withdraw that

5  question.

6          You can strike that.

7  BY MS. McAULIFFE:

8      Q.    So generally would you say now that the

9  relocation companies hold themselves out as having

10  title?

11      MR. McCARTHY:  Object to the lack of foundation.

12      MS. McAULIFFE:  All right.  I'll withdraw that

13  question.

14  BY MS. McAULIFFE:

15      Q.    So in the typical situation you said that

16  you don't typically ask the relocation companies if

17  they have title?

18      A.    In the typical situation we do not, that I

19  can recall.  In this situation I believe our letters

20  indicate where we ask AIRES to contact the prior

21  owner.  I read that, that's gonna assume that a

22  conveyance of title has taken place.  We're asking

23  about the prior owner.  So my letters or approach

24  letters or whatever will indicate, I think by those

1    questions, on who we think the owner of the property

2    is.  And that's -- This isn't -- This isn't isolated

3    to this particular transaction.  Because those are --

4    Those are the responses that you can get from a relo

5    company when you ask those insurance claims, water

6    infiltration, hey, we don't know anything about it.

7    It is then customary for us to go back and say can

8    you please contact the prior owner and see if you can

9    get a little more information on this, if possible.

10           Q.    But you didn't ask AIRES if, in fact, the

11   Gonrings were prior owners or if they had taken

12   title?

13           A.    I can't recall other than what's listed in

14   the letter indicating that we think there's a prior

15   owner, which in this case would be the Gonrings.

16           Q.    So there's nothing in the letter though

17   where you ask if they have taken title or not?

18           A.    Not -- Not directly.  Not that I can

19   recall.

20           Q.    So in the letters or your e-mails you

21   never asked AIRES directly if they had taken title

22   though, right?

23           A.    Not that I recall.

24           Q.    And you don't have any e-mails or letters

Page 38

1  where you asked them directly though?

2       A.    You know, I didn't -- Not that I recall.

3  But I didn't go through all of the e-mails.

4       Q.    Okay.  And in these other -- You stated

5  that the letter was a typical letter that you send

6  out.

7             So that letter doesn't normally include

8  that title question?

9       A.    No.

10      Q.    And have you ever done a closing with a

11 relocation company when they don't have title?

12      A.    I don't know.

13      Q.    So if 80 percent or approximately 80

14 percent of the situations you've been in the owner

15 passes title to the relocation company to the buyer,

16 do you know that they -- that, in fact, happened?

17      A.    No, not if I don't see a deed showing that

18 at closing.

19      Q.    And do you typically ask for the deed?

20      A.    Yeah, probably.

21      Q.    But you didn't in this case, right?

22      A.    Well, I don't know that.  I wasn't at

23 closing.

24      Q.    Okay.  So -- But in the correspondence

Page 39

1    that we had, you didn't ask to see a deed that AIRES

2    had --

3         A.    Not that I -- I'm sorry.  Not that I see.

4         Q.    Okay.  All right.  So you mentioned that

5    you spoke to Carol about this.

6              Did she have any deed or proof of any

7    deeds passing from Gonrings to AIRES?

8         A.    I don't believe so.

9         Q.    Okay.  And -- Sorry to keep jumping

10   around.

11             But when you said that approximately 80

12   percent goes from owner to relo to buyer, does that

13   mean that 20 percent of the closings the relocation

14   company doesn't have the deed?

15        MR. McCARTHY:  Can I just place an objection

16   that that is a mischaracterization of his testimony.

17   He didn't say it was approximately 80.  He said he

18   didn't know.  You then said was it -- could it be

19   more than 60?  Probably more than 60.  Could it be

20   80?  Maybe 80.  Yeah, maybe 80.  So he didn't say

21   it's approximately 80.  His answer to the question

22   was he didn't know.

23   BY MS. McAULIFFE:

24        Q.    Okay.  So in the -- You said more often

Page 40

1    than not it goes from owner to relo to buyer.

2           So in the situations where it doesn't go

3    from owner to relo to buyer, the relocation company

4    doesn't have a deed, correct?

5    A.    I don't know that.  I don't know if they

6    don't have a deed that's sitting there and they ask a

7    buyer for whatever reason to re-execute a deed

8    directly to the new buyers?  I don't know.  I'm

9    not -- I'm not privy to any of that.

10   Q.    So what do you base the more often than

11   not it goes from owner to relo to buyer on then?

12   A.    You know I just -- I'm trying to think.

13   We'll take, for example, last year.  If we did 1,400

14   closings, I would say maybe 15 or 20 of those might

15   have been relo, maybe.  I mean, I don't know.  So,

16   you know, these are few and far between.  But when

17   I'm -- But when I'm -- When I think of a relo

18   closing, I think of having two deeds at closing.

19   More often than not I usually see two deeds.  I mean,

20   that's all I can say, I guess.

21   Q.    Okay.  But in this situation that's not

22   what happened?

23   A.    Yeah, apparently not.

24   Q.    Okay.  And when you say apparently not,

Page 41

1   you mean it didn't happen, right?

2        A.    Well, I -- When I say apparently not, I

3   don't know if there was ever a deed that was executed

4   between the Gonrings and AIRES, or if a new deed was

5   executed, for whatever AIRES said, hey, you know what

6   Gonrings, we lost the original deed, they conveyed it

7   to us.  At this point we are two weeks away from

8   closing or a week away from closing, would you mind

9   executing a new deed, directly to the Gonrings.  I

10  mean, I don't know -- I don't know any of that.  I

11  don't know the behind the scenes because that's

12  between AIRES and the Gonrings.

13       Q.    And you never asked either of them what

14  was going on with the title?

15       A.    No.  No.  Now, in the end if I get a title

16  commitment from the title company that insures my

17  client, that's what I'm most concerned with.

18       Q.    Yeah.  It doesn't matter to you either way

19  as long as your client has a title that works, right?

20       A.    At closing I would probably agree with

21  you.  It probably matters a little more when we're

22  going through attorney review though.

23       Q.    What do you mean by that?

24       A.    I mean that if I'm getting good clean

Page 42

1  title at closing and I only see one deed, or if AIRES
2  would have said, hey, we're not the owners of the
3  property, the questioning and the correspondence in
4  attorney review would have taken a much different
5  tone.
6      Q.    And did your client end up with clean
7  title in the end --
8      A.    Yes.
9      Q.    -- at this closing?  Okay.
10         And did you ever try to contact the
11  Gonrings?
12      A.    No.  Not that I'm aware of.
13      Q.    Why not?
14      A.    Because we would have assumed that they
15  were out of the picture.
16      Q.    And did anyone ever tell you you couldn't
17  talk to them?
18      A.    I -- I don't recall.
19      Q.    But in Sarah Wilkins and in all that
20  correspondence, no one mentioned that you were
21  forbidden from talking to the Gonrings?
22      A.    Not that I see.  Not that I can see in the
23  correspondence.
24      Q.    And in her deposition Ms. Sgariglia

Page 43

1    mentioned that you told her that she couldn't contact

2    the Gonrings.

3              Did you ever say that?

4         A.    Not that I can recall.

5         MS. OSHANA:   I'm going to object to

6    mischaracterization of testimony.   Thank you.

7    BY MS. McAULIFFE:

8         Q.    In your experience with the relocation

9    companies, had you ever contacted the original owners

10   directly?

11        A.    Not that I'm aware of.   I don't think we

12   ever have any of the contact information.

13        MS. OSHANA:   I'm sorry.   I have one more

14   objection I forgot to put on the record.   It's also

15   attorney-client privilege.   Thank you.

16   BY MS. McAULIFFE:

17        Q.    All right.   So now I'd like to turn to the

18   complaint that Ms. Sgariglia filed in this case.

19              Did you ever see the complaint or did

20   anyone show it to you?

21        A.    I have not.

22        Q.    Okay.   So I'll pull up a copy of the

23   complaint.

24              We can mark it as -- I believe we're on

Page 44

1    Exhibit 7?

2         MS. REPORTER:  Exhibit 8.

3         MS. McAULIFFE:  Exhibit 8.  Thank you.

4    BY MS. McAULIFFE:

5         Q.    So you'll see here that it says that

6    Ms. Sgariglia is alleging that by failing to disclose

7    the title owner, it induced her closing attorney,

8    you, to refrain from directly contacting with the

9    Gonrings.

10            Do you think that's a fair statement?

11        MS. OSHANA:  Are you showing an exhibit because

12   I don't see any?

13        MS. McAULIFFE:  Okay.  Can you see it now.

14   BY MS. McAULIFFE:

15        Q.    All right.  So you'll see in Paragraph 61

16   it reads that Defendant AIRES' representation that it

17   was the current owner which caused her attorney to

18   refrain from demanding direct communication with the

19   actual owners of the condo.

20            Would you say that's a fair statement?

21        A.    Yes.

22        Q.    Okay.  And why do you think you were

23   refrained from direct communication -- Why do you

24   think you refrained from direct communication with

Page 45

1  them?

2      A.    Because -- Because they were the prior

3  owners.  They were out of the picture is what we're

4  assuming.

5      Q.    And why did you assume that?

6      A.    Well, because our Attorney Review Letters

7  referenced them as the prior owners.  I think that

8  the point here is that if Sarah or AIRES would have

9  say, hey, I noticed that you mentioned prior owners,

10  hey, the Gonrings are still the owners of the

11  property, then we're not going to take -- we are a

12  third-party relocation company, we cannot make any

13  representations, we would have never settled for

14  that.

15      Q.    But why can't you talk to the prior owners

16  of a property?

17      A.    Well, I suppose you can.  But if you're

18  buying a property, are you going to go back two or

19  three owners and ask them questions especially when a

20  relo is involved?  It's just not going to be typical

21  for you to do that.

22      Q.    But you knew they were the last ones to

23  occupy the property, right?

24      A.    I would assume that that's what we

Page 46

1    concluded.

2        Q.    Because AIRES told you that they had never

3    occupied the property?

4        A.    Well, right.  And we're asking in this

5    Attorney Review Letter, hey, contact the prior

6    owners.  That is our attempt to get these answers

7    directly from the Gonrings.  But that third-party

8    relocation company barrier was continuously put

9    forth.

10       Q.    What barrier are you referring to?

11       A.    That I can't get the representations

12   directly from the Gonrings.  The only -- The only

13   correspondence or representations I'm going to get

14   are from AIRES.

15       Q.    But it would have been possible to get

16   those -- that information from the Gonring?

17       A.    Yes, we tried.  Our letters -- Our letters

18   indicate that we tried.

19       Q.    But that was asking AIRES, not the

20   Gonrings, for that information, right?

21       A.    Yeah.  Correct.  I mean, what are we going

22   to do?  Try to hire an investigator to locate their

23   address and phone number and give them a call.  It's

24   just not feasible to do that.

Page 47

1      Q.     But you knew who -- But you knew who they

2   were, right?

3      A.     Only a -- Only a name.

4      Q.     Did you ever ask AIRES for any more

5   information about them?

6      A.     No, other than getting a representation --

7   getting answers to these questions from them which --

8   which AIRES said we couldn't get.

9      Q.     Which -- But AIRES actually said that they

10  didn't -- they couldn't provide the information.

11  They didn't say they couldn't get it if they wanted

12  to, right?

13     A.     Well, had AIRES said, hey, you guys keep

14  referencing prior owner.  I just want you to know

15  that the Gonrings are the current owners of the

16  property.  I can tell you wholeheartedly that the

17  response would have been, hey, you need to answer

18  these questions.  I need this -- I need to see

19  answers coming directly from the Gonrings.  Not from

20  you AIRES.  But directly from the Gonrings on these

21  questions that we put forth in our Attorney Review

22  Letter.

23     Q.     But you only referenced prior owner in one

24  letter, right?

Page 48

1      A.    Yeah -- Or -- I don't know.  I'd have to
2  look through them.  But --
3      Q.    Right.  And you never asked AIRES for a
4  phone number or address or any way to contact them,
5  right?
6      A.    Not that I recall.
7      Q.    And in the letters you never directly
8  asked to contact them?
9      A.    I think we did.  We asked them, hey,
10  please contact the prior owner.  But for us to
11  specifically contact them, I don't believe that we
12  asked that.
13      Q.    So -- One moment, please.  All right.
14           And you discussed previously about it
15  would have been -- not the -- I'm summarizing.  But
16  you discussed that you -- it would have been a red
17  flag if you had known that the Gonrings were current
18  owners.
19           What would you have done differently if
20  you had known they were current owners?
21      A.    Well, I would have treated this just like
22  any other transaction in that Sarah is an attorney
23  representing the sellers.  That kind of layer of relo
24  would have been removed and these questions that

Page 49

1    we're asking especially as it pertains to

2    insurability and the water infiltration, the ones

3    that we pushed back on, I would have required -- We

4    would have requested, hey, I need these questions

5    answered.  This needs to come directly from the

6    sellers whom presumably you're representing.

7        Q.    And what's the difference between seller

8    and owner?

9        A.    In my opinion, in this situation, nothing,

10   they're one and the same.  I'm assuming that they're

11   one and the same.  We're assuming that they're one

12   and the same.

13       Q.    All right.  I'd like to turn to again some

14   answers that Ms. Sgariglia provided in her

15   interrogatories, that she provided.

16             Do you know what interrogatories are?

17       A.    Yes.

18       Q.    Okay.  Just making sure.  All right.

19             So please mark this as Exhibit 9.

20             I'll give you a moment to read No. 7 in

21   the response.

22       A.    No. 7?

23       Q.    Yes.

24       A.    Okay.

Page 50

1     Q.    All right.  So we discussed this a little

2     bit before, but -- Have you seen this before?

3     A.    No.

4     Q.    Okay.  So you'll see in No. 7 that we

5     asked Melinda what evidence she had for stating that

6     as is typical in real estate transactions involving

7     real estate -- relocation companies, there are often

8     two deeds recorded at closing.  One deed is for the

9     previous owner to the relocation company.  And the

10    second deed is from the relocation company to the

11    buyer.  And she responded that her evidence was

12    Plaintiff's real estate counsel.

13          Did you ever tell Melinda this?

14    A.    No, I can't recall.

15    Q.    But you -- Do you believe that to be true?

16    A.    Yes.

17    Q.    And what's your basis for that statement?

18    A.    That there's two deeds?

19    Q.    Yes.

20    A.    Just experience.

21    Q.    Okay.

22    MS. McAULIFFE:  All right.  That was all the

23    questions that I had.

24          If anyone else have any questions, you can

Page 51

1    proceed.

2         MS. OSHANA:  I have questions.

3         MR. McCARTHY:  I have questions too.

4         MR. GOOD:  I have questions at the end, but I'd

5    like to go last.

6         MS. OSHANA:  All right.  Go ahead, Mr. McCarthy,

7    I'll go after you.

8         MR. McCARTHY:  Okay.  Thanks, Carol.

9              Good morning, Tom.  My name is Paul

10   McCarthy.  I represent the Gonrings in this case.

11                    EXAMINATION

12   BY MR. McCARTHY:

13        Q.    How many lawyers are in your firm?

14        A.    Seven.

15        Q.    And how many are lawyers who attend real

16   estate closings?

17        A.    Six.

18        Q.    And how many -- How many lawyers attended

19   real estate closings back in 2018?

20        A.    Probably four.

21        Q.    And I understood you to say and wanted to

22   confirm that Paul Garber is an attorney at your

23   office who covered the closing of this transaction

24   for Melinda's purchase of this condominium unit, am I

Page 52

1    right about that?

2         A.    Correct.  At least I believe so.  It --

3    The only thing that we have is an e-mail stating that

4    he was going to be there, that I saw.

5         Q.    Is Paul still with your firm?

6         A.    Yes.

7         Q.    All right.  What is the percentage of your

8    practice that focuses on real estate -- residential

9    real estate transactions and closings?

10        A.    Probably 85 percent.

11        Q.    So it's a vast majority of your practice?

12        A.    Yes.

13        Q.    What is the other 15 percent?

14        A.    Estate planning and probate.

15        Q.    Do you have your file with you?

16        A.    Yes, it's a digital, but it's in front of

17   me.

18        Q.    Can you tell me what is your file

19   comprised of?  If you can kind of take us through

20   what's in your file?

21        A.    Yeah, we have folders in the file.  So I

22   go to, you know, 2018 old closings.  Sort by S.  I go

23   to Melinda's file.  You know, I can see receipts.  A

24   receipts folder.  Mortgage contingency.  Power of

Page 53

1  attorney.  Attorney review.  Title.  Addendums.
2  Association.  And then they all -- Correspondence
3  goes into those folders.  What sits out are, you
4  know, engagement letters, the contract, assessed
5  values, tax bills, closing statements, and then, you
6  know, all the documents from closing, the final
7  settlement statement, et cetera.
8      Q.    Can you look in your file and tell me what
9  disclosures you have in your file?
10      A.    When I look at the contract, I have a
11  seller's property disclosure statement, and then I
12  have an Illinois residential real property
13  disclosure.
14      Q.    All right.  And the seller's property
15  disclosure statement, who is that from?
16      A.    It has the sellers names on it, and it is
17  signed by the seller, the Gonrings, and a prospective
18  buyer, Amanda something or other, two prospective
19  buyers, and then there's a side initial with
20  Melinda's initials on there.
21      Q.    And when would you have received that
22  disclosure statement in the course of your firm's
23  representation of Melinda?
24      A.    It looks like when we would have received

Page 54

1   a copy of the contract.

2        Q.    So right at the beginning?

3        A.    Yes.

4        Q.    All right.  Are you -- Is this the

5   document that's in your file?  Do you see it?

6        A.    Yeah, I'm just going back to mine.  Yep,

7   it looks to be the same document.

8        MR. McCARTHY:  All right.  I would like to mark

9   this as Exhibit 9.

10       MS. McAULIFFE:  10.

11       THE REPORTER:  Exhibit 10.

12  BY MR. McCARTHY:

13       Q.    Tom, if you can just review with me what

14  else would you have received in this initial tranche

15  of information?  You indicated the Purchase and Sale

16  Agreement; is that right?

17       A.    Yeah.  Correct.  It's typically that and

18  the disclosures that we -- that we receive at the

19  outset.

20       Q.    All right.  And then you also indicated

21  that you had a State of Illinois Disclosure form?

22       A.    Correct.

23       Q.    All right.  We'll get to that one in a

24  second.

Page 55

1          And is it your practice and your firm's

2     practice to review the disclosures when they're

3     received?

4          A.    Typically, yes.

5          Q.    Or is it -- Is it not that important

6     because you have your standard letters that go out

7     that asks specific questions?

8          A.    I would say it's typical practice that we

9     do review those.  And, yes, these are standard

10    letters, so those requests are always in the letters.

11         Q.    Kind of a belt and suspender kind of --

12         A.    Yeah, kind of.

13         Q.    So the disclosure that we're looking at,

14    Exhibit 10, is on an AIRES form, correct?

15         A.    Correct.

16         Q.    And it identifies Nicholas and Kelsey

17    Gonring, am I right about that?

18         A.    Yes.

19         Q.    And then it goes through and it has

20    Melinda's electronic signatures on each page; is that

21    right?

22         A.    Correct.

23         Q.    And then at the end it indicates that the

24    sellers are Kelsey and Nicholas Gonring.  They signed

Page 56

1   this document in May of '18.  The buyer is listed as

2   AIRES.  This is dated June 6th of '18.  And then

3   there's another buyer on here for Melinda, and that's

4   dated June 7 of '18.

5              Am I right about all of those things?

6        A.    Yes.

7        Q.    So you would have known from the inception

8   of this matter that this is a relocation situation

9   where the relocation company is going to be the buyer

10  from the Gonrings and then the relocation company is

11  going to be the seller to Melinda?

12       A.    Yes.

13       Q.    All right.  And you indicated that while

14  roughly 60 percent of the time there are typically

15  two deeds at closing -- And I want to specify, and I

16  think you said this in your testimony -- but one deed

17  is from the owner to the relocation company, and the

18  second deed is from the relocation company to the

19  buyer?

20       A.    Correct.

21       Q.    And none of that is a surprise to you

22  because you guys get the closing packets in advance

23  of closing, correct?

24       A.    No, that's not correct.  Typically we

Page 57

1    don't see any of that until you get to closing.

2    That's more typical than not.  Actually that's

3    probably 95 percent of the time.

4        Q.    All right.  So sometimes, but not often,

5    you get the closing packets in advance, but mostly

6    you receive them at the closing?

7        A.    That's correct.  By closing packet, I'm

8    assuming deed, affidavit, title, bill of sale.

9    Sellers closing packet you don't see until the

10   closing table typically, yes.

11       Q.    What do you typically see with respect to

12   the closing in advance of the closing?  Do you get

13   a -- Do you get a closing statement, a draft closing

14   statement, at least?

15       A.    Exactly.  You get a preliminary closing

16   statement from the title company.

17       Q.    All right.  So let's talk about the other

18   way that this goes, and that is that -- that

19   sometimes the deed is issued directly from the owner

20   to the buyer and there is no deed with a relocation

21   company, am I right about that?

22       A.    Yes.

23       Q.    And that happens -- The balance of, let's

24   say, if 50 percent is typical, then the other -- the

Page 58

1    other portion is roughly 40 percent?

2         MS. OSHANA:  I'm going to object because that

3    mischaracterizes his testimony.  He didn't say that

4    it occurred 60 percent of the time versus 40 percent.

5    Thank you.

6    BY MR. McCARTHY:

7         Q.    Well, I want to be -- I want to be fair to

8    you, Tom.  So why don't you share with us what is

9    your best estimate of that percentage.

10        A.    I just -- I don't know.  I'm trying to put

11   myself at the closing table on some of these and -- I

12   would just say it's more often than not, and what I'm

13   accustomed to seeing are two deeds.  I mean, that's

14   as good of an answer as I can give you.  I'm sorry.

15        Q.    No, that's fine.  And I just want to be

16   clear on the record that the other way that that goes

17   is that there's one deed at closing and that one deed

18   is from the owner to the buyer and it doesn't go

19   through the relocation company, fair?

20        A.    Fair.

21        Q.    All right.

22        A.    And the only situation that I can

23   affirmatively state that that applied was in this

24   situation.

1     Q.    Well, but those are -- Those are the two

2  ways that it would go at closing, am I right about

3  that, that --

4     A.    Well, I know that there's two ways --

5     Q.    -- that --

6     A.    I'm sorry.  Go ahead.

7     Q.    I'm just trying to make sure that you and

8  I are communicating.  I'm understanding you need to

9  say there's two ways that this goes.  One way is that

10  there are two deeds at closing from owner to

11  relocation company and from relocation company to

12  buyer.  And the other way that this can go is that --

13  that the deed goes from owner to new buyer and there

14  is no deed to the relocation company, correct?

15     A.    Correct.

16     Q.    All right.  And from the beginning of this

17  transaction we know that -- that there's going to be

18  a situation where the Gonrings are conveying title or

19  they're going to be the sellers to AIRES and AIRES is

20  going to be the seller to Melinda, right?

21     A.    Correct.

22     Q.    And in your work in the real estate area,

23  you understand that there's often the situation where

24  there is mutual agreements.  In other words, a

Page 60

1    Purchase Agreement from owner to relocation company
2    and then relocation company has Purchase Agreement
3    with buyer.
4              That's common, isn't it?
5         A.    I -- I -- I don't know what is executed
6    between owner and relocation company.  I only know
7    what's executed between relocation company and buyer.
8    I don't think I've ever been privy to that.
9         Q.    You would presume there's a Purchase
10   Agreement of some kind?
11        A.    Agreed.  Yes, I would have presumed that.
12        Q.    All right.  So let's go -- So we see that
13   on the -- the initial disclosure, that we have a
14   situation where the Gonrings are going to -- they're
15   identified as sellers.  We've got two buyers on this
16   document.  And then I want to scroll up and -- on
17   Paragraph 6, Section 6, it says structural items.
18             Do you see that?
19        A.    Yes.
20        Q.    And 6A asks are you aware of any past or
21   present water leakage in the house or other
22   structure?  And there's handwritten response to this
23   that says Unit 3 had leaks on west-facing windows,
24   HOA sealed building to resolve Unit 3 leak.

Page 61

1          Do you see that here?

2     A.   Yes.

3     Q.   Would you have made note of that at the

4  time when this came in, or might that have been

5  something that wouldn't have been noteworthy to you?

6     A.   No, I would say that that would have been

7  something that was noteworthy.

8     Q.   Because what this is -- this is

9  identifying is that now the buyer has knowledge that

10  Unit 3 had leaks on the west-facing windows; is that

11  right?

12     A.   Yes.

13     Q.   And the buyer has knowledge that an action

14  was taken by the HOA to seal the building to resolve

15  the Unit 3 leak, fair?

16     A.   Fair.

17     Q.   And I assume, but should ask, you probably

18  don't have any specific recollection of this

19  language?

20     A.   Correct.

21     Q.   Then the other disclosure that you

22  identified in your file -- Well, let me ask you this

23  as well.  So -- Would you agree with me that as of

24  May of 2018 that you're on notice, the buyer is on

Page 62

1    notice that the Gonrings were -- Well, let me --

2    Strike that question.  That's not a good question.

3            Does this sellers property disclosure

4    statement tell you, Tom, that the Gonrings are in

5    occupancy of that unit?

6        A.    No, it does not.

7        Q.    They could have moved out May 25th of

8    2018?

9        A.    Exactly.

10       Q.    But that's something that could be asked

11   of your client, Melinda.  You could ask Melinda, you

12   know, did you go to the inspection?  Was the unit

13   occupied?  Was there furniture?  Was there clothes

14   there?  Those sorts of things, right?

15       A.    Agreed.  Correct.

16       Q.    And there's nothing -- Forgive me.  I'm a

17   Michigan attorney.

18            There's nothing under Illinois law -- And

19   I think the other counsel asked this a number of

20   times.  There's nothing that prohibits you from

21   contacting the Gonrings, correct?

22       A.    Well --

23       Q.    I get that it's not standard, but I'm just

24   saying that there's no legal prohibition, right?

Page 63

1       A.      Well, there is a prohibition.  If we had

2   known that they were still the owners of the

3   property, I would have to go through their

4   representation.  I can't contact another party who's

5   represented by counsel.

6       Q.      What about through real estate agents?

7   Can you contact the real estate agent?

8       A.      If I know that they're represented by

9   counsel, I wouldn't -- I would direct all

10  correspondence through their counsel.

11      Q.      All right.  Fair enough.

12              Melinda, however, Melinda could contact

13  her -- Presumably she had a real estate agent, right?

14      A.      Correct.

15      Q.      And that real estate agent can talk to the

16  sellers' real estate agent, fair?

17      A.      Certainly.

18      Q.      And ask for specific information from the

19  Gonrings if they were to push that, fair?

20      A.      Fair.

21      Q.      Right.  All right.  The Illinois Realtors

22  Residential Real Property Disclosure Report that's in

23  your file, how many of those do you have?  Is it just

24  one or two?

Page 64

1      A.    I have one that I'm looking at right now

2   that was attached to the contract.  Do you want me to

3   look through my -- I see I've received another one,

4   but it looks to be -- 6/7 -- It appears to be the

5   same one.

6      Q.    And who is -- Who filled it out?

7      A.    The Gonrings did.

8      Q.    All right.  I'm going to mark as Exhibit

9   11 -- Let me just make a note for myself here.  I'm

10  going to mark as Exhibit 11 the Illinois Realtors

11  Residential Real Property Disclosure Report.  This is

12  signed by Melinda on Dot -- in Dotloop which is an

13  electronic signature platform for real estate,

14  correct?

15     A.    Yes.

16     Q.    And that's dated June 7, 2018.

17           Am I right about that?

18     A.    Yes.

19     Q.    And this one is filled out by an agent for

20  American International Relocation Services.

21           Do you have that in your file?

22     A.    I see where they sign as prospective

23  buyer.  But it's filled out by the Gonrings as seller

24  in the box above.

Page 65

1      Q.    Yep.  Correct.  Thank you for that.  So

2  this is filled out by the Gonrings and then signed by

3  an agent for AIRES identified as prospective buyer,

4  and then signed again by Melinda?

5      A.    Correct.

6      Q.    All right.  So, again, everyone is --

7  everyone is on notice that there are going to be --

8  there's two deals going on here.

9            One is between the Gonrings and AIRES, and

10  another one is between AIRES and Melinda, fair?

11      A.    Yes.

12      Q.    I'm marking as Exhibit 11 -- I'm sorry --

13  12, another Illinois Realtors Residential Real

14  Property Disclosure Report that has Xs through it,

15  and it is signed by Amanda -- I can't really see her

16  last name very well -- an agent for AIRES, and then

17  signed by Melinda.

18            Do you see that?

19      A.    Yes.

20      Q.    Do you have this in your file?

21      A.    Yes.

22      Q.    Do you have any other disclosures in your

23  file?

24      A.    Just Raydon.

Page 66

1      Q.     Okay.

2      A.     Two Raydon disclosures.  One that was

3  completed by the Gonrings, and one that is just X'd

4  out and signed for by AIRES.

5      Q.     Okay.  Counsel asked you questions about

6  the inspection report.  And as I recall, your answer

7  was you do -- that is something that you and your

8  firm take a look at to consider what the conditions

9  are of the property that were identified by the

10  inspector?

11      A.     Yes and no.  We will largely defer to our

12  clients when it comes to inspection requests because

13  what are issues for some people are not issues for

14  others.  We're not at the home inspecting the

15  property.  So there are times where we don't review

16  the inspection report at all if I get the requests

17  directly from my client.  We would review it if they

18  have questions.

19      Q.     And forgive my lack of geographic

20  knowledge.

21             But where are you in relation to the city?

22      A.     20 minute train ride -- 15 miles.

23      Q.     And what percentage of your work deals

24  with purchase agreements relating to condominiums?

Page 67

```
 1       A.    Half.
 2       Q.    And I assume a lot of that is in the city
 3   itself?
 4       A.    Correct.
 5       Q.    Is there -- Is there any knowledge on your
 6   part as a real estate dedicated lawyer with respect
 7   to buildings that are constructed with
 8   split-face-brick?
 9       A.    Yes.
10       Q.    And what is your knowledge in that regard?
11       A.    That they need to be taken care of.  They
12   need to be maintained because they could be -- they
13   can be porous.
14       Q.    And is there -- Is split-face-brick now
15   prohibited from being used as a construction material
16   in the city of Chicago?
17       A.    I don't know.
18       MR. McCARTHY:  Just to clarify.  I'm sorry.  I
19   think it's called split-face-block.
20   BY MR. McCARTHY:
21       Q.    Is that the same thing, Tom?
22       A.    Yeah, I think we're talking about the same
23   thing.  We're talking about non-brick.
24       Q.    All right.  And do you typically ask your
```

Page 68

1  clients, hey, listen, is this a split-face-block
2  construction because you need to be concerned about
3  that?
4      A.    Sometimes I think we will -- we may have
5  that conversation.
6      Q.    Would you agree with me that if it came to
7  your attention that the building is made of
8  split-face-block, that would be something that you
9  would talk to them about?
10     A.    I don't think that I can agree or
11 disagree.  I mean, this falls within the purview of
12 an inspection.  I mean, the City is absolutely
13 littered with split face -- I've owned three condos
14 in the City and all of them had split face.  Some had
15 very, very minor issues.  When you're proactive with
16 it, that's the -- that's the element that you stress.
17 You've just got to be proactive with it.  When you're
18 proactive with it, my experience is that it's just
19 fine.
20     Q.    And by being proactive with it, does that
21 mean sealing the split-face-block?
22     A.    Exactly.
23     Q.    What else does it mean to be proactive
24 with split-face-block other than sealing?

Page 69

1      A.     You know, your typical flashing,

2   tuckpointing, sealing.

3      Q.     And when you say that you've owned three

4   condominiums that were constructed with split face

5   block, so you have personal knowledge of being an

6   owner of one of those units?

7      A.     Correct.

8      Q.     And you said it can just be, you know,

9   minor issues.

10             What are the minor issues that you

11  experienced as a condominium owner of a

12  split-face-block building?

13     A.     Minor leak.  Little like spot on the

14  sealing or around the window.

15     Q.     And that occurred on two other units that

16  you owned?

17     A.     Yeah.  Out of three, I would say honestly

18  one that I can only think of.

19     Q.     And what was the most significant problem

20  that you had with the three condominium units that

21  you owned that were constructed of split-face-block?

22     A.     On my unit I was a first floor and the

23  sixth unit.  I was a duplex down.  Water had come

24  somehow and came down through the fireplace in my

Page 70

1   unit.

2        Q.    And what problems did that present?

3        A.    I think that was the roof, to be quite

4   honest with you.  I can't recall having -- The

5   building may have had -- Other units may have had

6   leaks around the windows, I'm trying to think -- I

7   can't recall having -- having leaks in any of my

8   units other than the one that I just disclosed to

9   you.  I could be wrong.  This is many, many years

10  ago.

11       Q.    Understood.  And you don't -- Do you have

12  any recollection of having knowledge that this unit,

13  Unit 1, in this building was in a building made of

14  split-face-block?

15       A.    I can't recall.

16       Q.    You probably don't.

17       A.    Yeah, I can't recall.

18       Q.    And in your experience, one thing that

19  would be important to you to share with a client who

20  is purchasing a building in a -- purchasing a

21  condominium unit in a building constructed of

22  split-face-block would be to inquire as to when the

23  block was last sealed?

24       A.    Yeah, that's typical.  That can be

Page 71

1   typical.

2        Q.    All right.  I'm going to get back to the

3   other document that would have been at the beginning

4   of your representation.  And I take it from your --

5   from the way you described this process, Tom, that

6   your group works a bit as a team, that you and Kirk

7   commonly work on situations together, and that's not

8   atypical whatsoever in your practice?

9        A.    Correct.

10       Q.    And whether you attend the closing, Kirk

11  attends the closing or another lawyer attends the

12  closing, that's also common in your practice?

13       A.    Correct.

14       Q.    All right.  I would like to mark as

15  Exhibit 13 a Purchase Agreement.  This is a

16  Condominium Real Estate Purchase and Sale Contract,

17  and my guess is, but I want to confirm with you, this

18  is a -- this is a form agreement created by the

19  Chicago Association of Realtors that is unique to the

20  sale of condominium units?

21       A.    Correct.

22       Q.    And under this Purchase Agreement the

23  property here at the top is defined as Unit 1 of this

24  building, correct?

Page 72

1      A.     Correct.

2      Q.     The purchaser is Melinda, and the seller

3  is AIRES, right?

4      A.     Yes.

5      Q.     And that's consistent with all of the

6  disclosures that show -- that reveal we're going to

7  have two transactions; we've got one deal from the

8  Gonrings to AIRES, and another deal from AIRES to

9  Melinda, right?

10     A.     Right.

11     Q.     No secret about that here, right?

12     A.     Right.

13     Q.     And then under the signature lines we have

14  the signature lines for all of the appropriate

15  parties, correct?

16     A.     It appears so, yes.

17     Q.     And then as I understand it, under

18  Illinois law there's a 5-day period to get something

19  done with attorneys?  Can you explain that for me?

20     A.     Yeah, upon acceptance of a contract

21  there's typically a 5 business day attorney

22  inspection review period, and within those five

23  business days it gives a buyer an opportunity to have

24  an inspection and for us to prepare a letter, like we

Page 73

1    did here, to be able to send over to the sellers'

2    side, the sellers get the proposed modifications or

3    whatever and send it to the buyer's side, and then

4    the parties have a reasonable amount of time to reach

5    an agreement on all of those issues, and if an

6    agreement cannot be reached, the contract will

7    terminate and both parties part ways, the buyers get

8    a return of their earnest money.

9         Q.    Help me understand the time period here,

10   and I'm asking because I literally just don't

11   understand it.  So we have an acceptance date of

12   June 8, 2018, and a signature date by Melinda in May

13   of 2018.

14              It's my assumption -- But maybe you can

15   help me understand specifically -- you would have

16   received this Purchase Agreement in the

17   disclosures -- Let me just ask you when?  When would

18   you have received those?

19        A.    It's typically after the seller signs.  So

20   it looks like it was saved in our folder on June 8th.

21        Q.    All right.  So June 8, 2018 begins the

22   five-day attorney review period?

23        A.    That's exactly right, five business days.

24        Q.    All right.  So assuming there's a weekend

Page 74

1    in there, you have seven days from June 8th, so you

2    have until June 15, '18 to have the buyers -- to have

3    a lawyer approve -- lawyers approve the contract?

4         A.    Yeah, more or less.

5         Q.    All right.  But the letters that we see

6    between your office and Sarah Wilkensen [sic], those

7    go well outside June 15.

8              Is that -- Is that part of this five-day

9    period, Tom, or is that a different process?

10        A.    I'm sorry.  Can you state that again.

11        Q.    The letters between your firm and the

12   lawyer for AIRES where, you know, there are questions

13   that are being asked and counsel marked those as

14   exhibits, those are well after and outside the date

15   of June 15th, aren't they?

16        A.    Yeah, well.  The initial letter -- All

17   that's required is for you -- for each party's

18   respective attorneys to make the modifications within

19   that five business days.  Then, you know, it can

20   stretch for as long as the parties want to or until

21   either party terminates.

22        Q.    And I think the last document that was

23   marked as between your office and Sarah Wilkins was

24   stretched into July of 2018.

```
                                                 Page 75

 1              Is that -- Just for my own edification, is

 2    that still part of this five-day period or is that

 3    different?

 4         A.    No, it's part of that same process.  Part

 5    of that same five-day period.

 6         Q.    And are the parties, through the lawyers,

 7    agreeing to extend that five days to encompass these

 8    discussions?

 9         A.    Yeah, but either party can terminate at

10    any time.

11         Q.    Okay.  Fair enough.  All right.

12              So in addition to that original Purchase

13    Agreement, then there is an AIRES addendum to

14    Purchase Agreement, and this was provided at the same

15    time apparently that AIRES signed off on the Purchase

16    Agreement.

17              Would you agree with that?

18         A.    Yeah, it appears so.

19         Q.    All right.  And then Melinda, your client,

20    signs off on that on June 8th as well?

21         A.    I don't -- Where is that on your -- Is

22    that --

23         Q.    Buyer.  And it just looks like an M.

24         A.    Let me look at the contract.  That's -- I
```

Page 76

1    would assume it is.  That's the addendum.

2        Q.    Here.  I can go to the top and just -- We

3    could look to see --

4        A.    I don't -- I don't know -- I don't know

5    if -- Honestly, I can't tell you.

6        Q.    Well, it's signed by AIRES and seller.  We

7    can agree on that much.

8        A.    I'm looking at --

9        Q.    It's signed by someone as buyer, and the

10   someone has -- It looks to be an M.  Does that look

11   to be an M to you?

12       A.    I'm just looking at the initials.  Yeah, I

13   suppose.  I mean, I can't imagine who else would have

14   signed that.

15       Q.    And then we also have an addendum to the

16   Purchase and Sale Contract that's also part of

17   Exhibit 13 -- I just included these all in one

18   document for convenience -- is the addendum to the

19   Purchase and Sale Agreement, and this is dated and

20   signed by AIRES on July 5 and by your client on

21   July 7th?

22       A.    Yeah, that would have been a result of

23   that attorney review.  That wasn't part of the

24   initial contract.

Page 77

1      Q.    Right.  That's why we have an addendum to

2  the purchase -- All to say we have an addendum that

3  is giving your client a $3,000 credit at close?

4      A.    Correct.

5      Q.    All right.  Have we reviewed all of the

6  disclosures that were in your file?

7      A.    As far as I can tell, yes.

8      Q.    Now you indicated you have a folder in

9  your file called Association.

10          What's in the Association folder?

11     A.    What's called a 22.1 disclosure rules and

12 regs, budget, declaration and bylaws, HOA bank

13 statement, paid assessment letter and meeting

14 minutes.

15     Q.    Okay.  Can you explain for the benefit of

16 someone who's unfamiliar with the 22.1?

17     A.    Yeah, 22.1 is a statutory requirement that

18 just really addresses threshold questions for a

19 condominium purchaser.  You know, the most important

20 typically are, hey, are there any capital

21 expenditures that the Association intends to

22 undertake, and how are those capital expenditures

23 going to be financed?  So it really puts a

24 prospective buyer on notice of, you know, of

Page 78

1    potential incidents of getting dinged with a special

2    assessment or an increase in assessments or what may

3    be problematic with a particular building.  Super --

4    Very important disclosure.

5         Q.    All right.  I'm going to mark -- Nope,

6    that's not it.  I'm going to mark as Exhibit 14 the

7    22.1.

8              Is that what this document is?

9         A.    Yes.

10        Q.    And for the benefit of the -- of the jury,

11   this is a document that gets filled out by the

12   Condominium Association itself?

13        A.    Correct.

14        Q.    And tell me what's -- From your

15   perspective as counsel for a buyer of a condominium

16   unit in Chicago, what -- what are you looking for in

17   this document?

18        A.    Really everything that's on there.  I

19   mean, those important threshold questions.  So this

20   is -- This is a document that we absolutely review.

21   It's probably the single most important condominium

22   document, in my opinion.  So I think that the

23   questions on the disclosure statement are pretty

24   self-explanatory.  How much are in reserves?  Are

Page 79

1   there any specific projects that are upcoming?  Any

2   capital expenditures that we should anticipate?  How

3   are those going to be financed?  Special assessment?

4   Increase monthly?  Loans in some circumstances.  Is

5   there anything not in compliance with the condominium

6   declaration?  Are there any liens on the property?

7   So I think the document itself is -- is pretty

8   self-explanatory.

9         MS. OSHANA:  Counsel -- Sorry, Mr. McCarthy.

10  Can you just make -- I want to make sure it's the

11  correct line.  Can you just go to the signature page,

12  please.  Thank you.

13  BY MR. McCARTHY:

14        Q.    And this document -- Can you confirm, Tom,

15  that in your file you have the same 22.1 signed by

16  John Gorr on behalf of the Board of Managers?

17        A.    Confirmed.

18        Q.    Okay.  And the 22.1 with respect to this

19  situation identifies the amount of reserves for

20  capital expenditures of $2,208, right?

21        A.    Correct.

22        Q.    And then it indicates, are there any

23  reserves designated for any specific projects?

24              And the answer to that question is, no,

Page 80

1    correct?

2        A.    Correct.

3        Q.    And then it also asks are there any

4    capital expenditures anticipated in the next two

5    fiscal years that would require special assessment?

6              And the answer to that question was?

7        A.    No.

8        Q.    You also indicated that you had meeting

9    minutes in your file.

10             What are the meeting minutes of?

11       A.    It looks like just one page, May 7, 2018,

12   lists item discussed.  Really they're talking about

13   the tuckpointing.  It looks like -- It looks like

14   their agreement to commit to Arrow.  It looks like

15   their agreement to contract with Arrow Masonry &

16   Exteriors to perform work on the building.

17       Q.    Does your file indicate when you received

18   that?

19       A.    The meeting minutes?  You know -- They're

20   saved in our file on June 29th --

21       Q.    I'm going to --

22       A.    -- 2018.

23       Q.    I'm going to mark as Exhibit 15 a June 29

24   e-mail.  This is from Ariana Listecki,

Page 81

1    L-I-S-T-E-C-K-I.

2              Is that someone from your office?

3       A.   Yes.

4       Q.   And do you know who this was sent to you?

5       A.   Just by looking at the cc, yes.

6       Q.   And who -- Who are the recipients?

7       A.   Actually, I don't know.  I'm assuming that

8    our client, Melinda, is M dot aeunc.  MC at

9    @Properties would have been the buyer's agent, Megan.

10   Kirk in our office.  Copies to our action step file.

11      Q.   I also assume that given the nature of

12   your practice, you know a ton of real estate agents?

13      A.   Yes.

14      Q.   And you know and probably have your own

15   opinions about who's good and who's really diligent

16   and who's kind of sloppy, you probably know that?

17      A.   Yeah, a little bit.

18      Q.   Were you familiar with the agents on both

19   sides of this transaction?

20      A.   I don't know.  Let me look who the agent

21   was on the list side.  Certainly on the buy side I

22   was.  On the sell side, no, not -- not anything

23   specific.

24      Q.   All right.  SO exhibit 15 is -- is -- This

Page 82

1    is your -- your firm's launching and circulating of

2    the meeting minutes.  So we don't -- It doesn't show

3    where you received them from, but it shows you're

4    sending them out to your client and to other parties;

5    is that right?

6         A.    Correct.

7         Q.    All right.  And then the meeting minutes

8    contain a May 7, 2018 meeting minute.

9               And would this have been reviewed?

10        A.    Yes.

11        Q.    This would be important, would it not?

12        A.    Yeah.  I mean, minutes aren't even

13   required pursuant to Section 22.1 of the Illinois

14   Condominium Property Act.  You got to make specific

15   requests for those.  But, yeah, sometimes you can

16   gain insightful information on -- in the meeting

17   minutes.  As a practitioner we will -- we place a lot

18   of emphasis on the 22.1 disclosure as well.

19        Q.    Understood.  I guess -- I guess -- Let me

20   ask it this way.  In this situation, given the AIRES

21   Seller's Disclosure Form that specifically identified

22   water getting into Unit 3 and the HOA sealing the

23   building to address those issues, in that context

24   would you agree with me that the meeting minutes

Page 83

1   would be important?

2        A.    Yes.   There's a caveat to that, I guess.

3   So because there were two disclosures that were

4   attached to the contract, one was a Seller's

5   Disclosure that the Gonrings had provided to the relo

6   company, and one was the Residential Real Property

7   Disclosure that the Gonrings completed.   Pursuant to

8   the latter, the Residential Real Property Disclosure,

9   if someone reasonably believes an issue has been

10  corrected, they are not under a duty to disclose that

11  issue, right.   So you don't get a litany of 20

12  repairs that a homeowner has made over their

13  ownership of 20 years.   So when you look at that --

14  So theoretically when you look at -- when you couple

15  the seller's disclosure that says, hey, we had some

16  leaking around the window, it's been tuckpointed,

17  with the Residential Real Property Disclosure but

18  does not lists any issues, I think the conclusion

19  there to is that therefore that issue has been

20  resolved.

21       Q.    And your point is an important one.

22            So if there had been an issue historically

23  but it had been addressed and resolved, there's no

24  duty to disclose?

Page 84

1      A.     Exactly.

2      Q.     All right.  But in this situation there

3  was a disclosure as to water coming into Unit 3 as

4  well as the HOA sealing the building that we

5  identified on the earlier document, correct?

6      A.     Right.

7      Q.     All right.  And now we have a May 7, 2018

8  meeting minute where it indicates tuckpoint and seal

9  the exterior of the building, last sealed, 2012,

10 correct?

11     A.     Correct.

12     Q.     And it also identifies that Arrow Masonry

13 & Exteriors had issued a quote, the scope of that

14 work is spot grinding, spot tuckpointing, caulking,

15 flashing installation, and sealing of the east-west

16 and north elevation of split-face-block, correct?

17     A.     Correct.

18     Q.     And the cost of that.  So it's $16,000 --

19 $16,840 was the cost of that quote?

20     A.     Correct.

21     Q.     And this meeting minute is informing your

22 office and your client that that quote was being

23 agreed upon and accepted and that work was being

24 done?

Page 85

1       A.      Correct.

2       Q.      Fair?

3       A.      Right.  Fair.

4       Q.      And given your knowledge and experience

5    with split-face-block, this would be good news and

6    presumably was in the event you read this at the time

7    that this was a prudent thing to do for the care and

8    treatment of split-face-block?

9       A.      Agreed.

10      Q.      Does your file contain -- Maybe you can

11   just look at it and tell us what it does contain that

12   is in preparation for the actual closing?  What sort

13   of information is in your file in that regard?

14      A.      You mean the file that I would take to

15   closing?

16      Q.      No.  No.  Whatever information was

17   provided in advance of closing that deals with

18   closing, whether it's just a --

19      A.      Yeah.

20      Q.      -- preliminary closing statement or, you

21   know, further title work.  Just walk us through what

22   your file --

23      A.      The full digital folder.  Everything that

24   I relayed to you earlier is accessible.  Everything

Page 86

1   is digital.

2       Q.    All right.  I understand that.  Actually

3   there's a separate question.  Can I get a copy -- Can

4   I get a digital copy of your file following the

5   deposition?  If I give you my e-mail, is that

6   something you can send to me?

7       A.    Yeah.  I would --

8       MS. OSHANA:  If you want, you would send it for

9   all of us.

10  BY THE WITNESS:

11      A.    Yeah, I'm just wondering if there's any

12  attorney-client privileged stuff in there.  I

13  guess -- I'd just have to parse through it just to

14  see what -- if there's any e-mails that are saved in

15  there between myself and my client -- or our firm and

16  our client.  I don't see that there are in this file.

17      MR. McCARTHY:  Well, let's do this.  We'll

18  provide you everyone's e-mail addresses at the

19  conclusion of the deposition.  Then when you send a

20  link, whether it's through a Share File or Dropbox or

21  whatever is easiest for you, just indicate in the

22  cover e-mail whether any documentation was withheld

23  on the basis of privilege, or if anything was

24  identified in that regard, just indicate that as

Page 87

1   well.  Okay?

2        THE WITNESS:  Okay.

3        MR. McCARTHY:  All right.  My question was just

4   inarticulate.

5   BY MR. McCARTHY:

6        Q.    What I was trying to find out was -- So

7   now we're after July 5.  You've got the addendum to

8   the Purchase Agreement.  You've got a $3,000 credit

9   coming to your client.  And now things kind of go

10  quiet until there's the closing, I'm assuming,

11  correct?

12       A.    Yeah.  More or less, yes.

13       Q.    Because once you have the documented

14  contract and amendment, now all -- all that's left to

15  be done is the work incidental to getting ready for

16  closing, satisfying the title company, satisfying

17  lenders, you know, a knit here, a knit there, fair?

18       A.    Fair.

19       Q.    All right.  And then when we're getting

20  ready for closing, what documentation is your office

21  provided in advance on this transaction specifically?

22  What does your file contain?

23       A.    Well, it's all kind of muddled in here.

24  But I just see that I have, you know, a closing

Page 88

1  confirm that was sent from the title company, an
2  e-mail, you know, sending to our client an e-mail
3  telling me how much my client wired.  I don't even
4  see -- and then e-mail saying title company has wire.
5  I don't even see, which isn't atypical, I don't even
6  see that we received a preliminary settlement
7  statement in this case.  I don't see one saved.
8       Q.   All right.  Let me mark -- I'm going to
9  share my screen here.
10      THE WITNESS:  Can I duck out for 30 seconds?
11      MR. McCARTHY:  Of course.
12      THE WITNESS:  I've got to go use the restroom.
13  I'll be right back.
14      MR. McCARTHY:  Sure.
15                    (WHEREUPON, WE WERE OFF THE
16                     RECORD.)
17      MR. McCARTHY:  Back on the record after a short
18  break.
19  BY MR. McCARTHY:
20      Q.   I want to mark as Exhibit 16 what I think
21  you're going to describe as the Closing Statement.
22  But you tell me what this is called in your world?
23      A.   Yeah, that's the Settlement Statement.
24      Q.   And this is -- It looks like the print

Page 89

1   date and time is 7-25-18.  That's the date of

2   closing, I'll represent to you.  And so presumably

3   this would be then something that would have been

4   provided to Paul of your office when he attended the

5   closing that day?

6          A.    Correct.

7          Q.    And it identifies -- It's consistent with

8   all of the Purchase Agreements and the amendments and

9   the addendums that Melinda is the buyer and AIRES is

10  the seller, correct?

11         A.    Correct.

12         Q.    And this transaction closed consistent

13  with that approach?

14         A.    Correct.

15         Q.    And this then identifies all of the flow

16  of funds, the deposit amount, the ins and outs, the

17  charges and whatnot, and identifies that Melinda

18  needs to bring to closing 36,537.69, right?

19         A.    Correct.

20         Q.    And this would have been something --

21  Because that specific amount needs to be provided,

22  oftentimes these are provided in advance, aren't

23  they?

24         A.    Yeah, they are.  I mean, typically just

Page 90

1   about a day prior to closing.

2        Q.    Does your file reflect that?  Does it

3   contain this document in there?

4        A.    No, it doesn't.  I had said that earlier.

5   I don't see that we received a prelim before closing.

6        Q.    Okay.  Now, walk us through closing.  So

7   you're -- And I recognize that -- that Paul Garver,

8   G-A-R-V-E-R, is that how you spell his last name?

9        A.    Yeah.

10       Q.    So Paul is at the closing to the best of

11  your information.  Share with us what information --

12  what documents he's going to be presented with to

13  review with Melinda at the closing table?

14       A.    Yeah.  So the -- The typical flow of this

15  is you get to the title company and then there's all

16  of the loan documents.  So those are usually the

17  first documents that you go through, right, the note

18  and the mortgage and all of the disclosures.

19  Actually, the Settlement Statement is probably the

20  first document you go through.  Once you go through

21  the Settlement Statement, sign that, you go through

22  all of the loan documents because those need to be

23  send back to the lender usually, and then the lender

24  reviews them.  So you want to kind of get those

Page 91

1    documents to them as soon as possible so you're not

2    sitting at closing for three hours.  Once you're done

3    with all of the loan documents, then there's a

4    seller's packet, and that's where you'll find the

5    deed, the affidavit, the title, bill of sale, all of

6    the statements Kirk does, whatever -- whatever is

7    applicable to that particular transaction.  And then

8    after that, after you review all of those, you know,

9    you're hoping that by that time the lender says, hey,

10   we've reviewed everything, we're good to disburse and

11   checks are cut and the parties go their own way.

12        Q.    Okay.  So describe the process for me if

13   you would, Tom, because maybe our process here in

14   Michigan is a little different.

15              Where do closings typically take place?

16        A.    At the title company.  So at this

17   particular -- You know, this was in the loop.  This

18   would have been down on Wacker.  You go into the

19   title company --

20        Q.    And this is called Attorneys' Title

21   Guaranty?

22        A.    Correct.  Correct.

23        Q.    So that's the title company in this case?

24        A.    Yeah, at 1 South Wacker.  So, yeah, you go

Page 92

1    into a room.  There's other closings that are going

2    on.  But you go into your own little room.  You have

3    your closure or an at-the-table funding stage.  So

4    everything is handled and processed right there at

5    the closing.  You know, you usually budget about an

6    hour and a half for a closing when things go right,

7    hour, hour and a half, but they can last two, two and

8    a half.  A lot of times they're just waiting on the

9    lender to get back to you.  Or they might say, hey,

10   we don't like the way that this is signed, you need

11   to re-sign this.  I mean, there's a number of things

12   that could happen at closing.  Typically that's how

13   it goes.

14        Q.    So at the closing there would be Paul and

15   Melinda and a closer in the room?

16        A.    Correct.

17        Q.    And the closer comes in, they have all the

18   documents, and they're basically going through one

19   after another all of the documents that need to be

20   reviewed, executed and signed?

21        A.    Right.  They have a set of closing

22   instructions from the lender that says, hey, this is

23   what we need back.  So she'll go through and notarize

24   the documents that have been executed, pull out the

Page 93

1    funding documents, so they're called, and get those

2    back over to the lender where the lender will review?

3         Q.    And is it common that -- Is there a split

4    closing?  Like where is the AIRES representative and

5    where are the Gonrings?

6         A.    Yeah.  Typically the seller does not show

7    up to closing or the seller's attorney, but they

8    certainly can, just because there's only a handful of

9    documents that a seller needs to execute, right.

10   It's really kind of a buyer's show at closing.  So

11   the sellers pre-sign their documents.  Then they're

12   kind of done and the attorney will sign the

13   Settlement Statement or any ancillary documents

14   remotely via power of attorney or something like

15   that.

16        Q.    Okay.  Other than the closing statement

17   itself, what other documents are signed at closing

18   that, again, confirm Melinda as buyer and AIRES as

19   seller?

20        A.    Well, let me look.  I have docs from

21   closing -- Let's see what the -- I get my waived

22   title, of course.  You know, I received a FIRPTA

23   listing AIRES as the seller, AIRES.

24        Q.    Can you identify that acronym for the

Page 94

1   court reporter.

2       A.    Yeah, it's just a Foreign -- It's an IRS,

3   what, Foreign Real Estate Property -- Foreign

4   Investment Real Estate Property.  I don't know what

5   it actually stands for.  I just know it as a FIRPTA.

6   It just certifies that the seller has a U.S. tax

7   paying Social Security number or an EIN so that

8   proceeds -- There's a provision of the IRS Code,

9   Section 1445, sellers of foreign entity, you have to

10  withhold proceeds from the sale to ensure applicable

11  capital gains taxes get paid.  So when we ask for a

12  FIRPTA it's essentially saying they're exempt from

13  any withholding.  So that was completed on behalf of

14  AIRES.  I see the deed.  I don't have a copy of the

15  ALTA Statement, who signed that.  My presumption is

16  that would have been signed by the relocation company

17  as well.

18      Q.    All right.  And let's mark the deed as

19  Exhibit 17.

20            Is that showing on your screen?

21      A.    Yeah.

22      Q.    And, again, this -- this deed falls into

23  the second category.  It's -- It's the less popular

24  or the less common, but it's a deed directly from the

Page 95

1    Gonrings to your client, and not -- There's no
2    separate deed that's going through the relocation
3    company, correct?
4         A.    Correct.
5         Q.    And Paul would have seen this at closing,
6    Paul would have said -- If that was a problem, he
7    would say, no, no, no, no, we've got to do something
8    else, fair?
9         A.    Yeah, he could have.  Yes.
10        Q.    And this was acceptable to him because
11   really just to have a separate deed from Gonrings to
12   AIRES and then AIRES to Melinda, this deed
13   accomplishes the same thing, doesn't it?
14        A.    Yeah, more or less.  You know, what
15   conversation may have happened with the title
16   company.  And in the end again, if the title
17   company -- The title company is the one that insures
18   it.  So they're comfortable with the fact that they
19   have a deed here executed by the Gonrings and
20   everything else executed by the relocation company,
21   they are comfortable with insuring the transaction,
22   which gives us, in turn, a lot of comfort as well.
23        Q.    Fair enough.  All right.  So in summary,
24   at the time this transaction closed in July of 2018,

Page 96

1    the buyer and your office had knowledge of the leak

2    in Unit 3, correct?

3         A.    Well, active or repaired?

4         Q.    Repaired.  Well, the disclosure that there

5    had been a leak, right?

6         A.    Correct.  Yes.

7         Q.    That the HOA addressed it through sealing

8    the building, correct?

9         A.    Correct.

10        Q.    Disclosure of the meeting minutes that

11   identified the contractor to do that work, correct?

12        A.    Correct.

13        Q.    Identified the scope of that work,

14   correct?

15        A.    Yes.  Generally, correct.

16        Q.    Identified the cost of that work, correct?

17        A.    Yes.

18        Q.    You had a 22.1 disclosure that confirmed

19   that no capital expenditures were anticipated the

20   next two years, fair?

21        A.    Fair.

22        Q.    All of the purchase agreements revealed

23   that the Gonrings were sellers to AIRES and AIRES was

24   the seller to your client, correct?

Page 97

1      A.      Correct.

2      Q.      And then at closing Melinda accepted and

3  your office accepted a deed directly from the

4  Gonrings to her and did not demand a deed through

5  AIRES and then AIRES to her, correct?

6      A.      That I can't speak to.  I don't know what

7  happened at closing.  I don't know what the

8  conversations may have been at closing.

9      Q.      You would agree with me it -- at the end

10  of the day it doesn't matter so long as title is

11  conveyed to Melinda for the unit, correct?

12      A.      Yeah, I -- I guess I would agree with

13  that.

14      Q.      And you would -- You would concede that

15  Paul obviously didn't put the brakes on the closing

16  because this deed was executed and conveyed?  He

17  didn't pull the plug and refuse to move forward on

18  behalf of your client?

19      A.      Well, yeah, I would say -- Yeah.  This

20  closed.  This closed on the scheduled closing date.

21      Q.      All right.  And do you recall having any

22  discussion with Paul after the closing or at any

23  point in time that there's anything amiss or

24  problematic here?

Page 98

1       A.    Not that I recall.

2       MR. McCARTHY:  Thank you.  That's all I have.

3       MS. OSHANA:  Okay.  I have a few.

4            Mr. Hawbecker, my name is Carol Oshana.  I

5  am the attorney for the Plaintiff, Melinda.

6            Counsel, you have some documents on your

7  screen.

8       MR. McCARTHY:  Sorry.

9                    EXAMINATION

10  BY MS. OSHANA:

11      Q.    Let's go back.  One second, please.  I'm

12  going to share screen as well.

13           Counsel previously marked this exhibit as

14  Exhibit 13.  I'm just going to use the same number

15  for this one.  Now, this is the real estate contract

16  that was executed -- Let me make this a little

17  smaller so you could see it.

18           This is the contract executed between

19  Melinda and, it says, OOR, which is scratched out.

20           What does OOR mean?

21      A.    Owner of Record.

22      Q.    Okay.  And it was scratched out and

23  replaced as AIRES.

24           Why is that done typically?

Page 99

```
 1        A.    A lot of times to satisfy lender
 2   requirements.
 3        Q.    Yes.  Okay.  So the lender actually needs
 4   to know on the contract the Owner of Record, isn't
 5   that correct?
 6        A.    Yes.
 7        Q.    And here it's represented essentially that
 8   the Owner of Record is AIRES, isn't that correct?
 9        A.    Yes.
10        Q.    And going down -- Paragraph 15 of the
11   contract articulates that there is to be attorney
12   modifications within five business days after
13   acceptance date which is considered the attorney
14   approval period, right?
15        A.    Correct.
16        Q.    These are -- You have a couple of options
17   here according to the attorney modification provision
18   of the contract.  Number one, you may approve this
19   contract in its entirety.
20              Do you see that?
21        A.    Yes.
22        Q.    And/or you can propose modifications to
23   this contract; is that correct?
24        A.    Correct.
```

```
                                          Page 100

 1       Q.    Okay.  These modifications, these what we

 2   call Attorney Review Letters, these are legally

 3   binding statements, aren't they?

 4       A.    Yes.

 5       Q.    Okay.  So when you send a letter to a

 6   seller and ask questions like is there water coming

 7   into the building, and they say, no, that is a

 8   legally-binding representation, isn't it?

 9       A.    Correct.

10       Q.    Now, if you call someone that you consider

11   to be the previous owner, they are no longer the

12   owner, but they are the prior owner, if you call them

13   and ask them is there water leaking in the building

14   and they answer yes or no, is that legally binding

15   according to this contract?

16       A.    No.

17       MR. McCARTHY:  Objection to form.

18   BY MS. OSHANA:

19       Q.    In other words, as attorneys we're doing

20   closings -- And I do them often as well -- is it --

21   it is not our understanding when we're doing closings

22   that when we call previous owners that that is a

23   modification to the contract, isn't that correct?

24       MR. McCARTHY:  Objection to the form.
```

Page 101

1  Speculation.

2  BY THE WITNESS:

3       A.    I would say, yes that's correct.

4       MS. OSHANA:  Let me just clarify it further for

5  addressing the form.

6  BY MS. OSHANA:

7       Q.    Current owners modify the -- can modify

8  the contract -- Let me strike that.  Let me make this

9  clear.

10           Only current owners may accept or reject

11  modifications to a contract, isn't that correct?

12      MR. McCARTHY:  Object to form.  Foundation.

13  BY THE WITNESS:

14      A.    I would say that's a fair statement, yes.

15  BY MS. OSHANA:

16      Q.    And isn't it also a fair statement to say

17  that the prior owner and the prior owner before them

18  and the prior owner before them and the prior owner

19  before them have no obligation to modify the

20  contract, isn't that correct?

21      A.    Correct, there would be no privity there.

22      Q.    Right.  So isn't it true that in your

23  mind, in your experience, simply calling a previous

24  owner has no contractual benefit to your client?

1     A.   I would agree with that.

2     Q.   Okay.  So in other words, you wouldn't

3 normally take it upon yourself to call previous

4 owners of property because they do you no good

5 legally, isn't that right?

6     A.   Correct.

7     Q.   So this was not previously introduced to

8 you.  I'm gonna use this -- I believe we're on

9 Exhibit 18.

10       Is that correct, Madam Court Reporter?

11    THE REPORTER:  Yes, that's correct.

12    MS. OSHANA:  Okay.  Thank you.

13 BY MS. OSHANA:

14     Q.   So this is a document Gonring 000123.

15 That's the Bates stamp.  It is an e-mail from Kelsey

16 Gonring to a bunch of people.  But one of them is

17 Amanda Flucker of AIRES and Sarah Wilkins of Wilkins

18 Law.

19       Do you see this?

20     A.   Yes.

21     Q.   And you also see Nicholas Gonring is cc'd

22 on here as well?  Do you see that?

23     A.   Yes.

24     Q.   Now, I know you've -- I mean, you've never

Page 103

1    seen this document before, right?

2          A.    I've never seen this document before.

3          Q.    Okay.  Let's go over it for just a second.

4    Ms. Gonring says, Hello everyone.  Thank you for

5    looping us in ahead of time given the holiday.  Nick

6    and I have reviewed the buyer's response and have

7    decided to agree to the buys terms, open quote,

8    $3,000 closing credit and 125 percent tax proration,

9    closed parentheses, outlined in the attached

10   document.  The next paragraph says to address items

11   -- to address Item No. 12 stating, open quote, with

12   respect to Item 15, another inquiry has been made

13   with the property's Condominium Association regarding

14   whether rental restrictions are in place, and a

15   further response will be provided, end quote.  There

16   are no rules or regulations regarding renting of the

17   property.  This information can be found in the

18   Association documents that are attached.  Okay.

19              Now, were you aware that Ms. Gonring was

20   talking to Amanda Flucker during the closing?

21         A.    No.  Well, when you say during the

22   closing, I wasn't there.  If you're assuming during

23   the pendency of attorney review, then my answer is

24   no.

```
                                            Page 104

 1       Q.    Let me just start -- From the beginning to

 2   the end, okay.

 3             From the beginning when the contract was

 4   signed, until closing, were you aware that the

 5   Gonrings were in communications with Attorney --

 6   Attorney Sarah Wilkins?

 7       A.    No.

 8       Q.    Okay.  Now, did you know that it was the

 9   Gonrings that were making the decisions about closing

10   cost credits and tax prorations?

11       A.    No.

12       MR. McCARTHY:  I'm sorry.  I couldn't get to

13   unmute quick enough.  Please register my objection to

14   the lack of foundation for that question.

15   BY MS. OSHANA:

16       Q.    Did Ms. Wilkins, the attorney, did she

17   ever tell you that she is in communication with the

18   Gonrings?

19       A.    Not that I recall.

20       Q.    Does this e-mail surprise you?

21       A.    Yes.

22       Q.    Why?

23       A.    This just isn't how I expect that a relo

24   transaction transpires.  This -- On this, this is
```

Page 105

1   just a -- this is a normal residential real estate

2   transaction where I would deem Sarah is representing

3   the Gonrings.

4        Q.    And if you believed that Sarah Wilkins was

5   representing the Gonrings, how would your approach be

6   different?

7        A.    Well, I think I stated this earlier in

8   that the big push is on the representations and --

9   You know, I can't recall what happened.  But when you

10  ask somebody, hey, do this, they say, no, do this

11  again, please, contact the prior owner, no, one more

12  time, please, do this, no.  I guess the bottom line

13  would have been we would have insisted that any

14  representations or all responses, really, for that

15  matter, need to come on behalf of the Gonrings, not

16  on behalf of the relocation company.  So you omit

17  that shield.

18       Q.    Do you feel that the relationship between

19  attorneys in closings is typically an amicable one?

20       A.    For the most part, yes.

21       Q.    And do you believe that attorneys in real

22  estate closings, the buyer's attorney and the

23  seller's attorney, typically have trust among one

24  another?

Page 106

1        A.      Typically, yes.

2        Q.      Do you anticipate that an attorney in a

3    real estate closing representing the other side will

4    fully disclose information to you?

5        MR. CASEY:  Objection to form.

6        MR. McCARTHY:  Same objection.  Join.

7        THE WITNESS:  Can I answer?

8        MS. OSHANA:  Yes.

9    BY THE WITNESS:

10       A.      Yeah.  I mean, to the extent that they get

11   that information from their clients, yes.  I don't

12   think an attorney is going to withhold, specifically

13   at their whim, withhold information that was provided

14   to them by their clients.

15   BY MS. OSHANA:

16       Q.      So when you were asking about the prior

17   owner, you assumed that the Gonrings were no longer

18   owners of this particular property that's being

19   purchased by Melinda, isn't that correct?

20       A.      Yeah, that's correct.

21       Q.      Okay.  And obviously looking at this

22   e-mail now and understanding that the Gonrings were

23   communicating with Ms. Wilkins, do you believe that

24   you were deceived?

Page 107

1      MR. CASEY:  Objection to form.

2      MR. McCARTHY:  Same objection.

3  BY THE WITNESS:

4      A.    I -- We certainly would have pushed back

5  in a different demeanor.  Like had this e-mail been

6  sent to us by Ms. Wilkins that said, hey, here's the

7  response on the outstanding questions, and I would

8  have seen this e-mail, that would have raised a brow

9  for sure.

10  BY MS. OSHANA:

11      Q.    Let me show you another one.  Exhibit 19.

12  This is a July 5, 2018 e-mail.  Mind you the

13  closing -- Just as a reminder.  The closing occurred

14  on July 25.  This document is Bates stamped Gonring

15  000125.  Okay.  So this e-mail is, again, dated

16  July 25, 2018.  It's from Nick Gonring to Amanda

17  Flucker, and it is cc'ing Kelsey Gonring, Garrett

18  Luehrs, L-U-E-H-R-S, and Terry Wilkins of swilkin --

19  swilklaw.com.  Nick said -- Nick Gonring writes, Good

20  morning.  Is it common for us to have zero contact

21  with the attorneys that are working on our behalf

22  through AIRES.  This seems to be a definitive

23  bottleneck in closing this deal in any sort of timely

24  fashion.  We are aware that through the home sale

Page 108

1   process AIRES is to sign the addendum.  Given the

2   time sensitivity of this sale, we are hopeful and

3   confident that you can take our verbal agreement of

4   the buyer's addendum ($3,000 total closing credit and

5   125 percent tax proration) and finalize the sale

6   today.  This sale process has been stalemated with

7   too many hands in the pot and our potential buyer is

8   threatening to walk away from this deal.  This whole

9   experience has been anything but expeditious and

10  needs to get finalized ASAP.  Call me live with any

11  questions.

12          Now, as you can see -- Let me -- After

13  reading this e-mail, do you believe that -- do you

14  get the impression, I should say, that Nick Gonring

15  believes that Wilks Law is their attorney?

16      A.    Yes.

17      MR. CASEY:  Objection to form.

18      MR. McCARTHY:  Object to foundation.

19  Complete -- Calls for speculation.  Ask anyone on the

20  street this question.

21      MS. OSHANA:  Yes.  Exactly.  I will ask anyone

22  on the street this question.

23  BY MS. OSHANA:

24      Q.    So if you had seen this e-mail, what would

Page 109

1    you have -- what would you have assumed?

2        A.   I mean, I'm looking at it now.  It's just

3    sneaky.  Very sneaky, right.  They're controlling the

4    responses that we're getting, yet shielding behind

5    I'm a relo company, never occupy the property, don't

6    disclose.  That's -- That's -- That's my initial

7    blush on this.

8        Q.   So you feel that you were deceived?

9        A.   Yeah.

10       MR. McCARTHY:  Objection.  Complete lack of

11   foundation.  Calls for speculation.  It has nothing

12   to do with anything.

13       MR. CASEY:  AIRES joins in that objection.

14   BY MS. OSHANA:

15       Q.   Do you feel that you were deceived?

16       A.   Yeah, I think that this e-mail is

17   deceiving.

18       Q.   And it's deceiving because it's not

19   disclosing the relationship between the attorneys and

20   the Gonrings, isn't that correct?

21       MR. CASEY:  Objection to form

22       MR. McCARTHY:  Objection to form and foundation.

23   BY THE WITNESS:

24       A.   Yeah, I would agree with that.

```
 1        MS. OSHANA:  And let me be clear.
 2   BY MS. OSHANA:
 3        Q.    It's not reflecting the relationship
 4   between Nicholas Gonring and Kelsey Gonring and Wilk
 5   Law; is that correct?
 6        A.    I would agree.
 7        MR. CASEY:  Objection to form.
 8   BY MS. OSHANA:
 9        Q.    Now -- Well, let me ask you another
10   question as we're going over this.
11             You've been practicing law in real estate
12   for how many years?
13        A.    About 20.  About 20.
14        Q.    In your 20 years of practicing law, have
15   you ever seen a real estate agent answer Attorney
16   Review Letters?
17        A.    No.  Not that we would accept anyway.
18        Q.    Have you ever seen it?
19        A.    No.
20        Q.    Is it common in your experience for people
21   to represent that they are the sellers when they
22   don't actually have title?
23        MR. McCARTHY:  Object to foundation.  Calls for
24   speculation.
```

Page 111

1      MR. CASEY:  Same objection.

2   BY THE WITNESS:

3      A.    No, it's not common.

4   BY MS. OSHANA:

5      Q.    In fact, typically when you sell property

6   in our understanding of doing real estate law --

7   Never mind ours.  Let me -- Let me strike that

8   question.  That's a bad question.

9            I've been doing real estate law like you

10   for 20 years, so I understand you, but I'm going to

11   try to stick it to you and not with me.

12            So in real estate closings isn't it almost

13   always the case if not always the case that the

14   seller is the owner?

15      A.    Yes.

16      Q.    So when you're doing this closing for

17   Melinda, you believed that AIRES was the owner?

18      A.    Yes.

19      Q.    And you believed that AIRES, as the

20   relocation company, has an arm's-length transaction

21   with the Gonrings, isn't that correct?

22      A.    That has already been done, yes.

23      Q.    Yes.

24      A.    Yes.

Page 112

1      Q.    So in your mind, the Gonrings and AIRES

2   are not working together on this deal?

3      A.    Yes, in my mind.  When I look at this

4   e-mail that you had on the screen, my take on this,

5   the response would be -- Well, I probably wouldn't

6   respond at all because I would say you're not my

7   client.  Right?

8      Q.    Who's not your client?  Could you clarify.

9      A.    The Gonrings.  I'm saying when I'm looking

10  at this e-mail, and I'm putting myself in Ms.

11  Wilkins' shoes, and I get an e-mail like this on my

12  understanding of a relocation transaction, I wouldn't

13  even respond.  I've got no duty to report to

14  Mr. Gonring.

15     Q.    Right.  I'm going to go back to the

16  Settlement Statement that was Exhibit 16 that is

17  dated July 25, 2018.  This is -- I like to call this

18  like a closing Excel spreadsheet.

19           Is that a fair statement?

20     A.    Sure.

21     Q.    And basically the Excel spreadsheet, this

22  Settlement Statement, gives an idea to the buyer and

23  the seller where their money is going, isn't that

24  fair?

Page 113

1    A.    Yes.

2    Q.    So, for example, it's showing how much the

3  seller is selling the property for and how much the

4  buyer is purchasing the property for, isn't that

5  right?

6    A.    Correct.

7    Q.    And then there's credits that are provided

8  from the seller to the buyer.  So, for example, here

9  the seller is giving $4,525.91 as county property

10  taxes from January 1, 2018 through July 25, 2018,

11  right?

12    A.    Correct.

13    Q.    And that's because property taxes for 2018

14  are payable in 2019, isn't that right?

15    A.    Correct.

16    Q.    So the seller is saying, here, take this

17  money, your bill won't come out until next year, but

18  I'm paying it to you now, isn't that right?

19    A.    That's right.

20    Q.    So this document is signed by Sarah

21  Wilkins as the agent for AIRES, isn't that right?

22    A.    Yes.

23    Q.    So you would assume that that tax credit

24  is being paid from AIRES to Melinda Sgariglia, isn't

Page 114

1    that correct?

2         A.    Correct.

3         Q.    And also at the bottom you see where it

4    says on the seller's side, on the left, it says due

5    to seller?  Do you see that part, the second to the

6    last part?

7         A.    Yes.

8         Q.    And it says 27,477.10 isn't that right?

9         A.    Correct.

10        Q.    Who do you think is -- Who do you think

11   gets that check?

12        A.    I would say that that check goes to AIRES.

13        Q.    Because they're the owner?

14        A.    Correct.

15        Q.    Is that correct?

16        A.    Correct.

17        Q.    Okay.  Now, earlier you were shown a

18   disclosure report by counsel -- two disclosure

19   reports, okay.

20        THE WITNESS:  Carol, I hate to do this.  I was

21   thirsty.  I drank water.  Give me one minute.

22        MS. OSHANA:  Take your time.

23        THE WITNESS:  One minute.

24                         (WHEREUPON, WE WERE OFF THE

Page 115

1                    RECORD.)

2    BY MS. OSHANA:

3         Q.    So I had -- I am on Exhibit 19.  No, that

4    was my last one.  I think this is Exhibit 20.  This

5    is a July 13, 2018 e-mail.

6         A.    Yes, I can read that.

7         Q.    So this is a July 13, 2018 e-mail.  It's

8    Bates stamped Gorr 00239.  Now, this is an e-mail

9    from John Gorr dated July 13, 2018, and the e-mail is

10   to Nick Gonring, Kelsey Gonring, and other people

11   that you don't know.

12              But obviously now you know who the

13   Gonrings are, correct?

14        A.    Yes.

15        Q.    Okay.  In the letter he talks about how

16   he's president of the HOA.  He says, moisture was

17   detected in the southwest window area after the last

18   hard rain.  Due to that, my buyer backed out.  So I'm

19   back on the market and disclosing the previous water

20   issues ahead of time.  After the last inspection

21   Arrow Masonry came back and applied a second layer of

22   sealant at the entire west-facing wall above the

23   third-floor windows, and they applied the same

24   elastomeric sealant to the capstones.  I have a

Page 116

1    moisture meter and will be monitoring the moisture

2    levels in the wood over the next few weeks.  I'll

3    also be looking at if there are any other areas of

4    water infiltration.  I hope the secondary work

5    resolved it for good.  The moisture monitoring will

6    help me determine that.  Next paragraph.  Regardless,

7    if I'm unable -- Sorry -- If I'm able to sell, I'll

8    be taking a hit on the selling price and will be

9    putting money in escrow to cover any future problems.

10   Being that it has been documented as a building

11   issue, this escrowed money would cover Unit 3's

12   portion of future work.  I'm not entirely sure how

13   this will work out or how it affects any other units

14   and would rather resolve the issue and make no

15   concessions.  I have not received any responses from

16   anyone, so I'm just proceeding as I'm advised.  I

17   recommend talking to your realtors and lawyers or let

18   me know if you have any input.  Then he does go on to

19   say, on request, we are giving the potential buyers

20   the background of the issues and how we handled them

21   as best as possible similar to the italicized wording

22   below.  Then he goes on to write:  We filed a claim

23   with the building insurance.  The insurance hired ESI

24   to inspect building.  Based on the report, the claim

Page 117

1   was denied, but we utilized their scope of work.

2   Unit 3 -- 2014 -- Sorry.  It goes into all this

3   detail.  It also mentions an ESI Engineering Report.

4   The report recommends to retain a masonry contractor

5   to make exploratory openings in the masonry to

6   determine the caused water infiltration.  And it goes

7   on.

8           Now, this was done before closing because

9   remember closing was July 25, 2018.  Here, the

10  building president, the Association President, is

11  discussing giving concessions to his seller --

12  Sorry -- his buyer.  He's the seller -- to his buyer,

13  escrowed money that would cover Unit 3's portion of

14  future work.

15          Now, have you ever seen this e-mail

16  before?

17      A.    No.

18      Q.    Okay.  Based on this e-mail, would you

19  believe if you had received this that the 20 -- the

20  disclosure reports should have been updated?

21      A.    Yes.

22      MR. McCARTHY:  Object to form and foundation.

23  BY MS. OSHANA:

24      Q.    And I want to discuss the Disclosure

Page 118

1    Reports.  I'm talking about Exhibits -- the

2    Residential Real Property Report, Exhibit 11, and

3    Exhibit 12, the AIRES -- Sorry -- No, the AIRES

4    disclosure is Exhibit 10, and the Residential Real

5    Property Report is Exhibit 11.  So the -- Either one

6    of those documents.  But especially the Residential

7    Real Property Report.  Let me ask it that way.

8            Should the Residential Real Property

9    Disclosure Report have been updated based on this

10   information?

11       MR. McCARTHY:  Object to form and foundation.

12   Calls for speculation.

13   BY THE WITNESS:

14       A.   If the water didn't hit the Gonrings'

15   unit, the Residential Real Property Disclosure

16   wouldn't address that.  If this is a common element,

17   I think the Residential Real Property Disclosure

18   excludes common elements.

19       MS. OSHANA:  Fair enough.

20   BY MS. OSHANA:

21       Q.   How about the 22.1, should it have been

22   disclosed?

23       A.   Yes.  In any of these real estate

24   transactions if something is different from it was on

Page 119

1    the day of the contract, I think it triggers a duty

2    to disclose.  As a matter of fact, in the form

3    e-mails that we send to our sellers when we're in

4    receipt of a contract, is a line item that says

5    please advise our office if you become aware of any

6    changes to the Residential Real Property Disclosure

7    prior to closing, because you should have a duty to

8    disclose that.  It says that in our form e-mails to

9    our clients.

10         Q.    It seems, based on this, that John Gorr

11   who's the President of the HOA was also the one that

12   signed 22.1 was anticipating future work.

13             Do you see that?

14        A.    I would agree.

15        MR. McCARTHY:  Objection.  Form.  And it's a

16   mischaracterization.

17   BY MS. OSHANA:

18        Q.    If there is anticipated future work that

19   is -- If the President of the Association anticipates

20   future work, should they disclose that on the 22.1?

21        MR. McCARTHY:  Object to form.  Foundation.

22   Calls for speculation.  It's an incomplete

23   recitation.

24        MR. GOOD:  Join in those objections.

Page 120

1       THE WITNESS:  Just to say, you guys are noting

2   objections for the record.  I'm still free to answer

3   the question, or should I not answer the question?

4       MR. GOOD:  You should answer the question unless

5   instructed not to.

6   BY THE WITNESS:

7       A.    Yeah, I would agree with that.

8   BY MS. OSHANA:

9       Q.    You've obviously represented a lot of

10  sellers, correct?

11      A.    Yes.

12      Q.    And you've obviously received a lot of

13  22.1 reports, isn't that fair?

14      A.    Yes.

15      Q.    And as a real estate attorney you actually

16  help people, especially with small associations, help

17  them do the 22.1, isn't that right?

18      A.    Yeah, they'll have questions, and we'll

19  answer questions, yes.

20      Q.    Okay.  If you had seen this e-mail and you

21  were representing the seller, what would you have

22  done differently?  What would you have done?

23      A.    Listen, our cardinal rule, and I don't

24  think it's the Cardinal rule for everybody, but if

Page 121

```
 1   there's ever a question, you always disclose.
 2   Whether you walk that fine line, hey, well, I think
 3   this might be exempt, I don't think I need to
 4   disclose.  My -- Inevitably I will let it be the
 5   client's decision.  But my suggestion always is
 6   disclose.  Because by disclosing you can put them on
 7   notice, yes, you may lose a buyer, you may lose a
 8   buyer, but it's also gonna circumvent the possibility
 9   that a year after closing you get notice that you
10   didn't disclose something that you should have
11   disclosed.  It's our cardinal rule.  You're gonna get
12   the same answer from everybody in this firm that does
13   real estate.  But that's our take on it.  Other
14   attorneys may be different.
15        Q.    Okay.  Now, you said that you received
16   some documentation from the Association and meeting
17   minutes, right?
18        A.    Yes.
19        Q.    Which ones?
20        A.    In our -- Just the -- The only minutes I
21   have are the May 7, 2018 minutes.
22        Q.    That's the only minutes you got?
23        A.    Yeah.  Hold on.  Yeah, I don't see any
24   other meeting minutes.
```

Page 122

1      Q.     How about this one?  Did you ever get this

2    one?  It's dated March 19, 2018.  We're gonna mark

3    this as Exhibit 21.  Gorr 00247.  Just review it,

4    please.

5      A.     Yeah, you can scroll down.  Okay.

6      Q.     Okay.  I just want to understand.

7             You never received this March 19, 2018

8    meeting minutes; is that right?

9      A.     It is not in our file.

10     Q.     I'm going to stop the share for one

11   second, please.  Can you give me a minute?

12     A.     Um-hum.

13                    (WHEREUPON, WE WERE OFF THE

14                     RECORD.)

15     MS. OSHANA:  I'm back.  Can you hear me?

16     THE WITNESS:  Yep.

17   BY MS. OSHANA:

18     Q.     In your Attorney Review Letter, you asked

19   for meeting minutes, right?

20     A.     Yeah.

21     Q.     Let me go back and make sure I have the

22   correct exhibit number.  This should be Exhibit 2.

23   Let me just make sure.  Yes, this is Exhibit 2.  This

24   is the June 14, 2018 letter.

Page 123

1          You asked for the last 12 months
2     Association minutes, isn't that right?
3          A.    Yes.
4          Q.    And going back, remember the closing was
5     July 25, 2018, these minutes are March 19, 2018.
6          Is that within the last 12 months?
7          A.    Yes.
8          Q.    Now -- Now -- I'm sorry.  Let's go back to
9     it, March 19, 2018.  Now I understand that you
10    received one set of minutes, and those were dated, I
11    believe, May 7, 2018; is that right, May 7, 2018?
12         A.    Hold.  Let me pull that back up.  May 7,
13    2018.
14         Q.    Okay.  Now, since you had asked for the
15    last 12 months of meeting minutes, did you believe
16    that the May 7, 2018 meeting minutes were the only
17    meeting minutes that the Association had for the last
18    12 months?
19         A.    Yeah, that would have been what we
20    concluded.
21         Q.    Okay.  Would this March 19, 2018 meeting
22    minutes, would you consider this important for a
23    buyer, in your experience?
24         A.    Yes.

1      MS. OSHANA:  Okay.  For right now I have nothing

2  further.  I might follow up.  Why don't we proceed so

3  we don't waste time.

4      MR. GOOD:  Who wants to go next?

5      MS. OSHANA:  Ross, are you coming next?

6      MR. GOOD:  I guess I am.  I'll go next.

7          Tom, my name is Ross Good.  I represent

8  Mr. Gorr and the Condominium Association.  I will do

9  my best to be brief.  You'll have to forgive me, I'm

10  going to go a little out of order, but I'll try to

11  continue along the last line of questioning.

12                    EXAMINATION

13  BY MR. GOOD:

14      Q.    Who did you request the meeting minutes

15  from?

16      A.    From the sellers' attorney.

17      Q.    Which at the time you understood to be

18  AIRES' attorney; is that correct?

19      A.    Yes, Ms. Wilkins, via the letter, via our

20  Attorney Review Letter.

21      Q.    At any time did you reach out to John Gorr

22  for the Condominium Association, to your knowledge?

23      A.    Not to my knowledge.

24      Q.    I'm going to attempt to show you -- an a

Page 125

1    exhibit directly.

2              Are you able to see the July 13th e-mail

3    which has previously been marked as Deposition

4    Exhibit 20?

5         A.    Yeah.  We just went through this one,

6    right?

7         Q.    Yes.

8         A.    Okay.

9         Q.    One of the sentences reads, Being that it

10   has been documented as a building issue, this

11   escrowed money would cover Unit 3 -- No. 3's portion

12   of future work.

13             Do you see that?

14        A.    Yes.

15        Q.    And it's your understanding that Unit --

16   that the issue is the one that was disclosed on the

17   Seller Disclosure Form that was discussed earlier in

18   your deposition; is that correct?

19        A.    Right.

20        Q.    According to the paragraph above, the

21   sentence I'm highlighting reads, After Arrow Masonry

22   came back and applied a second layer of sealant at

23   the entire west-facing wall above the third-floor

24   windows and they applied the same elastomeric sealant

Page 126

1    to the capstones, do you see that?

2         A.    Yes.

3         Q.    And then it continues, I have a moisture

4    meter and will be monitoring the moisture levels in

5    the wood over the next few weeks.  I'll also be

6    looking at if there are any other areas of water

7    infiltration.  I hope the secondary work resolved it

8    for good.  The moisture monitoring will help me to

9    determine that.

10             Do you see that?

11        A.    Yes.

12        Q.    Based on your review of this e-mail, is it

13   your understanding that Mr. Gorr believed that the

14   moisture issue had been resolved but he was going to

15   continue monitoring to see if a further moisture

16   issue emerged?

17        MS. OSHANA:  Object to foundation.  Thank you.

18   BY THE WITNESS:

19        A.    In isolation looking at this, yeah, I

20   think you could draw that inference.  I guess I say

21   in isolation because that doesn't -- that wouldn't

22   jibe with the March -- the meeting minutes that I

23   don't think we received.

24   BY MR. GOOD:

Page 127

1    Q.    And those meeting minutes were from March

2    of 2018, correct?

3    A.    Correct.

4    Q.    Okay.  And draw your attention further

5    down the page.  I'm going to go through the timeline

6    that is laid out in the Gorr e-mail that we're still

7    discussing.  On March 6, 2018, Bral contract to do

8    exploratory work to determine the scope of work for

9    repairs.  May 3, 2018 Bral's conclusion from

10   exploratory work, need to grind/tuckpoint and add

11   elastomeric sealant.  May 7, 2018, Arrow's proposal

12   for grind/tuckpoint and add elastomeric sealant to

13   all sides of building and inside parapet.  And,

14   finally, on June 4, 2018, Arrow concluded the work.

15         Do you see that?

16   A.    Yep.

17   Q.    So based on that, is it your understanding

18   that the work was concluded on June 4, 2018?

19   A.    No.  I wouldn't agree with that.

20   Q.    Okay.

21   A.    And this is why.

22   Q.    Please.

23   A.    Had I been privy to this letter, there's

24   no way that I would have advised Melinda to move

Page 128

1    forward without getting a copy of the ESI Engineering

2    Report, without getting a report from building

3    doctor, not getting a copy of the Bral contract.  So

4    these are -- These are notes promulgated between unit

5    owners.  And what I have come to discover over the

6    years of doing this is that anything that's going to

7    be memorialized, knowing it is memorialized can

8    sugarcoat things.  Maybe not intentionally.  I'm not

9    saying that there's always an intent to deceive.  But

10   had we been privy to this, I 100 percent can assure

11   you that the follow up would have been you need to

12   get me copies of those reports, and then you would

13   let us make a determination, A, do we feel

14   comfortable in that this issue has been resolved.

15       Q.   And looking back at your records, the 22.1

16   Disclosure, what day did that occur?

17            I can pull it up if necessary.

18       A.   I got it right here.  It's saved in my

19   file as June 29th.

20       Q.   What information, if any, do you believe

21   is inaccurate on that disclosure as you sit here now?

22       A.   Well, I --

23       MR. McCARTHY:  Object to form.  Calls for

24   speculation.

Page 129

1   BY THE WITNESS:

2       A.    Yeah, it would be hard for me to answer

3   that.  I would love to see the ESI Engineering

4   Report, right, and then let us draw a conclusion as

5   to whether or not they think that the issues have

6   been adequately resolved.

7       MR. GOOD:  Okay.

8   BY MR. GOOD:

9       Q.    And I believe you said earlier you would

10  want to see the ESI Engineering Report, the Bral

11  restoration, um --

12      A.    We would have asked for copies of all of

13  those.

14      Q.    All three of those?

15      A.    Yes.  Right.

16      Q.    And you never reached out to John Gorr or

17  the Condominium Association, correct?

18      A.    Not that I can recall.

19      Q.    Okay.  Did you review the buyer's

20  inspection report?

21      A.    In this particular situation, I don't -- I

22  don't know.  I think I had said this earlier, that we

23  will largely defer to the buyers on their inspection

24  requests.  But when they have specific questions or,

Page 130

1   hey, Tom, can you pull up this section and let me

2   know your thoughts, we're happy to dive into that.

3   But by and large we look to the buyers to say, hey,

4   you let me know what your inspection requests are,

5   and if you have questions we're happy to talk about

6   it.  You know, sometimes, hey, is this reaching, is

7   this something that's fair game?  So it's a little of

8   those conversations.

9       Q.   Do you recall offhand if the buyer's

10  inspection report found any water damage in a common

11  area basement?

12      A.   No, I don't.

13      Q.   And if water damage was uncovered in a

14  buyer inspection report, would it be your custom and

15  practice to disclose it to the seller?

16      A.   I guess it depends on the buyer.  I mean,

17  obviously we're not going to do that without consent

18  of the buyer.  So it's going to be up to the buyer.

19      MR. GOOD:  I have no further questions.

20      MR. McCARTHY:  I have just a couple of follow

21  ups.

22                    FURTHER EXAMINATION

23  BY MR. McCARTHY:

24      Q.   I understood you to say, and want to

1  confirm, that the Gonrings have no duty to disclose

2  for their Unit No. 1 moisture on a window in Unit

3  No. 3; is that correct?

4      A.    You know what, what unit number is this?

5      Q.    Gonrings are Unit 1.  Gorr is Unit 3.

6      A.    Yeah, the Residential Real Property

7  Disclosure, you know, if I've looked at it, I'm

8  fairly certain that it says that the disclosure is

9  not intended to cover common elements of the

10 building.

11     Q.    It is limited to the unit, correct?

12     A.    Correct.  I'm just trying to pull up the

13 actual language.

14     Q.    It says at the bottom, note, these

15 disclosures are not intended to cover the common

16 elements of the condominium.

17     A.    Right.

18     Q.    But only the actual residential real

19 property, including limited common elements allocated

20 to the exclusive use thereof that form an integral

21 part of the condominium unit.

22     A.    Right.

23     Q.    These disclosures are intended to reflect

24 the current condition of the premises and do not

Page 132

1    include previous problems, if any, that the seller

2    reasonably believes have been corrected.

3            And that relates to their own specific

4    unit, correct?

5        A.    Yes.

6        Q.    And that's what -- That's the advice you

7    give your clients when they are sellers, correct?

8        A.    Well, not necessarily.  I think it comes

9    full circle again that -- if there's a building

10   issue, I would let them know, hey, you don't have to

11   disclose buildings issues, per se, but I would always

12   advise doing that.  That's how -- That's how we

13   handle it.

14       Q.    Understood.  But the duty to disclose as

15   contained in the disclosure relates only to and

16   exclusively to the actual unit.  It doesn't relate to

17   other units or other common elements.

18       A.    Correct.  That's my interpretation of it

19   as well.

20       Q.    Now, with respect to counsel's questions

21   about the Gonrings' e-mails to Amanda and Sarah, as

22   we reviewed in my earlier questions, it was no secret

23   that there were two transactions that were going to

24   take place in this situation, one from the Gonrings

Page 133

1    to AIRES, and one from AIRES to Melinda, correct?

2        A.    Right.

3        Q.    So we have another side of this

4    transaction which is between AIRES and the Gonrings,

5    don't we?

6        A.    Right.    Right.

7        Q.    And so if the Gonrings were agreeing as

8    between themselves and AIRES that they were going to

9    provide a $3,000 concession, you would expect there

10   to be discussions between the Gonrings and AIRES in

11   that regard, wouldn't you, in a relocation setting,

12   fair?

13       A.    I mean, I would say that that would be

14   very -- That's not something that I would have

15   thought was happening.

16       MS. McAULIFFE:  Objection to form.  Sorry, I

17   couldn't get my hand on the mute.

18   BY MR. McCARTHY:

19       Q.    But you anticipate that there's a Purchase

20   Agreement -- We reviewed this earlier in my earlier

21   examination -- there's a Purchase Agreement between

22   AIRES and the Gonrings on the purchase of the unit,

23   right?

24       A.    Correct.  I would assume so, yes.

Page 134

1     Q.    And, therefore, there has to be some
2    discussion between someone about what the terms of
3    that transaction are or if there are going to be
4    changes to that, for example, a $3,000 concession,
5    fair?
6     A.    Between AIRES and the Gonrings?
7     Q.    Yes, sir.
8     A.    No.  That's not how -- That's not how I
9    would have thought that this transaction was being
10   handled.  The $3,000 credit -- My understanding as to
11   how these work is if somebody is going to give a
12   $3,000 credit, AIRES is the one that determines
13   whether or not they're getting a $3,000 credit, not
14   the Gonrings.
15    Q.    Well, maybe the Gonrings were just
16   misapprehending that as people who weren't familiar
17   with that process.
18          You would concede that too, wouldn't you?
19    MS. OSHANA:  Objection, form.
20    MS. McAULIFFE:  Objection, foundation.
21   BY THE WITNESS:
22    A.    I don't -- I don't think that I would.  I
23   don't think that I would.
24

Page 135

1    BY MR. McCARTHY:

2        Q.    Why not?  I'm not tracking.

3        A.    Our correspondence is between us and

4    AIRES, and I think our correspondence makes that very

5    clear.  It's addressed.  AIRES is littered on the

6    attorney review correspondence.  I guess if you're

7    saying is it fair to conclude that the Gonrings felt

8    they were still part of this transaction, I can't get

9    into their heads, but I would say they shouldn't

10   have.

11       Q.    Yeah, and I'm not asking you to get in

12   their heads.  Let --

13             We'll just conclude on, you understood,

14   your office understood, your file reflects there are

15   two transactions in this case; one between the

16   Gonrings and AIRES, and another between AIRES and

17   your client, fair?

18       A.    Two separate transactions, yes.

19       Q.    You contemplate two different Purchase

20   Agreements, and the one side of that that you're

21   focused on is Melinda's side, right?

22       A.    Correct.  I would agree with that.

23       MR. McCARTHY:  Thank you much.  That's all I

24   have.

```
                                            Page 136

 1        MS. OSHANA:  Let me ask this in sum, Counsel.

 2             Sorry, Mr. Hawbecker.

 3                  FURTHER EXAMINATION

 4   BY MS. OSHANA:

 5        Q.    Do you believe after reviewing the meeting

 6   minutes that I've shown you and the correspondence

 7   between the Gonrings and AIRES' attorney, do you

 8   believe that there was not full disclosure to you as

 9   per your Attorney Review Letters?

10        MR. McCARTHY:  Object to lack of foundation, and

11   a misrepresentation of the testimony.

12        MS. McAULIFFE:  Join in that.

13   BY THE WITNESS:

14        A.    Yes, I believe -- I would state that there

15   was nondisclosure.

16   BY MS. OSHANA:

17        Q.    There was not disclosure by whom?

18        A.    By both parties.

19        Q.    AIRES and the Gonrings?

20        A.    Yeah.

21        MS. OSHANA:  Thank you.  Nothing further.

22        MR. GOOD:  I have nothing further as well.

23        MS. OSHANA:  Okay.  So we'll be back at

24   1 o'clock.
```

```
                                              Page 137

  1        MR. McCARTHY:  I've got one last question in

  2   light of that question by counsel.

  3                     FURTHER EXAMINATION

  4   BY MR. McCARTHY:

  5        Q.    Again, the Gonrings have no duty to

  6   disclose as to Unit 1 water or moisture on the window

  7   in Unit 3, right?

  8        A.    Only as it pertains to the Residential

  9   Real Property Disclosure.  Not as it pertains to our

 10   questions as highlighted in the attorney review

 11   correspondence.

 12        MR. McCARTHY:  Thank you.  No further questions.

 13        MS. McAULIFFE:  I have no further questions

 14   either.  So we'll being back at 1:00?

 15        MR. McCARTHY:  Sounds good.

 16        THE WITNESS:  Thank you all.

 17                          (WHEREUPON, WE WERE OFF THE

 18                           RECORD AT 12:19 P.M.)

 19        *     *     *     *     *     *     *     *

 20

 21

 22

 23

 24
```

Page 138

1                    CERTIFICATE

2                        OF

3          CERTIFIED SHORTHAND REPORTER

4

5          I, Trudy G. Gordon, a Certified Shorthand

6    Reporter of the State of Illinois, CSR License No.

7    084-004077, do hereby certify:

8          That previous to the commencement of the

9    examination of the aforesaid witness, the witness was

10   duly sworn by me to testify the whole truth

11   concerning the matters herein;

12         That the foregoing deposition transcript

13   was stenographically reported by me and was

14   thereafter reduced to typewriting under my personal

15   direction and constitutes a true and accurate record

16   of the testimony given and the proceedings had at the

17   aforesaid deposition;

18         That the said deposition was taken before

19   me at the time and place specified;

20         That I am not a relative or employee or

21   attorney or counsel for any of the parties herein,

22   nor a relative or employee of such attorney or

23   counsel for any of the parties hereto, nor am I

24   interested directly or indirectly in the outcome of

Page 139

1    this action.

2            IN WITNESS WHEREOF, I do hereunto set my

3    hand at Chicago, Illinois, this 3rd day of June,

4    2023.

5

6

7

8

9

10            TRUDY G. GORDON, CSR

11            CSR License No. 084-004077

12

13

14

15

16

17

18

19

20

21

22

23

24

| & |
| --- |

**&** 1:9 3:2 80:15
84:13

| 0 |
| --- |

**000123** 5:11
102:14
**000125** 107:15
**00239** 115:8
**00247** 122:3
**05684** 1:6
**084-004077**
3:24 138:7
139:11

| 1 |
| --- |

**1** 2:8 4:14
13:16 17:5
19:4 70:13
71:23 91:24
113:10 131:2,5
136:24 137:6
**1,400** 40:13
**10** 4:23 54:10
54:11 55:14
118:4
**100** 128:10
**102** 5:11
**107** 5:12
**11** 5:2 64:9,10
65:12 118:2,5
**115** 5:13
**11602** 8:14
**12** 5:4 65:13
103:11 118:3
123:1,6,15,18

**122** 5:14
**124** 4:7
**125** 103:8
108:5
**12:19** 137:18
**12th** 24:5
**13** 5:6 71:15
76:17 98:14
115:5,7,9
**130** 4:8
**136** 4:9
**137** 4:10
**13th** 125:2
**14** 5:7 78:6
122:24
**1445** 94:9
**14th** 18:1
**15** 5:8 40:14
52:13 66:22
74:2,7 80:23
81:24 99:10
103:12
**15th** 74:15
**16** 5:9 88:20
112:16
**16,000** 84:18
**16,840** 84:19
**1600** 3:3
**161** 3:2
**17** 4:14 5:10
94:19
**1741** 139:9
**18** 4:15 5:11
56:1,2,4 74:2
102:9

**18th** 20:9
**19** 5:12,14
107:11 115:3
122:2,7 123:5
123:9,21
**1974** 8:10
**1:00** 137:14
**1:19** 1:6

| 2 |
| --- |

**2** 4:15 18:3
122:22,23
**2,208** 79:20
**20** 4:16 5:13
11:5 39:13
40:14 66:22
83:11,13
110:13,13,14
111:10 115:4
117:19 125:4
**200** 2:3
**2002** 8:24
**2003** 9:6,21
**2012** 84:9
**2014** 117:2
**2018** 5:12,13,14
24:5 26:24,24
51:19 52:22
61:24 62:8
64:16 73:12,13
73:21 74:24
80:11,22 82:8
84:7 95:24
107:12,16
112:17 113:10
113:10,13

115:5,7,9
117:9 121:21
122:2,7,24
123:5,5,9,11,11
123:13,16,21
127:2,7,9,11,14
127:18
**2019** 113:14
**2023** 1:19
139:4
**21** 4:17 5:14
122:3
**22.1** 5:7 77:11
77:16,17 79:15
79:18 82:13,18
96:18 118:21
119:12,20
120:13,17
128:15
**22.1.** 78:7
**22nd** 21:17
**23** 4:18
**23rd** 1:18
**25** 4:19 107:14
107:16 112:17
113:10 117:9
123:5
**25th** 62:7
**26** 4:20
**27,477.10** 114:8
**2726** 13:10,15
**29** 80:23
**29th** 80:20
128:19

**[2nd - accomplishes]**

**2nd** 25:4,11

**3**

**3** 4:16 5:13
20:10 60:23,24
61:10,15 82:22
84:3 96:2
117:2 125:11
127:9 131:3,5
137:7
**3's** 116:11
117:13 125:11
**3,000** 27:20
77:3 87:8
103:8 108:4
133:9 134:4,10
134:12,13
**30** 88:10
**300** 2:19
**312-244-6700**
2:10
**312-404-8390**
2:4
**312-899-6626**
3:4
**3200** 2:9
**33** 2:2
**36,537.69** 89:18
**3rd** 25:5,9,12
139:3

**4**

**4** 4:17 21:18
127:14,18
**4,525.91** 113:9

**40** 58:1,4
**44** 4:21
**49** 4:22
**49503** 2:19

**5**

**5** 4:18,20 5:12
13:11 23:19
26:23 72:18,21
76:20 87:7
107:12
**50** 57:24
**51** 4:5
**54** 4:23
**55** 2:18
**5th** 26:6

**6**

**6** 4:4,19 13:11
25:6 26:24
60:17,17 127:7
**6-14-2018** 4:15
**6-18** 4:16 20:12
**6-22** 4:17
**6-29** 5:8
**6/7** 64:4
**60** 35:9 39:19
39:19 56:14
58:4
**60527** 8:14
**60601** 3:3
**60602** 2:3
**60606-3610** 2:9
**61** 44:15
**616-235-3500**
2:20

**64** 5:2
**65** 5:4
**6a** 60:20
**6th** 56:2

**7**

**7** 4:20 26:7
44:1 49:20,22
50:4 56:4
64:16 80:11
82:8 84:7
121:21 123:11
123:11,12,16
127:11
**7-2** 4:19
**7-25-18** 89:1
**7-3** 4:19
**7-6-18** 27:2
**71** 5:6
**78** 5:7
**7th** 76:21

**8**

**8** 4:21 8:10
44:2,3 73:12
73:21
**80** 5:8 35:12
38:13,13 39:11
39:17,20,20,20
39:21
**85** 52:10
**88** 5:9
**8e** 20:23,24
**8th** 73:20 74:1
75:20

**9**

**9** 4:22 49:19
54:9
**94** 5:10
**95** 57:3
**98** 4:6
**9:00** 1:18
**9:46** 34:15
**9a** 20:23,23

**a**

**a.d.** 1:19
**a.m.** 1:18
**ability** 21:11
**able** 17:15
27:22 73:1
116:7 125:2
**above** 64:24
115:22 125:20
125:23
**absolutely**
28:20 68:12
78:20
**accept** 101:10
110:17
**acceptable**
95:10
**acceptance**
72:20 73:11
99:13
**accepted** 84:23
97:2,3
**accessible**
85:24
**accomplishes**
95:13

accordance  7:4
accurate
   138:15
accustomed
   58:13
acronym  93:24
act  13:3,6
   82:14
action  61:13
   81:10 139:1
active  96:3
actual  44:19
   85:12 131:13
   131:18 132:16
actually  34:13
   47:9 57:2 81:7
   86:2 90:19
   94:5 99:3
   110:22 120:15
add  127:10,12
addendum
   26:13,19 75:13
   76:1,15,18
   77:1,2 87:7
   108:1,4
addendums
   12:10 53:1
   89:9
addition  75:12
address  8:13
   46:23 48:4
   82:23 103:10
   103:11 118:16
addressed
   83:23 96:7

135:5
addresses
   77:18 86:18
addressing
   101:5
adequately
   129:6
advance  56:22
   57:5,12 85:17
   87:21 89:22
advice  132:6
advise  119:5
   132:12
advised  116:16
   127:24
aeunc  81:8
affects  116:13
affidavit  57:8
   91:5
affirmatively
   31:2 58:23
aforesaid  138:9
   138:17
agent  15:2 63:7
   63:13,15,16
   64:19 65:3,16
   81:9,20 110:15
   113:21
agents  63:6
   81:12,18
ago  13:12,19
   14:19 32:22
   33:4 70:10
agree  6:8,9,10
   6:11,13 41:20

61:23 68:6,10
   75:17 76:7
   82:24 97:9,12
   102:1 103:7
   109:24 110:6
   119:14 120:7
   127:19 135:22
agreed  27:2
   60:11 62:15
   84:23 85:9
agreeing  75:7
   133:7
agreement  5:6
   6:5,6 7:2 26:1
   54:16 60:1,2
   60:10 71:15,18
   71:22 73:5,6
   73:16 75:13,14
   75:16 76:19
   80:14,15 87:8
   108:3 133:20
   133:21
agreements
   59:24 66:24
   89:8 96:22
   135:20
ahead  17:20
   19:6 51:6 59:6
   103:5 115:20
aires  1:8 2:15
   15:7 20:7 21:1
   23:6,11 24:14
   24:23 25:22
   27:9 28:2,3,14
   29:7,23 30:14

31:1,3,7,9 32:8
   36:20 37:10,21
   39:1,7 41:4,5
   41:12 42:1
   44:16 45:8
   46:2,14,19
   47:4,8,9,13,20
   48:3 55:14
   56:2 59:19,19
   65:3,9,10,16
   66:4 72:3,8,8
   74:12 75:13,15
   76:6,20 82:20
   89:9 93:4,18
   93:23,23 94:14
   95:12,12 96:23
   96:23 97:5,5
   98:23 99:8
   102:17 107:22
   108:1 109:13
   111:17,19
   112:1 113:21
   113:24 114:12
   118:3,3 124:18
   133:1,1,4,8,10
   133:22 134:6
   134:12 135:4,5
   135:16,16
   136:7,19
alert  31:17
alleging  44:6
allocated
   131:19
alta  94:15

[amanda - attached]                                     Page 4

amanda  53:18
65:15 102:17
103:20 107:16
132:21
amendment
87:14
amendments
89:8
american  1:7
2:14 12:3
64:20
amicable
105:19
amiss  97:23
amount  73:4
79:19 89:16,21
ancillary  93:13
annual  11:12
answer  7:14,16
7:21 22:12
39:21 47:17
58:14 66:6
79:24 80:6
100:14 103:23
106:7 110:15
120:2,3,4,19
121:12 129:2
answered  30:9
49:5
answers  21:13
27:14 46:6
47:7,19 49:14
anticipate  7:14
79:2 106:2
133:19

anticipated
80:4 96:19
119:18
anticipates
119:19
anticipating
119:12
anyway  110:17
apparently
40:23,24 41:2
75:15
appearances
2:1
appeared  2:6
2:14,22 3:6
appears  64:4
72:16 75:18
applicable  7:4
91:7 94:10
applied  58:23
115:21,23
125:22,24
approach
36:23 89:13
105:5
appropriate
72:14
approval  99:14
approve  74:3,3
99:18
approximately
38:13 39:11,17
39:21
area  59:22
115:17 130:11

areas  10:2
116:3 126:6
ariana  5:8
80:24
arm's  111:20
arrangement
32:8
arrow  80:14,15
84:12 115:21
125:21 127:14
arrow's  127:11
articulates
99:11
asap  108:10
asked  19:1,20
20:2 37:21
38:1 41:13
48:3,8,9,12
50:5 62:10,19
66:5 74:13
122:18 123:1
123:14 129:12
asking  7:15
13:20 14:19
22:6 36:22
46:4,19 49:1
73:10 106:16
135:11
asks  55:7 60:20
80:3
assessed  53:4
assessment
77:13 78:2
79:3 80:5

assessments
78:2
assessor's
31:18
association  3:6
9:14,17 53:2
71:19 77:9,10
77:21 78:12
103:13,18
117:10 119:19
121:16 123:2
123:17 124:8
124:22 129:17
associations
120:16
assume  26:16
34:9 36:21
45:5,24 61:17
67:2 76:1
81:11 113:23
133:24
assumed  32:19
42:14 106:17
109:1
assuming  23:4
33:5,9 45:4
49:10,11 57:8
73:24 81:7
87:10 103:22
assumption
73:14
assure  128:10
attached  26:13
64:2 83:4
103:9,18

**[attempt - block]**

**attempt** 46:6
124:24
**attend** 51:15
71:10
**attended** 51:18
89:4
**attends** 71:11
71:11
**attention** 68:7
127:4
**attorney** 6:7
9:4 12:23 14:4
14:11,23 15:6
15:7,22 16:9
18:14 27:14
30:8 41:22
42:4 43:15
44:7,17 45:6
46:5 47:21
48:22 51:22
53:1,1 62:17
72:21 73:22
76:23 86:12
93:7,12,14
98:5 99:11,13
99:17 100:2
103:23 104:5,6
104:16 105:22
105:23 106:2
106:12 108:15
110:15 120:15
122:18 124:16
124:18,20
135:6 136:7,9
137:10 138:21

138:22
**attorneys** 4:18
15:16,18 24:1
72:19 74:18
91:20 100:19
105:19,21
107:21 109:19
121:14
**atypical** 31:12
71:8 88:5
**authority** 25:18
**avenue** 2:18
**aware** 42:12
43:11 60:20
103:19 104:4
107:24 119:5

**b**

**b** 4:11
**back** 23:3 27:1
34:22 37:7
45:18 49:3
51:19 54:6
71:2 88:13,17
90:23 92:9,23
93:2 98:11
107:4 112:15
115:19,21
122:15,21
123:4,8,12
125:22 128:15
136:23 137:14
**backed** 115:18
**background**
18:16 116:20

**bad** 111:8
**balance** 57:23
**bank** 77:12
**bar** 9:14,17
**barrier** 46:8,10
**base** 40:10
**based** 32:18
33:21 34:2
116:24 117:18
118:9 119:10
126:12 127:17
**basement**
130:11
**basically** 92:18
112:21
**basing** 28:7
33:4,7,9,20
**basis** 11:12
50:17 86:23
**bates** 102:15
107:14 115:8
**beginning** 6:6
54:2 59:16
71:3 104:1,3
**begins** 73:21
**behalf** 2:6,14
2:22 3:6 6:12
79:16 94:13
97:18 105:15
105:16 107:21
**believe** 9:7,17
9:18 13:7
16:22 28:1
36:19 39:8
43:24 48:11

50:15 52:2
102:8 105:21
106:23 108:13
117:19 123:11
123:15 128:20
129:9 136:5,8
136:14
**believed** 105:4
111:17,19
126:13
**believes** 83:9
108:15 132:2
**bell** 11:22
**belt** 55:11
**beneficial**
31:16
**benefit** 77:15
78:10 101:24
**best** 58:9 90:10
116:21 124:9
**better** 26:3
**big** 10:11 105:8
**bill** 57:8 91:5
113:17
**bills** 53:5
**binding** 100:3
100:8,14
**birth** 8:9
**bit** 34:12 35:1
50:2 71:6
81:17
**block** 67:19
68:1,8,21,24
69:5,12,21
70:14,22,23

84:16 85:5,8
**blush** 109:7
**board** 79:16
**boilerplate**
18:12
**bottleneck**
107:23
**bottom** 105:12
114:3 131:14
**box** 64:24
**brakes** 97:15
**bral** 127:7
128:3 129:10
**bral's** 127:9
**break** 7:23,24
8:2 34:12
88:18
**briarwood** 8:14
**brick** 67:8,14
67:23
**brief** 124:9
**bring** 89:18
**brow** 107:8
**budget** 77:12
92:5
**building** 60:24
61:14 68:7
69:12 70:5,13
70:13,20,21
71:24 78:3
80:16 82:23
84:4,9 96:8
100:7,13
116:10,23,24
117:10 125:10

127:13 128:2
131:10 132:9
**buildings** 67:7
132:11
**bunch** 102:16
**burr** 8:12,13,14
**business** 10:10
72:21,23 73:23
74:19 99:12
**busy** 10:13
**buy** 81:21
**buyer** 12:19
14:16 31:24
35:3 38:15
39:12 40:1,3,7
40:11 50:11
53:18 56:1,3,9
56:19 57:20
58:18 59:12,13
60:3,7 61:9,13
61:24 64:23
65:3 72:23
75:23 76:9
77:24 78:15
89:9 93:18
96:1 108:7
112:22 113:4,8
115:18 117:12
117:12 121:7,8
123:23 130:14
130:16,18,18
**buyer's** 73:3
81:9 93:10
103:6 105:22
108:4 129:19

130:9
**buyers** 10:15
40:8 53:19
60:15 73:7
74:2 116:19
129:23 130:3
**buying** 45:18
**buys** 103:7
**bylaws** 77:12

**c**

**c** 81:1
**c.s.r.** 3:23
**caitlin** 2:10 6:8
**call** 7:5 18:14
46:23 100:2,10
100:12,22
102:3 108:10
112:17
**called** 6:17
67:19 77:9,11
88:22 91:20
93:1
**calling** 101:23
**calls** 108:19
109:11 110:23
118:12 119:22
128:23
**campau** 2:18
**capital** 77:20
77:22 79:2,20
80:4 94:11
96:19
**capstones**
115:24 126:1

**cardinal**
120:23,24
121:11
**care** 67:11 85:7
**career** 11:8,11
**carol** 2:4 6:9
14:8,10 28:5
28:18,19 29:6
29:11 39:5
51:8 98:4
114:20
**case** 12:20
13:18 14:14,18
15:16 16:3
23:17 29:12
37:15 38:21
43:18 51:10
88:7 91:23
111:13,13
135:15
**casey** 2:13
106:5 107:1
108:17 109:13
109:21 110:7
111:1
**category** 94:23
**caulking** 84:14
**caused** 44:17
117:6
**caveat** 83:2
**cc** 81:5
**cc'd** 102:21
**cc'ing** 107:17
**certain** 131:8

**[certainly - commencement]**

**certainly** 7:24
  16:14 22:4
  63:17 81:21
  93:8 107:4
**certificate** 3:24
  138:1
**certified** 1:14
  138:3,5
**certifies** 94:6
**certify** 138:7
**cetera** 24:13
  29:5 53:7
**chance** 29:1
**change** 16:11
  31:23
**changes** 24:20
  27:1 119:6
  134:4
**charges** 89:17
**check** 114:11
  114:12
**checks** 91:11
**chicago** 2:3,9
  3:3 9:17 13:16
  67:16 71:19
  78:16 139:3
**circle** 132:9
**circulating**
  82:1
**circumstances**
  79:4
**circumvent**
  121:8
**city** 66:21 67:2
  67:16 68:12,14

**civil** 1:16
**claim** 116:22
  116:24
**claims** 19:21
  22:19 37:5
**clarified** 7:17
**clarify** 7:18
  32:3 33:17
  67:18 101:4
  112:8
**clark** 3:2
**clause** 31:17
**clean** 41:24
  42:6
**clear** 58:16
  101:9 110:1
  135:5
**client** 13:20
  23:12 29:1
  41:17,19 42:6
  43:15 62:11
  66:17 70:19
  75:19 76:20
  77:3 81:8 82:4
  84:22 86:12,15
  86:16 87:9
  88:2,3 95:1
  96:24 97:18
  101:24 112:7,8
  135:17
**client's** 121:5
**clients** 30:11
  66:12 68:1
  106:11,14
  119:9 132:7

**close** 77:3
**closed** 89:12
  95:24 97:20,20
  103:9
**closer** 92:15,17
**closing** 11:1
  12:16,23 14:23
  15:4,7,10,14
  31:13,20,23
  32:13 34:1
  38:10,18,23
  40:18,18 41:8
  41:8,20 42:1,9
  44:7 50:8
  51:23 53:5,6
  56:15,22,23
  57:1,5,6,7,9,10
  57:12,12,13,13
  57:15 58:11,17
  59:2,10 71:10
  71:11,12 85:12
  85:15,17,18,20
  87:10,16,20,24
  88:21 89:2,5
  89:18 90:1,5,6
  90:10,13 91:2
  92:5,6,12,14,21
  93:4,7,10,16,17
  93:21 95:5
  97:2,7,8,15,20
  97:22 103:8,20
  103:22 104:4,9
  106:3 107:13
  107:13,23
  108:4 111:16

  112:18 117:8,9
  119:7 121:9
  123:4
**closings** 10:13
  10:16,18 11:3
  12:2,22 15:19
  15:20 16:1,2
  16:10 34:24
  39:13 40:14
  51:16,19 52:9
  52:22 91:15
  92:1 100:20,21
  105:19,22
  111:12
**closure** 92:3
**clothes** 62:13
**cmcauliffe** 2:11
**code** 94:8
**coin** 23:14
**come** 15:21
  28:10 49:5
  69:23 105:15
  113:17 128:5
**comes** 23:1,3
  28:24,24 66:12
  92:17 132:8
**comfort** 95:22
**comfortable**
  95:18,21
  128:14
**coming** 47:19
  84:3 87:9
  100:6 124:5
**commencem...**
  138:8

**commencing**
  1:18
**comments**
  25:13
**commit** 80:14
**commitment**
  23:16,24 24:3
  24:6,7,14,17,21
  31:9 41:16
**common** 60:4
  71:12 93:3
  94:24 107:20
  110:20 111:3
  118:16,18
  130:10 131:9
  131:15,19
  132:17
**commonly** 71:7
**communicate**
  27:3 30:16
**communicating**
  59:8 106:23
**communication**
  44:18,23,24
  104:17
**communicati...**
  104:5
**companies** 11:4
  11:19,21 13:6
  23:9 31:19
  33:22 35:15,22
  36:9,16 43:9
  50:7
**company** 11:1
  11:15 12:8,14

12:18 20:21
21:3,6 22:13
27:18 28:12
29:24 31:12,24
32:13 33:24
34:24 35:3
37:5 38:11,15
39:14 40:3
41:16 45:12
46:8 50:9,10
56:9,10,17,18
57:16,21 58:19
59:11,11,14
60:1,2,6,7 83:6
87:16 88:1,4
90:15 91:16,19
91:23 94:16
95:3,16,17,17
95:20 105:16
109:5 111:20
**complaint** 4:21
  43:18,19,23
**complete**
  108:19 109:10
**completed** 66:3
  83:7 94:13
**compliance**
  79:5
**comprised**
  52:19
**concede** 97:14
  134:18
**concern** 30:2
**concerned**
  41:17 68:2

**concerning**
  30:4 138:11
**concession**
  133:9 134:4
**concessions**
  116:15 117:11
**conclude** 135:7
  135:13
**concluded** 46:1
  123:20 127:14
  127:18
**conclusion**
  83:18 86:19
  127:9 129:4
**condition**
  131:24
**conditions** 66:8
**condo** 3:6
  44:19
**condominium**
  51:24 69:11,20
  70:21 71:16,20
  77:19 78:12,15
  78:21 79:5
  82:14 103:13
  124:8,22
  129:17 131:16
  131:21
**condominiums**
  22:15,16 66:24
  69:4
**condos** 68:13
**confident** 108:3
**confirm** 24:9
  51:22 71:17

79:14 88:1
93:18 131:1
**confirmed**
  79:17 96:18
**consent** 130:17
**consider** 66:8
  100:10 123:22
**considered**
  99:13
**consistent** 72:5
  89:7,12
**constitutes**
  138:15
**constructed**
  67:7 69:4,21
  70:21
**construction**
  67:15 68:2
**contact** 12:22
  21:11 28:11
  36:20 37:8
  42:10 43:1,12
  46:5 48:4,8,10
  48:11 63:4,7
  63:12 105:11
  107:20
**contacted** 15:7
  43:9
**contacting** 44:8
  62:21
**contain** 82:8
  85:10,11 87:22
  90:3
**contained**
  29:19 132:15

**contemplate**
135:19
**context** 82:23
**contingency**
52:24
**continue** 22:6
124:11 126:15
**continued** 3:1
5:1
**continues**
126:3
**continuously**
46:8
**contract** 12:10
12:11 17:10
23:12 26:14
30:23 32:20
33:5 34:7 53:4
53:10 54:1
64:2 71:16
72:20 73:6
74:3 75:24
76:16,24 80:15
83:4 87:14
98:15,18 99:4
99:11,18,19,23
100:15,23
101:8,11,20
104:3 119:1,4
127:7 128:3
**contractor**
96:11 117:4
**contracts** 18:12
18:12

**contractual**
101:24
**controlling**
109:3
**convenience**
76:18
**conversation**
32:23 68:5
95:15
**conversations**
97:8 130:8
**conveyance**
36:22
**conveyed** 23:5
23:8 41:6
97:11,16
**conveying**
59:18
**copies** 81:10
128:12 129:12
**copy** 13:20
16:23 17:2
43:22 54:1
86:3,4 94:14
128:1,3
**corporation**
1:8 2:16
**correct** 19:19
28:16 30:1
31:11 40:4
46:21 52:2
54:17,22 55:14
55:15,22 56:20
56:23,24 57:7
59:14,15,21

61:20 62:15,21
63:14 64:14
65:1,5 67:4
69:7 71:9,13
71:21,24 72:1
72:15 77:4
78:13 79:11,21
80:1,2 82:6
84:5,10,11,16
84:17,20 85:1
87:11 89:6,10
89:11,14,19
91:22,22 92:16
95:3,4 96:2,6,8
96:9,11,12,14
96:15,16,24
97:1,5,11 99:5
99:8,15,23,24
100:9,23 101:3
101:11,20,21
102:6,10,11
106:19,20
109:20 110:5
111:21 113:6
113:12,15
114:1,2,9,14,15
114:16 115:13
120:10 122:22
124:18 125:18
127:2,3 129:17
131:3,11,12
132:4,7,18
133:1,24
135:22

**corrected** 83:10
132:2
**corresponden...**
13:24 14:2,12
15:21,23 16:9
17:18,22 27:1
28:6 29:7,9,19
30:22 38:24
42:3,20,23
46:13 53:2
63:10 135:3,4
135:6 136:6
137:11
**corresponding**
29:17
**cortez** 13:10,16
**cost** 84:18,19
96:16 104:10
**counsel** 50:12
62:19 63:5,9
63:10 66:5
74:13 78:15
79:9 98:6,13
114:18 136:1
137:2 138:21
138:23
**counsel's**
132:20
**county** 113:9
**couple** 7:11
13:19 14:19
83:14 99:16
130:20
**course** 11:8,11
53:22 88:11

[course - designated]

93:22
**court** 1:1 5:16
6:3 7:19 94:1
102:10
**courts** 1:17
**cover** 86:22
116:9,11
117:13 125:11
131:9,15
**covered** 15:14
51:23
**covering** 15:20
15:24 16:1,10
**created** 71:18
**credit** 27:20
77:3 87:8
103:8 108:4
113:23 134:10
134:12,13
**credits** 104:10
113:7
**cs5760610** 1:24
**csr** 138:6
139:10,11
**current** 44:17
47:15 48:17,20
101:7,10
131:24
**currently** 8:11
**custom** 130:14
**customary** 37:7
**cut** 91:11
**cv** 1:6

**d**

**d** 4:1
**d.b.a** 2:15
**d.b.a.** 1:8
**damage** 20:3
20:18 22:7
130:10,13
**date** 7:2 8:9
73:11,12 74:14
89:1,1 97:20
99:13
**dated** 56:2,4
64:16 76:19
107:15 112:17
115:9 122:2
123:10
**day** 1:18 72:18
72:21 73:22
74:8 75:2,5
89:5 90:1
97:10 119:1
128:16 139:3
**days** 72:23
73:23 74:1,19
75:7 99:12
**deal** 72:7,8
107:23 108:8
112:2
**dealing** 24:11
30:6
**deals** 65:8
66:23 85:17
**dearborn** 2:2
**deceive** 128:9

**deceived**
106:24 109:8
109:15
**deceiving**
109:17,18
**decided** 103:7
**decision** 121:5
**decisions** 27:17
104:9
**declaration**
77:12 79:6
**dedicated** 67:6
**deed** 5:10 31:13
32:4,11,13,16
33:8,10,19,23
34:4 38:17,19
39:1,6,14 40:4
40:6,7 41:3,4,6
41:9 42:1 50:8
50:10 56:16,18
57:8,19,20
58:17,17 59:13
59:14 91:5
94:14,18,22,24
95:2,11,12,19
97:3,4,16
**deeds** 12:17
31:20,22 39:7
40:18,19 50:8
50:18 56:15
58:13 59:10
**deem** 105:2
**deeper** 21:10
**defendant**
44:16

**defendants**
1:10
**defer** 66:11
129:23
**defined** 71:23
**definitive**
107:22
**degree** 8:19
**delinquent**
24:13
**demand** 97:4
**demanding**
44:18
**demeanor**
107:5
**denied** 117:1
**depends** 130:16
**deposed** 7:8
**deposit** 89:16
**deposition** 1:13
4:13 6:2 7:1,3
8:7 13:23 14:6
42:24 86:5,19
125:3,18
138:12,17,18
**depositions**
1:17
**describe** 88:21
91:12
**described** 71:5
**description**
4:13 24:10
**designated**
79:23

**detail** 117:3
**detected**
  115:17
**determination**
  128:13
**determine**
  116:6 117:6
  126:9 127:8
**determines**
  134:12
**develop** 31:14
**developed** 30:5
**difference** 49:7
**different** 29:22
  42:4 74:9 75:3
  91:14 105:6
  107:5 118:24
  121:14 135:19
**differently**
  48:19 120:22
**dig** 21:10
**digital** 52:16
  85:23 86:1,4
**diligence** 18:11
**diligent** 81:15
**dinged** 78:1
**direct** 22:11
  44:18,23,24
  63:9
**direction**
  138:15
**directly** 12:22
  12:24 37:18,21
  38:1 40:8 41:9
  43:10 44:8

46:7,12 47:19
47:20 48:7
49:5 57:19
66:17 94:24
97:3 125:1
138:24
**disagree** 68:11
**disburse** 91:10
**disclose** 13:8
  27:18 44:6
  83:10,24 106:4
  109:6 119:2,8
  119:20 121:1,4
  121:6,10
  130:15 131:1
  132:11,14
  137:6
**disclosed** 70:8
  118:22 121:11
  125:16
**disclosing**
  109:19 115:19
  121:6
**disclosure** 4:23
  5:2,4,7 13:3
  53:11,13,15,22
  54:21 55:13
  60:13 61:21
  62:3 63:22
  64:11 65:14
  77:11 78:4,23
  82:18,21 83:5
  83:7,8,15,17
  84:3 96:4,10
  96:18 114:18

114:18 117:20
117:24 118:4,9
118:15,17
119:6 125:17
128:16,21
131:7,8 132:15
136:8,17 137:9
**disclosures**
  13:10 18:18
  53:9 54:18
  55:2 65:22
  66:2 72:6
  73:17 77:6
  83:3 90:18
  131:15,23
**discover** 128:5
**discuss** 17:17
  22:23 29:3
  117:24
**discussed** 22:1
  48:14,16 50:1
  80:12 125:17
**discussing** 25:4
  117:11 127:7
**discussion**
  97:22 134:2
**discussions**
  28:1,3 75:8
  133:10
**distracting**
  34:21
**district** 1:1,1
  1:16
**dive** 130:2

**division** 1:2
**docs** 93:20
**doctor** 128:3
**doctorate** 8:19
**document** 18:4
  18:6 20:11
  21:19 23:21
  25:7 54:5,7
  56:1 60:16
  71:3 74:22
  76:18 78:8,11
  78:17,20,22
  79:7,14 84:5
  90:3,20 102:14
  103:1,2,10
  107:14 113:20
**documentation**
  86:22 87:20
  121:16
**documented**
  87:13 116:10
  125:10
**documents**
  53:6 90:12,16
  90:17,22 91:1
  91:3 92:18,19
  92:24 93:1,9
  93:11,13,17
  98:6 103:18
  118:6
**doing** 10:12
  100:19,21
  111:6,9,16
  128:6 132:12

**[dot - examination]**

**dot** 64:12 81:8
**dotloop** 64:12
**draft** 19:14
  57:13
**drank** 114:21
**draw** 126:20
  127:4 129:4
**dropbox** 86:20
**duck** 88:10
**due** 6:1 18:11
  31:15,17 114:4
  115:18
**duly** 6:14,17
  138:10
**duplex** 69:23
**duty** 13:7 83:10
  83:24 112:13
  119:1,7 131:1
  132:14 137:5

**e**

**e** 4:1,11 5:8,11
  5:12,13,14
  27:3 29:15
  37:20,24 38:3
  52:3 80:24
  81:1 86:5,14
  86:18,22 88:2
  88:2,4 90:8
  102:15 104:20
  106:22 107:5,8
  107:12,15,18
  108:13,24
  109:16 112:4
  112:10,11
  115:5,7,8,9

117:15,18
119:3,8 120:20
125:2 126:12
127:6 132:21
**earlier** 84:5
  85:24 90:4
  105:7 114:17
  125:17 129:9
  129:22 132:22
  133:20,20
**earnest** 73:8
**easiest** 86:21
**east** 84:15
**eastern** 1:2
**ed** 11:18
**edification** 75:1
**education** 8:18
**ein** 94:7
**eisenberg** 3:2
**either** 41:13,18
  74:21 75:9
  118:5 137:14
**elastomeric**
  115:24 125:24
  127:11,12
**electronic**
  55:20 64:13
**element** 68:16
  118:16
**elements**
  118:18 131:9
  131:16,19
  132:17
**elevation** 84:16

**emerged**
  126:16
**emphasis** 82:18
**employee**
  138:20,22
**encompass**
  75:7
**engagement**
  53:4
**engineering**
  117:3 128:1
  129:3,10
**ensure** 94:10
**entire** 115:22
  125:23
**entirely** 116:12
**entirety** 24:19
  99:19
**entity** 94:9
**escrow** 116:9
**escrowed**
  116:11 117:13
  125:11
**esi** 116:23
  117:3 128:1
  129:3,10
**especially**
  22:15 45:19
  49:1 118:6
  120:16
**essentially**
  14:11 94:12
  99:7
**estate** 10:11,14
  10:18 11:1

14:23 50:6,7
50:12 51:16,19
52:8,9,14
59:22 63:6,7
63:13,15,16
64:13 67:6
71:16 81:12
94:3,4 98:15
105:1,22 106:3
110:11,15
111:6,9,12
118:23 120:15
121:13
**estimate** 58:9
**et** 24:13 29:5
  53:7
**event** 85:6
**everybody**
  120:24 121:12
**everyone's**
  86:18
**evidence** 50:5
  50:11
**exact** 20:19
**exactly** 9:24
  14:21 22:20
  29:11 57:15
  62:9 68:22
  73:23 84:1
  108:21
**examination**
  4:4,5,6,7,8,9,10
  6:19 51:11
  98:9 124:12
  130:22 133:21

136:3 137:3
138:9
**examined** 6:18
**example** 40:13
113:2,8 134:4
**excel** 112:18,21
**exceptions** 16:8
24:9,12
**exchanged**
17:24 21:16
**excludes**
118:18
**exclusive**
131:20
**exclusively**
132:16
**execute** 40:7
93:9
**executed** 26:14
26:19 33:23
41:3,5 60:5,7
92:20,24 95:19
95:20 97:16
98:16,18
**executing** 41:9
**exempt** 94:12
121:3
**exhibit** 4:14,15
4:16,17,18,19
4:20,21,22,23
5:2,4,6,7,8,9,10
5:11,12,13,14
17:5 18:3
20:10 21:18
23:19 25:6

26:7 44:1,2,3
44:11 49:19
54:9,11 55:14
64:8,10 65:12
71:15 76:17
78:6 80:23
81:24 88:20
94:19 98:13,14
102:9 107:11
112:16 115:3,4
118:2,3,4,5
122:3,22,22,23
125:1,4
**exhibits** 4:13
5:16 74:14
118:1
**expect** 104:23
133:9
**expeditious**
108:9
**expenditures**
77:21,22 79:2
79:20 80:4
96:19
**experience**
12:13,21 23:8
32:18 33:22
34:3 43:8
50:20 68:18
70:18 85:4
101:23 108:9
110:20 123:23
**experienced**
69:11

**explain** 72:19
77:15
**explanatory**
78:24 79:8
**exploratory**
117:5 127:8,10
**extend** 75:7
**extent** 106:10
**exterior** 84:9
**exteriors** 80:16
84:13
**eyes** 30:3

**f**

**face** 67:8,14,19
68:1,8,13,14,21
68:24 69:4,12
69:21 70:14,22
84:16 85:5,8
**facilitate** 15:23
**facing** 60:23
61:10 115:22
125:23
**fact** 33:7 37:10
38:16 95:18
111:5 119:2
**failing** 44:6
**fair** 16:15
35:10 44:10,20
58:7,19,20
61:15,16 63:11
63:16,19,20
65:10 75:11
85:2,3 87:17
87:18 95:8,23
96:20,21

101:14,16
112:19,24
118:19 120:13
130:7 133:12
134:5 135:7,17
**fairly** 131:8
**falls** 68:11
94:22
**familiar** 13:2
19:7 81:18
134:16
**far** 40:16 77:7
**fashion** 107:24
**feasible** 46:24
**february** 1:19
**federal** 1:15
**feel** 105:18
109:8,15
128:13
**felt** 135:7
**file** 13:21 14:20
15:19 16:9,18
24:4 25:9
52:15,18,20,21
52:23 53:8,9
54:5 61:22
63:23 64:21
65:20,23 77:6
77:9 79:15
80:9,17,20
81:10 85:10,13
85:14,22 86:4
86:16,20 87:22
90:2 122:9
128:19 135:14

**filed** 43:18
116:22
**files** 16:13,14
16:15
**filled** 64:6,19
64:23 65:2
78:11
**final** 53:6
**finalize** 108:5
**finalized**
108:10
**finally** 127:14
**financed** 77:23
79:3
**find** 87:6 91:4
**fine** 7:7 16:19
30:2 58:15
68:19 121:2
**finish** 7:13
**fireplace** 69:24
**firm** 2:2 9:6,20
10:2,4,5,8,9,12
15:18 17:24
25:5 31:6
51:13 52:5
66:8 74:11
86:15 121:12
**firm's** 53:22
55:1 82:1
**firms** 11:13,17
**firpta** 93:22
94:5,12
**first** 6:17 7:12
13:17 17:23
24:21 32:12

69:22 90:17,20
**fiscal** 80:5
**five** 32:21,22
33:3 34:13
72:22 73:22,23
74:8,19 75:2,5
75:7 99:12
**flag** 48:17
**flags** 17:13
**flashing** 69:1
84:15
**floor** 69:22
115:23 125:23
**flow** 89:15
90:14
**flucker** 102:17
103:20 107:17
**focus** 10:3
**focused** 135:21
**focuses** 52:8
**folder** 52:24
73:20 77:8,10
85:23
**folders** 52:21
53:3
**follow** 124:2
128:11 130:20
**followed** 32:13
**following** 86:4
**follows** 6:18
**forbidden**
42:21
**foregoing**
138:12

**foreign** 94:2,3
94:3,9
**forgive** 62:16
66:19 124:9
**forgot** 43:14
**form** 54:21
55:14 71:18
82:21 100:17
100:24 101:5
101:12 106:5
107:1 108:17
109:21,22
110:7 117:22
118:11 119:2,8
119:15,21
125:17 128:23
131:20 133:16
134:19
**formulate** 29:4
**forth** 46:9
47:21
**forward** 97:17
128:1
**found** 15:1
103:17 130:10
**foundation**
36:11 101:12
104:14 108:18
109:11,22
110:23 117:22
118:11 119:21
126:17 134:20
136:10
**founded** 9:20

**four** 8:16 51:20
**franklin** 2:8
**free** 120:2
**front** 52:16
**full** 85:23 132:9
136:8
**fully** 26:19
106:4
**funding** 92:3
93:1
**funds** 89:16
**furniture** 62:13
**further** 4:8,9
4:10 85:21
101:4 103:15
124:2 126:15
127:4 130:19
130:22 136:3
136:21,22
137:3,12,13
**future** 116:9,12
117:14 119:12
119:18,20
125:12

**g**

**g** 1:14 3:23
90:8 138:5
139:10
**gain** 82:16
**gains** 94:11
**game** 130:7
**garber** 15:14
51:22
**garrett** 107:17

[garver - gordon]

| | | | |
|---|---|---|---|
| **garver** 90:7 | 37:7 38:3 40:2 | 79:3 80:21,23 | 48:17 51:10 |
| **gates** 10:11 | 45:18 51:5,6,7 | 88:8,21 90:12 | 53:17 56:10 |
| **generally** 36:8 | 52:22,22 55:6 | 92:1,18 95:2 | 59:18 60:14 |
| 96:15 | 58:18 59:2,6 | 98:12,14 99:10 | 62:1,4,21 |
| **geographic** | 59:12 60:12 | 106:12 110:10 | 63:19 64:7,23 |
| 66:19 | 62:12 63:3 | 111:10 112:15 | 65:2,9 66:3 |
| **getting** 20:19 | 74:7 76:2 | 112:23 122:10 | 72:8 83:5,7 |
| 27:9,16 28:14 | 79:11 87:9 | 123:4 124:10 | 93:5 95:1,11 |
| 41:24 47:6,7 | 88:12 90:17,20 | 124:24 126:14 | 95:19 96:23 |
| 78:1 82:22 | 90:20,21 91:11 | 127:5 128:6 | 97:4 104:5,9 |
| 87:15,19 109:4 | 91:18,24 92:2 | 130:17,18 | 104:18 105:3,5 |
| 128:1,2,3 | 92:6,23 98:11 | 132:23 133:8 | 105:15 106:17 |
| 134:13 | 103:3 112:15 | 134:3,11 | 106:22 109:20 |
| **give** 27:14,19 | 116:18 122:21 | **gonna** 17:21 | 111:21 112:1,9 |
| 29:1 32:9 | 123:8 124:4,6 | 36:21 102:8 | 115:13 118:14 |
| 46:23 49:20 | 124:10 127:5 | 121:8,11 122:2 | 131:1,5 132:21 |
| 58:14 86:5 | **goes** 39:12 40:1 | **gonring** 1:9,9 | 132:24 133:4,7 |
| 114:21 122:11 | 40:11 53:3 | 2:22 5:11 | 133:10,22 |
| 132:7 134:11 | 55:19 57:18 | 24:18,18 32:9 | 134:6,14,15 |
| **given** 5:16 | 58:16 59:9,13 | 46:16 55:17,24 | 135:7,16 136:7 |
| 22:10 81:11 | 92:13 114:12 | 102:14,16,21 | 136:19 137:5 |
| 82:20 85:4 | 116:22 117:2,6 | 103:4,19 | **good** 3:4 4:7 |
| 103:5 108:1 | **going** 12:23 | 107:14,16,17 | 6:11,11 41:24 |
| 138:16 | 13:18 17:2 | 107:19 108:14 | 51:4,9 58:14 |
| **gives** 24:10 | 19:11 28:13 | 110:4,4 112:14 | 62:2 81:15 |
| 72:23 95:22 | 30:9 34:8 36:2 | 115:10,10 | 85:5 91:10 |
| 112:22 | 41:14,22 43:5 | **gonrings** 6:13 | 102:4 107:19 |
| **giving** 77:3 | 45:11,18,20 | 28:3 29:7 | 116:5 119:24 |
| 113:9 116:19 | 46:13,21 52:4 | 30:13 32:8,9 | 120:4 124:4,6 |
| 117:11 | 54:6 56:9,11 | 37:11,15 39:7 | 124:7,13 126:8 |
| **glance** 24:11 | 58:2 59:17,19 | 41:4,6,9,12 | 126:24 129:7,8 |
| **go** 7:11 8:20 | 59:20 60:14 | 42:11,21 43:2 | 130:19 136:22 |
| 17:20 18:22,23 | 64:8,10 65:7,8 | 44:9 45:10 | 137:15 |
| 19:5,6 24:16 | 71:2 72:6 | 46:7,12,20 | **gordon** 1:14 |
| 28:17 34:14 | 77:23 78:5,6 | 47:15,19,20 | 3:23 138:5 |

139:10
**gorr** 3:6 79:16
  115:8,9 119:10
  122:3 124:8,21
  126:13 127:6
  129:16 131:5
**gosh** 11:5
**gotten** 25:8
  27:23
**graduate** 8:22
**graduated** 9:5
**grand** 2:19
**great** 10:23
  11:7
**grew** 10:12
**grind** 127:10
  127:12
**grinding** 84:14
**group** 71:6
**guaranty** 4:18
  24:1 91:21
**guess** 24:7
  32:21 34:6
  40:20 71:17
  82:19,19 83:2
  86:13 97:12
  105:12 124:6
  126:20 130:16
  135:6
**guys** 47:13
  56:22 120:1

**h**

**h** 4:11 107:18
**half** 67:1 92:6,7
  92:8

**halt** 15:21
**hand** 23:13
  32:5,11 33:10
  133:17 139:3
**handful** 93:8
**handle** 16:12
  132:13
**handled** 16:15
  16:16 92:4
  116:20 134:10
**handling** 16:9
  16:14
**hands** 108:7
**handwritten**
  60:22
**hang** 36:1,1
**happen** 11:10
  41:1 92:12
**happened**
  26:10 38:16
  40:22 95:15
  97:7 105:9
**happening**
  133:15
**happens** 28:23
  35:4 57:23
**happy** 7:18
  130:2,5
**hard** 115:18
  129:2
**hate** 114:20
**hawbecker**
  1:14 4:3 6:10
  6:10,16,23 7:1
  7:6 98:4 136:2

**head** 7:22
  11:18,22
**heads** 135:9,12
**hear** 122:15
**held** 33:13
**hello** 103:4
**help** 21:24 73:9
  73:15 116:6
  120:16,16
  126:8
**hereto** 138:23
**hereunto** 139:2
**hey** 27:17,19
  30:6,9 31:18
  32:9 37:6 41:5
  42:2 45:9,10
  46:5 47:13,17
  48:9 49:4 68:1
  77:20 83:15
  91:9 92:9,22
  105:10 107:6
  121:2 130:1,3
  130:6 132:10
**highest** 8:17
**highlighted**
  137:10
**highlighting**
  125:21
**hire** 46:22
**hired** 116:23
**historically**
  83:22
**hit** 116:8
  118:14

**hoa** 60:24
  61:14 77:12
  82:22 84:4
  96:7 115:16
  119:11
**hold** 35:22 36:9
  121:23 123:12
**holding** 34:8
**holiday** 103:5
**home** 4:14 17:6
  66:14 107:24
**homeowner**
  83:12
**homeowners**
  12:22
**honest** 70:4
**honestly** 9:18
  69:17 76:5
**hope** 116:4
  126:7
**hopeful** 108:2
**hoping** 91:9
**hour** 92:6,7,7
**hours** 91:2
**house** 60:21
**hum** 9:9 19:2
  122:12
**hundreds** 11:6
  34:23
**husband** 24:19

**i**

**idea** 112:22
**identified**
  60:15 61:22
  65:3 66:9

82:21 84:5
86:24 96:11,13
96:16
**identifies** 55:16
79:19 84:12
89:7,15,17
**identify** 93:24
**identifying**
61:9
**il** 5:2,4
**illinois** 1:1,8
2:3,9,15 3:3
8:12 9:2 13:3
13:16 53:12
54:21 62:18
63:21 64:10
65:13 72:18
82:13 138:6
139:3
**imagine** 27:5
76:13
**immune** 13:6
**important**
22:14 55:5
70:19 77:19
78:4,19,21
82:11 83:1,21
123:22
**impression**
108:14
**inaccurate**
128:21
**inarticulate**
87:4

**inception** 56:7
**incidental**
87:15
**incidents** 78:1
**include** 38:7
132:1
**included** 76:17
**including**
131:19
**incomplete**
119:22
**increase** 78:2
79:4
**indicate** 6:5
36:20,24 46:18
80:17 86:21,24
**indicated** 54:15
54:20 56:13
77:8 80:8
**indicates** 55:23
79:22 84:8
**indicating**
37:14
**indicia** 30:24
**indirectly**
138:24
**induced** 44:7
**inevitably**
121:4
**inference**
126:20
**infiltration**
20:3,18 37:6
49:2 116:4
117:6 126:7

**information**
18:20 21:2
22:8 27:9,16
27:22 28:10,15
37:9 43:12
46:16,20 47:5
47:10 54:15
63:18 82:16
85:13,16 90:11
90:11 103:17
106:4,11,13
118:10 128:20
**informing**
84:21
**initial** 15:6
18:9 22:9
53:19 54:14
60:13 74:16
76:24 109:6
**initials** 53:20
76:12
**input** 25:16
116:18
**inquire** 70:22
**inquiry** 103:12
**ins** 89:16
**inside** 127:13
**insightful**
82:16
**insisted** 105:13
**inspect** 116:24
**inspected** 16:21
**inspecting**
66:14

**inspection** 4:14
16:24 17:3,6,9
17:13,14 18:17
27:19 62:12
66:6,12,16
68:12 72:22,24
115:20 129:20
129:23 130:4
130:10,14
**inspector** 66:10
**installation**
84:15
**instances** 11:9
**instructed**
120:5
**instructions**
92:22
**insurability**
49:2
**insurance**
19:21 22:18
37:5 116:23,23
**insures** 41:16
95:17
**insuring** 95:21
**integral** 131:20
**intended** 131:9
131:15,23
**intends** 77:21
**intent** 128:9
**intentionally**
128:8
**interest** 23:6,7
31:16

**interested**
138:24
**international**
1:7 2:15 12:3
64:20
**interpretation**
132:18
**interrogatories**
4:22 49:15,16
**introduced**
102:7
**investigator**
46:22
**investment**
94:4
**involved** 11:3
11:14 12:8
16:4 28:19
45:20
**involving** 12:3
50:6
**irs** 94:2,8
**isolated** 37:2
**isolation**
126:19,21
**issue** 83:9,11
83:19,22
116:11,14
125:10,16
126:14,16
128:14 132:10
**issued** 23:24
57:19 84:13
**issues** 16:11
29:5 31:14

66:13,13 68:15
69:9,10 73:5
82:23 83:18
115:20 116:20
129:5 132:11
**italicized**
116:21
**item** 80:12
103:11,12
119:4
**items** 16:17
60:17 103:10

**j**

**january** 113:10
**jibe** 126:22
**job** 1:24
**john** 3:6 79:16
115:9 119:10
124:21 129:16
**join** 106:6
119:24 136:12
**joins** 109:13
**july** 4:20 5:12
5:13 24:5 25:4
25:5,9,9,11,12
26:6,23,24
74:24 76:20,21
87:7 95:24
107:12,14,16
112:17 113:10
115:5,7,9
117:9 123:5
125:2
**jump** 16:12
25:3

**jumping** 16:14
39:9
**june** 18:1 20:9
21:17 56:2,4
64:16 73:12,20
73:21 74:1,2,7
74:15 75:20
80:20,23
122:24 127:14
127:18 128:19
139:3
**juris** 8:19
**jury** 78:10

**k**

**k** 81:1
**keep** 22:6 39:9
47:13
**kelly** 1:9
**kelsey** 2:22
24:18 55:16,24
102:15 107:17
110:4 115:10
**kids** 8:16
**kind** 10:2 18:11
23:2 30:21
48:23 52:19
55:11,11,12
60:10 81:16
87:9,23 90:24
93:10,12
**kirk** 14:7 15:13
16:3,8 19:16
21:21 22:4,21
22:24 25:15
26:3,23 71:6

71:10 81:10
91:6
**kirk's** 22:3 27:2
**knew** 29:23
45:22 47:1,1
**knit** 87:17,17
**know** 7:18,24
10:9 11:6,9
12:1,9,19 13:5
14:17 15:1,23
16:13,19,20
17:9 19:4
20:22 24:11
25:8 26:12,22
27:23 28:2,4
28:14 30:6,7
30:11,11,23
31:5 32:7,9
33:21,22 34:6
35:5,6 37:6
38:2,12,16,22
39:18,22 40:5
40:5,8,12,15,16
41:3,5,10,10,11
47:14 48:1
49:16 52:22,23
53:4,6 58:10
59:4,17 60:5,6
62:12 63:8
67:17 69:1,8
74:12,19 76:4
76:4 77:19,24
80:19 81:4,7
81:12,14,16,20
85:21 87:17,24

88:2 91:8,17
92:5 93:22
94:4,5 95:14
97:6,7 99:4
102:24 104:8
105:9 115:11
115:12 116:18
129:22 130:2,4
130:6 131:4,7
132:10
**knowing** 128:7
**knowledge**
20:20,24 61:9
61:13 66:20
67:5,10 69:5
70:12 85:4
96:1 124:22,23
**known** 28:10
48:17,20 56:7
63:2

**l**

**l** 81:1 107:18
**lack** 36:11
66:19 104:14
109:10 136:10
**laid** 127:6
**lane** 8:14
**langefeld** 15:13
**language** 61:19
131:13
**large** 130:3
**largely** 66:11
129:23
**launching** 82:1

**law** 2:2 8:19,20
9:2,8,22,24
11:13,17,20
16:1 62:18
72:18 102:18
108:15 110:5
110:11,14
111:6,9
**lawyer** 67:6
71:11 74:3,12
**lawyers** 51:13
51:15,18 74:3
75:6 116:17
**layer** 48:23
115:21 125:22
**leak** 60:24
61:15 69:13
96:1,5
**leakage** 60:21
**leaking** 83:16
100:13
**leaks** 60:23
61:10 70:6,7
**learn** 13:17
**left** 87:14 114:4
**legal** 9:10,13
24:10 62:24
**legally** 100:2,8
100:14 102:5
**lender** 90:23,23
91:9 92:9,22
93:2,2 99:1,3
**lenders** 87:17
**length** 111:20

**letter** 4:15,16
4:17,19,20
17:23 18:9,11
18:21,23 19:14
20:6,8,22
21:16 24:21
25:4,9,11,13
26:5,8,11,24
28:23 37:14,16
38:5,5,7 46:5
47:22,24 72:24
74:16 77:13
100:5 115:15
122:18,24
124:19,20
127:23
**letters** 14:4
16:4 19:24
20:1,4 22:17
25:3 26:20
27:8 28:17,21
36:19,23,24
37:20,24 45:6
46:17,17 48:7
53:4 55:6,10
55:10 74:5,11
100:2 110:16
136:9
**level** 8:17
**levels** 116:2
126:4
**liability** 1:8
2:15
**license** 138:6
139:11

**licensed** 9:1
**liens** 79:6
**lieu** 27:20
**light** 137:2
**limited** 1:8 2:15
131:11,19
**line** 79:11
105:12 119:4
121:2 124:11
**lines** 72:13,14
**link** 86:20
**list** 81:21
**listecki** 5:8
80:24
**listed** 37:13
56:1
**listen** 68:1
120:23
**listing** 93:23
**lists** 80:12
83:18
**litany** 83:11
**literally** 73:10
**littered** 68:13
135:5
**little** 10:10 15:5
18:15 21:10
34:12 35:1
37:9 41:21
50:1 69:13
81:17 91:14
92:2 98:16
124:10 130:7
**live** 8:11,15
108:10

**[lived - mccarthy]**

| | | | |
|---|---|---|---|
| **lived** 22:12 | 75:23 76:10 | **mails** 37:20,24 | **marked** 74:13 |
| **llc** 1:7 2:15 | 80:11,13,13,14 | 38:3 86:14 | 74:23 98:13 |
| **llp** 2:8 | 88:24 | 119:3,8 132:21 | 125:3 |
| **loan** 90:16,22 | **loop** 91:17 | **maintained** | **market** 115:19 |
| 91:3 | **looping** 103:5 | 67:12 | **marking** 65:12 |
| **loans** 79:4 | **lose** 121:7,7 | **majority** 52:11 | **masonry** 80:15 |
| **locate** 46:22 | **lost** 41:6 | **make** 7:21 | 84:12 115:21 |
| **loftus** 3:2 | **lot** 11:19,20 | 27:17 45:12 | 117:4,5 125:21 |
| **loftusandeise...** | 67:2 82:17 | 59:7 64:9 | **material** 67:15 |
| 3:5 | 92:8 95:22 | 74:18 79:10,10 | **matousek** 2:8 |
| **long** 9:4 41:19 | 99:1 120:9,12 | 82:14 98:16 | **matter** 41:18 |
| 74:20 97:10 | **love** 129:3 | 101:8 116:14 | 56:8 97:10 |
| **longer** 32:10 | **luehrs** 107:18 | 117:5 122:21 | 105:15 119:2 |
| 100:11 106:17 | **m** | 122:23 128:13 | **matters** 41:21 |
| **look** 17:16 | | **makes** 135:4 | 138:11 |
| 18:14 19:5 | **m** 2:10 75:23 | **making** 19:9 | **matthew** 2:13 |
| 48:2 53:8,10 | 76:10,11 81:8 | 49:18 104:9 | **mc** 81:8 |
| 64:3 66:8 | **madam** 102:10 | **managers** | **mcasey** 2:13 |
| 75:24 76:3,10 | **made** 61:3 68:7 | 79:16 | **mcauliffe** 2:10 |
| 81:20 83:13,14 | 70:13 83:12 | **manifested** | 4:4 6:8,8,20 |
| 85:11 93:20 | 103:12 | 30:21 | 34:11,19 36:4 |
| 112:3 130:3 | **mail** 5:8,11,12 | **march** 5:14 | 36:7,12,14 |
| **looked** 19:6 | 5:13,14 27:3 | 122:2,7 123:5 | 39:23 43:7,16 |
| 131:7 | 29:15 52:3 | 123:9,21 | 44:3,4,13,14 |
| **looking** 18:20 | 80:24 86:5,18 | 126:22 127:1,7 | 50:22 54:10 |
| 26:23 55:13 | 86:22 88:2,2,4 | **mark** 17:4 18:2 | 133:16 134:20 |
| 64:1 76:8,12 | 102:15 104:20 | 20:10 21:18 | 136:12 137:13 |
| 78:16 81:5 | 106:22 107:5,8 | 23:19 25:6 | **mccarthy** 2:20 |
| 106:21 109:2 | 107:12,15 | 26:7 43:24 | 2:21 4:5,8,10 |
| 112:9 116:3 | 108:13,24 | 49:19 54:8 | 6:12,12 36:1 |
| 126:6,19 | 109:16 112:4 | 64:8,10 71:14 | 36:11 39:15 |
| 128:15 | 112:10,11 | 78:5,6 80:23 | 51:3,6,8,10,12 |
| **looks** 26:18 | 115:5,7,8,9 | 88:8,20 94:18 | 54:8,12 58:6 |
| 53:24 54:7 | 117:15,18 | 122:2 | 67:18,20 79:9 |
| 64:4 73:20 | 120:20 125:2 | | 79:13 86:17 |
| | 126:12 127:6 | | |

87:3,5 88:11
88:14,17,19
98:2,8 100:17
100:24 101:12
104:12 106:6
107:2 108:18
109:10,22
110:23 117:22
118:11 119:15
119:21 128:23
130:20,23
133:18 135:1
135:23 136:10
137:1,4,12,15
**mckee** 2:18
**mean** 11:18,21
13:11 16:7
17:15 20:6,15
22:13 25:24
28:2 30:24
32:4 35:5
39:13 40:15,19
41:1,10,23,24
46:21 58:13
68:11,12,21,23
76:13 78:19
82:12 85:14
89:24 92:11
98:20 102:24
106:10 109:2
130:16 133:13
**meeting** 5:8
77:13 80:8,10
80:19 82:2,7,8
82:16,24 84:8

84:21 96:10
121:16,24
122:8,19
123:15,16,17
123:21 124:14
126:22 127:1
136:5
**megan** 81:9
**melinda** 1:4 2:6
14:24 16:20
28:18,21 32:14
50:5,13 53:23
56:3,11 59:20
62:11,11 63:12
63:12 64:12
65:4,10,17
72:2,9 73:12
75:19 81:8
89:9,17 90:13
92:15 93:18
95:12 97:2,11
98:5,19 106:19
111:17 113:24
127:24 133:1
**melinda's**
51:24 52:23
53:20 55:20
135:21
**memorialized**
128:7,7
**mentioned** 9:20
28:5 35:1 39:4
42:20 43:1
45:9

**mentions** 117:3
**meter** 116:1
126:4
**michigan** 2:19
62:17 91:14
**miles** 66:22
**mind** 7:5 31:12
41:8 101:23
107:12 111:7
112:1,3
**mine** 54:6
**minor** 68:15
69:9,10,13
**minute** 66:22
82:8 84:8,21
114:21,23
122:11
**minutes** 5:8
34:14 77:14
80:9,10,19
82:2,7,12,17,24
96:10 121:17
121:20,21,22
121:24 122:8
122:19 123:2,5
123:10,15,16
123:17,22
124:14 126:22
127:1 136:6
**misapprehen...**
134:16
**mischaracteri...**
39:16 43:6
119:16

**mischaracteri...**
58:3
**mischaracteri...**
36:3
**misrepresent...**
136:11
**mix** 10:16,17
**modification**
18:14 99:17
100:23
**modifications**
18:19 73:2
74:18 99:12,22
100:1 101:11
**modify** 101:7,7
101:19
**moisture**
115:16 116:1,1
116:5 126:3,4
126:8,14,15
131:2 137:6
**moment** 20:13
33:1 48:13
49:20
**money** 73:8
112:23 113:17
116:9,11
117:13 125:11
**monitoring**
116:1,5 126:4
126:8,15
**monthly** 79:4
**months** 123:1,6
123:15,18

**morielli** 11:19
**morning** 51:9
   107:20
**mortgage**
   31:15 52:24
   90:18
**move** 19:11
   97:17 127:24
**moved** 62:7
**muddled** 87:23
**multiple** 15:15
**mute** 133:17
**mutual** 59:24

**n**

**n** 4:1
**name** 6:6,21
   47:3 51:9
   65:16 90:8
   98:4 124:7
**names** 11:21
   53:16
**nature** 12:11
   81:11
**necessarily**
   132:8
**necessary**
   128:17
**need** 6:1 7:23
   24:12 47:17,18
   47:18 49:4
   59:8 67:11,12
   68:2 90:22
   92:10,19,23
   105:15 121:3
   127:10 128:11

**needs** 49:5
   89:18,21 93:9
   99:3 108:10
**never** 30:10
   31:2 37:21
   41:13 45:13
   46:2 48:3,7
   102:24 103:2
   109:5 111:7
   122:7 129:16
**new** 10:9 31:18
   40:8 41:4,9
   59:13
**news** 85:5
**nicholas** 1:9
   2:22 24:18
   55:16,24
   102:21 110:4
**nick** 103:5
   107:16,19,19
   108:14 115:10
**nodding** 7:22
**non** 67:23
**nondisclosure**
   136:15
**nope** 78:5
**normal** 105:1
**normally** 38:7
   102:3
**north** 2:2,8 3:2
   84:16
**northern** 1:1
**notarize** 92:23
**note** 61:3 64:9
   90:17 131:14

**notes** 128:4
**noteworthy**
   61:5,7
**notice** 7:2
   61:24 62:1
   65:7 77:24
   121:7,9
**noticed** 45:9
**noticing** 6:7
**noting** 120:1
**november** 8:10
**number** 24:10
   31:14 46:23
   48:4 62:19
   92:11 94:7
   98:14 99:18
   122:22 131:4
**nw** 2:18

**o**

**o'clock** 1:18
   136:24
**object** 36:2,11
   43:5 58:2
   101:12 108:18
   110:23 117:22
   118:11 119:21
   126:17 128:23
   136:10
**objection** 39:15
   43:14 100:17
   100:24 104:13
   106:5,6 107:1
   107:2 108:17
   109:10,13,21
   109:22 110:7

   111:1 119:15
   133:16 134:19
   134:20
**objections**
   119:24 120:2
**obligation**
   101:19
**obviously**
   97:15 106:21
   115:12 120:9
   120:12 130:17
**occupancy** 62:5
**occupied** 46:3
   62:13
**occupy** 45:23
   109:5
**occur** 11:8
   128:16
**occurred** 17:9
   58:4 69:15
   107:13
**offhand** 130:9
**office** 8:8 11:20
   11:20 14:7
   15:13,22 31:18
   51:23 74:6,23
   81:2,10 84:22
   87:20 89:4
   96:1 97:3
   119:5 135:14
**oftentimes**
   89:22
**oh** 11:5 14:17
   19:13 33:12,21
   34:12

**[ohio - page]**

**ohio** 8:21,22
**okay** 7:8,11 8:5
8:9,17 9:8,19
10:7 12:2,6
13:2,9 14:2,5,9
14:22 15:15
16:23 17:2,12
18:22 19:3,8
19:14,17 20:2
20:5,17 21:15
23:15 25:8,22
26:20 29:6,21
34:11,12,16,21
35:9,14,22
36:4 38:4,24
39:4,9,24
40:21,24 42:9
43:22 44:13,22
49:18,24 50:4
50:21 51:8
66:1,5 75:11
77:15 79:18
87:1,2 90:6
91:12 93:16
98:3,22 99:3
100:1,5 102:2
102:12 103:3
103:18 104:2,8
106:21 107:15
114:17,19
115:15 117:18
120:20 121:15
122:5,6 123:14
123:21 124:1
125:8 127:4,20

129:7,19
136:23
**old** 52:22
**omit** 105:16
**once** 29:2 87:13
90:20 91:2
**ones** 26:21
45:22 49:2
121:19
**oor** 98:19,20
**open** 103:7,11
**openings** 117:5
**opinion** 49:9
78:22
**opinions** 81:15
**opportunity**
22:11 29:3
72:23
**options** 99:16
**order** 124:10
**organizations**
9:11,13
**original** 41:6
43:9 75:12
**originally** 23:3
**oshana** 2:2,4
4:6,9 6:9,9
14:8,10 43:5
43:13 44:11
51:2,6 58:2
79:9 86:8 98:3
98:4,10 100:18
101:4,6,15
102:12,13
104:15 106:8

106:15 107:10
108:21,23
109:14 110:1,2
110:8 111:4
114:22 115:2
117:23 118:19
118:20 119:17
120:8 122:15
122:17 124:1,5
126:17 134:19
136:1,4,16,21
136:23
**oshanalaw** 2:5
**outcome**
138:24
**outlined** 103:9
**outs** 89:16
**outset** 23:11
54:19
**outside** 74:7,14
**outstanding**
107:7
**overall** 12:11
**overly** 30:4
**own** 75:1 81:14
91:11 92:2
132:3
**owned** 68:13
69:3,16,21
**owner** 12:18
22:22 23:5,14
31:1,23 33:14
34:10 35:2
36:21,23 37:1
37:8,15 38:14

39:12 40:1,3
40:11 44:7,17
47:14,23 48:10
49:8 50:9
56:17 57:19
58:18 59:10,13
60:1,6 69:6,11
98:21 99:4,8
100:11,12,12
101:17,17,18
101:18,24
105:11 106:17
111:14,17
114:13
**owners** 22:23
33:24 37:11
42:2 43:9
44:19 45:3,7,9
45:10,15,19
46:6 47:15
48:18,20 63:2
100:22 101:7
101:10 102:4
106:18 128:5
**ownership**
83:13

**p**

**p.m.** 137:18
**packet** 57:7,9
91:4
**packets** 56:22
57:5
**page** 4:2,13
18:6 19:4,5,12
24:16 55:20

**[page - practiced]**

79:11 80:11 127:5

**pages** 19:13

**paid** 31:15 77:13 94:11 113:24

**paragraph** 44:15 60:17 99:10 103:10 116:6 125:20

**parapet** 127:13

**parentheses** 103:9

**parse** 86:13

**part** 9:10,13 10:12 12:11 20:15 32:7,11 67:6 73:7 74:8 75:2,4,4 76:16 76:23 105:20 114:5,6 131:21 135:8

**particular** 13:22 16:6 28:9 37:3 78:3 91:7,17 106:18 129:21

**parties** 6:2 7:3 28:6 29:13 72:15 73:4,7 74:20 75:6 82:4 91:11 136:18 138:21 138:23

**partner** 16:1

**party** 20:21 27:18 30:7 45:12 46:7 63:4 74:21 75:9

**party's** 74:17

**passes** 38:15

**passing** 39:7

**past** 60:20

**paul** 2:20 6:12 15:13 16:1 51:9,22 52:5 89:4 90:7,10 92:14 95:5,6 97:15,22

**payable** 113:14

**paying** 94:7 113:18

**pc** 2:18

**pendency** 103:23

**pending** 8:1

**people** 21:12 66:13 102:16 110:20 115:10 120:16 134:16

**peppered** 11:12

**percent** 35:9,12 38:13,14 39:12 39:13 52:10,13 56:14 57:3,24 58:1,4,4 103:8 108:5 128:10

**percentage** 52:7 58:9 66:23

**perfect** 18:13

**perform** 80:16

**period** 72:18,22 73:9,22 74:9 75:2,5 99:14

**person** 22:12 23:5 27:13

**personal** 69:5 138:14

**perspective** 78:15

**pertaining** 1:17

**pertains** 49:1 137:8,9

**phone** 27:6 29:15 46:23 48:4

**picture** 42:15 45:3

**place** 6:2 14:1 36:22 39:15 82:17 91:15 103:14 132:24 138:19

**places** 22:21

**plaintiff** 1:5 2:6 98:5

**plaintiff's** 14:22 50:12

**planning** 52:14

**platform** 64:13

**please** 6:5,21 7:15 17:4 18:2 23:19 25:6 26:7 37:8 48:10,13 49:19 79:12 98:11 104:13 105:11 105:12 119:5 122:4,11 127:22

**plug** 97:17

**point** 29:4 41:7 45:8 83:21 97:23

**popular** 94:23

**porous** 67:13

**portion** 58:1 116:12 117:13 125:11

**possibility** 121:8

**possible** 37:9 46:15 91:1 116:21

**pot** 108:7

**potential** 78:1 108:7 116:19

**power** 52:24 93:14

**practice** 9:2 52:8,11 55:1,2 55:8 71:8,12 81:12 130:15

**practiced** 9:1

practicing
110:11,14
practitioner
82:17
pre 93:11
precisely 15:5
prefer 7:6
prelim 90:5
preliminary
57:15 85:20
88:6
premises
131:24
preparation
14:6 85:12
prepare 21:24
72:24
present 60:21
70:2
presented
90:12
president
115:16 117:10
117:10 119:11
119:19
presumably
17:10 49:6
63:13 85:6
89:2
presume 60:9
presumed
60:11
presumption
94:15

pretty 78:23
79:7
previous 50:9
100:11,22
101:23 102:3
115:19 132:1
138:8
previously
17:19 28:11
48:14 98:13
102:7 125:3
price 116:8
print 88:24
prior 12:17
22:22,23 23:5
23:14 33:23
36:20,23 37:8
37:11,14 45:2
45:7,9,15 46:5
47:14,23 48:10
90:1 100:12
101:17,17,18
101:18 105:11
106:16 119:7
privilege 43:15
86:23
privileged
86:12
privity 101:21
privy 40:9 60:8
127:23 128:10
proactive 68:15
68:17,18,20,23
probably 15:2
15:8 18:21

26:1 35:11
38:20 39:19
41:20,21 51:20
52:10 57:3
61:17 70:16
78:21 81:14,16
90:19 112:5
probate 52:14
problem 33:2
69:19 95:6
problematic
78:3 97:24
problems 22:16
70:2 116:9
132:1
procedure 1:16
procedures
35:1
proceed 51:1
124:2
proceeding
116:16
proceedings
138:16
proceeds 94:8
94:10
process 12:6,7
21:9 71:5 74:9
75:4 91:12,13
108:1,6 134:17
processed 92:4
prohibited
67:15
prohibition
62:24 63:1

prohibits 62:20
projects 79:1
79:23
promulgated
128:4
proof 39:6
properties 81:9
property 4:23
5:2,4 12:15
13:3,9,14
14:23 16:21
18:16,18 22:12
22:14 30:10
31:1 33:14
34:10 37:1
42:3 45:11,16
45:18,23 46:3
47:16 53:11,12
53:14 62:3
63:3,22 64:11
65:14 66:9,15
71:23 79:6
82:14 83:6,8
83:17 94:3,4
102:4 103:17
106:18 109:5
111:5 113:3,4
113:9,13 118:2
118:5,7,8,15,17
119:6 131:6,19
137:9
property's
103:13
proposal
127:11

propose 99:22
proposed 73:2
proration
103:8 108:5
prorations
104:10
prospective
53:17,18 64:22
65:3 77:24
protocol 31:19
provide 7:21
21:2 25:23
27:23 47:10
86:18 133:9
provided 25:5
49:14,15 75:14
83:5 85:17
87:21 89:4,21
89:22 103:15
106:13 113:7
providing
27:10
provision 94:8
99:17
prudent 85:7
pull 17:2 23:20
26:4 43:22
92:24 97:17
123:12 128:17
130:1 131:12
pulled 17:7
purchase 5:6
26:14 51:24
54:15 60:1,2,9
66:24 71:15,16

71:22 73:16
75:12,14,15
76:16,19 77:2
87:8 89:8
96:22 133:19
133:21,22
135:19
purchased
106:19
purchaser 72:2
77:19
purchasing
70:20,20 113:4
purpose 18:9
pursuant 1:15
7:1 82:13 83:7
purview 68:11
push 63:19
105:8
pushed 49:3
107:4
put 43:14 46:8
47:21 58:10
97:15 121:6
puts 77:23
putting 112:10
116:9

**q**

question 7:14
7:15,17,19 8:1
20:22 21:5
26:3 35:18,21
36:2,5,13 38:8
39:21 62:2,2
79:24 80:6

86:3 87:3
104:14 108:20
108:22 110:10
111:8,8 120:3
120:3,4 121:1
137:1,2
questioning
42:3 124:11
questions 8:3
20:18 21:14
22:15,17 37:1
45:19 47:7,18
47:21 48:24
49:4 50:23,24
51:2,3,4 55:7
66:5,18 74:12
77:18 78:19,23
100:6 107:7
108:11 120:18
120:19 129:24
130:5,19
132:20,22
137:10,12,13
quick 104:13
quiet 87:10
quite 70:3
quote 84:13,19
84:22 103:7,11
103:15

**r**

r 90:8,8 107:18
rain 115:18
raised 107:8
rapids 2:19

rather 116:14
raydon 65:24
66:2
reach 29:2 73:4
124:21
reached 13:20
14:19 73:6
129:16
reaching 130:6
read 36:21
49:20 85:6
115:6
reading 108:13
reads 44:16
125:9,21
ready 19:12
87:15,20
real 5:2,4 10:11
10:14,18,24
13:3 14:23
50:6,7,12
51:15,19 52:8
52:9 53:12
59:22 63:6,7
63:13,15,16,22
64:11,13 65:13
67:6 71:16
81:12 83:6,8
83:17 94:3,4
98:15 105:1,21
106:3 110:11
110:15 111:6,9
111:12 118:2,4
118:7,8,15,17
118:23 119:6

120:15 121:13
131:6,18 137:9
**really** 65:15
77:18,23 78:18
80:12 81:15
93:10 95:11
105:14
**realtors** 5:2,4
63:21 64:10
65:13 71:19
116:17
**reason** 31:21
40:7
**reasonable**
73:4
**reasonably**
83:9 132:2
**reasons** 32:1
**recall** 12:5
13:11 14:21
16:6,16 17:15
19:15 22:1
23:2 25:17
27:7 31:4,8
32:24 33:4
35:17 36:19
37:13,19,23
38:2 42:18
43:4 48:6
50:14 66:6
70:4,7,15,17
97:21 98:1
104:19 105:9
129:18 130:9

**receipt** 119:4
**receipts** 52:23
52:24
**receive** 21:6
24:2,20 54:18
57:6
**received** 23:17
24:5 26:10
31:10 35:16
53:21,24 54:14
55:3 64:3
73:16,18 80:17
82:3 88:6 90:5
93:22 116:15
117:19 120:12
121:15 122:7
123:10 126:23
**recipients** 81:6
**recitation**
119:23
**recognize**
16:18 25:7
90:7
**recollection**
61:18 70:12
**recommend**
116:17
**recommends**
117:4
**reconvene**
34:14
**record** 6:6,22
6:24 7:12
31:12,20 32:12
34:14,18 43:14

58:16 88:16,17
98:21 99:4,8
115:1 120:2
122:14 137:18
138:15
**recorded** 32:7
32:12 33:24
34:1 50:8
**records** 128:15
**red** 17:12 48:16
**reduced** 138:14
**referenced** 45:7
47:23
**referencing**
23:4 25:10
47:14
**referral** 15:2
**referring** 46:10
**reflect** 6:24
90:2 131:23
**reflecting**
110:3
**reflects** 135:14
**refrain** 44:8,18
**refrained** 44:23
44:24
**refuse** 97:17
**regard** 67:10
85:13 86:24
133:11
**regarding**
103:13,16
**regardless**
116:6

**regards** 20:17
27:19
**register** 104:13
**regs** 77:12
**regulations**
103:16
**reject** 101:10
**relate** 132:16
**relates** 132:3
132:15
**relating** 66:24
**relation** 66:21
**relationship**
21:12,13
105:18 109:19
110:3
**relative** 138:20
138:22
**relayed** 85:24
**relo** 11:19,20
12:16,18,18
22:13 30:7
31:12,19 32:13
33:24 37:4
39:12 40:1,3
40:11,15,17
45:20 48:23
83:5 104:23
109:5
**relocation** 1:7
2:15 11:1,4,14
12:3,7,14,24
13:1,5 20:21
21:3,6 23:9
27:12,18 28:12

29:23 31:24
33:22 34:23
35:3,14,15,22
36:9,16 38:11
38:15 39:13
40:3 43:8
45:12 46:8
50:7,9,10 56:8
56:9,10,17,18
57:20 58:19
59:11,11,14
60:1,2,6,7
64:20 94:16
95:2,20 105:16
111:20 112:12
133:11
**remember** 9:18
11:13 15:3
18:19 29:16
117:9 123:4
**reminder**
107:13
**remote** 2:1
**remotely** 6:2
93:14
**removed** 48:24
**rental** 103:14
**renting** 103:16
**rep** 12:23
**repaired** 96:3,4
**repairs** 27:20
83:12 127:9
**rephrase** 15:5
**replaced** 98:23

**report** 4:14 5:3
5:5 16:24 17:3
17:6,13,14
18:17 63:22
64:11 65:14
66:6,16 112:13
114:18 116:24
117:3,4 118:2
118:5,7,9
128:2,2 129:4
129:10,20
130:10,14
**reported** 3:23
138:13
**reporter** 1:15
5:16 6:1,3 7:19
44:2 54:11
94:1 102:10,11
138:3,6
**reports** 114:19
117:20 118:1
120:13 128:12
**represent**
10:15 32:15
51:10 89:2
110:21 124:7
**representation**
25:23 26:2
44:16 47:6
53:23 63:4
71:4 100:8
**representations**
18:15 30:7
45:13 46:11,13
105:8,14

**representative**
27:12,15 28:12
93:4
**represented**
14:24 32:22
63:5,8 99:7
120:9
**representing**
48:23 49:6
105:2,5 106:3
120:21
**represents**
11:19,20
**request** 116:19
124:14
**requested** 49:4
**requests** 18:14
27:19 55:10
66:12,16 82:15
129:24 130:4
**require** 80:5
**required** 49:3
74:17 82:13
**requirement**
77:17
**requirements**
99:2
**reserves** 78:24
79:19,23
**reside** 22:14
**resided** 30:10
**residential** 5:2
5:4 10:11,14
10:18,24 11:14
13:3 18:17

52:8 53:12
63:22 64:11
65:13 83:6,8
83:17 105:1
118:2,4,6,8,15
118:17 119:6
131:6,18 137:8
**resolve** 60:24
61:14 116:14
**resolved** 83:20
83:23 116:5
126:7,14
128:14 129:6
**respect** 57:11
67:6 79:18
103:12 132:20
**respective**
74:18
**respond** 19:10
21:9 112:6,13
**responded**
50:11
**response** 16:4
20:14 21:5,7
21:24 22:10
25:5,16 28:22
28:24 29:4
47:17 49:21
60:22 103:6,15
107:7 112:5
**responses** 4:19
25:12 37:4
105:14 109:4
116:15

**responsibility**
22:3
**restoration**
129:11
**restrictions**
103:14
**restroom** 88:12
**result** 76:22
**retain** 12:15
117:4
**return** 25:2
73:8
**reveal** 72:6
**revealed** 96:22
**review** 13:9,22
14:3,3,4,11,12
16:9 17:14
20:13 22:5
29:1,3 30:8
41:22 42:4
45:6 46:5
47:21 53:1
54:13 55:2,9
66:15,17 72:22
73:22 76:23
78:20 90:13
91:8 93:2
100:2 103:23
110:16 122:3
122:18 124:20
126:12 129:19
135:6 136:9
137:10
**reviewed** 17:19
19:13,17 20:16

22:2 28:20
77:5 82:9
91:10 92:20
103:6 132:22
133:20
**reviewing**
25:19 136:5
**reviews** 90:24
**rhoades** 2:18
**rhoadesmcke...**
2:21
**ride** 66:22
**ridge** 8:12,13
8:14
**right** 8:6 9:8,22
9:23,24 10:9
13:18 18:7
21:22 22:10,18
22:21 23:10
26:15 29:22,24
30:21 31:10,24
32:7 33:1
34:13 36:12
37:22 38:21
39:4 41:1,19
43:17 44:15
45:23 46:4,20
47:2,12,24
48:3,5,13
49:13,18 50:1
50:22 51:6
52:1,7 53:14
54:2,4,8,16,20
54:23 55:17,21
56:5,13 57:4

57:17,21 58:21
59:2,16,20
60:12 61:11
62:14,24 63:11
63:13,21,21
64:1,8,17 65:6
67:24 71:2,14
72:3,9,10,11,12
73:21,23,24
74:5 75:11,19
77:1,5 78:5
79:20 81:24
82:5,7 83:11
84:2,6,7 85:3
86:2 87:3,19
88:8,13 89:18
90:17 92:4,6
92:21 93:9
94:18 95:23
96:5 97:21
99:14 101:22
102:5 103:1
109:3 112:7,15
113:5,11,14,18
113:19,21
114:8 120:17
121:17 122:8
122:19 123:2
123:11 124:1
125:6,19
128:18 129:4
129:15 131:17
131:22 133:2,6
133:6,23
135:21 137:7

**ring** 11:22
**roof** 70:3
**room** 92:1,2,15
**ross** 3:4,5 6:11
124:5,7
**roughly** 56:14
58:1
**rule** 120:23,24
121:11
**rules** 1:15 7:4
7:12 77:11
103:16

**s**

**s** 4:11 52:22
81:1 107:18
**sale** 26:14
31:15 54:15
57:8 71:16,20
76:16,19 91:5
94:10 107:24
108:2,5,6
**sales** 31:17
**sarah** 11:23
17:18,22 18:10
18:20 20:17
25:12 26:5
27:3 31:2
42:19 45:8
48:22 74:6,23
102:17 104:6
105:2,4 113:20
132:21
**satisfy** 99:1
**satisfying**
87:16,16

**[saved - selling]**

**saved** 73:20
  80:20 86:14
  88:7 128:18
**saw** 52:4
**saying** 21:1
  34:6 62:24
  88:4 94:12
  112:9 113:16
  128:9 135:7
**says** 34:7 44:5
  60:17,23 83:15
  91:9 92:22
  98:19 103:4,10
  114:4,4,8
  115:16 119:4,8
  131:8,14
**scenes** 41:11
**scheduled** 7:2
  97:20
**school** 8:20 9:8
  9:22 10:1
**scope** 84:13
  96:13 117:1
  127:8
**scratched**
  98:19,22
**screeching**
  15:21
**screen** 34:20
  88:9 94:20
  98:7,12 112:4
**scroll** 60:16
  122:5
**se** 132:11

**seal** 61:14 84:8
**sealant** 115:22
  115:24 125:22
  125:24 127:11
  127:12
**sealed** 60:24
  70:23 84:9
**sealing** 68:21
  68:24 69:2,14
  82:22 84:4,15
  96:7
**second** 17:16
  18:23 36:1,2
  50:10 54:24
  56:18 94:23
  98:11 103:3
  114:5 115:21
  122:11 125:22
**secondary**
  116:4 126:7
**seconds** 88:10
**secret** 72:11
  132:22
**section** 60:17
  82:13 94:9
  130:1
**security** 94:7
**see** 12:17,17
  16:23 17:6,12
  19:20 21:11,13
  21:21 22:10
  24:22 25:15,21
  26:13 37:8
  38:17 39:1,3
  40:19 42:1,22

  42:22 43:19
  44:5,12,13,15
  47:18 50:4
  52:23 54:5
  57:1,9,11
  60:12,18 61:1
  64:3,22 65:15
  65:18 74:5
  76:3 86:14,16
  87:24 88:4,5,6
  88:7 90:5
  93:21 94:14
  98:17 99:20
  102:19,21,22
  108:12 114:3,5
  119:13 121:23
  125:2,13 126:1
  126:10,15
  127:15 129:3
  129:10
**seeing** 58:13
**seem** 11:10
**seems** 107:22
  119:10
**seen** 18:4 20:11
  21:19 23:21
  26:8 29:9 50:2
  95:5 103:1,2
  107:8 108:24
  110:15,18
  117:15 120:20
**self** 78:24 79:8
**sell** 81:22 111:5
  116:7

**seller** 12:15
  20:5,6 30:23
  33:12,13 34:7
  34:8,9 49:7
  53:17 56:11
  59:20 64:23
  72:2 73:19
  76:6 89:10
  93:6,9,19,23
  94:6 96:24
  100:6 111:14
  112:23 113:3,8
  113:9,16 114:5
  117:11,12
  120:21 125:17
  130:15 132:1
**seller's** 53:11
  53:14 82:21
  83:4,15 91:4
  93:7 105:23
  114:4
**sellers** 4:23
  10:16 48:23
  49:6 53:16
  55:24 57:9
  59:19 60:15
  62:3 63:16
  73:1,2 93:11
  94:9 96:23
  110:21 119:3
  120:10 124:16
  132:7
**selling** 33:15
  113:3 116:8

**send** 19:24
25:19 26:20
28:24 38:5
73:1,3 86:6,8
86:19 90:23
100:5 119:3
**sending** 82:4
88:2
**sensitivity**
108:2
**sent** 18:10
25:11 26:5,24
28:22 81:4
88:1 107:6
**sentence**
125:21
**sentences** 125:9
**separate** 86:3
95:2,11 135:18
**service** 12:24
13:1
**services** 1:7
2:15 64:20
**set** 92:21
123:10 139:2
**setting** 133:11
**settled** 45:13
**settlement** 5:9
30:22 53:7
88:6,23 90:19
90:21 93:13
112:16,22
**seven** 51:14
74:1

**sgariglia** 1:4
2:6 14:13,16
42:24 43:18
44:6 49:14
113:24
**shapiro** 11:18
**share** 16:15
58:8 70:19
86:20 88:9
90:11 98:12
122:10
**shared** 34:20
**she'll** 7:20
92:23
**shield** 105:17
**shielding** 109:4
**shoes** 112:11
**short** 88:17
**shorthand** 1:15
138:3,5
**shortly** 10:1
17:11
**shoulders** 7:23
**show** 24:8,9
29:6 43:20
72:6 82:2 93:6
93:10 107:11
124:24
**showing** 38:17
44:11 94:20
113:2
**shown** 114:17
136:6
**shows** 24:4
82:3

**shrugging** 7:22
**sic** 74:6
**side** 53:19 73:2
73:3 81:21,21
81:22 106:3
114:4 133:3
135:20,21
**sides** 81:19
127:13
**sign** 64:22
90:21 92:11
93:11,12 108:1
**signature** 27:2
64:13 72:13,14
73:12 79:11
139:9
**signatures**
55:20
**signed** 18:6
19:17 21:21
23:12 25:15
30:22 32:19
53:17 55:24
64:12 65:2,4
65:15,17 66:4
75:15 76:6,9
76:14,20 79:15
92:10,20 93:17
94:15,16 104:4
113:20 119:12
**significant**
69:19
**signing** 16:4
26:23

**signs** 73:19
75:20
**similar** 116:21
**simply** 101:23
**simultaneous**
31:20
**single** 15:19
78:21
**sir** 134:7
**sit** 128:21
**sits** 53:3
**sitting** 40:6
91:2
**situation** 28:9
30:5 36:15,18
36:19 40:21
49:9 56:8
58:22,24 59:18
59:23 60:14
79:19 82:20
84:2 129:21
132:24
**situations** 23:4
38:14 40:2
71:7
**six** 51:17
**sixth** 69:23
**sloppy** 81:16
**small** 120:16
**smaller** 98:17
**sneaky** 109:3,3
**social** 94:7
**solicited** 18:16
**solutions** 12:3

[somebody - summarizing] Page 32

**somebody**
   105:10 134:11
**soon** 91:1
**sorry** 9:12 14:3
   19:9 20:12
   25:2 33:1,6,17
   39:3,9 43:13
   58:14 59:6
   65:12 67:18
   74:10 79:9
   98:8 104:12
   116:7 117:2,12
   118:3 123:8
   133:16 136:2
**sort** 52:22
   85:12 107:23
**sorts** 30:24
   62:14
**sounds** 137:15
**south** 91:24
**southwest**
   115:17
**span** 11:5
**speak** 14:5,9,13
   97:6
**special** 78:1
   79:3 80:5
**specific** 55:7
   61:18 63:18
   79:1,23 81:23
   82:14 89:21
   129:24 132:3
**specifically**
   13:14 14:18
   48:11 73:15

82:21 87:21
   106:12
**specified**
   138:19
**specify** 56:15
**speculating**
   34:2
**speculation**
   101:1 108:19
   109:11 110:24
   118:12 119:22
   128:24
**spell** 90:8
**split** 67:8,14,19
   68:1,8,13,14,21
   68:24 69:4,12
   69:21 70:14,22
   84:16 85:5,8
   93:3
**spoke** 14:7,8
   39:5
**spoken** 14:17
**spot** 20:19
   69:13 84:14,14
**spreadsheet**
   112:18,21
**stage** 92:3
**stalemated**
   108:6
**stamp** 102:15
**stamped**
   107:14 115:8
**standard** 20:1
   55:6,9 62:23

**stands** 94:5
**start** 8:3 17:23
   19:3 104:1
**started** 8:5 9:6
   10:4,5,8,20
   15:3
**state** 6:21 8:21
   8:23 54:21
   58:23 74:10
   136:14 138:6
**stated** 22:7
   28:11 30:12
   32:2 33:16,18
   38:4 105:7
**statement** 4:23
   5:7,9 28:8
   30:22 44:10,20
   50:17 53:7,11
   53:15,22 57:13
   57:14,16 62:4
   77:13 78:23
   85:20 88:7,21
   88:23 90:19,21
   93:13,16 94:15
   101:14,16
   112:16,19,22
**statements**
   25:22 53:5
   91:6 100:3
**states** 1:1,16
   25:22
**stating** 6:5 50:5
   52:3 103:11
**statutory** 77:17

**stayed** 10:13
**stenographic...**
   138:13
**step** 16:11
   34:22 81:10
**stick** 111:11
**sticks** 11:18
**stipulate** 6:3
**stop** 122:10
**stopped** 10:12
**street** 2:8 3:2
   13:10,16
   108:20,22
**stress** 68:16
**stretch** 74:20
**stretched** 74:24
**strike** 36:6 62:2
   101:8 111:7
**structural**
   60:17
**structure** 60:22
**structured**
   15:17
**stuff** 86:12
**subsequent**
   31:13
**sugarcoat**
   128:8
**suggestion**
   121:5
**suite** 2:3,9,19
   3:3
**sum** 136:1
**summarizing**
   48:15

[summary - thomas]

**summary** 95:23
**super** 78:3
**suppose** 45:17
  76:13
**sure** 6:23 7:21
  19:9 20:20
  34:16 49:18
  59:7 79:10
  88:14 107:9
  112:20 116:12
  122:21,23
**surprise** 56:21
  104:20
**surprising** 21:4
**suspect** 31:21
**suspender**
  55:11
**swear** 6:3
**swilkin** 107:18
**swilklaw.com.**
  107:19
**sworn** 6:15,18
  138:10

**t**

**t** 4:11 81:1
**table** 57:10
  58:11 90:13
  92:3
**take** 6:2 7:23
  7:24 8:1 12:14
  16:3 17:16,16
  18:23 22:9
  34:12,20,22
  40:13 45:11
  52:19 66:8

71:4 85:14
91:15 102:3
108:3 112:4
113:16 114:22
121:13 132:24
**taken** 1:14 7:1
  7:3 8:7 14:1
  24:23 36:22
  37:11,17,21
  42:4 61:14
  67:11 138:18
**talk** 13:13 27:6
  29:4 34:24
  42:17 45:15
  57:17 63:15
  68:9 130:5
**talking** 29:14
  42:21 67:22,23
  80:12 103:20
  116:17 118:1
**talks** 115:15
**tax** 24:10 53:5
  94:6 103:8
  104:10 108:5
  113:23
**taxes** 24:13
  94:11 113:10
  113:13
**team** 71:6
**tell** 29:2,11
  42:16 47:16
  50:13 52:18
  53:8 62:4 76:5
  77:7 78:14
  85:11 88:22

104:17
**telling** 88:3
**tenants** 24:19
**term** 22:22
**terminate** 73:7
  75:9
**terminates**
  74:21
**terms** 103:7
  134:2
**terry** 107:18
**testified** 6:18
**testify** 138:10
**testimony** 36:3
  39:16 43:6
  56:16 58:3
  136:11 138:16
**text** 27:6
**thank** 43:6,15
  44:3 58:5 65:1
  79:12 98:2
  102:12 103:4
  126:17 135:23
  136:21 137:12
  137:16
**thanks** 51:8
**theoretically**
  83:14
**thereof** 131:20
**thing** 20:24
  31:19 52:3
  67:21,23 70:18
  85:7 95:13
**things** 10:13
  18:24 30:24

56:5 62:14
87:9 92:6,11
128:8
**think** 13:19
  14:20 21:1
  23:1 26:2,2
  27:9 30:10
  36:24 37:1,14
  40:12,17,18
  43:11 44:10,22
  44:24 45:7
  48:9 56:16
  60:8 62:19
  67:19,22 68:4
  68:10 69:18
  70:3,6 74:22
  78:22 79:7
  83:18 88:20
  105:7 106:12
  109:16 114:10
  114:10 115:4
  118:17 119:1
  120:24 121:2,3
  126:20,23
  129:5,22 132:8
  134:22,23
  135:4
**third** 20:21
  27:18 30:7
  45:12 46:7
  115:23 125:23
**thirsty** 114:21
**thomas** 1:13
  4:3 6:16 7:1

**thought** 133:15
134:9
**thoughts** 130:2
**thousands**
10:22,22
**threatening**
108:8
**three** 45:19
68:13 69:3,17
69:20 91:2
129:14
**threshold**
77:18 78:19
**time** 28:13,20
34:13 35:9,12
56:14 57:3
58:4 61:4 73:4
73:9 75:10,15
85:6 89:1 91:9
95:24 97:23
103:5 105:12
108:2 114:22
115:20 124:3
124:17,21
138:19
**timeline** 127:5
**timely** 107:23
**times** 25:21
62:20 66:15
92:8 99:1
**title** 4:18 12:14
12:15 23:16,24
24:1,2,6,7,9,12
24:14,17,21,23
30:14,18,19

31:3,7,9 32:6
32:10 35:2,16
35:23 36:10,17
36:22 37:12,17
37:21 38:8,11
38:15 41:14,15
41:16,19 42:1
42:7 44:7 53:1
57:8,16 59:18
85:21 87:16
88:1,4 90:15
91:5,16,19,20
91:23 93:22
95:15,16,17
97:10 110:22
**today** 13:23
14:6 108:6
**today's** 7:2
**together** 71:7
112:2
**told** 33:18 34:3
34:5 43:1 46:2
**tom** 6:10,23 7:5
7:8 34:22 51:9
54:13 58:8
62:4 67:21
71:5 74:9
79:14 91:13
124:7 130:1
**tom's** 7:7
**ton** 81:12
**tone** 42:5
**top** 11:22 71:23
76:2

**topic** 29:22
**total** 108:4
**totally** 16:19
**tracking** 135:2
**train** 66:22
**tranche** 54:14
**transaction**
12:12 16:7
23:11 30:21
32:11 37:3
48:22 51:23
59:17 81:19
87:21 89:12
91:7 95:21,24
104:24 105:2
111:20 112:12
133:4 134:3,9
135:8
**transactions**
50:6 52:9 72:7
118:24 132:23
135:15,18
**transcript**
138:12
**transfer** 31:16
35:2
**transferred**
30:14,18,19
32:6,10
**transpired** 16:7
**transpires**
104:24
**treated** 48:21
**treatment** 85:8

**tried** 46:17,18
**trigger** 31:15
31:17
**triggers** 119:1
**trudy** 1:14 3:23
138:5 139:10
**true** 50:15
101:22 138:15
**trust** 105:23
**truth** 138:10
**try** 10:10,10
18:15 21:10
42:10 46:22
111:11 124:10
**trying** 40:12
58:10 59:7
70:6 87:6
131:12
**tuckpoint** 84:8
127:10,12
**tuckpointed**
83:16
**tuckpointing**
69:2 80:13
84:14
**turn** 16:17
17:21 20:8
21:15 23:16
29:21 34:11
43:17 49:13
95:22
**two** 12:17
15:18 28:6
29:13 40:18,19
41:7 45:18

50:8,18 53:18
56:15 58:13
59:1,4,9,10
60:15 63:24
65:8 66:2
69:15 72:7
80:4 83:3 92:7
92:7 96:20
114:18 132:23
135:15,18,19
**typewriting**
138:14
**typical** 12:7
18:14 19:23
20:3 21:5
31:19 35:1,18
35:20 36:15,18
38:5 45:20
50:6 55:8 57:2
57:24 69:1
70:24 71:1
90:14
**typically** 10:15
15:24 23:8
25:1 28:23
30:5,8,13
31:23 36:16
38:19 54:17
55:4 56:14,24
57:10,11 67:24
72:21 73:19
77:20 89:24
91:15 92:12
93:6 98:24
105:19,23

106:1 111:5

**u**

**u** 107:18
**u.s.** 94:6
**um** 9:9 19:2
122:12 129:11
**unable** 116:7
**uncovered**
130:13
**under** 13:6
17:10 62:18
71:22 72:13,17
83:10 138:14
**underlying**
12:10
**understand**
7:16 22:13
59:23 72:17
73:9,11,15
86:2 111:10
122:6 123:9
**understanding**
23:10 27:11
30:13 59:8
100:21 106:22
111:6 112:12
125:15 126:13
127:17 134:10
**understood**
51:21 70:11
82:19 124:17
130:24 132:14
135:13,14
**undertake**
77:22

**unfamiliar**
77:16
**unh** 7:22
**unhs** 7:22
**unique** 71:19
**unit** 13:16
51:24 60:23,24
61:10,15 62:5
62:12 69:22,23
70:1,12,13,21
71:23 78:16
82:22 84:3
96:2 97:11
116:11 117:2
117:13 118:15
125:11,15
128:4 131:2,2
131:4,5,5,11,21
132:4,16
133:22 137:6,7
**united** 1:1,16
**units** 69:6,15
69:20 70:5,8
71:20 116:13
132:17
**unmute** 104:13
**upcoming** 79:1
**updated** 117:20
118:9
**ups** 130:21
**use** 20:5 24:8
88:12 98:14
102:8 131:20
**used** 67:15

**uses** 22:21
**usually** 12:10
12:14,15,16,16
12:24 13:1
16:7,8 21:8
33:14 40:19
90:16,23 92:5
**utilized** 117:1

**v**

**v** 90:8
**vacation** 16:13
**value** 31:18
**values** 53:5
**various** 22:21
**vary** 12:8
**vast** 52:11
**verbal** 108:3
**versus** 58:4
**vesting** 24:8
**videoconfere...**
1:13 6:4
**volume** 15:19
**vs** 1:6

**w**

**w** 2:13
**wacker** 91:18
91:24
**wait** 7:15
**waiting** 19:9
92:8
**waived** 93:21
**walk** 85:21
90:6 108:8
121:2

**walker** 2:8
**walkerwilcox...**
2:11,13
**wall** 115:22
125:23
**want** 15:20
17:15 18:23
22:10 47:14
56:15 58:7,7
58:15 60:16
64:2 71:17
74:20 79:10
86:8 88:20
90:24 117:24
122:6 129:10
130:24
**wanted** 47:11
51:21
**wants** 124:4
**warranties**
25:23
**waste** 124:3
**water** 20:2,18
22:7,17 37:5
49:2 60:21
69:23 82:22
84:3 100:6,13
114:21 115:19
116:4 117:6
118:14 126:6
130:10,13
137:6
**way** 15:17 21:9
30:20 32:24
41:18 48:4

57:18 58:16
59:9,12 71:5
82:20 91:11
92:10 118:7
127:24
**ways** 59:2,4,9
73:7
**we've** 30:10
60:15 72:7
91:10 95:7
**week** 41:8
**weekend** 73:24
**weeks** 41:7
116:2 126:5
**went** 19:18
22:2 26:21
125:5
**west** 13:10,15
60:23 61:10
84:15 115:22
125:23
**whatnot** 89:17
**whatsoever**
71:8
**whereof** 139:2
**whim** 106:13
**wholeheartedly**
47:16
**wife** 8:16 24:19
**wilcox** 2:8
**wilk** 110:4
**wilkensen** 74:6
**wilkins** 11:23
17:18,22 25:12
26:6 31:2

42:19 74:23
102:17,17
104:6,16 105:4
106:23 107:6
107:18 112:11
113:21 124:19
**wilks** 108:15
**window** 69:14
83:16 115:17
131:2 137:6
**windows** 60:23
61:10 70:6
115:23 125:24
**wire** 88:4
**wired** 88:3
**withdraw** 36:4
36:12
**withheld** 86:22
**withhold** 94:10
106:12,13
**withholding**
94:13
**witness** 4:2 6:4
6:14,17 34:16
86:10 87:2
88:10,12 101:2
101:13 106:7,9
107:3 109:23
111:2 114:20
114:23 118:13
120:1,6 122:16
126:18 129:1
134:21 136:13
137:16 138:9,9
139:2

**wondering**
86:11
**wood** 116:2
126:5
**word** 20:5
**wording**
116:21
**words** 59:24
100:19 102:2
**work** 12:6 15:9
59:22 66:23
71:7 80:16
84:14,23 85:21
87:15 96:11,13
96:16 116:4,12
116:13 117:1
117:14 119:12
119:18,20
125:12 126:7
127:8,8,10,14
127:18 134:11
**worked** 11:23
**working** 15:4
107:21 112:2
**workload**
16:12
**works** 41:19
71:6
**world** 88:22
**write** 116:22
**writes** 107:19
**written** 18:12
18:21
**wrong** 70:9

**[x - zoom]**

| **x** |
|---|
| **x**  4:1,11 |
| **x'd**  66:3 |
| **xs**  65:14 |

| **y** |
|---|
| **yahoo.com**  2:5 |
| **yeah**  9:24 |
| 11:16 13:4,13 |
| 13:24 14:24 |
| 15:6,8 17:20 |
| 19:6,6,13 |
| 20:23 21:10 |
| 26:2,4,18 |
| 31:11 32:1,3 |
| 32:21 33:16 |
| 34:5 35:13,24 |
| 38:20 39:20 |
| 40:23 41:18 |
| 46:21 48:1 |
| 52:21 54:6,17 |
| 55:12 67:22 |
| 69:17 70:17,24 |
| 72:20 74:4,16 |
| 75:9,18 76:12 |
| 76:22 77:17 |
| 81:17 82:12,15 |
| 85:19 86:7,11 |
| 87:12 88:23 |
| 89:24 90:9,14 |
| 91:24,24 93:6 |
| 94:2,21 95:9 |
| 95:14 97:12,19 |
| 97:19 106:10 |
| 106:20 109:9 |
| 109:16,24 |

120:7,18
121:23,23
122:5,20
123:19 125:5
126:19 129:2
131:6 135:11
136:20
**year**  8:22 40:13
113:17 121:9
**years**  11:5
13:12,19 14:19
32:22 33:3
70:9 80:5
83:13 96:20
110:12,14
111:10 128:6
**yep**  54:6 65:1
122:16 127:16

| **z** |
|---|
| **zero**  107:20 |
| **zoom**  1:13 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.