# Exhibit 13

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2
3     MELINDA SGARIGLIA,              )
                                      )
4              Plaintiff,             )
                                      )
5         vs.                         )  No. 1:19-cv-05684
                                      )
6     AMERICAN INTERNATIONAL RELOCATION )
      SERVICES, LLC, D.B.A. AIRES, an  )
7     ILLINOIS LIMITED LIABILITY      )
      CORPORATION, NICHOLAS GONRING &  )
8     KELLY GONRING,                  )
                                      )
9              Defendants.            )
10
              The hybrid deposition of MELINDA SGARIGLIA,
11
      called for examination, taken pursuant to the Federal
12
      Rules of Civil Procedure of the United States District
13
      Courts pertaining to the taking of depositions, taken
14
      before KELLY A. BRICHETTO, CSR No. 84-3252, Certified
15
      Shorthand Reporter, of the State of Illinois, taken at
16
      Suite 3200, One North Franklin, Chicago, Illinois, on the
17
      13th day of February, 2023, at 10 a.m.
18
19
20
21
22
23
24    Job No. CS5706285

```
                                                    Page 2

 1      APPEARANCES:
 2
                On behalf of the Plaintiff:
 3
                        OSHANA LAW, by
 4                      MS. CAROL OSHANA
                        20 North Clark
 5                      Suite 3000
                        Chicago, Illinois  60602
 6                      (312) 404-8390
                        oshanalaw@yahoo.com
 7
 8              On behalf of the Defendant American
                International Relocation:
 9
                        WALKER WILCOX MATOUSEK, LLP, by
10                      MR. KEVIN KOJS
                        One North Franklin Street
11                      Suite 3200
                        Chicago, Illinois  60606
12                      (312) 244-6700
                        kkojs@walkerwilcox.com
13
14              On behalf of the Third-Party Defendant John
                Gorr and the Condo Association:
15
                        LOFTUS & EISENBERG, by
16                      MR. ROSS GOOD
                        161 North Clark Street
17                      Suite 1600
                        Chicago, Illinois  60601
18                      (312) 899-6625
                        ross@loftusandeisenberg.com
19
                On behalf of the Defendants Nicholas Gonring
20              and Kelly Gonring:
21                      PATZIK, FRANK & SAMOTNY, LTD., by
                        MR. JORDAN FINFER
22                      200 South Wacker Drive
                        Suite 2700
23                      Chicago, Illinois  60606
                        (312) 205-4462
24                      jfinfer@pfs-law.com
```

Page 3

1                    RHOADES McKee, PC, by
                     MR. PAUL McCARTHY
2                    55 Campau Avenue NW
                     Suite 300
3                    Grand Rapids, Michigan  49503
                     (616) 235-3500
4

5
                          - - - - - - - -
6

     ALSO PRESENT:
7

     ANDREW WATTS
8

     Kelsey Gonring (Via Zoom)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

TRANSCRIPT INDEX

APPEARANCES . . . . . . . . . . . . . . . . . . . . . 2

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . 4

EXAMINATION OF MELINDA SGARIGLIA

BY MR. KOJS . . . . . . . . . . . . . . . . . . . . . 6

BY MR. GOOD . . . . . . . . . . . . . . . . . . . . 81

BY MR. FINFER . . . . . . . . . . . . . . . . . . . 86

BY MR. KOJS . . . . . . . . . . . . . . . . . . . . 168

BY MR. GOOD . . . . . . . . . . . . . . . . . . . . 174

REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 181

EXHIBIT CUSTODY

COURT REPORTER RETAINED PLAINTIFF'S EXHIBITS 1-8

ATTORNEY RETAINED PLAINTIFF'S EXHIBIT 9

ATTORNEY RETAINED ALL GONRING MARKED EXHIBITS

Page 5

1                      INDEX OF EXHIBITS
2      NUMBER                DESCRIPTION            IDENTIFIED
3      Exhibit No. 1     Condominium Real Estate Purchase and
                         Sale Contract             46
4
       Exhibit No. 2     Addendum to the Purchase and Sale
5                        Agreement                 49
6      Exhibit No. 3     Seller's Property Disclosure
                         Statement                 35
7
       Exhibit No. 4     Residential Real Property Disclosure
8                        Report                    58
9      Exhibit No. 5     6-14-18 letter Thomas Hawbecker
                         to Sarah Wilkins          60
10
       Exhibit No. 6     Attorney Modifications Response
11                       Letter                    61
12     Exhibit No. 7     Attorney Modification Second
                         Response Letter           64
13
       Exhibit No. 8     Plaintiff's Answers to Aires
14                       First Interrogatories     66
15     Exhibit No. 9     Excel spreadsheet         68
16     Gonring No. 1     Aires Disclosure          93
       Gonring No. 2     Letter of 5-7-18          92
17     Gonring No. 3     9-10-18 meeting minutes   100
       Gonring No. 4     Gonring 2044-2045         106
18     Gonring No. 5     Plaintiff's Bates stamp 645  109
       Gonring No. 6     Purchase order for the mold
19                       work                      121
       Gonring No. 7     Association's 22.1
20                       Disclosure                123
21     Gonring No. 8     ESI Report                148
22     Gonring No. 9     BRAL Report               153
23
24

Page 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                              Page 7
 1                      (Witness sworn.)
 2    WHEREUPON:
 3                      MELINDA YOUNG,
 4    called as a witness herein, having been first duly sworn,
 5    was examined and testified as follows:
 6                      DIRECT EXAMINATION
 7    BY MR. KOJS:
 8         Q.    Can you please state your first and last name
 9    for the record and spell it, please.
10         A.    Melinda Young, Y-O-U-N-G.
11         Q.    Do you mind if I call you Melinda throughout
12    this?
13         A.    I don't mind.
14         Q.    Thank you.  Have you ever given a deposition
15    before?
16         A.    No.
17         Q.    All right.  So I'm sure your attorney went
18    through some of the ground rules before, but obviously
19    I'll be asking questions today.  If you don't mind, just
20    let me finish my question and then you answer.  I'll let
21    you answer before I start my next question.
22         A.    Who are you?
23         Q.    Kevin.
24         A.    And you are?
```

Page 8

1      Q.     I represent American International Relocation

2   Services.

3              As you see, we have members on Zoom as well.

4   They might have some questions at the end or later on.

5   Then obviously we have a court reporter here, so just

6   make sure your answers are out loud.  Sometimes when you

7   say yes or no you might shake your head up and down.

8   It's hard for her to get that, so if you wouldn't mind

9   just saying it verbally.

10             If you need a break at any time, we could

11  take a five-minute break, ten-minute break to use the

12  restroom.  Just make sure if I have a question pending

13  you answer before we take a break.  Okay?

14     A.     Yeah.  I need a break from 1:55 until 3

15  o'clock.

16     Q.     Okay.

17             MS. OSHANA:  I sent you that e-mail.

18             MR. KOJS:  Yeah.

19  BY MR. KOJS:

20     Q.     I'm going to go through some background stuff

21  with you and then we'll get to the meat of the case.

22             What is your date of birth?

23     A.     6-13-75.

24     Q.     Are you married?

Page 9

1          A.    No.

2          Q.    Do you have any children?

3          A.    Yes.

4          Q.    How many children do you have?

5          A.    Three.

6          Q.    And where do you currently live?

7          A.    2726 West Cortez, Unit 1.

8          Q.    How long have you lived there?

9          A.    Since 2018.

10         Q.    What's your highest level of education?

11         A.    MBA.

12         Q.    Where did you get your MBA at?

13         A.    Chicago Booth.

14         Q.    Did you get your undergraduate degree there

15    too?

16         A.    No.

17         Q.    Where did you get your undergraduate degree?

18         A.    Northwestern.

19         Q.    What was it in?

20         A.    English international studies.

21         Q.    When did you graduate undergrad?

22         A.    1997.

23         Q.    When did you get your MBA?

24         A.    2003.

Page 10

1    Q.    Do you have any other education?

2    A.    No.

3    Q.    Are you currently employed?

4    A.    No.

5    Q.    When were you last employed?

6    A.    November.

7    Q.    Of 2022?

8    A.    Yes.

9    Q.    What was your job?

10   A.    Program manager.

11   Q.    Who did you -- who was your employer?

12   A.    Meta.

13   Q.    How long were you employed there?

14   A.    Year and three months.

15   Q.    And why did you end up leaving there?

16   A.    I was laid off.

17   Q.    How about before Meta, where were you

18   employed?

19   A.    I was unemployed before Meta.

20   Q.    When were you last employed before Meta?

21   A.    2020.

22   Q.    Where were you employed then?

23   A.    Nuveen.

24   Q.    What was your job title there?

```
                                                        Page 11
    1           A.    Program manager.

    2           Q.    How long were you employed there for?

    3           A.    Since 2016.

    4           Q.    All right.  So we're here today to talk about

    5      the purchase of the condo at 2726 West Cortez Street,

    6      Unit 1, Chicago, 60622.  That's the correct address;

    7      right?

    8           A.    Yes.

    9           Q.    So prior to buying that condo when -- do you

   10      recall when you first started looking at condos or houses

   11      or anything?

   12           A.    I'd been looking for about a year.

   13           Q.    Okay.  What was your prior address?

   14           A.    1012 North California.

   15           Q.    How long did you live there for?

   16           A.    Three years.

   17           Q.    Did you own that?

   18           A.    No.

   19           Q.    Prior to owning the unit on Cortez Street did

   20      you own any other property?

   21           A.    Yes.

   22           Q.    When was the last time you owned a property?

   23           A.    2015.

   24           Q.    Was that a house, condo?
```

                                                    Page 12

1           A.    A house.

2           Q.    Where was that located?

3           A.    In Logan Square.

4           Q.    How long did you live there for?

5           A.    Since 2008.

6           Q.    And then prior to that did you own any other

7     properties?

8           A.    Yes.

9           Q.    Where did you own a property at prior to

10    that?

11          A.    Logan Square.

12          Q.    And how long did you live at that property

13    for?

14          A.    Three years.

15          Q.    And then prior to that --

16                MR. McCARTHY:  I'm not hearing some of the

17    answers.  I don't know -- if the witness could speak up.

18    I don't know if other people on Zoom -- sometimes there's

19    just no answer coming through.

20                MR. GOOD:  I am having a problem too.  When

21    she says yes, I hear it.  When she says other things, the

22    first word I don't always hear.

23                MS. OSHANA:  Could you speak up?

24

1    BY MR. KOJS:

2         Q.    So prior to the one we just talked about did

3    you own any other properties?

4         A.    Yes.

5         Q.    And then what years were those?

6         A.    2001 to 2003.

7         Q.    Where was that property located?

8         A.    River North.

9         Q.    How about prior to 2001?

10        A.    No.

11        Q.    All right.  So before buying the property at

12   Cortez you owned three different properties?

13        A.    Yes.

14        Q.    Did you own all those by yourself?

15        A.    No.

16        Q.    Can you just go through each one and say who

17   you owned them with?

18        A.    2125 North Albany I owned with my ex-husband.

19   The property before that in Logan Square I owned with my

20   husband, and the property before that I owned by myself.

21        Q.    And then the two you owned with your

22   ex-husband, were you a big part of that process?

23        A.    Yes.

24        Q.    You read through all the documents, met with

```
 1    your real estate attorney, whoever you needed to meet

 2    with?

 3         A.    I worked with a real estate attorney.

 4         Q.    Okay.  Were you there for inspections on

 5    those homes?

 6         A.    Yes, I was there for the inspection.

 7         Q.    Did you have to take out a mortgage on those

 8    two?

 9         A.    Yes.

10         Q.    Were you -- did you have to sign the

11    mortgage?  You signed off on it?

12         A.    I had to sign a mortgage when I bought that

13    property.

14         Q.    Okay.  So would you say you have some

15    familiarity with going through the process of buying a

16    property?

17         A.    I have some familiarity as a buyer.

18         Q.    And then when did you first visit the Cortez

19    property prior to buying it?

20         A.    In 2018.

21         Q.    Do you know which month?

22         A.    I don't recall.

23         Q.    Obviously sometime prior to July?

24         A.    Yes.
```

Page 15

1          Q.    How many times did you visit the property

2     before you bought it?

3          A.    Once.

4          Q.    And when you visited, was it by yourself,

5     real estate agent, anybody else?

6          A.    With my real estate agent.

7          Q.    What's the name of your real estate agent?

8          A.    I don't recall her name right now.

9          Q.    Had you used her for those prior three

10    properties?

11         A.    No.

12         Q.    How did you find this real estate agent?

13         A.    She was referred to me.

14         Q.    By who?

15         A.    A friend.

16         Q.    Do you know what agency she worked at, the

17    real estate agent?

18         A.    @properties.

19         Q.    Would you be able to find out the name at

20    some point after the deposition maybe?

21         A.    Yes.

22         Q.    Do you know how long she had been a real

23    estate agent?

24         A.    No.

```
                                              Page 16

 1          Q.    Do you know the approximate age of the real

 2    estate agent?

 3          A.    No.

 4          Q.    Would you say she's over 40, under 40?

 5          A.    I don't know.

 6          Q.    Did it seem like she had a lot of experience

 7    in the real estate industry?

 8          A.    I don't know.

 9          Q.    Did you feel comfortable with her?

10          A.    Yes.

11          Q.    Did you look at any other properties while

12    you were looking to buy this one?

13          A.    Yes.

14          Q.    How many properties do you think you looked

15    at?

16          A.    Maybe five, six.

17          Q.    And then when you visited the Cortez

18    property, was it currently occupied?

19          A.    Yes.

20          Q.    Were the owners there when you took a visit

21    there?

22          A.    No.

23          Q.    Then when did you first decide to put an

24    offer in?
```

```
                                              Page 17

1          A.    May.

2          Q.    Of 2018?

3          A.    Yes.

4          Q.    Then who conveyed the offer?

5          A.    I don't understand your question.

6          Q.    I mean who let them know or who let the prior

7    owners know that you were putting an offer in, was it

8    your real estate agent?

9          A.    Yes.

10         Q.    Do you know how she communicated the offer to

11   them?

12         A.    No.

13         Q.    Did she ever tell you the names of the owners

14   there at the time?

15         A.    No.

16         Q.    Then after you put your offer in was there

17   any sort of negotiations?

18         A.    Yes.

19         Q.    Do you know what your initial offer was?

20         A.    I don't recall.

21         Q.    Approximately how long were the negotiations,

22   a couple weeks, a month?

23         A.    Maybe a month.

24         Q.    And then do you know -- after you agreed on a
```

```
                                                    Page 18
 1    price, do you know when the inspection was done?
 2           A.    I don't recall how long before or after the
 3    inspection was done.
 4           Q.    Do you know who performed the inspection?
 5           A.    Yes.
 6           Q.    Who was it?
 7           A.    Windy City Inspection.
 8           Q.    Do you know the actual inspector that came
 9    out?
10           A.    His name's in the paperwork.
11           Q.    You don't know off the top of your head right
12    now?
13           A.    No.
14           Q.    Was that somebody that you reached out to or
15    your real estate agent found them for you?
16           A.    My real estate agent referred them.
17           Q.    Had you ever used Windy City Inspectors on
18    your prior houses?
19           A.    No.
20           Q.    Were you there for the inspection?
21           A.    Yes.
22           Q.    Was anybody else there?
23           A.    My real estate agent.
24           Q.    So you, the real estate agent and the
```

```
                                              Page 19
 1    inspector?
 2          A.    Yeah, and I think the real estate agent for
 3    the seller was there as well.
 4          Q.    Do you know the name of the real estate agent
 5    for the seller?
 6          A.    No.
 7          Q.    Was it a male, female?
 8          A.    A male.
 9          Q.    Did he ever tell you who the owners of the
10    house were?
11          A.    No.
12          Q.    Then how long was the inspection for?
13          A.    I don't recall.
14          Q.    Were you following the inspector around while
15    he was doing it or did you stay in one room?
16          A.    I don't recall.
17          Q.    Do you know if you asked any questions during
18    the inspection?
19          A.    I did.
20          Q.    What sort of questions did you ask?
21          A.    There was a light that was not functioning.
22    The rear slider wasn't functioning.
23          Q.    Did you bring that up to him or did he let
24    you know?
```

Page 20

```
 1          A.    We both discussed it.  I don't know who
 2    brought what up to who.
 3          Q.    Besides those two things was there anything
 4    else that was brought up?
 5          A.    I don't recall.
 6          Q.    Did you ever look over the inspection report
 7    that he completed?
 8          A.    Yes.
 9          Q.    Did you have any questions about it?
10          A.    Yes.
11          Q.    What sort of questions did you have?
12          A.    He had some recommendations, so I asked him
13    about the recommendations.  I asked him specifically
14    about a couple of the issues that I noticed myself.
15          Q.    And those issues were the light and you said
16    rear slider?
17          A.    Um-hum.  Yes.
18          Q.    Was there anything else?
19          A.    I don't recall.
20          Q.    What sort of recommendations did he have?
21          A.    I don't recall him having recommendations.
22          Q.    Was there anything he thought was concerning?
23          A.    There was some information on a page about
24    things that he found during the inspection.
```

Page 21

1          Q.     Anything you remember?

2          A.     I'd have to look at the document.

3          Q.     Okay.  Did he ever discuss any sort of water

4     damage or water issues or find anything?

5          A.     There was water damage in the exterior of the

6     basement entrance to the building.

7          Q.     And was that part of your unit or was that

8     part of the condo as a whole?

9          A.     It was the condo.

10          Q.     How many units were there?

11          MS. OSHANA:  Just so -- when you say "condo,"

12     you're saying the Condo Association?

13          MR. KOJS:  Yeah.

14          MS. OSHANA:  You're saying -- you're not

15     talking about the unit itself?

16          MR. KOJS:  Yeah.

17          MS. OSHANA:  Okay.

18     BY THE WITNESS:

19          A.     Can you repeat the question, please.

20     BY MR. KOJS:

21          Q.     Yeah.  How many units were in the Condo

22     Association?

23          A.     Three.

24          Q.     Did the inspector inspect anything else

```
                                                    Page 22

 1      besides your unit?

 2            A.    We walked around the building.

 3            Q.    Did he notice anything else besides the, you

 4      said the water damage in the basement area, the door?

 5            A.    As I said before, I'd have to look at the

 6      document.

 7            Q.    So you just remember the -- was it the

 8      entrance to the basement?

 9            A.    Yes.

10            Q.    What sort of water damage did he see?

11            A.    The molding was black and it had expanded.

12            Q.    Did he say how that occurred or what his --

13            A.    I don't recall.

14            Q.    Did you ever bring that up with the prior

15      owners or anybody that lived in the other units?

16            A.    I don't recall.

17            Q.    How close is that area to your unit?

18            A.    Three feet.

19            Q.    Where was it located, like the back of your

20      unit?

21            A.    There's a door from the exterior basement of

22      my unit three feet and then the door to the exterior of

23      the building.

24            Q.    Did that concern you at all that there was
```

Page 23

1     water damage there and some black mold or maybe not black

2     mold but mold in the area you said?

3              A.    I don't know what it was.

4              Q.    Did that concern you at all though?

5              A.    I had concerns about -- that I spoke with my

6     real estate attorney about.

7              Q.    What did you guys speak about?

8              A.    You'd have to check the e-mails.  It's in the

9     e-mails.

10             Q.    You don't remember off the top of your head?

11             A.    No.

12             Q.    Then I have the official purchase date as

13    July 25th, 2018.  Does that sound accurate?

14             A.    If that's what the documents say, then that's

15    accurate.

16             Q.    Do you know when you would have moved in?

17             A.    Probably a few days later.

18             Q.    Do you know when the prior owners had moved

19    out?

20             A.    I don't know the date they moved out, no.

21             Q.    When did you first start to notice any issues

22    with the unit or the whole building in general?

23             A.    I received an e-mail approximately six weeks

24    after I moved in.

Page 24

1      Q.    Who did you receive an e-mail from?

2      A.    John Gorr.

3      Q.    Who is John Gorr?

4      A.    He was the owner of Unit 3.

5      Q.    Was he the President of the HOA?

6      A.    Yes.

7      Q.    What did the e-mail say?

8      A.    That there had been issues in the building

9   for quite some time, that it was -- he was not sure what

10  the former owners had communicated to me prior to

11  closing, that they were aware of the issues in the

12  building and their unit, that it was an unfortunate way

13  to meet each other.

14     Q.    Is there any reason he randomly sent you an

15  e-mail six weeks after you moved in about this?

16     A.    He failed a mold test as he was trying to

17  sell his unit.

18     Q.    In his unit he failed a mold test?

19     A.    Yes.

20     Q.    And that prompted him to send an e-mail to

21  you?

22     A.    Yes.

23     Q.    Did he send it to Unit 2 as well?

24     A.    Yes.

Page 25

1      Q.    You mentioned he said former owners.  Did he

2    mention who the former owners were?

3      A.    I don't know if he said that in the e-mail,

4    if he said their names.  He said -- I don't know.

5      Q.    Is it your understanding the former owners

6    that actually lived in your unit were Kelsey and Nicholas

7    Gonring?

8      A.    Yes.

9      Q.    So as you sit here now, when John sent that

10   e-mail and said the former owners were aware of this, you

11   would imagine that was Kelsey and Nicholas Gonring?

12     A.    Yes.

13     Q.    Then what did John -- what do you remember

14   John saying in that e-mail?  Was he saying there was

15   issues with the whole building, your unit specifically?

16     A.    As I said before, I recall him saying that

17   there were issues with the building and the unit.

18     Q.    When you say "the unit," you're referring to

19   yours?

20     A.    Yes.

21     Q.    Do you remember if he had said anything

22   specifically about your unit?

23     A.    I don't remember.

24     Q.    Then did you respond to that e-mail?

Page 26

1           A.    Yes.

2           Q.    Do you recall what you said back?

3           A.    That I was shocked.

4           Q.    So that was something -- you had no idea

5    about all these issues to your unit and the building

6    itself?

7           A.    That's correct.

8           Q.    So after responding, you said you were

9    shocked, you know, what kind of happened after that?

10          A.    I asked that the HOA convene a meeting to

11   discuss what was going on.

12          Q.    Did that meeting ever occur?

13          A.    Yes.

14          Q.    Do you know approximately when it occurred?

15          A.    It's in the e-mails.

16          Q.    Do you know if it was shortly after John sent

17   that first e-mail to you?

18          A.    Yes.

19          Q.    Prior to John e-mailing you six weeks after

20   you moved in had you met him before?

21          A.    No.

22          Q.    Had you met the owners of Unit 2?

23          A.    No.

24          Q.    That first HOA meeting you were at, who was

Page 27

1    all there?

2        A.    John Gorr was there, Ryan Brown was there and

3    myself.

4        Q.    You said Ryan Brown?

5        A.    Yes.

6        Q.    Was he the Unit 2 owner?

7        A.    Yes.

8        Q.    So it was just the three of you?

9        A.    Yes.

10        Q.    Did you meet in person?

11        A.    Yes.

12        Q.    Where did you meet?

13        A.    In my house.

14        Q.    What do you recall being discussed at that

15    meeting?

16        A.    It's all in the e-mail, and the meeting

17    minutes reflect that.  We discussed that there were

18    significant water issues in the building, that all three

19    unit owners had experienced water damage in their units,

20    that all three were aware of water damage in their

21    building and in their units and that no one had done

22    anything about the water that had been infiltrating the

23    units since 2012.

24        Q.    What was your initial reaction to hearing

Page 28

1    that?

2           A.    As I said before, I was shocked.

3           Q.    After that meeting concluded did you reach

4    out to your real estate agent or anybody else that was

5    part of the process of you buying the condo?

6           A.    Yes.

7           Q.    Who did you reach out to?

8           A.    My closing attorney.

9           Q.    Who was?

10          A.    Hawbecker & Langveld.

11          Q.    Did you have a specific attorney you were

12   dealing with?

13          A.    Hawbecker.

14          Q.    Do you know the first name?

15          A.    Thomas.

16          Q.    Had you ever used them in your prior

17   properties?

18          A.    No.

19          Q.    How did you get to the point where you used

20   them for this purchase?

21          A.    My real estate agent referred me.

22          Q.    What were your impressions of Thomas?

23          A.    What are you asking me?

24          Q.    Just in general with him, you know, working

```
                                                       Page 29

 1    with you closing.  Did you feel he was experienced

 2    enough?

 3            A.    Yes.

 4            Q.    When you first reached out to him after that

 5    HOA meeting, do you know how you communicated to him?

 6            A.    Yes.  I called him.

 7            Q.    Do you recall what you told him?

 8            A.    I told him there was significant water damage

 9    in the building and in the units that had not been

10    disclosed to me and I asked what -- if he knew of an

11    attorney that I could speak to.

12            Q.    Did he refer you to someone?

13            A.    He did.

14            Q.    Who did he refer you to?

15            A.    I don't recall that person's name.

16            Q.    Did you ever reach out to them?

17            A.    Yes.

18            Q.    What did you tell them?

19                  MS. OSHANA:  Tell who?

20                  MR. KOJS:  The attorney.

21                  MS. OSHANA:  Attorney/client privilege.

22    Objection.

23    BY MR. KOJS:

24            Q.    Did you end up hiring them?
```

```
                                                         Page 30

 1          A.    No.

 2          Q.    Why did you not hire them?

 3          A.    They were located in the suburbs and he told

 4     me that --

 5                MS. OSHANA:  Objection.  Don't talk about it.

 6     BY MR. KOJS:

 7          Q.    So they were just located in the suburbs and

 8     you didn't feel comfortable?

 9          A.    They were located in the suburbs.

10          Q.    Did you ask Thomas to refer you to anybody

11     else?

12          A.    No.

13          Q.    Did you end up -- were you searching any

14     other attorneys to talk to?

15          A.    Yes.

16          Q.    Who did you next reach out to?

17          A.    Ms. Oshana.

18          Q.    Did you hire her shortly after reaching out

19     to her?

20          A.    Yes.

21          Q.    Did you have any other HOA meetings to

22     discuss these issues?

23          A.    Yes.

24          Q.    When was your next one after the first one?
```

```
                                                    Page 31
 1              MR. McCARTHY:  Counsel, you're muted.
 2                              (Brief pause.)
 3              MR. KOJS:  Do you mind rereading the last
 4      question?
 5                              (Requested portion of the
 6                              record read.)
 7      BY THE WITNESS:
 8          A.    Very soon after.
 9      BY MR. KOJS:
10          Q.    Was that meeting in person?
11          A.    Yes.
12          Q.    Where was that located?
13          A.    In my unit.
14          Q.    What was discussed during that meeting?
15          A.    We started to discuss what was gonna be the
16      next step.
17          Q.    Did you guys agree on the next step?
18          A.    We discussed options for next steps.
19          Q.    Which were?
20          A.    Getting more information about what was going
21      on, what the issue was in Unit 3 in greater detail, what
22      was going on with his sale and how we would find out what
23      was going on with the water damage in the building.
24          Q.    When you say get more info, what do you mean?
```

Page 32

```
 1          A.    Well, John had disclosed that there had been
 2    issues since 2012.  He disclosed that all unit owners
 3    were aware.  He disclosed that he -- I don't think he
 4    knew what we were gonna do next, and Ryan said that his
 5    unit was under contract and they wanted to do something
 6    quickly so that his sale could go through.
 7          Q.    So Ryan was selling his unit, Unit 2?
 8          A.    Yes.  All three owners were selling their
 9    units all at the same time.
10          Q.    Did you know if it was because of these
11    issues that were brought up?
12          A.    I came to understand that later, yes.
13          Q.    Did they tell you that or you're just kind of
14    assuming based on --
15          A.    It's pretty clear from the evidence they were
16    all colluding together.  They knew.
17          Q.    When you say "they all," who do you mean?
18          A.    The Gonrings, the Gorrs and Ryan and Ada
19    Brown.
20          Q.    Is Ada Brown Ryan's spouse or partner?
21          A.    Something.  I don't know if they were married
22    or not.
23          Q.    But they both lived in Unit 2?
24          A.    Yes, they did.
```

```
                                                    Page 33
 1          Q.    Did John live with anybody?
 2                MR. GOOD:  Sorry to interrupt.
 3                MR. KOJS:  Yes.
 4                MR. GOOD:  Never mind.  It's fixed.
 5                            (Brief pause.)
 6    BY MR. KOJS:
 7          Q.    Did John live by himself?
 8          A.    John had moved out of the unit and had not
 9    been living there.
10          Q.    When you say all of them were kind of
11    colluding to keep it a secret, are you saying that based
12    off the -- all those e-mails you read or what are you
13    basing that off of?
14          A.    The e-mails I read.  The next door neighbor
15    told me that the Gonrings couldn't wait to get out of
16    there.  I asked the neighbors if they were aware.  Other
17    neighbors told me that they knew there were water issues.
18          Q.    Do you know the names of the neighbors you
19    spoke to?
20          A.    One was Brian.  Brian lives on east side
21    third floor.
22          Q.    When you say "east side" -- I haven't looked
23    at the actual area itself, but was there another building
24    attached to yours or --
```

Page 34

1          A.     No.

2          Q.     -- just next property over?

3          A.     The next property.

4          Q.     Did you go over there and like knock on their

5    doors and inquire about your unit in your building?

6          A.     I spoke with them from my back door and I

7    spoke with them out in front of my building.

8          Q.     And you were just investigating if they knew

9    anything about your building and unit?

10         A.     That's correct.

11         Q.     Do you know if they spoke with the Gonrings

12   personally about it?

13         A.     My neighbor spoke with the Gonrings

14   personally about it.

15         Q.     Did it seem like they were friends?

16         A.     No, it did not.

17         Q.     Do you know if those neighbors spoke to Unit

18   2 or Unit 3?

19         A.     I know that Brian spoke with Unit 3.

20         Q.     Do you know if Brian still lives there today?

21         A.     No, he does not.

22         Q.     Do you still keep in touch with Brian?

23         A.     I haven't spoken with him as of late.

24         Q.     When was the last time you spoke with him?

Page 35

1          A.    In the fall of this year, 2022.

2          Q.    Was it related to the issues we've been

3    talking about?

4          A.    No.  That was related to his sale.

5          Q.    Do you know if he'd ever been into your unit

6    or any of the other units?

7          A.    I don't know.

8          Q.    Do you recall what he specifically said

9    besides just saying there's, you know, been issues there,

10   he knows the Gonrings wanted to sell?

11         A.    Those are the issues that I'm aware of, and

12   then the other neighbor told me that the Gonrings heard

13   water running through their walls.

14         Q.    Do you know approximately when that would

15   have been?

16         A.    She told me that, this was before my sale,

17   that they couldn't wait to get out of there.

18         Q.    Who's she?

19         A.    The neighbor who filled out the affidavit.

20   Her name is Randi.

21         Q.    Was she in the same building as Brian?

22         A.    No.  She was in the building on the west

23   side.

24         Q.    How did you meet Randi?

Page 36

1      A.    I said hello to her as she was coming in the

2   door to her unit.

3      Q.    Would that have been back at some point in

4   2018?

5      A.    Yes.

6      Q.    How many times do you think you've spoken

7   with her?

8      A.    Five.

9      Q.    Were they all -- all the conversations in

10  regards to your property or your unit?

11     A.    No.

12     Q.    How did she know about the issues with the

13  water in the walls?

14     A.    She spoke to the Gonrings.

15     Q.    Do you know when she spoke to the Gonrings

16  about it?

17     A.    I'd have to look at her affidavit.

18     Q.    Besides Randi and Brian do you know anybody

19  else you might have spoke to, any of the other neighbors?

20     A.    I don't recall.

21     Q.    Then we've spoken a little bit about the

22  e-mails prior to you owning that property.  Do you know

23  when you received all those?

24     A.    It was September, October of 2018.

Page 37

1      Q.    Who sent them to you?

2      A.    John and Ryan and then the e-mails that Gorr

3    also produced as part of his discovery or whatever he had

4    to produce.

5      Q.    You might have told me but did they say how

6    long these issues had been going on?

7      A.    Yes.

8      Q.    How long?

9      A.    Since 2012.

10     Q.    And did you ask if there was any

11   correspondence or they just let you know hey, we've been

12   talking about this for the last six years, we have

13   e-mails?

14     A.    I asked them to release that information to

15   me under Condo Association laws.

16     Q.    Did you read through all the e-mails they

17   sent you?

18     A.    Yes.

19     Q.    What was your initial reaction?

20     A.    I was shocked.

21     Q.    Do you recall what you ascertained from those

22   e-mails when you first read them?

23     A.    Yeah, that this was a nightmare.

24     Q.    And all the e-mails that were sent to you,

1    were they discussing issues with the property and the

2    three units?

3          A.    Yes, Kelsey, Nick, Ryan and John were all

4    discussing the issues with the unit and with the

5    building.

6          Q.    Kelsey and Nick Gonring; right?

7          A.    That's correct.

8          Q.    Do you remember specifically what they were

9    referencing?

10         A.    I don't understand your question.

11         Q.    Do you know if they specifically said any

12   issues with the property like your unit itself or the

13   exterior of the building?

14         A.    Leaking windows, doors, vents, ceilings,

15   walls.

16         Q.    Did they say anything specifically about Unit

17   1?

18         A.    Yes.

19         Q.    What did they say in those e-mails?

20         A.    That Unit 1 was having water leaking in their

21   windows.

22         Q.    Was that Kelsey or Nick that said that in the

23   e-mails?

24         A.    They were e-mails John Gorr forwarded me from

1    the Mulligans who owned the property before the Gonrings

2    purchased it that the Gonrings received.

3         Q.   Do you know when the Gonrings purchased Unit

4    1 from the Mulligans?

5         A.   Not off the top of my head, no.

6         Q.   Do you know if in 2012 whether the Mulligans

7    or Gonrings owned the property?

8         A.   Mulligan owned the building in 2012.

9         Q.   Owned Unit 1?

10        A.   No.  Yes, he owned Unit 1.

11        Q.   So those e-mails that John provided you, you

12   saw the Mulligans on there and the Gonrings on there?

13        A.   Yes.

14        Q.   Do you remember specifically anything about

15   the actual building itself not just your unit that they

16   discussed in those e-mails?

17        A.   Yes.  I said the windows, the doors, the

18   walls, the roof, the ceiling.

19        Q.   And that was all water damage they were

20   talking about?

21        A.   Yes.

22        Q.   Do you know how old the building is?

23        A.   The building was built in 2007.

24        Q.   Did you ever reach out to the Mulligans or

Page 40

1      the Gonrings after you discovered these issues?

2            A.    Absolutely not.

3            Q.    And then after -- well, during that second

4      HOA meeting, did you discuss having contractors come out

5      to check on the damage?

6            A.    We discussed what our next steps would be,

7      and I discussed having an inspection done on the building

8      and the units.

9            Q.    Was that eventually done?

10           A.    Yes.

11           Q.    Were you the one kind of taking lead on all

12     of this or did you guys --

13           A.    Absolutely.

14           Q.    -- split it up?

15                 You were taking the lead?

16           A.    Yes.

17           Q.    Do you know who you hired to inspect the

18     building?

19           A.    Steve Hier.  He's a water intrusion expert,

20     specialist and expert in the field when it comes to split

21     face block.

22           Q.    How did you end up hiring him?

23           A.    What do you mean?

24           Q.    Well, how did you end up having him be the

Page 41

1    one that inspected your building?  Were you referred to

2    him?

3          A.    Yes, I was referred to him.

4          Q.    Who referred you to him?

5          A.    Andrew Watts.

6          Q.    Do you know approximately when he came out?

7          A.    He came out in September or October of 2018.

8          Q.    Were you there when he came out?

9          A.    Yes.

10         Q.    What did he say after his inspection or

11   during it?

12         A.    That it was the worst unit, building water

13   damage he's ever seen in his career.

14         Q.    Did he prepare like an inspection summary?

15         A.    Yes.

16         Q.    Did you read through it?

17         A.    Yes.

18         Q.    Did he have any recommendation for you?

19         A.    Yeah, he recommended some exploratory work to

20   try to determine how badly the damage permeated through

21   the units and the building.

22         Q.    Was that something he could do or you had to

23   hire a separate --

24         A.    No.  He's an inspector.

Page 42

1      Q.    Did he have an opinion of what was causing

2  the water intrusion and other water damage issues?

3      A.    Yeah, that the block was letting in water,

4  that whoever -- whatever had been applied to the building

5  in June had been done incorrectly, that the windows and

6  doors were improperly flashed, that it was a building

7  construction issue.

8      Q.    So he thinks this stems from when the

9  building was built in 2007?

10     A.    It stems from when the building was

11  constructed and subsequent cheap, non-conforming fixes

12  that were done to the building by non-qualified

13  contractors.

14     Q.    What kind of fixes were done?

15     A.    Windows and doors were caulked.  Weeps were

16  sealed.  The sealant that was applied was applied

17  improperly, and it would not keep water from infiltrating

18  into the block.  Flashing was inappropriately done.  The

19  roof was inappropriately installed.

20     Q.    Do you know when all these fixes were done

21  after the building was constructed?

22     A.    John supplied a document that the -- in his

23  primary, first e-mail to me that had a history of the

24  water infiltration into the building along with the

Page 43

1    various fixes and quotes that he and others had gotten.

2         Q.    Do you know when these services were

3    performed?

4         A.    From 2012 all the way up until June of 2018.

5         Q.    Do you know who was the one taking the lead

6    on hiring these contractors?

7         A.    Kelsey hired the Arrow company.  John hired

8    some of them as well.

9         Q.    What's the Arrow company?

10        A.    Arrow is the company that the HOA hired in

11   June to seal the building, flash, caulk.

12        Q.    June of 2018?

13        A.    Yes.

14        Q.    And Steven, the inspector that you had hired,

15   he said that was all done improperly?

16        A.    Yes.  He said that the sealant that was

17   applied by Arrow had been applied incorrectly, that

18   caulking should never be done around the windows and

19   doors, the weeps should never be sealed.  Those were the

20   things he said to me.  He also said the building was

21   inappropriately constructed.

22        Q.    After his inspection was done did you have

23   another HOA meeting?

24        A.    Yes.

```
                                                    Page 44
  1          Q.    And the results of the inspection were
  2    discussed I'm assuming?
  3          A.    Yes.
  4          Q.    What was decided after that HOA meeting?
  5          A.    We came up with a scope of work and we
  6    decided to have this bid out.  I also had looked at the
  7    ESI report that John provided.  That was also provided to
  8    the Gonrings and the entire HOA.
  9          Q.    At that point were you, you know, looking for
 10    contractors to come and fix all these issues?
 11          A.    We had a scope of work defined and we were
 12    looking for a contractor who could address the issues
 13    that we had identified and adhere to the scope of work
 14    that we put together.
 15          Q.    Did you end up hiring different contractors
 16    or just one general contractor who maybe subcontracted
 17    the work out?
 18          A.    We bid out the work per the guidelines of
 19    best practices of the Condo Association and we got three
 20    bids on the work and we hired Allendorfer to do the work.
 21          Q.    When did he start the work?
 22          A.    I don't know.  I'd have to look at the first
 23    contract.
 24          Q.    Did he end up completing everything?
```

Page 45

1          A.    He completed the work that we contracted him

2     for.

3          Q.    Do you know when he completed his work?

4          A.    I don't know.  I'd have to look at the last

5     contract.  2020 or 2021.

6          Q.    Did you hire anybody else to fix any of the

7     issues that had been discussed in the HOA meetings?

8          A.    Yeah, we hired Mold Solutions.

9          Q.    Anybody else?

10         A.    Not that I recall.

11         Q.    Do you know when Mold Solutions came out?

12         A.    Yeah, in 2018.

13         Q.    And did they finish the work in 2018?

14         A.    Yes.

15         Q.    Do you know where they discovered mold in the

16    building?

17         A.    In Unit 3 and inside the walls.

18         Q.    Inside the walls in Unit 3?

19         A.    Yes.

20         Q.    Was there any mold found in your unit?

21         A.    We didn't open up my unit.

22         Q.    Any reason they did not or you did not?

23         A.    I don't recall.

24         Q.    Are Ryan and John still in their respective

Page 46

1    units?

2          A.    John is.  Ryan sold his unit.

3          Q.    Have you met the new owners in Unit 2?

4          A.    I know the unit owner.

5          Q.    When did Ryan sell Unit 2?

6          A.    You'd have to check his sales contract.

7          Q.    Do you know if those owners were aware of all

8    these issues prior to them purchasing Unit 2?

9          A.    Yes.

10         Q.    They were aware?

11         A.    They were disclosed to.  They told the truth.

12         Q.    All right.  Like I said in the beginning, I

13   represent American Relocation Services.  I'm going to

14   refer to them as Aires if that's all right, A-R-I-E-S.

15   Do you know what type of company they are?

16         A.    It says relocation service.

17         Q.    Had you ever heard of them before this case?

18         A.    No.

19         Q.    You ever hear of any sort of relocation

20   service prior to this case?

21         A.    No.

22         Q.    All right.  I'm going to show you what we're

23   going to mark as Plaintiff's Exhibit 1.  It's the

24   Condominium Real Estate Purchase and Sale Contract for

```
                                              Page 47
1     your unit.  I'm going to share this with everybody too.
2                  MR. GOOD:  Thank you.
3                  MR. KOJS:  Can you guys see it?
4                  MR. GOOD:  Yes.
5                  MR. KOJS:  Thank you.
6                             (Exhibit No. 1 marked as
7                             requested.)
8     BY MR. KOJS:
9          Q.    Have you seen this document before?
10         A.    Yes.
11         Q.    Then if we turn to --
12                  MS. OSHANA:  Can you give her the marked
13    exhibit?
14                  THE REPORTER:  Yes.
15    BY MR. KOJS:
16         Q.    Can you turn to Page 3 of Exhibit 1?
17    Paragraph 118, "Buyer's name," is that your name right
18    there?
19         A.    Yes.
20         Q.    The line up above it, 117, is that your
21    electronic signature?
22         A.    Yes.
23         Q.    Then the same line, 117, "Seller's
24    Signature," it says "Amanda Flucker."  Do you see that?
```

Page 48

1          A.    Yes.

2          Q.    Do you know Amanda?

3          A.    No.

4          Q.    Have you ever heard of her name?

5          A.    I've seen her name in the correspondence.

6          Q.    Then just below her signature it says:

7     "Seller's name:  Aires as an agent for American

8     International Relocation Solutions, LLC"?

9          A.    I see their name, but they weren't the

10    seller.

11         Q.    But did I read that correctly on the page?

12         A.    Yes.

13         Q.    When you were going over this document and

14    signing it, were you confused why Aires was listed as the

15    seller's name?

16         A.    I saw an e-mail that said that Aires was the

17    seller.

18         Q.    Who did you see an e-mail from?

19         A.    Sara Wilkins.

20         Q.    Who's Sara Wilkins?

21         A.    I don't know exactly what her title was.  She

22    was an attorney I think for Aires.

23         Q.    Did she send an e-mail directly to you or --

24         A.    No.

Page 49

1          Q.    Who did she send it to?

2          A.    My attorney.

3          Q.    Did your attorney explain who Aires was?

4          A.    He told me that they were the seller, the

5     owner.

6          Q.    At this point in time when you were reading

7     this over and signing it, did you know who the Gonrings

8     were?

9          A.    Yes.  I believe there was another document

10    that had the Gonrings' name on it as the seller.

11         Q.    If you knew the Gonrings were the sellers as

12    well, did you have any confusion that this one listed

13    Aires but you also knew the Gonrings were selling it?

14         A.    The e-mail from Sara said that Aires was the

15    seller.

16         Q.    Then so sticking on Page 3, like I said, the

17    seller's name, paragraph 118, "Aires as an agent for

18    American International Relocation Solutions."  It doesn't

19    say Aires as an agent for the Gonrings; correct?

20         A.    The document does not say that.

21              MR. KOJS:  We're going to mark Plaintiff's

22    Exhibit 2.

23                                (Exhibit No. 2 marked as

24                                 requested.)

```
                                                      Page 50

 1    BY MR. KOJS:

 2          Q.    It is the addendum to the Purchase and Sale

 3    Agreement.  Have you seen this document before?

 4          A.    Yes.

 5          Q.    If we turn to the last page, Page 3, where it

 6    says "Buyers," is that your signature?

 7          A.    Yes.

 8          Q.    It has a date of June 6, 2018?

 9          A.    Yes.

10          Q.    Then seller says "American International

11    Relocation Solutions" signed by Amanda Flucker?

12          A.    It says that, but that's not the case.

13    Aires never became a contractual owner of the property.

14          Q.    On this page it says that though; correct?

15          A.    Yes.  It's a lie.

16          Q.    Did you read through this document before

17    signing?

18          A.    I recall reviewing it with my attorney.

19          Q.    Do you recall any questions while going

20    through it?

21          A.    I don't recall.

22          Q.    Then if we go to the first page, it's the

23    third bolded Seller's Representations.  Do you see where

24    I'm looking at?
```

Page 51

```
 1          A.    Yes.
 2          Q.    It reads:  "Any representation by seller
 3     shall be to the best of the seller's knowledge and belief
 4     without requiring investigation.  No representation shall
 5     survive the closing unless specifically expressed
 6     herein."  So according to this document, the seller would
 7     be Aires; correct?
 8          A.    No.
 9          Q.    Why no?
10          A.    Aires was not the seller.  They never
11     received the deed.  You can't sell something that you
12     don't own.
13          Q.    But according to this document, the seller is
14     listed as Aires though; correct?
15          A.    This document doesn't exist because they
16     never became the contractual owner, so this document is
17     not a document with any legal standing.
18          Q.    That's fine, but at Page 3 under Seller it
19     lists Aires; correct?
20          A.    I'm not going to answer the question and say
21     something illogical.  Aires was never the seller.
22          Q.    Okay.  But on this document it says that
23     Aires is the seller?
24          A.    I am not going to tell you something
```

1    illogical.  I'm not going to agree that they are the

2    seller.  They were not the seller.  They were never the

3    owner.  You cannot sell something that you don't own.

4         Q.    That's fine if you don't think they're the

5    seller, but on this page, it lists their name as the

6    seller?

7         A.    I'm not going to agree to that.

8         Q.    So, what, do you think it's somebody else

9    that --

10              MS. OSHANA:  Counselor, we get the point.  On

11   this piece of paper it reads --

12              MR. KOJS:  I need her to say that.

13              MS. OSHANA:  Can I finish?  On a piece of

14   paper it does list Aires as the seller.  That's the

15   point.  It was not true.  So yes, they misrepresented

16   themselves.

17              MR. KOJS:  Okay.  Well, we don't need to fight

18   about it here.  I just want her to confirm that's what it

19   says.

20              MS. OSHANA:  I understand.  That's what I'm

21   stipulating to, so you don't need to ask her over and

22   over again.  There is a piece of paper that says that

23   Aires is the seller.  That's a misrepresentation.

24              MR. KOJS:  Okay.  Are you going to stipulate

Page 53

1    that the "Seller's Representation" as of this document

2    would be Aires?

3           MS. OSHANA:  I'm sorry?

4           MR. KOJS:  Will you stipulate where it says

5    "Seller's Representation," what I just read, that when

6    they're referring to "seller" it would be Aires?

7           MS. OSHANA:  No.  The legal consequences of

8    this document have to be determined by the court.  But I

9    will tell you that on this piece of paper, whatever is

10   printed on here, it does exist on this piece of paper.

11   The legal effect is up to the judge.

12          MR. KOJS:  No, we're not arguing legal effects

13   right now.

14          MS. OSHANA:  Right.  But you're asking my

15   client -- are you asking my client is there type that

16   says seller's authority, things like this, seller's

17   representation?  There are words on this piece of paper.

18   Yes, they are typed, and the judge will read these words,

19   so what my client thinks of the words on this piece of

20   paper, no, I will not.

21          MR. KOJS:  That's fine.  She can answer that.

22          MS. OSHANA:  She is answering that.  The piece

23   of paper -- I'm answering for her.  I will stipulate that

24   the type that's on here does exist, yes.

Page 54

1          MR. KOJS:  So you'll stipulate that any part

2     where it says seller, we'll fight over the legal part,

3     but anywhere it says seller according to this paper is

4     Aires?

5          MS. OSHANA:  That's why there's a

6     misrepresentation.  The misrepresentation is Aires saying

7     that they're the seller on many pieces of paper, and this

8     is where they lied, yes.

9          MR. KOJS:  I understand.  But can you just

10    stipulate that anywhere it says seller, according to

11    this, it says Aires?

12         MS. OSHANA:  Yes, of course.  According to

13    this piece of paper, this is where the misrepresentation

14    occurred because Aires kept listing itself as the seller.

15         MR. KOJS:  Okay.

16    BY MR. KOJS:

17    Q.    If we go to "Condition of Premises" just

18    below "Seller's Representation," it reads, the first

19    sentence:  "Buyer understands that seller is a relocation

20    management service and has never lived on or in the

21    property."

22    A.    They are not the seller.

23    Q.    That's fine.  Can you confirm that's what it

24    says?

```
                                            Page 55
 1              MS. OSHANA:  Counselor, hold on.  We're not
 2     going to do this.
 3              MR. KOJS:  She can't confirm whether or not it
 4     says that?
 5              MS. OSHANA:  No.  Hold on a second.  We are
 6     not going to go into does it say this, does it say this,
 7     does it say this.  There's a piece of paper.  Of course
 8     everything that's typed on this piece of paper is on this
 9     piece of paper.  If you want to ask her a question about
10     her understanding, that's different.  But if you're just
11     saying does this piece of paper say this, the words say
12     what's on this piece of paper.  Why are you going into
13     that?
14              MR. KOJS:  Well, that's my prerogative why I
15     would go through it.
16              MS. OSHANA:  It's ridiculous.
17              MR. KOJS:  It's not.
18              MS. OSHANA:  Move on.  No, it is ridiculous.
19              MR. KOJS:  It's a huge speaking objection, and
20     it's inappropriate.
21              MS. OSHANA:  There's a piece of paper in front
22     of us.  We will stipulate that whatever is typed on this
23     piece of paper does exist.  I already stipulated to that.
24     BY MR. KOJS:
```

Page 56

1          Q.    All right.  I will show you what we'll mark

2     as Plaintiff's Exhibit 3.  It's titled "Seller's Property

3     Disclosure Statement."

4                              (Exhibit No. 3 marked as

5                               requested.)

6     BY MR. KOJS:

7          Q.    Have you seen this document before?

8          A.    Yes.

9          Q.    If we go to the last page, it says "Seller,

10    Kelsey and Nicholas Gonring --"

11         A.    Yes.

12         Q.    -- is that correct?

13               It has your electronic signature as the buyer

14    on there?

15         A.    Yes.

16         Q.    If we go back to the first page, it says

17    "Seller" at the top under "property address Nicholas and

18    Kelsey Gonring"?

19         A.    Yes.

20         Q.    When you were reading through this, was it

21    your understanding that Nicholas and Kelsey were the ones

22    that were checking either yes or no or unknown?

23         A.    Yes.

24         Q.    Then sticking on the first page, the first

```
                                                    Page 57
  1     sentence:  "Seller must disclose to a buyer all known
  2     material defects about the property being sold."  Do you
  3     see that?
  4             A.    Yes.
  5             Q.    When it says "seller," your understanding was
  6     that it would be Nicholas and Kelsey Gonring --
  7             A.    That's correct.
  8             Q.    -- to disclose that?
  9                   Then Section 2, "Occupancy" on the first
 10     page, subparagraph A it states:  "Do you, seller,
 11     currently occupy the property."  It's checked yes.  It's
 12     your understanding that, again, seller there would refer
 13     to Nicholas and Kelsey Gonring?
 14             A.    Yes.
 15             Q.    If we go to the last page, the last thing on
 16     this document, you see, I think it's the third sentence
 17     in, it's capitalized:  "Seller alone is responsible for
 18     the accuracy of the information contained in this
 19     statement."  Do you see that?
 20             A.    Yes.
 21             Q.    And, again, as seller, you would -- your
 22     understanding was Kelsey and Nicholas Gonring?
 23             A.    I don't know who was the seller.  I had
 24     documents that say Aires is the seller.  I had documents
```

Page 58

1     that said the Gonrings are the seller.  I don't know who

2     the seller is.  Are we going to go through the document

3     too where they were lying?  Go through the documents

4     where you guys were lying to me too.

5            Q.    But on this document you already said the

6     seller was, your understanding was Kelsey and Nicholas

7     Gonring?

8            A.    I don't know who the seller is.

9                  MS. OSHANA:  At the time or now?

10                 MR. KOJS:  At the time.

11                 MS. OSHANA:  I think he's saying at the time.

12    BY THE WITNESS:

13           A.    I don't know.  I was told Aires was the

14    seller.

15    BY MR. KOJS:

16           Q.    Okay.  Even though it says "Nicholas and

17    Kelsey" at the top under "Seller"?

18           A.    At the time I understood Aires was the

19    seller.

20           Q.    Who did you think Nicholas and Kelsey Gonring

21    were then?

22           A.    I don't -- I don't -- I don't know.  I don't

23    understand.

24           Q.    So when you were looking through this

Page 59

1    document and you thought Aires was the seller, did you

2    ask your real estate agent or anybody why it lists

3    Nicholas and Kelsey Gonring as the seller at the top?

4              A.    I don't recall.

5                    THE WITNESS:  Can we take a break?

6                    MR. KOJS:  Yeah.

7                                  (WHEREUPON, a break was

8                                  taken.)

9                    I'm going to mark this Plaintiff's Exhibit

10   4.  It's the Residential Real Property Disclosure Report.

11                                 (Exhibit No. 4 marked as

12                                 requested.)

13   BY MR. KOJS:

14             Q.    Have you seen this document before?

15             A.    Yes.

16             Q.    If you go to Page 2, "Seller," is that the

17   signatures of Kelsey and Nicholas Gonring?

18             A.    Yes.

19             Q.    And on Page 4, "Seller," again, it's

20   electronic signatures of Nicholas and Kelsey Gonring?

21             A.    Yes.

22             Q.    Then back to the first page, seller's name,

23   Nicholas Gonring and Kelsey Gonring; correct?

24             A.    Yes.

Page 60

1        Q.    Then if we go to paragraph 5 and 6 towards

2   the middle, paragraph 5 says:  "I am aware of leaks or

3   material defects in the roof, ceilings or chimney," and

4   it's checked off no; correct?

5        A.    Correct.

6        Q.    On paragraph 6:  "I'm aware of material

7   defects in the walls, windows, doors or floors."  Again,

8   it's checked no?

9        A.    That's correct.

10       Q.    Is it your understanding that Kelsey and

11  Nicholas checked no on this document?

12       A.    Again, I have no idea who the seller and the

13  owner are.  Aires told me that they were the owner.  They

14  told me they were the seller.  I have Nick and Kelsey

15  Gonring on some documents that say they are the seller.

16  I have Aires on other documents that say they were the

17  seller.

18       Q.    Did someone at Aires tell you they were the

19  owner?

20       A.    The e-mail from Sara Wilkins says they're a

21  seller.  I don't understand how you can sell something

22  you don't own.  I don't understand how you can give me

23  this that says how the seller becomes the contractual

24  owner on Exhibit 2.

```
                                                      Page 61
 1          Q.    But Aires just told you they were the seller;
 2     correct?
 3               MS. OSHANA:  She just answered it.  Did you
 4     hear what she just said?
 5               MR. KOJS:  She -- reread the question and
 6     answer if you don't mind.
 7                                   (Requested portion of the
 8                                   record read.)
 9     BY MR. KOJS:
10          Q.    Were you on that e-mail from Aires?
11          A.    As I told you before, my attorney shared that
12     with me.
13          Q.    On this document, the Disclosure Report, is
14     there any indication that Aires or anybody from Aires
15     checked any of these boxes or signed anything?
16          A.    I don't see that.
17               MR. KOJS:  All right.  This will be
18     Plaintiff's Exhibit 5.  It is a June 14, 2018 letter from
19     Thomas Hawbecker to Sarah Wilkins.
20                                   (Exhibit No. 5 marked as
21                                   requested.)
22     BY MR. KOJS:
23          Q.    Have you seen this document before?
24          A.    Yes.
```

```
                                            Page 62
 1           Q.    This was sent from your attorney; correct?
 2           A.    It would appear so, yes.
 3           Q.    Did you have any involvement in preparing
 4      this letter?
 5           A.    We talked about this.
 6           Q.    If we go to Section 8 on Page 2, subparagraph
 7      E -- you see where I'm at?
 8           A.    Yes.
 9           Q.    It reads:  "Please verify that the Condo
10      Association has not experienced any instances of water,
11      interior or exterior, leaking into the property and/or
12      any water damage during seller's ownership of the
13      property.  If there have been any such occurrences,
14      please provide dates, locations, damage and any repairs
15      made."  Did I read that correctly?
16           A.    Yes.
17           Q.    If you wouldn't mind keeping that one in
18      front of you.
19                 MR. KOJS:  I'm going to mark this one as
20      Plaintiff's Exhibit 6.  It's titled "Attorney
21      Modifications Response Letter."  It's sent from Sarah
22      Wilkins to Thomas Hawbecker.
23                              (Exhibit No. 6 marked as
24                               requested.)
```

```
                                                    Page 63

  1

  2    BY MR. KOJS:

  3         Q.    Have you seen this letter?

  4         A.    Yes.

  5         Q.    Would you agree this is a response to the

  6    June 14th, 2018 letter?

  7         A.    Yes.

  8              MR. McCARTHY:  Counsel, can you share the

  9    screen on that, please.

 10              MR. KOJS:  Yeah.

 11    BY MR. KOJS:

 12         Q.    If you go to Page 2, Section 8, subparagraph

 13    E, it reads:  "As a third-party corporate relocation

 14    company, seller is unable to make verifications regarding

 15    whether the property has experienced water leaking or

 16    water damage.  However, seller agrees to abide by the

 17    terms of the buyer's duty to inspect, test sections of

 18    the Aires addendum with respect to possible leaks,

 19    seepage or water infiltration of the property.  Seller

 20    would have no knowledge of such matters unless raised

 21    during the home inspection process."  Did I read that

 22    correctly?

 23         A.    Yes.

 24         Q.    Then do you see the okay responses on the
```

Page 64

1    left side?

2              MS. OSHANA:  No, not this one.  Not on hers

3    either.  Unless you're talking about the ones below.  Are

4    you talking about below?

5              MR. KOJS:  Oh, yeah.

6              MS. OSHANA:  You talking about down here?

7              MR. KOJS:  Yeah.  Not next to a, b but just --

8              MS. OSHANA:  Oh.

9    BY MR. KOJS:

10        Q.    Do you see the okay right next to 6a, 6b or

11   6c says "agreed"?

12        A.    Yes.

13        Q.    Is it your understanding those are your

14   responses to these responses from Aires?

15        A.    Yes.

16        Q.    And then for 8e just at the bottom, it looks

17   like it says:  "Please confirm the same with the prior

18   owner as the seller has direct contact with the prior

19   owner"?

20        A.    Yep.  There you go again.  Lying to me about

21   who the seller is.  So now we've looked at four different

22   things that show who the seller is and it is all

23   different.

24        Q.    Would you agree that your attorney or

Page 65

1     yourself wrote or responded with that saying:  "Please
2     confirm the same with the prior owner as the seller has
3     direct contact with the prior owner"?
4          A.   Yes.
5          Q.   Based off of that, is it your understanding
6     that you were asking Aires to confirm with the prior
7     owner?
8          A.   I'm not sure what else it would mean.
9          Q.   Prior owner it's your understanding would be
10    the Gonrings?
11         A.   Yes.
12         Q.   Keep that in front of you if you don't mind.
13              MR. KOJS:  We'll mark this as Plaintiff's
14    Exhibit 7.  It's titled "Attorney Modification Second
15    Response Letter."
16                              (Exhibit No. 7 marked as
17                               requested.)
18    BY MR. KOJS:
19         Q.   Have you seen this letter?
20         A.   Yes.
21         Q.   Again, this was sent by Sarah Wilkins to your
22    attorney Thomas Hawbecker; correct?
23         A.   Yes.
24         Q.   The second sentence under:  "Dear Mr.

```
                                             Page 66

 1    Hawbecker:  The seller has reviewed your June 22nd, 2018

 2    in-line response to my June 18th, 2018 letter and has

 3    provided the following response."  Did I read that

 4    correctly?

 5          A.    Yes.

 6          Q.    Would you agree that this response is to the

 7    responses that you made in the prior letter we just

 8    looked at?  I know it's a little confusing with these

 9    three separate letters.

10          A.    Yes.

11          Q.    And then in a July 2nd, 2018 letter, if you

12    look at Section 7:  "With respect to item 8e, again, as

13    third-party corporate relocation company, seller is

14    unable to make verifications regarding whether the

15    property has experienced water leakage or water damage.

16    However, seller agrees to abide by the terms of the buyer

17    being able to inspect, test section of the Aires addendum

18    with respect to possible leaks, seepage or water

19    infiltration of the property as seller would have no

20    knowledge of such matters unless raised during the home

21    inspection process when the information reported in the

22    Residential Real Property Disclosure Report or the home

23    owner provided disclosures makes no mention of water

24    infiltration in the property."
```

```
                                            Page 67

1          A.    Yeah, but you weren't the seller.

2          Q.    Did I read that correctly though?

3          A.    You're reading the words on the page.

4          Q.    And then would you agree your response just

5     to the left of Section 7 says "okay"?

6          A.    Yes.

7                MR. KOJS:  Exhibit 8.  Exhibit 8 is

8     Plaintiff's Answers to Aires First Interrogatories.

9                            (Exhibit No. 8 marked as

10                            requested.)

11    BY MR. KOJS:

12         Q.    Have you seen this document?

13         A.    Yeah.

14         Q.    On the last page that's your electronic

15    signature verifying these Answers?

16         A.    Yes.

17         Q.    Did you work with your attorney to prepare

18    these Answers?

19         A.    Yes.

20         Q.    Then question 1:  "Describe all the evidence

21    you have for your contention on paragraph 51 that claim

22    that Aires is the agent for the Gonrings."  Your

23    response, first sentence was:  "Aires was not the owner

24    of the property despite their misrepresentations to the
```

```
                                                    Page 68

1      contrary;" is that correct?

2           A.    Correct.

3           Q.    And what were the misrepresentations that

4      you're talking about?

5           A.    The calling yourself the seller in the last

6      exhibits that you just shared with me, 7, 6, 5, 2, 1.

7           Q.    Then the third sentence of the response to

8      question 1 you say:  "If one is not an owner of property

9      and is trying to sell it, then that person is an agent."

10     Did I read that correctly?

11          A.    Yes.

12          Q.    Where did you get that that person would be

13     your -- company would be an agent?

14          A.    What?

15          Q.    You said:  "If one is not an owner of a

16     property and trying to sell it, then that person is an

17     agent."  I'm just wondering where you got that whoever's

18     just trying to sell a property if they don't own it is

19     considered an agent.

20          A.    We would have looked it up.

21          Q.    When you say "we," who do you mean?

22          A.    I worked with my attorney.

23          Q.    Where would you have looked it up?

24          A.    Google search.  Would have looked up the
```

```
                                                      Page 69
 1      legal definition of those words.

 2           Q.    A Google search that Aires was the agent for

 3      the Gonrings?

 4           A.    No.  Google search for what a seller and an

 5      owner are.

 6           Q.    And that's how you came to the determination

 7      that Aires would be or if someone's not an owner trying

 8      to sell it would be an agent?

 9           A.    I'm not sure what you're trying to get me to

10      say.  What are you asking me?

11                MS. OSHANA:  Just rephrase it.  She's

12      obviously -- just rephrase it.

13                MR. KOJS:  We'll move on.  I might come back

14      to it.

15      BY MR. KOJS:

16           Q.    All right.  We'll move on from that.  If you

17      wouldn't mind looking at the screen up there.  We'll mark

18      this as Exhibit 9.  Have you seen this Excel sheet

19      before?

20           A.    Yes.

21           Q.    So your attorney provided this to us I think

22      last Friday.  Did you create this Excel sheet?

23           A.    Yes.

24           Q.    You yourself or did you have any help with
```

Page 70

1    it?

2            A.    I created it myself.  I took something that

3    the HOA had created and added to it.

4            Q.    And all the way at the top it's titled "Area

5    1 2726 West Cortez Unit 1 Expenses"?

6            A.    Yes.

7            Q.    Then "Building Repairs and Unit 3 Work"?

8            A.    Yes, that's what it says.

9            Q.    All right.  See where I'm highlighting it

10   says "Special Assessment Date"?

11           A.    Yes.

12           Q.    Then "October 17, 2018 Mold Solutions"?

13           A.    Yes.

14           Q.    This is kind of what we talked about earlier;

15   correct?  You had to hire a mold solution company?

16           A.    That's right.

17           Q.    It says "Unit 1 Responsibility."  That's you?

18           A.    Yes.

19           Q.    It has the number $5,926.36 paid in full?

20           A.    That's right.

21           Q.    That was out of a total contract from Mold

22   Solutions for $13,469?

23           A.    Yes.

24           Q.    So was this for your unit directly or was it

Page 71

1    for the building as a whole?

2           A.    This was for the building and this was for

3    Unit 3.

4           Q.    Was this like a special assessment?

5           A.    That's what it says.

6                 MR. McCARTHY:  Are you able to share your

7    screen?

8                 MR. KOJS:  Yeah.  I thought I was.  It says

9    I'm sharing.

10                MR. McCARTHY:  But it's showing the

11   interrogatories not the spreadsheet.

12                MR. GOOD:  If you'd like, I could be of some

13   assistance here.  I have the spreadsheet.  I think I can

14   try it.

15                MR. KOJS:  Do you see it now?

16                MR. GOOD:  There it is.

17                MR. McCARTHY:  Yes, we can see it.

18                MR. GOOD:  Yes.

19   BY MR. KOJS:

20          Q.    So for the $5,926.36 that you paid, did you

21   pay the HOA for them to pay the contractor or did you pay

22   Mold Solutions directly?

23          A.    That's correct.  The HOA paid the bills.

24          Q.    Okay.  So you sent like a check or a wire to

```
                                                     Page 72

 1    the HOA?

 2          A.    That's correct.

 3          Q.    All right.  Then the next one, masonry work,

 4    March 26, 2019 has your responsibility as $61,919;

 5    correct?

 6          A.    Yes.

 7          Q.    Again, that was paid directly to the HOA?

 8          A.    That's correct.

 9          Q.    It was a special assessment?

10          A.    That's what it says.

11          Q.    And then April 27, 2019 "Structural

12    exploratory and structural engineer, steel beams to

13    rebuild ceiling, roofing, floor of Unit 3;" correct?

14          A.    Yes, it does.

15          Q.    Your responsibility, $4,628.80?

16          A.    Yep.

17          Q.    Again, that was paid to the HOA?

18          A.    That's correct.

19          Q.    Going back a second, sorry, masonry work, was

20    that -- any of that for your specific unit?

21          A.    That's correct.

22          Q.    There was none for your --

23          A.    No, there were absolutely things for my unit

24    on that.  Those were limited common elements, windows and
```

Page 73

1    doors.

2          Q.    Common elements?

3          A.    I said limited common elements, windows and

4    doors.

5          Q.    And that would be for the other units too

6    though?

7          A.    That's correct.

8          Q.    And then the 4-17 2019, like I said, you paid

9    4,628.  Was any of that for your specific unit?

10         A.    It was for the roof of Unit 3.  It was for

11   the roof of the building.

12         Q.    Again, that was a special assessment?

13         A.    Yes, it was.

14         Q.    The next one, June 26, 2019, "Truss work plus

15   roof replacement," you paid $42,116.80?

16         A.    That's correct.

17         Q.    This was a special assessment?

18         A.    Yes, it was.

19         Q.    Was any of that for your specific unit?

20         A.    Yeah.  The issues were with the structure.

21   The structure comprises Unit 1, Unit 2, Unit 3.  All of

22   these repairs were done for Unit 1, Unit 2 and Unit 3, so

23   yes, it was done for my unit.

24         Q.    Okay.  I don't need argumentative responses

Page 74

1    though.  I'm just asking questions.

2         A.    Yes, and you're leading me to try to get me

3    to say something that you're going to come back and tell

4    me in court was wrong.

5              MS. OSHANA:  It's okay.

6              MR. KOJS:  I'm not.  I'm just trying to --

7              MS. OSHANA:  Don't worry about it.

8              MR. KOJS:  I'm just trying to confirm the

9    Excel sheet.

10             MS. OSHANA:  It's okay.  She's -- it's okay.

11   BY MR. KOJS:

12        Q.    And Unit 2 and Unit 3 paid into part of

13   that --

14        A.    Yes.

15        Q.    -- the truss work?

16             Next one, January 21st, 2021, "South facing

17   terrace roof replacement Unit 2 and Unit 1

18   responsibility."  You paid $2,831.40?

19        A.    Yes.  I was having water leaking in my

20   ceiling.

21        Q.    Okay.  This one was just -- based on the

22   description it was just for Unit 1 and Unit 2?

23        A.    I had water coming in my ceiling from those

24   terraces.

Page 75

1          Q.    Okay.  But for purposes of paying this $6,000

2     bill, was this just you in Unit 2 or Unit 3 as well?

3          A.    All three units paid.

4          Q.    This was a special assessment?

5          A.    That's correct.

6          Q.    And you paid the HOA directly?

7          A.    Yes.

8          Q.    All right.  August 8, 2021, "Refinish

9     building front door," you paid $490.60; is that correct?

10         A.    Yes.

11         Q.    This was a special assessment?

12         A.    Yes.

13         Q.    You paid the HOA directly?

14         A.    Yes.

15         Q.    March 9th, 2022, "Heat trace cable

16    installation main roof," you paid $2,882?

17         A.    We've not done that work yet.

18         Q.    This, again, though -- once the work is done

19    and paid for it would be a special assessment?

20         A.    Yes.

21         Q.    And you would pay the HOA?

22         A.    Yes.

23         Q.    And then you have your Unit 1 total financial

24    responsibility for building repairs $120,79.96?

Page 76

1          A.     That's not total financial responsibility.

2     The front steps aren't on there and the front window

3     replacements aren't on there yet.

4          Q.     Okay.  So that would be a special assessment

5     for everybody?

6          A.     Yes.

7          Q.     Do you know how much those are gonna cost?

8          A.     Yeah.  They're down below.

9          Q.     Okay.  This next headline, "Area 2 Unit 1

10    Additional Financial Responsibilities Related To Lawsuit

11    Including Legal Fees, Loan on Interest and Other

12    Expenses."  Then June 20th, "Rebuild of interior Unit 3,

13    that's $12,672?

14         A.     Yes.

15         Q.     You're not paying any of that; is that

16    correct?

17         A.     I haven't paid it.

18         Q.     Is that going to be a special assessment?

19         A.     I need to work with my attorney on that.

20         Q.     Is Unit 3 asking you to pay some of that?

21         A.     I need to look --

22              MS. OSHANA:  I think so.  I think he is

23    asking.  I have to look at the e-mails.  I don't

24    remember.

```
                                                    Page 77

 1

 2      BY THE WITNESS:

 3           A.    I have to reread the condo guidelines.

 4      BY MR. KOJS:

 5           Q.    Okay.  "Attorney Fees To Date HOA Lawsuit

 6      Versus Aires Insurance, $2,530."  Is that a special

 7      assessment?

 8           A.    Yes.

 9           Q.    That hasn't been paid yet at all?

10           A.    That was paid.

11           Q.    Was that 2,500 your share or the total?

12           A.    My share.

13           Q.    And you paid the HOA directly?

14           A.    That's correct.

15           Q.    "Ongoing Accrued Interest," is that home

16      equity loan?

17           A.    That's correct.

18           Q.    $8,855.74?

19           A.    No, $18,855.74.

20           Q.    Yes.  Has that gone for payments for some of

21      this stuff in here?

22           A.    The home equity line of credit was taken out

23      to pay for all the building repairs and the unit repairs.

24           Q.    This 401(k) loan interest, accrued interest,
```

Page 78

1    $2,105.43?

2           A.    Yes.  That was a 401(k) loan to pay for the

3    damages in Unit 1, 2, 3 and the building.

4           Q.    That would have been a special assessment?

5           A.    Yes.

6           Q.    Next one, "Unit 1 Front Window Replacement

7    South Facing, $19,750;" is that correct?

8           A.    Yes.

9           Q.    Is that a special assessment or is that

10   yours?

11          A.    No.  That's a limited common element.

12          Q.    But all three units are paying it?

13          A.    No.  That's my responsibility.

14          Q.    Okay.  "Ongoing Steve Heir Consulting

15   Payments, $2,574.10"?

16          A.    Yes.

17          Q.    That's the Steve that came out and did an

18   inspection we talked about earlier?

19          A.    He's been working with us not only to do the

20   inspection but to make sure the work was done in a

21   workman like manner and to make sure that the completion

22   of the work was done according to the specifications we

23   issued in the statements of work.

24          Q.    And that $2,574.10, is that total or just

Page 79

1    your --

2              A.    That's my responsibility.

3              Q.    And this is a special assessment?

4              A.    Yes.

5              Q.    You're paying the HOA directly for that?

6              A.    Yes.

7              Q.    "Ongoing Oshana Law Fees, 50,000;" is that

8    correct?

9              A.    Yes.

10             Q.    Are you just paying that or is that part of

11   the --

12             A.    That's my responsibility.  That's my

13   agreement.

14             Q.    Are you sharing that or is Unit 2 and Unit 3

15   involved with this or no?

16             A.    No.

17             Q.    "401(k) withdrawal, 100,630.20, $33,333.33;"

18   is that correct?

19             A.    Yes.

20             Q.    Oh, the taxes owed is 33,000?

21             A.    That's correct.

22             Q.    That was to pay for some of this --

23             A.    That's correct.

24             Q.    -- on the Excel sheet?

```
                                                        Page 80
 1              "Ongoing lawsuit, $1,000."  It says:  "No HOA
 2      component"?
 3              A.    So I also had Steve Hier working with me, so
 4      I have him -- I paid him another $1,000 for work for me
 5      related to this lawsuit.
 6              Q.    So this 1,000 is just you?
 7              A.    That's correct.
 8              Q.    And then "Replace Basement Storage Area In
 9      Basement Entry Area Door Frames, $1,364;" is that
10      correct?
11              A.    Yes.
12              Q.    Is this a special assessment?
13              A.    That's not been done yet, and it will be a
14      special assessment.
15              Q.    Okay.  When it's paid, it will be directly to
16      the HOA?
17              A.    That's correct.
18              Q.    "HOA Insurance Premium Increase Due to HOA
19      Lawsuits, $10,584.64;" is that correct?
20              A.    Yes.
21              Q.    Is that a special assessment?
22              A.    We voted as an HOA to increase the fees, the
23      monthly assessments.
24              Q.    It says:  "Unit 1 Responsibility, $2,646.12"?
```

```
                                                    Page 81
 1          A.    That's per year, and it's been going on since
 2     2020, so you have to multiply that out which is why it
 3     gets to $10,000.
 4          Q.    Okay.  And that's -- everybody's
 5     contributing?  Unit 2 and Unit 3 are contributing?
 6          A.    No.  That's my responsibility.
 7          Q.    Unit 1 and Unit 3 are also paying a premium?
 8          A.    Their assessments went up as well.
 9          Q.    Then "Total Unit 1" or "Unit 1 Total
10     Financial Responsibility as of 1-25-23, $277,735.63"?
11          A.    Yes, that's my understanding.
12          Q.    And that's just a total of all the numbers we
13     just went through?
14          A.    Yes.
15          Q.    And then just above that:  "Total Amount Of
16     Additional Fees Related To Building Repairs As Of
17     11-4-22, $156,840.67"
18          A.    Yes.  So that's a summary of the second set
19     of items we just went through.
20          Q.    Okay.
21          A.    So the orange line is the total amount.
22          Q.    Just to confirm, you're not a real estate
23     agent or never have been?
24          A.    Correct.
```

```
                                                    Page 82
 1          Q.    You don't have any sort of real estate
 2     license or any sort of certificates with real estate?
 3          A.    No.
 4               MR. KOJS:  All right.  That's all I have for
 5     now.  Thank you.
 6                    Anybody else want to ask questions?
 7               MR. FINFER:  Could we take a short, maybe
 8     ten-minute break?  I'm trying to figure out how to do
 9     this in light of the hour.
10               MR. KOJS:  Yeah, that's fine.
11               MR. GOOD:  I have some questions as well.
12                              (WHEREUPON, a break was
13                               taken.)
14                    CROSS EXAMINATION
15     BY MR. GOOD:
16          Q.    Earlier in the deposition you discussed the
17     buyer's inspector that was retained by you and your
18     realtor.  Do you recall that?
19          A.    Sorry.  Who's speaking?
20          Q.    I'm sorry.  My name is Ross Good.  I
21     represent the Third-Party Defendants John Gorr and the
22     Condominium Association.
23          A.    Okay.
24          Q.    I'll just reiterate.  My question was do you
```

Page 83

1    recall earlier in the deposition discussing the Buyer's

2    Inspection Report generated by the inspector retained by

3    yourself through your realtor?

4         A.    You're asking about the Unit 1 inspection

5    report?

6         Q.    Yes, the one that was done prior to the

7    purchase by you.

8         A.    Yes.

9         Q.    Do you recall disclosing that report to

10   either the Gonrings or the Condominium Association prior

11   to the purchase going through?

12        A.    I don't recall.

13        Q.    Do you recall discussing that with your real

14   estate attorneys at the time?

15        A.    Yes, I did.

16        Q.    Do you recall discussing the water issue in

17   the basement area with them?

18             MS. OSHANA:  Who's them?

19             MR. GOOD:  I'm sorry.  What did you say?

20             MS. OSHANA:  Who's them?  You said them.

21             MR. GOOD:  I'm sorry.  I'll rephrase.

22   BY MR. GOOD:

23        Q.    Do you recall discussing the water issue

24   identified on that prior inspection report with anybody?

Page 84

1         A.    Yes.  I shared the report with my attorney.

2         Q.    Other than your attorney did you share it

3  with anybody else?

4         A.    The report?

5         Q.    Yes, that's what I'm asking about.

6         A.    I don't recall if it was shared with the

7  Gonrings or not.

8         Q.    And prior to purchasing the property was it

9  shared with the Condominium Association, to your

10  knowledge?

11         A.    Not to my knowledge.

12         Q.    Do you recall any correspondence drafted by

13  your attorney referencing the basement water that was

14  located?

15         A.    There was a credit at closing that I believe

16  might have been related to that.

17         Q.    Did that credit reference anything in the

18  buyer inspection report?

19         A.    Yes.

20         Q.    And did it reference the water damage in the

21  common area?

22         A.    I don't know.  I'd have to look at the report

23  or at the request.

24         Q.    Were there any requests for remediation to

1    the Condominium Association for the common area water

2    that was located by the buyer's inspector?

3         A.    I don't know what the -- what was relayed to

4    the HOA.

5         Q.    I'm not going to put the exhibit back up, but

6    on the spreadsheet you were shown before we went on break

7    the HELOC was discussed.  Do you recall that?

8         A.    Yes.

9         Q.    And HELOC stands for home equity line of

10   credit; correct?

11        A.    Yes, it does.

12        Q.    And the home equity line of credit that's on

13   the line item for that spreadsheet, that's a home equity

14   line of credit for your unit; correct?

15        A.    That's correct.

16        Q.    And the 401(k) withdrawal on the line items

17   is your own personal 401(k); is that correct?

18        A.    Yes, it is.

19        Q.    Were you instructed by anybody from the

20   Condominium Association to take out a withdrawal from the

21   401(k)?

22        A.    No.

23        Q.    Were you advised of the tax implications from

24   anybody at the Condominium Association?

Page 86

1          A.      In the Condo Association?

2          Q.      That was my question, yes.

3          A.      No.

4          Q.      One of the line items for the work not done

5     yet was for the replacement of the basement storage area

6     and basement entry area door frames.  Do you recall

7     discussing that before going on break?

8          A.      Yes.

9          Q.      And the quote was provided by Renner & Renner

10    and Allendorfer.  Do you recall that?

11         A.      Yes.

12         Q.      Are those two different companies or is that

13    all part of Allendorfer's company?

14         A.      No.  Those are different quotes from

15    different contractors.

16         Q.      And were those different quotes obtained by

17    the Condominium Association?

18         A.      Yes.

19         Q.      And was the door frame issue something noted

20    on the Buyer's Inspection Report prior to your purchase

21    of the unit?

22         A.      I would have to look at it but I believe so.

23              MR. GOOD:  I have no further questions.

24              MR. FINFER:  I'm ready to go unless someone

```
                                                      Page 87

 1      needs another break.

 2                  THE WITNESS:  Okay.

 3                  MR. FINFER:  Are we all good?

 4                  THE WITNESS:  Yes.

 5                  MR. FINFER:  All right.  Good afternoon, Ms.

 6      Young.  My name is Jordan Finfer.  I'm the attorney for

 7      the Gonrings.

 8                  THE WITNESS:  Hi.

 9                       CROSS EXAMINATION

10      BY MR. FINFER:

11          Q.    I'd like to start by showing you -- I

12      apologize, Kevin, if you marked this as an exhibit

13      already, but I don't have it in my notes.  What I want to

14      show you is the Aires Seller Disclosure Statement.  Can

15      you see this?

16          A.    Yes.

17          Q.    Do you recall receiving this statement?

18          A.    Yes.

19          Q.    I'm scrolling down to the second page.  Item

20      6 where it says "Structural Items" --

21          A.    Yes.

22          Q.    -- do you see that?

23          A.    Um-hum.

24          Q.    I can zoom in if it's helpful.
```

Page 88

1      A.    I see it.

2      Q.    The question is:  "Are you aware of any past

3    or present water leakage in the house or other

4    structures."  And the answer by the Gonrings was:  "Unit

5    3 had leaks on west facing windows.  HOA building to --

6    HOA sealed building to resolve Unit 3 leak."  Do you see

7    that?

8      A.    Yes.

9      Q.    What, if anything, did you do to investigate

10   that issue further prior to closing on the property?

11     A.    I don't recall.

12     Q.    Do you recall doing anything?

13     A.    I just said I don't recall.

14     Q.    Is there something that might refresh your

15   recollection?

16     A.    You know, I relied on this document and them

17   to tell the truth about this.  This is a lie.  There was

18   not a leak in Unit 3.

19     Q.    Explain to me why --

20     A.    There was water coming in the north, the west

21   and the east side of the building, so there was no leak

22   in just the west side.  There was not just a sealant put

23   on the building.  There was flashing installed on my unit

24   sliding door.  There was caulking done, and the sealing

```
                                                Page 89
 1    was to the entire building, so this is a lie.
 2         Q.    When did the building learn of these
 3    additional leaks that you just mentioned?
 4              MS. OSHANA:  Hold on.  Objection.  Vague.
 5    When you're saying "the building," you mean the
 6    Association?
 7              MR. FINFER.  Correct, yes.
 8    BY THE WITNESS:
 9         A.    They've been aware for several years.  2012.
10    BY MR. FINFER:
11         Q.    I'm sorry?
12         A.    2012.
13         Q.    Well, you testified earlier that substantial
14    work had been done from 2012 all through 2018; is that
15    correct?
16              MS. OSHANA:  I don't recall that.
17    BY THE WITNESS:
18         A.    I don't recall saying that.  I said it had
19    been -- there had -- some work had been done, and it
20    hadn't been done well and it had been done poorly.
21    BY MR. FINFER:
22         Q.    Okay.  So going back to my original question
23    regarding this Disclosure, did you take any steps to
24    investigate water leaking in the building prior to
```

1    closing?

2         A.   I asked several times in my attorney review

3    letters whether there had been water in the building, and

4    I was told there was nothing or they neglected to answer

5    the question which is lying by omission, so yes, I did.

6         Q.   So other than the attorney review letters

7    where Aires said they're not the seller and can't make

8    any representations did you take any other steps to

9    investigate the water leaks in the building?

10        A.   Yes.  I had asked the HOA as well whether

11   there were issues with the building.

12        Q.   And what did the HOA tell you?

13        A.   They lied.  You'll have to look at the HOA

14   disclosures.

15        Q.   So other than your attorney review letters

16   and your inquiry into the HOA regarding leaks in the

17   building did you take any other steps?

18        A.   I can't recall.

19        Q.   Is there anything that would refresh your

20   recollection?

21        A.   I don't know how to answer that question.

22        Q.   Is there something I could show you that

23   might help you recall?

24        A.   I just told you to pull up the HOA 22.1,

Page 91

1    didn't I?

2         Q.    All right.  So besides the HOA 22.1 is there

3    anything else?

4         A.    No.

5         Q.    So it's fair to say that prior to you

6    purchasing the unit you were aware that there had been

7    leaks in Unit 3; correct?

8         A.    No.  This isn't a leak.  This is not a leak.

9    This is water coming from all three sides of the building

10   and the roof.  This is not a leak.  I relied on them

11   telling the truth.  This is not true.  This was not a

12   leak.  The e-mails between the Gorrs and the Gonrings and

13   the Browns, he's saying water's coming in everywhere,

14   water's coming in the building, water's coming in my

15   unit, water's coming in Unit 1.

16        Q.    So is it fair to say that you had been

17   informed that there, whether you agree with the statement

18   leaks or not, that you had been --

19        A.    No, I don't agree.

20        Q.    You weren't informed that there were leaks in

21   Unit 3 before you closed?

22        A.    There was not a leak in Unit 3.  I just

23   answered that question.

24        Q.    Were you informed that there was water

```
                                                    Page 92

 1      infiltration in Unit 3 prior to closing?

 2            A.    No.  They told me it was a leak.

 3            Q.    Okay.  So the distinction here is that a leak

 4      to you doesn't mean water infiltration, is that what

 5      we're talking about?

 6            A.    The distinction here is you're trying to get

 7      me to say something so you can come back and tell me in

 8      court it wasn't right.  The answer to you is still no.

 9      They told me it was a leak.  That is not true.  There was

10      water on three sides of the building.  They were coming

11      in the walls, the doors, the windows, the roof, the

12      vents.

13            Q.    All right.  So I understand that your issue

14      is that leak doesn't adequately describe the magnitude of

15      the problem?

16            A.    Yeah, and it says it was remediated and it

17      wasn't.

18            Q.    And when did you learn that it wasn't

19      remediated?

20            A.    When I read the e-mails from John Gorr that

21      said they had -- the Gonrings, John Gorr and the Browns

22      said that Arrow had to come back and do some additional

23      work on the unit and the building after they had done the

24      original work in June.
```

Page 93

1          Q.    Are you aware what split face block is?

2          A.    I am now.

3          Q.    And do you recall seeing that the building

4     was split face block in the inspection report prior to

5     closing?

6          A.    Yes.

7          Q.    And prior to closing did you investigate what

8     was required to maintain split face block?

9          A.    Yes to maintain it.  No for the repairs.  No

10    one did any repairs in the HOA.  They put their heads in

11    the sand.  They didn't do the work, and the reason that

12    they didn't do the work is why this is a complete

13    nightmare.  I relied on their statements that they were

14    continuing to do work that needed to be done on the

15    building.  They didn't do that.

16         Q.    I want to show you -- I can't tell.  Are you

17    seeing these meeting minutes from May 7, 2018?

18         A.    Yes.

19               MS. OSHANA:  Are you introducing this as an

20    exhibit?

21               MR. FINFER:  I'm sorry?

22               MS. OSHANA:  Are you introducing this as an

23    exhibit?

24               MR. FINFER:  Yes.  We can mark this as Gonring

Page 94

1   Exhibit 2.

2           Gonring Exhibit 1 should be the Aires

3   Disclosure.  I don't believe it was shown by counsel for

4   Aires.

5   BY MR. FINFER:

6       Q.    Do you recall seeing this document as part of

7   the Disclosure prior to closing?

8       A.    Yes.

9       Q.    All right.  And do you see that there was

10  discussion regarding sealing the building at that time?

11      A.    Yes.

12      Q.    You further see that scope of work included

13  spot grinding, tuckpointing, caulking, flashing and

14  sealing of east, west, north elevations of the block;

15  right?

16      A.    Yes.

17      Q.    So prior to closing you were made aware that

18  the building had not been sealed since 2012; correct?

19      A.    A building that is well maintained should not

20  have to be sealed between 2012 and 2018.  I was under the

21  impression that they had been doing the appropriate work

22  on this building.  I relied on their representations, and

23  if you go look at the e-mails around this particular

24  document that was produced, Kelsey was very specific

1    about the fact that oh, I'm just gonna put together a

2    small document, I'm not going to say a whole lot, I'm

3    going to keep it slow and then we're not going to talk

4    about the water because they didn't bring it up.  Of

5    course, I did bring it up.  I brought it up several

6    times, and they lied.

7         Q.    That wasn't really my question.  My question

8    was as of receiving this document which you received

9    prior to closing you were aware the building --

10              MS. OSHANA:  Wait.  Objection.  Which

11   document?  Which document?

12              MR. FINFER:  The document that's up right now.

13              MS. OSHANA:  You're saying you think my client

14   received Exhibit 2 before closing?

15              MR. FINFER:  Carol --

16              MS. OSHANA:  Wait.  I just want to --

17              MR. FINFER:  She testified that she --

18              MS. OSHANA:  No.  No.  No.  She never

19   testified she received this document before closing.

20              MR. FINFER:  Carol, Carol, we cannot -- we

21   cannot have speaking objections.

22              MS. OSHANA:  My objection is you are -- you're

23   incorrectly describing her previous testimony.  She did

24   not say that she received the May 7, 2018 meeting

Page 96

1    minutes -- I didn't hear that answer.

2                  Answer the question.  You can answer it.

3    Go ahead.  Did you receive this before closing, this

4    May 7, 2018 document?

5    BY THE WITNESS:

6         A.    I don't know.

7    BY MR. FINFER:

8         Q.    All right.  So I'm going to show you here.

9    This is the top of the document.  You testified before

10   that you did but you don't recall --

11                  MS. OSHANA:  No, she didn't.  I didn't hear

12   that.

13                  MR. FINFER:  Carol, come on.

14                  MS. OSHANA:  Hold on a second.  Hold on a

15   second.  You're not putting words in her mouth.  I'm

16   sorry.

17                  If you can show me an e-mail -- where's

18   the e-mail that's -- because obviously there's the

19   attorney review letter.  Is there an e-mail to that?  I

20   want to see it.

21                  MR. FINFER:  Yeah, here it is.  I pulled it

22   up.  This is the same document.  It says "Association

23   Documents To Buyer 2726 West Cortez, Unit 1 Aires, Ms.

24   Sgariglia."  It was produced in discovery, and by the

Page 97

1     way, it is acknowledged that it was received in a request

2     to admit prior to closing.

3              MS. OSHANA:  I want to see.

4              MR. FINFER:  It was provided by Hawbecker &

5     Garver.  Meeting Minutes, Rules and Regulations for the

6     new Association that were sent to Ms. Young.

7              MS. OSHANA:  Wait.  You have to go back up.  I

8     have to read it.  You're going too fast.

9              MR. FINFER:  That's fine.

10    BY MR. FINFER:

11        Q.   Ms. Young --

12             MS. OSHANA:  Wait.  No.  No.  No.  I have to

13    read the doc.  It's not my fault that you didn't bring

14    the docs here.  If you're going to do that, I need a

15    minute.  You have to let me read it.  You should have

16    brought documents.  I understand you're sick.  That's

17    totally fair.  I get it.  But you could easily have just

18    asked counsel to print these for you, so now you have to

19    give me a second.  Hold on.

20             MR. FINFER:  That's fine.  I can e-mail it to

21    you as well if that would be helpful.

22             MS. OSHANA:  No, it's not.  I didn't bring my

23    laptop.  If you would have told me ahead of time, I would

24    have, but you didn't tell me, Jordan, so no, you have to

```
                                                    Page 98

 1    wait a minute.

 2                    What number is this exhibit?

 3                MR. FINFER:  It's my Exhibit 2.

 4                MS. OSHANA:  Exhibit 2 is the May 7, 2018

 5    letter and this document, this Friday, June 29th?

 6                MR. FINFER:  I'm only trying to demonstrate

 7    through this top one here that it was sent prior to

 8    closing.

 9                MS. OSHANA:  I understand that, but this

10    particular e-mail dated June 29, 2018 are you saying is

11    Exhibit 2?  I just need to do it for my notes and for the

12    dep.

13                MR. FINFER:  Yes.

14                MS. OSHANA:  Okay.  So we have as Exhibit 2

15    the May 7, 2018 letter and this June 29, 2018 e-mail;

16    correct?

17                MR. FINFER:  That's correct.  It's all part of

18    the same document.

19                MS. OSHANA:  Okay.  So hold on a second.

20                          (Brief pause.)

21                Okay.  Go on.

22                MR. FINFER:  So just scrolling down.

23                          (Attorney scrolling.)

24                And this is from the paralegal for Ms.
```

Page 99

1      Young's real estate attorney.

2              MS. OSHANA:  Okay.  Go ahead.

3                          (Attorney scrolling.)

4              Okay.  What was your question?

5      BY MR. FINFER:

6          Q.    Can you confirm that you received this prior

7      to closing?

8          A.    Yes.

9          Q.    Okay.  And when you reviewed this, were you

10     aware then that the Association had not sealed the

11     building since 2012?

12         A.    No.  This was also done on May 7th.

13         Q.    2018.  You closed three months later;

14     correct?

15         A.    Yeah, and this is before they signed the

16     Disclosures --

17         Q.    In response to receiving --

18         A.    -- so they knew there was water issues.

19         Q.    The Disclosures were signed in June of 2018

20     but not that it matters.  My question to you is did you

21     take any steps to investigate the condition of the

22     building in light of the fact that it hadn't been sealed

23     in over six years.

24             MS. OSHANA:  That's --

Page 100

1    BY THE WITNESS:

2         A.    I relied on them telling the truth that they

3    were doing the appropriate maintenance that needed to be

4    done to the building, and they lied.

5    BY MR. FINFER:

6         Q.    What in this document is a lie?  What in this

7    document is not truthful?

8         A.    It doesn't talk about which units are having

9    the flashing installed.  They then filled out the

10   Disclosure that said they weren't aware of any issues

11   with water in their unit.  This sounds to me like they

12   were doing regular maintenance on the building.  They

13   were not doing regular maintenance on the building.

14        Q.    But it's fair to say that in response to

15   receiving these meeting minutes you did not take any

16   further steps to investigate the condition of the

17   building?

18        A.    I trusted that they were gonna tell the

19   truth.

20        Q.    Please just answer my question.  Did you take

21   any further steps to investigate the building in response

22   to these meeting minutes?

23        A.    Yeah.  Yeah.  I asked them to fill out the

24   Disclosures.  I asked in the documents between my

Page 101

1     attorney and their attorney whether there had been water

2     infiltration in the building.  I asked whether the HOA

3     had made any claims against the building.  I did.  I did

4     investigate, and I was lied to.

5          Q.   Other than being told that there was leaking

6     in Unit 3?

7          A.   There was no leaking in Unit 3.  There was

8     water pouring in the entire building including the

9     limited common elements, the walls and the doors.

10          Q.   I'm now sharing with you meeting minutes from

11    September 10th, 2018.  Can you see this?

12          A.   No.  You'll need to make it bigger.  I can't

13    read it.

14          Q.   Okay.

15               MS. OSHANA:  Which exhibit is this, 3?

16               MR. FINFER:  I don't know if this was shown.

17    This would be my Exhibit 3.  I don't recall this being

18    shown.

19               MS. OSHANA:  No, I don't think it was.  So can

20    you go to the top so I can note it, what it is?

21               MR. FINFER:  Yeah.  Just one second.  So it's

22    Gorr production 249 through 250.  I'll scroll to the top.

23               MS. OSHANA:  Right.  But it's the

24    September 10, 2018 meeting minutes it looks like between

Page 102

1    John Gorr, Melinda and Ryan Brown.  Okay.  This is

2    Gonring Exhibit 3?

3              MR. FINFER:  Yes.

4    BY MR. FINFER:

5         Q.    So do you recall attending this meeting, Ms.

6    Young?

7         A.    Yes.

8         Q.    And do you recall this particular note

9    wherein what was discussed was that to the best of the

10   building's knowledge the damage was due to water

11   infiltration through the split face block prior to the

12   building being sealed on May 31st, 2018?

13        A.    Yeah.  Now I know that's not true.  There was

14   still water coming into the building, and Arrow had to

15   come back after they had the work done in June.

16        Q.    Yeah, and no one's debating that they had to

17   come back nor is anyone debating expenses associated with

18   that.  What I want to ask of you is what basis do you

19   have to believe that this representation at the time it

20   was made was false.

21             MS. OSHANA:  What representation?  Which

22   representation?

23             MR. FINFER:  Carol, just please object to

24   vagueness.  Where it says:  "To the best of our

Page 103

1    knowledge, the damage was due to water intrusion through

2    the split face block prior to the building being sealed

3    on May 31st, 2018."

4    BY THE WITNESS:

5        A.    What's your question?

6    BY MR. FINFER:

7        Q.    What basis do you have to believe that that

8    representation is false?

9        A.    I have all the e-mails.  I have -- we saw

10   that there's water coming in after they had the building

11   sealed.  There's --

12       Q.    So when you sat in this meeting, it's your

13   position that Gorr and Brown were lying about what they

14   thought had been accomplished by the sealing?

15       A.    Absolutely.

16       Q.    What support do you have for that?

17       A.    Well, I have the ESI report.  I have the

18   Arrow report.  They speak English so do I.  I have the

19   neighbor's testimony.  They lied throughout the whole

20   transaction, so all the Disclosures are lies.  I have

21   lies about who the seller actually is.

22       Q.    But other than these general statements about

23   grand conjectures of lies is there any specific thing

24   that you can point to that indicates that Gorr, Brown or

Page 104

1    the Gonrings believed that there was still water

2    intrusion after sealing on May 31st, 2018?

3         A.    Yeah.

4         Q.    What about the fact that the next item here

5    says that:  "The water damage around the perimeter is dry

6    indicating that current sealant is preventing further

7    water intrusion"?

8         A.    Well, that was wrong.

9         Q.    Yes, but was it a lie?

10        A.    Yes.

11        Q.    By whom?

12        A.    All three unit owners conspired to get out of

13   this sale because they knew that there was so much damage

14   to this building that it was gonna cost an enormous

15   amount of money to get this done.  All three of them put

16   their buildings up for sale or their units up for sale

17   within six weeks of each other.  They lied.

18        Q.    So the basis for the lie is because they

19   happened to put their, listed their units for sale around

20   the same time?

21        A.    Oh, my God.

22             MS. OSHANA:  Objection, mischaracterizes her

23   testimony.

24             MR. FINFER:  I'm trying to figure it out.

Page 105

1          MS. OSHANA:  We just gave you the answer,

2     Jordan.  You just don't want to listen.

3     BY MR. FINFER:

4          Q.    Are you aware that the reason that the

5     Gonrings moved is because they were relocated for work?

6          A.    So?

7          Q.    Well, doesn't that cut against your theory

8     that this was some conspiracy for them to get out all at

9     the same time?

10         A.    Not at all.  This was a convenient way for

11    them to get out of it.

12         Q.    Okay.  But you don't have support for that

13    position; that's just what you've come up with?

14         A.    Not at all.  I have the testimony from the

15    neighbor.  I have Gorr, Brown saying we're not sure

16    whether you knew this or not but there's been significant

17    water issues with the building and the units since 2012.

18    I have all the e-mails between the unit owners.  I have

19    the Gonrings saying yeah, we would have sued the former

20    owner Mulligans; we should have done that.

21         Q.    Going through this report further, it talks

22    about mold testing in Unit 3 and that there's mold in

23    Unit 3.  Do you see that?

24         A.    Yes.

1       Q.    Can you explain how mold in Unit 3 has any

2    impact on Unit 2 and Unit 1?

3       A.    Yeah, I have e-mail from the Mulligans saying

4    that they had mold in Unit 1 and that there was water

5    infiltration where the windows and the door well openings

6    are in the building, and I can't afford to open my walls

7    yet, but we'll see what's there when we open them.

8       Q.    So I just wanted to confirm this but you

9    would agree that to date you've not discovered any mold

10   in your unit; right?

11      A.    Not yet, but there's water coming in.

12      Q.    The water that you referenced coming in, I

13   think that was on your damages spreadsheet, that's

14   recent; correct?

15      A.    No, it's not.

16      Q.    Was it 2019?

17      A.    I've had water coming in since the fall of

18   2018.

19      Q.    I'm sorry.  I don't see any items listed for

20   repair work to Unit 1 for water coming in in the fall of

21   2018.

22      A.    Yep, that's -- I just told you I can't afford

23   to replace the windows.

24      Q.    So here -- we have meeting minute here from

1    September of 2018 which is fall.  At what point did you

2    have water coming into Unit 1?

3         A.    October, November and then after that.

4         Q.    Is water still coming in?

5         A.    Yes, it is.

6         Q.    I'm sorry?

7         A.    I said yes.

8         Q.    Have you ever actually obtained a mold test

9    for Unit 1?

10        A.    I just explained to you I don't have the

11   money.

12        Q.    Are you aware that a mold test costs $500?

13        A.    Are you aware how much money I've already

14   spent to fix this fucking building?

15        Q.    But you've never conducted a mold test for

16   Unit 1?

17        A.    I don't have the money.

18        Q.    So no?

19             MS. OSHANA:  Not yet.

20   BY MR. FINFER:

21        Q.    Is this showing here?  Can you see this?

22        A.    Yep.

23        Q.    Okay.  So just for the record -- and this

24   will be Gonring Exhibit 4.  This is Gorr production 2044

Page 108

1    through 2045.

2                Do you recall receiving this e-mail?

3        A.    Yes.

4        Q.    Do you see where at that time Gorr was

5    telling you that the work was concluded regarding the

6    sealant?

7        A.    Yes.  That's a lie.

8        Q.    Do you think this is a lie where Gorr says we

9    are fairly confident that the water stopped getting into

10   the building?

11       A.    That's a lie.

12       Q.    Is it a lie or do you think he just

13   misunderstood what the -- the success of the Arrow

14   Masonry work?

15       A.    Look at the e-mails.  It says it's a building

16   problem.  There is water coming in at the wall openings.

17   It is a lie.  They had ESI come in, a structural

18   engineer, and tell them what was wrong with the building,

19   and they didn't do a thing to fix it, and anything they

20   did do actually made it worse.

21       Q.    So the basis for you believing that Gorr was

22   lying to you is because the ESI report showed different

23   issues?

24       A.    The ESI report shows issues that they never

Page 109

1    addressed.  I don't know what you're asking me.

2         Q.    Have you talked to the -- what's the name of

3    the owner, the current owner of Unit 2?

4         A.    Kristen Keene.

5         Q.    Do you know what was disclosed to Kristen

6    Keene?

7         A.    No.

8         Q.    Excuse me.  I can withdraw that.  That's a

9    bad question.

10          Do you know what was disclosed to Kristen

11    Keene prior to her purchasing the unit?

12         A.    No, I don't.

13         Q.    Do you know if there was some discount on her

14    purchase price given the potential water infiltration

15    issues in the building?

16         A.    Yes, I do.

17         Q.    And do you know what that was?

18         A.    What what was?

19         Q.    That discount.

20         A.    I don't recall the number.  I'd have to look

21    at the documents.

22         Q.    What document would you look at?

23         A.    Whatever information was shared with her and

24    whatever document was shared that had the discount that

Page 110

1    you're discussing.

2         Q.    I want to show you what we'll mark as Exhibit

3    5.

4         A.    Can you please make it bigger.

5         Q.    Yes.  B. Allendorfer is the company that the

6    Association used to address all of the issues that you

7    believe exist in the building?

8         A.    We hired them to fix the building issues that

9    we're aware of.

10        Q.    Okay.  And so what I'm looking at here -- and

11   this is something that you produced Bates stamped as 645,

12   Plaintiff's Bates stamp 645.  So the first thing that was

13   paid for was remove the existing drywall ceiling in Unit

14   3, remove the existing drywall ceiling and walls in Unit

15   2, remove all debris resulting from our operation on the

16   premises.  Is this something that you had to pay for as

17   part of a member of the Association?

18        A.    Yeah, the bylaws state that if the HOA is

19   negligent they are required to pay to remediate.

20        Q.    So who at the Association determined that the

21   HOA was negligent and thus responsible for all repairs to

22   the building or any unit for that matter?

23        A.    Anyone who could speak English.

24        Q.    Yeah, but was there a vote at a meeting to

Page 111

1    make that determination?

2        A.    I don't recall, but yes, we came to that

3    conclusion.  I mean it's pretty clear from the fact that

4    all the e-mails that John Gorr has been producing to me

5    that the HOA was pretty negligent.  They didn't do any

6    work.  They didn't do anything to fix this.  They just

7    let it sit and sit.  They ignored the problem and they

8    put their heads in the sand.

9        Q.    Other than the sealant in 2018?

10       A.    I don't know what your -- what's your

11   question?

12       Q.    I want to make sure I understand the point

13   here.  So you paid for work done in Unit 3 because

14   collectively the Association decided -- because they had

15   been so negligent in maintaining Unit 3 that the entire

16   Association should be responsible for the repairs to Unit

17   3?

18       A.    No, that's not what I'm saying at all.  I'm

19   saying if damage is caused to a unit by negligence of the

20   HOA, it's the HOA's responsibility to remediate the

21   issue.  Read the bylaws.

22       Q.    So have you sued the HOA?

23       A.    Well, the Gonrings have done that.

24       Q.    Yes, but if it is the HOA's negligence that

Page 112

1   has caused you to incur damages or has breach of

2   fiduciary duty, what does that have to do with the

3   Gonrings?

4           MS. OSHANA:  I'm going to object.  You know,

5   you're asking legal analysis of my client.  You want to

6   ask me, I'll tell you.  Ask me.  You're asking her for a

7   legal analysis.  She's not a lawyer.

8           MR. FINFER:  Carol, just say objection, calls

9   for legal conclusion --

10          MS. OSHANA:  Thank you.

11          MR. FINFER:  -- and then have her answer

12  anyway.

13          MS. OSHANA:  I'd be delighted to answer it.

14  BY MR. FINFER:

15      Q.   Ms. Young, can you answer the question,

16  please.

17          MS. OSHANA:  I just told you she's not a

18  lawyer.  I'm going to object.  It asks for a legal

19  conclusion.

20          MR. FINFER:  I'm not -- look --

21          MS. OSHANA:  If you can answer.

22          MR. FINFER:  I'm asking the question

23  because -- Carol, I'm asking the question because she is

24  a member of the Association and she has just testified

Page 113

1    that the Association made a legal determination that the

2    Association should be responsible for all the repairs to

3    Unit 3.  It is also the basis for almost the entirety of

4    the damages claim asserted against my clients, so I

5    certainly have the right to dig into that issue.

6              MS. OSHANA:  You absolutely can.

7              MR. FINFER:  That's what I'm trying to figure

8    out.

9              MS. OSHANA:  I didn't say you can't dig, but

10   you can't ask her to answer legal questions.  She doesn't

11   know.

12   BY MR. FINFER:

13        Q.    Have you considered pursuing claims against

14   the Association, Ms. Young?

15        A.    Yes.

16        Q.    Is that something you intend to do?

17        A.    That's something that I'll work on with my

18   attorney.

19        Q.    Okay.  But is your position that the reason

20   you paid for work done in Unit 3 was because of the HOA's

21   negligence in maintaining the building?

22        A.    Yes.

23        Q.    Okay.  I'm going to scroll down here.  This

24   is an 18-page document but it's many purchase orders.  I

Page 114

1    just want to ask you about each of them.

2                This is for June 5th, 2019.  The work here --

3    can you see this okay?

4          A.    Yep.

5          Q.    So I'm highlighting this because from my

6    review, this again has nothing to do with Unit 1 and this

7    is work associated with Unit 3.

8          A.    That's not true.

9          Q.    And my question to you again --

10         A.    This is for the roof.  The roof belongs to,

11   to the building.

12         Q.    Right.  It was the HOA's obligation to

13   maintain the roof?

14         A.    That's right.

15         Q.    And its failure to maintain the roof is the

16   basis that you are seeking to recover these damages now;

17   correct?

18         A.    I'm recovering damages because they lied to

19   me about material issues with the building that they were

20   required to disclose and they did not do that.  They were

21   required to disclose issues with the wall openings that

22   are limited common elements.  They did not disclose that.

23   They know of materially evident information that affects

24   the value of my unit.  This materially affects the value

Page 115

1    of my unit.

2         Q.    Okay.  But we're agreeing that the roof is a

3    common element; correct?

4         A.    The roof is a common element.

5         Q.    And that the work here that was paid to

6    Allendorfer for $27,500 was for roof repair; correct?

7         A.    Yes.

8         Q.    So this next item is for mortar and sealant

9    maintenance to all glass block openings.  This was the

10   work that was previously performed by Arrow; correct --

11        A.    No.

12        Q.    -- the sealant?

13        A.    It didn't say -- it says the -- no, the Arrow

14   contract doesn't say that they applied sealant to glass

15   block openings.  It also doesn't say that they performed

16   mortar to glass block openings.  That's not what the

17   Arrow contract says.

18        Q.    Okay.  So in your mind, this is just

19   different work altogether?

20        A.    This is work that should have been done.

21        Q.    Okay.  So the next item here is front stoop

22   to be constructed with lower beam walls and steel

23   railings?

24        A.    Yup.

Page 116

1      Q.    What does this work have to do with something

2      that wasn't properly disclosed?

3      A.    They were, they were aware of issues that

4      materially affected the value of my unit.  They're

5      required to disclose that.  There was significant water

6      damage to the stairs that was caused by the glass -- by

7      the split face block.  They are required to disclose

8      issues that they are aware of that would materially

9      affect the value of my building.

10     Q.    So it's your position that the Association

11     was aware of damage to the front steps, front stoop and

12     didn't disclose it?

13     A.    That's right.

14     Q.    And that's your position because you believe

15     the Association was aware of water infiltration generally

16     to the building and should have known the causes of that

17     would have included damage to the front stoop?

18     A.    That's correct.  And they lied the entire

19     time.

20     Q.    So this is another scope of work here which

21     is again specific to Unit 3.  Can you see this okay or do

22     I need to zoom?

23     A.    Zoom it in, please.

24     Q.    You see where it says "kitchen and great

Page 117

1    room"?

2         A.    Yeah.

3         Q.    So we agree that this is all work being done

4    in Unit 3; correct?

5         A.    That's right.

6         Q.    And the reason that you paid for work that

7    was being done to Unit 3 is because of the HOA's

8    negligence in maintaining the common elements?

9         A.    I didn't pay for this work.

10        Q.    So I just pulled up the Allendorfer report

11   which had all the work.  I assumed --

12        A.    You assumed wrong.

13        Q.    Hold on.

14                            (Brief pause.)

15             If you could look up here.  What I was trying

16   to do was figure out for the masonry work that accounts

17   for $61,919 of your damages as to all that went into

18   that.

19        A.    You can pull up the quote from Allendorfer.

20        Q.    Well, that's what I was doing.  I was going

21   through it.  But that was a $15,000 item that you did not

22   pay for?

23        A.    No.

24        Q.    But for purposes of this $61,919, this is all

Page 118

1    work that Allendorfer performed; correct?

2        A.    Yes.

3        Q.    Since I'm on this document, I wouldn't mind

4    digging into it a little bit further.  I think I have

5    some of the answer based upon your prior testimony but

6    nonetheless.

7             The first line item on here was the $5,926.36

8    for mold remediation which was mold remediation performed

9    in Unit 3; correct?

10       A.    No.  There was mold in Unit 3 and there was

11   mold in the walls and the floors and the joists.

12       Q.    Mold in the walls of the entire building or

13   mold in the walls of Unit 3?

14            MS. OSHANA:  She said joists.  I don't know if

15   you heard her.  She said floors and joists.

16            MR. FINFER:  I did.

17            MS. OSHANA:  Joists are obviously not in a

18   unit.

19   BY MR. FINFER:

20       Q.    Ms. Young, are you going to answer that

21   question?

22       A.    Would you please ask the question again.

23       Q.    Yeah.  Mold in the walls for the entire

24   building or mold in the walls of Unit 3?

1      A.     There was mold in the building walls.  There

2    was also mold in Unit 3.

3      Q.     Where was the mold -- was there mold

4    remediation performed in your unit?  I thought you

5    already said there wasn't?

6      A.     You asked me if there was mold in the

7    building and I said yes.  There's mold in the joists.

8      Q.     Where was that remediation work performed?

9      A.     Above and below and around Unit 3.

10     Q.     So these were some limited common element and

11   some common element repairs?

12     A.     Yes.

13     Q.     And they were limited common elements for

14   Unit 3; correct?

15     A.     Yes.

16     Q.     And so you believe that it is your

17   responsibility to pay for this because of the HOA's

18   negligence in maintaining the building?

19     A.     There was negligence and there were limited

20   or there were walls of the building that had mold in them

21   that had to be fixed.

22     Q.     Sure but that's a common element; correct?

23     A.     Sure.  That's a common element.

24     Q.     And you believe that the mold in the common

Page 120

1  elements, the walls and the joists was the result of the

2  building's failure to properly maintain the building;

3  correct?

4      A.    There were two issues.  The building was

5  improperly constructed which was not disclosed to me and

6  the HOA never did anything to remediate the issues.  The

7  HOA is comprised of the Gonrings, Unit 1, Unit 2 and Unit

8  3.

9      Q.    Bear with me for a second.

10                         (Brief pause.)

11            THE WITNESS:  Can I take a break while you're

12  trying to find stuff?

13            MS. OSHANA:  Can she take a break?

14            MR. FINFER:  Sure.  Ms. Young, you need to

15  leave -- you need to take a break in 35 minutes?

16            THE WITNESS:  Yes.

17            MS. OSHANA:  I'm hungry too.  Are we taking a

18  lunch break?

19            MR. FINFER:  Well, I figured we would just do

20  that during that hour break.

21            MS. OSHANA:  She has to attend a meeting for

22  her kid.

23            MR. FINFER:  Okay.  Tell me what you'd like to

24  do.

Page 121

1            MS. OSHANA:  I'd like to get food because she

2       can't really eat while she's in a meeting.

3            MR. FINFER:  Well, I don't want you to be

4       uncomfortable, Ms. Young.  I don't have a strong

5       preference other than I'd like to get this done today.

6            MS. OSHANA:  How much time do you think you

7       have?

8            MR. FINFER:  I don't know, 45 minutes, an

9       hour.

10           MS. OSHANA:  Oh, yeah, we need a lunch break

11      for sure.  Why don't we just break now?  Let's break now

12      because it's 1:20.  She's got to be on the phone in 20

13      minutes for her kid.  It's probably going to last like an

14      hour?

15           THE WITNESS:  Yeah.

16           MS. OSHANA:  So in the meantime, I'll go get

17      some food for all of us.  We'll eat and come back at 3.

18           MR. GOOD:  3:05?

19           MS. OSHANA:  Your meeting is until 3?

20           THE WITNESS:  I can't say for sure, but it's

21      scheduled for an hour.

22           MS. OSHANA:  Okay.  This is for -- you know,

23      she has no choice but to attend this meeting.  Why don't

24      we just -- are you guys like -- are you by your phones?

Page 122

1    Can we e-mail you and say okay, we're back or -- you

2    know, is that possible?

3                MR. GOOD:  I'm going to leave my Zoom window

4    open.

5                MS. OSHANA:  Can you do the same?

6                MR. FINFER:  You want to e-mail one of us?  I

7    think we all plan on being back here at 3:05.

8                MS. OSHANA:  Yeah, let's do that.

9                MR. FINFER:  Okay.

10               MS. OSHANA:  Okay.  Thanks.

11                                (WHEREUPON, a lunch break

12                                 was taken.)

13               MR. FINFER:  Is it possible to have the court

14   reporter read back the last exchange?

15                                (Requested portion of the

16                                 record read.)

17   BY MR. FINFER:

18        Q.    So I want to share what we can mark as

19   Gonring Exhibit 6.  Ms. Young, are you able to see this?

20   I can zoom out a little bit if that's helpful.

21        A.    Yes, I can see it.

22        Q.    Would this be the purchase order for the mold

23   work that was performed?

24        A.    Yes, it is.

Page 123

1          Q.    So I'm just looking at this invoice.  Some of

2     it is covered over by the check that was written.  Just

3     for the record, this is what was produced, so it's

4     Plaintiff's Bates stamp 819.  I see where the mold

5     remediation work was performed all within the interior of

6     the unit.  I'm trying to get some clarity as to whether

7     this was the extent of the mold work that was performed

8     or if there's another invoice out there.

9          A.    I can produce the invoice without the check

10    on top of it, but the last -- 1, 2, 3 -- 5, it looks like

11    it's "Sanitize exposed walls."

12         Q.    And so this was what you were referring to

13    when you were talking about the common elements?

14         A.    I'll have to look at that.  I can't read it.

15              MR. FINFER:  Carol, is that something you

16    could produce?

17              MS. OSHANA:  Yeah.

18              MR. FINFER:  Carol, is that something you

19    could produce?

20              MS. OSHANA:  Yeah.

21              MR. FINFER:  Thank you.

22              MS. OSHANA:  Um-hum.

23    BY MR. FINFER:

24         Q.    I'm going to show you what, I don't believe

Page 124

1    it's been shown before, we'll mark as Exhibit 7 which is

2    the Association's 22.1 Disclosure.  Ms. Young, have you

3    seen this document before?

4         A.    Yes.

5         Q.    Okay.  And I want to call your attention to

6    question 3 which asks if there's any reserves designated

7    by the Association for any specific projects.  The answer

8    was:  "No."  Then with respect to question 4:  "Are there

9    any anticipated capital expenditures," and the answer is

10   "No."  Is it -- this document was signed by John Gorr.

11   Is it your position that when he signed this document

12   indicating that there were no anticipated capital

13   expenditures that this was a lie?

14        A.    They were lying.

15        Q.    So it is your position that this was a lie by

16   the Association?

17        A.    Kelsey and John have e-mails back and forth

18   about how they were going to fill this out.  This is a

19   lie.

20        Q.    Okay.  But this is signed just -- Kelsey

21   didn't sign this document just John did?

22        A.    Yep.  Kelsey was telling John how to write

23   it.  They were part of the HOA.  They colluded about how

24   they were going to fill this out.

Page 125

1    Q.    Just to clarify, I think the e-mail

2    communication you were referencing relates to the sale of

3    a different unit?

4    A.    No, it does not.

5    Q.    And really my question -- but regardless of

6    what work product went into completion of this 22.1

7    Disclosure, it's your position that the representations

8    made in here are false; is that correct?

9    A.    Yes.

10    MR. FINFER:  Was this marked as an exhibit, it

11    must have been --

12    MR. KOJS:  Yeah.

13    MR. FINFER:  -- your damages?

14    MR. KOJS:  Yeah.

15    MR. GOOD:  It's Exhibit 9 for Plaintiff.

16    MS. OSHANA:  Not for Plaintiff.  For yours.

17    MR. KOJS:  I said Plaintiff's exhibit.

18    MS. OSHANA:  Oh, you're calling it Plaintiff's

19    exhibit?

20    MR. KOJS:  Yeah.

21    MS. OSHANA:  Okay.

22    BY MR. FINFER:

23    Q.    So I want to go back to the masonry work that

24    we talked about a little bit in the Allendorfer post.  I

Page 126

1    haven't seen anything in the production that shows what

2    the base $120,000 contract was for.  What was produced is

3    what we sort of went through, and I think that you

4    recalled there was some work that was anticipated being

5    performed for Gorrs' unit on the interior which you

6    testified to that you didn't pay for.  I didn't see

7    anything with respect to the full contract scope of the

8    120,000.

9         A.    Okay.

10        Q.    Do you have that?

11        A.    I sent it over.  Yeah, I'll resend it.

12        Q.    Well, I mean here's -- I just want to pull

13   this up.  This is what we had marked as Gonring Exhibit

14   5.  I pulled this from your production.  I could scroll

15   through it real quickly but I don't see anything in here

16   that accounts for the full 140 or $120,000.

17        A.    Okay.  I'll send it through.

18             MS. OSHANA:  I think -- I'm pretty sure I sent

19   it to you.

20   BY MR. FINFER:

21        Q.    This is what you sent.  I looked back during

22   the breaks to make sure that I wasn't missing something,

23   and it's also, for whatever it's worth, the same thing

24   that the Association sent and so I can't figure out --

Page 127

1    because if you look, for example, we have a previous

2    contract total of 129, excuse me, $129,900 here, but if

3    you go -- if you scroll through the entirety of this

4    document, you never really get -- I think it might be a

5    different contract.  This is for roofing work.

6           A.    Yep.  Can you go back --

7           Q.    This is for elevation tuckpointing.

8           A.    Can you go back to the spreadsheet?

9                 MS. OSHANA:  Go back to the spreadsheet.

10                THE WITNESS:  Can you scroll to the right?

11                          (Attorney scrolling.)

12                Okay.  I'll send the invoice again.

13   BY MR. FINFER:

14          Q.    Yeah, you sent this check on April 9th for

15   $60,000.

16          A.    Yep.

17          Q.    Since we're on this topic, the $60,000 -- I'm

18   sorry?

19                MS. OSHANA:  No, I was trying to figure out

20   where we could find it but go ahead.

21   BY MR. FINFER:

22          Q.    The check for $60,000 that you wrote, check

23   1004 --

24          A.    Yes.

Page 128

1       Q.    -- did that come from your personal funds?

2       A.    No.  That's an HOA check.

3       Q.    But you wrote a total of $60,000, no?

4       A.    I have all images of all the checks that I

5  wrote, and I can clarify which checks are for what.  One

6  side is HOA check, and one side is my check to the HOA.

7       Q.    Let me see if I can show you this.  Are you

8  able to see this check here?

9       A.    No.

10      Q.    It's not -- hold on.  I can't tell what's

11 shared.  Do you see the check --

12      A.    Yes.

13      Q.    -- that you wrote?

14      A.    Yes.

15      Q.    So this is on August 6, 2020.  So I have this

16 check.  I have this check on April 25th, 2019 for 26,400.

17      A.    Okay.

18      Q.    I assume this corresponds with -- maybe it

19 doesn't.  I see on your spreadsheet that you have there

20 was a check written from the Association for -- here we

21 go.  I see.  So your initial deposit was 26,400?

22      A.    I don't know.  If you go back to the

23 spreadsheet, every check number I wrote corresponds with

24 the HOA payments, and I have images that I've verified

Page 129

1    and validated in --

2         Q.    So I think I understand you now.  So this

3    was -- the initial payment here was 26,400.  Then there's

4    another payment for $8,712 and another payment for 4,158

5    then another for 9,722?

6         A.    Yeah, that's correct.  There's an initial

7    deposit, and then you had to make progress payments

8    against that contract or against the work that was being

9    done.

10         Q.    Okay.  And for the total of the $61,919 that

11    you paid to Allendorfer did these funds -- did this money

12    come from your personal funds?

13         A.    Yes.

14         Q.    So no one lent you money or no one paid this

15    on your behalf?

16         A.    No.  You can see my home equity line of

17    credit, my 401(k) withdrawal, my 401(k) loan.

18         Q.    Okay.  I don't know that we have all these

19    checks but I'd ask that whichever checks --

20         A.    You have all the checks.  I have reconciled

21    this six times.

22              MS. OSHANA:  Was it in the one we just sent

23    right now, the last one too?

24              THE WITNESS:  Yes.

Page 130

1            MS. OSHANA:  Did you get my e-mail on Friday?

2            MR. FINFER:  Yes.  That's what I have pulled

3      up.  So I've got three checks --

4            THE WITNESS:  Okay.

5            MR. FINFER:  -- from Ms. Young.

6            MS. OSHANA:  Hold on.  She's pulling them up

7      for you.

8            THE WITNESS:  So the HOA checks for this

9      particular masonry work that was done 3-26-19 is in a

10     folder that's been shared with you called "HOA Check

11     Reconciliation."

12           MR. FINFER:  I have it entitled "HOA Checks

13     And Bill Payments."

14           THE WITNESS:  Okay.  I don't have it open in

15     front of me, so I can't --

16           MS. OSHANA:  You mean the drive?

17           THE WITNESS:  Yeah.

18           MR. FINFER:  I just want to make sure we're --

19     I believe you.  I just want to make sure that we're not

20     missing some production since we're all sitting here, you

21     know, spending our time doing this.  I don't want to have

22     to come back.

23           MR. McCARTHY:  This is Paul McCarthy.  I've

24     gone through the production too.  I can't tie out all of

Page 131

1    the checks from Melinda's account, so I would echo the

2    request just to make sure that we have within the

3    production all of the checks that were written from her

4    various accounts.

5            MS. OSHANA:  I'll make sure -- she and I will

6    go over it again and I'll make sure that everything -- if

7    there's anything missing, I'll definitely get it to you.

8    I'll just reproduce all those -- you're talking about

9    those one, two, three, four -- is it ten checks?

10           MR. FINFER:  Is there a way for that to happen

11    while we're sitting here?

12           MS. OSHANA:  Can we get -- do you think we can

13    get on the drive?

14           THE WITNESS:  How long do you want to sit here

15    for?

16           MR. FINFER:  Not much longer, but by the same

17    point, otherwise, we're going to look at these documents

18    and we're going to have to come back.

19           THE REPORTER:  Do you want to go off the

20    record?

21           MR. FINFER:  We can go off the record.

22                   (Discussion had off the

23                    record.)

24           I'm going to stop the share for a minute

```
                                             Page 132

 1    while you pull that up.

 2                          (Discussion had off the

 3                          record.)

 4              Ms. Young, are you able to sort of move

 5    the camera a little bit just so I could see you?

 6                          (Camera readjusted.)

 7              Thank you.

 8    BY MR. FINFER:

 9         Q.    All right.  You have to bear with me as I try

10    to work through some of this because I'm looking at it

11    for the first time.  I'm just going to start here.  No

12    particular reason.

13              These are images of alleged water damage in

14    Unit 1; is that correct?

15         A.    Water infiltration and water damage, yes.

16         Q.    When were these photos taken?

17         A.    Since 2018.

18         Q.    These photos were taken in 2018?

19         A.    Since 2018.  There have been multiple

20    occasions of water intrusion.  These represent different

21    times that water has been in my unit.

22         Q.    It looks like there's some stamp on there

23    from 2021?

24         A.    As I said --
```

Page 133

1   Q. What do you --

2   A. -- the water has been infiltrating since the

3 fall of 2018.  These are different images of multiple

4 occasions that water has been infiltrating my unit from

5 those windows.

6   Q. What did you take these photos with?

7   A. Camera.

8   Q. Was it like an iPhone camera?

9   A. Yeah, an iPhone camera.

10   MR. GOOD:  Jordan, could we go off the record

11 for a second?

12   MR. FINFER:  Yes.

13      (Discussion had off the

14      record.)

15   So just to be clear, I received a PDF but

16 what Ross had access to was the metadata you see on the

17 right, so we're going to have to go through each photo

18 and confirm the accuracy on this metadata.

19 BY MR. FINFER:

20   Q. If you look at the photo right here, this

21 indicates that it was taken --

22   A. I can't see.  Your faces are over the

23 metadata.

24   MS. OSHANA:  Can you make it smaller?  Can you

Veritext Legal Solutions

800-567-8658                   973-410-4098

```
                                                Page 134

 1      move the metadata?  Can these screens be --

 2                 MR. FINFER:  You can move our faces too.

 3                 MS. OSHANA:  He's moving them.  Hold on.

 4                                 (Brief pause.)

 5                 MR. GOOD:  Can you see the right side of the

 6      screen?

 7                 MR. KOJS:  Yeah.

 8                 MR. FINFER:  Where did Ms. Young go?

 9                 MS. OSHANA:  She's getting water.

10      BY MR. FINFER:

11           Q.    Can you see this, Ms. Young?

12           A.    Yeah.

13           Q.    So you see that it says "October 7th, 2021"?

14           A.    No.

15           Q.    Do you see where it says "Info"?

16           A.    Yep.

17           Q.    Do you see below it says "2-23"?

18           A.    Yes.

19           Q.    Then below there it says "October 7, 2021"?

20           A.    Yes.

21           Q.    "6:35 p.m."?

22           A.    Um-hum.

23           Q.    Do you have any reason to believe that that

24      date is incorrect as to the date of when you took this
```

Page 135

1    photo?

2              A.    No.

3              Q.    I'm sorry.  Was that a no?  I didn't --

4              MS. OSHANA:  She said no.

5    BY MR. FINFER:

6              Q.    Okay.  Let's go to the next one.  Same

7    question.  Do you see here it says "October 7th, 2021

8    6:37 p.m."?

9              A.    Yep.

10             Q.    Is that date correct?

11             A.    Yep.

12             Q.    Okay.  Let's do the next one.  Same question.

13   This says "October 7th, 2021 at 6:31 p.m"?

14             A.    Yep.

15             Q.    Do you have any reason to believe that that

16   date is incorrect?

17             A.    No.

18             Q.    Okay.  Next one.  This says "October 7th,

19   2021 6:34 p.m."  Any reason to believe that this date's

20   incorrect?

21             A.    No.

22             Q.    Next one.  This says "October 7th, 2021 6:37

23   p.m."?

24             A.    Yep.

                                                    Page 136

1           Q.    Any reason to believe that -- is that date

2     correct?

3           A.    No.

4           Q.    No, it's not?

5           A.    No, I have no reason to think it's incorrect.

6           Q.    Okay.  Got it.

7                 Let's go to the next one.  This one says

8     "February 7th, 2023"?

9           A.    Yes.

10          Q.    Do you have any reason to believe that that

11    date's incorrect?

12          A.    No.

13          Q.    Do you have any more?

14                MR. McCARTHY:  I don't mean to be the

15    technological knuckle dragger here but where are you

16    seeing the dates on these?

17                MR. FINFER:  On the right-hand side where it

18    says "Info."

19                MR. McCARTHY:  Oh, I see.  My Zoom window is

20    over it.

21                MR. FINFER:  Yeah.

22                MR. McCARTHY:  Okay.  Thank you.

23                MR. FINFER:  Did we just go through all the

24    photos there, Ross?

Page 137

1          MR. GOOD:  These two appear to be duplicates,

2     so yes.

3          MR. FINFER:  Okay.  I think you can stop

4     sharing.

5          MR. GOOD:  Okay.

6     BY MR. FINFER:

7          Q.    Ms. Young, would you agree that all the

8     photos of the water filtration were taken on October 7th,

9     2021 and February 7th, 2023?

10         A.    Those pictures reflect those dates.

11         Q.    Are there others?

12         A.    I've produced everything that I have.  The

13    Mulligans had water in Unit 1.  John Gorr says there's

14    been water infiltration in Unit 1.  I'm seeing water

15    infiltration in Unit 1.  And why the hell did they flash

16    the rear deck sliding doors if they weren't having water

17    infiltration in their unit?

18         MS. OSHANA:  He's just asking about the

19    photos.  Are those the only photos?

20    BY THE WITNESS:

21         A.    As far as I know, those are the only photos.

22    BY MR. FINFER:

23         Q.    Okay.  All right.  So the next thing I

24    noticed I haven't seen before -- I'll share this.  Can

Page 138

1    you see this document here?

2         A.    Yes.

3         Q.    For the record, this is an engagement letter

4    between the 2726 West Cortez Condominium Association and

5    Klein, Daday, Aretos & O'Donoghue, Attorneys-at-Law.

6    This is a contract for legal services related to a demand

7    to Arrow Masonry & Exteriors dated July 22, 2020.  Did

8    you ever enter into an engagement letter with Klein,

9    Daday, Aretos & O'Donoghue?

10        A.    The HOA did.

11        Q.    And do you know if a demand was sent to Arrow

12   Masonry?

13        A.    Yes.

14        Q.    And what came of that?

15        A.    Nothing.

16        Q.    Is this law firm still engaged to pursue a

17   claim against Arrow?

18        A.    They could be.  I don't have any more money

19   to pursue any legal action against anyone else, and I

20   certainly don't want someone with an F on the Better

21   Business Bureau rating to come back or have anything to

22   do -- to touch this building.  They did shoddy work.

23        Q.    I'm not sure who you're referring to.

24        A.    Arrow.  Arrow Masonry.

Page 139

1          Q.    Well, there has never been produced a demand

2     letter by the Association to Arrow Masonry.

3          A.    Okay.  Ask the Association.

4          Q.    Has any money been recovered from Arrow?

5          A.    No.

6          Q.    Do you know if there's any communication

7     between Arrow and the counsel that you hired?

8          A.    There is not that I know of.

9          Q.    I'm at a bit of a loss because this is a --

10    separately is a claim on behalf of the Association

11    against Erie Insurance Group.

12         A.    Yes.

13         Q.    Did the Association file a lawsuit against

14    Erie Insurance?

15         A.    I believe so, but you'd have to ask John

16    Gorr.  This was his work.

17         Q.    What was the outcome of that lawsuit?

18         A.    I don't recall.

19         Q.    Did the Association recover some money?

20         A.    No, not at all.

21         Q.    What was the nature -- what was the nature of

22    the lawsuit?

23         A.    I'd have to go back and look.  I don't

24    recall.

Page 140

1        Q.    The last item on this document here is

2     "Motion for Judgment on the Pleadings" which suggests to

3     me that some at least endeavor to pursue a judgment

4     against

5     Erie -- I'm not -- it's not quite clear from this

6     document whether that was obtained or not.

7        A.    You need to ask John.

8        Q.    Well, what's your role within the

9     Association?

10       A.    I have to do everything.

11       Q.    But you didn't do anything for this lawsuit?

12       A.    Okay.  I was general contracting over

13     $260,000 worth of repairs.  It was the middle of COVID.

14     I have three children.  I don't know how to get money on

15     the table, so forgive me if I didn't have the chance or

16     the opportunity to work on this.  Because of your

17     client's lies I have so much debt.  You have ruined my

18     life.  This has been a nightmare from the start, so I

19     don't appreciate you going into me and asking me why I

20     didn't do one thing or another.  I did everything I could

21     to remediate the issues that your clients left this mess

22     for me.

23       Q.    Yeah, I'm not challenging the effectiveness

24     of your efforts.

Page 141

1     A.    You absolutely are.

2     Q.    However, we are -- no.  We are here because

3  you are pursuing a lawsuit for damages, and it is very

4  relevant in that lawsuit as to whether or not any damages

5  have been recovered to offset losses as we're not seeing

6  any of that on your damage calculation and so --

7     A.    Correct.

8     Q.    -- that's the reason I'm asking the question.

9          MS. OSHANA:  It looks like it might be a

10 coverage lawsuit.  Isn't that what this is?  Isn't that

11 coverage, seeking coverage?

12         THE WITNESS:  I don't remember.

13         MR. FINFER:  One could presume, but that

14 doesn't make much sense in a deposition when we're trying

15 to understand all the facts.

16         MS. OSHANA:  We can look it up.  It's in the

17 state court; right?  We can look it up.

18         MR. FINFER:  Well, the bigger issue, Carol, is

19 that we're four years into this litigation and I've never

20 seen any of these documents.

21         MS. OSHANA:  I don't know anything about this

22 lawsuit either, so we can look it up.

23         MR. FINFER:  Okay.  Well, your client produced

24 it to you.

Page 142

1           MS. OSHANA:  It's not really relevant to mine

2     unless they got money which I don't think they did.  I

3     can look up the lawsuit.  I think it's just about

4     coverage which I'm sure was denied.

5           MR. FINFER:  I appreciate you opining

6     something you know nothing about.

7           MS. OSHANA:  Otherwise, I'd be getting paid

8     from the insurance company, right, but clearly they don't

9     have coverage.

10    BY MR. FINFER:

11         Q.    Okay.  Ms. Young, you don't know the outcome

12    of the lawsuit against Erie Insurance?

13         A.    No, I don't recall at this time.  We did not

14    receive any money.

15         Q.    Okay.  And you don't know the outcome of the

16    demands pursued against Arrow Masonry?

17         A.    There was no -- nothing happened after the

18    demand letter was issued.

19         Q.    Has the Association, to your knowledge,

20    recovered dollars from any other third party related to

21    the damages that you've asserted in this lawsuit?

22         A.    Not to my knowledge.

23         Q.    And is there anybody else besides you that

24    would know of this?

Page 143

1          MS. OSHANA:  Gorr.

2     BY THE WITNESS:

3          A.    Yeah, you'd have to ask John Gorr.  You'd

4     have to ask Kristen.

5

6     BY MR. FINFER:

7          Q.    Okay.  Let's get back into the damage

8     analysis here.  So we went through the masonry work.  I

9     think we now have the contract with Allendorfer.  The

10    next item on this list is "Structural, exploratory and

11    structural engineer steel beams to rebuild ceiling and

12    roofing/floor of Unit 3."  You wrote a check -- was this

13    Allendorfer?

14         A.    This was Allendorfer.

15         Q.    To Allendorfer?

16         A.    Yes.

17         Q.    Do you know what the findings of that

18    exploratory work were?

19         A.    Yeah, there's a findings document.

20         Q.    I think I have that.  Hold on a second.  I

21    have a final structural engineer -- hold on.  This is

22    titled "Final Structural Engineer Exploratory Work

23    Invoice."  Is this where it would be or no?

24         A.    Under structural engineering repairs there

Page 144

1    are several invoices.

2         Q.    Yep.

3         A.    I'm off line again.  I can't access this.

4    Okay.  I'm in the folder with the structural engineering.

5         Q.    I'm just looking for the report on the

6    exploratory findings.  I think it's this one.

7         A.    No.

8         Q.    Final structural --

9         A.    There's actually a stamped structural

10   engineering report that exists.

11        Q.    Is that in here?

12        A.    I don't see it.

13        Q.    Okay.  So the "structural exploratory and

14   structural engineer steel beams to rebuild ceiling," this

15   is all work that was done within Unit 3 and on the roof

16   above Unit 3; correct?

17        A.    The steel beams are part of the common

18   elements.

19        Q.    Okay.  That's what I wanted to understand.

20   So we're talking about common elements and possibly

21   limited common elements.  I don't know if roofing/floor

22   of Unit 3 -- that would strike me as a limited common

23   element to Unit 3?

24        A.    I would need to read the report but I believe

Page 145

1    you're right.

2        Q.    And did this become -- as to the limited

3    common elements, was this your responsibility because of

4    the Association's general negligence or breach of its

5    obligations to maintain the building?

6        A.    Yes.

7        Q.    So let me go down to 6-26 2019.  This is

8    truss work and roof replacement.  Again, this is all

9    common element work; correct?

10        A.    I believe the roof is a common element.  I

11    don't know what a truss is.

12        Q.    It looks like this is the invoice for that

13    work.  Can you see this okay?  I can zoom in if you need

14    me to.

15        A.    Yeah, that looks like it.  That's the initial

16    contract not -- yeah, the initial contract.

17        Q.    So if I'm looking here:  "Remove

18    approximately 100 square feet of additional drywall

19    ceiling on the south end of Unit 3, dismantle parapet

20    wall on east side of building to access truss pockets,

21    rebuild parapet wall, furnish all labor, furnish and

22    apply mold sealant to all exposed trusses."  This

23    contract is for 64,690.  There must have been some change

24    orders for this as well?

Page 146

1      A.    Yes, I believe there were.  So the

2   engineering services here are split out from the truss

3   work.

4      Q.    Yeah, I see that.  Okay.  Did any of this

5   work -- I'm just looking at this invoice or this contract

6   for the moment.  Where it says:  "Remove the existing

7   drywall, ceiling and walls in Unit 2, expose truss and

8   truss pockets," I assume that the idea here was that

9   because there was exposure on the roof that it impacted

10  the trusses and truss pockets in Unit 2?

11     A.    We did not find issues with Unit 2.  I

12  believe we opened the floor and we didn't find any

13  issues.

14     Q.    Okay.  I'm going to go back to the damages

15  calculation.  So then we have:  "South facing terrace

16  roof replacement, Unit 2 and Unit 1 responsibility"?

17     A.    So those were common elements.

18     Q.    So why wasn't Unit 3 responsible?

19     A.    I think that's a typo.  Oh, yeah, there's no

20  roof over John's balcony.  No, there are.  I have to look

21  at a picture of the structure, but on the south side of

22  the building there are two decks.  There's a deck off

23  Unit 3, I believe.  There's a deck off Unit 2 on the

24  south side.  There was water leaking into Unit 1, so

Page 147

1    those --

2           Q.    From the terrace of Unit 2?

3           A.    From the roof of Unit 2.

4           Q.    Was this Allendorfer that did this work too?

5           A.    Yes.

6           Q.    I'm just looking for this -- was this

7    contract under roofing in the subfolder of Allendorfer?

8           A.    I'm looking.

9           Q.    Oh, here we go.  I got it.

10                Hold on.  So I'm looking at a contract dated

11   March 16th, 2021.  This is for the work that's reflected

12   here in your damage calculation for south facing terrace

13   roof replacement?

14          A.    Yes.

15          Q.    I'm looking at this and I apologize.  It

16   doesn't seem apparent to me.  What does this have to do

17   with the water infiltration in Unit 3?

18          A.    The roof of Unit 2 is the deck of Unit 3.

19   The ceiling of Unit 2 is the deck, south facing deck in

20   Unit 3.

21          Q.    This happened two years after you repaired

22   the roof on Unit 3 or the roof of the building I should

23   say and the interior of Unit 3.  Yeah, almost, I guess

24   almost three years.  It's just not clear to me whether

Page 148

1    this relates to --

2           A.    It's all related.

3           Q.    -- the fact that you feel it's --

4           A.    It's all related.

5           Q.    In your mind, it's all related because -- in

6    your mind, you feel it's all related because the building

7    had water infiltration so any subsequent water

8    infiltration problems relate back to that initial lack of

9    as you allege disclosures?

10          A.    The ESI report stated that there were

11   structural issues in all the wall openings.  Water

12   continued to come in the building.  As we found the water

13   coming into the building, we fixed it.  This was during

14   COVID, so I can't -- I got these guys out as soon as I

15   can get them out, but this was as you can see a

16   significant amount of work.

17          Q.    Yeah, I recognize that the building needed a

18   lot of work.  What I'm trying to parse out is whether

19   that work relates to what disclosures you allege should

20   have been made versus what disclosures were made, and

21   that's why the timing of this is what I'm asking about.

22          A.    It's all the same.

23          Q.    Just so I understand, in your mind, it's all

24   the same because there was water infiltration in Unit 3

Page 149

1     that was not as you allege properly disclosed and that

2     lack of alleged disclosure created issues throughout the

3     entire building that took some time to figure it out, was

4     that your position?

5          A.    They didn't disclose the water infiltration

6     in Unit 1 on both the south facing windows as well as

7     their sliding door.  All of this is related to the ESI

8     report that indicates that the building was incorrectly

9     built and there were structural defects with the

10    building.  They had the obligation to disclose those

11    limited common elements and they never disclosed it.

12              MR. FINFER:  Could we just take a quick, real

13    quick just two-minute break?  I just need another

14    document.  I don't have it in front of me.  Thank you.

15                              (WHEREUPON, a break was

16                              taken.)

17    BY MR. FINFER:

18         Q.    I am now sharing the ESI report.  We could

19    mark that as Gonring Exhibit 8.

20              Ms. Young, can you see this?

21         A.    Yes.

22         Q.    I'm sorry.  I didn't hear an answer.

23         A.    Yes, I can see the report.

24         Q.    This is the report that's dated October 20th,

Page 150

1    2017?

2         A.    Yes.

3         Q.    This is a report that you've been referencing

4    which shows that the entire unit's structurally unsound;

5    correct?

6         A.    Yes.

7         Q.    So I just want to note, and maybe you're

8    already aware of this, but the intro of this report is

9    that the scope was to inspect water infiltration

10   occurring in Unit 3.  I'm highlighting that for your

11   reference.  Do you see that?

12        A.    I do.

13        Q.    Would you agree that the scope of ESI's

14   inspection was just in Unit 3?

15        A.    No.  They say the entire structure at window

16   and wall openings is defective.  Structure includes Unit

17   1, Unit 2 and Unit 3.

18        Q.    But they didn't go into Unit 1 or Unit 2?

19        A.    They talk about the limited common elements

20   of Unit 1, Unit 2 and Unit 3.

21        Q.    But if you read the report, the only unit

22   they went into was Unit 3?

23        A.    They don't have to go into the unit to

24   determine that there's a structural issue.

Page 151

1          Q.    I see.  So we're in agreement that ESI's

2     inspection was limited to Unit 3; correct?

3              MS. OSHANA:  No.

4

5     BY THE WITNESS:

6          A.    No.  They filed an insurance claim for the

7     building which includes Unit 1, Unit 2 and Unit 3, and

8     the report talks about the structure which is Unit 1,

9     Unit 2 and Unit 3.  Water infiltration is occurring at

10    various locations of the structure.

11    BY MR. FINFER:

12         Q.    But just so we're clear, it's talking about

13    Unit 3?

14         A.    It's talking about the entire --

15         Q.    And I'm fine -- we don't have to agree on

16    this, but when you see the word structure here, it's your

17    opinion that structure refers to the building not Unit 3?

18         A.    Structure is Unit 1, 2 and 3.

19              MR. WATTS:  Read the second bullet.

20    BY THE WITNESS:

21         A.    It says that the water infiltration is

22    occurring --

23              MR. KOJS:  You can't keep telling her how to

24    answer.

1          MS. OSHANA:  Leave it alone.  The document

2     says what it says.

3          MR. FINFER:  I'm sorry.  I can't hear her.  Is

4     Carol telling her how to answer?

5          MS. OSHANA:  No.  No.  The document says what

6     it says.  It is what it is.

7          MR. FINFER:  With all due respect, this is

8     your entire case, so it is relevant for us to discuss.

9          MS. OSHANA:  You have a right to discuss it.

10     I'm not talking to you.  I'm talking to counsel.

11     BY MR. FINFER:

12          Q.   Ms. Young, do you mind just lowering your

13     camera a bit so I can see your face?  I'm sorry.

14          A.   Yes.

15          Q.   I just want to see your face.

16          A.   I can see my face on the screen.

17          Q.   Would you mind just lowering it a little bit?

18          MS. OSHANA:  It's black on the screen.  I

19     don't know why.  I don't know if it's frozen on yours,

20     Jordan.

21          MR. FINFER:  Oh.  It just went frozen.  Could

22     we get that back up.

23                         (WHEREUPON, a break was

24                         taken.)

Page 153

1    BY MR. FINFER:

2         Q.    So going back to the ESI report, it talks

3    about discussion and conclusion.  It says:  "ESI was

4    retained to determine the cause of the water infiltration

5    occurring in Unit 3 of the structure located at 2726 West

6    Cortez," and it provides the following summary of its

7    opinion that indicates here that a masonry contractor

8    should be contacted and recommends BRAL Restoration.  Do

9    you see that?

10        A.    Yes.

11        Q.    So if we go to the BRAL report, they hired

12   who ESI recommended.  We could mark the BRAL report as

13   Exhibit 9.  You see the recommendations or the results of

14   the water testing?

15        A.    What are you pointing to?

16        Q.    Well, take a moment to read this.

17        A.    Yes.  It says:  "The existing flashing

18   allowed the water to penetrate right to the back of the

19   wall.  They were able to produce leakage into Unit 3

20   because of the deficiencies in the building within ten

21   minutes of spraying water," and they decided not to go

22   any further.

23        Q.    Well, that's incorrect.  They hired Arrow

24   Masonry; right?  And the report states:  "Previous

Page 154

1    proposal including as-needed repointing and application

2    of two coats of Modac was modified to include the

3    application of one coat of chem treat as an alternative."

4    We're talking about --

5         A.    So it talks about the flashing that was not

6    working and it talks about water coming through the

7    building.

8         Q.    Then it talks about a recommendation?

9         A.    Right, from a contractor not a certified --

10   who did the ESI report?  A licensed structural engineer.

11        Q.    But you would agree that they hired Arrow

12   Masonry to perform the work that was recommended here at

13   the bottom of the BRAL report; correct?

14        A.    No.  They didn't do all the work.  It says it

15   was flashing issues.  They didn't hire someone to

16   complete all the work.

17        Q.    So the issue then you have is that there was

18   sealant but there wasn't flashing?

19        A.    They didn't repair the issues to the

20   building.  They did a crappy job putting on the sealant.

21   That didn't work.  They added caulk which was not the

22   right thing to do from the information I've learned, and

23   they didn't flash the, all the windows and door openings.

24        Q.    So I'm not really debating whether or not

Page 155

1    Arrow did a poor job.  My question to you is what does
2    Arrow doing a bad job have to do with the Gonrings.
3         A.    Kelsey signed the contract.  How can you take
4    all these different quotes over all these years for
5    hundreds of thousands and then make a $17,000 decision?
6    Only an idiot would do that.  They went with the cheapest
7    solution.  They continued to ignore the problem.
8         Q.    Even though they were following both ESI and
9    BRAL?
10        A.    No, they didn't.  They didn't fix the
11   structural openings in the walls and the doors.  They
12   didn't fix all the flashing.
13        Q.    Have you seen all the quotes they got for the
14   work?
15        A.    I don't know.  What's been produced I've seen
16   the quotes, yes.
17        Q.    So you're aware that Arrow was not the
18   cheapest to do the work?
19        A.    Arrow was the cheapest of the three quotes
20   they got for $17,000.  All these other quotes are coming
21   in at 60,000 to $100,000 and they choose the $17,000
22   quote.  That is ridiculous.
23        Q.    How did you learn that information?
24        A.    I looked at the quotes.

Page 156

```
 1          Q.    And you got the quotes from the HOA?

 2          A.    I got the quotes from John Gorr.

 3          Q.    When?

 4          A.    When he disclosed to me that Unit 1, 2 and 3

 5    were having water infiltration in September.

 6          Q.    Let's get back to your damages calculation

 7    here.  When John disclosed this in 2018, did he tell you

 8    that he thought the issue was resolved?

 9          A.    No.  He told me there was a continued history

10    of water issues being in the building.

11          Q.    Yes, but if you look back at his e-mail, this

12    is the meeting, this was September 10th, 2018 where he

13    says:  "To the best of our knowledge, the water was due

14    to water intrusion through split face block prior to the

15    building being sealed on May 31st, 2018."  I know you're

16    saying the work was done was not work that should have

17    been done and wasn't done well, but I'm asking you about

18    Gorr's knowledge at the time.  There's a difference.

19          A.    He knew.  He knew.  He's lying.

20          Q.    So you think what he said here in this

21    meeting, this was a lie?

22          A.    Yes.

23          Q.    So on August 8, 2021, you wrote a check

24    for -- I guess you had work performed to refinish
```

Page 157

1    building front door?

2         A.    Yes.

3         Q.    Can you explain how this has to do with leaks

4    in the building?

5         A.    There was water leaking from the building

6    onto the door.  The door was damaged from water

7    infiltration.

8         Q.    This occurred three years after you bought

9    your unit?

10        A.    This entire building --

11        Q.    Was this just a --

12        A.    -- was crumbling.  This work had to be staged

13   out, and it takes an entire amount of work and time to

14   get this stuff done.

15        Q.    What about the heat trace cable installation,

16   what is that?

17        A.    We haven't put that in yet.

18        Q.    Okay.  Have you paid for all the truss work

19   and roof replacement?

20        A.    Yes.

21        Q.    But the heat trace cable installation, that

22   work hasn't been done?

23        A.    Correct.

24        Q.    What is that work?

Page 158

1        A.    They have to install some electric heating
2    element into the downspouts off the roof.
3        Q.    For when it freezes?
4        A.    Yes.  Water infiltrates the building.
5        Q.    So in terms of your total financial
6    responsibility through October 31st of last year, not all
7    of this has been paid yet?
8            MS. OSHANA:  You mean paid for?
9    BY MR. FINFER:
10       Q.    No.  The $2,882 for the heat trace cable
11   hasn't been paid for.  Is there anything else on here
12   that you haven't paid for?
13       A.    No.
14           MS. OSHANA:  Windows.
15   BY THE WITNESS:
16       A.    Oh, yeah, my windows.  We haven't replaced my
17   windows.  That's further down below.
18   BY MR. FINFER:
19       Q.    Yes.  Yes.  Right.  So here you have the
20   rebuild of interior Unit 3 but this you didn't pay for;
21   right?
22       A.    Correct.
23       Q.    The attorney's fees for the HOA, did you pay
24   the -- was this another special assessment where you paid

```
                                                    Page 159

 1      $2,500?

 2            A.    Yes, it was.

 3            Q.    Then I understand your interest on the HELOC.

 4      What was the amount of the loan you got?

 5            A.    $101,000.

 6            Q.    Has that been paid back?

 7            A.    No.

 8            Q.    And you also took out a loan on your 401(k)?

 9            A.    Yes.

10            Q.    Has that been paid back?

11            A.    Yes.

12            Q.    That was paid back as of June 30th, 2021?

13            A.    Yes.

14            Q.    Window work you haven't done.

15                  Have you actually paid Oshana Law $50,000?

16            A.    Those are my accrued fees to date.  No, I

17      have not.

18            Q.    Are you paying hourly or is this a

19      contingency case?

20            A.    I'm paying hourly.

21            Q.    How much have you paid to date?

22            A.    $1,000.

23            Q.    But your invoices from Oshana Law equal

24      $50,000?
```

Page 160

1          A.    That's my estimate.

2          Q.    Have you seen invoices?

3          A.    Not yet.

4          Q.    So where did you estimate $50,000?

5               MS. OSHANA:  From her lawyer.

6               MR. FINFER:  Carol, come on.

7               MS. OSHANA:  I'm telling you the answer.

8     You're asking.

9               MR. FINFER:  Don't give --

10              MS. OSHANA:  You're asking about my invoices.

11    I'm giving you an answer.  She's getting the figures from

12    me.

13              MR. FINFER:  Okay.  If you want to get out of

14    here at a reasonable time, stop answering questions I'm

15    asking to the deponent that are reasonable for me to ask.

16              MS. OSHANA:  It's reasonable for you to ask.

17    That's why I'm helping you.  She's getting it from me.

18    BY MR. FINFER:

19         Q.    So your lawyer told you that your bill to

20    date is approximately $50,000?

21         A.    Yes.

22         Q.    But you haven't seen a bill for $50,000?

23         A.    No.

24         Q.    Is this going to be through trial or is this

Page 161

1    to date?

2          A.    This is to date.

3          Q.    Have you produced the engagement letter?

4                MS. OSHANA:  I don't think so.

5    BY THE WITNESS:

6          A.    I don't know.

7                MS. OSHANA:  I don't know if you asked for

8    that.  I don't remember.  Did you ask?

9                MR. FINFER:  Well, we've asked for all

10   documents related to your damages, and $50,000 represents

11   a significant portion of the alleged damages, so let's

12   assume it was requested.

13               MS. OSHANA:  Yeah, if you show me the

14   interrogatory, of course, I'll produce it.

15   BY MR. FINFER:

16         Q.    So on the 401(k) withdrawal, have you

17   actually written a check for $33,333.33?

18         A.    I sure have.

19         Q.    So this is the 1,000 you paid Oshana Law.  So

20   your --

21         A.    No.  That's Steve --

22         Q.    So your total --

23         A.    That's Steve Hier.  If you go to the left

24   where it says "Lawsuit," go two cells to the left that

Page 162

1   you've highlighted, it says:  "Miller Hier home

2   inspection."

3          Q.   Oh, got it.  Have you produced a check that

4   you wrote to the IRS?

5          A.   I don't know.  I can.

6          MS. OSHANA:  I'll get it for you.

7          MR. FINFER:  I don't think it's recoverable in

8   the lawsuit, but, nonetheless, if you're going to claim

9   it as damages, we should see it.

10  BY MR. FINFER:

11         Q.   What's the "replace basement storage area and

12  basement entry area door frames"?

13         A.   There is --

14         MR. McCARTHY:  Jordan, do we have an

15  engagement on the record that the engagement letter and

16  $33,000 IRS check are going to be produced?

17         MS. OSHANA:  The check, yes.  If you show me

18  where it is, I will produce it.  Just show me where it is

19  in the request to produce.

20         MR. FINFER:  Well, just as a reminder, this

21  case started with the -- under the mandatory discovery.

22  We were obligated to produce all documents to support a

23  damage claim.

24         MS. OSHANA:  Yeah, usually what I do with

Page 163

1    these attorney's fees petitions, they're produced at the

2    time of the petition.  I've done a million attorney's fee

3    petitions.  Under the statute when I present them, I

4    present them with my motion to recover attorney fees.

5    That's typically how it's done.  I don't usually produce

6    all my billing as it goes and goes and goes and goes.

7    That's not normal.  I never produce the engagement

8    letters, like rarely.

9              MR. McCARTHY:  This is Paul.  So then for

10   purposes of the damage claim, would you stipulate that

11   the 50,000 or whatever she's asking for in fees comes out

12   and that's a post-judgment motion?

13             MS. OSHANA:  Yeah, the judge has to grant it

14   to me because it's whatever the reasonable attorney fees

15   are for the prevailing party.  It's up to the judge to

16   decide that.

17   BY MR. FINFER:

18        Q.    The "replace basement storage area," what's

19   going on in the basement storage area?

20        A.    The trim around the basement doors is damaged

21   from water.

22        Q.    Okay.  Have you received a -- is the quote

23   from Renner & Renner in here?

24        A.    Yes, I believe so.

Page 164

1          Q.    Wasn't the damage that's referenced in
2     "replacement of the basement storage area and basement
3     entry door frames" in your inspection report?
4          A.    Yes.
5          Q.    You didn't seek a credit for this prior to
6     closing, did you, or you didn't obtain one at least?
7          A.    I didn't obtain one.
8          Q.    So then we can agree to remove this from your
9     damage calculation?
10         A.    No.
11         Q.    The last bullet point here:  "Increased
12    premium due to HOA lawsuits," is this in reference to the
13    Erie lawsuit and the potential lawsuit against Arrow?
14    I'm sorry.  I didn't hear you.
15         A.    Yeah, I'm thinking.
16         Q.    Oh, got it.
17         A.    The HOA has a claim on its record, and so as
18    a result of that, we cannot get regular insurance, so
19    this has -- the claims have caused the HOA insurance to
20    go up.
21         Q.    So this is a decision that the HOA made;
22    right?  It had nothing to do with the Gonrings or Aires?
23         A.    No, this is related to the Gonrings and
24    Aires.  All the water infiltration has caused these

Page 165

1    issues and now the HOA can't get insurance.  The only

2    insurance we could get causes what this is right now.

3         Q.    What claims are we talking about?  I'm aware

4    of the claim against Erie Insurance.  Are there other

5    claims?

6         A.    All the pending litigation that's going on

7    right now.

8         Q.    I'm only aware of one pending litigation

9    which is this.  Are there others?

10        MS. OSHANA:  Isn't there a countersuit?

11   BY THE WITNESS:

12        A.    Yeah, the Gonrings are suing the HOA.

13        MS. OSHANA:  Aren't your clients suing?

14   BY MR. FINFER:

15        Q.    Yeah, this lawsuit.  I'm aware of this

16   lawsuit.  I'm saying are there others.

17        A.    Yes, my lawsuit against the Gonrings.  My

18   lawsuit against Aires.

19        Q.    I also see here it says Cincinnati Life D&O.

20   Did your D&O insurance increase?

21        A.    Yes.

22        Q.    Did anyone sue the Board of Directors?

23        A.    Sounds like the Gonrings are.

24        Q.    So one member.  Are there any other claims

Page 166

1    pending --

2           A.    Not that I'm aware of.

3           Q.    -- against the Board?

4                 I'm seeing in your production the State Farm

5    quote.  Do you have a quote that predates this to

6    indicate that it's $10,584 higher?

7                 MS. OSHANA:  Sorry.  Which line are you

8    looking at?

9                 MR. FINFER:  I'm just looking at this entire

10   box 11.

11                MS. OSHANA:  Okay.

12   BY THE WITNESS:

13          A.    I do have a quote.

14   BY MR. FINFER:

15          Q.    It says 10,864 -- $10,584.64 but it looks

16   like it's including total here, let's see, right?

17          A.    I don't know.  If you click on the cell, the

18   number 10,000 --

19          Q.    Yeah, hold on.

20          A.    -- now click up at --

21          Q.    I know.  I'm looking at it.  D90 plus D91

22   times 4.

23          A.    Yes.  It's four years that this has been

24   going on and I owe 44 percent of it.

Page 167

1        Q.   I see.  So you're including all 23 in this

2   then?

3        A.   Yes.

4        Q.   Do you have the contact information for Randi

5   Horton?

6        A.   Yes.

7        Q.   What is it?

8        A.   Isn't it in the affidavit?

9        Q.   I don't think so.

10       A.   (517) 489-6614.

11       Q.   Thank you.

12       A.   Um-hum.

13       Q.   You're not alleging that the Gonrings had

14   knowledge of mold in Gorrs' unit, are you?

15       A.   The Gonrings had knowledge of significant

16   issues in the building including mold.

17       Q.   What do you cite to for support of that?

18       A.   John Gorr shared e-mails between himself and

19   the Mulligans with the Gonrings that state there was

20   mold.

21       Q.   Has the HOA pursued any claims against the

22   developer?

23       A.   We can't find the developer.  No.

24       Q.   I just want to go back to the May 7, 2018

Page 168

1    meeting minutes that you had an opportunity to review

2    prior to closing where it talks about the work that was

3    going to be done by Arrow Masonry.

4        A.    I see it.

5        Q.    I just want to confirm -- thank you.  I just

6    want to confirm each step that you took to follow up on

7    this.  So I recall you saying that you had your lawyer

8    follow up with Aires in those lawyer letters we looked at

9    earlier; correct?

10       A.    That's correct.

11       Q.    What else?

12       A.    We asked the HOA.

13       Q.    Via the 22.1 Disclosure?

14       A.    Yes.

15       Q.    Okay.  Anything else?

16       A.    Not that I recall.

17            MR. FINFER:  Would you mind if we take a

18   five-minute break?  I think I'm almost done here.

19                              (WHEREUPON, a break was

20                              taken.)

21            Ms. Young, can you hear me?

22            THE WITNESS:  Yes.

23            MR. FINFER:  So I just want to confirm that

24   you're going to produce your check to the IRS in the

Page 169

1    amount of $33,333.33?

2              THE WITNESS:  That's correct.

3              MR. FINFER:  Subject to that and subject to us

4    having the right to ask potentially additional questions

5    at some point in the future given that we received a

6    substantial document dump on Friday, I have no further

7    questions.

8              MR. KOJS:  I just have a few more.

9              MR. GOOD:  I have a few follow-ups.  Kevin, do

10   you want to go first?

11             MR. KOJS:  Yeah, if you don't mind.  I just

12   have one about the Excel sheet and then a couple random

13   ones.

14             MR. GOOD:  Go for it.

15                    REDIRECT EXAMINATION

16   BY MR. KOJS:

17        Q.   The one about the Unit 1 front window

18   replacement, 19,750, I know you already testified you

19   haven't paid that yet, are those the pictures that we

20   looked at earlier?

21        A.   Yes.

22        Q.   What exactly are you claiming are wrong with

23   your windows?

24        A.   Water is leaking through the windows and --

Page 170

1    between the masonry and the windows.

2          Q.    And has that been occurring since you bought

3    the place?

4          A.    Yes.

5          Q.    And it's your claim that it's from the

6    failure of the Gonrings and the HOA to disclose certain

7    issues with the unit in the property?

8          A.    Yes.

9          Q.    And then I just want to clear this part up.

10   At the time you were going through the process of

11   purchasing your unit did you believe Aires was the

12   seller?

13         A.    I believed Aires was the seller, therefore,

14   the owner.

15         Q.    So is there anything you would have done

16   differently if it was your assumption at the time you

17   were purchasing your unit that the Gonrings were the

18   actual sellers?

19         A.    Absolutely.

20         Q.    What would you have done differently?

21         A.    I would have forced them to answer these

22   questions.

23         Q.    Do you have any reason to believe you weren't

24   able to reach out to the Gonrings during this purchasing

Page 171

1    process?

2         A.    We asked several times.

3         Q.    Who is we?

4         A.    My attorney.

5         Q.    Real estate attorney?

6         A.    Yes.

7         Q.    Do you know who they asked?

8         A.    Yes.  It's in the letters.  Exhibit 6,

9    "Please confirm with the prior owner."

10        Q.    What letter, the June 14th?

11            MS. OSHANA:  It's Exhibit -- what is that?

12   BY THE WITNESS:

13        A.    Exhibit 6.

14   BY MR. KOJS:

15        Q.    Is that the June 14th letter?

16        A.    It's June 18th, 2018.

17        Q.    Thank you.  Which one, 8E, or which one are

18   you looking at?

19        A.    8E.  Number 13 also says 8E.

20        Q.    And then did you see their response in the

21   July 2nd, 2018 letter under --

22        A.    Yeah.

23        Q.    -- number 7?

24        A.    Yes.

Page 172

1          Q.    And you guys put or you and your real estate

2     attorney put okay to the left?

3          A.    Yes.

4          Q.    And it says:  "With respect to Item 8E,

5     again, as third-party corporate relocation company,

6     seller is unable to make verification regarding whether

7     the property has experienced water leakage or water

8     damage."

9          A.    Aires was not the seller, so they hid it.

10         Q.    Aires hid it?

11         A.    You all are in collusion with each other, so

12    y'all hid it from me.

13         Q.    Okay.  But at that time what did you think

14    the Gonrings were?

15         A.    The prior owner it says.

16         Q.    Okay.  And you said that you knew they were

17    still living there while you were going through the

18    purchasing process?

19         A.    Yes.

20         Q.    Is there any reason you or likely your

21    attorney or real estate agent wouldn't reach out to the

22    Gonrings specifically after Aires said in this response

23    that they're unable to make verifications regarding

24    whether the property had experienced water leakage or

Page 173

1    water damage?

2         A.    Are you joking?

3         Q.    No.

4         A.    No.  This is -- this is an arm's length

5    agreement.  I have been -- I had legal advice not to

6    contact them.

7         Q.    Your real estate attorney told you not to

8    contact the Gonrings?

9         A.    I spoke -- I can see no reason to contact

10   those people.  This is between Sarah, Aires and me.

11   We've asked more than two times whether or not there's an

12   issue, and they continued to not answer the question.

13        Q.    But after you guys said okay to that did you

14   try to follow up again with the Gonrings or Aires?

15        A.    I trusted the information in this document to

16   be accurate and truthful.  I trusted that the attorneys

17   were being accurate and truthful.  How many times do I

18   have to ask to get an answer?

19        Q.    So would that be a no, you didn't follow up

20   after that?

21        A.    I asked three times.

22        Q.    Okay.  But after you said okay in this

23   July 2nd, 2018 response, I just want to confirm, you or

24   nobody else followed up and wondered why Aires said they

Page 174

1    were unable to make verifications whether their property

2    experienced water leakage or damage?

3         A.    Aires said they were the seller.

4         Q.    Did you question why it said seller's unable

5    to make verification about the water damage?

6         A.    I asked -- we asked every question that we

7    could ask and they hid the answers or they lied.

8         Q.    If it was your impression that the Gonrings

9    were the sellers, you would have or your real estate

10   agent or real estate attorney would have reached out

11   directly to them?

12        A.    We would have reached out to their attorneys

13   and asked them to answer the question.

14        Q.    But did anybody specifically say you cannot

15   reach out to the Gonrings?

16        A.    I've never heard of a real estate transaction

17   where the buyer reaches out directly to a --

18        Q.    I'm not specifically saying you but maybe

19   your real estate attorney or agent.  Did anybody say --

20        A.    It's in the letters.  We asked.

21        Q.    You asked if you could reach out to -- I just

22   want to confirm.  I know we're getting -- it's been

23   awhile.

24        A.    The letters say that we reached out.  I

Page 175

1    reached out.  I reached out through my attorney and they

2    didn't answer the questions.  They lied.

3         Q.    Okay.  I get that.  I just want to confirm

4    that nobody said you couldn't reach out, you, your real

5    estate agent, real estate attorney couldn't reach out to

6    the Gonrings?

7         A.    No.

8              MR. KOJS:  That's all I have.  Thank you.

9              MR. GOOD:  I just have a couple follow-ups.

10             THE WITNESS:  Okay.

11                   RECROSS EXAMINATION

12   BY MR. GOOD:

13        Q.    I'm putting on the screen a document.  I

14   don't know if it's identified or not.  This is the

15   September 10, 2018 meeting note.  Can you see that?

16        A.    Can you please increase the font or increase

17   the size.

18        Q.    Yes.

19        A.    Yes.

20        Q.    Are you able to read that now?

21        A.    Yes.

22        Q.    By September 10th, 2018 you had taken

23   possession of the unit; is that correct?

24        A.    Yes.

Page 176

```
 1          Q.    I'm just going to read one sentence to you.
 2    "To the best of our knowledge, the damage was due to
 3    water intrusion through the split face block prior to the
 4    building being sealed on May 31, 2018."  Do you see that?
 5          A.    Yes.
 6          Q.    And on September 10th, 2018, did you believe
 7    that statement to be accurate?
 8          A.    No.  At that time?
 9          Q.    Yeah, on September 10th, 2018.
10          A.    Yes.
11          Q.    And did you believe -- Or strike that.
12                Well, is it your understanding that Ryan
13    Brown believed that statement to be accurate?
14          A.    I don't know what Ryan Brown was thinking.
15          Q.    And was it your belief that John Gorr
16    believed that statement to be accurate?
17          A.    No.
18          Q.    I'm sorry.  I didn't hear you.
19          A.    No.  He's lying.
20          Q.    But, again, I was asking specifically on
21    September 10th, 2018 --
22          A.    I don't know.
23          Q.    -- you believed --
24          A.    I don't know what John was thinking.  I
```

Page 177

1    don't, I don't know.

2         Q.    Okay.  You believe that now, but back on

3    September 10th, 2018 did you believe that that statement

4    was accurate?

5         A.    Yes.

6         Q.    And the mold testing that's referred to on

7    bullet point two down, this was done after you purchased

8    your unit; correct?

9         A.    Yes.  I don't know actually.  I'd have to

10   look at John's mold test.  I assume so.

11        Q.    Are you aware of any other instances where

12   John Gorr lied in your opinion?

13        A.    Yeah, he lied when he produced all this

14   information and told me about all the water issues.  He

15   lied on the 22.1 and colluded with the Gonrings on the

16   HOA.  He's lied through this whole thing.

17        Q.    And regarding the 22.1, you've alleged that

18   he lied in collusion with the Gonrings.  Do you also

19   believe he lied in collusion with Ryan Brown?

20        A.    Yes.

21        Q.    Is there anybody else in on the collusion, to

22   the best of your knowledge?

23        A.    Ryan, John and the Gonrings.

24        Q.    I understand that.  I asked if there was

Page 178

1   anybody in addition to them.

2        A.    No.

3        Q.    Were there any attorneys in on the collusion,

4   to the best of your knowledge?

5        A.    Well, the attorneys for Aires certainly lied

6   when they told me they were the seller and the owner of

7   the unit.

8        Q.    And I apologize for not asking a specific

9   enough question.  Regarding the 22.1 Disclosure, was

10  there anybody else that you allege was in on the

11  collusion other than Mr. Brown, Mr. Gorr and the

12  Gonrings?

13       A.    Which 22.1 are you referring to?

14       Q.    The Disclosure from the Homeowner's

15  Association related to the water that you received prior

16  to your purchase.

17            MS. OSHANA:  To her?  I think there's more

18  than one.  Are you talking about the one that she got?

19            MR. GOOD:  Yes, the one that she got.  I want

20  to know if anybody else she alleges was part of the

21  collusion.

22            MS. OSHANA:  The one that was pertaining to

23  her sale?

24            MR. GOOD:  Yes.  I'm asking if there's anybody

Page 179

1   else besides Mr. Brown, Mr. Gorr and the Gonrings she

2   alleges was part of the collusion.

3   BY THE WITNESS:

4        A.    Not that I'm aware.

5   BY MR. GOOD:

6        Q.    At all relevant times since you took

7   ownership of the unit has Mr. Gorr been the President of

8   the Condo Association?

9        A.    No.

10       Q.    And who else has been the President?

11       A.    I am doing all three roles because John lied

12  on the 22.1.

13       Q.    And you were elected President?

14       A.    I told him that he was not to touch any other

15  documents related to the HOA because he was lying and I

16  told him that --

17       Q.    Did you do this in writing?

18       A.    -- in the presence of Kristen and himself and

19  that I was taking over.

20       Q.    Did you follow up in writing?

21       A.    There's an e-mail that says that.

22       Q.    When your building inspector found the water

23  damage in the basement, did your attorneys reach out to

24  Mr. Gorr?

Page 180

1      A.    I don't know.  You'll have to look at the

2    correspondence between the attorneys asking for the HOA

3    information.

4      Q.    And to the best of your knowledge, did your

5    attorneys reach out to the Homeowner's Association?

6      A.    Yeah, they reached out to the Homeowner's

7    Association to ask questions about water infiltration in

8    our attorney letters back and forth with Aires.  We asked

9    them --

10          MR. GOOD:  Madame Court Reporter, can you

11   repeat the question?

12                      (Requested portion of the

13                       record read.)

14   BY THE WITNESS:

15     A.    They reached out to Aires to ask the

16   Homeowner's Association about water infiltration.

17          MR. GOOD:  I have no further questions.

18          MR. FINFER:  I don't have any further

19   questions other than the right to ask additional

20   questions pending the additional documents we received on

21   Friday.

22          MS. OSHANA:  Okay.  Thank you.

23          MR. GOOD:  I make the same reservation.  I

24   have nothing else.

Page 181

SIGNATURE:

1

2    It was agreed by and between counsel and the parties that

3    the Deponent will read and sign the transcript of said

4    deposition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 182

STATE OF ILLINOIS)
                  )  SS:
COUNTY OF C O O K)

         I, KELLY A. BRICHETTO, a Certified Shorthand

Reporter of said state, do hereby certify

that the within named witness, MELINDA SGARIGLIA, was by

me first duly sworn to testify the truth, the whole truth

and nothing but the truth in the cause aforesaid; that

the testimony then given by the above-referenced witness

was by me reduced to stenotype in the presence of said

witness; afterwards transcribed, and that the foregoing

is a true and correct transcription of the testimony so

given by the above-referenced witness.

         I do further certify that this deposition was

taken at the time and place in the foregoing caption

specified and was completed without adjournment.

          I do further certify that I am not a relative,

counsel or attorney for either party or otherwise

interested in the event of this action.

Page 183

1          IN WITNESS WHEREOF, I do hereunto set my hand

2    this 27th day of February, 2023.

3

4

5

6

7                    KELLY A. BRICHETTO

8                    CSR License No. 84-3252

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 184

1    Carol Oshana, Esq.

2    oshanalaw@yahoo.com

3                          February 27, 2023

4    RE: Sgariglia v. American Internation Relocation Services

5        2/13/2023, Melinda Sgariglia (#5706285)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25

```
                                              Page 185
```

1    Sgariglia v. American Internation Relocation Services, LLC

2    Melinda Sgariglia (#5706285)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Melinda Sgariglia                          Date

25

Page 186

1    Sgariglia v. American Internation Relocation Services, LLC

2    Melinda Sgariglia (#5706285)

3             ACKNOWLEDGEMENT OF DEPONENT

4      I, Melinda Sgariglia, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____   _____

12    Melinda Sgariglia                Date

13    *If notary is required

14                SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20____.

16

17

18                _____

19                NOTARY PUBLIC

20

21

22

23

24

25

[& - 2,882]

Page 1

| **&** | | | |
|---|---|---|---|
| **&** 1:7 2:15,21 28:10 86:9 97:4 138:5,7,9 163:23 | **1-25-23** 81:10<br>**1-8** 4:16<br>**10** 1:17 101:24<br>175:15<br>**10,000** 81:3<br>166:18 | **123** 5:20<br>**12498** 183:6<br>**129** 127:2<br>**129,900** 127:2<br>**13** 171:19<br>**13,469** 70:22 | **1:20** 121:12<br>**1:55** 8:14 |
| **0** | **10,584** 166:6<br>**10,584.64** 80:19<br>166:15 | **13th** 1:17<br>**14** 61:18 | **2** |
| **05684** 1:5 | **10,864** 166:15 | **140** 126:16<br>**148** 5:21 | **2** 4:2 5:4,16<br>24:23 26:22 |
| **1** | **100** 5:17<br>145:18 | **14th** 63:6<br>171:10,15 | 27:6 32:7,23<br>34:18 46:3,5,8 |
| **1** 5:3,16 9:7<br>11:6 38:17,20<br>39:4,9,10<br>46:23 47:6,16<br>67:20 68:6,8<br>70:5,5,17<br>73:21,22 74:17<br>74:22 75:23<br>76:9 78:3,6<br>80:24 81:7,9,9<br>83:4 91:15<br>94:2 96:23<br>106:2,4,20<br>107:2,9,16<br>114:6 120:7<br>123:10 132:14<br>137:13,14,15<br>146:16,24<br>149:6 150:17<br>150:18,20<br>151:7,8,18<br>156:4 169:17<br>**1,000** 80:1,4,6<br>159:22 161:19<br>**1,364** 80:9 | **100,000** 155:21<br>**100,630.20**<br>79:17<br>**1004** 127:23<br>**101,000** 159:5<br>**1012** 11:14<br>**106** 5:17<br>**109** 5:18<br>**10th** 101:11<br>156:12 175:22<br>176:6,9,21<br>177:3<br>**11** 166:10<br>**11-4-22** 81:17<br>**117** 47:20,23<br>**118** 47:17<br>49:17<br>**12,672** 76:13<br>**120,000** 126:2,8<br>126:16<br>**120,79.96** 75:24<br>**121** 5:19 | **15,000** 117:21<br>**153** 5:22<br>**156,840.67**<br>81:17<br>**1600** 2:17<br>**161** 2:16<br>**168** 4:10<br>**16th** 147:11<br>**17** 70:12<br>**17,000** 155:5,20<br>155:21<br>**174** 4:11<br>**18** 113:24<br>**18,855.74.**<br>77:19<br>**181** 4:13<br>**18th** 66:2<br>171:16<br>**19,750** 78:7<br>169:18<br>**1997** 9:22<br>**1:19** 1:5 | 49:22,23 57:9<br>59:16 60:24<br>62:6 63:12<br>68:6 73:21,22<br>74:12,17,22<br>75:2 76:9 78:3<br>79:14 81:5<br>94:1 95:14<br>98:3,4,11,14<br>106:2 109:3<br>110:15 120:7<br>123:10 146:7<br>146:10,11,16<br>146:23 147:2,3<br>147:18,19<br>150:17,18,20<br>151:7,9,18<br>156:4<br>**2,105.43** 78:1<br>**2,500** 77:11<br>159:1<br>**2,530** 77:6<br>**2,574.10** 78:15<br>78:24<br>**2,646.12** 80:24<br>**2,831.40** 74:18<br>**2,882** 75:16<br>158:10 |

**[2-23 - 3]**                                                Page 2

| | | | **3** |
|---|---|---|---|

**2-23** 134:17
**2/13/2023**
  184:5
**20** 2:4 121:12
  186:15
**200** 2:22
**2001** 13:6,9
**2003** 9:24 13:6
**2007** 39:23
  42:9
**2008** 12:5
**2012** 27:23
  32:2 37:9 39:6
  39:8 43:4 89:9
  89:12,14 94:18
  94:20 99:11
  105:17
**2015** 11:23
**2016** 11:3
**2017** 150:1
**2018** 9:9 14:20
  17:2 23:13
  36:4,24 41:7
  43:4,12 45:12
  45:13 50:8
  61:18 63:6
  66:1,2,11
  70:12 89:14
  93:17 94:20
  95:24 96:4
  98:4,10,15,15
  99:13,19
  101:11,24
  102:12 103:3
  104:2 106:18

106:21 107:1
111:9 132:17
132:18,19
133:3 156:7,12
156:15 167:24
171:16,21
173:23 175:15
175:22 176:4,6
176:9,21 177:3
**2019** 72:4,11
73:8,14 106:16
114:2 128:16
145:7
**2020** 10:21
45:5 81:2
128:15 138:7
**2021** 45:5
74:16 75:8
132:23 134:13
134:19 135:7
135:13,19,22
137:9 147:11
156:23 159:12
**2022** 10:7 35:1
75:15
**2023** 1:17
136:8 137:9
183:2 184:3
**2044** 107:24
**2044-2045** 5:17
**2045** 108:1
**205-4462** 2:23
**20th** 76:12
149:24

**2125** 13:18
**21st** 74:16
**22** 138:7
**22.1** 5:19 90:24
  91:2 124:2
  125:6 168:13
  177:15,17
  178:9,13
**22.1.** 179:12
**22nd** 66:1
**23** 167:1
**235-3500** 3:3
**244-6700** 2:12
**249** 101:22
**250** 101:22
**25th** 23:13
  128:16
**26** 72:4 73:14
**26,400** 128:16
  128:21 129:3
**260,000** 140:13
**27** 72:11 184:3
**27,500** 115:6
**2700** 2:22
**2726** 9:7 11:5
  70:5 96:23
  138:4 153:5
**277,735.63**
  81:10
**27th** 183:2
**29** 98:10,15
**29th** 98:5
**2nd** 66:11
  171:21 173:23

**3** 5:6,17 8:14
24:4 31:21
34:18,19 45:17
45:18 47:16
49:16 50:5
51:18 56:2,4
70:7 71:3
72:13 73:10,21
73:22 74:12
75:2 76:12,20
78:3 79:14
81:5,7 88:5,6
88:18 91:7,21
91:22 92:1
101:6,7,15,17
102:2 105:22
105:23 106:1
110:14 111:13
111:15,17
113:3,20 114:7
116:21 117:4,7
118:9,10,13,24
119:2,9,14
120:8 121:17
121:19 123:10
124:6 143:12
144:15,16,22
144:23 145:19
146:18,23
147:17,18,20
147:22,23
148:24 150:10
150:14,17,20
150:22 151:2,7

**[3 - 9]**

151:9,13,17,18
153:5,19 156:4
158:20
**3-26-19**   130:9
**30**   184:17
**300**   3:2
**3000**   2:5
**30th**   159:12
**31**   176:4
**312**   2:6,12,18
2:23
**31st**   102:12
103:3 104:2
156:15 158:6
**3200**   1:16 2:11
**33,000**   79:20
162:16
**33,333.33**   79:17
161:17 169:1
**35**   5:6 120:15
**3:05**   121:18
122:7

**4**

**4**   4:4 5:7,17
59:10,11,19
107:24 124:8
166:22
**4,158**   129:4
**4,628**   73:9
**4,628.80**   72:15
**4-17**   73:8
**40**   16:4,4
**401**   77:24 78:2
79:17 85:16,17
85:21 129:17

129:17 159:8
161:16
**404-8390**   2:6
**42,116.80**   73:15
**44**   166:24
**45**   121:8
**46**   5:3
**489-6614**
167:10
**49**   5:5
**490.60**   75:9
**49503**   3:3

**5**

**5**   5:9,18 60:1,2
61:18,20 68:6
110:3 123:10
126:14
**5,926.36**   70:19
71:20 118:7
**5-7-18**   5:16
**50,000**   79:7
159:15,24
160:4,20,22
161:10 163:11
**500**   107:12
**51**   67:21
**517**   167:10
**55**   3:2
**5706285**   184:5
185:2 186:2
**58**   5:8
**5th**   114:2

**6**

**6**   4:7 5:10,18
50:8 60:1,6
62:20,23 68:6
87:20 122:19
128:15 171:8
171:13
**6,000**   75:1
**6-13-75**   8:23
**6-14-18**   5:9
**6-26**   145:7
**60**   5:9
**60,000**   127:15
127:17,22
128:3 155:21
**60601**   2:17
**60602**   2:5
**60606**   2:11,23
**60622**   11:6
**61**   5:11
**61,919**   72:4
117:17,24
129:10
**616**   3:3
**64**   5:12
**64,690**   145:23
**645**   5:18
110:11,12
**66**   5:14
**68**   5:15
**6:31**   135:13
**6:34**   135:19
**6:35**   134:21
**6a**   64:10

**6b**   64:10
**6c**   64:11

**7**

**7**   5:12,19 65:14
65:16 66:12
67:5 68:6
93:17 95:24
96:4 98:4,15
124:1 134:19
167:24 171:23
**7th**   99:12
134:13 135:7
135:13,18,22
136:8 137:8,9

**8**

**8**   5:13,21 62:6
63:12 67:7,7,9
75:8 149:19
156:23
**8,712**   129:4
**8,855.74**   77:18
**81**   4:8
**819**   123:4
**84-3252**   1:14
183:8
**86**   4:9
**899-6625**   2:18
**8e**   64:16 66:12
171:17,19,19
172:4

**9**

**9**   4:17 5:15,22
69:18 125:15
153:13

**[9,722 - aires]**

**9,722** 129:5
**9-10-18** 5:17
**92** 5:16
**93** 5:16
**9th** 75:15
  127:14

**a**

**a.m.** 1:17
**abide** 63:16
  66:16
**able** 15:19
  66:17 71:6
  122:19 128:8
  132:4 153:19
  170:24 175:20
**above** 47:20
  81:15 119:9
  144:16 182:8
  182:12 184:6
  186:7
**absolutely** 40:2
  40:13 72:23
  103:15 113:6
  141:1 170:19
**access** 133:16
  144:3 145:20
**accomplished**
  103:14
**account** 131:1
**accounts**
  117:16 126:16
  131:4
**accrued** 77:15
  77:24 159:16

**accuracy** 57:18
  133:18 184:9
**accurate** 23:13
  23:15 173:16
  173:17 176:7
  176:13,16
  177:4
**acknowledged**
  97:1
**acknowledge...**
  186:3
**acknowledg...**
  184:12
**action** 138:19
  182:18
**actual** 18:8
  33:23 39:15
  170:18
**actually** 25:6
  103:21 107:8
  108:20 144:9
  159:15 161:17
  177:9
**ada** 32:18,20
**added** 70:3
  154:21
**addendum** 5:4
  50:2 63:18
  66:17
**addition** 178:1
**additional**
  76:10 81:16
  89:3 92:22
  145:18 169:4
  180:19,20

**additions** 186:6
**address** 11:6,13
  44:12 56:17
  110:6
**addressed**
  109:1
**adequately**
  92:14
**adhere** 44:13
**adjournment**
  182:15
**admit** 97:2
**advice** 173:5
**advised** 85:23
**affect** 116:9
**affected** 116:4
**affects** 114:23
  114:24
**affidavit** 35:19
  36:17 167:8
**afford** 106:6,22
**aforesaid** 182:7
**afternoon** 87:5
**age** 16:1
**agency** 15:16
**agent** 15:5,6,7
  15:12,17,23
  16:2 17:8
  18:15,16,23,24
  19:2,4 28:4,21
  48:7 49:17,19
  59:2 67:22
  68:9,13,17,19
  69:2,8 81:23
  172:21 174:10

**174:19 175:5**
**agree** 31:17
  52:1,7 63:5
  64:24 66:6
  67:4 91:17,19
  106:9 117:3
  137:7 150:13
  151:15 154:11
  164:8
**agreed** 17:24
  64:11 181:2
**agreeing** 115:2
**agreement** 5:5
  50:3 79:13
  151:1 173:5
**agrees** 63:16
  66:16
**ahead** 96:3
  97:23 99:2
  127:20
**aires** 1:6 5:13
  5:16 46:14
  48:7,14,16,22
  49:3,13,14,17
  49:19 50:13
  51:7,10,14,19
  51:21,23 52:14
  52:23 53:2,6
  54:4,6,11,14
  57:24 58:13,18
  59:1 60:13,16
  60:18 61:1,10
  61:14,14 63:18
  64:14 65:6
  66:17 67:8,22

67:23 69:2,7
77:6 87:14
90:7 94:2,4
96:23 164:22
164:24 165:18
168:8 170:11
170:13 172:9
172:10,22
173:10,14,24
174:3 178:5
180:8,15
**albany** 13:18
**allege** 148:9,19
149:1 178:10
**alleged** 132:13
149:2 161:11
177:17
**alleges** 178:20
179:2
**alleging** 167:13
**allendorfer**
44:20 86:10
110:5 115:6
117:10,19
118:1 125:24
129:11 143:9
143:13,14,15
147:4,7
**allendorfer's**
86:13
**allotted** 184:20
**allowed** 153:18
**alternative**
154:3

**altogether**
115:19
**amanda** 47:24
48:2 50:11
**american** 1:6
2:8 8:1 46:13
48:7 49:18
50:10 184:4
185:1 186:1
**amount** 81:15
81:21 104:15
148:16 157:13
159:4 169:1
**analysis** 112:5
112:7 143:8
**andrew** 3:7
41:5
**answer** 7:20,21
8:13 12:19
51:20 53:21
61:6 88:4 90:4
90:21 92:8
96:1,2,2
100:20 105:1
112:11,13,15
112:21 113:10
118:5,20 124:7
124:9 149:22
151:24 152:4
160:7,11
170:21 173:12
173:18 174:13
175:2
**answered** 61:3
91:23

**answering**
53:22,23
160:14
**answers** 5:13
8:6 12:17 67:8
67:15,18 174:7
**anticipated**
124:9,12 126:4
**anybody** 15:5
18:22 22:15
28:4 30:10
33:1 36:18
45:6,9 59:2
61:14 82:6
83:24 84:3
85:19,24
142:23 174:14
174:19 177:21
178:1,10,20,24
**anyway** 112:12
**apologize** 87:12
147:15 178:8
**apparent**
147:16
**appear** 62:2
137:1
**appearances**
2:1 4:2
**appended**
186:7
**applicable**
184:8
**application**
154:1,3

**applied** 42:4,16
42:16 43:17,17
115:14
**apply** 145:22
**appreciate**
140:19 142:5
**appropriate**
94:21 100:3
**approximate**
16:1
**approximately**
17:21 23:23
26:14 35:14
41:6 145:18
160:20
**april** 72:11
127:14 128:16
**area** 22:4,17
23:2 33:23
70:4 76:9 80:8
80:9 83:17
84:21 85:1
86:5,6 162:11
162:12 163:18
163:19 164:2
**aretos** 138:5,9
**arguing** 53:12
**argumentative**
73:24
**arm's** 173:4
**arrow** 43:7,9
43:10,17 92:22
102:14 103:18
108:13 115:10
115:13,17

**[arrow - aware]**

138:7,11,17,24
138:24 139:2,4
139:7 142:16
153:23 154:11
155:1,2,17,19
164:13 168:3
**ascertained**
37:21
**asked**   19:17
20:12,13 26:10
29:10 33:16
37:14 90:2,10
97:18 100:23
100:24 101:2
119:6 161:7,9
168:12 171:2,7
173:11,21
174:6,6,13,20
174:21 177:24
180:8
**asking**   7:19
28:23 53:14,15
65:6 69:10
74:1 76:20,23
83:4 84:5
109:1 112:5,6
112:22,23
137:18 140:19
141:8 148:21
156:17 160:8
160:10,15
163:11 176:20
178:8,24 180:2
**asks**   112:18
124:6

**asserted**   113:4
142:21
**assessment**
70:10 71:4
72:9 73:12,17
75:4,11,19
76:4,18 77:7
78:4,9 79:3
80:12,14,21
158:24
**assessments**
80:23 81:8
**assistance**
71:13
**associated**
102:17 114:7
**association**
2:14 21:12,22
37:15 44:19
62:10 82:22
83:10 84:9
85:1,20,24
86:1,17 89:6
96:22 97:6
99:10 110:6,17
110:20 111:14
111:16 112:24
113:1,2,14
116:10,15
124:7,16
126:24 128:20
138:4 139:2,3
139:10,13,19
140:9 142:19
178:15 179:8

180:5,7,16
**association's**
5:19 124:2
145:4
**assume**   128:18
146:8 161:12
177:10
**assumed**
117:11,12
**assuming**   32:14
44:2
**assumption**
170:16
**attached**   33:24
184:11
**attend**   120:21
121:23
**attending**
102:5
**attention**   124:5
**attorney**   4:17
4:18 5:10,12
7:17 14:1,3
23:6 28:8,11
29:11,20,21
48:22 49:2,3
50:18 61:11
62:1,20 64:24
65:14,22 67:17
68:22 69:21
76:19 77:5
84:1,2,13 87:6
90:2,6,15
96:19 98:23
99:1,3 101:1,1

113:18 127:11
163:4,14 171:4
171:5 172:2,21
173:7 174:10
174:19 175:1,5
180:8 182:17
184:13
**attorney's**
158:23 163:1,2
**attorneys**   30:14
83:14 138:5
173:16 174:12
178:3,5 179:23
180:2,5
**august**   75:8
128:15 156:23
**authority**   53:16
**available**   184:6
**avenue**   3:2
**aware**   24:11
25:10 27:20
32:3 33:16
35:11 46:7,10
60:2,6 88:2
89:9 91:6 93:1
94:17 95:9
99:10 100:10
105:4 107:12
107:13 110:9
116:3,8,11,15
150:8 155:17
165:3,8,15
166:2 177:11
179:4

**awhile** 174:23

**b**

**b** 64:7 110:5
**back** 22:19
26:2 34:6 36:3
56:16 59:22
69:13 72:19
74:3 85:5
89:22 92:7,22
97:7 102:15,17
121:17 122:1,7
122:14 124:17
125:23 126:21
127:6,8,9
128:22 130:22
131:18 138:21
139:23 143:7
146:14 148:8
152:22 153:2
153:18 156:6
156:11 159:6
159:10,12
167:24 177:2
180:8
**background**
8:20
**bad** 109:9
155:2
**badly** 41:20
**balcony** 146:20
**base** 126:2
**based** 32:14
33:11 65:5
74:21 118:5

**basement** 21:6
22:4,8,21 80:8
80:9 83:17
84:13 86:5,6
162:11,12
163:18,19,20
164:2,2 179:23
**basing** 33:13
**basis** 102:18
103:7 104:18
108:21 113:3
114:16
**bates** 5:18
110:11,12
123:4
**beam** 115:22
**beams** 72:12
143:11 144:14
144:17
**bear** 120:9
132:9
**beginning**
46:12
**behalf** 2:2,8,14
2:19 129:15
139:10
**belief** 51:3
176:15
**believe** 49:9
84:15 86:22
94:3 102:19
103:7 110:7
116:14 119:16
119:24 123:24
130:19 134:23

135:15,19
136:1,10
139:15 144:24
145:10 146:1
146:12,23
163:24 170:11
170:23 176:6
176:11 177:2,3
177:19
**believed** 104:1
170:13 176:13
176:16,23
**believing**
108:21
**belongs** 114:10
**best** 44:19 51:3
102:9,24
156:13 176:2
177:22 178:4
180:4
**better** 138:20
**bid** 44:6,18
**bids** 44:20
**big** 13:22
**bigger** 101:12
110:4 141:18
**bill** 75:2 130:13
160:19,22
**billing** 163:6
**bills** 71:23
**birth** 8:22
**bit** 36:21 118:4
122:20 125:24
132:5 139:9
152:13,17

**black** 22:11
23:1,1 152:18
**block** 40:21
42:3,18 93:1,4
93:8 94:14
102:11 103:2
115:9,15,16
116:7 156:14
176:3
**board** 165:22
166:3
**bolded** 50:23
**booth** 9:13
**bottom** 64:16
154:13
**bought** 14:12
15:2 157:8
170:2
**box** 166:10
**boxes** 61:15
**bral** 5:22 153:8
153:11,12
154:13 155:9
**breach** 112:1
145:4
**break** 8:10,11
8:11,13,14
59:5,7 82:8,12
85:6 86:7 87:1
120:11,13,15
120:18,20
121:10,11,11
122:11 149:13
149:15 152:23
168:18,19

**breaks**  126:22
**brian**  33:20,20
  34:19,20,22
  35:21 36:18
**brichetto**  1:14
  182:3 183:7
**brief**  31:2 33:5
  98:20 117:14
  120:10 134:4
**bring**  19:23
  22:14 95:4,5
  97:13,22
**brought**  20:2,4
  32:11 95:5
  97:16
**brown**  27:2,4
  32:19,20 102:1
  103:13,24
  105:15 176:13
  176:14 177:19
  178:11 179:1
**browns**  91:13
  92:21
**building**  21:6
  22:2,23 23:22
  24:8,12 25:15
  25:17 26:5
  27:18,21 29:9
  31:23 33:23
  34:5,7,9 35:21
  35:22 38:5,13
  39:8,15,22,23
  40:7,18 41:1
  41:12,21 42:4
  42:6,9,10,12,21

42:24 43:11,20
45:16 70:7
71:1,2 73:11
75:9,24 77:23
78:3 81:16
88:5,6,21,23
89:1,2,5,24
90:3,9,11,17
91:9,14 92:10
92:23 93:3,15
94:10,18,19,22
95:9 99:11,22
100:4,12,13,17
100:21 101:2,3
101:8 102:12
102:14 103:2
103:10 104:14
105:17 106:6
107:14 108:10
108:15,18
109:15 110:7,8
110:22 113:21
114:11,19
116:9,16
118:12,24
119:1,7,18,20
120:2,4 138:22
145:5,20
146:22 147:22
148:6,12,13,17
149:3,8,10
151:7,17
153:20 154:7
154:20 156:10
156:15 157:1,4

157:5,10 158:4
167:16 176:4
179:22
**building's**
  102:10 120:2
**buildings**
  104:16
**built**  39:23
  42:9 149:9
**bullet**  151:19
  164:11 177:7
**bureau**  138:21
**business**
  138:21
**buy**  16:12
**buyer**  14:17
  54:19 56:13
  57:1 66:16
  84:18 96:23
  174:17
**buyer's**  47:17
  63:17 82:17
  83:1 85:2
  86:20
**buyers**  50:6
**buying**  11:9
  13:11 14:15,19
  28:5
**bylaws**  110:18
  111:21

**c**

**c**  182:2
**cable**  75:15
  157:15,21
  158:10

**calculation**
  141:6 146:15
  147:12 156:6
  164:9
**california**
  11:14
**call**  7:11 124:5
**called**  1:11 7:4
  29:6 130:10
**calling**  68:5
  125:18
**calls**  112:8
**camera**  132:5,6
  133:7,8,9
  152:13
**campau**  3:2
**capital**  124:9
  124:12
**capitalized**
  57:17
**caption**  182:14
**career**  41:13
**carol**  2:4 95:15
  95:20,20 96:13
  102:23 112:8
  112:23 123:15
  123:18 141:18
  152:4 160:6
  184:1
**case**  8:21 46:17
  46:20 50:12
  152:8 159:19
  162:21
**caulk**  43:11
  154:21

**caulked** 42:15
**caulking** 43:18
  88:24 94:13
**cause** 153:4
  182:7
**caused** 111:19
  112:1 116:6
  164:19,24
**causes** 116:16
  165:2
**causing** 42:1
**ceiling** 39:18
  72:13 74:20,23
  110:13,14
  143:11 144:14
  145:19 146:7
  147:19
**ceilings** 38:14
  60:3
**cell** 166:17
**cells** 161:24
**certain** 170:6
**certainly** 113:5
  138:20 178:5
**certificate** 4:13
**certificates**
  82:2
**certified** 1:14
  154:9 182:3
**certify** 182:4,13
  182:16
**challenging**
  140:23
**chance** 140:15

**change** 145:23
  185:4,7,10,13
  185:16,19
**changes** 184:10
  186:6
**cheap** 42:11
**cheapest** 155:6
  155:18,19
**check** 23:8 40:5
  46:6 71:24
  123:2,9 127:14
  127:22,22
  128:2,6,6,8,11
  128:16,16,20
  128:23 130:10
  143:12 156:23
  161:17 162:3
  162:16,17
  168:24
**checked** 57:11
  60:4,8,11
  61:15
**checking** 56:22
**checks** 128:4,5
  129:19,19,20
  130:3,8,12
  131:1,3,9
**chem** 154:3
**chicago** 1:16
  2:5,11,17,23
  9:13 11:6
**children** 9:2,4
  140:14
**chimney** 60:3

**choice** 121:23
**choose** 155:21
**cincinnati**
  165:19
**cite** 167:17
**city** 18:7,17
**civil** 1:12
**claim** 67:21
  113:4 138:17
  139:10 151:6
  162:8,23
  163:10 164:17
  165:4 170:5
**claiming**
  169:22
**claims** 101:3
  113:13 164:19
  165:3,5,24
  167:21
**clarify** 125:1
  128:5
**clarity** 123:6
**clark** 2:4,16
**clear** 32:15
  111:3 133:15
  140:5 147:24
  151:12 170:9
**clearly** 142:8
**click** 166:17,20
**client** 29:21
  53:15,15,19
  95:13 112:5
  141:23
**client's** 140:17

**clients** 113:4
  140:21 165:13
**close** 22:17
**closed** 91:21
  99:13
**closing** 24:11
  28:8 29:1 51:5
  84:15 88:10
  90:1 92:1 93:5
  93:7 94:7,17
  95:9,14,19
  96:3 97:2 98:8
  99:7 164:6
  168:2
**coat** 154:3
**coats** 154:2
**collectively**
  111:14
**colluded**
  124:23 177:15
**colluding** 32:16
  33:11
**collusion**
  172:11 177:18
  177:19,21
  178:3,11,21
  179:2
**come** 40:4
  44:10 69:13
  74:3 92:7,22
  96:13 102:15
  102:17 105:13
  108:17 121:17
  128:1 129:12
  130:22 131:18

138:21 148:12
160:6
**comes** 40:20
163:11
**comfortable**
16:9 30:8
**coming** 12:19
36:1 74:23
88:20 91:9,13
91:14,14,15
92:10 102:14
103:10 106:11
106:12,17,20
107:2,4 108:16
148:13 154:6
155:20
**common** 72:24
73:2,3 78:11
84:21 85:1
101:9 114:22
115:3,4 117:8
119:10,11,13
119:22,23,24
123:13 144:17
144:20,21,22
145:3,9,10
146:17 149:11
150:19
**communicated**
17:10 24:10
29:5
**communication**
125:2 139:6
**companies**
86:12

**company** 43:7
43:9,10 46:15
63:14 66:13
68:13 70:15
86:13 110:5
142:8 172:5
**complete** 93:12
154:16 186:8
**completed** 20:7
45:1,3 182:15
184:17
**completing**
44:24
**completion**
78:21 125:6
**component**
80:2
**comprised**
120:7
**comprises**
73:21
**concern** 22:24
23:4
**concerning**
20:22
**concerns** 23:5
**concluded** 28:3
108:5
**conclusion**
111:3 112:9,19
153:3
**condition** 54:17
99:21 100:16
**condo** 2:14
11:5,9,24 21:8

21:9,11,12,21
28:5 37:15
44:19 62:9
77:3 86:1
179:8
**condominium**
5:3 46:24
82:22 83:10
84:9 85:1,20
85:24 86:17
138:4
**condos** 11:10
**conducted**
107:15
**confident** 108:9
**confirm** 52:18
54:23 55:3
64:17 65:2,6
74:8 81:22
99:6 106:8
133:18 168:5,6
168:23 171:9
173:23 174:22
175:3
**conforming**
42:11
**confused** 48:14
**confusing** 66:8
**confusion**
49:12
**conjectures**
103:23
**consequences**
53:7

**considered**
68:19 113:13
**conspiracy**
105:8
**conspired**
104:12
**constructed**
42:11,21 43:21
115:22 120:5
**construction**
42:7
**consulting**
78:14
**contact** 64:18
65:3 167:4
173:6,8,9
**contacted**
153:8
**contained**
57:18
**contention**
67:21
**contingency**
159:19
**continued**
148:12 155:7
156:9 173:12
**continuing**
93:14
**contract** 5:3
32:5 44:23
45:5 46:6,24
70:21 115:14
115:17 126:2,7
127:2,5 129:8

[contract - cv]                                    Page 11

138:6 143:9
145:16,16,23
146:5 147:7,10
155:3
**contracted**
45:1
**contracting**
140:12
**contractor**
44:12,16 71:21
153:7 154:9
**contractors**
40:4 42:13
43:6 44:10,15
86:15
**contractual**
50:13 51:16
60:23
**contrary** 68:1
**contributing**
81:5,5
**convene** 26:10
**convenient**
105:10
**conversations**
36:9
**conveyed** 17:4
**copies** 184:14
**corporate**
63:13 66:13
172:5
**corporation**
1:7
**correct** 11:6
26:7 34:10

38:7 49:19
50:14 51:7,14
51:19 56:12
57:7 59:23
60:4,5,9 61:2
62:1 65:22
68:1,2 70:15
71:23 72:2,5,8
72:13,18,21
73:7,16 75:5,9
76:16 77:14,17
78:7 79:8,18
79:21,23 80:7
80:10,17,19
81:24 85:10,14
85:15,17 89:7
89:15 91:7
94:18 98:16,17
99:14 106:14
114:17 115:3,6
115:10 116:18
117:4 118:1,9
119:14,22
120:3 125:8
129:6 132:14
135:10 136:2
141:7 144:16
145:9 150:5
151:2 154:13
157:23 158:22
168:9,10 169:2
175:23 177:8
182:11 186:8
**corrections**
186:6

**correctly** 48:11
62:15 63:22
66:4 67:2
68:10
**corresponden...**
37:11 48:5
84:12 180:2
**corresponds**
128:18,23
**cortez** 9:7 11:5
11:19 13:12
14:18 16:17
70:5 96:23
138:4 153:6
**cost** 76:7
104:14
**costs** 107:12
**counsel** 31:1
63:8 94:3
97:18 139:7
152:10 181:2
182:17 184:14
**counselor**
52:10 55:1
**countersuit**
165:10
**county** 182:2
**couple** 17:22
20:14 169:12
175:9
**course** 54:12
55:7 95:5
161:14
**court** 1:1 4:16
8:5 53:8 74:4

92:8 122:13
141:17 180:10
**courts** 1:13
**coverage**
141:10,11,11
142:4,9
**covered** 123:2
**covid** 140:13
148:14
**crappy** 154:20
**create** 69:22
**created** 70:2,3
149:2
**credit** 77:22
84:15,17 85:10
85:12,14
129:17 164:5
**cross** 82:14
87:9
**crumbling**
157:12
**cs** 184:15
**cs5706285** 1:24
**csr** 1:14 183:8
**current** 104:6
109:3
**currently** 9:6
10:3 16:18
57:11
**custody** 4:15
**cut** 105:7
**cv** 1:5

[d&o - different]

| d | | | |
|---|---|---|---|
| **d&o** 165:19,20 | **date** 8:22 23:12 | 147:18,19,19 | **deposit** 128:21 |
| **d.b.a.** 1:6 | 23:20 50:8 | **decks** 146:22 | 129:7 |
| **d90** 166:21 | 70:10 77:5 | **declare** 186:4 | **deposition** 1:10 |
| **d91** 166:21 | 106:9 134:24 | **deed** 51:11 | 7:14 15:20 |
| **daday** 138:5,9 | 134:24 135:10 | **deemed** 186:6 | 82:16 83:1 |
| **damage** 21:4,5 | 135:16 136:1 | **defective** | 141:14 181:4 |
| 22:4,10 23:1 | 159:16,21 | 150:16 | 182:13 |
| 27:19,20 29:8 | 160:20 161:1,2 | **defects** 57:2 | **depositions** |
| 31:23 39:19 | 185:24 186:12 | 60:3,7 149:9 | 1:13 |
| 40:5 41:13,20 | **date's** 135:19 | **defendant** 2:8 | **describe** 67:20 |
| 42:2 62:12,14 | 136:11 | 2:14 | 92:14 |
| 63:16 66:15 | **dated** 98:10 | **defendants** 1:9 | **describing** |
| 84:20 102:10 | 138:7 147:10 | 2:19 82:21 | 95:23 |
| 103:1 104:5,13 | 149:24 | **deficiencies** | **description** 5:2 |
| 111:19 116:6 | **dates** 62:14 | 153:20 | 74:22 |
| 116:11,17 | 136:16 137:10 | **defined** 44:11 | **designated** |
| 132:13,15 | **day** 1:17 183:2 | **definitely** 131:7 | 124:6 |
| 141:6 143:7 | 186:15 | **definition** 69:1 | **despite** 67:24 |
| 147:12 162:23 | **days** 23:17 | **degree** 9:14,17 | **detail** 31:21 |
| 163:10 164:1,9 | 184:17 | **delighted** | **determination** |
| 172:8 173:1 | **dealing** 28:12 | 112:13 | 69:6 111:1 |
| 174:2,5 176:2 | **dear** 65:24 | **demand** 138:6 | 113:1 |
| 179:23 | **debating** | 138:11 139:1 | **determine** |
| **damaged** 157:6 | 102:16,17 | 142:18 | 41:20 150:24 |
| 163:20 | 154:24 | **demands** | 153:4 |
| **damages** 78:3 | **debris** 110:15 | 142:16 | **determined** |
| 106:13 112:1 | **debt** 140:17 | **demonstrate** | 53:8 110:20 |
| 113:4 114:16 | **decide** 16:23 | 98:6 | **developer** |
| 114:18 117:17 | 163:16 | **denied** 142:4 | 167:22,23 |
| 125:13 141:3,4 | **decided** 44:4,6 | **dep** 98:12 | **difference** |
| 142:21 146:14 | 111:14 153:21 | **deponent** | 156:18 |
| 156:6 161:10 | **decision** 155:5 | 160:15 181:3 | **different** 13:12 |
| 161:11 162:9 | 164:21 | 184:13 186:3 | 44:15 55:10 |
| | **deck** 137:16 | **deposing** | 64:21,23 86:12 |
| | 146:22,23 | 184:13 | 86:14,15,16 |

108:22 115:19
125:3 127:5
132:20 133:3
155:4
**differently**
170:16,20
**dig** 113:5,9
**digging** 118:4
**direct** 7:6 64:18
65:3
**directly** 48:23
70:24 71:22
72:7 75:6,13
77:13 79:5
80:15 174:11
174:17
**directors**
165:22
**disclose** 57:1,8
114:20,21,22
116:5,7,12
149:5,10 170:6
**disclosed** 29:10
32:1,2,3 46:11
109:5,10 116:2
120:5 149:1,11
156:4,7
**disclosing** 83:9
**disclosure** 5:6,7
5:16,20 56:3
59:10 61:13
66:22 87:14
89:23 94:3,7
100:10 124:2
125:7 149:2

168:13 178:9
178:14
**disclosures**
66:23 90:14
99:16,19
100:24 103:20
148:9,19,20
**discount**
109:13,19,24
**discovered**
40:1 45:15
106:9
**discovery** 37:3
96:24 162:21
**discuss** 21:3
26:11 30:22
31:15 40:4
152:8,9
**discussed** 20:1
27:14,17 31:14
31:18 39:16
40:6,7 44:2
45:7 82:16
85:7 102:9
**discussing** 38:1
38:4 83:1,13
83:16,23 86:7
110:1
**discussion**
94:10 131:22
132:2 133:13
153:3
**dismantle**
145:19

**distinction** 92:3
92:6
**district** 1:1,1
1:12
**doc** 97:13
**docs** 97:14
**document** 21:2
22:6 42:22
47:9 48:13
49:9,20 50:3
50:16 51:6,13
51:15,16,17,22
53:1,8 56:7
57:16 58:2,5
59:1,14 60:11
61:13,23 67:12
88:16 94:6,24
95:2,8,11,11,12
95:19 96:4,9
96:22 98:5,18
100:6,7 109:22
109:24 113:24
118:3 124:3,10
124:11,21
127:4 138:1
140:1,6 143:19
149:14 152:1,5
169:6 173:15
175:13
**documents**
13:24 23:14
57:24,24 58:3
60:15,16 96:23
97:16 100:24
109:21 131:17

141:20 161:10
162:22 179:15
180:20
**doing** 19:15
88:12 94:21
100:3,12,13
117:20 130:21
155:2 179:11
**dollars** 142:20
**door** 22:4,21,22
33:14 34:6
36:2 75:9 80:9
86:6,19 88:24
106:5 149:7
154:23 157:1,6
157:6 162:12
164:3
**doors** 34:5
38:14 39:17
42:6,15 43:19
60:7 73:1,4
92:11 101:9
137:16 155:11
163:20
**downspouts**
158:2
**drafted** 84:12
**dragger** 136:15
**drive** 2:22
130:16 131:13
**dry** 104:5
**drywall** 110:13
110:14 145:18
146:7

due  80:18
102:10 103:1
152:7 156:13
164:12 176:2
duly  7:4 182:6
dump  169:6
duplicates
137:1
duty  63:17
112:2

**e**

e  8:17 23:8,9,23
24:1,7,15,20
25:3,10,14,24
26:15,17,19
27:16 33:12,14
36:22 37:2,13
37:16,22,24
38:19,23,24
39:11,16 42:23
46:14 48:16,18
48:23 49:14
60:20 61:10
62:7 63:13
76:23 91:12
92:20 94:23
96:17,18,19
97:20 98:10,15
103:9 105:18
106:3 108:2,15
111:4 122:1,6
124:17 125:1
130:1 156:11
167:18 179:21
185:3,3,3

earlier  70:14
78:18 82:16
83:1 89:13
168:9 169:20
easily  97:17
east  33:20,22
88:21 94:14
145:20
eat  121:2,17
echo  131:1
education  9:10
10:1
effect  53:11
effectiveness
140:23
effects  53:12
efforts  140:24
eisenberg  2:15
either  56:22
64:3 83:10
141:22 182:17
elected  179:13
electric  158:1
electronic
47:21 56:13
59:20 67:14
element  78:11
115:3,4 119:10
119:11,22,23
144:23 145:9
145:10 158:2
elements  72:24
73:2,3 101:9
114:22 117:8
119:13 120:1

123:13 144:18
144:20,21
145:3 146:17
149:11 150:19
elevation  127:7
elevations
94:14
employed  10:3
10:5,13,18,20
10:22 11:2
employer  10:11
endeavor  140:3
engaged  138:16
engagement
138:3,8 161:3
162:15,15
163:7
engineer  72:12
108:18 143:11
143:21,22
144:14 154:10
engineering
143:24 144:4
144:10 146:2
english  9:20
103:18 110:23
enormous
104:14
enter  138:8
entire  44:8 89:1
101:8 111:15
116:18 118:12
118:23 149:3
150:4,15
151:14 152:8

157:10,13
166:9
entirety  113:3
127:3
entitled  130:12
entrance  21:6
22:8
entry  80:9 86:6
162:12 164:3
equal  159:23
equity  77:16,22
85:9,12,13
129:16
erie  139:11,14
140:5 142:12
164:13 165:4
errata  184:11
184:13,17
erratas  184:15
esi  5:21 44:7
103:17 108:17
108:22,24
148:10 149:7
149:18 153:2,3
153:12 154:10
155:8
esi's  150:13
151:1
esq  184:1
estate  5:3 14:1
14:3 15:5,6,7
15:12,17,23
16:2,7 17:8
18:15,16,23,24
19:2,4 23:6

[estate - feel]

Page 15

28:4,21 46:24
59:2 81:22
82:1,2 83:14
99:1 171:5
172:1,21 173:7
174:9,10,16,19
175:5,5
**estimate** 160:1
160:4
**event** 182:18
**eventually** 40:9
**everybody** 47:1
76:5
**everybody's**
81:4
**evidence** 32:15
67:20
**evident** 114:23
**ex** 13:18,22
**exactly** 48:21
169:22
**examination**
1:11 4:6 7:6
82:14 87:9
169:15 175:11
**examined** 7:5
**example** 127:1
**excel** 5:15
69:18,22 74:9
79:24 169:12
**exchange**
122:14
**excuse** 109:8
127:2

**exhibit** 4:15,17
5:3,4,6,7,9,10
5:12,13,15
46:23 47:6,13
47:16 49:22,23
56:2,4 59:9,11
60:24 61:18,20
62:20,23 65:14
65:16 67:7,7,9
69:18 85:5
87:12 93:20,23
94:1,2 95:14
98:2,3,4,11,14
101:15,17
102:2 107:24
110:2 122:19
124:1 125:10
125:15,17,19
126:13 149:19
153:13 171:8
171:11,13
**exhibits** 4:4,16
4:18 5:1 68:6
**exist** 51:15
53:10,24 55:23
110:7
**existing** 110:13
110:14 146:6
153:17
**exists** 144:10
**expanded**
22:11
**expenditures**
124:9,13

**expenses** 70:5
76:12 102:17
**experience** 16:6
**experienced**
27:19 29:1
62:10 63:15
66:15 172:7,24
174:2
**expert** 40:19,20
**explain** 49:3
88:19 106:1
157:3
**explained**
107:10
**exploratory**
41:19 72:12
143:10,18,22
144:6,13
**expose** 146:7
**exposed** 123:11
145:22
**exposure** 146:9
**expressed** 51:5
**extent** 123:7
**exterior** 21:5
22:21,22 38:13
62:11
**exteriors** 138:7

**f**

**f** 138:20
**face** 40:21 93:1
93:4,8 102:11
103:2 116:7
152:13,15,16
156:14 176:3

**faces** 133:22
134:2
**facing** 74:16
78:7 88:5
146:15 147:12
147:19 149:6
**fact** 95:1 99:22
104:4 111:3
148:3
**facts** 141:15
**failed** 24:16,18
**fails** 184:19
**failure** 114:15
120:2 170:6
**fair** 91:5,16
97:17 100:14
**fairly** 108:9
**fall** 35:1 106:17
106:20 107:1
133:3
**false** 102:20
103:8 125:8
**familiarity**
14:15,17
**far** 137:21
**farm** 166:4
**fast** 97:8
**fault** 97:13
**february** 1:17
136:8 137:9
183:2 184:3
**federal** 1:11
**fee** 163:2
**feel** 16:9 29:1
30:8 148:3,6

[fees - following]

Page 16

**fees** 76:11 77:5
  79:7 80:22
  81:16 158:23
  159:16 163:1,4
  163:11,14
**feet** 22:18,22
  145:18
**female** 19:7
**fiduciary** 112:2
**field** 40:20
**fight** 52:17
  54:2
**figure** 82:8
  104:24 113:7
  117:16 126:24
  127:19 149:3
**figured** 120:19
**figures** 160:11
**file** 139:13
**filed** 151:6
**fill** 100:23
  124:18,24
**filled** 35:19
  100:9
**filtration** 137:8
**final** 143:21,22
  144:8
**financial** 75:23
  76:1,10 81:10
  158:5
**find** 15:12,19
  21:4 31:22
  120:12 127:20
  146:11,12
  167:23

**findings** 143:17
  143:19 144:6
**fine** 51:18 52:4
  53:21 54:23
  82:10 97:9,20
  151:15
**finfer** 2:21 4:9
  82:7 86:24
  87:3,5,6,10
  89:7,10,21
  93:21,24 94:5
  95:12,15,17,20
  96:7,13,21
  97:4,9,10,20
  98:3,6,13,17,22
  99:5 100:5
  101:16,21
  102:3,4,23
  103:6 104:24
  105:3 107:20
  112:8,11,14,20
  112:22 113:7
  113:12 118:16
  118:19 120:14
  120:19,23
  121:3,8 122:6
  122:9,13,17
  123:15,18,21
  123:23 125:10
  125:13,22
  126:20 127:13
  127:21 130:2,5
  130:12,18
  131:10,16,21
  132:8 133:12

  133:19 134:2,8
  134:10 135:5
  136:17,21,23
  137:3,6,22
  141:13,18,23
  142:5,10 143:6
  149:12,17
  151:11 152:3,7
  152:11,21
  153:1 158:9,18
  160:6,9,13,18
  161:9,15 162:7
  162:10,20
  163:17 165:14
  166:9,14
  168:17,23
  169:3 180:18
**finish** 7:20
  45:13 52:13
**firm** 138:16
**first** 5:14 7:4,8
  11:10 12:22
  14:18 16:23
  23:21 26:17,24
  28:14 29:4
  30:24 37:22
  42:23 44:22
  50:22 54:18
  56:16,24,24
  57:9 59:22
  67:8,23 110:12
  118:7 132:11
  169:10 182:6
**five** 8:11 16:16
  36:8 168:18

**fix** 44:10 45:6
  107:14 108:19
  110:8 111:6
  155:10,12
**fixed** 33:4
  119:21 148:13
**fixes** 42:11,14
  42:20 43:1
**flash** 43:11
  137:15 154:23
**flashed** 42:6
**flashing** 42:18
  88:23 94:13
  100:9 153:17
  154:5,15,18
  155:12
**floor** 33:21
  72:13 143:12
  144:21 146:12
**floors** 60:7
  118:11,15
**flucker** 47:24
  50:11
**folder** 130:10
  144:4
**follow** 168:6,8
  169:9 173:14
  173:19 175:9
  179:20
**followed**
  173:24
**following** 19:14
  66:3 153:6
  155:8

**follows** 7:5
**font** 175:16
**food** 121:1,17
**forced** 170:21
**foregoing**
182:10,14
186:5
**forgive** 140:15
**former** 24:10
25:1,2,5,10
105:19
**forth** 124:17
180:8
**forwarded**
38:24
**found** 18:15
20:24 45:20
148:12 179:22
**four** 64:21
131:9 141:19
166:23
**frame** 86:19
**frames** 80:9
86:6 162:12
164:3
**frank** 2:21
**franklin** 1:16
2:10
**freezes** 158:3
**friday** 69:22
98:5 130:1
169:6 180:21
**friend** 15:15
**friends** 34:15

**front** 34:7
55:21 62:18
65:12 75:9
76:2,2 78:6
115:21 116:11
116:11,17
130:15 149:14
157:1 169:17
**frozen** 152:19
152:21
**fucking** 107:14
**full** 70:19 126:7
126:16
**functioning**
19:21,22
**funds** 128:1
129:11,12
**furnish** 145:21
145:21
**further** 86:23
88:10 94:12
100:16,21
104:6 105:21
118:4 153:22
158:17 169:6
180:17,18
182:13,16
**future** 169:5

**g**

**g** 7:10
**garver** 97:5
**general** 23:22
28:24 44:16
103:22 140:12
145:4

**generally**
116:15
**generated** 83:2
**getting** 31:20
108:9 134:9
142:7 160:11
160:17 174:22
**give** 47:12
60:22 97:19
160:9
**given** 7:14
109:14 169:5
182:8,12 186:9
**giving** 160:11
**glass** 115:9,14
115:16 116:6
**go** 8:20 13:16
32:6 34:4
50:22 54:17
55:6,15 56:9
56:16 57:15
58:2,3 59:16
60:1 62:6
63:12 64:20
86:24 94:23
96:3 97:7
98:21 99:2
101:20 121:16
125:23 127:3,6
127:8,9,20
128:21,22
131:6,19,21
133:10,17
134:8 135:6
136:7,23

139:23 145:7
146:14 147:9
150:18,23
153:11,21
161:23,24
164:20 167:24
169:10,14
**god** 104:21
**goes** 163:6,6,6
163:6
**going** 8:20
14:15 26:11
31:20,22,23
37:6 46:13,22
46:23 47:1
48:13 49:21
50:19 51:20,24
52:1,7,24 55:2
55:6,12 58:2
59:9 62:19
72:19 74:3
76:18 81:1
83:11 85:5
86:7 89:22
95:2,3,3 96:8
97:8,14 105:21
112:4,18
113:23 117:20
118:20 121:13
122:3 123:24
124:18,24
131:17,18,24
132:11 133:17
140:19 146:14
153:2 160:24

**[going - help]** Page 18

162:8,16
163:19 165:6
166:24 168:3
168:24 170:10
172:17 176:1
**gonna** 31:15
32:4 76:7 95:1
100:18 104:14
**gonring** 1:7,8
2:19,20 3:8
4:18 5:16,16
5:17,17,17,18
5:18,19,21,22
25:7,11 38:6
56:10,18 57:6
57:13,22 58:7
58:20 59:3,17
59:20,23,23
60:15 93:24
94:2 102:2
107:24 122:19
126:13 149:19
**gonrings** 32:18
33:15 34:11,13
35:10,12 36:14
36:15 39:1,2,3
39:7,12 40:1
44:8 49:7,10
49:11,13,19
58:1 65:10
67:22 69:3
83:10 84:7
87:7 88:4
91:12 92:21
104:1 105:5,19

111:23 112:3
120:7 155:2
164:22,23
165:12,17,23
167:13,15,19
170:6,17,24
172:14,22
173:8,14 174:8
174:15 175:6
177:15,18,23
178:12 179:1
**good** 2:16 4:8
4:11 12:20
33:2,4 47:2,4
71:12,16,18
82:11,15,20
83:19,21,22
86:23 87:3,5
121:18 122:3
125:15 133:10
134:5 137:1,5
169:9,14 175:9
175:12 178:19
178:24 179:5
180:10,17,23
**google** 68:24
69:2,4
**gorr** 2:14 24:2
24:3 27:2 37:2
38:24 82:21
92:20,21
101:22 102:1
103:13,24
105:15 107:24
108:4,8,21

111:4 124:10
137:13 139:16
143:1,3 156:2
167:18 176:15
177:12 178:11
179:1,7,24
**gorr's** 156:18
**gorrs** 32:18
91:12 126:5
167:14
**gotten** 43:1
**graduate** 9:21
**grand** 3:3
103:23
**grant** 163:13
**great** 116:24
**greater** 31:21
**grinding** 94:13
**ground** 7:18
**group** 139:11
**guess** 147:23
156:24
**guidelines**
44:18 77:3
**guys** 23:7 31:17
40:12 47:3
58:4 121:24
148:14 172:1
173:13

**h**

**h** 185:3
**hand** 136:17
183:1
**happen** 131:10

**happened** 26:9
104:19 142:17
147:21
**hard** 8:8
**hawbecker** 5:9
28:10,13 61:19
62:22 65:22
66:1 97:4
**head** 8:7 18:11
23:10 39:5
**headline** 76:9
**heads** 93:10
111:8
**hear** 12:21,22
46:19 61:4
96:1,11 149:22
152:3 164:14
168:21 176:18
**heard** 35:12
46:17 48:4
118:15 174:16
**hearing** 12:16
27:24
**heat** 75:15
157:15,21
158:10
**heating** 158:1
**heir** 78:14
**hell** 137:15
**hello** 36:1
**heloc** 85:7,9
159:3
**help** 69:24
90:23

| | | | |
|---|---|---|---|
| **helpful** 87:24 | 43:10,23 44:4 | **home** 63:21 | 175:14 |
| 97:21 122:20 | 44:8 45:7 70:3 | 66:20,22 77:15 | **idiot** 155:6 |
| **helping** 160:17 | 71:21,23 72:1 | 77:22 85:9,12 | **ignore** 155:7 |
| **hereto** 186:7 | 72:7,17 75:6 | 85:13 129:16 | **ignored** 111:7 |
| **hereunto** 183:1 | 75:13,21 77:5 | 162:1 | **illinois** 1:1,7,15 |
| **hey** 37:11 | 77:13 79:5 | **homeowner's** | 1:16 2:5,11,17 |
| **hi** 87:8 | 80:1,16,18,18 | 178:14 180:5,6 | 2:23 182:1 |
| **hid** 172:9,10,12 | 80:22 85:4 | 180:16 | **illogical** 51:21 |
| 174:7 | 88:5,6 90:10 | **homes** 14:5 | 52:1 |
| **hier** 40:19 80:3 | 90:12,13,16,24 | **horton** 167:5 | **images** 128:4 |
| 161:23 162:1 | 91:2 93:10 | **hour** 82:9 | 128:24 132:13 |
| **higher** 166:6 | 101:2 110:18 | 120:20 121:9 | 133:3 |
| **highest** 9:10 | 110:21 111:5 | 121:14,21 | **imagine** 25:11 |
| **highlighted** | 111:20,22 | **hourly** 159:18 | **impact** 106:2 |
| 162:1 | 120:6,7 124:23 | 159:20 | **impacted** 146:9 |
| **highlighting** | 128:2,6,6,24 | **house** 11:24 | **implications** |
| 70:9 114:5 | 130:8,10,12 | 12:1 19:10 | 85:23 |
| 150:10 | 138:10 156:1 | 27:13 88:3 | **impression** |
| **hire** 30:2,18 | 158:23 164:12 | **houses** 11:10 | 94:21 174:8 |
| 41:23 45:6 | 164:17,19,21 | 18:18 | **impressions** |
| 70:15 154:15 | 165:1,12 | **huge** 55:19 | 28:22 |
| **hired** 40:17 | 167:21 168:12 | **hum** 20:17 | **improperly** |
| 43:7,7,10,14 | 170:6 177:16 | 87:23 123:22 | 42:6,17 43:15 |
| 44:20 45:8 | 179:15 180:2 | 134:22 167:12 | 120:5 |
| 110:8 139:7 | **hoa's** 111:20,24 | **hundreds** | **inappropriate** |
| 153:11,23 | 113:20 114:12 | 155:5 | 55:20 |
| 154:11 | 117:7 119:17 | **hungry** 120:17 | **inappropriately** |
| **hiring** 29:24 | **hold** 55:1,5 | **husband** 13:18 | 42:18,19 43:21 |
| 40:22 43:6 | 89:4 96:14,14 | 13:20,22 | **include** 154:2 |
| 44:15 | 97:19 98:19 | **hybrid** 1:10 | **included** 94:12 |
| **history** 42:23 | 117:13 128:10 | | 116:17 |
| 156:9 | 130:6 134:3 | **i** | **includes** 150:16 |
| **hoa** 24:5 26:10 | 143:20,21 | **idea** 26:4 60:12 | 151:7 |
| 26:24 29:5 | 147:10 166:19 | 146:8 | **including** 76:11 |
| 30:21 40:4 | | **identified** 5:2 | 101:8 154:1 |
| | | 44:13 83:24 | |

166:16 167:1
167:16
**incorrect**
134:24 135:16
135:20 136:5
136:11 153:23
**incorrectly**
42:5 43:17
95:23 149:8
**increase** 80:18
80:22 165:20
175:16,16
**increased**
164:11
**incur** 112:1
**index** 4:1,4 5:1
**indicate** 166:6
**indicates**
103:24 133:21
149:8 153:7
**indicating**
104:6 124:12
**indication**
61:14
**industry** 16:7
**infiltrates**
158:4
**infiltrating**
27:22 42:17
133:2,4
**infiltration**
42:24 63:19
66:19,24 92:1
92:4 101:2
102:11 106:5

109:14 116:15
132:15 137:14
137:15,17
147:17 148:7,8
148:24 149:5
150:9 151:9,21
153:4 156:5
157:7 164:24
180:7,16
**info** 31:24
134:15 136:18
**information**
20:23 31:20
37:14 57:18
66:21 109:23
114:23 154:22
155:23 167:4
173:15 177:14
180:3
**informed** 91:17
91:20,24
**initial** 17:19
27:24 37:19
128:21 129:3,6
145:15,16
148:8
**inquire** 34:5
**inquiry** 90:16
**inside** 45:17,18
**inspect** 21:24
40:17 63:17
66:17 150:9
**inspected** 41:1
**inspection** 14:6
18:1,3,4,7,20

19:12,18 20:6
20:24 40:7
41:10,14 43:22
44:1 63:21
66:21 78:18,20
83:2,4,24
84:18 86:20
93:4 150:14
151:2 162:2
164:3
**inspections**
14:4
**inspector** 18:8
19:1,14 21:24
41:24 43:14
82:17 83:2
85:2 179:22
**inspectors**
18:17
**install** 158:1
**installation**
75:16 157:15
157:21
**installed** 42:19
88:23 100:9
**instances** 62:10
177:11
**instructed**
85:19
**insurance** 77:6
80:18 139:11
139:14 142:8
142:12 151:6
164:18,19
165:1,2,4,20

**intend** 113:16
**interest** 76:11
77:15,24,24
159:3
**interested**
182:18
**interior** 62:11
76:12 123:5
126:5 147:23
158:20
**internation**
184:4 185:1
186:1
**international**
1:6 2:8 8:1
9:20 48:8
49:18 50:10
**interrogatories**
5:14 67:8
71:11
**interrogatory**
161:14
**interrupt** 33:2
**intro** 150:8
**introducing**
93:19,22
**intrusion** 40:19
42:2 103:1
104:2,7 132:20
156:14 176:3
**investigate**
88:9 89:24
90:9 93:7
99:21 100:16
100:21 101:4

**investigating** 34:8

**investigation** 51:4

**invoice** 123:1,8 123:9 127:12 143:23 145:12 146:5

**invoices** 144:1 159:23 160:2 160:10

**involved** 79:15

**involvement** 62:3

**iphone** 133:8,9

**irs** 162:4,16 168:24

**issue** 31:21 42:7 83:16,23 86:19 88:10 92:13 111:21 113:5 141:18 150:24 154:17 156:8 173:12

**issued** 78:23 142:18

**issues** 20:14,15 21:4 23:21 24:8,11 25:15 25:17 26:5 27:18 30:22 32:2,11 33:17 35:2,9,11 36:12 37:6 38:1,4,12 40:1

42:2 44:10,12 45:7 46:8 73:20 90:11 99:18 100:10 105:17 108:23 108:24 109:15 110:6,8 114:19 114:21 116:3,8 120:4,6 140:21 146:11,13 148:11 149:2 154:15,19 156:10 165:1 167:16 170:7 177:14

**item** 66:12 85:13 87:19 104:4 115:8,21 117:21 118:7 140:1 143:10 172:4

**items** 81:19 85:16 86:4 87:20 106:19

### j

**january** 74:16

**jfinfer** 2:24

**job** 1:24 10:9 10:24 154:20 155:1,2

**john** 2:14 24:2 24:3 25:9,13 25:14 26:16,19 27:2 32:1 33:1 33:7,8 37:2

38:3,24 39:11 42:22 43:7 44:7 45:24 46:2 82:21 92:20,21 102:1 111:4 124:10 124:17,21,22 137:13 139:15 140:7 143:3 156:2,7 167:18 176:15,24 177:12,23 179:11

**john's** 146:20 177:10

**joists** 118:11,14 118:15,17 119:7 120:1

**joking** 173:2

**jordan** 2:21 87:6 97:24 105:2 133:10 152:20 162:14

**judge** 53:11,18 163:13,15

**judgment** 140:2,3 163:12

**july** 14:23 23:13 66:11 138:7 171:21 173:23

**june** 42:5 43:4 43:11,12 50:8 61:18 63:6 66:1,2 73:14

76:12 92:24 98:5,10,15 99:19 102:15 114:2 159:12 171:10,15,16

### k

**k** 77:24 78:2 79:17 85:16,17 85:21 129:17 129:17 159:8 161:16 182:2

**keene** 109:4,6 109:11

**keep** 33:11 34:22 42:17 65:12 95:3 151:23

**keeping** 62:17

**kelly** 1:8,14 2:20 182:3 183:7

**kelsey** 3:8 25:6 25:11 38:3,6 38:22 43:7 56:10,18,21 57:6,13,22 58:6,17,20 59:3,17,20,23 60:10,14 94:24 124:17,20,22 155:3

**kept** 54:14

**kevin** 2:10 7:23 87:12 169:9

**kid** 120:22
121:13
**kind** 26:9 32:13
33:10 40:11
42:14 70:14
**kitchen** 116:24
**kkojs** 2:12
**klein** 138:5,8
**knew** 29:10
32:4,16 33:17
34:8 49:11,13
99:18 104:13
105:16 156:19
156:19 172:16
**knock** 34:4
**know** 12:17,18
14:21 15:16,22
16:1,5,8 17:6,7
17:10,19,24
18:1,4,8,11
19:4,17,24
20:1 23:3,16
23:18,20 25:3
25:4 26:9,14
26:16 28:14,24
29:5 32:10,21
33:18 34:11,17
34:19,20 35:5
35:7,9,14
36:12,15,18,22
37:11 38:11
39:3,6,22
40:17 41:6
42:20 43:2,5
44:9,22 45:3,4

45:11,15 46:4
46:7,15 48:2
48:21 49:7
57:23 58:1,8
58:13,22 66:8
76:7 84:22
85:3 88:16
90:21 96:6
101:16 102:13
109:1,5,10,13
109:17 111:10
112:4 113:11
114:23 118:14
121:8,22 122:2
128:22 129:18
130:21 137:21
138:11 139:6,8
140:14 141:21
142:6,11,15,24
143:17 144:21
145:11 152:19
152:19 155:15
156:15 161:6,7
162:5 166:17
166:21 169:18
171:7 174:22
175:14 176:14
176:22,24
177:1,9 178:20
180:1
**knowledge**
51:3 63:20
66:20 84:10,11
102:10 103:1
142:19,22

156:13,18
167:14,15
176:2 177:22
178:4 180:4
**known** 57:1
116:16
**knows** 35:10
**knuckle** 136:15
**kojs** 2:10 4:7
4:10 7:7 8:18
8:19 13:1
21:13,16,20
29:20,23 30:6
31:3,9 33:3,6
47:3,5,8,15
49:21 50:1
52:12,17,24
53:4,12,21
54:1,9,15,16
55:3,14,17,19
55:24 56:6
58:10,15 59:6
59:13 61:5,9
61:17,22 62:19
63:2,10,11
64:5,7,9 65:13
65:18 67:7,11
69:13,15 71:8
71:15,19 74:6
74:8,11 77:4
82:4,10 125:12
125:14,17,20
134:7 151:23
169:8,11,16
171:14 175:8

**kristen** 109:4,5
109:10 143:4
179:18

**l**

**labor** 145:21
**lack** 148:8
149:2
**laid** 10:16
**langveld** 28:10
**laptop** 97:23
**late** 34:23
**law** 2:3 79:7
138:5,16
159:15,23
161:19
**law.com** 2:24
**laws** 37:15
**lawsuit** 76:10
77:5 80:1,5
139:13,17,22
140:11 141:3,4
141:10,22
142:3,12,21
161:24 162:8
164:13,13
165:15,16,17
165:18
**lawsuits** 80:19
164:12
**lawyer** 112:7
112:18 160:5
160:19 168:7,8
**lead** 40:11,15
43:5

**[leading - loftusandeisenberg.com]** Page 23

| | | | |
|---|---|---|---|
| **leading** 74:2 | **length** 173:4 | 177:13,15,16 | **listing** 54:14 |
| **leak** 88:6,18,21 | **lent** 129:14 | 177:18,19 | **lists** 51:19 52:5 |
| 91:8,8,10,12,22 | **letter** 5:9,11,12 | 178:5 179:11 | 59:2 |
| 92:2,3,9,14 | 5:16 61:18 | **lies** 103:20,21 | **litigation** |
| **leakage** 66:15 | 62:4,21 63:3,6 | 103:23 140:17 | 141:19 165:6,8 |
| 88:3 153:19 | 65:15,19 66:2 | **life** 140:18 | **little** 36:21 66:8 |
| 172:7,24 174:2 | 66:7,11 96:19 | 165:19 | 118:4 122:20 |
| **leaking** 38:14 | 98:5,15 138:3 | **light** 19:21 | 125:24 132:5 |
| 38:20 62:11 | 138:8 139:2 | 20:15 82:9 | 152:17 |
| 63:15 74:19 | 142:18 161:3 | 99:22 | **live** 9:6 11:15 |
| 89:24 101:5,7 | 162:15 171:10 | **likely** 172:20 | 12:4,12 33:1,7 |
| 146:24 157:5 | 171:15,21 | **limited** 1:7 | **lived** 9:8 22:15 |
| 169:24 | **letters** 66:9 | 72:24 73:3 | 25:6 32:23 |
| **leaks** 60:2 | 90:3,6,15 | 78:11 101:9 | 54:20 |
| 63:18 66:18 | 163:8 168:8 | 114:22 119:10 | **lives** 33:20 |
| 88:5 89:3 90:9 | 171:8 174:20 | 119:13,19 | 34:20 |
| 90:16 91:7,18 | 174:24 180:8 | 144:21,22 | **living** 33:9 |
| 91:20 157:3 | **letting** 42:3 | 145:2 149:11 | 172:17 |
| **learn** 89:2 | **level** 9:10 | 150:19 151:2 | **llc** 1:6 48:8 |
| 92:18 155:23 | **liability** 1:7 | **line** 47:20,23 | 185:1 186:1 |
| **learned** 154:22 | **license** 82:2 | 66:2 77:22 | **llp** 2:9 |
| **leave** 120:15 | 183:8 | 81:21 85:9,12 | **loan** 76:11 |
| 122:3 152:1 | **licensed** 154:10 | 85:13,14,16 | 77:16,24 78:2 |
| **leaving** 10:15 | **lie** 50:15 88:17 | 86:4 118:7 | 129:17 159:4,8 |
| **left** 64:1 67:5 | 89:1 100:6 | 129:16 144:3 | **located** 12:2 |
| 140:21 161:23 | 104:9,18 108:7 | 166:7 185:4,7 | 13:7 22:19 |
| 161:24 172:2 | 108:8,11,12,17 | 185:10,13,16 | 30:3,7,9 31:12 |
| **legal** 51:17 | 124:13,15,19 | 185:19 | 84:14 85:2 |
| 53:7,11,12 | 156:21 | **list** 52:14 | 153:5 |
| 54:2 69:1 | **lied** 54:8 90:13 | 143:10 | **locations** 62:14 |
| 76:11 112:5,7 | 95:6 100:4 | **listed** 48:14 | 151:10 |
| 112:9,18 113:1 | 101:4 103:19 | 49:12 51:14 | **loftus** 2:15 |
| 113:10 138:6 | 104:17 114:18 | 104:19 106:19 | **loftusandeise...** |
| 138:19 173:5 | 116:18 174:7 | **listen** 105:2 | 2:18 |
| 184:23 | 175:2 177:12 | | |

**logan** 12:3,11
13:19
**long** 9:8 10:13
11:2,15 12:4
12:12 15:22
17:21 18:2
19:12 37:6,8
131:14
**longer** 131:16
**look** 16:11 20:6
21:2 22:5
36:17 44:22
45:4 66:12
76:21,23 84:22
86:22 90:13
94:23 108:15
109:20,22
112:20 117:15
123:14 127:1
131:17 133:20
139:23 141:16
141:17,22
142:3 146:20
156:11 177:10
180:1
**looked** 16:14
33:22 44:6
64:21 66:8
68:20,23,24
126:21 155:24
168:8 169:20
**looking** 11:10
11:12 16:12
44:9,12 50:24
58:24 69:17

110:10 123:1
132:10 144:5
145:17 146:5
147:6,8,10,15
166:8,9,21
171:18
**looks** 64:16
101:24 123:10
132:22 141:9
145:12,15
166:15
**loss** 139:9
**losses** 141:5
**lot** 16:6 95:2
148:18
**loud** 8:6
**lower** 115:22
**lowering**
152:12,17
**lunch** 120:18
121:10 122:11
**lying** 58:3,4
64:20 90:5
103:13 108:22
124:14 156:19
176:19 179:15

**m**

**madame**
180:10
**made** 62:15
66:7 94:17
101:3 102:20
108:20 113:1
125:8 148:20
148:20 164:21

186:5
**magnitude**
92:14
**mail** 8:17 23:23
24:1,7,15,20
25:3,10,14,24
26:17 27:16
42:23 48:16,18
48:23 49:14
60:20 61:10
96:17,18,19
97:20 98:10,15
106:3 108:2
122:1,6 125:1
130:1 156:11
179:21
**mailing** 26:19
**mails** 23:8,9
26:15 33:12,14
36:22 37:2,13
37:16,22,24
38:19,23,24
39:11,16 76:23
91:12 92:20
94:23 103:9
105:18 108:15
111:4 124:17
167:18
**main** 75:16
**maintain** 93:8
93:9 114:13,15
120:2 145:5
**maintained**
94:19

**maintaining**
111:15 113:21
117:8 119:18
**maintenance**
100:3,12,13
115:9
**make** 8:6,12
63:14 66:14
78:20,21 90:7
101:12 110:4
111:1,12
126:22 129:7
130:18,19
131:2,5,6
133:24 141:14
155:5 172:6,23
174:1,5 180:23
**makes** 66:23
**male** 19:7,8
**management**
54:20
**manager** 10:10
11:1
**mandatory**
162:21
**manner** 78:21
**march** 72:4
75:15 147:11
**mark** 46:23
49:21 56:1
59:9 62:19
65:13 69:17
93:24 110:2
122:18 124:1
149:19 153:12

**marked** 4:18
47:6,12 49:23
56:4 59:11
61:20 62:23
65:16 67:9
87:12 125:10
126:13
**married** 8:24
32:21
**masonry** 72:3
72:19 108:14
117:16 125:23
130:9 138:7,12
138:24 139:2
142:16 143:8
153:7,24
154:12 168:3
170:1
**material** 57:2
60:3,6 114:19
**materially**
114:23,24
116:4,8
**matousek** 2:9
**matter** 110:22
**matters** 63:20
66:20 99:20
**mba** 9:11,12,23
**mccarthy** 3:1
12:16 31:1
63:8 71:6,10
71:17 130:23
130:23 136:14
136:19,22
162:14 163:9

**mckee** 3:1
**mean** 17:6
31:24 32:17
40:23 65:8
68:21 89:5
92:4 111:3
126:12 130:16
136:14 158:8
**meat** 8:21
**meet** 14:1
24:13 27:10,12
35:24
**meeting** 5:17
26:10,12,24
27:15,16 28:3
29:5 31:10,14
40:4 43:23
44:4 93:17
95:24 97:5
100:15,22
101:10,24
102:5 103:12
106:24 110:24
120:21 121:2
121:19,23
156:12,21
168:1 175:15
**meetings** 30:21
45:7
**melinda** 1:3,10
4:6 7:3,10,11
102:1 182:5
184:5 185:2,24
186:2,4,12

**melinda's**
131:1
**member** 110:17
112:24 165:24
**members** 8:3
**mention** 25:2
66:23
**mentioned** 25:1
89:3
**mess** 140:21
**met** 13:24
26:20,22 46:3
**meta** 10:12,17
10:19,20
**metadata**
133:16,18,23
134:1
**michigan** 3:3
**middle** 60:2
140:13
**miller** 162:1
**million** 163:2
**mind** 7:11,13
7:19 8:8 31:3
33:4 61:6
62:17 65:12
69:17 115:18
118:3 148:5,6
148:23 152:12
152:17 168:17
169:11
**mine** 142:1
**minute** 8:11,11
82:8 97:15
98:1 106:24

131:24 149:13
168:18
**minutes** 5:17
27:17 93:17
96:1 97:5
100:15,22
101:10,24
120:15 121:8
121:13 153:21
168:1
**mischaracteri...**
104:22
**misrepresent...**
52:23 54:6,6
54:13
**misrepresent...**
67:24 68:3
**misrepresented**
52:15
**missing** 126:22
130:20 131:7
**misunderstood**
108:13
**modac** 154:2
**modification**
5:12 65:14
**modifications**
5:10 62:21
**modified** 154:2
**mold** 5:18 23:1
23:2,2 24:16
24:18 45:8,11
45:15,20 70:12
70:15,21 71:22
105:22,22

**[mold - notes]** Page 26

106:1,4,9
107:8,12,15
118:8,8,10,11
118:12,13,23
118:24 119:1,2
119:3,3,6,7,20
119:24 122:22
123:4,7 145:22
167:14,16,20
177:6,10
**molding** 22:11
**moment** 146:6
153:16
**money** 104:15
107:11,13,17
129:11,14
138:18 139:4
139:19 140:14
142:2,14
**month** 14:21
17:22,23
**monthly** 80:23
**months** 10:14
99:13
**mortar** 115:8
115:16
**mortgage** 14:7
14:11,12
**motion** 140:2
163:4,12
**mouth** 96:15
**move** 55:18
69:13,16 132:4
134:1,2

**moved** 23:16
23:18,20,24
24:15 26:20
33:8 105:5
**moving** 134:3
**mulligan** 39:8
**mulligans** 39:1
39:4,6,12,24
105:20 106:3
137:13 167:19
**multiple**
132:19 133:3
**multiply** 81:2
**muted** 31:1

### n

**n** 7:10
**name** 7:8 15:7
15:8,19 19:4
28:14 29:15
35:20 47:17,17
48:4,5,7,9,15
49:10,17 52:5
59:22 82:20
87:6 109:2
**name's** 18:10
**named** 182:5
**names** 17:13
25:4 33:18
**nature** 139:21
139:21
**necessary**
186:6
**need** 8:10,14
52:12,17,21
73:24 76:19,21

97:14 98:11
101:12 116:22
120:14,15
121:10 140:7
144:24 145:13
149:13
**needed** 14:1
93:14 100:3
148:17 154:1
**needs** 87:1
**neglected** 90:4
**negligence**
111:19,24
113:21 117:8
119:18,19
145:4
**negligent**
110:19,21
111:5,15
**negotiations**
17:17,21
**neighbor** 33:14
34:13 35:12,19
105:15
**neighbor's**
103:19
**neighbors**
33:16,17,18
34:17 36:19
**never** 33:4
43:18,19 50:13
51:10,16,21
52:2 54:20
81:23 95:18
107:15 108:24

120:6 127:4
139:1 141:19
149:11 163:7
174:16
**new** 46:3 97:6
**nicholas** 1:7
2:19 25:6,11
56:10,17,21
57:6,13,22
58:6,16,20
59:3,17,20,23
60:11
**nick** 38:3,6,22
60:14
**nightmare**
37:23 93:13
140:18
**non** 42:11,12
**normal** 163:7
**north** 1:16 2:4
2:10,16 11:14
13:8,18 88:20
94:14
**northern** 1:1
**northwestern**
9:18
**notary** 186:13
186:19
**note** 101:20
102:8 150:7
175:15 184:10
**noted** 86:19
186:7
**notes** 87:13
98:11

**notice** 22:3
  23:21
**noticed** 20:14
  137:24
**november** 10:6
  107:3
**number** 5:2
  70:19 98:2
  109:20 128:23
  166:18 171:19
  171:23
**numbers** 81:12
**nuveen** 10:23
**nw** 3:2

**o**

**o** 7:10 182:2,2
**o'clock** 8:15
**o'donoghue**
  138:5,9
**object** 102:23
  112:4,18
**objection** 29:22
  30:5 55:19
  89:4 95:10,22
  104:22 112:8
**objections**
  95:21
**obligated**
  162:22
**obligation**
  114:12 149:10
**obligations**
  145:5
**obtain** 164:6,7

**obtained** 86:16
  107:8 140:6
**obviously** 7:18
  8:5 14:23
  69:12 96:18
  118:17
**occasions**
  132:20 133:4
**occupancy** 57:9
**occupied** 16:18
**occupy** 57:11
**occur** 26:12
**occurred** 22:12
  26:14 54:14
  157:8
**occurrences**
  62:13
**occurring**
  150:10 151:9
  151:22 153:5
  170:2
**october** 36:24
  41:7 70:12
  107:3 134:13
  134:19 135:7
  135:13,18,22
  137:8 149:24
  158:6
**offer** 16:24
  17:4,7,10,16,19
**official** 23:12
**offset** 141:5
**oh** 64:5,8 79:20
  95:1 104:21
  121:10 125:18

136:19 146:19
  147:9 152:21
  158:16 162:3
  164:16
**okay** 8:13,16
  11:13 14:4,14
  21:3,17 51:22
  52:17,24 54:15
  58:16 63:24
  64:10 67:5
  71:24 73:24
  74:5,10,10,21
  75:1 76:4,9
  77:5 78:14
  80:15 81:4,20
  82:23 87:2
  89:22 92:3
  98:14,19,21
  99:2,4,9
  101:14 102:1
  105:12 107:23
  110:10 113:19
  113:23 114:3
  115:2,18,21
  116:21 120:23
  121:22 122:1,9
  122:10 124:5
  124:20 125:21
  126:9,17
  127:12 128:17
  129:10,18
  130:4,14 135:6
  135:12,18
  136:6,22 137:3
  137:5,23 139:3

140:12 141:23
  142:11,15
  143:7 144:4,13
  144:19 145:13
  146:4,14
  157:18 160:13
  163:22 166:11
  168:15 172:2
  172:13,16
  173:13,22,22
  175:3,10 177:2
  180:22
**old** 39:22
**omission** 90:5
**once** 15:3 75:18
**one's** 102:16
**ones** 56:21 64:3
  169:13
**ongoing** 77:15
  78:14 79:7
  80:1
**open** 45:21
  106:6,7 122:4
  130:14
**opened** 146:12
**openings** 106:5
  108:16 114:21
  115:9,15,16
  148:11 150:16
  154:23 155:11
**operation**
  110:15
**opining** 142:5
**opinion** 42:1
  151:17 153:7

177:12
**opportunity**
  140:16 168:1
**options** 31:18
**orange** 81:21
**order** 5:18
  122:22
**orders** 113:24
  145:24
**original** 89:22
  92:24
**oshana** 2:3,4
  8:17 12:23
  21:11,14,17
  29:19,21 30:5
  30:17 47:12
  52:10,13,20
  53:3,7,14,22
  54:5,12 55:1,5
  55:16,18,21
  58:9,11 61:3
  64:2,6,8 69:11
  74:5,7,10
  76:22 79:7
  83:18,20 89:4
  89:16 93:19,22
  95:10,13,16,18
  95:22 96:11,14
  97:3,7,12,22
  98:4,9,14,19
  99:2,24 101:15
  101:19,23
  102:21 104:22
  105:1 107:19
  112:4,10,13,17

112:21 113:6,9
118:14,17
120:13,17,21
121:1,6,10,16
121:19,22
122:5,8,10
123:17,20,22
125:16,18,21
126:18 127:9
127:19 129:22
130:1,6,16
131:5,12
133:24 134:3,9
135:4 137:18
141:9,16,21
142:1,7 143:1
151:3 152:1,5
152:9,18 158:8
158:14 159:15
159:23 160:5,7
160:10,16
161:4,7,13,19
162:6,17,24
163:13 165:10
165:13 166:7
166:11 171:11
178:17,22
180:22 184:1
**oshanalaw** 2:6
184:2
**outcome**
  139:17 142:11
  142:15
**owe** 166:24

**owed** 79:20
**own** 11:17,20
  12:6,9 13:3,14
  51:12 52:3
  60:22 68:18
  85:17
**owned** 11:22
  13:12,17,18,19
  13:20,21 39:1
  39:7,8,9,10
**owner** 24:4
  27:6 46:4 49:5
  50:13 51:16
  52:3 60:13,13
  60:19,24 64:18
  64:19 65:2,3,7
  65:9 66:23
  67:23 68:8,15
  69:5,7 105:20
  109:3,3 170:14
  171:9 172:15
  178:6
**owners** 16:20
  17:7,13 19:9
  22:15 23:18
  24:10 25:1,2,5
  25:10 26:22
  27:19 32:2,8
  46:3,7 104:12
  105:18
**ownership**
  62:12 179:7
**owning** 11:19
  36:22

**p**

**p.m** 135:13
**p.m.** 134:21
  135:8,19,23
**page** 20:23
  47:16 48:11
  49:16 50:5,5
  50:14,22 51:18
  52:5 56:9,16
  56:24 57:10,15
  59:16,19,22
  62:6 63:12
  67:3,14 87:19
  113:24 185:4,7
  185:10,13,16
  185:19
**paid** 70:19
  71:20,23 72:7
  72:17 73:8,15
  74:12,18 75:3
  75:6,9,13,16,19
  76:17 77:9,10
  77:13 80:4,15
  110:13 111:13
  113:20 115:5
  117:6 129:11
  129:14 142:7
  157:18 158:7,8
  158:11,12,24
  159:6,10,12,15
  159:21 161:19
  169:19
**paper** 52:11,14
  52:22 53:9,10
  53:17,20,23

54:3,7,13 55:7
55:8,9,11,12,21
55:23
**paperwork**
18:10
**paragraph**
47:17 49:17
60:1,2,6 67:21
**paralegal** 98:24
**parapet** 145:19
145:21
**parse** 148:18
**part** 13:22 21:7
21:8 28:5 37:3
54:1,2 74:12
79:10 86:13
94:6 98:17
110:17 124:23
144:17 170:9
178:20 179:2
**particular**
94:23 98:10
102:8 130:9
132:12
**parties** 181:2
**partner** 32:20
**party** 2:14
63:13 66:13
82:21 142:20
163:15 172:5
182:17
**past** 88:2
**patzik** 2:21
**paul** 3:1 130:23
163:9

**pause** 31:2 33:5
98:20 117:14
120:10 134:4
**pay** 71:21,21
71:21 75:21
76:20 77:23
78:2 79:22
110:16,19
117:9,22
119:17 126:6
158:20,23
**paying** 75:1
76:15 78:12
79:5,10 81:7
159:18,20
**payment** 129:3
129:4,4
**payments**
77:20 78:15
128:24 129:7
130:13
**pc** 3:1
**pdf** 133:15
**pending** 8:12
165:6,8 166:1
180:20
**penetrate**
153:18
**people** 12:18
173:10
**percent** 166:24
**perform** 154:12
**performed** 18:4
43:3 115:10,15
118:1,8 119:4

119:8 122:23
123:5,7 126:5
156:24
**perimeter**
104:5
**permeated**
41:20
**person** 27:10
31:10 68:9,12
68:16
**person's** 29:15
**personal** 85:17
128:1 129:12
**personally**
34:12,14
**pertaining** 1:13
178:22
**petition** 163:2
**petitions** 163:1
163:3
**pfs** 2:24
**phone** 121:12
**phones** 121:24
**photo** 133:17
133:20 135:1
**photos** 132:16
132:18 133:6
136:24 137:8
137:19,19,21
**picture** 146:21
**pictures** 137:10
169:19
**piece** 52:11,13
52:22 53:9,10
53:17,19,22

54:13 55:7,8,9
55:11,12,21,23
**pieces** 54:7
**place** 170:3
182:14
**plaintiff** 1:4 2:2
125:15,16
**plaintiff's** 4:16
4:17 5:13,18
46:23 49:21
56:2 59:9
61:18 62:20
65:13 67:8
110:12 123:4
125:17,18
**plan** 122:7
**pleadings**
140:2
**please** 7:8,9
21:19 62:9,14
63:9 64:17
65:1 100:20
102:23 110:4
112:16 116:23
118:22 171:9
175:16
**plus** 73:14
166:21
**pockets** 145:20
146:8,10
**point** 15:20
28:19 36:3
44:9 49:6
52:10,15
103:24 107:1

111:12 131:17
164:11 169:5
177:7
**pointing**
153:15
**poor** 155:1
**poorly** 89:20
**portion** 31:5
61:7 122:15
161:11 180:12
**position** 103:13
105:13 113:19
116:10,14
124:11,15
125:7 149:4
**possession**
175:23
**possible** 63:18
66:18 122:2,13
**possibly** 144:20
**post** 125:24
163:12
**potential**
109:14 164:13
**potentially**
169:4
**pouring** 101:8
**practices** 44:19
**predates** 166:5
**preference**
121:5
**premises** 54:17
110:16
**premium** 80:18
81:7 164:12

**prepare** 41:14
67:17
**preparing** 62:3
**prerogative**
55:14
**presence**
179:18 182:9
**present** 3:6
88:3 163:3,4
**president** 24:5
179:7,10,13
**presume**
141:13
**pretty** 32:15
111:3,5 126:18
**prevailing**
163:15
**preventing**
104:6
**previous** 95:23
127:1 153:24
**previously**
115:10
**price** 18:1
109:14
**primary** 42:23
**print** 97:18
**printed** 53:10
**prior** 11:9,13
11:19 12:6,9
12:15 13:2,9
14:19,23 15:9
17:6 18:18
22:14 23:18
24:10 26:19

28:16 36:22
46:8,20 64:17
64:18 65:2,3,6
65:9 66:7 83:6
83:10,24 84:8
86:20 88:10
89:24 91:5
92:1 93:4,7
94:7,17 95:9
97:2 98:7 99:6
102:11 103:2
109:11 118:5
156:14 164:5
168:2 171:9
172:15 176:3
178:15
**privilege** 29:21
**probably** 23:17
121:13
**problem** 12:20
92:15 108:16
111:7 155:7
**problems** 148:8
**procedure** 1:12
**process** 13:22
14:15 28:5
63:21 66:21
170:10 171:1
172:18
**produce** 37:4
123:9,16,19
153:19 161:14
162:18,19,22
163:5,7 168:24

**produced** 37:3
94:24 96:24
110:11 123:3
126:2 137:12
139:1 141:23
155:15 161:3
162:3,16 163:1
177:13
**producing**
111:4
**product** 125:6
**production**
101:22 107:24
126:1,14
130:20,24
131:3 166:4
**program** 10:10
11:1
**progress** 129:7
**projects** 124:7
**prompted**
24:20
**properly** 116:2
120:2 149:1
**properties** 12:7
13:3,12 15:10
15:18 16:11,14
28:17
**property** 5:6,7
11:20,22 12:9
12:12 13:7,11
13:19,20 14:13
14:16,19 15:1
16:18 34:2,3
36:10,22 38:1

[property - read]

38:12 39:1,7
50:13 54:21
56:2,17 57:2
57:11 59:10
62:11,13 63:15
63:19 66:15,19
66:22,24 67:24
68:8,16,18
84:8 88:10
170:7 172:7,24
174:1
**proposal** 154:1
**provide** 62:14
**provided** 39:11
44:7,7 66:3,23
69:21 86:9
97:4
**provides** 153:6
**public** 186:19
**pull** 90:24
117:19 126:12
132:1
**pulled** 96:21
117:10 126:14
130:2
**pulling** 130:6
**purchase** 5:3,4
5:18 11:5
23:12 28:20
46:24 50:2
83:7,11 86:20
109:14 113:24
122:22 178:16
**purchased** 39:2
39:3 177:7

**purchasing**
46:8 84:8 91:6
109:11 170:11
170:17,24
172:18
**purposes** 75:1
117:24 163:10
**pursuant** 1:11
**pursue** 138:16
138:19 140:3
**pursued** 142:16
167:21
**pursuing**
113:13 141:3
**put** 16:23 17:16
44:14 85:5
88:22 93:10
95:1 104:15,19
111:8 157:17
172:1,2
**putting** 17:7
96:15 154:20
175:13

**q**

**qualified** 42:12
**question** 7:20
7:21 8:12 17:5
21:19 31:4
38:10 51:20
55:9 61:5
67:20 68:8
82:24 86:2
88:2 89:22
90:5,21 91:23
95:7,7 96:2

99:4,20 100:20
103:5 109:9
111:11 112:15
112:22,23
114:9 118:21
118:22 124:6,8
125:5 135:7,12
141:8 155:1
173:12 174:4,6
174:13 178:9
180:11
**questions** 7:19
8:4 19:17,20
20:9,11 50:19
74:1 82:6,11
86:23 113:10
160:14 169:4,7
170:22 175:2
180:7,17,19,20
**quick** 149:12
149:13
**quickly** 32:6
126:15
**quite** 24:9
140:5
**quote** 86:9
117:19 155:22
163:22 166:5,5
166:13
**quotes** 43:1
86:14,16 155:4
155:13,16,19
155:20,24
156:1,2

**r**

**r** 46:14 185:3,3
**railings** 115:23
**raised** 63:20
66:20
**randi** 35:20,24
36:18 167:4
**random** 169:12
**randomly**
24:14
**rapids** 3:3
**rarely** 163:8
**rating** 138:21
**reach** 28:3,7
29:16 30:16
39:24 170:24
172:21 174:15
174:21 175:4,5
179:23 180:5
**reached** 18:14
29:4 174:10,12
174:24 175:1,1
180:6,15
**reaches** 174:17
**reaching** 30:18
**reaction** 27:24
37:19
**read** 13:24 31:6
33:12,14 37:16
37:22 41:16
48:11 50:16
53:5,18 61:8
62:15 63:21
66:3 67:2
68:10 92:20

97:8,13,15
101:13 111:21
122:14,16
123:14 144:24
150:21 151:19
153:16 175:20
176:1 180:13
181:3 184:9
186:5
**reading** 49:6
56:20 67:3
**readjusted**
132:6
**reads** 51:2
52:11 54:18
62:9 63:13
**ready** 86:24
**real** 5:3,7 14:1
14:3 15:5,6,7
15:12,17,22
16:1,7 17:8
18:15,16,23,24
19:2,4 23:6
28:4,21 46:24
59:2,10 66:22
81:22 82:1,2
83:13 99:1
126:15 149:12
171:5 172:1,21
173:7 174:9,10
174:16,19
175:4,5
**really** 95:7
121:2 125:5
127:4 142:1

154:24
**realtor** 82:18
83:3
**rear** 19:22
20:16 137:16
**reason** 24:14
45:22 93:11
105:4 113:19
117:6 132:12
134:23 135:15
135:19 136:1,5
136:10 141:8
170:23 172:20
173:9 184:11
185:6,9,12,15
185:18,21
**reasonable**
160:14,15,16
163:14
**rebuild** 72:13
76:12 143:11
144:14 145:21
158:20
**recall** 11:10
14:22 15:8
17:20 18:2
19:13,16 20:5
20:19,21 22:13
22:16 25:16
26:2 27:14
29:7,15 35:8
36:20 37:21
45:10,23 50:18
50:19,21 59:4
82:18 83:1,9

83:12,13,16,23
84:6,12 85:7
86:6,10 87:17
88:11,12,13
89:16,18 90:18
90:23 93:3
94:6 96:10
101:17 102:5,8
108:2 109:20
111:2 139:18
139:24 142:13
168:7,16
**recalled** 126:4
**receipt** 184:18
**receive** 24:1
96:3 142:14
**received** 23:23
36:23 39:2
51:11 95:8,14
95:19,24 97:1
99:6 133:15
163:22 169:5
178:15 180:20
**receiving** 87:17
95:8 99:17
100:15 108:2
**recent** 106:14
**recognize**
148:17
**recollection**
88:15 90:20
**recommendat...**
41:18 154:8
**recommendat...**
20:12,13,20,21

153:13
**recommended**
41:19 153:12
154:12
**recommends**
153:8
**reconciled**
129:20
**reconciliation**
130:11
**record** 7:9 31:6
61:8 107:23
122:16 123:3
131:20,21,23
132:3 133:10
133:14 138:3
162:15 164:17
180:13
**recover** 114:16
139:19 163:4
**recoverable**
162:7
**recovered**
139:4 141:5
142:20
**recovering**
114:18
**recross** 175:11
**redirect** 169:15
**reduced** 182:9
**refer** 29:12,14
30:10 46:14
57:12
**reference** 84:17
84:20 150:11

164:12
**referenced**
106:12 164:1
182:8,12 184:6
**referencing**
38:9 84:13
125:2 150:3
**referred** 15:13
18:16 28:21
41:1,3,4 177:6
**referring** 25:18
53:6 123:12
138:23 178:13
**refers** 151:17
**refinish** 75:8
156:24
**reflect** 27:17
137:10
**reflected**
147:11
**refresh** 88:14
90:19
**regarding**
63:14 66:14
89:23 90:16
94:10 108:5
172:6,23
177:17 178:9
**regardless**
125:5
**regards** 36:10
**regular** 100:12
100:13 164:18
**regulations**
97:5

**reiterate** 82:24
**relate** 148:8
**related** 35:2,4
76:10 80:5
81:16 84:16
138:6 142:20
148:2,4,5,6
149:7 161:10
164:23 178:15
179:15
**relates** 125:2
148:1,19
**relative** 182:16
**relayed** 85:3
**release** 37:14
**relevant** 141:4
142:1 152:8
179:6
**relied** 88:16
91:10 93:13
94:22 100:2
**relocated** 105:5
**relocation** 1:6
2:8 8:1 46:13
46:16,19 48:8
49:18 50:11
54:19 63:13
66:13 172:5
184:4 185:1
186:1
**remediate**
110:19 111:20
120:6 140:21
**remediated**
92:16,19

**remediation**
84:24 118:8,8
119:4,8 123:5
**remember** 21:1
22:7 23:10
25:13,21,23
38:8 39:14
76:24 141:12
161:8
**reminder**
162:20
**remove** 110:13
110:14,15
145:17 146:6
164:8
**renner** 86:9,9
163:23,23
**repair** 106:20
115:6 154:19
**repaired**
147:21
**repairs** 62:14
70:7 73:22
75:24 77:23,23
81:16 93:9,10
110:21 111:16
113:2 119:11
140:13 143:24
**repeat** 21:19
180:11
**rephrase** 69:11
69:12 83:21
**replace** 80:8
106:23 162:11
163:18

**replaced**
158:16
**replacement**
73:15 74:17
78:6 86:5
145:8 146:16
147:13 157:19
164:2 169:18
**replacements**
76:3
**repointing**
154:1
**report** 5:8,21
5:22 20:6 44:7
59:10 61:13
66:22 83:2,5,9
83:24 84:1,4
84:18,22 86:20
93:4 103:17,18
105:21 108:22
108:24 117:10
144:5,10,24
148:10 149:8
149:18,23,24
150:3,8,21
151:8 153:2,11
153:12,24
154:10,13
164:3
**reported** 66:21
**reporter** 1:15
4:16 8:5 47:14
122:14 131:19
180:10 182:4

**reporter's** 4:13
**represent** 8:1
46:13 82:21
132:20
**representation**
51:2,4 53:1,5
53:17 54:18
102:19,21,22
103:8
**representations**
50:23 90:8
94:22 125:7
**represents**
161:10
**reproduce**
131:8
**request** 84:23
97:1 131:2
162:19
**requested** 31:5
47:7 49:24
56:5 59:12
61:7,21 62:24
65:17 67:10
122:15 161:12
180:12
**requests** 84:24
**required** 93:8
110:19 114:20
114:21 116:5,7
186:13
**requiring** 51:4
**reread** 61:5
77:3

**rereading** 31:3
**resend** 126:11
**reservation**
180:23
**reserves** 124:6
**residential** 5:7
59:10 66:22
**resolve** 88:6
**resolved** 156:8
**respect** 63:18
66:12,18 124:8
126:7 152:7
172:4
**respective**
45:24
**respond** 25:24
**responded** 65:1
**responding**
26:8
**response** 5:10
5:12 62:21
63:5 65:15
66:2,3,6 67:4
67:23 68:7
99:17 100:14
100:21 171:20
172:22 173:23
**responses**
63:24 64:14,14
66:7 73:24
**responsibilities**
76:10
**responsibility**
70:17 72:4,15
74:18 75:24

76:1 78:13
79:2,12 80:24
81:6,10 111:20
119:17 145:3
146:16 158:6
**responsible**
57:17 110:21
111:16 113:2
146:18
**restoration**
153:8
**restroom** 8:12
**result** 120:1
164:18
**resulting**
110:15
**results** 44:1
153:13
**retained** 4:16
4:17,18 82:17
83:2 153:4
**return** 184:13
184:17
**review** 90:2,6
90:15 96:19
114:6 168:1
184:7
**reviewed** 66:1
99:9
**reviewing**
50:18
**rhoades** 3:1
**ridiculous**
55:16,18
155:22

**right** 7:17 11:4
11:7 13:11
15:8 18:11
38:6 46:12,14
46:22 47:17
53:13,14 56:1
61:17 64:10
69:16 70:9,16
70:20 72:3
75:8 82:4 87:5
91:2 92:8,13
94:9,15 95:12
96:8 101:23
106:10 113:5
114:12,14
116:13 117:5
127:10 129:23
132:9 133:17
133:20 134:5
136:17 137:23
141:17 142:8
145:1 152:9
153:18,24
154:9,22
158:19,21
164:22 165:2,7
166:16 169:4
180:19
**river** 13:8
**role** 140:8
**roles** 179:11
**roof** 39:18
42:19 60:3
73:10,11,15
74:17 75:16

91:10 92:11
114:10,10,13
114:15 115:2,4
115:6 144:15
145:8,10 146:9
146:16,20
147:3,13,18,22
147:22 157:19
158:2
**roofing** 72:13
127:5 143:12
144:21 147:7
**room** 19:15
117:1
**ross** 2:16,18
82:20 133:16
136:24
**ruined** 140:17
**rules** 1:12 7:18
97:5
**running** 35:13
**ryan** 27:2,4
32:4,7,18 37:2
38:3 45:24
46:2,5 102:1
176:12,14
177:19,23
**ryan's** 32:20

**s**

**s** 46:14 185:3
**sale** 5:3,4 31:22
32:6 35:4,16
46:24 50:2
104:13,16,16
104:19 125:2

178:23
**sales** 46:6
**samotny** 2:21
**sand** 93:11
111:8
**sanitize** 123:11
**sara** 48:19,20
49:14 60:20
**sarah** 5:9 61:19
62:21 65:21
173:10
**sat** 103:12
**saw** 39:12
48:16 103:9
**saying** 8:9
21:12,14 25:14
25:14,16 33:11
35:9 54:6
55:11 58:11
65:1 89:5,18
91:13 95:13
98:10 105:15
105:19 106:3
111:18,19
156:16 165:16
168:7 174:18
**says** 12:21,21
46:16 47:24
48:6 50:6,10
50:12,14 51:22
52:19,22 53:4
53:16 54:2,3
54:10,11,24
55:4 56:9,16
57:5 58:16

60:2,20,23
64:11,17 67:5
70:8,10,17
71:5,8 72:10
80:1,24 87:20
92:16 96:22
102:24 104:5
108:8,15
115:13,17
116:24 134:13
134:15,17,19
135:7,13,18,22
136:7,18
137:13 146:6
151:21 152:2,2
152:5,6 153:3
153:17 154:14
156:13 161:24
162:1 165:19
166:15 171:19
172:4,15
179:21
**scheduled**
121:21
**scope** 44:5,11
44:13 94:12
116:20 126:7
150:9,13
**screen** 63:9
69:17 71:7
134:6 152:16
152:18 175:13
**screens** 134:1
**scroll** 101:22
113:23 126:14

127:3,10
**scrolling** 87:19
98:22,23 99:3
127:11
**seal** 43:11
**sealant** 42:16
43:16 88:22
104:6 108:6
111:9 115:8,12
115:14 145:22
154:18,20
**sealed** 42:16
43:19 88:6
94:18,20 99:10
99:22 102:12
103:2,11
156:15 176:4
**sealing** 88:24
94:10,14
103:14 104:2
**search** 68:24
69:2,4
**searching**
30:13
**second** 5:12
40:3 55:5
65:14,24 72:19
81:18 87:19
96:14,15 97:19
98:19 101:21
120:9 133:11
143:20 151:19
**secret** 33:11
**section** 57:9
62:6 63:12

66:12,17 67:5
**sections**  63:17
**see**  8:3 22:10
47:3,24 48:9
48:18 50:23
57:3,16,19
61:16 62:7
63:24 64:10
70:9 71:15,17
87:15,22 88:1
88:6 94:9,12
96:20 97:3
101:11 105:23
106:7,19
107:21 108:4
114:3 116:21
116:24 122:19
122:21 123:4
126:6,15 128:7
128:8,11,19,21
129:16 132:5
133:16,22
134:5,11,13,15
134:17 135:7
136:19 138:1
144:12 145:13
146:4 148:15
149:20,23
150:11 151:1
151:16 152:13
152:15,16
153:9,13 162:9
165:19 166:16
167:1 168:4
171:20 173:9

175:15 176:4
**seeing**  93:3,17
94:6 136:16
137:14 141:5
166:4
**seek**  164:5
**seeking**  114:16
141:11
**seem**  16:6
34:15 147:16
**seen**  41:13 47:9
48:5 50:3 56:7
59:14 61:23
63:3 65:19
67:12 69:18
124:3 126:1
137:24 141:20
155:13,15
160:2,22
**seepage**  63:19
66:18
**sell**  24:17 35:10
46:5 51:11
52:3 60:21
68:9,16,18
69:8
**seller**  19:3,5
48:10,17 49:4
49:10,15 50:10
51:2,6,10,13,18
51:21,23 52:2
52:2,5,6,14,23
53:6 54:2,3,7
54:10,14,19,22
56:9,17 57:1,5

57:10,12,17,21
57:23,24 58:1
58:2,6,8,14,17
58:19 59:1,3
59:16,19 60:12
60:14,15,17,21
60:23 61:1
63:14,16,19
64:18,21,22
65:2 66:1,13
66:16,19 67:1
68:5 69:4
87:14 90:7
103:21 170:12
170:13 172:6,9
174:3 178:6
**seller's**  5:6
47:23 48:7,15
49:17 50:23
51:3 53:1,5,16
53:16 54:18
56:2 59:22
62:12 174:4
**sellers**  49:11
170:18 174:9
**selling**  32:7,8
49:13
**send**  24:20,23
48:23 49:1
126:17 127:12
**sense**  141:14
**sent**  8:17 24:14
25:9 26:16
37:1,17,24
62:1,21 65:21

71:24 97:6
98:7 126:11,18
126:21,24
127:14 129:22
138:11 184:14
**sentence**  54:19
57:1,16 65:24
67:23 68:7
176:1
**separate**  41:23
66:9
**separately**
139:10
**september**
36:24 41:7
101:11,24
107:1 156:5,12
175:15,22
176:6,9,21
177:3
**service**  46:16
46:20 54:20
**services**  1:6 8:2
43:2 46:13
138:6 146:2
184:4 185:1
186:1
**set**  81:18 183:1
**several**  89:9
90:2 95:5
144:1 171:2
**sgariglia**  1:3,10
4:6 96:24
182:5 184:4,5
185:1,2,24

[sgariglia - specific]

186:1,2,4,12
shake 8:7
share 47:1 63:8
71:6 77:11,12
84:2 122:18
131:24 137:24
shared 61:11
68:6 84:1,6,9
109:23,24
128:11 130:10
167:18
sharing 71:9
79:14 101:10
137:4 149:18
sheet 69:18,22
74:9 79:24
169:12 184:11
shocked 26:3,9
28:2 37:20
shoddy 138:22
short 82:7
shorthand 1:15
182:3
shortly 26:16
30:18
show 46:22
56:1 64:22
87:14 90:22
93:16 96:8,17
110:2 123:24
128:7 161:13
162:17,18
showed 108:22
showing 71:10
87:11 107:21

shown 85:6
94:3 101:16,18
124:1
shows 108:24
126:1 150:4
sick 97:16
side 33:20,22
35:23 64:1
88:21,22 128:6
128:6 134:5
136:17 145:20
146:21,24
sides 91:9
92:10
sign 14:10,12
124:21 181:3
184:12
signature 47:21
47:24 48:6
50:6 56:13
67:15 181:1
183:6
signatures
59:17,20
signed 14:11
50:11 61:15
99:15,19
124:10,11,20
155:3 184:20
significant
27:18 29:8
105:16 116:5
148:16 161:11
167:15

signing 48:14
49:7 50:17
sit 25:9 111:7,7
131:14
sitting 130:20
131:11
six 16:16 23:23
24:15 26:19
37:12 99:23
104:17 129:21
size 175:17
slider 19:22
20:16
sliding 88:24
137:16 149:7
slow 95:3
small 95:2
smaller 133:24
sold 46:2 57:2
solution 70:15
155:7
solutions 45:8
45:11 48:8
49:18 50:11
70:12,22 71:22
184:23
somebody
18:14 52:8
someone's 69:7
soon 31:8
148:14
sorry 33:2 53:3
72:19 82:19,20
83:19,21 89:11
93:21 96:16

106:19 107:6
127:18 135:3
149:22 152:3
152:13 164:14
166:7 176:18
sort 17:17
19:20 20:11,20
21:3 22:10
46:19 82:1,2
126:3 132:4
sound 23:13
sounds 100:11
165:23
south 2:22
74:16 78:7
145:19 146:15
146:21,24
147:12,19
149:6
speak 12:17,23
23:7 29:11
103:18 110:23
speaking 55:19
82:19 95:21
special 70:10
71:4 72:9
73:12,17 75:4
75:11,19 76:4
76:18 77:6
78:4,9 79:3
80:12,14,21
158:24
specialist 40:20
specific 28:11
72:20 73:9,19

[specific - subcontracted] Page 38

94:24 103:23
116:21 124:7
178:8
**specifically**
20:13 25:15,22
35:8 38:8,11
38:16 39:14
51:5 172:22
174:14,18
176:20
**specifications**
78:22
**specified**
182:15
**spell** 7:9
**spending**
130:21
**spent** 107:14
**split** 40:14,20
93:1,4,8
102:11 103:2
116:7 146:2
156:14 176:3
**spoke** 23:5
33:19 34:6,7
34:11,13,17,19
34:24 36:14,15
36:19 173:9
**spoken** 34:23
36:6,21
**spot** 94:13
**spouse** 32:20
**spraying**
153:21

**spreadsheet**
5:15 71:11,13
85:6,13 106:13
127:8,9 128:19
128:23
**square** 12:3,11
13:19 145:18
**ss** 182:1
**staged** 157:12
**stairs** 116:6
**stamp** 5:18
110:12 123:4
132:22
**stamped**
110:11 144:9
**standing** 51:17
**stands** 85:9
**start** 7:21
23:21 44:21
87:11 132:11
140:18
**started** 11:10
31:15 162:21
**state** 1:15 7:8
110:18 141:17
166:4 167:19
182:1,4
**stated** 148:10
**statement** 5:6
56:3 57:19
87:14,17 91:17
176:7,13,16
177:3
**statements**
78:23 93:13

103:22
**states** 1:1,12
57:10 153:24
**statute** 163:3
**stay** 19:15
**steel** 72:12
115:22 143:11
144:14,17
**stems** 42:8,10
**stenotype**
182:9
**step** 31:16,17
168:6
**steps** 31:18
40:6 76:2
89:23 90:8,17
99:21 100:16
100:21 116:11
**steve** 40:19
78:14,17 80:3
161:21,23
**steven** 43:14
**sticking** 49:16
56:24
**stipulate** 52:24
53:4,23 54:1
54:10 55:22
163:10
**stipulated**
55:23
**stipulating**
52:21
**stoop** 115:21
116:11,17

**stop** 131:24
137:3 160:14
**stopped** 108:9
**storage** 80:8
86:5 162:11
163:18,19
164:2
**street** 2:10,16
11:5,19
**strike** 144:22
176:11
**strong** 121:4
**structural**
72:11,12 87:20
108:17 143:10
143:11,21,22
143:24 144:4,8
144:9,13,14
148:11 149:9
150:24 154:10
155:11
**structurally**
150:4
**structure** 73:20
73:21 146:21
150:15,16
151:8,10,16,17
151:18 153:5
**structures** 88:4
**studies** 9:20
**stuff** 8:20 77:21
120:12 157:14
**subcontracted**
44:16

**subfolder**
147:7
**subject** 169:3,3
**subparagraph**
57:10 62:6
63:12
**subscribed**
186:14
**subsequent**
42:11 148:7
**substantial**
89:13 169:6
**suburbs** 30:3,7
30:9
**success** 108:13
**sue** 165:22
**sued** 105:19
111:22
**suggests** 140:2
**suing** 165:12
165:13
**suite** 1:16 2:5
2:11,17,22 3:2
**summary** 41:14
81:18 153:6
**supplied** 42:22
**support** 103:16
105:12 162:22
167:17
**sure** 7:17 8:6
8:12 24:9 65:8
69:9 78:20,21
105:15 111:12
119:22,23
120:14 121:11

121:20 126:18
126:22 130:18
130:19 131:2,5
131:6 138:23
142:4 161:18
**survive** 51:5
**sworn** 7:1,4
182:6 186:14

**t**

**t** 185:3,3
**table** 140:15
**take** 8:11,13
14:7 59:5 82:7
85:20 89:23
90:8,17 99:21
100:15,20
120:11,13,15
133:6 149:12
153:16 155:3
168:17
**taken** 1:11,13
1:15 59:8
77:22 82:13
122:12 132:16
132:18 133:21
137:8 149:16
152:24 168:20
175:22 182:14
**takes** 157:13
**talk** 11:4 30:5
30:14 95:3
100:8 150:19
**talked** 13:2
62:5 70:14
78:18 109:2

125:24
**talking** 21:15
35:3 37:12
39:20 64:3,4,6
68:4 92:5
123:13 131:8
144:20 151:12
151:14 152:10
152:10 154:4
165:3 178:18
**talks** 105:21
151:8 153:2
154:5,6,8
168:2
**tax** 85:23
**taxes** 79:20
**technological**
136:15
**tell** 17:13 19:9
29:18,19 32:13
51:24 53:9
60:18 74:3
88:17 90:12
92:7 93:16
97:24 100:18
108:18 112:6
120:23 128:10
156:7
**telling** 91:11
100:2 108:5
124:22 151:23
152:4 160:7
**ten** 8:11 82:8
131:9 153:20

**terms** 63:17
66:16 158:5
**terrace** 74:17
146:15 147:2
147:12
**terraces** 74:24
**test** 24:16,18
63:17 66:17
107:8,12,15
177:10
**testified** 7:5
89:13 95:17,19
96:9 112:24
126:6 169:18
**testify** 182:6
**testimony**
95:23 103:19
104:23 105:14
118:5 182:8,11
184:9,18 186:8
**testing** 105:22
153:14 177:6
**thank** 7:14 47:2
47:5 82:5
112:10 123:21
132:7 136:22
149:14 167:11
168:5 171:17
175:8 180:22
**thanks** 122:10
**theory** 105:7
**thing** 57:15
103:23 108:19
110:12 126:23
137:23 140:20

**[thing - transcript]**

Page 40

154:22 177:16

**things** 12:21
20:3,24 43:20
53:16 64:22
72:23

**think** 16:14
19:2 32:3 36:6
48:22 52:4,8
57:16 58:11,20
69:21 71:13
76:22,22 95:13
101:19 106:13
108:8,12 118:4
121:6 122:7
125:1 126:3,18
127:4 129:2
131:12 136:5
137:3 142:2,3
143:9,20 144:6
146:19 156:20
161:4 162:7
167:9 168:18
172:13 178:17

**thinking**
164:15 176:14
176:24

**thinks** 42:8
53:19

**third** 2:14
33:21 50:23
57:16 63:13
66:13 68:7
82:21 142:20
172:5

**thomas** 5:9
28:15,22 30:10
61:19 62:22
65:22

**thought** 20:22
59:1 71:8
103:14 119:4
156:8

**thousands**
155:5

**three** 9:5 10:14
11:16 12:14
13:12 15:9
21:23 22:18,22
27:8,18,20
32:8 38:2
44:19 66:9
75:3 78:12
91:9 92:10
99:13 104:12
104:15 130:3
131:9 140:14
147:24 155:19
157:8 173:21
179:11

**tie** 130:24

**time** 8:10 11:22
17:14 24:9
32:9 34:24
49:6 58:9,10
58:11,18 83:14
94:10 97:23
102:19 104:20
105:9 108:4
116:19 121:6

130:21 132:11
142:13 149:3
156:18 157:13
160:14 163:2
170:10,16
172:13 176:8
182:14 184:19

**timeframe**
184:8

**times** 15:1 36:6
90:2 95:6
129:21 132:21
166:22 171:2
173:11,17,21
179:6

**timing** 148:21

**title** 10:24
48:21

**titled** 56:2
62:20 65:14
70:4 143:22

**today** 7:19 11:4
34:20 121:5

**together** 32:16
44:14 95:1

**told** 29:7,8 30:3
33:15,17 35:12
35:16 37:5
46:11 49:4
58:13 60:13,14
61:1,11 90:4
90:24 92:2,9
97:23 101:5
106:22 112:17
156:9 160:19

173:7 177:14
178:6 179:14
179:16

**took** 16:20 70:2
134:24 149:3
159:8 168:6
179:6

**top** 18:11 23:10
39:5 56:17
58:17 59:3
70:4 96:9 98:7
101:20,22
123:10

**topic** 127:17

**total** 70:21
75:23 76:1
77:11 78:24
81:9,9,12,15,21
127:2 128:3
129:10 158:5
161:22 166:16

**totally** 97:17

**touch** 34:22
138:22 179:14

**towards** 60:1

**trace** 75:15
157:15,21
158:10

**transaction**
103:20 174:16

**transcribed**
182:10

**transcript** 4:1
181:3 184:6,20
186:5,8

[transcription - unit]                                    Page 41

| | | | |
|---|---|---|---|
| **transcription** 182:11 | **tuckpointing** 94:13 127:7 | **undergrad** 9:21 | 25:22 26:5,22 27:6,19 31:13 |
| **treat** 154:3 | **turn** 47:11,16 50:5 | **undergraduate** 9:14,17 | 31:21 32:2,5,7 32:7,23 33:8 |
| **trial** 160:24 | **two** 13:21 14:8 | **understand** | 34:5,9,17,18,19 |
| **trim** 163:20 | 20:3 86:12 | 17:5 32:12 | 35:5 36:2,10 |
| **true** 52:15 | 120:4 131:9 | 38:10 52:20 | 38:4,12,16,20 |
| 91:11 92:9 | 137:1 146:22 | 54:9 58:23 | 39:3,9,10,15 |
| 102:13 114:8 | 147:21 149:13 | 60:21,22 92:13 | 41:12 45:17,18 |
| 182:11 186:8 | 154:2 161:24 | 97:16 98:9 | 45:20,21 46:2 |
| **truss** 73:14 | 173:11 177:7 | 111:12 129:2 | 46:3,4,5,8 47:1 |
| 74:15 145:8,11 | **type** 46:15 | 141:15 144:19 | 70:5,7,17,24 |
| 145:20 146:2,7 | 53:15,24 | 148:23 159:3 | 71:3 72:13,20 |
| 146:8,10 | **typed** 53:18 | 177:24 | 72:23 73:9,10 |
| 157:18 | 55:8,22 | **understanding** | 73:19,21,21,21 |
| **trusses** 145:22 | **typically** 163:5 | 25:5 55:10 | 73:22,22,22,23 |
| 146:10 | **typo** 146:19 | 56:21 57:5,12 | 74:12,12,17,17 |
| **trusted** 100:18 | **u** | 57:22 58:6 | 74:22,22 75:2 |
| 173:15,16 | | 60:10 64:13 | 75:2,23 76:9 |
| **truth** 46:11 | **u** 7:10 | 65:5,9 81:11 | 76:12,20 77:23 |
| 88:17 91:11 | **um** 20:17 87:23 | 176:12 | 78:3,6 79:14 |
| 100:2,19 182:6 | 123:22 134:22 | **understands** | 79:14 80:24 |
| 182:6,7 | 167:12 | 54:19 | 81:5,5,7,7,9,9 |
| **truthful** 100:7 | **unable** 63:14 | **understood** | 83:4 85:14 |
| 173:16,17 | 66:14 172:6,23 | 58:18 | 86:21 88:4,6 |
| **try** 41:20 71:14 | 174:1,4 | **unemployed** | 88:18,23 91:6 |
| 74:2 132:9 | **uncomfortable** | 10:19 | 91:7,15,15,21 |
| 173:14 | 121:4 | **unfortunate** | 91:22 92:1,23 |
| **trying** 24:16 | **under** 16:4 | 24:12 | 96:23 100:11 |
| 68:9,16,18 | 32:5 37:15 | **unit** 9:7 11:6,19 | 101:6,7 104:12 |
| 69:7,9 74:6,8 | 51:18 56:17 | 21:7,15 22:1 | 105:18,22,23 |
| 82:8 92:6 98:6 | 58:17 65:24 | 22:17,20,22 | 106:1,2,2,4,10 |
| 104:24 113:7 | 94:20 143:24 | 23:22 24:4,12 | 106:20 107:2,9 |
| 117:15 120:12 | 147:7 162:21 | 24:17,18,23 | 107:16 109:3 |
| 123:6 127:19 | 163:3 171:21 | 25:6,15,17,18 | 109:11 110:13 |
| 141:14 148:18 | | | |

**[unit - want]** Page 42

110:14,22
111:13,15,16
111:19 113:3
113:20 114:6,7
114:24 115:1
116:4,21 117:4
117:7 118:9,10
118:13,18,24
119:2,4,9,14
120:7,7,7
123:6 125:3
126:5 132:14
132:21 133:4
137:13,14,15
137:17 143:12
144:15,16,22
144:23 145:19
146:7,10,11,16
146:16,18,23
146:23,24
147:2,3,17,18
147:18,19,20
147:22,23
148:24 149:6
150:10,14,16
150:17,17,18
150:18,20,20
150:20,21,22
150:23 151:2,7
151:7,7,8,9,9
151:13,17,18
153:5,19 156:4
157:9 158:20
167:14 169:17
170:7,11,17

175:23 177:8
178:7 179:7
**unit's** 150:4
**united** 1:1,12
**units** 21:10,21
22:15 27:19,21
27:23 29:9
32:9 35:6 38:2
40:8 41:21
46:1 73:5 75:3
78:12 100:8
104:16,19
105:17
**unknown** 56:22
**unsound** 150:4
**ups** 169:9
175:9
**use** 8:11
**used** 15:9 18:17
28:16,19 110:6
184:20
**usually** 162:24
163:5

**v**

**v** 184:4 185:1
186:1
**vague** 89:4
**vagueness**
102:24
**validated** 129:1
**value** 114:24
114:24 116:4,9
**various** 43:1
131:4 151:10

**vents** 38:14
92:12
**verbally** 8:9
**verification**
172:6 174:5
**verifications**
63:14 66:14
172:23 174:1
**verified** 128:24
**verify** 62:9
184:9
**verifying** 67:15
**veritext** 184:14
184:23
**veritext.com**
184:15
**versus** 77:6
148:20
**visit** 14:18 15:1
16:20
**visited** 15:4
16:17
**vote** 110:24
**voted** 80:22
**vs** 1:5

**w**

**wacker** 2:22
**wait** 33:15
35:17 95:10,16
97:7,12 98:1
**walked** 22:2
**walker** 2:9
**walkerwilcox...**
2:12

**wall** 108:16
114:21 145:20
145:21 148:11
150:16 153:19
**walls** 35:13
36:13 38:15
39:18 45:17,18
60:7 92:11
101:9 106:6
110:14 115:22
118:11,12,13
118:23,24
119:1,20 120:1
123:11 146:7
155:11
**want** 52:18
55:9 82:6
87:13 93:16
95:16 96:20
97:3 102:18
105:2 110:2
111:12 112:5
114:1 121:3
122:6,18 124:5
125:23 126:12
130:18,19,21
131:14,19
138:20 150:7
152:15 160:13
167:24 168:5,6
168:23 169:10
170:9 173:23
174:22 175:3
178:19

| | | | |
|---|---|---|---|
| **wanted** 32:5 | 148:7,7,11,12 | 155:6 | **withdrawal** |
| 35:10 106:8 | 148:24 149:5 | **west** 9:7 11:5 | 79:17 85:16,20 |
| 144:19 | 150:9 151:9,21 | 35:22 70:5 | 129:17 161:16 |
| **water** 21:3,4,5 | 153:4,14,18,21 | 88:5,20,22 | **witness** 7:1,4 |
| 22:4,10 23:1 | 154:6 156:5,10 | 94:14 96:23 | 12:17 21:18 |
| 27:18,19,20,22 | 156:13,14 | 138:4 153:5 | 31:7 58:12 |
| 29:8 31:23 | 157:5,6 158:4 | **whereof** 183:1 | 59:5 77:2 87:2 |
| 33:17 35:13 | 163:21 164:24 | **whichever** | 87:4,8 89:8,17 |
| 36:13 38:20 | 169:24 172:7,7 | 129:19 | 96:5 100:1 |
| 39:19 40:19 | 172:24 173:1 | **whoever's** | 103:4 120:11 |
| 41:12 42:2,2,3 | 174:2,5 176:3 | 68:17 | 120:16 121:15 |
| 42:17,24 62:10 | 177:14 178:15 | **wilcox** 2:9 | 121:20 127:10 |
| 62:12 63:15,16 | 179:22 180:7 | **wilkins** 5:9 | 129:24 130:4,8 |
| 63:19 66:15,15 | 180:16 | 48:19,20 60:20 | 130:14,17 |
| 66:18,23 74:19 | **water's** 91:13 | 61:19 62:22 | 131:14 137:20 |
| 74:23 83:16,23 | 91:14,14,15 | 65:21 | 141:12 143:2 |
| 84:13,20 85:1 | **watts** 3:7 41:5 | **window** 76:2 | 151:5,20 |
| 88:3,20 89:24 | 151:19 | 78:6 122:3 | 158:15 161:5 |
| 90:3,9 91:9,24 | **way** 24:12 43:4 | 136:19 150:15 | 165:11 166:12 |
| 92:4,10 95:4 | 70:4 97:1 | 159:14 169:17 | 168:22 169:2 |
| 99:18 100:11 | 105:10 131:10 | **windows** 38:14 | 171:12 175:10 |
| 101:1,8 102:10 | **we've** 35:2 | 38:21 39:17 | 179:3 180:14 |
| 102:14 103:1 | 36:21 37:11 | 42:5,15 43:18 | 182:5,8,10,12 |
| 103:10 104:1,5 | 64:21 75:17 | 60:7 72:24 | 183:1 184:8,10 |
| 104:7 105:17 | 161:9 173:11 | 73:3 88:5 | 184:12,19 |
| 106:4,11,12,17 | **weeks** 17:22 | 92:11 106:5,23 | **wondered** |
| 106:20 107:2,4 | 23:23 24:15 | 133:5 149:6 | 173:24 |
| 108:9,16 | 26:19 104:17 | 154:23 158:14 | **wondering** |
| 109:14 116:5 | **weeps** 42:15 | 158:16,17 | 68:17 |
| 116:15 132:13 | 43:19 | 169:23,24 | **word** 12:22 |
| 132:15,15,20 | **went** 7:17 81:8 | 170:1 | 151:16 |
| 132:21 133:2,4 | 81:13,19 85:6 | **windy** 18:7,17 | **words** 53:17,18 |
| 134:9 137:8,13 | 117:17 125:6 | **wire** 71:24 | 53:19 55:11 |
| 137:14,14,16 | 126:3 143:8 | **withdraw** | 67:3 69:1 |
| 146:24 147:17 | 150:22 152:21 | 109:8 | 96:15 |

**work** 5:19
41:19 44:5,11
44:13,17,18,20
44:20,21 45:1
45:3,13 67:17
70:7 72:3,19
73:14 74:15
75:17,18 76:19
78:20,22,23
80:4 86:4
89:14,19 92:23
92:24 93:11,12
93:14 94:12,21
102:15 105:5
106:20 108:5
108:14 111:6
111:13 113:17
113:20 114:2,7
115:5,10,19,20
116:1,20 117:3
117:6,9,11,16
118:1 119:8
122:23 123:5,7
125:6,23 126:4
127:5 129:8
130:9 132:10
138:22 139:16
140:16 143:8
143:18,22
144:15 145:8,9
145:13 146:3,5
147:4,11
148:16,18,19
154:12,14,16
154:21 155:14

155:18 156:16
156:16,24
157:12,13,18
157:22,24
159:14 168:2
**worked** 14:3
15:16 68:22
**working** 28:24
78:19 80:3
154:6
**workman**
78:21
**worry** 74:7
**worse** 108:20
**worst** 41:12
**worth** 126:23
140:13
**write** 124:22
**writing** 179:17
179:20
**written** 123:2
128:20 131:3
161:17
**wrong** 74:4
104:8 108:18
117:12 169:22
**wrote** 65:1
127:22 128:3,5
128:13,23
143:12 156:23
162:4

| y |
|---|

**y** 7:10
**y'all** 172:12

**yahoo.com** 2:6
184:2
**yeah** 8:14,18
19:2 21:13,16
21:21 37:23
41:19 42:3
45:8,12 59:6
63:10 64:5,7
67:1,13 71:8
73:20 76:8
82:10 92:16
96:21 99:15
100:23,23
101:21 102:13
102:16 104:3
105:19 106:3
110:18,24
117:2 118:23
121:10,15
122:8 123:17
123:20 125:12
125:14,20
126:11 127:14
129:6 130:17
133:9 134:7,12
136:21 140:23
143:3,19
145:15,16
146:4,19
147:23 148:17
158:16 161:13
162:24 163:13
164:15 165:12
165:15 166:19
169:11 171:22

176:9 177:13
180:6
**year** 10:14
11:12 35:1
81:1 158:6
**years** 11:16
12:14 13:5
37:12 89:9
99:23 141:19
147:21,24
155:4 157:8
166:23
**yep** 64:20
72:16 106:22
107:22 114:4
124:22 127:6
127:16 134:16
135:9,11,14,24
144:2
**young** 7:3,10
87:6 97:6,11
102:6 112:15
113:14 118:20
120:14 121:4
122:19 124:2
130:5 132:4
134:8,11 137:7
142:11 149:20
152:12 168:21
**young's** 99:1
**yup** 115:24

| z |
|---|

**zoom** 3:8 8:3
12:18 87:24
116:22,23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.