**In the United States District Court
for the Northern District of Illinois
Eastern Division**

| | |
|---|---|
| Melinda Sgariglia, | |
| Plaintiff, | Case No.: 1:19-cv-05684 |
| vs. | Honorable Robert W. Gettleman |
| American International Relocation Solutions, LLC, et al., | Honorable Gabriel A. Fuentes |
| Defendants. | |

**Defendant American International Relocation Solutions, LLC's Response to Plaintiff's
LR. 56.1 Statement of Material Undisputed Facts**

Pursuant to L.R. 56.1(b)(2), Defendant American International Relocation Solutions, LLC d/b/a Aires submits the following response to Plaintiff's L.R. 56.1 Statement of Material Undisputed Facts (Dkt. 205):

1.     Plaintiff is a resident of the State of Illinois residing at the property located at 2726 West Cortez Street, Unit 1, Chicago, Illinois (hereinafter, "Unit 1"). Second Amended Complaint (Dkt. #44),

**RESPONSE**: Undisputed.

2.     Defendant American International Relocations Services, L.L.C. ("AIRES") is a limited liability company whose Global Headquarters is located in Pennsylvania. (Defendant AIRES website, attached as Exhibit 1).

**RESPONSE**: Disputed that Aires full legal name is American International Relocations Services, L.L.C. Aires full legal name is American International Relocation Solutions, LLC. (Aires Answer to Second Amended Verified Complaint, Dkt. 117, ¶ 2.)

3.     On June 20, 2019, Plaintiff Melinda Sgariglia (hereinafter, "Sgariglia") filed a 3-Count Verified Complaint after purchasing a Chicago condominium from Defendants. Sgariglia filed for a violation of the Illinois Residential Real Property Disclosure Act, 76 ILCS 77/35 et seq., ("Disclosure Act"), Fraudulent Concealment and Breach of Contract. Sgariglia's Complaint is a detailed analysis of the facts as required under the Illinois Code of Civil Procedure. (See Complaint, attached as Exhibit 2).

1

**RESPONSE**: Objection as to Statement of Fact 3's legal conclusion that the Complaint meets the requirements of Illinois Code of Civil Procedure. Undisputed as to the rest of Statement of Fact 3.

4.　　On March 26, 2020, Plaintiff filed a 1st Amended Verified Complaint. (See Complaint, attached as Exhibit 3).

**RESPONSE**: Undisputed.

5.　　On April 29, 2020, Plaintiff filed a 2nd Amended Verified Complaint, alleging in Count I violation of the Illinois Residential Real Property Disclosure Act, 76 ILCS 77/35 et seq., ("Disclosure Act") against the Defendants Nicholas and Kelsey Gonring; Count II as Fraudulent Concealment against Nicholas and Kelsey Gonring and Breach of Contract; Count III as Fraudulent Concealment against American International Relocation Services (AIRES). (See 2nd Am. Complaint, attached as Exhibit 4).

**RESPONSE**: Undisputed.

6.　　The Court has jurisdiction over this matter because the parties are domiciled in different states and the amount in dispute exceeds Seventy Five Thousand Dollars ($75,000.00). (See 2nd Amended Complaint, attached as Exhibit 4).

**RESPONSE**: Undisputed.

7.　　Since approximately May 2016, Defendants Nicholas and Kelsey Gonring owned the property located at 2726 West Cortez Street, Chicago, IL, Unit 1. The PIN is 16-01-408-055-1001. (See Warranty Deed, attached as Exhibit 5).

**RESPONSE**: Undisputed.

8.　　The subject of the Plaintiff's lawsuit is the property located at 2726 West Cortez Street, Chicago, Illinois, which is a 3 story condominium structure that is self managed by the owners. (See MLS listing, attached Exhibit 6).

**RESPONSE**: Undisputed.

9.　　On or about October 15, 2017, the 2726 West Cortez Condo Association filed a claim with Erie Insurance Group. (See Ex. 7, ¶ 5).

**RESPONSE**: Disputed that the claim with Erie was filed on October 15, 2017, because the Association submitted a claim to Erie on October 9, 2017. (See Gonrings' Answers to Interrogatories, ¶ 5). Undisputed as to the rest of Statement of Fact 9.

10.     Pursuant to a condominium insurance claim, a structural engineering firm named Engineering Systems, Inc. ("ESI") inspected the Structure located at 2726 West Cortez, Chicago, IL ("Structure") and generated a report that identifies the inspection date as October 19, 2017. (See ESI Report, attached as Exhibit 8, with date of inspection on page 3).

**RESPONSE**: Undisputed.

11.     On November 9, 2017, the Association had a meeting discussing water issues from split faced block and the "need to tuckpoint the entire building..." (See Nov. 9, 2017 meeting minutes, attached as Exhibit 9).

**RESPONSE**: Undisputed.

12.     On November 29, 2017, Erie Insurance, the insurance company for the Association, sent an email to John Gorr, as President of the Association and owner of Unit 3, which included a report from a ESI. (See Erie Letter, attached as Exhibit 10; see also ESI report, attached as Exhibit 8).

**RESPONSE**: Disputed. Neither Exhibit 8 nor Exhibit 10 evidence any email sent to John Gorr. Exhibit 10 states the letter was sent by certified mail.

13.     The Erie letter states that they are responding to a claim by 2726 West Cortez Condo Association that they "submitted for water damage to the building which was discovered on October 9, 2017..." (See Letter, attached as Exhibit 9).

**RESPONSE**: Disputed that Exhibit 9 is a letter from Erie Insurance. The letter is not "Exhibit 9". Exhibit 9 is a copy of certain meeting minutes. Undisputed insofar as Plaintiff is referring to Exhibit 10.

14.     The Erie letter states that the "structural engineer determined that the water infiltration is occurring because of the deficiencies in the original construction of the building with the predominant issue being improper flashing at wall openings." (See letter, attached as Exhibit 10).

**RESPONSE**: Undisputed.

15.     The ESI Report further states that Erie retained the structural engineer "in regard to an issue with water infiltration occurring in a multi-family residential Structure. The Structure, managed by 2726 W. Cortez Street Condo Association, was located at 2726 W. Cortez Street in Chicago, Illinois." (See Exhibit 8, page 2).

**RESPONSE**: Undisputed.

16.     The ESI Report also states that based upon an inspection, "Water infiltration is occurring at various locations of the structure, but particularly at window and door openings." (See Exhibit 8, page 5). It also found that water infiltration was occurring "because of deficiencies in the original construction of the building with the predominate issue being improper flashing at wall openings." (See Exhibit 8, page 5). The report further notes that the problem has occurred since the original construction of the building. Id.

**RESPONSE**: Undisputed.

17.     On December 4, 2017, John Gorr sent the Erie letter and ESI Report to the owners of Unit 1, Defendants Nicholas and Kelsey Gonring, by electronic mail. (See December 4, 2017 email, attached as Exhibit 11).

**RESPONSE**: Disputed that Exhibit 11 evidences that John Gorr sent the Erie letter and

ESI Report to the Gonrings.

18.     On December 7, 2017, John Gorr sent Defendants Gonring another email with attachments containing estimates from Best Brickmasters, Pioneer Tuckpointing, The Building Doctor as well as a history of the Structure's water infiltration. (See Group Exhibit 12). Gorr's statement about water infiltration includes, "2015 Continued to have leaks above all windows and doors on all facades during heavy rains." (See Exhibit 12, page 15).

**RESPONSE**: Disputed because "Group Exhibit 12" is not a clearly marked or cited

exhibit, and therefore Defendant is unsure what Plaintiff is referring to.

19.     On December 8, 2017, John Gorr informed the Gonrings, "the building is letting in water, it just happens to be coming in above my windows because thats [sic] where the water pools after its [sic] inside the masonry." (See December 8, 2017 email, attached as Exhibit 13).

**RESPONSE**: Undisputed.

20.     On December 12, 2017, John Gorr sent the Gonrings an estimate from D/R Services Unlimited, where Mr. Gorr states that "a great deal of tuckpointing is needed" while suggesting "flashing of the capstones and lintels" in addition to sealing and venting the building. (See December 12, 2017 email, attached as Exhibit 14).

**RESPONSE**: Undisputed.

4

21.     On February 5, 2018, Mr. Gorr sent the Gonrings a quote from Bral Restoration. On February 14, 2018, Mr. Gorr followed up with more information as to exploratory work by Bral Restoration. (See Feb. 5 & 14, 2018 email, attached as Exhibit 15).

**RESPONSE**: Undisputed.

22.     On February 20, 2018, Defendant Kelsney Gonring sent an email to John Gorr, expressing her alarm at the "extent and history of your water infiltration issues" and the "magnitude of the problem." (See February 20, 2018 email, attached as Exhibit 16). Ms. Gonring also wrote that "Nick and I were not made aware of this issue – present since 2012 – upon our purchase of our unit in 2016. In fact, as part of the purchase, we were given a signed document stating that no issues with any of the units had been raised with the HOA and no documented common element work had been done or was expected to be done in the next 2 years." (See Exhibit 16). Ms. Gonring complains about work Mr. Gorr did without HOA consent and further writes that "if we were aware of this issue upon purchase, our negotiation would have been conducted quite differently." (See Exhibit 16).

**RESPONSE**: Undisputed.

23.     On February 22, 2018, Mr. Gorr informs the Gonrings that the problem is "not unit-specific" and that "the building is leaking" and not simply Mr. Gorr's unit. (See Feb. 22, 2018 email, attached as Exhibit 17). Mr. Gorr further explains that the problem is "likely due to some of the following: Capstones on parapet. Improper flashing above windows and doors. Improper flashing between floors. Tuckpointing cracks. Lack of cavity wall. Improper weepholes. Water absorbed through split-face block. Roof damage." Mr. Gorr states, "The fact remains we have a building that is leaking... Water is in the structure and probably mold as well.... If you talk to a contractor, it is clearly a building issue...: (See Exhibit 17).

**RESPONSE**: Undisputed.

24.     On March 6, 2018, Mr. Gorr received a quote from Bral Restoration for "Masonry Inspection at Façade and Interior units." (See March 6, 2018 Bral quote, attached as Exhibit 18). On the same date, Bral Restoration prepared a 2nd quote for CMU Tuckpointing and Modac Application on West, North and East elevations. (See March 6, Bral quote II, attached as Exhibit 18).

**RESPONSE**: Disputed as to the second quote prepared by Bral Restoration. There is no

mention of Tuckpointing or the application of Modac in Exhibit 18.

25.     On March 19, 2018, the Association had a meeting to move forward with exploratory work, and this incurred a special assessment. (See March 19, 2018 minutes, attached as Exhibit 19).

**RESPONSE**: Disputed as to the fact that the meeting incurred a special assessment. The meeting minutes describe "financial responsibilities" of each Unit, but do not call it a special assessment. (Exhibit 19).

26.     On March 30, 2018, Mr. Gorr received a quote from Gralak Tuckpointing for "Exterior walls renovation/ waterproofing endeavor." (See March 30, 2018 Gralak quote, attached as Exhibit 20). The Gralak quote is for two coats of water repellant. However, the quote warns that "Enviroseal PBT will not inhibit water penetration through unsound or cracked surfaces or surfaces with defective flashing..." In addition, the warranty "does not apply to moisture penetration or damages caused by structural defects..." (See Exhibit 20, page 3). Additional work includes installation at the inner parapet wall counter flashing," elastomeric flashing system underneath 3 sides of the parapet wall coping stones" and tuckpointing. (See Exhibit 20, page 5). Gralak also recommended installing "the flashing systems (top and bottom) at the top lintel beam areas of window and door openings...," "thru wall flashing system at all building levels," "applying caulking on all windows, doors and metal frames" and "new counter flashing systems at the parapet wall." (See Exhibit 20, page 7).

**RESPONSE**: Disputed that warranty says it "does not apply to moisture penetration of damages caused by structural defects." (Ex. 20, p. 3). Undisputed as to the rest of Statement of Fact 26.

27.     On May 3, 2018, Bral Restoration gave the Association a quote that stated that the stated that "existing flashing was through wall that allowed water to penetrate right into the back of the block." This is considered a construction defect. (See Affidavit of Steve Hier, attached as Exhibit 24). On the same day, John Gorr sent the report, along with an invoice and proposal, to the Defendant Gonrings. (See May 3, 2018 email and its exhibits, attached as Exhibit 21).

**RESPONSE**: Disputed that Bral Restoration provided a quote with the exact words of the asserted statement because no citation has been provided. Undisputed that it is Steve Hier's opinion that this was a construction defect. Undisputed as to the rest of Statement of Fact 27.

28.     Defendant Kelsey Gonring admits that she contacted a company called Arrow Masonry and obtained a quote. (See Gonring Answers to Interrogatories, ¶8, Exhibit 7). At a meeting of the Condo Association on May 7, 2018, Defendant Kelsey Gonring signed a contract with Arrow Masonry. (See May 7, 2023 Minutes, attached as Exhibit 22; see also May 7, 2018 Arrow quote, attached as Exhibit 23).

**RESPONSE**: Undisputed.

29.     The Arrow Masonry quote includes work such as "Pac-clad flashing will be installed above all 3 rear decks." Further, the Arrow quote provides that all "Renaissance stone or limestone interface joints at the top of the parapet walls or above the window and door headers on all 3 elevations will be ground out, primed, caulked and tooled." (See Exhibit 23).

**RESPONSE**: Disputed that Arrow Masonry provided a quote with the exact words of the asserted statement because no citation has been provided. Undisputed as to the rest of Statement of Fact 29.

30.     Arrow Masonry provided a scope of work that failed to address this issue related to the flashing, which would have required removing the concrete blocks and installing the flashing correctly. (See Affidavit of Steve Hier, attached as Exhibit 24; see also Arrow Masonry quote, attached as Exhibit 23).

**RESPONSE**: Disputed that Arrow Masonry's scope of work failed to address the issue related to the flashing. (Exhibit 23.)

31.     Other quotes that the Defendant Gonrings obtained stated that more work was required than the quote provided by Arrow. Specifically, the May 3, 2018 Bral quote in the "Water Leak Investigation Results" states that the "existing flashing was through wall that allowed water to penetrate right back into the back of block." Bral also concluded that "installing a cavity wall system over just the masonry openings and allowing a proper through wall flashing system to be installed would not prevent water from penetrating at locations in between the openings." (See May 3, 2018 Bral letter, attached as Exhibit 21). The Arrow Masonry quote failed to remedy the issues identified by Bral. (See Affidavit of Steve Hier, attached as Exhibit 24).

**RESPONSE**: Undisputed that the Bral quote reads what Plaintiff quotes it as but disputed that the Arrow Masonry quote "failed to remedy the issues identified by Bral." (Ex. 23, p.1.)

32.     The March 30, 2018, quote from Gralak Tuckpointing recommended work that was not within the scope of work for Arrow. (See May 7, 2018 Arrow Masonry Contract, attached as Exhibit23; see also May 30, 2018 Gralak Tuckpointing quote, attached as Exhibit 20).

**RESPONSE**: Undisputed.

33.     The work performed by Arrow Masonry addressed none of the issues addressed in the site inspection on October 19, 2017, when ESI determined that "water infiltration is occurring because of deficiencies in the original construction of the building with the

predominate issue being improper flashing at wall openings." (See ESI Report, Exhibit 8; see also Affidavit of Steve Hier, attached as Exhibit 24).

**RESPONSE**: Disputed that Arrow Masonry "addressed none of the issues" identified by

ESI, (Ex. 8), because Arrow Masonry's scope of work included new flashing installation. (Ex.

23, p. 1.)

34.     Defendant Kelsey Gonring claims that as of May 17, 2018, she was aware of no defects to the Condominium. (See Gonring Answer to Interrogatories, Exhibit 7, ¶10).

**RESPONSE**: Undisputed, subject to Gonring's objection that the interrogatory called

for a narrative response. (See Exhibit 7, ¶ 10).

35.     Arrow Masonry identified work to windows, doors, as well as to the 3 rear decks, to which Pac-clad flashing was to be installed. (See Exhibit 23). These are all limited common elements. (See Bylaws, attached as Exhibit 25, page 4-5, ¶1(k)).

**RESPONSE**: Undisputed that Arrow Masonry identified work to windows and doors.

Further undisputed that Arrow was going to install Pac-clad flashing to 3 rear decks. Disputed

that limited common elements included the windows and doors, as the by-laws state portions of

windows, doors, and other fixtures are only common elements when they "lie outside the Unit

boundaries." (Ex. 25, p. 4-5, ¶ 1(k).)

36.     The Condo Association Declaration provides the following definitions:
(f) Common Elements. All portions of the Property except the Units, including the Limited Common Elements and the Parcel. The Common Elements include, without limiting the generality of the foregoing, any of the following items located at the Property: the land, foundations, walls, entrances and exits, hallways, basement, mailboxes, roof, pipes, ducts, flues, shafts, electrical wiring and conduits (except pipes, ducts, flues, shafts, electrical wiring and conduits situated entirely within a Unit and serving only such Unit), public utility lines, structural pans of the Building, all outside walks and driveways, and all other portions of the property except the individual Units. Structural columns located within the boundaries of a Unit shall be part of the Common Elements. Any references to "Common Elements" appearing on the Plat (except references to Limited Common Elements) shall not be limiting in any way, nor shall any reference define the Common Elements in any way.

(k) Limited Common Elements. (i) The part of the Common Elements contiguous to and serving a single Unit exclusively as an inseparable appurtenance thereto including specifically balconies, decks, porches and such portions of the perimeter walls, floors and ceilings, windows, doors and all fixtures and structures therein which lie outside the Unit boundaries; (ii) pipes, ducts, flues, shafts, electrical wiring or conduits or other systems or component parts thereof which serve a Unit exclusively to the extent such systems or component parts are located outside the boundaries of a Unit; (iii) any portion of the Common Elements so designated in this Declaration or on the Plat (as hereinafter defined) as being reserved for the use of a certain Unit or Units to the exclusion of other Units; (iv) parking spaces as delineated on the Plat as, respectively, P-1 (which shall be appurtenant to Unit 1), P-2 (which shall be appurtenant to Unit 2) and P-3 (which shall be appurtenant to Unit 3); (v) rooftop decks, rights to rooftop areas or storage lockers assigned to a particular Unit either as shown on the Plat of Survey or delineated herein,; and (vi) any other portion of the Common Elements which by the terms of this Declaration or by its nature or location is clearly intended to serve exclusively a certain Unit or Units (but less than all of the Units).
See Exhibit 25.

**RESPONSE**: Undisputed.

37. On May 17, 2018, Defendant Gonrings signed a listing agreement to sell their Unit with Coldwell Banker, and including Garrett Luehrs as the Broker/ Seller's designated Agent/ Licensee. (See Exhibit 26).

**RESPONSE**: Disputed that the Gonrings signed a listing agreement on May 17, 2018

(Ex. 26, p. 6.). The Gonrings signed the listing agreement on May 18, 2018. (Ex. 26, p. 6.).

Undisputed as to the rest of Statement of Fact 37.

38. On May 19 and 21, 2018, respectively, the Gonrings filled out and executed an ILLINOIS REALTORS ® RESIDENTIAL REAL PROPERTY DISCLOSURE REPORT pursuant to 765 ILCS 77/35 (the "First Disclosure Report"). (See Real Property Disc. Report, attached as Exhibit 27). The effective date of the First Disclosure Report is May 17, 2018. (See Exhibit 27).

**RESPONSE**: Disputed that the "effective date" of the First Disclosure Report is May

17, 2018. The First Disclosure Report states that the information in the First Disclosure Report

is "provided as of 5/17/2018." (Ex. 27, p. 1.). Undisputed as to the rest of Statement of Fact 38.

39. The disclosure form asks Defendant Gonrings to disclose whether they were aware of defects in the foundation, and "leaks or defects in the roof" and also "material defects in the walls, windows, doors or floors." The Defendant Gonrings answered, "no." (See Exhibit 27).

**RESPONSE**: Disputed that the First Disclosure Report asks the Gonrings whether they were aware of "leaks or defects in the roof," because the form asks whether the Gonrings are aware of "leaks or material defects in the roof." (Ex. 27, p. 1). Undisputed as to the rest of Statement of Fact 39.

40.     The Arrow quote requires a "deposit of 50% and/or bona fide purchase order is required with the acceptance of the contract and before any commencement of work." (See Exhibit 23).

**RESPONSE**: Undisputed.

41.     Arrow received the 50% Condo Association payment on May 30, 2018. (See June 4, 2018 invoice from Arrow, attached as Exhibit 28). The Gonrings admit they paid their share of the deposit on May 30, 2018, while paying the balance on June 8, 2018. (See Gonrings' Answers to Interrogatories, Exhibit 7, ¶11).

**RESPONSE**: Undisputed.

42.     Defendant Gonrings admit that Arrow started work on May 31, 2018 and completed the work on June 6, 2018. (See Gonrings' Answer to Interrogatories, Exhibit 7, ¶12). The Defendant Gonrings completed the May 17, 2018 First Disclosure Report 14 days before Arrow started its work on the Structure. (See Exhibit 27).

**RESPONSE**: Disputed that the Gonrings "completed the May 17, 2018 First Disclosure Report 14 days before Arrow started its work" because Nicholas Gonring did not sign the First Disclosure Report until May 21, 2018. (Ex. 27, p. 3.) Undisputed as to the rest of Statement of Fact 42.

43.     On May 21, 2018, Defendant Gonrings listed their Unit on the MLS with Garrett Luehrs as their agent. (See Exhibit 6).

**RESPONSE**: Undisputed.

44.     On May 29th and May 30th, 2018 respectively, the Gonrings signed the Seller's Property Disclosure Statement which was prepared by AIRES (the "Second Disclosure Report"). (See Second Disclosure Report, attached as Exhibit 29).

**RESPONSE**: Undisputed that on May 29, 2018 Kelsey Gorning signed the Seller's Property Disclosure Statement and that on May 30, 2018, Nicholas Gonring Signed the Seller's Property Disclosure Statement. The remaining statements in Statement of Fact 44 are disputed. The form was not "prepared by Aires." It was filled out, completed, and executed by the Gonrings. (Ex. 29, pp. 1, 7).

45.     As the Second Disclosure Report sought information about the Building as a whole and not just the Unit, as part of the Second Disclosure Report, the Gonrings disclosed that they were aware of past water leakage in the house or other structures, while stating that that "Unit 3 had leaks on west facing windows. HOA sealed building to resolve Unit 3 leak." (See 2nd Disclosure Report, Exhibit 29, page 2 of 7). When asked if they were aware of any past or present "deterioration or other problems with the walls, foundations or other structural components," the Defendant Gonrings answered "no." (Exhibit 29).

**RESPONSE**: Undisputed.

46.     The Second Disclosure Report was completed on the same day that Arrow received the 50% deposit from the Association and before they completed their work on the Structure but before any work commenced. (See Exhibit 28; see also Exhibit 29).

**RESPONSE**: Disputed that the Second Disclosure Report was completed on the same day that Arrow received 50% deposit from the Association, as Aires did not sign the report until June 6, 2018, Kelsey Gonring signed the Second Disclosure Report on May 29, 2018, not May 30, 2018. (Ex. 29, p. 7). Disputed that the Second Disclosure Report was completed before Arrow Masonry completed their work, as the work was completed on June 6, 2018. (Ex. 7, ¶ 12)

47.     Defendant Gonrings never mentioned in the 2nd Disclosure Report that Arrow would perform work on all 3 rear decks, that or that work would be performed throughout the entire Structure. (See 2nd Disclosure Report, Exhibit 29).

**RESPONSE**: Undisputed.

48.     On June 7, 2018, AIRES signed a listing agreement with Coldwell Banker to use Garrett Luehrs as their broker and exclusive agent for the sale of the Unit. (See June 7, 2018 contract, attached as Exhibit 30).

**RESPONSE**: Undisputed.

49. The next day, on or about June 8, 2018, AIRES entered into a Condominium Real Estate Purchase and Sale Contract with Plaintiff (the "Contract"). (See Contract, attached as Exhibit 31).

**RESPONSE**: Undisputed.

50. When Plaintiff Sgariglia's lawyers obtained a copy of the contract, they also received the First and Second Disclosure. (Hawbecker Dep, page 53-54, attached as Exhibit 32).

**RESPONSE**: Undisputed.

51. On June 14, 2018, Defendant Kelsey Gonring sent Mr.Gorr an email, attaching the 22.1 that they received for their unit. (See June 14, 2018 email, attached as Exhibit 33). In the email, Ms. Gonring instructs Mr. Gorr that there does not "seem like there is a question pertaining to leaks there would be no need to go into detail about issues in your unit or the building." (See Exhibit 33). Ms. Gonring further states that there it was not necessary "to go into a detailed history of how and why" the Association decided to hire Arrow." (See Exhibit 33).

**RESPONSE**: Disputed that Ms. Gonring "instructed" Mr. Gorr as quoted by Plaintiff.

(Ex. 33, p. 1). Undisputed as to the remainder of Statement of Fact 51.

52. The June 14, 2018 email also states that the Association agreed they would only release the May 7, 2018 meeting minutes. (Exhibit 33). Although paragraph 8 of the 22.1 calls for a "copy of the Board Minutes showing capital expenditures and/or approved of special assessments enclosed," The Association never gave the March 19, 2018 meeting minutes to counsel for Plaintiff, Thomas Hawbecker. (Exhibit 32, Hawbecker Dep., page 121-122). The March 19, 2018 meeting minutes show capital expenditures of $4,000.00, with a special assessment broken down for each unit. (See Exhibit 19). They also failed to turn over the November 9, 2017 meeting minutes where financing through a special assessment was approved. (See Nov. 9, 2017 meeting minutes, attached as Exhibit 9).

**RESPONSE**: Disputed that the Association "agreed they would only release the May 7, 2018 minutes." The email states that, "Question 8 asks for board meeting minutes showing approval of special assessments. We can provide minutes for the meeting where we decided on hiring Arrow." (Ex. 33, p. 1.). The November 9, 2017 meeting minutes also do not state that financing via a special assessment was approved. (*See* Exhibit 9.). Undisputed as to the remainder of Statement of Fact 52.

53.     Also part of the Sales Contract is an Addendum to Purchase and Sale Agreement, which identifies AIRES as the Seller. (See Addendum, attached as 34).

**RESPONSE**: Undisputed, although Exhibit 34 is not the complete Addendum to

Purchase and Sale Agreement.

54.     Pursuant to paragraph 15 of the Sales Contract, the attorney modification provision permits proposed modifications to the contract. (See Exhibit 31, ). These statements are legally binding. (See Exh. 32, Hawbecker Dep, page 99-100). Prior owner statements have no legally binding effect because there is no privity of contract. (Exh. 32, Hawbecker Dep. Page, 100-101).

**RESPONSE**: Undisputed that paragraph 15 of the Sales Contract permits proposed

modifications to the contract. Disputed as to the remainder of Statement of Fact 54, because it is

comprised of legal conclusions reached by Mr. Hawbecker and repeated by Plaintiff.

55.     Mr.Thomas Hawbecker, as attorney for Plaintiff Sgariglia, testified that attorneys in real estate closings typically have trust in one another, and that attorneys will fully disclose information. (Exh. 32, Hawbecker Dep., 105-106).

**RESPONSE**: Undisputed.

56.     Also On June 14, 2018, attorneys for Plaintiff Sgariglia sent an attorney review letter to Defendants' attorney. (See June 14, 2018 letter, attached as Exhibit 35; see also Exh. 32, Thomas Hawbecker dep, page 17-18). In paragraph 8, Plaintiff Sgariglia asks the Seller Defendants to verify that the Condo Association has not experienced any instances of water (interior or exterior) leaking into the Property and/or any water damage during Seller's ownership of the Property." Further, in paragraph 9, Plaintiff Sgariglia's attorney asked if there had been "any insurance claims within the last 5 years" and if there was "any other matter concerning this property or the Seller that may interfere with the Buyer's enjoyment and marketability of the property." The letter also seeks the last 12 months of meeting minutes. (Exhibit 35, ¶8d). Mr. Hawbecker testified that he only received the May 7, 2018 meeting minutes. (See Exh. 32, Hawbecker Dep., page 123).

**RESPONSE**: Disputed that Plaintiff Sgariglia's attorney communicated with

"Defendants' attorney" Plaintiff Sgariglia's attorney only communicated with Aires' attorney

(Ex. 35). Disputed that Plaintiff Sgariglia asked the "Seller Defendants" to verify that the Condo

Association has not experience any water leaking, because Plaintiff Sgariglia did not ask the

Gonrings anything in the attorney modification letters. (Ex. 35). Undisputed as to the remainder

of Statement of Fact 56.

57.     On June 18, 2018, Defendant AIRES' attorney responded to the letter, identifying the Seller as Aires, and refused to answer paragraphs 8e, 9a and 9e, claiming that as a relocation company, they are unable to make any representation or warranties beyond its factual report. (See June 18, 2018 letter, attached as Exhibit E.) They also answered paragraph 8d with a recitation of Section 22.1 of the Illinois Condominium Act. (See Exhibit 36).

**RESPONSE**: Disputed that Aires "refused to answer" because they did answer. (Ex. 36.)

The response to 8e says:

> "As a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leaking or water damage. However, Seller agrees to abide by the terms of the Buyer's Duty to Inspect/Test" section o the Aires addendum with respect to possible leaks, seepage, or water infiltration of the Property, as Seller would have no knowledge of such matters unless raised during the home inspection process."

(Ex. 36, p. 2.) The response to 9a says:

> "As a third-party corporate relocation company that has never occupied the property, Seller is unable to make representations or warranties regarding whether insurance claims have been made against the Property, as Seller would have no knowledge of such matters."

(Ex. 36, p. 2.) The response to 9e says:

> Seller reports that the Property is not subject to any current or pending complaints, violations, suits, notices, or other citations. As a third-party corporate relocation company, Seller is unable to make representations or warranties beyond its factual support."

Disputed that Aires "answered paragraph 8d with a recitation of Section 22.1 of the Illinois

Condominium Act." (Ex. 36, p. 2.) The response to 8d read does not recite the Illinois

Condominium Property Act. (Ex. 36, p. 2.) It reads:

> Seller agrees to abide by the Illinois Condominium Property Act and provide Buyer those required documents as delineated in 765 ILCS

605/22.1(a), with Buyer's approval of those documents to be consistent with **Paragraph 12, Lines 75-79** of the contract.

(Ex. 36, p. 2.)

58. Thomas Hawbecker as attorney for Plaintiff assumed that AIRES was obtaining the information they provided from a relocation representative who would give answers to their attorney. (See Exh. 32, Hawbecker Dep, page 27).

**RESPONSE**: Undisputed.

59. Thomas Hawbecker assumed that as a relocation company, the Gonrings would have transferred the property to AIRES and that AIRES was the owner. (See Exh. 32, Hawbecker Dep, page 30-31; 50, 56).

**RESPONSE**: Undisputed.

60. Thomas Hawbecker testified that typical protocol for relocation companies is to have simultaneous deeds at closing. (See Exh. 32, Hawbecker Dep, page 31-32, 56).

**RESPONSE**: Undisputed.

61. The only time Mr. Hawbecker has seen a deed bypass a relocation company was in this sale. (See Exh. 32, Hawbecker Dep., page 58).

**RESPONSE**: Disputed. Mr. Hawbecker testified that "the only situation that [he] could affirmatively state" that there was one deed was "in this situation." (Hawbecker Dep., Ex. 32, p. 58.) Mr. Hawbecker testified that he was "accustomed to seeing two deeds" and "that's as good of an answer as I can give you." (Hawbecker Dep., Ex. 32, p. 58.)

62. Mr. Hawbecker testified that AIRES held itself out to be the owner because it was the Seller. (See Exh. 32, Hawbecker Dep, page 33-34; 49; 111).

**RESPONSE**: Disputed. Mr. Hawbecker testified "They've held themselves out to the seller. Usually, you're the owner of the property you're the seller." (Hawbecker Dep. Pg. 33) (emphasis added). Mr. Hawbecker further testified that he "assum[ed]" the seller and owner are "one and the same." (Hawbecker Dep., Ex. 32, p. 49). Mr. Hawbecker never said they held themselves out as owner. (*See generally* Hawbecker Dep., Ex. 32.)

63.     Mr. Hawbecker testified that as he asked for information from the "prior owner" he assumed conveyance had already taken place from The Gonrings to AIRES. (See Exh. 32, Hawbecker Dep, page 36-37; 106).

**RESPONSE**: Undisputed.

64.     Mr. Hawbecker testified that had AIRES informed him that they were not the owners, the attorney review questions and correspondence would have been different, and he would not have accepted AIRES' representations. (See Exh. 32, Hawbecker Dep, page 41-42; 44-45, 47, 63, 105).

**RESPONSE**: Undisputed as to the contents of Mr. Hawbecker's testimony.

65.     On June 22, 2018, Mr. Hawbecker reiterated his request for information under paragraphs 8e, 9a and 9e. (See June 22, 2018 letter, attached as Exhibit 37). Under paragraph 8e and 9a, Mr. Hawbecker for Plaintiff Sgariglia requested Defendant AIRES to contact the 36" for information about water damage or leaking and insurance claims. (See Exhibit 37).

**RESPONSE**: Disputed that Mr. Hawbecker reiterated his request for information, as the June 22, 2018 letter is signed by Mr. Kirk Langfeld. (Ex. 37, p. 3). Disputed that Mr. Hawbecker requested Defendant Aires to contact the "prior owners," as Mr. Langfeld signed Exhibit 37. (Ex. 37, p. 3). Undisputed as to the contents of the letter.

66.     On July 2, 2018, Defendant AIRES responded and identified themselves as the Seller, and that they have no knowledge of any leaks "when the information reported in the Residential Real Property Disclosure Report or other homeowner provided disclosures makes no mention of water infiltration issues within the Property." (See July 2, 2018 letter, attached as Exhibit 38.)

**RESPONSE**: Undisputed, but AIRES also qualified this statement by stating, "[A]s a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leakage or water damage."

67.     In the same letter, Defendant AIRES reports no insurance claims were made against their homeowners' insurance within the last 5 years, and that it, as Seller, reports that the property is not subject to any current or pending complaints." (See Exhibit 38, para. 8, 10). Plaintiff again conveyed the  information that as a third party relocation company, it is unable to make additional representations or warranties. (See Exhibit 38, para. 8, 10).

**RESPONSE**: Disputed that Aires had homeowners' insurance on this property or represented that it did. The response says:

> "Seller reports that **the homeowners** made no claims against **their** homeowners' insurance within the last five years. As a third-party corporate relocation company that has never occupied the property, Seller is unable to make representations or warranties regarding whether insurance claims have been made against the Property, as Seller would have no knowledge of such matters."

(Ex. 38, 2.) (emphasis added). Disputed that Plaintiff conveyed that she is a third-party relocation company. (Ex. 38.)

68.     On July 3, 2018, the listing agent, Garrett Luehrs of Coldwell Banker, sends an email to Defendants Gonring, attorneys Terry Wilkins, Sarah Wilkins and Amanda Flucker, as attorneys for AIRES. (See July 3, 2018 email sent at 6:37 p.m, attached as Exhibit 39.). Garrett Luehrs represented Defendant Gonrings when they purchased the Unit. (See Exhibit 7, ¶14). Mr. Luehrs sent it to "expedite the decision making process." (Exh. 39).

**RESPONSE**: Undisputed.

69.     On July 3, 2018, at 6:59 p.m., Defendant Kelsey Gonring emails attorneys Terry Wilkins, and Sarah Wilkins, all attorneys for AIRES, stating that "Nick and I have reviewed the buyer's response and have decided to agree to the buy's terms ($3,000 closing credit and 125% tax proration) outlined in the attached document." (See July 3, 2018 email, attached as Exhibit 39).

**RESPONSE**: Undisputed.

70.     Thomas Hawbecker did not know that Defendant Gonrings were speaking to attorney Wilkins and making the decisions as to closing cost credit and tax prorations. (See Exh. 32, Hawbecker Dep., page 102-105).

**RESPONSE**: Undisputed.

71.     On July 5, 2018, at 11:25 a.m., Defendant Nicholas Gonring sent an email to Ms. Flucker, expressing frustration at the lack of communication with "attorneys that are working on our behalf through Aires" while relaying his "verbal agreement of the buyer's addendum ($3,000 total closing credit and 125% tax proration) and finalize the sale today." (See July 5, 2018 email, attached as Exhibit 39).

**RESPONSE**: Undisputed.

72.     After seeing the July 5, 2018, 11:25 a.m. email, Thomas Hawbecker testified that, "It's just sneaky. Very sneaky, right. They're controlling the responses that we're getting, yet shielding behind I'm the relo company, never occupy the property, don't disclose." (Exh. 32, Hawbecker Dep., page 107¬109). Mr. Hawbecker testified that he felt deceived that the relationship between the Gonrings and Wilk law counsel was not disclosed. (Exh. 32, Hawbecker Dep., page 109-110).

**RESPONSE**: Undisputed as to the contents of Mr. Hawbecker's testimony but disputed as to his characterizations that the situation was "sneaky" or deceptive.

73.     Also on July 5, 2018, at 2:08 p.m., Defendant Nicholas Gonring asks "when can we expect our attorneys to approve the addendum that we have verbally come to terms with." He adds, "We need this done today." (See July 5, 2018 email, attached at Exhibit 39).

**RESPONSE**: Disputed that email was sent at 2:08 p.m., as it was sent at 2:02 p.m. (Ex. 39.) Undisputed as to the rest of Statement of Fact 73.

74.     On July 5, 2018, at 2:29 p.m., Amanda Flucker of AIRES asks the Gonrings how they would like her to move forward. (See July 5, 2018 email, attached as Exhibit 39).

**RESPONSE**: Undisputed.

75.     After seeking a series of answers to The Gonrings questions about the credit, attorney Sarah Wilkins sent an email to the Gonrings and Amanda Flucker, explaining the legal process of attorney review. (See July 5, 2023 emails from 2:35pm to 4:45 p.m., attached as Exhibit 40).

**RESPONSE**: Disputed that Exhibit 40 contains multiple emails, as it only contains one email from 4:45 p.m. (Ex. 40.) Disputed that the letter "explain[s] the legal process of attorney review" because the letter explains the differences among an attorney modification letter, an addendum, and a hold harmless agreement. (Ex. 40.) Undisputed as to the rest of Statement of Fact 75.

76.     On July 13, 2018, Mr. Gorr sent an email to the Defendant Gonrings states that moisture was detected at his southwest window after the rain. (See July 13, 2018 email, attached as Exhibit 41). He advised that "it has been documented as a building issue" and that he would offer to put money in escrow to a potential buyer of his unit for his share of the "future work." (See Exhibit 41).

**RESPONSE**: Undisputed.

77.     The Defendant Gonrings never produced any revised either the First or Second Disclosure reports or the 22.1 disclosure form.

**RESPONSE**: Disputed as Plaintiff cites no support for Statement of Fact 77.

78.     On or about July 25, 2018, Defendants The Gonrings conveyed the Condominium to Plaintiff Sgariglia by Warranty Deed, which was drafted by Sarah Wilkins, the attorney for AIRES. (See Deed, attached as Exhibit 42).

**RESPONSE**: Disputed that the warranty deed was drafted by Sarah Wilkins, as Exhibit 42 does not support this assertion. Undisputed that the Gonrings conveyed the condominium to Plaintiff by Warranty Deed.

79.     Also on July 25, 2018, Defendant Gonrings entered into a Relocation Real Estate Purchase and Sale Agreement. (See July 25, 2018 Agreement, attached as Exhibit 43).

**RESPONSE**: Undisputed.

80.     In the Relocation Agreement, Defendant AIRES agrees to pay Defendant Gonrings $510,000 and that possession would be delivered on July 25, 2018. (See Exhibit 43, ¶2, 4). The Relocation Agreement also requires that "within 10 days of receipt of Deed Document Package Seller will execute and deliver to BUYER or its nominee a Power of Atttorney, a warranty deed or its equivalent conveying good, clear and marketable title to the BUYER or its nominee." (See Exhibit 43, page ¶9.1).

**RESPONSE**: Undisputed.

81.     Defendant Gonrings never conveyed by deed the Unit located at 2726 West Cortez Street, Unit 1, Chicago, IL to Defendant AIRES. (See generally, Cook County Recorder of Deeds under PIN for Unit).

**RESPONSE**: Undisputed.

82.     On September 7, 2018, Gorr sent Plaintiff an email in which he disclosed the mold infestation in his unit to Plaintiff. Ex. D, 126. ( See the September 7, 2018 email is attached hereto as Exhibit 44).

**RESPONSE**: Undisputed that Gorr sent Plaintiff an email in which he disclosed the mold infestation in his unit to Plaintiff, but disputed as to "Ex. D, 126" as there is no Ex. D.

83.     Plaintiff Sgariglia was "shocked" by the contents of the email, as she had no idea as to the problems with the Structure. (Pl. Dep. pages. 23, line 21-24; page 24-25, page 26; lines 1-7, attached as Exhibit 45).

**RESPONSE**: Undisputed.

84.     Plaintiff Sgariglia received a May 7, 2018 meeting minutes and relied upon the Sellers telling the truth that appropriate maintenance was being done to the Structure. (See Exh. 45, Sgariglia Dep, page 91, 100).

**RESPONSE**: Disputed that Sgariglia relied upon "the Sellers" telling the truth to the

extent she refers to Aires, as that is not Plaintiff's testimony. (Sgariglia Dep., Ex. 45, 90:10-24;

91:1-15; 98-100:1-7.)

85.     Plaintiff Sgariglia relied on the Sellers to tell the truth and their representations. (Exh. 45, Pl. Dep, page 91, 94).

**RESPONSE**: Disputed that Sgariglia relied upon "the Sellers" telling the truth to the

extent she refers to Aires, as that is not Plaintiff's testimony. (Sgariglia Dep., Ex. 45, 90:10-24;

91:1-15).

86.     She relied on the statements made in the 2nd Disclosure Report. (Exh. 45, Sgariglia Dep, page 88).

**RESPONSE**: Undisputed.

87.     Plaintiff Sgariglia relied upon answers from Sellers' attorneys to be truthful. (Exh. 45, Sgargilia Dep. Page 173).

**RESPONSE**: Disputed as Plaintiff's testimony is that she trusted the information, not

that that she relied up on it. (Ex. 45, 173:15-17.)

88.     After Plaintiff Sgariglia purchased Unit 1, and starting in the fall, she had water coming into her unit. (Exh. 45, Sgariglia Dep, page 106).

**RESPONSE**: Undisputed.

89.     Since closing, she has incurred over $100,000.00 in special assessment costs to repair the common elements and limited common elements. (Exh. 45, See Sgariglia Deposition Transcript, page 71¬74).

**RESPONSE**: Undisputed that she incurred special assessment costs, but disputed as to whether they were repairs for common elements or limited common elements, (Ex. 25), and to the amount, evidence of which Plaintiff does not attach to her Statement of Facts.

90.     Plaintiff Sgariglia had to obtain a home equity line of credit and borrow from her 401k to pay for the damage repair. (Exh. 45, Sgariglia Dep. Page 77-79, 129, 159).

**RESPONSE**: Undisputed.

91.     Work was also done to correct leakings in her unit, as she had water coming into her ceiling from the terraces. (Exh. 45, Sgariglia Dep. , page 74-75).

**RESPONSE**: Undisputed.

92.     Plaintiff Sgariglia also has to replace her front windows that have been leaking since she purchased her unit, and the estimate cost is $19,750.00. (Exh. 45, Sgariglia Dep. Page 78, 169-170).

**RESPONSE**: Disputed as Plaintiff does not attach evidence of her costs.

93.     Plaintiff Sgariglia continues to have leaking in her unit. (Exh. 45, Sgariglia Dep. Page 107).

**RESPONSE**: Disputed that Plaintiff has provided evidence that water is leaking to this day.

Date: July 28, 2023                          Respectfully submitted,

                                             American International Relocation Solutions, LLC

                                             /s/ Arthur J. McColgan
                                             Arthur J. McColgan
                                             Matthew W. Casey
                                             Walker Wilcox Matousek LLP
                                             One N. Franklin Street, Suite 3200
                                             Chicago, IL 60606
                                             amccolgan@walkerwilcox.com
                                             mcasey@walkerwilcox.com
                                             *Attorneys for American International Relocation Solutions, LLC*

**Certificate of Service**

I hereby certify that on July 28, 2023, a copy of the foregoing document was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Valerie Hosek