# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELINDA SGARIGLIA, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> AMERICAN INTERNATIONAL ) <br> RELOCATION SERVICES, LLC, d/b/a ) <br> AIRES, an Illinois limited liability ) <br> company, NICHOLAS GONRING, and ) <br> KELSEY GONRING, ) <br> ) <br> Defendants. ) <br> _____ ) <br> NICHOLAS GONRING and KELSEY ) <br> GONRING, ) <br> ) <br> Third Party Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> 2726 WEST CORTEZ CONDOMINIUM ) <br> and JOHN GORR, ) <br> ) <br> Third Party Defendants. ) | Case No. 1:19-cv-05684 <br><br> Honorable Robert W. Gettleman <br><br> Magistrate Judge Gabriel A. Fuentes <br><br> Jury Demanded |

## AFFIDAVIT OF KELSEY GONRING

I, Kelsey Gonring, hereby declare pursuant to 28 U.S.C. §1746:

1. I am over 18 years of age and competent to testify to the matters set forth below, of which I have personal knowledge.

2. From May 10, 2016, until July 25, 2018, my husband Nicholas Gonring and I owned unit 1 ("Unit 1") in a three-condo building located at 2726 W. Cortez Ave., Chicago, IL (the "Building"). Unit 2 was on the second floor and Unit 3, owned by John Gorr, was on the third (and top) floor of the Building.

3. By way of my ownership in the Unit, I was a member of the Building's condominium association (the "Condo Association").

4. The Condo Association was governed by its Declaration and Bylaws, which were kept as part of the ordinary course of business of the Condo Association. A true and correct copy of the Declaration and Bylaws of the Condo Association is attached to the Rule 56.1 Statement of Additional Facts as **Exhibit 5**.

5. During the course of our ownership of the Unit, we (my husband and I) never experienced any water infiltration or leaking into Unit 1.

6. Similarly, we were not aware of any structural damage or issues relating to Unit 1 over the course of our ownership.

7. On December 4, 2017, I received an email from John Gorr, the owner of Unit 3. This email (Plaintiff's Exhibit 13) was the first time I became aware of any significant water infiltration into John Gorr's Unit 3.

8. John Gorr had earlier submitted an insurance claim for water intrusion into his Unit 3, which resulted in the ESI report following its inspection of Unit 3. (Plaintiff's Exhibit 8). The ESI report concluded with a recommendation that a masonry contractor be retained to make exploratory openings in the masonry where the water infiltration is occurring and install proper flashing. (Plaintiff's Exhibit 8, p. 4). By way of a contractor, the ESI report identified Bral Restoration.

9. On March 11, 2018, the Condo Association held a meeting whereby the water infiltration into John Gorr's Unit 3 was discussed. At that meeting, my husband Nicholas Gonring and I, along with John Gorr, voted in favor of moving forward with exploratory work by Bral

2

Restoration, subject to determining the repair responsibility pursuant to the Declaration and Bylaws of the Condo Association.

10. The exploratory work was conducted by Bral Restoration ("Bral"). Bral concluded that the issue was not related to the wall flashing system. Bral's May 3, 2018 cover letter that accompanied its quote for tuck-pointing and sealing the block (but no flashing work) explained as follows:

> The removal of drywall allowed BRAL to confirm there is not a cavity wall system to be repaired and or reviewed. The existing flashing was through wall that allowed water to penetrate right into the back of block.
>
> It was decided to not continue with reviewing any further window or door openings besides these two. It was explained that installing a cavity wall system over just the masonry openings **and allowing a proper through wall flashing system to be installed would not prevent** water from penetrating at locations in between the openings.
>
> A previous proposal including as needed repointing and application of 2 coats of Modac was modified to include the application of 1 coast of Chem-Trete as an alternative.

(Plaintiff's Exhibit 21, Gorr-00214) (emphasis added).

11. Accordingly, Bral's proposal outlined work for tuck-pointing, power washing, the application of Modac coating (for cost of $49,821.00) and "Option A" work to apply Chem-Trete water repellant (for an additional cost of $38,700.00). Bral did **not** include in its proposal any flashing work, having determined that it was not needed. (Plaintiff's Exhibit 21, Gorr-00217-Gorr-00211).

12. On behalf of the Condominium Association, I reached out to Arrow Masonry[1] ("Arrow") and discussed Bral's exploratory work and requested Arrow to evaluate and provide a quotation for appropriate tuck-pointing and sealing the split-faced-block. Arrow's proposed

---

[1] Arrow Masonry was the only contractor that Kelsey Gonring contacted; John Gorr contacted the others.

contract was less expensive than Bral's and, unlike Bral, was backed by a 5-year warranty on material and labor and related guarantee on leak prevention. (Plaintiff's Exhibit 23).

13. On May 7, 2018, the Condominium Association held a special association meeting, at which time meeting minutes were taken. (Plaintiff's Exhibit 22).

14. At the May 7, 2018 special meeting, the Condominium Association approved the proposed contract with Arrow to remediate the water infiltration into Unit 3, together with approval of a special assessment based on the owners' *pro rata* shares of ownership in the Building. (Plaintiff's Exhibit 22).

15. On behalf of the Condominium Association, I signed the contract with Arrow Masonry on or about May 7, 2018.

16. The Arrow Masonry contract outlined its scope of work, including spot grinding, spot tuckpointing, caulking, flashing installation over decks and sealing of the east, west, and north elevations of the split-faced-block. (Plaintiff's Exhibit 23).

17. It was my understanding that sealing of the split-faced-block was routine maintenance that should be performed approximately every five years due to the nature of split-faced-block.

18. Arrow Masonry completed its work to remediate the water infiltration into unit 3 of the Building on or before June 4, 2018.

19. Upon completion of the work by Arrow Masonry, I believed that the water infiltration into Unit 3, including any issues with Unit 3's windows or other common elements of the Building, was resolved.

20. On May 19, 2018, I filled out and signed an ILLINOIS REALTORS ® RESIDENTIAL REAL PROPERTY DISCLOSURE REPORT pursuant to 765 ILCS 77/35 (the "Illinois Disclosure"). (Plaintiff's Exhibit 27).

21. I signed the Illinois Disclosure understanding that such disclosures only related to Unit 1 and did not include the common elements of the Building or any other units at the Building, pursuant to the Illinois Residential Real Property Disclosure Act.

22. As Unit 1 did not have any leaks or material defects in the roof, ceilings, or chimney, I indicated in the Illinois Disclosure that I was not aware of any defects regarding Unit 1's roof, ceilings, or chimneys. My answer was accurate then and it remains accurate today.

23. As Unit 1 did not have any material defects in the walls, windows, doors, or floors, I indicated in the Illinois Disclosure that I was not aware of any defects regarding Unit 1's walls, windows, doors, or floors. My answer was accurate then and it remains accurate today.

24. On information and belief, on May 21, 2018, AIRES listed the Unit for sale.

25. On May 29, 2018, I signed the Seller's Property Disclosure Statement that was a form prepared by AIRES (the "AIRES Disclosure"). (Gonring Statement of Additional Facts, Exhibit 1).

26. As the AIRES Disclosure sought information about the Building and not just Unit 1, I disclosed that I was aware of past water leakage at the Building and specifically stated that "**Unit 3 had leaks on west facing windows → HOA sealed building to resolve Unit 3 leak**." (Gonring Statement of Additional Facts, Exhibit 1, p. 2) (emphasis added).

27. Additionally, in the AIRES Report I disclosed that I was aware of shared or common areas or maintenance agreements for the Building and further stated in explanation

5

"**Tuckpointing & sealing of Building exterior**." (Gonring Statement of Additional Facts, Exhibit 1, p. 5) (emphasis added).

28. Arrow Masonry completed its work at the Building, and I believed that such work fully remediated the leaks experienced by Gorr in Unit 3 prior to Plaintiff's purchase of Unit 1.

29. John Gorr's email of July 13, 2018 did not change my belief that the work by Arrow Masonry remediated the leaks in Unit 3. It was my understanding that Gorr's buyer was utilizing a moisture monitoring system in Gorr's Unit 3 and that this monitoring system detected moisture "in the SW window area" after a hard rain. (Plaintiff's Exhibit 41, first paragraph). Gorr was not reporting water intrusion, just moisture detection. Further, I believed that Arrow Masonry had addressed any possible issue through its additional work (backed by its 5-year warranty). As Gorr explained:

> After the last inspection, Arrow masonry came back and applied a second layer of sealant at the entire west-facing wall above the 3rd floor windows, and they applied the same elastomeric sealant to the capstones. I have a moisture meter and will be monitoring the moisture levels in the wood over the next several weeks. I'll also be looking at if there are any other areas of water infiltration. I hope the secondary work resolved it for good the moisture monitoring will help me to determine that.

Plaintiff's Exhibit 41, para. 1).

30. After Gorr's July 13, 2018 email, I never received further communication from John Gorr regarding any further moisture readings or any water intrusion in Unit 3.

31. At no time prior to Plaintiff's filing of this litigation was I informed by anyone, including Gorr, that mold was discovered in Unit 3.

Declarant further sayeth naught.

I, Kelsey Gonring, declare under penalty of perjury that the foregoing is true and correct.

Executed 7/27/2023

Kelsey Gonring