**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MELINDA SGARIGLIA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-cv-05684 |
| v. | ) | |
| | ) | Honorable Robert W. Gettleman |
| AMERICAN INTERNATIONAL | ) | |
| RELOCATION SERVICES, LLC, d/b/a | ) | Magistrate Judge Gabriel A. Fuentes |
| AIRES, an Illinois limited liability | ) | |
| company, NICHOLAS GONRING, and | ) | Jury Demanded |
| KELSEY GONRING, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NICHOLAS GONRING and KELSEY | ) | |
| GONRING, | ) | |
| | ) | |
| Third Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 2726 WEST CORTEZ CONDOMINIUM and | ) | |
| JOHN GORR, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## DEFENDANTS NICHOLAS GONRING AND KELSEY GONRING'S RESPONSE TO PLAINTIFF'S LR 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS

### PARTIES AND JURISDICTION

1.     Plaintiff is a resident of the State of Illinois residing at the property located at 2726 West Cortez Street, Unit 1, Chicago, Illinois (hereinafter, "Unit 1").  Second Amended Complaint (Dkt. #44).

**RESPONSE: Admitted.**

2.     Defendant American International Relocations Services, L.L.C. ("AIRES") is a limited liability company whose Global Headquarters is located in Pennsylvania. (Defendant

AIRES website, attached as Exhibit 1).

**RESPONSE: Admitted.**

3.      On June 20, 2019, Plaintiff Melinda Sgariglia (hereinafter, "Sgariglia") filed a 3-Count Verified Complaint after purchasing a Chicago condominium from Defendants.  Sgariglia filed for a violation of the Illinois Residential Real Property Disclosure Act, 76 ILCS 77/35 et seq., ("Disclosure Act"), Fraudulent Concealment and Breach of Contract.  Sgariglia's Complaint is a detailed analysis of the facts as required under the Illinois Code of Civil Procedure.  (See Complaint, attached as Exhibit 2).

**RESPONSE: Disputed. Plaintiff's Complaint is not a detailed analysis of the facts of this case.**

4.      On March 26, 2020, Plaintiff filed a 1st Amended Verified Complaint. (See Complaint, attached as Exhibit 3).

**RESPONSE: Admitted.**

5.      On April 29, 2020, Plaintiff filed a 2nd Amended Verified Complaint, alleging in Count I violation of the Illinois Residential Real Property Disclosure Act, 76 ILCS 77/35 et seq., ("Disclosure Act") against the Defendants Nicholas and Kelsey Gonring; Count II as Fraudulent Concealment against Nicholas and Kelsey Gonring and Breach of Contract; Count III as Fraudulent Concealment against American International Relocation Services (AIRES).  (See 2nd Am. Complaint, attached as Exhibit 4).

**RESPONSE: Admitted.**

6.      The Court has jurisdiction over this matter because the parties are domiciled in different states and the amount in dispute exceeds Seventy Five Thousand Dollars ($75,000.00). (See 2nd Amended Complaint, attached as Exhibit 4).

**RESPONSE: Admitted.**

2

**DEFECTS, CONSTRUCTION AND REPAIRS OF 2726 WEST CORTEZ STREET**

7.      Since approximately May 2016, Defendants Nicholas and Kelsey Gonring (together, "the Gonrings") owned the property located at 2726 West Cortez Street, Chicago, IL, Unit 1.  The PIN is 16-01-408-055-1001. (See Warranty Deed, attached as Exhibit 5).

**RESPONSE: Disputed. The Gonrings conveyed title to Unit 1 of the property located at 2726 West Cortez Street, Chicago, IL to Plaintiff on July 25, 2018. (See Warranty Deed, Plaintiff's Exhibit 5).**

8.      The subject of the Plaintiff's lawsuit is the property located at 2726 West Cortez Street, Chicago, Illinois, which is a 3 story condominium structure that is self managed by the owners.  (See MLS listing, attached Exhibit 6).

**RESPONSE: Disputed. The subject of Plaintiff's lawsuit concerns Unit 1 of the property located at 2726 West Cortez Street, Chicago, Illinois. On July 25, 2018, the Gonrings only conveyed Unit 1 to Plaintiff, not the entire property. (See MLS listing, Plaintiff's Exhibit 6).**

9.      On or about October 15, 2017, the 2726 West Cortez Condo Association filed a claim with Erie Insurance Group.  (See Gonrings' Answers to Interrogatories, attached as Exhibit 7, ¶5).

**RESPONSE: Disputed. The Gonring's answer to interrogatory 5 states in relevant part: "on or about October 9, 2017, the 2726 West Cortez Condominium Association ("the Association") submitted a claim to Erie Insurance Group . . . to determine the cause of water infiltration <u>occurring in Unit 3</u> of 2726 W. Cortez St., Chicago, IL 60622." (See Gonrings' Answers to Interrogatories, Plaintiff's Exhibit 7, ¶5)(emphasis added).**

10.      Pursuant to a condominium insurance claim, a structural engineering firm named Engineering Systems, Inc. ("ESI") inspected the Structure located at 2726 West Cortez, Chicago, IL ("Structure") and generated a report that identifies the inspection date as October 19, 2017.  (See ESI Report, attached as Exhibit 8, with date of inspection on page 3).

**RESPONSE: Disputed. The report states: "ESI was retained to determine the cause of water**

infiltration <u>occurring in Unit 3</u>, which is owned by John Gorr." (See ESI Report, Plaintiff's Exhibit 8, page 3) (emphasis added). The other units of the structure were not inspected by ESI. (*Id.*).

11.     On November 9, 2017, the Association had a meeting discussing water issues from split faced block and the "need to tuckpoint the entire building…" (See Nov. 9, 2017 meeting minutes, attached as Exhibit 9).

**RESPONSE: The Gonring's admit the allegations in contained in paragraph 12. Further answering, the Nov. 9, 2017, meeting minutes also state: "JG [John Gorr] having leaks above some windows, and near back door" of Unit 3. (See Nov. 9, 2017, meeting minutes, Plaintiff's Exhibit 9).**

12.     On November 29, 2017, Erie Insurance, the insurance company for the Association, sent an email to John Gorr, as President of the Association and owner of Unit 3, which included a report from a ESI. (See Erie Letter, attached as Exhibit 10; see also ESI report, attached as Exhibit 8).

**RESPONSE: Admitted.**

13.     The Erie letter states that they are responding to a claim by 2726 West Cortez Condo Association that they "submitted for water damage to the building which was discovered on October 9, 2017…" (See Letter, attached as Exhibit 9).

**RESPONSE: Plaintiff's Exhibit 9 is Nov. 9, 2017, meeting minutes, not a letter from Erie Insurance. Assuming Plaintiff intended to cite Exhibit 10, a letter from Erie Insurance, the Gonring's admit to the allegations in paragraph 13 subject to the clarification that the claim related to a leak in Unit 3 only.**

14.     The Erie letter states that the "structural engineer determined that the water infiltration is occurring because of the deficiencies in the original construction of the building with the predominant issue being improper flashing at wall openings." (See letter, attached as Exhibit 10).

**RESPONSE: The Gonrings admit to the allegation in paragraph 14, subject to the clarification that <u>the ESI report only concerned water issues in Unit 3</u>, not the**

**remaining units (See ESI Report, Plaintiff's Exhibit 8, page 3).**

15.     The ESI Report further states that Erie retained the structural engineer "in regard to an issue with water infiltration occurring in a multi-family residential Structure.  The Structure, managed by 2726 W. Cortez Street Condo Association, was located at 2726 W. Cortez Street in Chicago, Illinois."  (See Exhibit 8, page 2).

**RESPONSE: Disputed. The quotation is inaccurate. Plaintiff capitalization of the term "structure," as if to give it a defined meaning, is not accurate. By way of further response the ESI report only concerned water issues in Unit 3, not the remaining units. Further answering, the sentence in the report following Plaintiff's allegations in paragraph 15 states: "ESI was retained to determine the cause of water infiltration <u>occurring in Unit 3</u>, which is owned by John Gorr." (See ESI Report, Plaintiff's Exhibit 8, p. 3) (emphasis added). Significantly, the structure as a whole was not inspected by ESI. *Id.***

16.     The ESI Report also states that based upon an inspection, "Water infiltration is occurring at various locations of the structure, but particularly at window and door openings."  (See Exhibit 8, page 5).  It also found that water infiltration was occurring "because of deficiencies in the original construction of the building with the predominate issue being improper flashing at wall openings."  (See Exhibit 8, page 5).  The report further notes that the problem has occurred since the original construction of the building.  Id.

**RESPONSE: Disputed. The scope of the report referenced in paragraph 16 was exclusive to Unit 3, not the structure as a whole.**

17.     On December 4, 2017, John Gorr sent the Erie letter and ESI Report to the owners of Unit 1, Defendants Nicholas and Kelsey Gonring, by electronic mail.  (See December 4, 2017 email, attached as Exhibit 11).

**RESPONSE: The Gonrings admit to the allegation in paragraph 17. Further answering, the email begins stating: "[h]ey guys, just wanted to forward the results of the inspection from the building insurance claim I put in for <u>the water damage in my unit</u>. The conclusion that the engineer came to was that the water damage is due to improper flashing <u>at my windows and doors</u>." (See December 4, 2017 email, Plaintiff's Exhibit 11) (emphasis added).**

18.     On December 7, 2017, John Gorr sent Defendants Gonring another email with attachments containing estimates from Best Brickmasters, Pioneer Tuckpointing, The Building Doctor as well as a history of the Structure's water infiltration.  (See Group Exhibit 12).   Gorr's statement about water infiltration includes, "2015 Continued to have leaks above all windows and doors on all facades during heavy rains." (See Exhibit 12, page 15).

**RESPONSE: Disputed. The email attachments are in reference to Unit 3's windows, doors, and water infiltration problems, not the structure as a whole. (See Plaintiff's Exhibit 12). Further, Gorr's December 4, 2017 email was the first notice to the Gonrings of any significant water infiltration into Gorr's Unit 3 (See Gonring Statement of Additional Material Facts).**

19.     On December 8, 2017, John Gorr informed the Gonrings, "the building is letting in water, it just happens to be coming in above my windows because thats [sic] where the water pools after its [sic] inside the masonry."  (See December 8, 2017 email, attached as Exhibit 13).

**RESPONSE: The Gonrings admit to the allegations in paragraph 19 but further clarify that Plaintiff's exhibit includes mention that windows and doors are <u>not</u> common elements of the building and are exclusively the responsibility of the unit's owner to maintain and repair. (See December 8, 2017 email, Plaintiff's Exhibit 13).**

20.     On December 12, 2017, John Gorr sent the Gonrings an estimate from D/R Services Unlimited, where Mr. Gorr states that "a great deal of tuckpointing is needed" while suggesting "flashing of the capstones and lintels" in addition to sealing and venting the building.  (See December 12, 2017 email, attached as Exhibit 14).

**RESPONSE: Admitted, but Plaintiff's Exhibit 14 does not contain the referenced quote.**

21.     On February 5, 2018, Mr. Gorr sent the Gonrings a quote from Bral Restoration. On February 14, 2018, Mr. Gorr followed up with more information as to exploratory work by Bral Restoration.  (See Feb. 5 & 14, 2018 email, attached as Exhibit 15).

**RESPONSE: Admitted.**

22. On February 20, 2018, Defendant Kelsey Gonring sent an email to John Gorr, expressing her alarm at the "extent and history of your water infiltration issues" and the "magnitude of the problem." (See February 20, 2018 email, attached as Exhibit 16). Ms. Gonring also wrote that "Nick and I were not made aware of this issue – present since 2012 – upon our purchase of our unit in 2016. In fact, as part of the purchase, we were given a signed document stating that no issues with any of the units had been raised with the HOA and no documented common element work had been done or was expected to be done in the next 2 years." (See Exhibit 16). Ms. Gonring complains about work Mr. Gorr did without HOA consent and further writes that "if we were aware of this issue upon purchase, our negotiation would have been conducted quite differently." (See Exhibit 16).

**RESPONSE: The Gonrings admit to the allegations in paragraph 22. Further answering, Ms. Gonring went on to say: "[g]iven the amount of interior, unit specific, exploratory work (drywall, windows) that needs to be completed, we are not comfortable with the HOA covering this cost. Once the issue is properly diagnosed, we intend to review each issue individually and in the context of the HOA guidelines, <u>specifically what is considered 'common elements' and what is unit owner responsibility</u>." (See Plaintiff's Exhibit 16) (emphasis added).**

23. On February 22, 2018, Mr. Gorr informs the Gonrings that the problem is "not unit-specific" and that "the building is leaking" and not simply Mr. Gorr's unit. (See Feb. 22, 2018 email, attached as Exhibit 17). Mr. Gorr further explains that the problem is "likely due to some of the following: Capstones on parapet. Improper flashing above windows and doors. Improper flashing between floors. Tuckpointing cracks. Lack of cavity wall. Improper weepholes. Water absorbed through split-face block. Roof damage." Mr. Gorr states, "The fact remains we have a building that is leaking… Water is in the structure and probably mold as well…. If you talk to a contractor, it is clearly a building issue…: (See Exhibit 17).

**RESPONSE: The Gonrings admit the quoted portions of paragraph 23 are in the email sent**

PFS:008071.0001.3142081.1

by Mr. Gorr, further adding that in response to the Gonrings being unaware of prior water issues, Mr. Gorr responded: "I highly doubt Matt/Stacy tried to hide any of this information, <u>they probably just thought it was resolved</u>." (emphasis added). He further states: "I'm sorry you guys have [to] pay into a problem that <u>doesn't have obvious evidence in your unit</u>." (See Plaintiff's Exhibit 17).

24.     On March 6, 2018, Mr. Gorr received a quote from Bral Restoration for "Masonry Inspection at Façade and Interior units."  (See March 6, 2018 Bral quote, attached as Exhibit 18). On the same date, Bral Restoration prepared a 2nd quote for CMU Tuckpointing and Modac Application on West, North and East elevations.  (See March 6, Bral quote II, attached as Exhibit 18).

**RESPONSE: The Gonrings admit to the allegations in paragraph 24. Further answering, the quote specifically mentions that the work will be done on a specific unit, identified as Unit 3. (See March 6, Bral quote II, Plaintiff's Exhibit 18).**

25.     On March 19, 2018, the Association had a meeting to move forward with exploratory work, and this incurred a special assessment.  (See March 19, 2018 minutes, attached as Exhibit 19).

**RESPONSE: Admitted. Further answering, that the "purpose" of the exploratory work discussed in the March 19, 2018, was to "determine if water infiltration within Unit #3 is considered a Common Element or Unit issue according to the Condo Association Bylaws." (See March 19, 2018 minutes, Plaintiff's Exhibit 19).**

26.     On March 30, 2018, Mr. Gorr received a quote from Gralak Tuckpointing for "Exterior walls renovation/ waterproofing endeavor."  (See March 30, 2018 Gralak quote, attached as Exhibit 20).  The Gralak quote is for two coats of water repellant. However, the quote warns that "Enviroseal PBT will not inhibit water penetration through unsound or cracked surfaces or surfaces with defective flashing…"  In addition, the warranty "does not apply to moisture penetration or damages caused by structural defects…"  (See Exhibit 20, page 3).  Additional work includes installation at the inner parapet wall counter flashing," elastomeric flashing system underneath 3 sides of the parapet wall coping stones" and tuckpointing.  (See Exhibit 20, page 5).  Gralak also

recommended installing "the flashing systems (top and bottom) at the top lintel beam areas of window and door openings…," "thru wall flashing system at all building levels," "applying caulking on all windows, doors and metal frames" and "new counter flashing systems at the parapet wall." (See Exhibit 20, page 7).

**RESPONSE: Disputed. Plaintiff exaggerates the contents of and selectively quotes from (often without citation) this lengthy exhibit.**

27.    On May 3, 2018, Bral Restoration gave the Association a quote that stated that the stated that "existing flashing was through wall that allowed water to penetrate right into the back of the block." This is considered a construction defect. (See Affidavit of Steve Hier, attached as Exhibit 24). On the same day, John Gorr sent the report, along with an invoice and proposal, to the Defendant Gonrings. (See May 3, 2018 email and its exhibits, attached as Exhibit 21).

**RESPONSE: Disputed. Bral did not conclude its work with a finding of a construction defect. Furthermore, the quote submitted by Bral for repair work did not include flashing. As detailed in the Bral quotation, contained within Plaintiff's Exhibit 21 at Gorr bates pages 217-2019, Bral quoted $49,821 for tuckpointing and application of Modac coating, together with "Work Option A" for application of Chem-Trete water repellant for an additional $38,700. There is no mention of flashing because Bral concluded as follows in its cover letter to the above-referenced quotation:**

> **It was decided to not continue with reviewing any further window or door openings besides these two. It was explained that installing a cavity wall system over just the masonry openings and allowing a proper through wall flashing system to be installed _would not prevent water from penetrating at locations in between the openings_.**

> **A previous proposal included as needed repointing and application of 2 coats of Modac was modified to include the application of 1 coat of Chem-Trete as an alternative.**

> **Further, Gonrings object to the Hier affidavit for lack foundation. The affidavit does not even indicate that Mr. Heir inspected the building and, further, whether he reviewed the Bral quotation, which lacks any reference to flashing.**

PFS:008071.0001.3142081.1

28.     Defendant Kelsey Gonring admits that she contacted a company called Arrow Masonry and obtained a quote.  (See Gonring Answers to Interrogatories, ¶8, Exhibit 7).  At a meeting of the Condo Association on May 7, 2018, Defendant Kelsey Gonring signed a contract with Arrow Masonry.  (See May 7, 2023 Minutes, attached as Exhibit 22; see also May 7, 2018 Arrow quote, attached as Exhibit 23).

**RESPONSE: Disputed. Ms. Gonring contacted Arrow Masonry and signed the contract "on behalf of the Association," not individually. (See Gonring Answers to Interrogatories, ¶8, Plaintiff's Exhibit 7; See May 7, 2023 Minutes, Plaintiff's Exhibit 22).**

29.     The Arrow Masonry quote includes work such as "Pac-clad flashing will be installed above all 3 rear decks." Further, the Arrow quote provides that  all "Renaissance stone or limestone interface joints at the top of the parapet walls or above the window and door headers on all 3 elevations will be ground out, primed, caulked and tooled."  (See Exhibit 23).

**RESPONSE: Admitted that Plaintiff selectively and incompletely quotes portions of Exhibit 23. Further answering, the quote provides a 5-year guarantee on material and labor. (See Plaintiff's Exhibit 23).**

30.     Arrow Masonry provided a scope of work that failed to address this issue related to the flashing, which would have required removing the concrete blocks and installing the flashing correctly.  (See Affidavit of Steve Hier, attached as Exhibit 24; see also Arrow Masonry quote, attached as Exhibit 23).

**RESPONSE: Disputed. The response to paragraph 27 is incorporated here by reference.**

31.     Other quotes that the Defendant Gonrings obtained stated that more work was required than the quote provided by Arrow.  Specifically, the May 3, 2018 Bral quote in the "Water Leak Investigation Results" states that the "existing flashing was through wall that allowed water to penetrate right back into the back of block."  Bral also concluded that "installing a cavity wall

system over just the masonry openings and allowing a proper through wall flashing system to be installed would not prevent water from penetrating at locations in between the openings." (See May 3, 2018 Bral letter, attached as Exhibit 21). The Arrow Masonry quote failed to remedy the issues identified by Bral. (See Affidavit of Steve Hier, attached as Exhibit 24).

**RESPONSE: Disputed. The response to paragraph 27 is incorporated here by reference.**

32.     The March 30, 2018, quote from Gralak Tuckpointing recommended work that was not within the scope of work for Arrow. (See May 7, 2018 Arrow Masonry Contract, attached as Exhibit23; see also May 30, 2018 Gralak Tuckpointing quote, attached as Exhibit 20).

**RESPONSE: Disputed. The Gralak Tuckpointing quote is lengthy and confusing and Gonrings object to a lack of foundation for Plaintiff's allegation and characterization (i.e. "recommended work"), which Plaintiff fails to specify or support.**

33.     The work performed by Arrow Masonry addressed none of the issues addressed in the site inspection on October 19, 2017, when ESI determined that "water infiltration is occurring because of deficiencies in the original construction of the building with the predominate issue being improper flashing at wall openings." (See ESI Report, Exhibit 8; see also Affidavit of Steve Hier, attached as Exhibit 24).

**RESPONSE: Disputed. ESI recommended further evaluation, which was conducted by Bral and Bral concluded that flashing would not prevent water penetration; thus Bral submitted a proposal for tuck-pointing and water proofing. By way of further answer, Gonrings incorporate by reference their response to paragraph 27.**

34.     Defendant Kelsey Gonring claims that as of May 17, 2018, she was aware of no defects to the Condominium. (See Gonring Answer to Interrogatories, Exhibit 7, ¶10).

**RESPONSE: Disputed. Ms. Gonring's answer to ¶10 states: "Ms. Gonring objects to Interrogatory No. 10 to the extent that it calls for a narrative response that is more appropriate for a deposition. Subject to and without waiver of this objection and the general objections set forth above, none." Plaintiff's allegation**

11

**in paragraph 34 mischaracterizes Ms. Gonring's response.**

35.    Arrow Masonry identified work to windows, doors, as well as to the 3 rear decks, to which Pac-clad flashing was to be installed.  (See Exhibit 23).   These are all limited common elements.  (See Bylaws, attached as Exhibit 25, page 4-5, ¶1(k)).

**RESPONSE: Disputed. The Arrow Masonry scope of work related to spot grinding, spot tuckpointing, caulking, flashing installation, and sealing of the east, west, and north elevations of the split face block, not work to windows, doors, or decks. See Plaintiff's Exhibit 23.**

36.    The Condo Association Declaration provides the following definitions:

(f) *Common Elements.* All portions of the Property except the Units, including the Limited Common Elements and the Parcel. The Common Elements include, without limiting the generality of the foregoing, any of the following items located at the Property: the land, foundations, walls, entrances and exits, hallways, basement, mailboxes, roof, pipes, ducts, flues, shafts, electrical wiring and conduits (except pipes, ducts, flues, shafts, electrical wiring and conduits situated entirely within a Unit and serving only such Unit), public utility lines, structural pans of the Building, all outside walks and driveways, and all other portions of the property except the individual Units. Structural columns located within the boundaries of a Unit shall be part of the Common Elements. Any references to "Common Elements" appearing on the Plat (except references to Limited Common Elements) shall not be limiting in any way, nor shall any reference define the Common Elements in any way.

(k) *Limited Common Elements.* (i) The part of the Common Elements contiguous to and serving a single Unit exclusively as an inseparable appurtenance thereto including specifically balconies, decks, porches and such portions of the perimeter walls, floors and ceilings, windows, doors and all fixtures and structures therein which lie outside the Unit boundaries; (ii) pipes, ducts, flues, shafts, electrical wiring or conduits or other systems or component parts thereof which serve a Unit exclusively to the extent such systems or component parts are located outside the boundaries of a Unit; (iii) any portion of the Common Elements so designated in this Declaration or on the Plat (as hereinafter defined) as being reserved for the use of a certain Unit or Units to the exclusion of other Units; (iv) parking spaces as delineated on the Plat as, respectively, P-1 (which shall be appurtenant to Unit 1), P-2 (which shall be appurtenant to Unit 2) and P-3 (which shall be appurtenant to Unit 3); (v) rooftop decks, rights to rooftop areas or storage lockers assigned to a particular Unit either as shown on the Plat of Survey or delineated herein,; and (vi) any other portion of the Common Elements which by the terms of this Declaration or by its nature or location is clearly intended to serve exclusively a certain Unit or Units (but less than all of the Units).

See Exhibit 25.

**RESPONSE: On the presumption that Plaintiff accurately quotes the bylaws, admitted.**

37.     On May 17, 2018, Defendant Gonrings signed a listing agreement to sell their Unit with Coldwell Banker, and including Garrett Luehrs as the Broker/ Seller's designated Agent/ Licensee. (See Exhibit 26).

**RESPONSE: Disputed. On May 18, 2018, the referenced listing agreement was signed by the Gonrings. (See Plaintiff's Exhibit 26).**

38.     On May 19 and 21, 2018, respectively, the Gonrings filled out and executed an ILLINOIS REALTORS ® RESIDENTIAL REAL PROPERTY DISCLOSURE REPORT pursuant to 765 ILCS 77/35 (the "First Disclosure Report"). (See Real Property Disc. Report, attached as Exhibit 27). The effective date of the First Disclosure Report is May 17, 2018. (See Exhibit 27).

**RESPONSE: Admitted.**

39.     The disclosure form asks Defendant Gonrings to disclose whether they were aware of defects in the foundation, and "leaks or defects in the roof" and also "material defects in the walls, windows, doors or floors." The Defendant Gonrings answered, "no." (See Exhibit 27).

**RESPONSE: Disputed. Plaintiff misquotes the form. The relevant parts ask if the Gonrings were: "aware of leaks or material defects in the roof, ceilings, or chimney," and if they were aware of "material defects in the walls, doors, or floors." Further, the disclosure form makes clear that the form refers only to Unit 1, as the first note at the bottom of the report specifically states: "[t]hese disclosures are not intended to cover the common elements of a condominium, but only the actual residential real property including limited common elements allocated <u>to the exclusive use thereof that form an integral part of the condominium unit</u>." (emphasis added). (See Plaintiff's Exhibit 27). By way of further answer, the Gonrings appropriately and accurately filled out the disclosure form.**

40.     The Arrow quote requires a "deposit of 50% and/or bona fide purchase order is required with the acceptance of the contract and before any commencement of work." (See Exhibit 23).

**RESPONSE: Disputed. The referenced quote is three pages and Plaintiff fails to identify the**

PFS:008071.0001.3142081.1

**paragraph number for the referenced quotation. By way of further answer, the end of the quote makes reference to a 50% deposit.**

41.     Arrow received the 50% Condo Association payment on May 30, 2018.  (See June 4, 2018 invoice from Arrow, attached as Exhibit 28).  The Gonrings admit they paid their share of the deposit on May 30, 2018, while paying the balance on June 8, 2018. (See Gonrings' Answers to Interrogatories, Exhibit 7, ¶11).

**RESPONSE: Admitted.**

42.     Defendant Gonrings admit that Arrow started work on May 31, 2018 and completed the work on June 6, 2018.  (See Gonrings' Answer to Interrogatories, Exhibit 7, ¶12).  The Defendant Gonrings completed the May 17, 2018 First Disclosure Report 14 days before Arrow started its work on the Structure.  (See Exhibit 27).

**RESPONSE: Admitted.**

43.     On May 21, 2018, Defendant Gonrings listed their Unit on the MLS with Garrett Luehrs as their agent.  (See Exhibit 6).

**RESPONSE: Admitted.**

44.     On May 29th and May 30th, 2018 respectively, the Gonrings signed the Seller's Property Disclosure Statement which was prepared by AIRES (the "Second Disclosure Report"). (See Second Disclosure Report, attached as Exhibit 29).

**RESPONSE: Admitted.**

45.     As the Second Disclosure Report sought information about the Building as a whole and not just the Unit, as part of the Second Disclosure Report, the Gonrings disclosed that they were aware of past water leakage in the house or other structures, while stating that that "Unit 3 had leaks on west facing windows. HOA sealed building to resolve Unit 3 leak."  (See 2nd Disclosure Report, Exhibit 29, page 2 of 7). When asked if they were aware of any past or present

14

"deterioration or other problems with the walls, foundations or other structural components," the

Defendant Gonrings answered "no." (Exhibit 29).

**RESPONSE: Admitted. By way of further answer, the Gonrings disclosed, in section 6 "Structural Items," that "Unit 3 had leaks on west facing windows. HOA sealed building to resolve Unit 3 leak." The Gonrings further referenced, on page 5 of the form, "[t]uckpointing & sealing of Building exterior." (Plaintiff's Exhibit 29).**

46.     The Second Disclosure Report was completed on the same day that Arrow received

the 50% deposit from the Association and before they completed their work on the Structure but

before any work commenced. (See Exhibit 28; see also Exhibit 29).

**RESPONSE: Admitted. Gonrings object to Plaintiff's use of the term "Structure," which is again capitalized as if to give it some defined meaning and suggesting, falsely, that Arrow was fixing the structure of the building. That is false. The work being done by Arrow was maintenance, which had been deferred by the HOA while John Gorr alone addressed the water leaking into his Unit 3. The Arrow quotation was more extensive than Bral and, unlike the Bral quote, was backed by a 5-year guarantee.**

47.     Defendant Gonrings never mentioned in the 2nd Disclosure Report that Arrow would

perform work on all 3 rear decks, that or that work would be performed throughout the entire

Structure. (See 2nd Disclosure Report, Exhibit 29).

**RESPONSE:  Disputed. First, Plaintiff again improperly uses the word "structure," then capitalizes it as if to suggest a defined term. Second, the Arrow quote does not include work on all 3 rear decks (See Plaintiff's Exhibit 23). Third, the Gonrings disclosed "[t]uckpointing & sealing of Building exterior." (Plaintiff's Exhibit 29, p. 5).**

### CONTRACT WITH PLAINTIFF MELINDA SGARIGLIA

48.     On June 7, 2018, AIRES signed a listing agreement with Coldwell Banker to use

Garrett Luehrs as their broker and exclusive agent for the sale of the Unit. (See June 7, 2018

contract, attached as Exhibit 30).

**RESPONSE: Disputed. The referenced agreement bears the date of June 8, 2018 for AIRES.**

15

49. The next day, on or about June 8, 2018, AIRES entered into a Condominium Real Estate Purchase and Sale Contract with Plaintiff (the "Contract"). (See Contract, attached as Exhibit 31).

**RESPONSE: Disputed. AIRES signed both documents on June 8, 2018.**

50. When Plaintiff Sgariglia's lawyers obtained a copy of the contract, they also received the First and Second Disclosure. (Hawbecker Dep, page 53-54, attached as Exhibit 32).

**RESPONSE: Admitted.**

51. On June 14, 2018, Defendant Kelsey Gonring sent Mr. Gorr an email, attaching the 22.1 that they received for their unit. (See June 14, 2018 email, attached as Exhibit 33). In the email, Ms. Gonring instructs Mr. Gorr that there does not "seem like there is a question pertaining to leaks there would be no need to go into detail about issues in your unit or the building." (See Exhibit 33). Ms. Gonring further states that there it was not necessary "to go into a detailed history of how and why" the Association decided to hire Arrow." (See Exhibit 33).

**RESPONSE: Disputed. Kelsey Gonring never "instructed" Mr. Gorr to do anything and only discussed the scope of the questions in the letter. (See Plaintiff's Exhibit 33). Further Ms. Gonring states that she would draft a document "stating our decision to hire Arrow following a recommendation to seal the building and the percentage breakdown per unit for that work." (*Id.*)**

52. The June 14, 2018 email also states that the Association agreed they would only release the May 7, 2018 meeting minutes. (Exhibit 33). Although paragraph 8 of the 22.1 calls for a "copy of the Board Minutes showing capital expenditures and/or approved of special assessments enclosed," The Association never gave the March 19, 2018 meeting minutes to counsel for Plaintiff, Thomas Hawbecker. (Exhibit 32, Hawbecker Dep., page 121-122). The March 19, 2018 meeting minutes show capital expenditures of $4,000.00, with a special assessment broken down for each unit. (See Exhibit 19). They also failed to turn over the November 9, 2017 meeting minutes where

16

financing through a special assessment was approved.  (See Nov. 9, 2017 meeting minutes, attached as Exhibit 9).

**RESPONSE: Disputed. Plaintiff mischaracterizes the email, the contents of which speak for itself. The provided Exhibit references the May 7, 2018 meeting as responsive to minutes relating to special assessments that relate to the time period for the sale. (Plaintiff's Exhibit 22). Further, the March 19, 2018 meeting minutes, relating to exploratory work already performed and paid for, does not include agreement on special assessments (financial outcomes were expressly contingent). (Plaintiff's Exhibit 19). Finally, the November 9, 2017 meeting minutes do not approve capital expenditures or special assessments.**

53.     Also part of the Sales Contract is an Addendum to Purchase and Sale Agreement, which identifies AIRES as the Seller.  (See Addendum, attached as 34).

**RESPONSE: Disputed. Plaintiff's Exhibit 34 is incomplete. Only the first page is provided.**

54.     Pursuant to paragraph 15 of the Sales Contract, the attorney modification provision permits proposed modifications to the contract.  (See Exhibit 31, ).  These statements are legally binding.  (See Exh. 32, Hawbecker Dep, page 99-100).  Prior owner statements have no legally binding effect because there is no privity of contract. (Exh. 32, Hawbecker Dep. Page, 100-101).

**RESPONSE: Disputed. Plaintiff again fails to reference an exhibit specifically, here referencing "Exhibit 31, " but with no reference to a specific provision within the Purchase and Sale Contract. Further, Plaintiff's reference to "these statements" is vague and likewise detached from any specific provision. Finally, the characterization of Mr. Hawbecker's testimony, which lacks line citation, is inaccurate.**

55.     Mr. Thomas Hawbecker, as attorney for Plaintiff Sgariglia, testified that attorneys in real estate closings typically have trust in one another, and that attorneys will fully disclose information. (Exh. 32, Hawbecker Dep., 105-106).

**RESPONSE: Disputed. Plaintiff's characterization of Mr. Hawbecker's testimony is again inaccurate.**

56.     Also On June 14, 2018, attorneys for Plaintiff Sgariglia sent an attorney review letter

PFS:008071.0001.3142081.1

to Defendants' attorney.  (See June 14, 2018 letter, attached as Exhibit 35; see also Exh. 32, Thomas

Hawbecker dep, page 17-18).  In paragraph 8, Plaintiff Sgariglia asks the Seller Defendants to

verify that the Condo Association has not experienced any instances of water (interior or exterior)

leaking into the Property and/or any water damage during Seller's ownership of the Property."

Further, in paragraph 9, Plaintiff Sgariglia's attorney asked if there had been "any insurance claims

within the last 5 years" and if there was "any other matter concerning this property or the Seller

that may interfere with the Buyer's enjoyment and marketability of the property."  The letter also

seeks the last 12 months of meeting minutes.  (Exhibit 35, ¶8d).  Mr. Hawbecker testified that he

only received the May 7, 2018 meeting minutes.  (See Exh. 32, Hawbecker Dep., page 123).

**RESPONSE: Disputed. The June 14, 2018 letter was sent to counsel for AIRES, not "Defendants' counsel." Paragraph 8 (e) states: "[p]lease verify that the Condo Association has not experienced any instances of water (interior or exterior) leaking into the Property and/or any water damage during Seller's ownership of the Property. If there have been any such occurrences, please provide dates, locations, damage and any repairs made." (See June 14, 2018 letter, attached as Plaintiff's Exhibit 35) (emphasis added). As confirmed by Plaintiff's real estate attorney, Thomas Hawbecker, the term "Property" under the Purchase Agreement is defined as Unit 1, not the entire structure. (See Gonrings' Statement of Additional Facts, ¶7). As to the allegation relating to paragraph 9, the paragraph specifically states: "[s]ellers have not made any insurance claims within the last 5 years." *Id.* (emphasis added).**

57.     On June 18, 2018, Defendant AIRES' attorney responded to the letter, identifying

the Seller as Aires, and refused to answer paragraphs 8e, 9a and 9e, claiming that as a relocation

company, they are unable to make any representation or warranties beyond its factual report.  (See

June 18, 2018 letter, attached as Exhibit E.)  They also answered paragraph 8d with a recitation of

Section 22.1 of the Illinois Condominium Act.  (See Exhibit 36).

**RESPONSE: Disputed. Plaintiff's reference to Exhibit E is wrong. The appropriate exhibit is Plaintiff's Exhibit 36.  Further, Plaintiff mischaracterizes AIRES' response.**

58.     Thomas Hawbecker as attorney for Plaintiff assumed that AIRES was obtaining the

information they provided from a relocation representative who would give answers to their attorney. (See Exh. 32, Hawbecker Dep, page 27).

**RESPONSE: Disputed. Mr. Hawbecker testified that, in his experience, relocation representatives "can't disclose in response to inspection requests." (Plaintiff's Exhibit 32, Hawbecker Dep., p. 27, lines 15-21).**

59.     Thomas Hawbecker assumed that as a relocation company, the Gonrings would have transferred the property to AIRES and that AIRES was the owner. (See Exh. 32, Hawbecker Dep, page 30-31; 50, 56).

**RESPONSE: Disputed. Attorney Thomas Hawbecker knew "from the inception of this matter that this was a relocation situation where the relocation company [American International Relocation Services, or "AIRES"] is going to be the buyer from the Gonrings and then the relocation company [AIRES] is going to be the seller to Melinda [Plaintiff]." (Plaintiff's Exhibit 32, Hawbecker Dep., p. 56, lines 7-11). This knowledge was derived from the AIRES disclosure form that lists the Gonrings as sellers and both AIRES and the Plaintiff as buyer. (Plaintiff's Exhibit 32, Hawbecker Dep., p. 55, line 23 to p. 56, line 6).**

60.     Thomas Hawbecker testified that typical protocol for relocation companies is to have simultaneous deeds at closing. (See Exh. 32, Hawbecker Dep, page 31-32, 56).

**RESPONSE: Admitted.**

61.     The only time Mr. Hawbecker has seen a deed bypass a relocation company was in this sale. (See Exh. 32, Hawbecker Dep., page 58).

**RESPONSE: Disputed. After being asked: "[b]ut the title commitment AIRES wasn't on it when you received it, right?" Mr. Hawbecker specifically states: "Yeah, correct. But that's not – That's not atypical mind you." (Dep page 31:9-12). Further, Mr. Hawbecker stated: "I would just say it's more often than not, and what I'm accustomed to seeing are two deeds. I mean, that's as good of an answer as I can give you." (Plaintiff's Exhibit 32, 58:7-17).**

62.     Mr. Hawbecker testified that AIRES held itself out to be the owner because it was the Seller. (See Exh. 32, Hawbecker Dep, page 33-34; 49; 111).

**RESPONSE: Disputed. Gonrings further incorporate by reference their response to**

paragraph 59.

63.     Mr. Hawbecker testified that as he asked for information from the "prior owner" he assumed conveyance had already taken place from The Gonrings to AIRES.   (See Exh. 32, Hawbecker Dep, page 36-37; 106).

**RESPONSE: Admitted, subject to Mr. Hawbecker's realization from the beginning that two transactions were taking place, one from Gonrings to AIRES and one from AIRES to Plaintiff. The Gonrings incorporate by reference their response to paragraph 59 above.**

64.     Mr. Hawbecker testified that had AIRES informed him that they were not the owners, the attorney review questions and correspondence would have been different, and he would not have accepted AIRES' representations. (See Exh. 32, Hawbecker Dep, page 41-42; 44-45, 47, 63, 105).

**RESPONSE: Disputed. Plaintiff cites to seven pages and fails to cite to a specific page and line reference. Further answering, Mr. Hawbecker admits that he could have asked AIRES or the Gonrings about who retained title to Unit 1. (Plaintiff's Exhibit 32, Hawbecker dep., p. 42 lines 16-23). Furthermore, in the end, if Mr. Hawbecker gets a title commitment from the title company that insures his client, that is what he is most concerned with. (Plaintiff's Exhibit 32, Hawbecker dep., p. 41, lines 13-17).**

65.     On June 22, 2018, Mr. Hawbecker reiterated his request for information under paragraphs 8e, 9a and 9e.  (See June 22, 2018 letter, attached as Exhibit 37). Under paragraph 8e and 9a, Mr. Hawbecker for Plaintiff Sgariglia requested Defendant AIRES to contact the "prior owner" for information about water damage or leaking and insurance claims. (See Exhibit 37).

**RESPONSE: Disputed. Exhibit 37 is not Mr. Hawbecker's correspondence, but rather, June 18, 2018 correspondence from Sarah Wilkins.**

66.     On July 2, 2018, Defendant AIRES responded and identified themselves as the Seller, and that they have no knowledge of any leaks "when the information reported in the Residential Real Property Disclosure Report or other homeowner provided disclosures makes no

20

mention of water infiltration issues within the Property."  (See July 2, 2018 letter, attached as Exhibit 38.)

**RESPONSE:  Disputed. Plaintiff again fails to cite to a specific paragraph in Exhibit 38, which is an enumerated paragraph letter. By way of further answer, Plaintiff's counsel ascribes their assent to nearly all of the enumerated paragraphs in Exhibit 38 with an "Ok" next to each. Further answering, the subject of the letter clearly indicates "2726 West Cortez Street Unit 1, Chicago, IL 60622" as the "Property". (See July 2, 2018 letter, Plaintiff's Exhibit 38). (emphasis added). Further answering, Unit 1 did not have water infiltration issues.**

67.     In the same letter, Defendant AIRES reports no insurance claims were made against their homeowners' insurance within the last 5 years, and that it, as Seller, reports that the property is not subject to any current or pending complaints."  (See Exhibit 38, para. 8, 10).   Plaintiff again conveyed the information that as a third party relocation company, it is unable to make additional representations or warranties.  (See Exhibit 38, para. 8, 10).

**RESPONSE:  Disputed. Plaintiff includes a closed quotation but no open quotation and then references two paragraphs, 8 and 10 of the correspondence. By way of further answer, paragraph 8 "Seller reports that the homeowners made no claims against their homeowner's insurance within the last five years," which cannot be contested by Plaintiff as false. Similarly, paragraph 10 "Seller reports that the Property is not subject to any current or pending complaints, violations, suits, notices, or other citations," which likewise cannot be contested by Plaintiff as false. Lastly, the letter defines the "Property" as "2726 West Cortez Street Unit 1, Chicago, IL 60622." (See Plaintiff's Exhibit 38) (emphasis added).**

68.     On July 3, 2018, the listing agent, Garrett Luehrs of Coldwell Banker, sends an email to Defendants Gonring, attorneys Terry Wilkins, Sarah Wilkins and Amanda Flucker, as attorneys for AIRES.  (See July 3, 2018 email sent at 6:37 p.m, attached as Exhibit 39.).  Garrett Luehrs represented Defendant Gonrings when they purchased the Unit.  (See Exhibit 7, ¶14).  Mr. Luehrs sent it to "expedite the decision making process."  (Exh. 39).

**RESPONSE: Admitted. By further answer, this related to Plaintiff's demand, as contained in Mr. Hawbecker's responses to AIRES' counsel, see Plaintiff's Exhibit 38:**

**"They buyer requests a $3,000 credit. This is the buyers [sic] final position."**

69.     On July 3, 2018, at 6:59 p.m., Defendant Kelsey Gonring emails attorneys Terry Wilkins, and Sarah Wilkins, all attorneys for AIRES, stating that "Nick and I have reviewed the buyer's response and have decided to agree to the buy's terms ($3,000 closing credit and 125% tax proration) outlined in the attached document." (See July 3, 2018 email, attached as Exhibit 39).

**RESPONSE: Admitted.**

70.     Thomas Hawbecker did not know that Defendant Gonrings were speaking to attorney Wilkins and making the decisions as to closing cost credit and tax prorations. (See Exh. 32, Hawbecker Dep., page 102-105).

**RESPONSE: Disputed. The testimony was objected to based on lack of foundation. (Plaintiff's Exhibit 32, Hawbecker Dep., p. 104, lines 8-14).**

71.     On July 5, 2018, at 11:25 a.m., Defendant Nicholas Gonring sent an email to Ms. Flucker, expressing frustration at the lack of communication with "attorneys that are working on our behalf through Aires" while relaying his "verbal agreement of the buyer's addendum ($3,000 total closing credit and 125% tax proration) and finalize the sale today." (See July 5, 2018 email, attached as Exhibit 39).

**RESPONSE: Admitted that Mr. Gonring expressed his understanding and assumptions.**

72.     After seeing the July 5, 2018, 11:25 a.m. email, Thomas Hawbecker testified that, "It's just sneaky. Very sneaky, right. They're controlling the responses that we're getting, yet shielding behind I'm the relo company, never occupy the property, don't disclose." (Exh. 32, Hawbecker Dep., page 107-109). Mr. Hawbecker testified that he felt deceived that the relationship between the Gonrings and Wilk law counsel was not disclosed. (Exh. 32, Hawbecker Dep., page 109-110).

**RESPONSE: Disputed. Plaintiff's citation to Mr. Hawbecker's testimony is incomplete.**

**Furthermore, the testimony was objected to for lack of foundation.**

73.     Also on July 5, 2018, at 2:08 p.m., Defendant Nicholas Gonring asks "when can we expect our attorneys to approve the addendum that we have verbally come to terms with." He adds, "We need this done today." (See July 5, 2018 email, attached at Exhibit 39).

**RESPONSE: Admitted that this is a selective quotation of an email in which Mr. Gonring is expressing his understanding and assumptions.**

74.     On July 5, 2018, at 2:29 p.m., Amanda Flucker of AIRES asks the Gonrings how they would like her to move forward. (See July 5, 2018 email, attached as Exhibit 39).

**RESPONSE: Admitted. Further answering, Ms. Flucker's question pertained to knowing the appraisal value of the property. (See July 5, 2018 email, Plaintiff's Exhibit 39).**

75.     After seeking a series of answers to The Gonrings questions about the credit, attorney Sarah Wilkins sent an email to the Gonrings and Amanda Flucker, explaining the legal process of attorney review. (See July 5, 2023 emails from 2:35pm to 4:45 p.m., attached as Exhibit 40).

**RESPONSE: Disputed. Exhibit 40 is a multi-page exhibit. It is bates labeled, yet Plaintiff fails to cite to a specific bates page. The referenced emails from 2:35 and 4:45 p.m. are not located in Exhibit 40. The exhibit does include a July 5, 2018 email from Terry Wilkins, Senior Paralegal, to Amanda Flucker and Nicholas Gonring, copy to Kelsey Gonring and Garret Luehrs:**

> **Good Afternoon Amanda:**
>
> **Our office receives direction from you (AIRES). We are not authorized to take direction from a transferee without your input.**
>
> **We will inform the buyer's side.**
>
> **Thank you for your time.**
>
> **Terry**

76.     On July 13, 2018, Mr. Gorr sent an email to the Defendant Gonrings states that moisture was detected at his southwest window after the rain. (See July 13, 2018 email, attached

as Exhibit 41). He advised that "it has been documented as a building issue" and that he would offer to put money in escrow to a potential buyer of his unit for his share of the "future work." (See Exhibit 41).

**RESPONSE: Admitted that this is a selective portion of the email. Further answering, Gorr states: "Arrow [M]asonry came back and applied a second layer of sealant at the entire west-facing wall above the 3rd floor windows, and they applied the same elastomeric sealant to the capstones. I have a moisture meter and will be monitoring the moisture levels in the wood over the next few week. I'll also be looking at if there are any other areas of water infiltrations. I hope the secondary work resolved it for good, the moisture monitoring will help me to determine that." (See Plaintiff's Exhibit 41, first paragraph).**

**Mr. Gorr further details in this email that Bral concluded that flashing was not the problem. He writes: "As recommended in the ESI report, Bral restoration was hired to complete exploratory openings. After exploratory inspection, they concluded that flashing is not the cause of the problem. Their recommendation was to grind/tuckpoint and apply an elastomeric sealant." (Plaintiff's Exhibit 41, bottom of Gorr-00239).**

**Mr Gorr further details as to Arrow Masonry: "Arrow masonry was contracted to complete all of the recommendations based on the Bral report. They tuckpointed and applied elastomeric sealant with a 5-year warranty." (Plaintiff's Exhibit 41, top of page 2, Gorr-00240).**

77. The Defendant Gonrings never produced any revised either the First or Second Disclosure reports or the 22.1 disclosure form.

**RESPONSE: Admitted that no such revised disclosures were required of the Gonrings or the 22.1 disclosure form for the association.**

78. On or about July 25, 2018, Defendants The Gonrings conveyed the Condominium to Plaintiff Sgariglia by Warranty Deed, which was drafted by Sarah Wilkins, the attorney for AIRES. (See Deed, attached as Exhibit 42).

**RESPONSE: Admitted.**

79. Also on July 25, 2018, Defendant Gonrings entered into a Relocation Real Estate Purchase and Sale Agreement. (See July 25, 2018 Agreement, attached as Exhibit 43).

24

**RESPONSE: Admitted that the Gonrings entered into a Purchase and Sale Agreement to sell their condominium Unit 1 to AIRES for $510,000, which is believed to coincide with the closing on the sale from AIRES to Plaintiff.**

80.    In the Relocation Agreement, Defendant AIRES agrees to pay Defendant Gonrings $510,000 and that possession would be delivered on July 25, 2018.  (See Exhibit 43, ¶2, 4).  The Relocation Agreement also requires that "within 10 days of receipt of Deed Document Package Seller will execute and deliver to BUYER  or its nominee a Power of Attorney, a warranty deed or its equivalent conveying good, clear and marketable title to the BUYER or its nominee."  (See Exhibit  43, page ¶9.1).

**RESPONSE: Admitted.**

81.    Defendant Gonrings never conveyed by deed the Unit located at 2726 West Cortez Street, Unit 1, Chicago, IL to Defendant AIRES. (See generally, Cook County Recorder of Deeds under PIN for Unit).

**RESPONSE: The Gonrings object to paragraph 81 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings admit that they were never presented a deed to sign other than the one prepared by Sarah Wilkinson by which title was conveyed from the Gonrings to Plaintiff.**

82.    On September 7, 2018, Gorr sent Plaintiff an email in which he disclosed the mold infestation in his unit to Plaintiff. Ex. D, 126. ( See the September 7, 2018 email is attached hereto as Exhibit 44).

**RESPONSE: The Gonrings object to paragraph 82 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, this paragraph is disputed, particularly the characterization "infestation."  By way of further answer, Gorr goes on to explain that this is a newly discovered issue:**

**"We had the building sealed with elastomeric sealant a few months back <u>so we're fairly confident that the water has stopped getting into the building</u>. However, with the recent inspections on my place a few items have been brought up that have <u>shed light on a new problem</u>. I recently tested positive for**

PFS:008071.0001.3142081.1

elevated levels of mold in my unit. That triggered me to look at replacing some floorboards. <u>Upon removing the floorboards, we discovered</u> that the subfloor was severely damaged in many areas and there is mold behind some walls, please see the attached pictures [which are not attached to Plaintiff's Exhibit 82]. From what started out as me replacing some floorboards has turned into a large and costly problem that was caused by a building issue. I have spoken with a few contractors about the next steps and the appropriate resolve is to remove some of the subfloor, and much of the drywall on the perimeter of my unit, treat the mold, and then repair and repaint." (Plaintiff's Exhibit 44) (emphasis added).

83. Plaintiff Sgariglia was "shocked" by the contents of the email, as she had no idea as to the problems with the Structure. (Pl. Dep. pages. 23, line 21-24; page 24-25, page 26; lines 1-7, attached as Exhibit 45).

**RESPONSE: The Gonrings object to paragraph 83 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 83. Plaintiff admits to having actual knowledge of visible "black" water damage just three feet from Unit 1. (See Plaintiff's Exhibit 45, 21-23). In her deposition, Plaintiff admits to knowing that: "there was water damage in the exterior of the basement entrance to the building." (See Plaintiff's Exhibit 45, 21:3-9). Plaintiff's inspector explained that that: "the molding was black and had expanded." (See Plaintiff's Exhibit 45, 22:10-11). Plaintiff further admits that the area identified by the inspector was "three feet" from Unit 1. (See Plaintiff's Exhibit 45, 22:10-11). When asked, "[d]id that concern you at all that there was water damage there and some black mold or maybe not black mold but mold in the area you said?" Plaintiff responded: "I had concerns -- that I had concerns that I spoke with my real estate attorney about." (See Plaintiff's Exhibit 45, 22-23: 24; 23, 1-6). Lastly, the Gonrings indicated "Unit 3 had leaks on West facing windows HOA sealed building to resolve Unit 3 leak" in their disclosures. (See Plaintiff's Exhibit 29).**

84. Plaintiff Sgariglia received a May 7, 2018 meeting minutes and relied upon the Sellers telling the truth that appropriate maintenance was being done to the Structure. (See Exh. 45, Sgariglia Dep, page 91, 100).

**RESPONSE: The Gonrings object to paragraph 84 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 84, which again references "structure" as some sort of defined term and, further, for the reason that the May 7, 2018 meeting minutes were true and accurate.**

85.     Plaintiff Sgariglia relied on the Sellers to tell the truth and their representations. (Exh. 45, Pl. Dep, page 91, 94).

**RESPONSE: The Gonrings object to paragraph 85 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 85 and assert that they were truthful in their disclosures.**

86.     She relied on the statements made in the 2nd Disclosure Report. (Exh. 45, Sgariglia Dep, page 88).

**RESPONSE: The Gonrings object to paragraph 86 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 86. The disclosure report makes disclosures, not statements, and the Gonrings were truthful and accurate in completing the disclosure forms.**

87.     Plaintiff Sgariglia relied upon answers from Sellers' attorneys to be truthful. (Exh. 45, Sgargilia Dep. Page 173).

**RESPONSE: The Gonrings object to paragraph 87 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 87. The transaction was governed and controlled by AIRES and the Gonrings' were true and accurate in completing the disclosure forms.**

88.     After Plaintiff Sgariglia purchased Unit 1, and starting in the fall, she had water coming into her unit. (Exh. 45, Sgariglia Dep, page 106).

**RESPONSE: The Gonrings object to paragraph 88 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 88 and contend that this statement is absolutely false.**

89.     Since closing, she has incurred over $100,000.00 in special assessment costs to repair the common elements and limited common elements. (Exh. 45, See Sgariglia Deposition Transcript, page 71-74).

**RESPONSE: The Gonrings object to paragraph 89 as it fails to comply with LR 56.1(d)(5) by**

**exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 89. It is completely unsupported by documentation and is not proximately related to the Gonrings' completing the disclosure forms.**

90.     Plaintiff Sgariglia had to obtain a home equity line of credit and borrow from her

401k to pay for the damage repair.  (Exh. 45, Sgariglia Dep. Page 77-79, 129, 159).

**RESPONSE: The Gonrings object to paragraph 90 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 90, which is not supported by documentary evidence.**

91.     Work was also done to correct leakings in her unit, as she had water coming into her

ceiling from the terraces.  (Exh. 45, Sgariglia Dep. , page 74-75).

**RESPONSE: The Gonrings object to paragraph 91 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 91 and believe that this is false.**

92.     Plaintiff Sgariglia also has to replace her front windows that have been leaking since

she purchased her unit, and the estimate cost is $19,750.00.  (Exh. 45, Sgariglia Dep. Page 78, 169-

170).

**RESPONSE: The Gonrings object to paragraph 92 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 92. Plaintiff has not replaced her windows and her allegation is self-contradicting by reference to an "estimate."**

93.     Plaintiff Sgariglia continues to have leaking in her unit. (Exh. 45, Sgariglia Dep.

Page 107).

**RESPONSE: The Gonrings object to paragraph 93 as it fails to comply with LR 56.1(d)(5) by exceeding 80 numbered paragraphs. Subject to and without waiver of this objection, the Gonrings dispute the allegation in paragraph 93 and believe this allegation to be false.**

Dated: July 28, 2023

Respectfully submitted,
Nicholas and Kelsey Gonring

By: ____/s/ Jordan Finfer_____,

One of their attorneys

Jordan Finfer (jfinfer@pfs-law.com)
ARDC #6296373
Elizabeth Archerd (earcherd@pfs-law.com)
ARDC #6329394
Patzik, Frank & Samotny Ltd.
200 South Wacker Drive, Suite 2700
Chicago, IL 60606
Phone: 312-551-8300
Firm I.D. No.: 35160

29

## CERTIFICATE OF SERVICE

The undersigned, a non-attorney, under penalty of perjury, hereby certifies that DEFENDANTS NICHOLAS GONRING AND KELSEY GONRING'S RESPONSE TO PLAINTIFF'S LR 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS was electronically filed on July 28, 2023 using the court's CM/ECF system and will then send same to all ECF-registered counsel of record.

*/s/ Melissa Siedlecki*

PFS:008071.0001.3142081.1