IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELINA SGARIGLIA,

    Plaintiff,

v.

AMERICAN INTERNATIONAL
RELOCATION SERVICES, LLC d/b/a
AIRES, NICHOLAS GONRING, and
KELSEY GONRING,

    Defendants.
_____

NICHOLAS GONRING and KELSEY
GONRING,

    Third Party Plaintiffs,

v.

2726 WEST CORTEZ CONDOMINIUM and
JOHN GORR,

    Third Party Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 19 CV 5684

Judge Robert W. Gettleman

## **MEMORANDUM OPINION & ORDER**

Plaintiff Melinda Sgariglia ("plaintiff") brings her second amended complaint against

defendants Nicholas and Kelsey Gonrings ("the Gonrings") and American International

Relocation Services, LLC d/b/a Aires ("Aires"). Count I alleges that the Gonrings violated the

Illinois Residential Real Property Disclosure Act ("the Illinois Disclosure Act"), 765 ILCS 77/1;

Count II alleges common law fraudulent concealment against the Gonrings; and Count III alleges

common law fraudulent concealment against Aires.[1]

---

[1] Judge Dow, to whom this case was previously assigned, dismissed plaintiff's claim for breach of contract against
the Gonrings and Aires on February 26, 2020. See Sgariglia v. Am. Int'l Relocation Servs., LLC, No. 19-CV-5684,

The Gonrings then brought a third-party complaint against the 2726 West Cortez Association ("the Association") and John Gorr ("Gorr"). Count I of the third-party complaint alleges that the Association violated Section 22.1 of the Condominium Property Act, 765 ILCS 605/22.1; Count II alleges breach of fiduciary duty against Gorr; Count III alleges breach of contract against the Association; and Count IV seeks contribution from the Association. Judge Dow denied the Gonrings' motion for summary judgment on plaintiff's counts against it on September 16, 2021, Sgariglia v. Am. Int'l Relocation Servs., LLC, No. 19-CV-5684, 2021 WL 4226195 (N.D. Ill. Sept. 16, 2021). On June 22, 2023, plaintiff moved for partial summary judgment (Docs. 205, 206) and seeks judgment against the Gonrings for liability on Counts I and II, and against Aires for liability on Counts III. On July 27, 2023, the Association and Gorr renewed their motion for summary judgment on all counts against them (Docs. 215. 216), and on July 28, 2023, Aires also moved for summary judgment on plaintiff's single count against it (Doc. 217).

For the reasons discussed below, the court grants Aires's motion for summary judgment (Doc. 217) on Count III of plaintiff's second amended complaint, and denies plaintiff's partial motion for summary judgment against Aires on that claim (Docs. 205, 206). The court grants plaintiff's partial motion for summary judgment of liability (Docs. 205, 206) against the Gonrings on Counts I and II of her second amended complaint. Last, the court grants the Association and Gorr's motion for summary judgment (Docs. 215, 216) on all counts against them in the Gonrings' third-party complaint.

## **BACKGROUND**

The court takes the relevant facts from the parties' Local Rule 56.1 statements and

---

2020 WL 919253, at *8 (N.D. Ill. Feb. 26, 2020).

supporting exhibits.[2]  The instant case arises out of the sale of a condominium unit located at

2726 West Cortez in Chicago, Illinois ("the Building").  The Building contains three units, and is

governed by the Association, which is comprised of the owners of those units.  The Gonrings

owned Unit 1 from May 2016 until July 25, 2018, and Gorr owned Unit 3 and was president of

the Association at all relevant times.

On or about October 15, 2017, Gorr filed a claim with Erie Insurance Group ("Erie")

pursuant to the Association's insurance policy for "water damage to the building which was

discovered on October 9, 2017."  Erie retained Engineering Systems, Inc. ("ESI") to examine the

water infiltration issue, and on October 19, 2017, ESI compiled a report that summarized its

recommendations.  According to ESI, "[w]ater infiltration is occurring at various locations in the

structure, but particularly at window and door openings."  The report explains that "[t]he water

infiltration is occurring because of deficiencies in the original construction of the building with

the predominate issue being improper flashing at wall openings."  ESI recommended that the

owner retain a masonry contractor for exploratory work to determine where any water infiltration

was occurring, and to install proper flashing that would allow water to flow out of the building.

Based on ESI's report, Erie denied the Association's claim in November 2017.

On November 9, 2017, the Association held a meeting to discuss the issues with the

Building's split-faced block and "the need to tuckpoint the entire building."  On December 4,

2017, Gorr emailed the other members of the Association, including the Gonrings, to forward

ESI's report.  In his email, Gorr stated,

> "Hey guys, just wanted to forward the results of the inspection from the building
> insurance claim I put in for the water damage at my unit. . . . Most of the water
> issues at my place are above windows and doors, which is where the water would

---

[2] Where the parties have not complied with Local Rule 56 requirements, the court disregards those facts and legal arguments.  Given the extensive number of statements of material facts and responsive statements of additional material facts involved in the instant motions, most facts presented by the parties are properly before the court.

collect and leak into my unit. . . . After 5 years of being unable to solve this with minor fixes, I believe we have to move forward with the large repair."

Gorr also informed them that,

"I've done everything I can over the years to repair on my own and it's just getting worse every year. At this point I believe it needs to become a building issue. To the best of my knowledge, it appears to me that the Condo documents would include this as a common element repair and would be paid for by the association. This also means it breaks down by unit percentage. (44% Unit 1, 26% Unit 2, 30% Unit 3)."

Kelsey Gonring ("Kelsey") responded on February 20, 2018, after Gorr forwarded various estimates for repairs. Kelsey explained that "[g]iven the amount of interior, unit specific, exploratory work (drywall, windows) that needs to be completed, we are not comfortable with the [Association] covering this cost." She also stated that "[o]nce the issue is properly diagnosed, we intend to review each issue individually in the context of the [homeowner association] guidelines, specifically what is considered 'common elements' and what is unit owner responsibility, and once that is agreed upon, we can determine the appropriate financial responsibility of each unit."[3]

In the same email, Kelsey stated that, as part of their purchase of Unit 1, "we were given a signed document stating that no issues with any of the units had been raised with the [Association] and no documented common element work had been done or was expected to be done in the next 2 years." Further, Kelsey wrote that "if we were aware of this issue upon purchase, our negotiation would have been conducted quite differently."

On February 22, 2018, Gorr responded that "[i]t's not a unit-specific problem, they just have to tear out the drywall in my unit to diagnose. The windows are not leaking, the building is

---

[3] The Association's bylaws define "common elements" to include, among other things, the "walls," and "limited common elements" to include "[t]he part of the Common Elements contiguous to and serving a single Unit exclusively as an inseparable appurtenance therefore including . . . such portions of the perimeter walls, floors and ceilings, windows, doors and all fixtures and structures therein which lie outside the Unit boundaries."

leaking, the wall above my door is leaking, the vent on my ceiling is dripping water," and stated that the issues were "most likely" due to "some" issues, including improper flashing above windows and doors, tuckpointing cracks, and water absorbed through the Building's split-faced block. Moreover, Gorr emphasized that "[t]his issue will only cause more damage to the building the longer we wait so I'm pushing hard to get something to happen here."

On March 19, 2018, the members of the Association met to discuss the problem, and Gorr and the Gonrings voted in favor of exploratory work to determine responsibility for repairs using Bral Restoration, LLC ("Bral"). The Association paid for Bral's exploratory work based on pro rata share of ownership, and Bral forwarded its report on May 3, 2018. According to plaintiff, Bral found that the existing flashing on the window and door on the third floor allowed water leakage through the walls of Unit 3, and the Association was responsible for covering the repairs because walls are a common element. The Gonrings dispute whether Bral determined that the issues were related to the wall flashing system; rather, the Gonrings emphasize Bral's determination that "allowing a proper through wall flashing system to be installed would not prevent water from penetrating at locations in between the openings." (Emphasis added).

On May 7, 2018, Kelsey obtained an estimate from Arrow Masonry ("Arrow") to perform work on the Building, and signed a contract with Arrow at the Association's meeting that day. The proposed scope of work included "spot grinding, spot tuckpointing, caulking, flasing [sic] installation and sealing of the east (70' x 48'), west (70' x 48') and north (24' x 48') elevations of split face block." The quote included work on "all 3 elevations" to limited common elements, but not changes to the flashing system. Kelsey stated in her affidavit that the Association contracted with Arrow because Arrow's proposed contract was less expensive and backed by a five-year warranty on material and labor, as well as a guarantee on leak prevention.

Around May 17, 2018, after the Association hired Arrow but before Arrow began its work, the Gonrings signed a listing agreement for Unit 1, naming the Gonrings as the "Seller." The Gonrings relocated to Michigan for Nicholas Gonring's work at Gordon Food Service, Inc., which contracted with defendant Aires, a relocation company, to help its employees with their move. Accordingly, Aires "facilitated the sale of [the Gonrings' unit]," which was listed on May 21, 2018.

On May 19 and 21, 2018, the Gonrings completed and executed an Illinois Residential Real Property Disclosure Report ("Illinois disclosure report"), as required by the Illinois Disclosure Act, 765 ILCS 77/1. The disclosure form cites to the Disclosure Act to define "residential real property," which includes "condominium units including the limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit." Further, the form notes that "[t]hese disclosures are not intended to cover the common elements of a condominium, but only the actual residential real property including limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit."

Thus, the Gonrings "made disclosures regarding the sale of their Unit, not the building as a whole," in their Illinois disclosure report. Because the disclosure report clarified that "[t]hese disclosures are intended to reflect the current condition of the premises and do not include previous problems, if any, that the seller reasonably believes have been corrected," the Gonrings answered "no" when prompted to disclose whether they were aware of any "leaks or material defects in the roof, ceilings, or chimney," as well as material defects "in the walls, windows, doors or floors." In her affidavit, Kelsey stated that the Gonrings never experienced water infiltration or leaking in their unit during their ownership and occupancy of Unit 1, and they

were not aware of any structural damage or issues relating to Unit 1.  Amanda Flucker, an agent

of Aires, also completed an Illinois Realtors Residential Real Property Disclosure Form on June

6, 2018, with large "X"s across the form and a statement that reads, "We are a relocation

company, and as such, have never occupied this property. We make no guarantee, warranty, or

representation about the condition of this property."

On May 29 and 30, 2018, the Gonrings each signed a Seller Property Disclosure

Statement ("the Aires disclosure report") on a form provided by Aires, which lists the Gonrings

as "Sellers" and Aires as "Buyer."  In the Aires disclosure report, the Gonrings disclosed that

they were aware of "past water leakage in the house or other structures," and that "Unit 3 had

leaks on west facing windows," but the "[Association] sealed building to resolve Unit 3 leak."

When prompted to disclose whether they were aware of past or present "deterioration or other

problems with the walls, foundations or other structural components," the Gonrings answered

"no," and they also indicated that they had not filed any insurance claims on their homeowner's

insurance policy for Unit 1 in the past five years.  They disclosed, however, "[t]uckpointing &

sealing of Building exterior," when prompted to disclose shared or common areas or

maintenance agreements.

On May 30, 2018, the Gonrings paid their pro rata share of the Association's down

payment for Arrow's work on the Building, which began on May 31, 2018.  The Gonrings paid

the balance on June 8, 2018, and Arrow completed its work by June 6, 2018.  Plaintiff disputes

whether the Gonrings and Gorr believed that Arrow truly remediated the water infiltration issue

in Unit 3 and other common elements.  The Gonrings counter that split-faced block needs to be

maintained because it is porous, and proper maintenance for split-faced block includes sealing

approximately every five years due to the nature of the block, which Hawbecker (plaintiff's

7

counsel) explained in his deposition.

On June 7, 2018 (shortly after Arrow completed its work), plaintiff made an offer to purchase the Gonrings' unit, and signed a Condominium Real Estate Purchase and Sale Contract with Aires, which listed Aires as "Seller," on June 8, 2018. Aires, however, was not the owner of Unit 1. Rather, the Gonrings retained title throughout the course of the sale, and the Gonrings transferred title to plaintiff via warranty deed upon closing. Hawbecker testified that the most common protocol for sales with a relocation company would be for the owner to transfer the property to Aires, and Aires to transfer the property to the buyer. Hawbecker testified that these sales generally have simultaneous deeds at closing. In the instant case, however, the parties used a "deed bypass" with only one transfer. Hawbecker stated that this sale was the only time he had seen a deed bypass.

Plaintiff received the Gonrings' Illinois disclosure report and Aires disclosure report, as well as a Section 22.1 Disclosure Statement ("22.1 disclosure statement") from Gorr, the Association's president. Gorr signed the 22.1 disclosure statement on June 14, 2018, after receiving an email from Kelsey with the form attached. Kelsey wrote that there did not "seem like there is a question pertaining to leaks there would be no need to go into detail about issues in your unit or the building." Ultimately, the 22.1 disclosure statement indicates that were no "capital expenditures anticipated by the Association for the current or next two fiscal years that would require a special assessment and/or increase in the monthly assessment to the unit owners." Gorr sent the statement to plaintiff's counsel after Kelsey explained that it was "[p]robably best if [plaintiff] gets it from you."

Gorr sent the 22.1 disclosure statement via email, and specified that the Association would release its May 7, 2018, meeting minutes. These meeting minutes state that the

8

Association accepted Arrow's quote for its proposed scope of work, and the Building was last sealed in 2012. The Association did not send the November 9, 2017, meeting minutes, which show that the Association approved financing through special assessment, or the March 19, 2018, meeting minutes, which show capital expenditures and a special assessment. In her email to Gorr in his capacity as Association president, Kelsey stated that "[w]e can provide minutes for the meeting where we decided on hiring Arrow. No need to go into a detailed history of how and why we came to that conclusion since that is not what they are asking for."

Also on June 14, 2018, Hawbecker sent an attorney review letter to Sarah Wilkins ("Wilkins"), Aires's attorney, to "verify that the Condo Association has not experienced any instances of water (interior or exterior) leaking into the Property and/or any water damage during Seller's ownership of the Property," in addition to "any insurance claims within the last 5 years" and "any other matter concerning this property or the Seller that may interfere with the Buyer's enjoyment and marketability of the property." Wilkins, while identifying Aires as the "Seller," refused to answer Hawbecker's inquiries because, "[a]s a third-party corporate relocation company, Seller is unable to make verifications regarding whether the Property has experienced water leaking or water damage," or "representations or warranties regarding whether insurance claims have been made against the Property."

According to Hawbecker, Aires held itself out to be the owner because it was the seller, and if Aires had told him that it was not the owner, his questions and correspondence in attorney review would have been different.[4] For example, on June 22, 2018, one of plaintiff's attorneys asked Aires to contact the "prior owner" for information because "the seller has direct contact with the prior owner," and plaintiff's counsel assumed that the Gonrings had already conveyed

---

[4] Conversely, Kirk Langefeld, another one of plaintiff's counsel, said that he would not have acted differently if he knew that Aires did not own Unit 1.

the unit to Aires. Defendants counter that representing Aires as the seller is not the same as holding Aires out to be the owner. For example, on June 18, 2018, Wilkins sent a home inspection response letter to Hawbecker, stating that "Seller [r]eports that the Property's HVAC has never been serviced by the homeowners," and "as the homeowners report, the flickering of one light in the main living space is not the result of a building issue." In their correspondence, Wilkins continued to refer to the Gonrings as the "homeowners."

Hawbecker testified that attorneys in real estate closings generally trust each other to fully disclose information. In her deposition, plaintiff stated that she relied on Aires's representations, in part because plaintiff's sales contract with Aires permitted proposed modifications to the contract if their representations changed. On July 2, 2018, Wilkins communicated to Hawbecker that, as a third-party company that never occupied the unit, Aires could not make additional representations or warranties, but that the homeowner-provided disclosures: "make[ ] no mention of water infiltration issues within the Property"; no insurance claims were made with the Gonrings' homeowners insurance within the last five years; and there were no current or pending complaints.

Plaintiff complains that the Gonrings were communicating with Wilkins, and it was misleading for Aires to communicate with the Gonrings without informing her. On July 3, 2018, Kelsey emailed Wilkins and another Aires attorney that "Nick and I have reviewed the buyer's response and have decided to agree to the buy's terms ($3,000 closing credit and 125% tax proration) outlined in the attached document." On July 5, 2018, Nicholas emailed Aires's counsel and expressed his frustration with their lack of communication with "attorneys that are working on our behalf through Aires." When Hawbecker saw the email, he testified that, "It's just sneaky. Very sneaky, right. [The Gonrings are] controlling the responses that we're getting,

10

yet shielding behind [Aires is a] relo company, never occupy the property, don't disclose."
Nicolas also asked, "when can we expect our attorneys to approve the addendum that we have
verbally come to terms with," because "[w]e need this done today." That same day, however,
Aires's counsel emailed Aires and stated, "Our office receives direction from you (AIRES). We
are not authorized to take direction directly from a transferee [like the Gonrings] without your
input."

Gorr listed his own unit around the same time as the Gonrings, and five days after signing
the 22.1 disclosure statement. On June 26, 2018, Gorr entered into a contract to sell Unit 3, but
the sale fell through after the buyers' inspector found excessive moisture in the unit. A second
contract fell through for the same reason. On July 13, 2018, Gorr emailed the Gonrings that his
window had moisture after it rained, and advised that, since "it has been documented as a building
issue," he would put money in escrow to a potential buyer of his unit for his share of the "future
work." The parties dispute whether this email demonstrates that water intrusion continued to be
an issue. According to the Gonrings, there is a distinction between water intrusion and mere
moisture detection. At this point, however, Arrow returned and applied a second layer of
elastomeric sealant, which Kelsey believed addressed "any possible issue." Gorr emailed Kelsey
that "I hope the secondary work resolved it for good[;] the moisture monitoring will help me to
determine that." The Gonrings did not hear anything from Gorr about moisture or water intrusion
after this point.

On July 23, 2018, two days prior to closing, Kirk Langefeld ("Langfeld") (another one of
plaintiff's counsel) asked Terry Wilkins ("Terry"), an Aires paralegal, to confirm what personal
property would be left in the unit along with a list to "forward to the owners." Terry explained
that Aires's counsel "would not have contact with the homeowners. BUT we will forward the List

11

to AIRES to have them forward same." Langefeld later asked again, and Wilkins responded, "No. Aires was not a party to that separate agreement. . . . Therefore, my office cannot confirm anything about the furniture because we represent Aires and Aires only."

The Gonring's sale of Unit 1 to plaintiff closed on July 25, 2018. The Gonrings entered into a Relocation Real Estate Purchase and Sale Agreement ("the relocation agreement") with Aires. In the relocation agreement, Aires agreed to pay the Gonrings $510,000, and required that "Seller will execute and deliver to BUYER or its nominee a Power of Attorney, a warranty deed or its equivalent conveying good, clear and marketable title to the BUYER or its nominee." As discussed above, the Gonrings then transferred Unit 1 to plaintiff via warranty deed. Attorney Paul Garver ("Garver"), from Hawbecker's office, attended the closing. Plaintiff accepted the deed directly from the Gonrings to plaintiff without objection by herself or Garver.

On July 31, 2018, Gorr hired MI&T Mold Inspection Testing ("MI&T") to test his unit for mold, and MI&T found that it tested positive. As a result, Gorr removed the floorboards in Unit 3 on September 7, 2018, and discovered mold damage in his unit's subflooring and behind the walls. Gorr emailed plaintiff on September 7, 2018, and stated:

> "Hey Melinda - this is going to be an unfortunate way for us to start talking. I've been very busy trying to sell my place for the past few months and have had several setbacks. I'm not sure what was communicated to you during closing but there has been a history of water intrusion to the building. This has occurred primarily in my unit from leaks through the split face block. The history of water intrusion has been thoroughly documented over some years and was clearly communicated along the way to the other unit owners.
>
> We had the building sealed with elastomeric sealant a few months back so we're fairly confident that the water has stopped getting into the building. However, with the recent inspections on my place a few items have been brought up that have shed light on a new problem. I recently tested positive for elevated levels of mold in my unit. That triggered me to look at replacing some floorboards. Upon removing the floorboards we discovered that the subfloor was severely damaged in many areas and there is mold behind some walls, please see the attached pictures. From what started out as me replacing some floorboards has turned into

12

a large and costly problem that was caused by a building issue. I have spoken with a few contractors about the next steps and the appropriate resolve is to remove some of the subfloor, and much of the drywall on the perimeter of my unit, treat the mold, and then repair and repaint."

Based on subsequent remediation expenditures, plaintiff filed her original complaint against the Gonrings and Aires on June 20, 2019.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden, and the court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in their favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. Rather, the nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Where both parties file motions for summary judgment, the court applies the same standards of review. See Wis. Alumni Research Found. v. Xenon Pharm., Inc., 591 F.3d 876, 882 (7th Cir. 2010). The court views all facts and inferences in the light most favorable to the nonmovant on each motion, on an individual and separate basis. Id.

## DISCUSSION

The court begins by evaluating plaintiff and defendant Aires's cross-motions for summary judgment on Count III of plaintiff's second amended complaint against Aires. Plaintiff maintains one claim against Aires for fraudulent concealment, which she conflates with her claim against the Gonrings.[5] To succeed on her claim for fraudulent concealment under Illinois

---

[5] Plaintiff argues that Aires colluded with the Gonrings in their fraudulent concealment, but she does not allege

13

law, plaintiff must establish the elements of fraudulent misrepresentation, in addition to demonstrating that Aires intentionally omitted or concealed a material fact that it was under a duty to disclose to plaintiff. See Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 571 (7th Cir. 2012). To establish a claim for fraudulent misrepresentation, plaintiff must show: (1) a false statement of material fact; (2) that Aires knew or believed the statement was false; (3) Aires intended to induce plaintiff to act; (4) plaintiff acted in reliance on the truth of the statement; and (5) damage to plaintiff resulting from that reliance. See id. at 569 (quoting Dloogatch v. Brincat, 920 N.E.2d 1161, 1166 (Ill. App. 2009)).

According to plaintiff, there is no genuine dispute that Aires fraudulently concealed several facts from plaintiff during the sale of Unit: that the Gonrings maintained ownership over Unit 1; that Aires acted as an agent for the Gonrings; and that there were construction defects in Unit 1, resulting in insurance claims on the Building. Aires counters that there is no genuine dispute that it is not liable for fraudulent concealment because plaintiff has failed to prove that: (1) any of these facts were material in her decision to purchase Unit 1; (2) Aires intended plaintiff to rely on false information; (3) Aires had a duty to disclose the relevant information; (4) plaintiff could not discover these facts through reasonable inquiry or inspection; (5) plaintiff would have acted differently with this information; and (6) plaintiff relied on Aires's alleged concealment to her detriment. The court agrees with Aires that no reasonable jury could conclude that Aires fraudulently concealed material facts from plaintiff.

Plaintiff has failed to provide evidence to support several aspects of her claim that Aires fraudulently concealed that the Gonrings owned Unit 1. First, plaintiff has not provided

---

collusion in her complaint and brings this argument for the first time at summary judgment. Even if the Gonrings were "shielding themselves behind the relocation company, AIRES," as plaintiff argues, whether the Gonrings intended plaintiff to rely on false information is a question separate from whether Aires intended plaintiff to rely on false information.

evidence that Aires intentionally omitted or concealed a material fact about ownership from plaintiff or plaintiff's counsel. Plaintiff held a mistaken belief about Aires's ownership (or more accurately, Aires's <u>lack</u> of ownership), but there is no evidence that Aires caused plaintiff to hold this belief through misrepresentation or concealment, or knew that she continued to believe it. Rather, the evidence shows that Aires and its counsel clarified to plaintiff on various occasions that Aires was a third-party relocation company, and if plaintiff or her counsel were confused about the relationship between "seller," "buyer," "owner," and "contractual owner," they could have asked for clarification. Ultimately, because plaintiff accepted title for Unit 1 directly from the Gonrings, not Aires, without objection, plaintiff cannot claim that she did not know that the Gonrings owned the unit.

Plaintiff argues that Aires did not correct her impression that the Gonrings were the "prior owners," and her counsel acted based on the "kinship implicit between legal professionals that impl[ies] that each attorney reposes his or her trust in the other to offer truthful and complete responses." This "kinship" may oblige Aires and its counsel to correct clear misunderstandings of material fact, but plaintiff has not provided any evidence of a duty to scour the record for plaintiff's misunderstandings, especially after Aires clarified its relationship to the unit on several occasions. Further, there is no evidence that plaintiff was rendered unable to determine ownership with due diligence, given that she was represented by counsel herself.

Last, even if Aires failed to satisfy its obligation to disclose ownership, or to correct plaintiff's mistaken impression of ownership, plaintiff has not provided evidence that disclosure would have changed the result. Although Hawbecker testified that the attorney review process would have taken "a different tone" if he had known that the Gonrings, not Aires, owned Unit 1, Langefeld (who represented plaintiff during the attorney review process) testified to the contrary.

Moreover, Hawbecker himself testified that generally non-bypass relocation company sales proceed with "simultaneous" deeds at closing, suggesting that relocation companies do not "own" the relevant property during the attorney review process in any case. Regardless, if the process had "a different tone," plaintiff does not explain how Aires's disclosure would have given plaintiff additional information about water infiltration. As Aires explained multiple times, it never occupied or managed Unit 1.

The court also concludes that no reasonable jury could find that Aires fraudulently concealed from plaintiff that Aires acted as an agent for the Gonrings, or that construction defects in Unit 1 resulted in insurance claims on the Association's policy. Plaintiff has provided no evidence that Aires knew about construction defects in Unit 1. Rather, the evidence shows that Aires, like plaintiff, relied on the Gonrings' disclosures for information regarding the condition of Unit 1. When Aires completed its own Aires disclosure report, it drew "X"s across each page and stated that, "We are a relocation company, and as such, have never occupied this property. We make no guarantee, warranty, or representation about the condition of this property."

Further, while plaintiff provides evidence that the Gonrings communicated with Aires during the attorney review process and believed that they controlled Aires, plaintiff offers no evidence that the Gonrings were the ultimate decisionmakers who controlled the flow of information to plaintiff. The Gonrings may have maintained the authority to approve closing cost credit and tax proration, but the evidence shows that Aires's counsel clarified to Aires that the Gonrings did not have control over its counsel, who were "not authorized to take direction directly from a transferee without [Aires's] input." It is unreasonable to argue that Aires shielded the Gonrings' control over its decisions when the evidence shows that it, and its

counsel, avoided delegating such control.

Consequently, because no reasonable jury could find that Aires fraudulently concealed any material fact from plaintiff, the court grants defendant Aires's motion for summary judgment on the remaining claim against it (Count III of plaintiff's second amended complaint), and denies plaintiff's partial motion for summary judgment against Aires on Count III.

Next, the court evaluates plaintiff's partial motion for summary judgment of liability against the Gonrings on Count I for violating the Disclosure Act and Count II for fraudulent concealment. It begins with plaintiff's claim for fraudulent concealment, which uses the same standard as her fraudulent concealment claim against Aires.

According to plaintiff, there is no genuine dispute that the Gonrings fraudulently concealed: their continued ownership of Unit 1 during the attorney review process; their alleged control over Aires and its counsel; and construction defects in Unit 1, which resulted in insurance claims on the Association's insurance. At the outset, the court agrees with the Gonrings that plaintiff has not provided evidence that the Gonrings made representations which concealed their ownership of Unit 1, or that they controlled Aires and its counsel during the review process, as discussed above.

It is a separate issue whether plaintiff is entitled to summary judgment on its claim that the Gonrings fraudulently concealed the construction defects in Unit 1. Plaintiff argues that the Gonrings' fraud began with their disclosure reports, and it continued when Kelsey advised Gorr to avoid going into detail about the leaks in the Association's 22.1 disclosure statement and to provide limited meeting minutes.[6]

---

[6] Plaintiff also complains that the Gonrings did not update their disclosures when Gorr advised them of moisture detection in his unit on July 13, 2018. In response, the Gonrings argue plaintiff improperly attempts to assert plaintiff's breach of contract claim, which Judge Dow dismissed. The court agrees with the Gonrings, and rejects plaintiff's argument.

The Gonrings counter that there is a genuine dispute whether they fraudulently concealed construction defects from plaintiff and her counsel. They argue that they were required only to disclose unresolved, material defects that were specific to Unit 1, not resolved, routine maintenance work to the Building. According to the Gonrings, they answered truthfully when Aires, via the Aires disclosure form, asked whether they were aware of any past or present water leakage in the "house or other structures." On that report, the Gonrings stated that "Unit 3 had leaks on west facing windows," but the "[Association] sealed building to resolve Unit 3 leak."

The court, however, finds that there is no genuine dispute that the Gonrings fraudulently concealed that the Building, including Unit 1, had unresolved, material defects. Whether the Gonrings genuinely believed that Arrow remediated the water infiltration issue after it first completed its work is irrelevant.[7] The important issue is whether the Gonrings believed that their building was free of unresolved, material defects when they completed their Aires disclosure report. Because Arrow did not begin its work until May 31 and did not complete its work until approximately June 6, the Gonrings have provided no evidence that the Building was free of material defects when they completed their disclosure statement on May 29 and 30.

The Gonrings also argue that they were not required to disclose Arrow's prospective work on the unit because split-faced block must be maintained due to its porous nature, and proper maintenance includes sealing around every five years. They emphasize that the Building was last sealed in 2012, and the Association hired Arrow in 2018. The need for routine maintenance, however, does not explain why Gorr experienced water infiltration issues for years prior to Arrow's work. Moreover, the Gonrings' routine maintenance argument is undercut by Kelsey's own statement that "if we were aware of this issue [with water infiltration] upon

---

[7] The parties dispute whether Arrow's quote, even if completed successfully, would have remediated the water infiltration issue, based on Bral's report.

purchase, our negotiation would have been conducted quite differently," as well as her original skepticism that the water infiltration issue in Unit 3 implicated the Gonrings' collective responsibility.

Thus, the court finds that a reasonable jury, faced with plaintiff's proffered evidence, could not conclude that there was a genuine dispute whether the Gonrings fraudulently concealed that their unit had material construction defects. The evidence shows that the Gonrings granularly dissected each disclosure request to minimize the information available to plaintiff about the water infiltration in the Building and its ramifications for Unit 1, including Gorr's claim on the Association's insurance. Accordingly, the court grants plaintiff's motion for summary judgment on Count II of her second amended complaint against the Gonrings.

The court now turns to plaintiff's motion for summary judgment on Count I of her second amended complaint, which claims that the Gonrings violated the Illinois Disclosure Act, 765 ILCS 77/1. Under the Disclosure Act, a seller of residential real property, including condominium units and "the limited common elements allocated to the exclusive use thereof that form an integral part of the condominium unit," must fill out the Residential Real Property Disclosure Report. See 765 ILCS 77/5; 765 ILCS 77/20. A seller "who discloses any information on the Residential Real Property Disclosure Report that he knows to be false shall be liable in the amount of actual damages and court costs, and the court may award reasonable attorney fees incurred by the prevailing party." 765 ILCS 77/55. The seller, however "is not liable for any error, inaccuracy, or omission of any information delivered pursuant to this Act if (i) the seller had no knowledge of the error, inaccuracy, or omission, [or] (ii) the error, inaccuracy, or omission was based on a reasonable belief that a material defect or other matter not disclosed had been corrected." 765 ILCS 77/25(a).

Plaintiff complains that the Gonrings answered "no" when asked whether they were aware of defects in the foundation, as well as "leaks or defects in the roof" and "material defects in the walls, windows, doors or floors," despite knowing that these limited common elements were materially defective due to water infiltration, or at least the risk of it, that would not be ameliorated with sealant alone. The Gonrings counter that the Disclosure Act did not require them to disclose defects in common elements or other units' limited common elements, especially when they reasonably believed that the problem had been corrected. According to the Gonrings, because Unit 1 does not have a roof, and because they did not experience any water infiltration in their unit's walls, windows, or doors, they were unaware of material defects in their unit. The Gonrings emphasize their perspective that Arrow determined that tuckpointing and sealing would remediate the problem.[8]

The court disagrees with the Gonrings. As discussed above, the evidence shows that Arrow did not start its remediation work, which included window and door perimeter sealing on "all 3 elevations," until after the Gonrings completed and executed their Illinois disclosure report. Even if the Gonrings reasonably believed that sealing alone would resolve any construction defects in the Building, no reasonable jury could find that the Gonrings were not obligated to disclose the defect when they executed their report. The Gonrings state that they never experienced water infiltration in Unit 1, but they cannot claim that they misunderstood Arrow's scope of work because they helped pay for it. The evidence shows that the continued risk of water infiltration was a material defect because Kelsey herself stated that they would have conducted their negotiations for Unit 1 "quite differently" if the Gonrings had known about it.[9]

---

[8] They also argue that there is a genuine dispute whether ESI's report evaluated the entire Building or limited its inspection to Unit 3, and whether Bral's report determined that the water infiltration issue was related to the wall flashing system.

[9] Under the Disclosure Act, a "material defect" is "a condition that would have a substantial adverse effect on the

Thus, the court grants plaintiff's motion for summary judgment on Count I of her second amended complaint.

Last, the court evaluates the Association and Gorr's motion for summary judgment on all counts against them in the Gonrings' third-party complaint. In the third-party complaint, Count I alleges that the Association violated Section 22.1 of the Condominium Property Act, 765 ILCS 605/22.1; Count II alleges breach of fiduciary duty against Gorr; and Count III alleges contribution against the Association. The court starts by granting summary judgment on Count III because, as the third-party defendants Association and Gorr argue, the Illinois Supreme Court has held that there is no right of contribution for intentional torts. See Gerill Corp. v. Jack L. Hargrove Builders, Inc., 128 Ill. 2d 179, 205 (1989). Plaintiff's claims against third-party plaintiffs (the Gonrings) consist of only intentional torts (knowing violation of the Disclosure Act and fraudulent concealment), so a reasonably jury could not find in the Gonrings' favor on Count III.

The crux of Counts I and II is whether third-party defendants submitted a fraudulent 22.1 disclosure statement to the Gonrings by failing to disclose that they knew, or should have known about, the need for a future special assessment for mold remediation in Gorr's unit. Third-party defendants argue that there is no genuine dispute that their 22.1 disclosure statement was accurate when they issued it on June 14. On June 14, the Association paid for Arrow's completed remediation work, and it did not anticipate additional capital expenditures or special assessments in the current and succeeding two years. The evidence shows that Gorr did not discover mold in his unit until he hired MI&T on July 31, and did not know the location of the mold until he removed the floorboards on September 7.

---

value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property."  765 ILCS 77/35.

The Gonrings counter that there is a genuine dispute whether Gorr truthfully completed the 22.1 disclosure statement based on his knowledge of continued issues with his unit. They argue that "[b]y having Arrow return to seal the Building a second time, the evidence suggests that Gorr himself suspected that water infiltration into his unit had not stopped," but he "kept silent throughout the completion of the Association Disclosure and Gonrings' sale of Unit 1" and chose not to disclose "in order to push forward the sale of his own unit."

The court agrees with third-party defendants that the Gonrings have not provided affirmative evidence that Gorr or the Association knew about or should have known about the mold in Gorr's unit when Gorr issued the Association's 22.1 disclosure statement, or that Arrow would need to return to reseal the Building. In fact, in his email to plaintiff on September 7, Gorr explicitly refers to the mold issue as "a new problem." The court grants third-party defendants' motion for summary judgment on Counts I and II of the Gonrings' third-party complaint.

The sole remaining count is Count III for breach of contract against the Association. The Gonrings argue that the Association breached its contract by "failing to remediate the issues with the limited common elements associated with Gorr's unit," as required by its governing declarations. The court agrees with third-party defendants that there is no genuine dispute that the Association took steps to remediate the water infiltration issues with Gorr's unit, first by hiring Bral and later by hiring Arrow. The evidence shows that Gorr worked to combat, and eventually overcome, skepticism among his fellow board members for the Association to take action against a problem with the Building. Further, as discussed above, there is no evidence that the Association knew of the mold prior to July 31, and after detecting mold, the Association acted to remediate it. Accordingly, the court grants third-party defendants' motion for summary

22

judgment on all counts of the Gonrings' third-party complaint.

## CONCLUSION

For the reasons stated above, the court grants Aires's motion for summary judgment (Doc. 217) on Count III of plaintiff's second amended complaint. The court grants in part and denies in part plaintiff's partial motion for summary judgment on the question of liability in her second amended complaint (Docs. 205, 206). The court grants summary judgment in plaintiff's favor on Counts I and II, and denies her motion for summary judgment on Count III. Last, the court grants third-party defendants' motion for summary judgment (Docs. 215, 216) on all counts against them in the Gonrings' third-party complaint.

ENTER:

Robert W. Gettleman
United States District Judge

DATE: November 2, 2023