IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELINDA SGARIGLIA, | ) | |
| | ) | 1:19-cv-05684 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Honorable Judge Robert M. Dow |
| | ) | |
| AMERICAN INTERNATIONAL RELOCATION | ) | |
| SERVICES, LLC, D.B.A. AIRES, AN ILLINOIS | ) | |
| LIMITED LIABILITY CORPORATION, | ) | |
| NICHOLAS GONRING & KELSEY GONRING., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF STEVE HIER

I, Steve Hier, being duly sworn on oath, depose and state as follows:

1. I am over 21 years old, reside in Chicago, Illinois, and am self-employed at Miller-Hier Enterprises, Inc. I am the President of Miller-Hier and have held this position since 1986.

2. I have personal knowledge of the facts sworn to herein and would testify to the same if called to do so

3. I have a BS in Mechanical Engineering from South Dakota School f Mines and Technology. I also graduated from the US Army Corp of Engineers Officer School. I am also a Certified Moisture Analyst from the school of the Exterior Design Institute. I am a certified EIFS (Dryvit) Inspector.

4. I have been a certified home inspector since 1994, and licensed in 2003 after it was mandated by the State of Illinois. I have been in the construction/ inspection business for over 30 years, building and rehabbing houses. For the past 20 years, I have done mainly inspections for commercial and residential properties. I have done at least 7,800 inspections in my lifetime, 95% being residential.

1

5. During my decades as a home inspector and builder, I have built and reviewed and overseen hundreds of roof repairs, masonry repairs and window repairs. I have observed how roofs are replaced, removed and built, and the types of materials that are used for them. I observe the work from the demolition phase to the construction phase, from start to finish, and have done so for hundreds of roofs. I have also seen quotes for this type of work in the Chicagoland area from hundreds of contractors over my 30 years in the industry. The quotes are for labor and materials.

6. The same is true of the masonry business, where I have overseen hundreds of repair and construction projects for masonry work. I have also seen hundreds of quotes for masonry repairs from scores of contractors in the Chicagoland area and have become familiar with their rates for labor and materials. I have observed work performed from start to finish in masonry construction of homes. I have also become familiar with concrete block, which is an inferior building material that has become common in the Chicagoland area.

7. In addition, I have seen hundreds of quotes for window repair and replacement in the Chicagoland area, as participated in their installation or overseeing installation. These quotes were also from hundreds of different Chicagoland contractors and I am familiar with the rates for labor and material costs.

8. I have testified as an expert witness in several of cases over the last 20 years. All the cases were in Circuit Court of Cook County, I believe I have testified in 6 cases and all were related to building construction issues. At least half had to do with split face block water infiltration issues. The judges in those cases deemed me an expert and permitted my testimony to proceed.

9. I have appeared in several publications in the Chicago Tribune and Chicago Sun Times Newspapers on 7 occasions to comment on construction subjects, including the

2

        subject of concrete block. I have been on WTTW in their news hour program about the subject of concrete block and water intrusion problems. I was also interviewed in Masonry Magazine for its January 2001 edition to discuss how quality inspection can promote the industry's image.

10. In the early 2000s, I worked with the city of Chicago on a code Exterior Insulation Finish System or Dryvit. I consulted with the city of Chicago to establish code standards.

11. Throughout my 30 years in the construction and home inspector industry, I have been in frequent contact with many industry leaders in the various trades and keep abreast of the latest innovations and price fluctuations for materials. We have discussed these price fluctuations on a regular basis. I have also observed prices for materials from wholesalers and minor or major retailers such as Home Depot and Menards. In addition, I am kept abreast of the latest and best materials and industry practices for masonry, roofing and window/ door installation.

12. Recently I allowed my license to lapse due to an injury to my back. I can no longer go on ladders. I am 75 years of age and am currently engaged in consulting work.

13. I was retained by 2726 Cortez HOA through Melinda Young on or about September 2018. She contacted me and sought an analysis on her building's health.

14. I went to the property located at 2726 N. Cortez, Chicago, IL (hereinafter "Property") on September 14, 2018. I met with Melinda outside the Property and I proceeded to inspect the exterior masonry and the coating that I later learned had been applied by Arrow Masonry.

15. I went up to the 3rd floor of the Property, which belonged to another unit owner, Mr. Gorr.

16. On that date, I took picture shows that the floor is rotted and the plywood base floor and the joists that hold up the floor were also rotted. These photos are attached to my September 14, 2018 report. (See Exhibit 1.) The red and black tool is a tool sharpened at the end that can penetrate rotted wood. These plate that holds the joist together were also rusted and rotted out. (See Exhibit 1). The pictures I took attached to my report I took with my cell phone on September 14, 2018. These photos are a true and accurate photo of the third floor rear bedroom on the east facing wall of the Property. During my observation of the third floor unit, I saw that the flooring was cupped and water damaged. The floor trim and parts of the flooring structure had already been opened to allow visual access of the interior walls and floors. With Melinda's permission, I stuck my tools up against the east wall in the flooring. The photo in my report shows my red and black handled tool sticking into the wood, which went in easily. In essence, this photos shows extensive water damage and water infiltration on the wooden joists. (Exhibit 1).

17. I also took the 2nd photo of my report. It is the same area but a photo of the space between the floor joists cavity, underneath the floor. Again, it shows water damage to the joists, which were extensive. . (Exhibit 1).

18. During my site visit, I also walked up the stairs to the roof. I noted that the roof was like a trampoline, bouncy as I jumped up and down. This is a very dangerous condition, and I understood that the roof could possibly collapse.

19. During this visit, I advised Mr. Gorr and Melinda Sgariglia that we needed to do destructive testing, remove drywall to expose the amount of damage.

20. On Friday, September 14, 2018, I created a report. (Exhibit 1). The report was typed by me on the same day after the site visit. I noted that the building was made of concrete block. I also noted that the block and weep wick had been painted with paint

like material, which rendered the weep wicks useless. The weep wicks are designed to allow moisture to leave the inside of the concrete blocks. By painting them, the weeps no longer work. This was noted on all 3 sides of the building where there is concrete block.

21. I also saw that many of the window and door lintels had been caulked. This traps the moisture inside. When moisture is trapped inside, it tries to go out or goes in. Moisture wants to go to low humidity. If it cannot go to the exterior, then it will go into the drywall, joists, flooring. This caulking exacerbated the problem of interior moisture damaging the property and rendering it vulnerable.

22. I noted that this building had been taking on water for a long time, although I was not exactly sure on how long. The painting and caulking trapped the water inside, making the rotting worse.

23. I also saw that the stone parapets had no weeps. These parapet walls extend above the roof. Stone caps are put on top of the concrete blocks. If you do not put these weeps underneath, then the water gets trapped and runs down into the wall because the flashing is not able to do its job. I could not evaluate at the time if there was any flashing because I did not do any destructive testing. Again, without the weeps, water stays in the building, causing more moisture damage.

24. I also saw multiple window steel lintels rusted. This is caused by not having proper weeps and flashing. I could see this on the exterior on the 3 sides where the concrete block existed.

25. I also saw the northwest hallway floor and trim of the 3rd floor unit. The trim had been removed to allow visual access. I also saw signs of water damage, exactly as I saw in the bedroom. I saw deteriorated wood.

26. I also saw possible mold, but I am not a mold inspector. I recommended a mold inspector. (See Exh. 1).

27. I billed Melinda for my time a total of $850 to do the building evaluation. This bill was paid. I also provided her with an agreement that I would be paid $250 for my consulting. (See Exhibit 1 and 2, Service Agreement).

28. I visited the property on numerous occasions, all of which are detailed in my emails. I put my HOA consulting hours together, along my hourly rate of $250 an hour. The attached emails are a true and accurate statement of my site visits taken contemporaneously. (See Group Exhibit 3).

29. I also made numerous phone calls to the Melinda and the owners, usually in conference calls to discuss the strategy of repairs. (See Group Exhibit 3).

30. To start the masonry project, I advised the Association that we should obtain 3 quotes.

31. After receiving the quotes, I recommended masonry company B. Allendorfer, as I have worked with them in the past. Their work is good and workmanlike, and their rates are within industry standards in the area. Also they could do a turn-key operation, doing the exterior and interior at the same. The other two companies that provided quotes could not do that.

32. A big part of the jobs was reinforcing the roof joists, tearing off the roof, and the other masons did not want to do this job but B. Allendorfer agreed.

33. Sometime in spring 2019, B. Allendorfer began work.

34. I oversaw the masonry work with site visits at the Property, but I was not the General Contractor. I served as a consultant to the Association. I observed what the workers for B. Allendorfer were doing and reported to the HOA.

35. On August 13, 2019, I returned to the Cortez Property. I noted that the ceiling drywall was removed from the living room ceiling in unit 3. I saw the wooden trusses exposed and they were totally rotted out. It was evident that water had completely destroyed them. In addition the plate that holds the joist together were rusted and rotted out. This looks like a metal cheese grater. (Exhibit 4). When this happens, the result is that the roof can collapse into the unit because the wooden trusses are designed to hold up the roof. There is also a deck on the roof so if a lot of people stood on the south end of the deck, then people could easily fall with the deck and roof as it collapses.

36. On Nov 14, 2019, I went to the property again. I got up close and saw multiple pin holes in the masonry coating, which is different from a continuous surface. I could see that the coating was not installed properly. I created a report and took a photo. (See Exhibit 5).

37. Sometime before going to the property on Nov 14, 2019, I don't recall exactly when but around that time, I reviewed the May 7, 2018 Arrow Quote and noted that manufacturer of the Flex Elastomeric High Breathability Waterproofing Sealer required two coats in order to have a warranty through the manufacturer. Arrow Masonry only applied 1 coat, based on their invoice.

38. During my representation of the HOA, after my initial inspection, I was given of the ESI Report. I noted that the report discussed structural defects in the building.

39. During the masonry phase of work with B. Allendorfer, the company remediated the structural integrity of the building. I made periodic stops and saw that the window and door flashing was being installed properly, along with other openings.

40. Throughout my career, I have reviewed thousands of invoices from masonry companies, roofing companies and other contractors.

41. I am familiar with the rates that are charged in the Chicagoland area for labor and materials for masonry work and roofing.

42. I have reviewed all of B. Allendorfer's quotes for this Property. As articulated below, it is my opinion that the invoices submitted by B. Allendorfer for masonry and roof repairs were necessary to remediate the structural problems associated with the Property. It is also my opinion that those charges as stated in the invoices are reasonable and commensurate with industry standards in the Chicgoland area, and I am familiar with those charges.

43. It is my opinion that the work described in the Allendorfer March 20, 2019 quote is entirely remedial. (Exh. 6). All of the work is recommended to address the structural defects of the property, as initially reported in the ESI Report. All of the work is to protect the structural integrity of the building for the long term. For the work described in B. Allendorfer's March 20, 2019 quote, it is my opinion that the rate of $120,000 is reasonable and commensurate with industry standards in the Chicagoland area. (See Exhibit 6).

44. As this work was being performed as described in the March 20, 2019 invoice, I had site visits to ensure the work was performed in a good and workmanlike manner. Upon completion of this work, it is my opinion that the work was performed in a good and workmanlike manner.

45. The April 25, 2019 quote from B. Allendorfer was done at my insistence that we remove the ceiling to expose the trusses. (See Exhibit 7). This was to determine the structural integrity of the trusses. This work was remedial and essential for safety of the building and to prevent a roof collapse. It is my opinion that the work and the charges are reasonable and commensurate with industry standards in the Chicagoland area. (See Exhibit 7).

46. I reviewed the June 5, 2019 quote from B. Allendorfer. (See Exhibit 8). This is for a new roof. This work was recommended by me to prevent the roof and deck collapse. This is to take off the old roof, the old rotted plywood under the roof, and put a new roof on top. This problem occurred due to the original defective construction of the property. This problem would not be seen until the ceiling from unit 3 was removed, which exposed the rotted trusses. The trusses are set in pockets in the masonry walls. Because of lack of flashing and weeps in the parapet caps, the water went into the areas of the trusses and caused the plywood to get, causing the plywood to deteriorate and fail. This work is remedial in nature. These charges are reasonable and commensurate with industry standards in the Chicagoland area.

47. I re I reviewed the June 6, 2019 B. Allendorfer quote. (See Exhibit 9). This is when they opened the 3rd floor living room and removed all the trusses. I believe it also went to the kitchen. This work is for 3rd floor south rotted trusses. By putting these back into the pocket, you have to take down part of the parapet wall to set the other end of the truss. After this, the masonry is done. This is related to the lack of flashing on the parapet walls. It is my opinion that this work was remedial and essential for safety of the building and to prevent a roof collapse. I believe that these charges articulated in the invoice are reasonable and commensurate with industry standards in the Chicagoland area.

48. I reviewed the May 14, 2020 quote from B. Allendorfer. (See Exhibit 10). This quote is for the coating that was put on the building. This is necessary to keep the building breathable and allow the water to escape the interior of the building. This addresses the pinholes that I had previously observed. When the water hits the building, it beads up and runs down as a result of this coating. It allows water vapor to exit the coating. This was also to fix Arrow Masonry's mistake in applying the

        coating. This work was remedial in nature and I observed B. Allendorfor's work when it was completed. It was done in a good and workmanlike manner and these charges are reasonable and commensurate with industry standards in the Chicagoland area.

49. I reviewed the May 26, 2020 quote from B. Allendorfer. (See Exhibit 11). This quote was for front part of the building that did not have concrete block, but instead had limestone and brick, both of which needed spot tuckpointing. The mortar had deteriorated over time. Open mortar joints allows for water intrusion. In my opinion, this work is remedial in nature and required for the Property's structural integrity. Also in my opinion, these charges are reasonable and commensurate with industry standards in the Chicagoland area and the work was done in a good and workmanlike manner.

50. I reviewed the July 8, 2020 3rd change order from B. Allendorfer. (See Exhibit 12). This is to have the caulk removed and resealed for all the glass block in the building, all of which were installed improperly. Specifically, they did not have proper flashing or caulking. The block windows are a problem as described in the ESI report. This work is remedial in nature.

51. This quote is also the front steps that had to be torn out and redone. The stairs were also installed improperly, those who installed the stairs did not compact the soil so when the stairs were installed, the stairs started to crack. The original steps were set on insufficient footings. This is discoverable after a trench was dug next to the wing walls. It showed that the original footings were insufficient and new ones had to be poured. This is poor construction from the original construction but not in the ESI report. I saw this work as it was completed and it was done in a good and

workmanlike manner. These charges for both the windows and the stairs are reasonable and commensurate with industry standards in the Chicagoland area.

52. I reviewed the July 10, 2020 invoice for additional plywood decking. (Exhibit 13). This is in conjunction with the necessary roof repair and requiring extra material. This charge of $1280 is remedial in nature and reasonable. These charges for materials are reasonable and commensurate with industry standards in the Chicagoland area.

53. On July 15, 2020, Melinda sent me an email complaining of water in her ceiling above unit 2 front porch. I advised the Association to get a roofer to fix it. B. Allendorfer's main foreman Scott and I recommended that we had to tear off the decking and the roofing on the balconies because they were installed improperly and causing leaking. They had poor flashing. I reviewed the March 16, 2021 invoice from B. Allendorfer. (See Exhibit 14). This work was describing these repairs. In my opinion the work is remedial in nature and again pertains to the lack of flashing in the original construction of the property. I visited the site and observed the work after it was completed. I saw this work as it was completed and it was done in a good and workmanlike manner. In my opinion, the charges as articulated in the invoice are reasonable and commensurate with industry standards in the Chicagoland area.

54. I reviewed the April 2, 2021 window quote from B. Allendorfer. (See Exhibit 15). This is for Melinda Sgariglia's unit and her front facing windows that are in her living room. These windows are defective and I noted they were in bad shape when I did my initial site visit in 2018. I saw the deterioration both on the inside and outside in 2018. The seals are broken, which is caused when the wooden framing expands and contracts. The causes of these windows being defective could be from defective window installation, bad caulking, or bad flashing. Subsequent repairs by the

11

previous owners included aluminum capping and lots of caulk. This made the situation worse because now moisture is getting the aluminum caps and causing more deterioration of the wood frames. To repair, you have to tear out the whole window set and replace it. I have reviewed hundreds of window repair quotes as an inspector or my decades or work, and I have observed hundreds of installations and repairs of windows. Generally speaking, these types of repairs costs between $25,000 and $30,000. Since 2018, the cost of windows has gone up 25 to 50%, especially this type that is a huge window frame that has to be assembled on site. In my opinion, the April 2, 2021 B. Allendorfer quote is reasonable and commensurate with rates in the area.

55. Melinda 's condo association retained me at a rate of $250 an hour. Thus far, the Association has paid me $5849.00 for his consulting work and for overseeing the construction. My billing is attached. (See Group Exhibit 16).

56. Currently, the Association is handling the garage which has also sustained water damage. There is a roof deck that is designed for social gatherings. The garage is also made of concrete block with insufficient weeps and flashing. I noticed the problems with the garage in 2018, and I informed the members of the Association; however the Association wanted to address main building first. In March 2024, I was retained by the Association to assess and monitor the contractors. One contractor did the roof repair and one did the masonry. Classic Restoration and Renner and Renner did structural repairs, while subbing Star Roofing to put a new roof on the garage. This work is related to the poor original construction of the property. Specifically, there was no flashing or weeps under the parapet caps. As a result, water got to the roof structure and trusses, causing them to rot. The work is remedial. The work is complete and my final inspection of the work was May 20, 2024. In my opinion, the

Renner & Renner quote is reasonable and commensurate with rates in the area, and that the work was done in a good and workmanlike manner. This is also true with Classic Restoration quote, which is also reasonable and commensurate with the rates in the area. Their work was done in a good and workmanlike manner. (See Exh. 46, pages 1-4).

57. I also billed the Association $750 for the garage consulting. (See Exh. 46, page 8). In addition, I billed Melinda $1,500.00 for the preparation of my affidavit. I verbally advised her of this on May 22, 2024, and I will prepare a bill to that effect.

FURTHER, affiant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED ON May 22, 2024

By: x__/s/ Steve Hier_____
      Steve Hier

13