IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELINDA SGARIGLIA, | ) | |
| | ) | 1:19-cv-05684 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Honorable Judge Robert M. Dow |
| | ) | |
| AMERICAN INTERNATIONAL RELOCATION | ) | |
| SERVICES, LLC, D.B.A. AIRES, AN ILLINOIS | ) | |
| LIMITED LIABILITY CORPORATION, | ) | |
| NICHOLAS GONRING & KELSEY GONRING., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF MELINDA SGARIGLIA

I, Melinda Sgariglia, being duly sworn on oath, depose and state as follows:

1. I am over 21 years old, reside in Chicago, Illinois. I am the Plaintiff in this matter. I currently work as a project manager for Airbnb. I have an MBA from the Chicago Booth School of Business.

2. I have personal knowledge of the facts sworn to herein and would testify to the same if called to do so

3. I bought my home, unit 1, in July 2018. Shortly after my purchase, I learned from John Gorr, the owner of unit 3, that the entire Property had suffered extensive water damage. The building is comprised of 3 condominium units.

4. I am responsible for 44% of all repairs for the common elements of my condo building. (See Bylaws, Exh 17, page 25).

5. All the information about the water infiltration in my home and the building as a whole was concealed from me by Nicholas and Kelsey Gonring, the sellers.

6. After receiving some of the emails and ESI Report from Mr. Gorr, I immediately went work to determine how to resolve the water issues of the building.

1

7. I also was elected Board President of our condo association and it became my job to keep records of the Association. Basically, I became the President but my duties encompass those of a secretary and treasurer. In other words, I organized meetings, called contractors to obtain quotes, received invoices that need to be paid, collected funds for the HOA account, and I paid them from the Association's account.

8. From 2018 to the present, I was the custodian of all records of the Association as it pertained to the repair of the HOA common elements and my unit. Specifically, when I received quotes from various contractors, I kept the records as I received them at my home or on my computer drive as a regular course of business activity. It also did the same with reports from Steve Hier, as well as all billing records that showed payments made to the contractors. Since 2018, it has been my business to be the record keeper of information transmitted to the Association for all repairs and billing from contractors. I also keep all the minutes and email exchanges of the Association.

9. My first order of business was hiring an expert building inspector. With the consent of the other 2 owners, I retained the services of Steve Hier.

10. Mr. Hier immediately came to the Property and inspected Mr. Gorr's 3rd floor unit. He saw water damage and drafted a report dated September 14, 2018. (See Exh 1). We understood from the report that the building had sustained water damage and that mold had accumulated.

11. Thereafter, the Association owners and myself engaged the mold remediation company for unit 3. We understood from consultations with various contractors who visited the site that the mold had to be remediated before we could proceed with further repairs to the property. We consulted a few contractors to provide us with quotes.

12. On October 17, 2018, our Association hired Mold Solutions. (See Exh. 18). We received 3 bids for this work and Mold Solutions was the most comprehensive in terms of scope of work, and the price of in the same ballpark as the others.

13. I visited the site daily and observed the company as it gutted Unit 3 to the studs, dispose of moldy drywall and floors, and they sprayed some solutions to kill the mold on the walls, ceilings and floor. I also saw that they sealed off the entire apartment and cleaned the air ducts.

14. Our Association took on this expense because we determined that Mr. Gorr's 3rd floor suffered damages that resulted from the common elements. The defects in construction, including the failure to have weep and proper flashing, caused Mr. Gorr's unit to experience water seepage, which caused the mold.

15. Furthermore, the Association's neglect in attending to the defects worsened the condition of Mr. Gorr's unit, causing greater damage than was reasonable. We determined that had the Association acted properly, Mr. Gorr's unit would not have suffered the extensive damage.

16. Mold Solutions remedied the extensive mold damage to Mr. Gorr's unit, caused by the construction defects. We as the Association took on the bill for Mold Solutions in the amount of $13,469.00. (See Exhibit 18). The Association paid the entire bill. My share of this bill was $5,926.36 and I paid it. (See check 1072, attached to Exh. 18).

17. At about the time Mold Solutions was performing work, I took a home equity line of credit because I knew the cost to repair all the damages would be extensive. I did not have cash to pay for all of this.

18. On or about November 2018, I took out a home equity line of credit of $102,000 from Huntington to pay for damages, with a variable interest rate. The interest started

       accumulating in December 2018. (See Exh. 19, bank statement showing line of credit).

19. The next work the Association took on was the masonry work. Steve Hier consulted the Association on the scope of work necessary to complete the repairs and remediate the construction defects.

20. At that point, I contacted 3 masonry companies and explained the scope of work to obtain bids. The other owners and I met with all 3, who came out to inspect the property.

21. We retained B. Allendorfer Construction Services. All quotes were similar but B. Allendorfer agreed to reduce their price to be on par with another quote. Mr. Hier inspected the work as it was being completed and at the end to ensure it was being done pursuant to the planned scope and in a good and workmanlike manner.

22. B. Allendorfer presented our Association with approximately 10 invoices and change orders, along with about 11 accounting invoices. (See B. Allendorfer invoices, attached as Exhibits 3-12, Group Exh 20).

23. The Association made payments in installments to B. Allendorfer. I paid 44% to the Association, which then paid B. Allendorfer.

24. The March 26, 2019 original contract amount with B. Allendorfer was $120,000. (See Exh. 6). This was the negotiated price to match another quote we received.

25. The first initial deposit was made on April 9, 2019, the Association paid $60,000. (See HOA April 2019 bank statement, check number 1004, bottom left, attached as Exhibit 21).

26. I made a personal payment to the HOA bank account on March 28, 2019 in the amount of $26,400. (See Exh. 22, deposit of Check 1679).

27. I made additional payment to the HOA account on May 8, 2019 in the amount of $26,400. This was the 2nd payment of my 44% share of $128,000. (See Exh. 23, deposit slip of May for check number 1681).

28. The Association made an additional progress payment on Dec 23, 2019 for $19,800.00. (See Group Exh. 24, check 1017.).

29. On May 20, 2020, the Association made another payment in the amount of $3,750.00. (See Group Exh. 24, check 1024.).

30. On May 27, 2020, the Association made another payment of $2,400.00. (See Group Exh 24, check number 1025).

31. On July 11, 2020, the Association for $2,250.00. (See Exh. 25, bank statement, check 1028).

32. On July 12, 2020, the Association paid $2,652.50. (See Exh. 25, bank statement, check 1029).

33. The Association was making additional payments due to the change orders by B. Allendorfer.

34. Again on July 12, 2020, the Association paid B. Allendorfer $3,750.00. (See Exh. 25, bank statement, check 1030)

35. On August 6, 2020, check number 1031 the Association paid B. Allendorfer $15,575.00. (See Exh. 26, bank statement, check 1031)

36. On Oct 16, 2020, the Association paid B. Allendorfer $5000 (See Exh. 27, bank statement, check 1034)

37. The Association made its final payment on Nov 3, 2020, in the amount of $22,097.50, (See Group Exh. 24, check 1036)

38. B. Allendorfer billed the Association a total of $140,725.00 for only the masonry repair.

39. In sum, for the masonry work, I paid a total of $61,919.00 to the Association. This was 44% attributed to my unit.

40. The Association incurred expenses in obtaining masonry quotes. Specifically, on Feb 5, 2019, the Association had to pay a mason to obtain 1 of the 3 quotes. The Association paid $150, of which I was responsible for $66.00 of it to Bob Kelly of Wickright. (See Exh. 28). I paid via Zelle into the Association account and kept track of my payments on spreadsheet of my costs (See Exh. 28, multiple Zelle payments by Melinda).

41. The Association remediated the interior common areas that were damaged from the initial defects and water over the course of the next 4 years because we could not afford to continue paying for everything all at once.

42. Some of the common areas affected by water include the basement trim around the rear exit common door.

43. In April 2019, the Association had to have the roof replaced and a steel beam put between the roof and unit 3.

44. The Association hired a structural engineer to put a plan together to design where the beams would be placed. Mr. Hier consulted on this work as well.

45. The Association retained B. Allendorfer to design and repair/ replace the beams and paid $10,520.00 to remedy the defective and rotted beams. The initial payment of $5265.00 was made on May 6, 2019. The 2nd half was made on July 1, 2019. (See Group Exh. 24, check 1006; 1010). My share was $4,628.80 (See Exh 32, check number 1682, page 3, which contains said payment, referencing B. Allendorfer invoice #2019101001).

46. In June 2019, we had the trusses done and roof replaced. I learned from Steve Hier and Mr. Brian Allendorfer that because there was no flashing around the roof

capstones, the water continued to seep into the building and the roof membrane. Also the CMU block was taking in water. As a result, water rotted the wooden trusses and rotted the plywood and roofing membrane. This also related to the steel beam because one of the trusses was completely damaged and had to be replaced.

47. To remedy the original construction defects that caused damage to the roof, we retained B. Allendlorfer.

48. The Association paid separate checks for each invoice as follows:

    Check #1011 - $13,750

    6/28/19 Check #1012 - $32,345

    5/14/20 Check # 1020 - $10,650

    5/14/20 Check #1021 $15,030

    5/14/20 Check # 1022 $9,450

    (See Group Exhibit 24).

49. My share of the roof replacement was $42,116.80 and I paid it in installments. See check numbers 1681 (Exh. 32, page 2), 1682 (Exh. 32, page 3), 1015, 1016 and 1017 (See Exh. 32, page 4, and Exh 33).

50. Also around January 2021, I was getting water in my living room. I noticed there was a water stain on my ceiling.

51. I called B. Allendorfer to determine the cause. They came to the Property and discovered that all the south facing terraces or decks had to be replaced because capstones were not flashed and CMU was taking in water. It therefore rotted the plywood and destroyed the roof membrane that was underneath the terraces and holding them in place.

52. B. Allendorfer remediated the terraces and the Association paid as follows:

    3/29/21 Check #1039 $2850 (See Exh. 29, p. 3, April bank statement)

7

4/20/21 Check #1043 $3585.00  (See Group Exhibit 24; see also Exh. 29, p. 3).

53. My share of this payment to B. Allendorfer was $2831.40.  I paid as follows from my home equity line of credit  (See Exh. 38):

| Date | Check # | Amount | Source | Description |
|---|---|---|---|---|
| 3/30/2021 | 1043 | $2,508.00 | HELOC | HOA - Terrace balcony roof replacement Unit 2 & Unit 3 |
| 4/20/2021 | 1045 | $323.40 | HELOC | HOA - Terrace balcony roof replacement Unit 2 & Unit 3 - Overage - Additional Work |

54. There is work that has not been completed yet that is to remediate the original construction defects.

55. My south facing windows have experienced water damage and must be replaced.  I noticed the water infiltration in the fall of 2018.  I took photos in Oct 2021 and Feb 2023.  (See photos of windows, Group Exh. 33).   These photos are a true and accurate reflection of my windows currently.

56. I received a quote from Brian Allendorfer for $19,750.00.  I have not paid for this work yet because I cannot afford it at this moment.  (See Exh. 15).

57. In July 2019, the Association also paid $5500.00 to lawyers to pursue a case against Erie Insurance and Arrow Construction, the original contractors who failed to perform work in a good and workmanlike manner.  (See Group Exh. 30, billing statements and showing it was paid with a credit card).  Arrow was the company hired by the Gonrings.  I paid $2530 of the $5500.00.  (See Exh. 32, page 2).  The lawyer also charged us $250 for a demand letter to Arrow Masonry and of that I paid $110.  (See check 1028, Exh. 37).

58. For the time frame 9/13/2018 to March 30, 2021, the Association paid Steve Hier $5849.00 for his consulting work and for overseeing all the construction for our entire building.  (Group Exh. 31, missing checks, I have $4499 so missing $1350).  I personally paid Steve Hier $850 using my own personal check on behalf of the

8

Association because it was the 1st check we paid for damages and I was unaware of what to do. (See Exh. 1, page 4, photo of my receipt signed by Steve Hier.). We also paid him $500 for his oversight of work being done. (Group Exh. 24, page 1, bottom, check number 1002).

59. My share of Steve's Association consulting work was $2474.10. Payments were made as follow:

| 2/8/19 | Zelle | $207.00 | Exh 49 |
|---|---|---|---|
| 1/6/21 | HELOC #1040 | $330.00 | Exh 29, p 5-7 |
| 1/6/21 | HELOC #1040 | $577.28 | Exh 29, p 5-7, |
| 6/1/20 | Zelle | $552.28 | Exh 49 |
| 3/30/21 | HELOC #1044 | $550.00 | Exh 36 |
| 1/6/21 | HELOC #1040 | $374.00 | Exh 29, p5-7 |

60. I also paid Steve Hier and additional $1000.00 for my own consulting work as it pertains to the lawsuit. Specifically, for preparing affidavits and expert witness consultation. (See 3/4/21 check 1041, Exh 35).

61. June 30, 2020, I took out a 401k withdrawal in the amount of $100,000 to pay for the repairs. (See check number 4705370388, Exh 39.) I applied to withdraw this money and due to Covid, I had 3 years to pay it back without a penalty, which would have been refunded by the IRS. (See Exh. 39, page 2-11). I deposited this money into my Heloc to continue making payments for the damages. After 3 years, I never received the refund for the $33,333.00 in taxes for early withdrawal because I could not pay it back before the 3 year mark. (See Tax Record of Account, Exh. 39, page 12-13).

62. Due to the Gonrings suing the Association, the condo association insurance company dropped coverage as of July 2021 as we had to obtain new insurance. The insurance rate to cover an Association being sued was higher. The last premium payment before the lawsuit, our Association paid $2779.44 to Erie Insurance for annual

coverage. After the lawsuit and Erie dropped the Association, the Association obtained coverage and it went to $6,014.00 per year. (See Erie invoices and letter dropping coverage as Group Exh. 40).

63. To obtain the equivalent pre-lawsuit coverage, the Association had to obtain two coverages, through State Farm and Cincinnati Insurance. (See Exh. 41, email exchange, pages 1- 5). We would not obtain directors and officer coverage without obtaining two policies. (See Exh. 41, page 7 & 16 for rates).

64. To cover only the increase, my share was $2646.12 per year from July 2021 to July 2023. (See Exh. 42). Then from July 2023 to March 2024, I had to pay the increase until the Gonrings lost their case and we found new coverage. I had already prepaid for the year. (See Exh 42, check 1038, Huntington Statement, page 5, highlighted). In sum, my share to cover only the increase was $7276.83 for insurance from July 2021 to early November 2023. This is the delta, this is the amount in excess due to the lawsuit.

65. After the Gonrings lost their lawsuit against Mr. Gorr, the Association was able to obtain Association coverage and the annual rate is $2939.00 with County Insurance. (See Exh. 43, invoice, payment and bank statement reflecting payment).

66. My Heloc has accrued interest. Through end of 2023, I have paid $17,794.76 in interest. (See Exh. 44, accrued interest statement from Huntington.)

67. I paid $1066.20 for my deposition transcript and for the transcript of my attorney Hawbecker , I paid $829.10. I fully paid both Vertitext invoices. (See Exh 45).

68. I also took a 401k loan to pay issues with this lawsuit. I took out $35,000 to pay for issues with the lawsuit. The interest was 4% and I repaid this loan in March 30, 2021, and in total I paid $2,105.43 in interest. (See sample of 1 statement, Ex 45.).

69. Due to defects in the masonry in the original construction, we had to work on the garage. We hired Steve Hier to oversee this project. We hired Classic Restoration to do the masonry and Renner and Renner to do the roof and deck replacement. The invoices are fully paid by the Association. (See invoices and payments, attached as Exhibit 46).

70. I transferred my condo to a corporation called 52 Surfsong, LLC. From my business account, I have made payments for the garage repair in the amount of $21,940.00. (See Exh. 47). This amount reflects representing 44% of the garage roof replacement, masonry work and 100% of the roof deck because it is a limited common element to my unit.

71. I also am billed $1,500.00 from Steve Hier for assisting with his Affidavit for this Motion for Summary Judgment on Damages. He has not submitted his bill to me yet but on May 22, 2024, he verbally advised me that this is the amount due. In addition, his consulting bill for the garage is $750, and my share is $330.00. (See Exh. 46, page 8).

72. Had there been no defects in the Property in accordance with the Gonrings' disclosures to me, I would never have had to borrow any money for repairs. I has sufficient savings for everyday repairs, common maintenance. I would not have opened a Heloc account, I would not have taken a 401k withdrawal, and I would not have taken a 401k loan.

73. The amounts I have paid or will pay (windows) as a result of my condo purchase are spelled out in an Excel Spreadsheet that I created. I created this spreadsheet in 2018 and I updated monthly. I did so by reviewing bank statements, invoices, and tax records. It is attached as Exhibit 49. My damages summary is for the entire building

    as a whole.  The $230,267.87 reflects all my damages, including taxes incurred, interest I have paid, garage roof deck, but not attorney fees.  (See Exh, 48).

74. The Association as a whole incurred $324,753.00. (See Exh, 48).

FURTHER, affiant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED ON May 15, 2024

By: x_____
Melinda Sgariglia